06-CV-01524-CMP

FILED _____ ENTERED
_____ LODGED_____ RECEIVED

OCT 23 2006    DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VIVENDI S.A.,

            Plaintiff,

            v.

T-MOBILE USA, INC., T-MOBILE
DEUTSCHLAND GMBH T-MOBILE
INTERNATIONAL AG, DEUTSCHE TELEKOM
AG, AND ZYGMUNT COLORZ-ZAK,

            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

NO. **CV6 1524** R

COMPLAINT

Jury Trial Demanded

## INTRODUCTION

1.      Plaintiff Vivendi S.A. ("Vivendi") brings this action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961(b) and (d) (the "RICO Act"). Defendant Deutsche Telekom AG and its T-Mobile subsidiaries (collectively "T-Mobile") conspired with Zygmunt Solorz-Zak ("Mr. Solorz or Solorz"), to engage in a pattern of racketeering activity and other fraudulent conduct, including U.S. wire fraud, in order to take over and corrupt a leading wireless Polish telephone company, Polska Telefonia Cyfrowa sp. zo.o. ("PTC"). Mr. Solorz is a convicted criminal and billionaire Polish oligarch. Through their misconduct, Defendants stole Vivendi's $2.5 billion investment in PTC and corrupted an

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

**ORIGINAL**

COMPLAINT - 1

1    enterprise that provides service to millions of U.S. consumers making wireless telephone calls to

2    Poland through an integrated global network.

3           2.       As set forth in this Complaint, T-Mobile and Mr. Solorz committed multiple

4    predicate acts of wire fraud in the United States in furtherance of their scheme. Specifically,

5

6    during a critical time in 2004, Defendants repeatedly used the U.S. wires to further their

7    conspiracy to deceive Vivendi and fraudulently induce it into believing that its joint venture

8    partner, Elektrim S.A. ("Elektrim"), was still adverse to T-Mobile and not conspiring with it.

9    Elektrim is a Polish company that had entered into a joint venture with Vivendi in 1999 through

10    a joint venture company, Elektrim Telekomunikacja Sp. z o.o ("Telco"), to legitimately acquire

11

12    and exercise control over PTC. Solorz first acquired a significant block of Elektrim stock in

13    2003 and solidified his control throughout 2004 – precisely the critical time that Defendants

14    deceived Vivendi and prevented it from taking informed defensive actions against their

15    conspiracy.

16           3.       Defendants' deception took two forms. First, in 2003-2004, Defendants used the

17    U.S. wires to deceive Vivendi into believing that Elektrim was acting independently of T-Mobile

18

19    and remained adverse to T-Mobile during a critical arbitration proceeding (the "Second Vienna

20    Arbitration") between T-Mobile, Elektrim and Telco concerning PTC stock ownership. Second,

21    in 2004, Defendants used the U.S. wires to fraudulently induce Vivendi into sham settlement

22    negotiations that were both detailed and comprehensive. Speaking at the end of these

23    negotiations, in late August 2004, a top executive of T-Mobile told a top executive of Vivendi,

24    who was in France at the time, that "we have a deal [to buy out Vivendi's stake in PTC] – you

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 2

1   can put champagne in the fridge." He was lying. Shortly thereafter, Vivendi received a two-

2   sentence letter abruptly ending the negotiations with no further explanation.

3       4.      As set forth below, the U.S. wire fraud detailed in this Complaint was pivotal to

4   Defendants' illegitimate takeover of PTC. Those fraudulent misrepresentations occurred at a

5   critical time and were a proximate cause of Vivendi's injury. Had Vivendi known in 2004 that

6

7   Solorz and T-Mobile were conspiring to cause Elektrim to turn against Vivendi, Vivendi could

8   have taken immediate action to preclude an adverse decision in the Second Vienna Arbitration

9   and thus protect its $2.5 billion investment. Among other things, it could have (i) taken charge

10  of Elektrim's defense in that arbitration proceeding and introduced evidence of T-Mobile and

11  Elektrim's conspiracy and (ii) filed an action in Polish court to dissolve the arbitration because

12  the parties who were purportedly adverse were in fact conspiring. It also could have taken

13

14  immediate action to prevent Defendants from executing their scheme and taking steps after the

15  Second Vienna Arbitration, including those described in this Complaint. For example, Vivendi

16  could have increased its 15% stake in Elektrim and blocked Solorz before he was able to

17  consolidate control over Elektrim.

18

19      5.      As explained below, once the Second Arbitration Award was issued and once

20  Elektrim and T-Mobile had jointly sought confirmation of only the portions of the decision that

21  would allow Defendant's scheme to succeed and not the portions of the Award that were adverse

22  to Defendants' scheme, the die was cast against Vivendi.

23      6.      Thereafter, Vivendi tried to obtain relief from the adverse effects of the improper

24  confirmation of the Second Arbitration Award, and the Defendants engaged in a pattern of

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1  misconduct to prevent Vivendi from obtaining such relief. Among other things, Defendants (i)

2  defied European courts and international arbitrators, (ii) falsified PTC's shareholder list, (iii) filed

3  misleading disclosures with the U.S. Securities and Exchange Commission ("SEC"), and (iv)

4  stripped Elektrim of its assets.

5      7.      Defendants' racketeering has not simply affected control of PTC; it has

6  substantially affected U.S. commerce. Millions of U.S. consumers use the T-Mobile network,

7  and Defendants have deprived these consumers of PTC's honest services on T-Mobile's seamless

8  global network, including when making or receiving wireless calls to Poland. Indeed,

9  Defendants' racketeering has infected the entire T-Mobile network, including the T-Mobile

10  network in the United States which is centered in Bellevue, Washington.

11      8.      Vivendi comes to this Court, in the District where T-Mobile's U.S. headquarters is

12  located, not only because Defendants have conspired in a racketeering scheme in order to seize

13  PTC, but also to protect U.S. consumers and to seek justice in a court that has the ability to

14  enforce its judgments.

15      9.      The remedy and justice that this action seeks are simple: Vivendi asks this Court

16  to order the Defendants to either pay Vivendi the fair market value of the assets that they stole or

17  return to Vivendi its rightful control of PTC – one or the other, the money or the shares.

18                          **JURISDICTION**

19      10.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 (c) and 28

20  U.S.C. §§ 1331, 1337(a), and 1367. Defendants' fraud and conversion occurred in significant

21  part as a result of wire fraud committed in the United States and have had direct, substantial, and

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1    reasonably foreseeable effects on U.S. commerce.  Their racketeering conduct was in furtherance
2    of T-Mobile's expanding international network, of which the United States is a centerpiece and
3    PTC is now infecting.  Defendants' misconduct involved a pattern of wire fraud in the United
4    States, and subjects millions of U.S. wireless telephone users to a now-corrupted, global network,
5
6    including when making telephone calls to or from Poland.  In addition, as part of its corrupt
7    takeover scheme, T-Mobile engaged in other activities in the United States which, although not
8    predicate acts, harmed U.S. consumers.  For example, T-Mobile filed false and misleading
9    statements with the SEC regarding PTC that, upon information and belief, have failed to disclose
10   material information to U.S. regulators and investors who trade the American Depositary
11   Receipts ("ADRs") of Deutsche Telekom AG on the New York Stock Exchange.
12
         11.    Defendants' conduct in the United States proximately caused Vivendi's injuries.
13
14   First, but for the wire-fraud that Defendants committed in the United States, Vivendi would have
15   been able to take timely defensive actions, such as preventing Solorz's takeover of Elektrim, and,
16   thus, preventing T-Mobile's takeover of PTC.  Second, if T-Mobile had accurately described in
17   its SEC filings its conduct with respect to Solorz and PTC, Vivendi also would have been alerted
18
19   to take timely defensive action.  Third, Vivendi has suffered lost revenues as a direct, proximate
20   result of U.S. customers paying roaming fees to the corrupted PTC enterprise that excludes
21   Vivendi, rather than to the formerly legitimate enterprise under Vivendi's control.  Fourth,
22   Defendants' racketeering has depressed Vivendi's share value, increasing its costs of raising
23   capital in the U.S. financial markets, particularly over the last seven years when Vivendi's ADRs
24   were traded on the New York Stock Exchange.
25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

12.     Venue in this District is proper pursuant to 18 U.S.C. §1965(a) and 28 U.S.C. §§ 1391(b) and (c).

## PARTIES

13.     Vivendi is a joint-stock company organized and existing under the laws of France. It is headquartered in Paris and has offices in the United States. Until mid-2006, it was listed on the New York Stock Exchange. It derives billions of dollars in revenue from the United States and has thousands of U.S. employees. Vivendi owns 100% of Universal Music Group, a U.S. corporation, and 20% of NBC Universal.

14.     Defendant Deutsche Telekom AG is a German corporation that does business in the United States and owns T-Mobile International AG, T-Mobile USA, Inc., and T-Mobile Deutschland GmbH. U.S. investors trade Deutsche Telekom AG's ADRs on the New York Stock Exchange. Deutsche Telekom AG relies on the U.S. financial markets to raise capital.

15.     Defendant T-Mobile International AG is a German corporation with substantial interests in the United States, operating in the United States through T-Mobile USA, Inc. under the well-known "T-Mobile" brand.

16.     Defendant T-Mobile USA, Inc., is a Delaware corporation with its principle place of business at 12920 S.E. 38th St., Bellevue, Washington. T-Mobile USA, Inc., has over 22 million U.S. wireless subscribers, deriving millions of dollars in U.S. revenues, and it employs thousands of people in the United States. T-Mobile USA, Inc., is part of an integrated international T-Mobile network which now includes PTC. According to T-Mobile USA, Inc.'s U.S. website, the global T-Mobile entities operate as "One Company." The website continues:

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1  "[d]espite the number of national markets, 'One Company' means one set of purchasing

2  requirements, one technology architecture, one marketing and communications strategy, and one

3  set of customer service standards." In addition the website states, "[a]s the competitive landscape

4  of the mobile communications market becomes increasingly international, being 'One Company'

5  is an indispensable prerequisite for the Group's future success." The CEO of T-Mobile USA,

6  Inc., Robert Dotson, sits on the Board of T-Mobile International and, upon information and

7

8  belief, T-Mobile USA, Inc. conspired with the other T-Mobile Defendants in their unlawful

9  conduct. In addition, upon information and belief, senior officials of T-Mobile International AG,

10  including Messrs. Gunther and Winkler, regularly visit T-Mobile USA, Inc. to coordinate T-

11  Mobile's one-network strategy. T-Mobile USA, Inc., places hundreds of thousands of calls from

12
   the United States through PTC to individuals in Poland, including U.S. citizens traveling in
13

14  Poland. Indeed, T-Mobile USA, Inc. "has become the main growth driver of the T-Mobile

15  family" and is a principle beneficiary of the Defendants' illegal scheme and of its expanded

16  global network. Recently, T-Mobile USA, Inc., paid more than $4 billion to buy additional U.S.

17  spectrum bands.

18
       17.    Defendant T-Mobile Deutschland GmbH (formerly DeTe Mobile Deutsche
19
   Telekom MobilNet GmbH) is a limited liability company organized under the laws of the Federal
20

21  Republic of Germany. It is one of the T-Mobile International AG subsidiaries through which T-

22  Mobile International AG and Deutsche Telekom AG have perpetrated parts of Defendants'

23  misconduct.

24

25

18.     Deutsche Telekom AG, T-Mobile International AG, T-Mobile Deutschland GmbH, and T-Mobile USA, Inc., act together as an organization to promote the T-Mobile brand in the United States and worldwide.

19.     Upon information and belief, these Defendants have acted in a coordinated manner to take over PTC and expand the T-Mobile brand into Poland. Accordingly, Deutsche Telekom, T-Mobile International, T-Mobile Deutschland, and T-Mobile USA are referred to collectively as "T-Mobile."

20.     Defendant Solorz is a Polish citizen and, according to the Fortune 400 list, is a billionaire. In 1995, he was convicted of two criminal offenses under Austrian law. In 2003, Solorz began acquiring shares of Elektrim, the Polish energy and telecommunications company through which Solorz and T-Mobile perpetrated their RICO violations.

## FACTS

### A.   Background

21.     The Republic of Poland currently has the fastest growing mobile telephone market in Central Europe. One of its leading mobile telephone operators is PTC – the asset that Defendants have stolen from Vivendi and acquired control of through a pattern of racketeering activity. As of February 2005, PTC had a market value of approximately $7 billion.

22.     In 1995, the Polish government granted PTC its first wireless license, and PTC began operating as a mobile telecommunications provider. At that time, Poland precluded foreign investors from holding more than 49% of a Polish telecommunications company's shares.

23.     A 1995 Shareholders Agreement (the "Shareholders Agreement") governs PTC's shareholders and provides, among other things, that if any shareholder materially breaches the

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 8

agreement, certain of the other shareholders have a call option to buy the breaching party's shares.

24.     In early 1999, the following companies held the following interests in PTC:

- Elektrim, directly and (through a company called Carcom) indirectly - 37.1%;

- T-Mobile - 22.5%;

- US West International (MediaOne) - 22.5%;

- Polpager - 4%; and

- A group of Polish minority investors comprised of BRE Bank S.A., BRE Fundusz, Kulczyk Holdings S.A., and Warta S.A., (the "Polish Minority Investors") - collectively 13.9%.

25.     In 1999, both US West and the Polish Minority Investors decided to seek buyers for their shares. At the same time, both Elektrim and T-Mobile had designs to gain control over PTC. For T-Mobile to accomplish its designs, it had to violate Polish law, which at the time limited foreign ownership of PTC to 49% and, therefore, prohibited T-Mobile from owning and controlling more than 49% of PTC's shares.

26.     Elektrim, which was short of cash, initially approached T-Mobile to jointly acquire the shares of PTC, with Elektrim having majority control over the joint venture in order to comply with Poland's foreign-ownership limitations. T-Mobile, however, secretly intending to gain control of PTC, rebuffed Elektrim's overture.

27.     While rebuffing Elektrim's invitation to form a joint venture, T-Mobile went ahead on its own to acquire 49% of PTC's shares. First, T-Mobile acquired Polpager's 4% stake. Then T-Mobile acquired US West's 22.5% stake by purchasing an intermediary holding company

in the Netherlands, circumventing the other shareholders' rights of first refusal arising from the Shareholders Agreement. Significantly, T-Mobile disguised its purchase of Polpager's shares by using the wife of its Polish lawyer to organize a sham Polish company ("Holdco") to acquire Polpager and thus control the PTC shares it held.

28.    T-Mobile held Holdco out as a Polish company notwithstanding the fact that T-Mobile had provided all of the money for Holdco's purchase of Polpager and controlled every action that Holdco took through T-Mobile's lawyer. Thus, hoping that no one would learn that it actually controlled Holdco and thus 49% of PTC, T-Mobile represented that it could still purchase another 3% from the Polish Minority Investors by exercising rights of first refusal arising from the Shareholders Agreement and still hold only 48% of PTC, ostensibly not violating the 49% ceiling under Polish law.

29.    While T-Mobile was secretly consolidating this 49% stake in PTC, Elektrim turned to Vivendi, knowing that Vivendi could provide the capital that Elektrim lacked in order to jointly acquire another 13.9% of PTC shares from the Polish Minority Investors. That would bring Elektrim's control to 51% of PTC.

30.    From 1999 through 2001, Elektrim and Vivendi entered into a series of investment agreements that established a joint venture to control PTC and that culminated in the Third Amended and Restated Investment Agreement dated September 3, 2001 (the "Joint Venture Agreement"). The joint venture operated through Telco which came to hold 48% of PTC's shares – the shares that Defendants ultimately stole -- and Carcom Warsawa Sp. Zo.o. ("Carcom") a sister joint venture company holding 3% of PTC's shares. Initially, Elektrim used

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 10

funds that Vivendi provided to acquire the Polish Minority Investors' shares. It then contributed all of its PTC shares (48% of PTC's total shares) to Telco, and Vivendi acquired 49% of Telco and 50% of Carcom. Subsequently, in December 2005, Vivendi acquired an additional 2% of Telco and 1% of Carcom, bringing its respective holdings to 51% of Telco and Carcom. The following chart sets forth stock holdings in December 2005:



31.     As a result of the Joint Venture Agreement, Elektrim owed Vivendi a duty of good faith and fair dealing. The Joint Venture Agreement also contained provisions protecting Vivendi, including (i) a provision allowing Vivendi to control the defense of any arbitration action brought against Elektrim that could impair Vivendi's interest in PTC and (ii) a provision providing for what would happen under various outcomes of arbitration proceedings.

    **1.      The First Vienna Arbitration**

32.     On October 21, 1999, T-Mobile initiated an arbitration under the Shareholders Agreement and PTC's Deed of Formation against Elektrim and the Polish Minority Investors. T-Mobile brought this arbitration in Vienna, before the International Arbitral Centre of the Austrian Federal Economic Chamber, claiming that T-Mobile was entitled under a right of first refusal to buy a portion of the Polish Minority Investors' shares – a portion that would have provided T-Mobile control over another 3% stake, giving T-Mobile control over a total of more than 52% of PTC's shares (the "First Vienna Arbitration").

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

33.    As a threshold matter, T-Mobile attempted to mislead the arbitral panel and asserted that it only owned and controlled 45% of PTC's shares. T-Mobile intentionally concealed from the arbitrators the fact that it actually controlled Holdco's indirect 4% stake and, therefore, 49% of PTC's shares. Thus, T-Mobile hid the fact that it could not lawfully acquire any more shares without violating Poland's 49% limit on foreign ownership.

34.    At the same time, to conceal its deception, T-Mobile filed false and misleading public filings with the SEC. For example, on April 19, 2000, Deutsche Telekom AG filed a Form 20-F for the year ending December 31, 1999 that stated the following (the "2000 20-F Statements"):

> "As part of this transaction, Deutsche Telekom in March 2000 acquired: Media One's 22.5 percent interest in [PTC], the leading GSM mobile telecommunications provider in Poland, *bringing Deutsche Telekom's total ownership interest in PTC to 45%.*"

> "Deutsche Telekom has held a 22.5 percent stake in PTC since December 1995 and acquired an additional *22.5 percent stake* in March 2000."

T-Mobile continued its fraudulent misrepresentations regarding its control of PTC stock in the 20-F Statements that it filed for the years ending December 31, 2000 and December 31, 2001.

36.    Through discovery, Elektrim and the arbitration panel eventually learned the truth – that T-Mobile controlled Holdco's indirect 4% PTC stake and that granting T-Mobile more shares would violate Poland's 49% foreign ownership limitation. Indeed, Holdco's only officers and directors appeared to be, at various times, the wife, brother in law, and sister in law of T-Mobile's Polish lawyer.

37.    After being exposed, Deutsche Telekom AG subsequently filed its Form 20-F for the year ending December 31, 2002, finally admitting that it owned 49% of PTC.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 12

38.     On April 9, 2003, the arbitration panel denied T-Mobile its demand, finding that

T-Mobile:

> wanted to "achieve a more [sic] 50% holding in PTC" while it was aware that the "foreign
> ownership restrictions" did not allow it due to the current foreign participation in PTC share
> capital. There is no doubt that the Polpager/Holdco structure has been set up by T-Mobile as a
> tool for achieving a more [sic] 50% holding in PTC.

### 2.     The Second Vienna Arbitration

39.     On December 7, 2000, perhaps anticipating defeat in the First Vienna Arbitration,

T-Mobile filed a second arbitration in Vienna against Elektrim claiming that Elektrim's transfer

of its PTC shares to Telco as part of the Joint Venture Agreement with Vivendi materially

violated the Shareholders Agreement.  T-Mobile further asserted that, as a result of the alleged

breach, it was consequently entitled to exercise a call option to buy all of those PTC shares at

book value, which was only a fraction of the fair market value.  (T-Mobile did this with

knowledge that as of January 1, 2001, Poland's 49% limit on foreign ownership would be

eliminated.)

40.     Under the Joint Venture Agreement, Vivendi was entitled to direct the defense

and appoint the law firm representing Elektrim.  It exercised these rights, selecting Watson

Farley and Williams as counsel.  Until 2003, Elektrim honored its obligations under the Joint

Venture Agreement and mounted a vigorous defense to the Second Vienna Arbitration.

### 3.     Solorz Efforts to Take Control of Elektrim and to Conspire With T-Mobile

41.     In the Spring of 2003, while the Second Vienna Arbitration was still pending,

Solorz illegally purchased a significant stock interest in Elektrim in violation of Polish securities

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

and antitrust laws. Consistent with his criminal past and foreshadowing the racketeering to come, Solorz (i) failed to notify the Polish authorities, (ii) failed to comply with Polish laws that were designed to protect minority investors, and (iii) failed to launch a tender offer on the shares to Elektrim as required by Polish law.

42.    Upon information and belief, on or about the time that Solorz made his investment in Elektrim, T-Mobile and Solorz entered into secret discussions to take over PTC.

43.    Upon information and belief, after Solorz had begun plotting with T-Mobile, Solorz illicitly obtained inside information concerning the up-coming Second Vienna Arbitration Award. Solorz then shared that information with T-Mobile in order to better execute their conspiracy.

44.    On January 14, 2004, Solorz caused Elektrim to terminate Watson Farley and Williams, the legal counsel that had been representing Elektrim in the Second Vienna Arbitration.

45.    On February 20, 2004, Solorz caused Elektrim to notify Vivendi that it was unilaterally voiding the Joint Venture Agreement. (A London arbitration panel later found this purported voidance to be unfounded and null.)

46.    While Vivendi was concerned about these two actions by Solorz, Vivendi did not interpret them as evidencing a conspiracy between T-Mobile and Solorz. Rather Vivendi regarded them as business tensions between joint venture partners and tactical moves by Solorz to improve Elektrim's position vis-à-vis Vivendi at a time when the two parties were discussing the split of proceeds of a joint sale of PTC to T-Mobile. In hindsight, however, Elektrim's

1  termination of counsel and the other material facts explained below can only have resulted from

2  the fraudulent collusion of T-Mobile and Solorz.

3
4
### B.    Defendants' Unlawful Racketeering Conduct

5      47.      In 2004, Defendants used the U.S. wires to further their conspiracy and to

6  fraudulently induce Vivendi into wrongly believing that Elektrim was not colluding with T-

7  Mobile and that Elektrim and T-Mobile were engaged in good faith settlement negotiations when

8  neither was the case.

9      48.      On multiple occasions in the Spring and Summer of 2004, Elektrim (acting, upon

10  information and belief, at Solorz's direction) and T-Mobile used the wires of the United States to

11  perpetrate their deception.  Specifically, T-Mobile and/or Solorz, acting through their

12  representatives, engaged in the following communications with Vivendi representatives when at

13
14  least one of their representatives was in the United States:

15
16      •   On May 11, 2004, Monika Halupczak of Elektrim emailed David Syed, an
          attorney representing Vivendi who was then in the United States, stating that
17        Elektrim was prepared to sign a Term Sheet pursuant to which Elektrim and
          Vivendi would suspend litigation against T-Mobile while exploring a joint sale of
18        their PTC stock to T-Mobile. The Term Sheet is very detailed, proposing specific
          terms of the transaction. There is no mention in the email of any cooperation,
19        much less collaboration, between T-Mobile and Elektrim.

20      •   On or about May 11, 2004, Ms. Halupczak had a telephone conversation with
          David Syed regarding the Term Sheet. The discussion was sufficiently detailed to
21        cause Mr. Syed to reasonably believe that Elektrim was acting in good faith.

22      •   On May 13, 2004, Peter Golob, a senior official of T-Mobile, sent several emails
          to Mr. Syed in the United States. In the first, he "interpolate[d] the position on
23        what should by my understanding be the last significant issue between the two
          sides regarding the term sheet."  Mr. Golob attached a revised Term Sheet for the
24        Sale of PTC to his email.  In the second, he proposed several alternatives to
25

overcome disagreement. In the third, he proposed an approach to "nail down the term sheet."

- On June 7, 2004, Mr. Golob, while in the United States, telephoned Mr. Syed informing him that T-Mobile had executed a revised version of the Term Sheet. Mr. Syed and Mr. Golob then exchanged views on an escrow agreement. Mr. Golob's statements were specific and substantive, reasonably conveying the impression to Mr. Syed that T-Mobile was acting in good faith and was committed to a settlement.

- On June 9, 2004, Mr. Golob, while in the United States, sent a long email to George Rigo, another attorney for Vivendi, and to Mr. Syed providing detailed comments on a draft Escrow Agreement. The next day, Mr. Syed and Mr. Golob had a telephone conversation on the same subject.

- On June 10, 2004, Mr. Golob, while in the United States, telephoned Mr. Syed to address other potential terms of a settlement. Once again, Mr. Golob failed to disclose the collaboration between T-Mobile and Elektrim nor gave any indication that the settlement negotiations were being conducted in bad faith, which was, on information and belief, the case.

- On July 15, 2004, Mr. Golob, while in the United States, sent Mr. Syed another email concerning timing and pricing of the proposed transaction.

- On July 27, 2004, Mr. Golob, while in the United States, emailed to Messrs. Syed and Rigo, a copy of a letter that Thomas Winkler of T-Mobile had written to Jacques Espinasse, Vivendi's CFO, stating that a "fully documented [settlement] offer would be presented to T-Mobile management board" on August 4, 2004. Mr. Golob expressed hope that Vivendi would be able to resolve matters with Solorz-Elektrim. Messrs. Syed and Rigo believed that Mr. Golob was being truthful, that Solorz-Elektrim was then still a loyal joint-venture partner of Vivendi, and that the negotiations were being conducted in good faith.

- On August 24, 2004, Marcin Olechowski on behalf of Elektrim sent two emails to Mr. Syed in the United States setting forth more terms of a proposed settlement and attaching a draft Guarantee and Indemnity Agreement between Elektrim and Vivendi on one hand and T-Mobile on the other.

- On August 25, 2004, Mr. Winkler of T-Mobile, while in Seattle visiting T-Mobile USA, Inc., sent a text message to Mr. Espinasse regarding settlement negotiations.

49.    In addition, in late August 2004, a senior official of T-Mobile told Mr. Espinasse

1   (Vivendi's CFO) that the settlement "deal" along the aforementioned terms was "done" and that

2   he could "put the champagne in the fridge." Mr. Espinasse understood this to mean that the

3   remaining review of the deal by T-Mobile's Supervisory Board was *pro forma* and that there was

4   definitely a settlement agreement. On information and belief, this statement, and all of the

5   settlement negotiations that had preceded it from April 2003 through September 2004, were

6
    knowingly false and deceitful and in furtherance of the conspiracy.
7

8        50.    On September 7, 2004, T-Mobile notified Vivendi in a two-sentence letter that its

9   Supervisory Board (the equivalent to a U.S. Board of Directors) had rejected the agreed-upon

10  settlement, and that T-Mobile was terminating all negotiations with Vivendi. Thereafter, on

11  September 29, 2004, Solorz caused Elektrim to send a letter to PTC purporting to revoke Telco's

12
    appointees to PTC's Management Board and replace them with Elektrim appointees.
13

14       51.    The T-Mobile and Elektrim communications with Vivendi during this time period

15  falsely expressed a desire to settle, falsely presented T-Mobile and Elektrim as acting

16  independently, and falsely presented the Defendants as negotiating terms that Defendants were

17  actually considering. In none of these communications did T-Mobile or Elektrim, acting under

18
    Solorz's influence, disclose their collusion or the fact that the negotiations were a sham intended
19
    to fraudulently induce Vivendi into forbearing from taking action to protect its investment until it
20

21  was too late.

22       52.    Vivendi reasonably relied on the communications from the Defendants set forth in

23  the preceding paragraphs and did not take steps that it could have taken to lawfully protect its

24

25

1    $2.5 billion investment in PTC against Defendants' scheme.  Among the things that Vivendi

2    could have done but for Defendants' wire fraud are the following:

3          •    Enforce its right under the Joint Venture Agreement to control Elektrim's defense
4               of the Second Vienna Arbitration;

5          •    Call the arbitrators' attention to the collusion between the purportedly adverse
               parties;
6
7          •    File an action in Polish court to enjoin the arbitration before the panel issued its
               decision; and

8          •    Block Solorz's efforts to take over Elektrim by, among other options, increasing
9               Vivendi's 15% stake in Elektrim;

10   53.    By fraudulently inducing Vivendi into active settlement negotiations in this

11   critical time, Defendants gave themselves sufficient time to implement their scheme to influence

12   the outcome of the Second Arbitration Proceeding and for Solorz to consolidate his control over

13   Elektrim to set the stage for Defendants' illegal takeover of the PTC enterprise.

14
15   54.    By this time the die was cast against Vivendi in its fight to protect its investment

16   in PTC.  Despite Vivendi's best efforts, it could never undo the effects of the confirmation of the

17   Second Arbitration Award.  As discussed in the next sections, Defendants fully exploited the

18   Award.

19
20          **C.    Defendants' Misused the Second Arbitration Award**

21   55.    Upon information and belief, Solorz obtained advance notice that the Second

22   Arbitration Panel would rule that Elektrim's transfer of PTC shares to Telco was ineffective.

23   Upon information and belief, Solorz shared this information with his conspirator, T-Mobile; but

24   he concealed it from Elektrim's putative joint venturer, Vivendi.

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 18

56.    On November 26, 2004, the Second Vienna Arbitration panel issued an award, based on the Shareholders Agreement, that in part held that the transfer of Elektrim's PTC shares to Telco was ineffective and that the PTC shares remained Elektrim's property at all material times. The panel further ruled that, if Elektrim did not recover the shares from Telco within two months, Elektrim would be in material breach of its Shareholders Agreement. Finally the arbitration panel ruled that it lacked jurisdiction over Telco and dismissed all of T-Mobile's claims against Telco. As a result of that finding, the Second Arbitration Award should not have been able to be exploited by Defendants to affect Telco's and thus Vivendi's ownership of PTC.

### 1.    Defendants Obtained a Truncated Partial Recognition of the Second Vienna Award in the Polish Courts

57.    After the Second Vienna Arbitration panel issued its award, Solorz caused Elektrim to immediately seek truncated partial recognition and enforcement in the Polish courts of that part of the award that was adverse to Elektrim, entirely omitting the favorable ruling with respect to lack of jurisdiction over Telco, thereby altering the meaning and scope of the Award so that it could be used improperly against Telco and Vivendi.

58.    Elektrim filed its petition for truncated partial recognition on December 17, 2004. T-Mobile joined in the proceeding and supported Elektrim.

59.    It was at this point that Vivendi realized for the first time with certainty that it had been the victim of collusion between T-Mobile and Solorz. To be sure, Elektrim and Vivendi had not always agreed on all issues relating to the Joint Venture Agreement, but until that point, there had been no clear evidence that T-Mobile and Solorz had been conspiring against Vivendi.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1    60.    In the meantime, Vivendi sought and obtained from a Polish court an injunction

2    that should have protected its investment in PTC.

3    61.    Undeterred by the injunction, Defendants joined forces to preclude Telco (and

4    thus Vivendi) from intervening in the previously filed court proceeding seeking truncated partial

5

6    recognition of the Second Vienna Award.  Defendants repeatedly argued to the Polish

7    Recognition Court that Telco, the registered owner of the PTC shares, should be excluded from

8    the proceeding notwithstanding the fact that Defendants could and did use the truncated partial

9    recognition to achieve their goal of stripping from Telco its PTC shares.  Defendants succeeded

10   and excluded Telco from the recognition hearings held by the Warsaw Regional Court.

11   62.    On February 2, 2005, the Regional Court granted Elektrim's and T-Mobile's

12
     petition and partially recognized that part of the Second Vienna Award that ruled that the transfer
13
14   of PTC stock from Elektrim to Telco was ineffective.  Thus, at Defendants' behest, without

15   affording Vivendi (through Telco) any hearing, and for presently unknown reasons, a Polish

16   court created a basis for Defendants to strip Vivendi (through Telco) of its $2.5 billion

17   investment without any compensation and without allowing Telco or Vivendi to utter one word

18   on the merits.

19
             **2.    Defendants Violated Polish Injunctions and Rulings and Seized
20                   Control of PTC**

21   63.    As noted in paragraph 60, Vivendi caused Telco to file an independent action in

22   the Warsaw Regional Court seeking a declaratory judgment confirming that Telco was the

23   rightful owner of its PTC shares.

24

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 20

64.     On December 30, 2004, the Warsaw Regional Court issued a protective

injunction, enjoining PTC from making any changes to PTC's shareholder registry until a hearing

and decision on the merits regarding Telco's title to its PTC shares. The Warsaw Regional Court

issued its injunction before the judges in the recognition proceeding issued their February 2, 2005

decision. Thus, the injunction should have nullified any practical or legal effect flowing from the

truncated partial recognition of the Second Vienna Award until Telco actually participated in

hearings on the merits regarding its control of PTC. Defendants, however, intentionally violated

this injunction.

65.     On February 23, 2005, Defendants created their own sham, illegitimate

Supervisory Board in purported charge of PTC and purported to appoint new members of the

Management Board and revoke Telco's and Vivendi's appointees. The new Management Board

then drew up a false and inaccurate shareholder list not reflecting the actual shareholder registry.

The inaccurate list made it appear that Elektrim, not Telco, owned the PTC shares. Defendants

did this notwithstanding that Telco was still the legal shareholder of its PTC shares. Thus,

Defendants had no legal right to assume *de facto* control of PTC or to draw up a fictitious list of

shareholders, and such actions violated the December 30, 2005 injunction.

66.     Defendants, however, through the sham Management Board, filed a request (using

the false shareholder list referred to above) with the Regional Court to change the government's

official share register, the KRS. On February 24, 2005, a Regional Court judge ordered that the

KRS be changed in Elektrim's favor, notwithstanding the outstanding injunction. In a subsequent

interview with a Polish official investigating the judge's conduct, the judge acknowledged that

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

the sham PTC Management Board made up of Defendants' appointees had misled him and caused him to believe that their fictitious list of shareholders was a correct list.

67.    After this ruling, Defendants seized complete control over PTC, managing (through presently unknown means) to convince PTC security members to use force to exclude and bar Telco and Vivendi representatives from PTC's premises.

68.    On August 26, 2005, the Polish Court of Appeal overturned the Regional Court decision that had changed the KRS for Defendants' benefit.  On remand, the Regional Court re-registered Telco as the PTC shareholder as of November 15, 2005.  This ruling returned control of PTC to Telco and Vivendi.  Defendants, however, defied the ruling and used force to maintain physical control of PTC.

69.    On July 13, 2006, the Polish Court of Appeal later favored Defendants and reinstated the initial changes to the KRS based solely on the truncated recognition  proceeding at the Regional Court which had been confirmed by the Court of Appeal on March 29, 2006. Nonetheless, for six months (from November 2005 through July 2006), Defendants defied a Polish court order and used physical force to prevent Telco's representatives from entering the premises of PTC.

### 3.    Defendants Violated and Defied Additional Adverse Court and Arbitration Orders as Part of Their Scheme

70.    Defendants' defiance of judicial and arbitration orders continued beyond November 2005 in four separate instances.

71.    First, on December 20, 2005, the Vienna Commercial Court annulled that part of the Second Vienna Award that had held that the transfer of Elektrim's PTC shares to Telco was

ineffective. Defendants, however, defied this annulment and failed to return control of PTC to Telco and Vivendi. In October, 2006, an appellate court lifted the annulment, but, more importantly, reaffirmed in a definitive manner that the Second Vienna Arbitration panel had no jurisdiction over Telco and thus could not bind Telco. Indeed, the court lifted the annulment for the very reason that the absence of jurisdiction over Telco meant that Telco could not be affected by the award and could not be forced to give up its PTC shares.

72.    Second, in April 2006, a London arbitration panel (in an action that Vivendi initiated against Elektrim to enforce the Joint Venture Agreement) ordered Elektrim (a) to vote in PTC's general meetings in accordance with Telco's instructions, (b) to place all dividends received from PTC in an escrow account, (c) to refrain from taking any actions aimed at preventing Telco from being re-registered as a PTC shareholder in the KRS, and (d) to refrain from selling or otherwise transferring the PTC shares. As part of Solorz's and T-Mobile's scheme to corruptly seize PTC, Solorz has caused Elektrim to defy this arbitration order.

73.    Third, on June 26, 2006, Vivendi obtained a Warsaw District Court order that attached the PTC shares as security for Vivendi's claims and prohibited Elektrim from transferring Telco's shares. As seen more fully below, Defendants violated this injunction.

74.    Finally, on August 16, 2006, the Polish Court of Appeal suspended the earlier decision of March 29, 2006 that had partially recognized the Second Vienna Award. Nonetheless, Defendants defied this decision and, by force, maintained control of PTC.

**D.    Defendants Continued Their Misconduct in 2006**

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 23

75.    During 2006, Defendants continued their misconduct, solidifying their control over PTC.

76.    Beginning about January 2006, Defendants approached Vivendi purporting to seek a settlement and an agreement through which Vivendi could recoup much of its investment and T-Mobile could increase its shareholdings in PTC. Despite its misgivings, Vivendi participated in the negotiations because Deutsche Telekom's Chairman and Chief Executive Officer was personally involved and had assured Vivendi's Chairman and Chief Executive Officer of Defendants' good faith.

77.    On March 7, 2006, Jean-Bernard Levy, Vivendi's Chief Executive Officer, spoke with Kai-Uwe Ricke and Dr. Karl Gerhard Eick, Deutsche Telekom AG's Chief Executive Officer and Deputy Chief Executive Officer, respectively, while Mr. Levy was in the United States. During this conversation, the three discussed the on-going settlement negotiations. In particular, Mssrs. Ricke and Eick assured Mr. Levy that T-Mobile had not agreed to provide Solorz (through PTC) with an agreement known as a Mobile Virtual Network Operator Agreement ("MVNO") – an agreement that would allow one of Solorz's companies to compete with PTC by using PTC's cellular network for its own customers. On information and belief, Mssrs. Ricke and Eick lied to Mr. Levy because three months later, on June 8, 2006, PTC's Supervisory Board (which included four T-Mobile representatives) approved granting Solorz's company an MVNO.

78.    The negotiations represented by these communications accelerated greatly by the end of March 2006 as PTC's finances worsened as a result of Defendants' misconduct. On or

1   about March 25, 2006, representatives of Vivendi and Defendants traveled to Poland to finalize

2   terms on which they had agreed in writing.

3       79.    On the morning of March 29, 2006, those representatives met in the offices of

4   Vivendi's lawyer to resolve the few remaining issues and to sign the settlement agreement that

5
    very day. The parties knew that the Polish Court of Appeal was to render a decision that
6
7   afternoon on whether to uphold the lower court's truncated partial recognition of the Second

8   Vienna Award. The parties expressly agreed, however, that their agreement would stand

9   regardless of the Court of Appeal's decision.

10      80.    Around 1 p.m. on that day (March 29, 2006), Elektrim's representative interrupted

11
    the meeting and proposed that the parties make a joint application to stay the Court of Appeal's
12
13  proceedings to ensure that any decision did not interfere with the settlement. T-Mobile asserted

14  that it was unnecessary because a deal was struck and that T-Mobile would stick with that deal

15  regardless of the Court of Appeal's decision.

16      81.    In fact, Defendants had no intention of honoring the settlement in the event they

17  received a favorable Court of Appeal decision. However, Defendants did not disclose this to

18
    Vivendi.
19
20      82.    One or two hours before the settlement was to be signed, the parties learned that

21  the Court of Appeal had upheld the lower court's truncated partial recognition. Despite the

22  months of communications asserting its good faith and its clear statements that very day, T-

23  Mobile purported to withdraw its agreement and back out of the deal.

24

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 25

83.    Thus, despite the assurance of Deutsche Telekom's Chief Executive Officer and other senior officers, T-Mobile's communications during the 2006 settlement negotiations were fraudulent and in bad faith.

84.    Vivendi reasonably relied on these false and misleading communications and did not take steps that it could have taken to better protect its $2.5 billion investment in PTC against T-Mobile's misconduct. Among other things, Vivendi did not move to suspend the Court of Appeal's decision on March 29, 2006 in reliance on T-Mobile's assertions that day and throughout 2006 that it was negotiating in good faith and that an agreement had already been reached that day.

### E.    In September 2006, T-Mobile Wrongly Asserted Formal Control of PTC, and Solorz Sought His Pay-Off

85.    While Defendants were illicitly taking *de facto* control of PTC in 2006, they were also trying to create an air of legitimacy for their seizure.

86.    Thus, on May 3, 2005, T-Mobile had initiated a third arbitration in Vienna "against" Elektrim (the "Third Vienna Arbitration"). This arbitration was in part a sham because Defendants had agreed beforehand to accelerate the process and transfer the PTC shares prior to an Elektrim bankruptcy in return for the book value of the shares. In this arbitration proceeding, T-Mobile sought a declaratory judgment that, on the basis of the Second Vienna Award, Elektrim had materially breached the Shareholders Agreement because Elektrim did not secure return of Telco's PTC shares within 60 days of the Second Vienna Award (it did so after 60 days). T-Mobile asserted that it was thereby entitled to exercise (under the Shareholders Agreement) a call option on the PTC shares transferred to Telco and to buy them at book value, which was

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1   drastically below market. Telco and Vivendi were once again excluded from these proceedings,

2   notwithstanding the significant potential impact on them.

3       87.     In June 2006, following a joint request for expedition from Elektrim and T-

4   Mobile, the Third Vienna Arbitration ruled in favor of T-Mobile, granting T-Mobile the ability to

5   exercise its call option based on Elektrim's breach. This outcome was very suspicious and defied

6   common sense: the Second Vienna Award's finding that the transfer of the PTC shares to Telco

7

8   was ineffective and had long been annulled in Austria. Why Elektrim desired to expedite the

9   proceeding that could deprive it of its most significant asset, the PTC stock, is beyond

10  comprehension absent Solorz's conspiracy with T-Mobile. Vivendi was not a party to the

11  proceeding.

12

13      88.     On October 2, 2006, Elektrim (operating at Solorz' direction) obtained another

14  arbitration award stating that T-Mobile would take legal title to the PTC shares (for presently

15  unknown reasons agreed to be effective retroactively to February 2005 so as to precede

16  Elektrim's bankruptcy and therefore escape any preference periods that would protect creditors)

17  upon payment of a price on which Defendants had already agreed. T-Mobile and Elektrim (under

18  Solorz' direction) conspired to keep the proceeding secret in defiance of London and Polish court

19

20  orders.

21      89.     On October 4, 2006, T-Mobile issued a statement to the press that included the

22  following:

23          In yet another award of October 2, 2006, the Arbitral Tribunal in Vienna conferred the
            ownership title to the disputable 48% of the shares in PTC to Deutsche Telecom [sic]
24          (with effect as of February 15, 2005, which *remains in concord with the joint stand of*
            *Elektrim S.A. and Deutsche Telecom* presented to date. For this reason Deutsche
25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

Telekom has paid an amount of more than EUR 600 million, which surely covers the current book value of the shares in PTC. [Emphasis added.]

90.     Thus, remarkably, T-Mobile acknowledged publicly that Defendants had a "common position" to hand over ownership of Telco's (and Plaintiffs) PTC shares to T-Mobile for a fraction of its worth.  Moreover, any transfer of the shares prior to payment would be inconsistent with the express language of the Third Vienna Arbitration Award.

**F.     Solorz Stripped Elektrim of Valuable Assets and Positioned Elektrim for Bankruptcy**

91.     While seizing control of PTC through a pattern of unlawful conduct that included wire and mail fraud, Defendants sought to corruptly strip Elektrim of its assets and to position Elektrim for a well-timed bankruptcy.   Upon information and belief, Solorz took such action as part of Defendants' scheme in order to leave Elektrim judgment proof.

92.     Historically, Elektrim has held three principal assets of significant value – the PTC shares, its shares in ZE PAK S.A. ("PAK") (one of Poland's leading power generation companies), and its shares in Port Praski sp. z o.o., a company which owns a significant real estate asset known as Port Praski.

93.     Initially, on January 31, 2005, Solorz purported to strip Elektrim of the PTC shares (which Elektrim did not lawfully own) by transferring them to a subsidiary even before Defendants changed the government's official share register.  It did this illegally in 2005 without public disclosures and without fair value in order to enable Defendants to put the PTC shares further out of Vivendi's reach while they finished consummating their plan to transfer the PTC shares to T-Mobile.  Indeed, even the Polish Securities Commission was obligated to fine

1  Elektrim for the manner in which Solorz concealed the transaction.

2      94.    Solorz also stripped Elektrim of PAK, a 50% State-owned company, by arranging

3  for it to be transferred through an illegitimate transaction to one of his companies for little value.

4  In this transaction, Solorz managed to seize for himself an asset worth many times more than his

5  *de facto* purchase price.

6

7      95.    Finally, Solorz has initiated a similar illegitimate transaction with respect to Port

8  Praski, positioning himself to be able to seize it illegitimately for one of his own companies at

9  will for a fraction of its value.

10      96.    Thus, Defendants have effectively stripped Elektrim of substantial value against

11  which Vivendi might otherwise have had recourse and positioned Elektrim for a tactical

12  bankruptcy when Vivendi's claims would crystallize.

13

14      **G.    Summary of Facts**

15      97.    As explained in this Complaint, Defendants engaged in a massive, multi-year

16  racketeering conspiracy to illegally seize PTC.

17

18      98.    With respect to Solorz and Elektrim, the hallmark of their post-2003 misconduct

19  is that it often went against Elektrim's own, objective self-interest.  Simply put, it was not in

20  Elektrim's self-interest to: (a) seek a partial recognition of the Second Vienna Award and to

21  exclude Telco from the proceedings; (b) defy and appeal, with T-Mobile, the Vienna Commercial

22  Court's annulment of the aspects of the Second Vienna Award that Elektrim had lost, (c) strip

23  itself of valuable assets; (d) breach its obligations to Vivendi under the Joint Venture Agreement;

24

25

1   (e) violate Polish court orders and injunctions; (f) violate arbitral rulings in the London

2   Arbitration; and (g) expedite the implementation of the call option at book value.

3       99.    Vivendi does not currently know all the inducements T-Mobile provided to Solorz

4   as part of the racketeering conspiracy.  However, as mentioned above, T-Mobile recently caused

5   PTC to grant to one of Solorz's companies an incredibly valuable benefit – the MVNO -- while

6   they were supposedly hotly contesting the Third Vienna Arbitration.

7

8       100.   All of Solorz's and Elektrim's misconduct can be understood only if it is viewed

9   through the prism of Elektrim's and Solorz's collusion with T-Mobile.  Moreover, the key time

10  period for this conspiracy was 2004 when the Defendants deceived Vivendi, in significant part,

11  through illegal use of the U.S. wires.

12      101.   After a three-year conspiracy, Defendants have now succeeded in wrenching PTC

13

14  away from Vivendi and have deprived Vivendi of its $2.5 billion investment.

15                          **COUNT ONE**

16                       **RICO Section 1962(b)**

17      102.   Vivendi incorporates by reference and realleges the allegations of the preceding

18  paragraphs.

19      103.   As set forth in paragraph 48, Defendants have engaged in and conspired to engage

20

21  in a pattern of related and continuous predicate, criminal acts to illegally acquire control over an

22  enterprise – PTC -- in violation of 18 U.S.C. §§1962(b) and (d).

23      104.   During the course of the Second Vienna Arbitration, Solorz caused Elektrim to

24  make misleading and deceptive statements in emails and phone calls to Vivendi officials and

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 30

agents in the United States, misleading Vivendi officials into believing that Elektrim was protecting the interests of its joint venture partner Vivendi in PTC rather than conspiring with T-Mobile to exclude Vivendi. These communications constituted wire fraud in violation of 18 U.S.C. § 1343.

105.    As set forth above, Vivendi relied on these misleading communications, believing that Elektrim was protecting Vivendi's interest when in fact Elektrim was conspiring with T-Mobile in a scheme to illegally transfer control of PTC to T-Mobile.

106.    As set forth above, Defendants' racketeering conduct took place in significant part in the United States and has had, and threatens to have, substantial effects on United States commerce. PTC is Poland's leading mobile telecommunications provider, and millions of United States citizens do business with it when making wireless phone calls to Poland on the T-Mobile network. The corruption of PTC harms these United States citizens by depriving them of honest service when making wireless telephone calls from the United States to Poland. If Vivendi had not been stripped of its ownership interest in PTC by Defendants' unlawful conduct, United States consumers would not have been injured and the revenues T-Mobile is now receiving would have belonged to Vivendi.

107.    Defendants' unlawful conduct has caused injury to Vivendi's business and property. Among other damages, Vivendi has (a) lost the fair market value of its investment in PTC (through Telco) which has a fair market value of more than $2.5 billion  and (b) lost revenue and profits it otherwise would have earned, including revenue from roaming charges relating to calls to and from the United States.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

108.    Vivendi's injury is caused by the same adverse effect of Defendants' unlawful conduct that harms United States commerce and consumers.  United States consumers are exposed to higher roaming rates and other abuses precisely because Defendants' unlawful conduct has precluded them from doing business with a non-corrupt PTC controlled by Vivendi.

### PRAYER FOR RELIEF

WHEREFORE, Vivendi prays this Court to grant the following relief as appropriate:

a) Order Defendant T-Mobile to return to Telco the PTC shares that were stolen by Defendants;

b) Award to Vivendi its actual and compensatory damages according to proof at trial;

c) Award to Vivendi three times its damages in accordance with 18 U.S.C. §1965(a);

d) Award to Vivendi pre- and post-judgment interest as permitted by law;

e) Award Vivendi its reasonable attorneys' fees and costs of suit as allowed by law; and

f) Award such other relief as the Court deems appropriate.

DATED this 23rd day of October 2006

Respectfully submitted,

Of Counsel

ORRICK, HERRINGTON & SUTCLIFFE, LLP

Lanny J. Davis
Washington Harbour
3050 K Street, Northwest
Washington D.C. 20007-5135
Attorneys for Plaintiff Vivendi S.A.

ROHDE & VAN KAMPEN, PLLC

Robert E. Rohde, WSBA #12809
1001 Fourth Avenue, Suite 4050
Seattle, WA 98154-1000
206-386-7353
Attorneys for Plaintiff Vivendi S.A.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

COMPLAINT - 32