# EXHIBIT C

File No. I CSK 330/06

**DECISION**

January 18, 2007

The Supreme Court, composed of:

The Supreme Court Judge Jozef Frackowiak (Chief Judge, Reporting Judge) The Supreme Court Judge Henryk Pietrzkowski

The Supreme Court Judge Grzegorz Misiurek

Court Reporter Ewa Krentzel

in the case brought by Elektrim S.A., based in Warsaw

with participation of T-Mobile Deutschland GmbH, based in Bonn

and with participation of the secondary intervenient Elektrim Telekomunikacja, Spółka z o.o., based in Warsaw

for the recognition of the effectiveness of a foreign arbitration court decision within the territory of Poland,

with Jan Szewczyk, a Prosecutor from the National Prosecutor's Office

having heard on January 18, 2007 in its Civil Law Division

the last resort appeal brought by the secondary intervenient

appealing the Appellate Court in Warsaw decision

dated May 29, 2006 r., File No. I ACa 893/05,

**overturns the appealed decision, and the decision of the Regional Court in Warsaw, dated February 2, 2005, File No. VII Co 1709104, annuls proceedings before these Courts, and transfers the case back to the Regional Court in Warsaw for reconsideration, and for a ruling on the cost of the last resort appeal.**

The original bears the appropriate signatures

This is a true and correct copy as certified by:

Senior Clerk of the Court

[signature]

Anna Matura

2

Grounds

Reacting to the announcement in Poland that new licenses would become available to entities providing cellular phone services, and the foreign share of capital in cellular telecommunication would be enlarged, Elektrim S.A. (hereafter called Elektrim) and T-Mobile Deutschland GmbH (formerly known as DeTe Mobil Deutsche Telekom Mobilnet Gmbh, hereafter called TMD), and other entities, entered into a shareholder agreement on December 21, 1995, and on December 20, 1995 they entered into a limited liability company agreement to do business as Polska Telefonia Cyfrowa (hereafter called PTC). The shareholder agreement specified, among others, terms for selling PTC shares, stating that such sale would require consent of the entire Board of Directors of the company while Art. 16 of the agreement defined Material Default, and what will be understood as the Economic Impairment of a party. The same provision of the shareholders agreement also sets forth consequences of a material default on the agreement which, generally speaking, would grant each party an irrevocable right to sell shares of PTC at the price specified in the shareholders agreement in case of material default on the agreement causing economic impairment of the party. The finding of material default on the agreement was to be made by an arbitration court. However, Art. 21 of the company agreement indicated that any differences of opinions arising from, or related to the agreements, should be resolved, if possible, through negotiations between the partners. If such negotiations were unsuccessful, and if shareholders did not decide otherwise, all differences of opinions among the shareholders, and between the shareholders and the company arising from other agreements entered into by the company, or related to other agreements pertaining to the company agreement, were to be resolved finally, with the effect binding on all parties, by the Arbitration Court at the Federal Chamber of Commerce and Industry in Vienna, by three arbiters acting pursuant to the Rules of that court. A similar arbitration clause was also included in the

shareholder agreement.

After negotiations and agreements related to the proposed investment by the French company Vivendi S.A. in the Elektrim Telekomunikacja Spółka z o.o., company (hereafter called Telco) – whose only shareholder at that time was Elektrim – the companies (Elektrim Vivendi and Telco) entered into an investment agreement on June 7, 1999 in order to take control over PTC (which was subsequently amended on July 28, September 7, and December 7, 1999). In performance of the agreement, Elektrim undertook to transfer all its PTC shares to Telco. PTC shares constituted non-cash initial capital that Elektrim was to pay for shares acquired in the initial capital of Telco. In the opinion of Elektrim and Telco, Elektrim made an effective declaration of intent as part of the legal procedure of transferring PTC shares to Elektrim, on Dec. 9, 1999.

On December 7, 2000, TDM filed at the Arbitration Tribunal in Vienna a case against Elektrim and Telco, defendants, related to transfer of the PTC, limited liability company, shares, owned by Elektrim, to Telco. TMD petitioned for a ruling whether or not the ownership of the PTC shares was effectively transferred to Telco, for damages from the company, and for findings that Elektrim, in its attempt to transfer shares to Telco, was in material default, as defined in Art. 16 Sec. 1 of the shareholders agreement.

On November 26, 2004, the Arbitration Tribunal of the International Arbitration Center at the Austrian Federal Chamber of Commerce in Vienna issued the Second Partial Ruling in the case No. SCH - 4750 (thereafter referred to as the Arbitration Tribunal ruling), finding that: 1) the transfer of shares to Telco was not effective, and that PTC shares in the transaction remained the property of Elektrim throughout the entire relevant period; 2) the transfer of shares to Telco in itself did not constitute a material default as defined in Art. 16, Section 1 of the shareholders agreement but it would constitute such (material default) if Telco did not return the shares to Elektrim within two months following receipt of the ruling; 3) TMD petition regarding "economic impairment" is

4

dismissed; 4) The Arbitration Tribunal has no jurisdiction over Telco, and TMD claims against that entity may not be included in this arbitration; 5) TMD claim for monetary damages was withdrawn; 6) the issue of the arbitration cost in relation to this procedure is being reserved, and will be decided in a separate ruling; 7) all other claims and counterclaims between parties are dismissed.

In its petition to the Regional Court in Warsaw, dated December 17, 2004, Elektrim, the petitioner, naming only TMD as a party to the procedure, asked for recognition as effective within the territory of Poland, for the parts of the above-referenced decision of the Arbitration Tribunal in Vienna, dated November 26, 2004. The content of the petition indicates that Elektrim only asked for recognition of clauses one, two, and three of the decision. The petitioner argued that no adverse conditions listed in the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, signed in New York on June 10, 1958, exist (Journal of Laws, 1962, No. 9, item 41, hereafter called the New York Convention).

Telco filed for an appearance before the Regional Court, petitioning to participate in the proceedings as a party, and when the Regional Court rejected the petition in its ruling on January 12, 2005 r., it filed on January 25, 2005 a primary, and a secondary intervention on January 25, 2005. The Regional Court held a hearing in January 26, 2005 where the petitioner objected to the above, and in its decision dated January 26, 2005, the Court denied Telco standing in the case as either a primary, or a secondary intervenient.

Telco, acting as an intervenient until the decision to deny it such standing became binding, motioned for a denial of petition to recognize the Arbitration Tribunal decision. The secondary intervenient argued that the referenced decision consisted of 7 parts, and recognizing only some of them would distort its meaning. The intervenient also argued the decision violated the principles of the public policy, in particular Art. 8 of the Constitution of the Republic of Poland, the right to court proceedings, and it unlawfully deprives the intervenient the right

to 226,079 PTC shares.

On January 26, 2005, the limited liability company Carcom Warszawa acting as a secondary intervenient on behalf of TMD filed a petition in the Regional Court in Warsaw to deny the petition to recognize the arbitration decision. On the same day, during the hearing before the Regional Court, a motion for exclusion of the reporting judge was filed by Carcom Warszawa. The motion was not ruled on. During a break in the hearing, the Chief Judge of the Division ordered the replacement of the presiding judge in the panel deciding the case, who was also the reporting judge, with a new judge, while another judge from the previous panel was appointed the reporting judge. After the break, the new panel of the Regional Court closed the proceedings, and postponed ruling regarding the petition for recognition. The decision was announced on February 2, 2005. Based on the decision, the Regional Court granted the petition for partial recognition of the Arbitration Tribunal decision, dated November 26, 2004 r., in its entirety. In the Regional Court's opinion, the recognition was fully acceptable because the petitioner submitted documents required under Art. IV of the New York Convention, and no adverse conditions existed for denial of recognition, as listed in the Convention. The Court, having analyzed positions of various entities participating in the case, including Telco's, whose arguments were considered ex officio, as it was not allowed to participate in the case in any capacity, concluded that the referenced Arbitration Tribunal judgment was not internally inconsistent. The Tribunal did not exceed its jurisdiction under the arbitration clause, the judgment did not violate public policy principles, and its partial recognition, when considering the content of the judgment, was acceptable under the New York Convention.

In the decision dated May 11, 2005, the Appellate Court reversed the Regional Court decision of January 26, 2006 r. that denied Telco the standing of the secondary intervenient in the case,

6

indicating that the appeal filed by Telco in that regard was against the decision to deny the intervenient participation in the case due to the objection of the petitioner. The decision of the Regional Court in Warsaw regarding partial recognition of the Arbitration Tribunal in Vienna decision was appealed by the Regional Prosecutor, by Carcom Warszawa Sp. z o.o., and by Telco acting as a party, the primary intervenient, and the secondary intervenient. The appeal filed by Telco as a party and the primary intervenient was rejected by the decision of the Regional Court dated May 17, 2005, and the decision of the Appellate Court dated March 29, 2006. The appeal filed by Carcom Warszawa was rejected by the decision of the Appellate Court dated December 20, 2005.

In the appeal filed by Telco as a secondary intervenient, it demanded that the appealed decision be reversed, and the petition be denied, or the appealed decision be overturned, and the case transferred back to the Regional Court for reconsideration. Telco argued in particular that the appealed decision violated Art. 379 clause 5 of the Code of Civil Procedure, as it deprived [the company] of an opportunity to defend its rights, and as such resulted in the proceedings being invalid, and Art. 1147 § 1 of the Code of Civil Procedure by not allowing [Telco] to become a party to the case, therefore depriving it of an opportunity to defend its rights in the proceedings for recognition of the foreign arbitration court decision. The intervenient also claimed violations of Art. 50 § 3 of the Code of Civil Procedure, Art. 217 § 2 of the Code of Civil Procedure, and Art. 224 § 1 of the Code of Civil Procedure, as evidenced in the fact the case was closed before the final parties to the procedure emerged, in the fact the decision denying Telco standing in the proceedings as a secondary intervenient was issued by the judge against whom an exclusion petition was filed, and in the fact that composition of the judicial panel changed during the hearing, and the new judge had no opportunity to review the case file, which was several hundred page long. Telco also claimed the Regional Court violated Art. III, Art. V section 2 item b and Art. V section 1, item c of the New York Convention in its ruling that the [Vienna] decision could be recognized partially, that it did not violate basic public policy principles of the Republic of Poland, and that it did not go beyond the limits of the arbitration clause.

7

The Regional Prosecutor Office claimed in its appeal that the decision violated Art. 1147 § 1 of the Code of Civil Procedure resulting in Telco being denied standing and defense of its rights in the proceedings before the Regional Court, and violated Art. V section 1 item . d of the New York Convention in issuing a decision without being familiar with the law that was the basis for the Arbitration Tribunal decision.

In rejecting Telco's appeal, the Appellate Court found no invalidity of the proceedings claimed by the intervenient.  Although Telco was not granted standing as a party in the proceedings for recognition of the Arbitration Tribunal findings, but it had an opportunity to protect its rights as a secondary intervenient practically throughout the entire proceedings. In point of fact, as early as on January 25, Telco filed a brief as a secondary intervenient where it objected against the petition, and presented its position (not different from the claims raised on appeal).  It maintained its position during the hearing on January 26, 2005, and that was the situation when the Regional Court issued its decision. As the Appellate Court pointed out, under Art. 78 § 3 of the Code of Civil Procedure, the third party obtains the standing as a secondary intervenient as soon as the party files a brief with the court. Therefore, the Appellant obtained such standing on January 25, 2005, and, pursuant to the decision of the Appellate Court dated May 11, 2005 r, it had maintained that standing until the conclusion of proceedings before the Appellate Court.

While the Appellate Court did not disagree with the position presented in the appeal that there is a difference between the standing of a party, and of a secondary intervenient in a case (procedural rights of a party are certainly broader), it stressed that in order to decide whether or not the Appellant was denied an opportunity to defend its rights, it would be necessary to show that if granted a different standing in the proceedings, [the Appellant] would have undertaken such actions in the proceedings that would have better protected its legal interests. In the Appellate Court's opinion, the Appellant would not have been able to undertake  actions than the actions already performed in the proceedings.  The Appellant presented its opinions in briefs and at the hearing, filed an appeal, and it would have undertaken the same procedural actions also as a party to the proceedings for recognition of a foreign decision. As the Appellant undertook all the procedural actions that would also be available to a party at any given stage of the case, the difference in standing was formal in character.

8

Also, the Appellant was not justified in raising the issue of violation of Art. 1147 § 1 of the Code of Civil Procedure in order to show it was denied an opportunity to protect its rights. In the Appellate Court's opinion, the referenced law merely states who is legally able to initiate proceedings to recognize a foreign court decision, and it does not address the issue whether or not Telco should be granted passive standing in the proceedings for recognition in Poland of the foreign arbitration court decision. The Appellate Court also found the claim of violation of Art. 224 of the Code of Civil Procedure ineffective. The Regional Court closed the session after hearing arguments of the parties (pursuant to Art. 224 of the Code of Civil Procedure); the fact that the decision denying the Appellant the standing of the secondary intervenient in the case was not binding at the time would not prevent the court from closing the case, due to the rules under Art. 78 § 3 of the Code of Civil Procedure, in reference to Art. 76 of the Code of Civil Procedure. The Appellate Court found the changes in the composition of the judicial panel, made prior to issuing the decision that concluded the material proceedings in the case, to be immaterial to the decision in the case. The Appellate Court also rejected the Telco assertion that due to material violations of the New York Convention, the Constitution of the Republic of Poland, and provisions of the Civil Code and the Code of Civil Procedure, the Arbitration Tribunal decision dated November 24, 2004 may not be recognized, as the Elektrim's petition requested. In rejecting the appeal filed by the Prosecutor, the Appellate Court indicated, referring to the same argument it presented while deciding on the same claim raised by Telco, that the company was not denied an opportunity to protect its rights. Quoting Art. V clause I of the New York Convention that was referenced in the appeal, the Appellate Court indicated that the intervenient did not assert violation of that provision of the convention at all, and therefore the Prosecutor had the obligation to make an argument as to the existence of circumstances indicated in the provision of the Convention. As [the Prosecutor] did not do it, the argument lacks merit.

In its last resort appeal, the secondary intervenient asserted violations of numerous provisions of the civil law due to the fact that they were not applied: 1) Art. 65 of the Civil Code in reference to Art. 697 § 1 of the Code of Civil Procedure, in reference to Art. 698 § 2 of the Code of Civil Procedure, in reference to Art. 1105 § 2 of the Code of Civil Procedure; 2) Art. 56 of the Civil Code in reference to z Art. 697 § 1 of the Code of Civil Procedure and Art. 698 § 1 of the Code of Civil Procedure in reference to Art. 1105 § 2 of the Code of Civil Procedure; 3) Art. 56.

9

of the Civil Code in reference to z Art. 698 § 2 of the Code of Civil Procedure, in reference to z Art. 697 § 1 of the Code of Civil Procedure, in reference to z Art. 1105 § 2 of the Code of Civil Procedure, and in reference to Art. II of the New York Convention; 4) violation of Art. 56 and Art. 65 of the Civil Code – claims in sections 1-4 boil down to the issue of the Appellate Court not taking into consideration the referenced provisions of the law in considering arbitration provision of the PTC company agreement; 5) Art. 21, Art. 64 and Art. 45 section 1 of the Constitution, in reference to Art. 77 section 2 and Art. 177 of the Constitution of the Republic of Poland, in reference to Art. 2 of the Code of Civil Procedure, in reference to Art. 1 of the Civil Code – these provisions of the law guarantee the Appellant the right to 226,079 PTC shares; the Appellant was unfairly deprived of that right through the court decision.

The secondary intervenient also asserted violations of procedural rules: 1) Art. V section I item c of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, in recognizing the Arbitration Tribunal decision dated November 26, 2004, as the ruling on ineffectiveness of the legal action, transferring the shares from the previous partner to the Appellant, included in the findings, goes beyond the limits of the arbitration provision of Art. 21 section 2 of the Polska Telefonia Cyfrowa Sp. z o.o. company agreement; 2) Art. III and Art. V section 1 item c of the New York Convention and Art. 1145 § of the Code of Civil Procedure, in the fact that the Decision was distorted in the proceedings to recognize the foreign courts decisions due to partial recognition of the Decision, and by exceeding the jurisdiction of the Appellate Court; 3) Art. V section 2 item b of the New York Convention, in reference to Art. 325 of the Code of Civil Procedure, in reference to Art. 2 of the Constitution of the Republic of Poland, in reference to Art. 2 of the Code of Civil Procedure, in reference to Art. of the Civil Code, in reference to Art. 697 of the Code of Civil Procedure, and in reference to Art. 1105 § 2 of the Code of Civil Procedure - in reference to violations of provisions of the civil law by the fact that they were not applied, i.e. Art. 21, Art. 64, Art. 177, Art. 45 section 1, Art. 77 section 2 of the Constitution of the Republic of Poland, in the erroneous assumption by the Appellate Court that the [Vienna] Decision was compatible with the Polish public policy; 4) Art. III of the New York Convention in reference to Art. V section 1 item c of the New York Convention, in reference to Art. 7 of the Constitution of the Republic of Poland, and in reference to Art. 1 of the Code of Civil Procedure by not reviewing and analyzing the law on which the referenced decision was based, i.e. without establishing the objective and subjective enforceability of the Decision in the jurisdiction in which it was issued (the Austrian law); 5) Art. IV. section I item b of the New York Convention in reference to Art. V section 1 item c of the New York Convention in deciding that "the conditions set forth in the Article IV of the Convention" were met while neither the original, nor

10

a certified copy of the agreement with the arbitration clause was submitted; and irrespectively, the Appellant has never entered into such agreement and is not a party to the agreement; 6) Art. 72 § 2 of the Code of Civil Procedure, in reference to Art. 195 of the Code of Civil Procedure, in reference to Art. 13 § 2 of the Code of Civil Procedure, in reference to Art. 1147 and Art. 1148 of the Code of Civil Procedure, in the fact they were interpreted erroneously, namely in the assertion that a person participating as a defendant in a foreign arbitration proceedings is not an obligatory necessary party to the proceedings for recognition of the decision of the same arbitration proceedings; 7) Art. 378 § 1 of the Code of Civil Procedure, in reference to Art. 379 of the Code of Civil Procedure, and Art. 386 § 2 of the Code of Civil Procedure, in reference to Art. 72 § 2 of the Code of Civil Procedure, Art. 78 § 2 and 3 of the Code of Civil Procedure, Art. 128 of the Code of Civil Procedure, Art. 156 of the Code of Civil Procedure, Art. 195 § 2 of the Code of Civil Procedure, Art. 215 of the Code of Civil Procedure, Art. 224 of the Code of Civil Procedure, Art. 225 of the Code of Civil Procedure, and Art. 316 of the Code of Civil Procedure, in reference to Art. 13 § 2 of the Code of Civil Procedure in the erroneous decision that the proceedings before the Regional Court were not invalidated by that Court's incorrect assertion that the Appellant was not denied an opportunity to defend its rights in the proceedings before the Regional Court; 8) Art. 378 § 1 of the Code of Civil Procedure, Art. 379 of the Code of Civil Procedure, and At. 386 § 2 of the Code of Civil Procedure in reference to Art. 13 § 2 of the Code of Civil Procedure, and violation of Art. 32 section 1 of the Constitution of the Republic of Poland in the fact that the Appellate Court did not consider the issue of violation of the principle of equality of the parties, and the principle of contradictory character of the proceeding for recognition of the foreign courts decision; 9) Art. 378 § 1 of the Code of Civil Procedure, Art. 379 clause 4 of the Code of Civil Procedure, and Art. 386 § 2 of the Code of Civil Procedure in reference to Art. 13 § 2 of the Code of Civil Procedure, in the fact that the proceedings before the Regional Court in Warsaw were not found ex officio to be invalid due to the fact that composition of the judicial panel was inconsistent with the provision of the law, i.e. § 64 and § 67 section 1 clause 2 of the Internal Rules for Proceedings in Public Courts, namely that a replacement in the judicial panel (of the reporting judge) was made during the proceedings without "extraordinary" circumstances obtaining and in such manner that the new member of the panel had no opportunity to become familiar with the case file; 10) Art. 378 § 1 of the Code of Civil Procedure, Art. 379, clause 5 of the Code of Civil Procedure, and Art. 386 § 2 of the Code of Civil Procedure, in reference to Art. 45 section 1 of the Constitution of the Republic of Poland in reference to Art. 13 § 2 of the Code of Civil Procedure, and violation of Article 6 section 1 of the Convention for the Protection of Human Right and Fundamental Freedoms signed in Rome on November 4, 1950, in that the fact that the issue of denying the Appellant the opportunity to protect its rights in the proceedings before the lower court was not taken into consideration, and also in violation of the right to fair and just trial before an impartial court; 11) Art. 380

11

of the Code of Civil Procedure, in reference to Art. 378 § 1 of the Code of Civil Procedure, in reference to Art. 13 § 2 of the Code of Civil Procedure 12) Art. 386 § 6 of the Code of Civil Procedure, in reference to Art. 397 § 2 of the Code of Civil Procedure, in reference to Art. 13 § 2 of the of the Code of Civil Procedure, in that the Appellate Court, while issuing the appealed decision, adopted a different legal position in regard to necessity of granting the Appellant standing in these proceedings, when compared to the grounds for the same court's findings dated May 11, 2005 (file No. A Cz 449/05), even though the Appellate Court agreed to be bound by the legal position expressed on the grounds for that decision.

The petitioner, and the party to the proceedings responded to the last resort appeal complaint with a motion to reject it as inadmissible, or, as an alternative, asserted that claims raised in the last resort appeal are without any justification, and moved for its dismissal.

The Appellant in its brief dated January 8 filed a motion, pursuant to Art. 398[17] § 1 of the Code of Civil Procedure, for hearing the case before the expanded judicial panel of the Supreme Court due to the fact that issues raised in the last resort appeal complaints, and in the brief, present serious legal challenges.

Also, while the last resort appeal was already in progress, Telco, Elektrim and TMD submitted ample briefs to supplement their positions stated in the last resort appeal complaints, and the responses. For example, Telco in the trial brief dated January 15, 2007, presents additional argument for invalidity of the proceedings before the lower court, indicating the composition of the court was not lawful under Art. 323 of the Code of Civil Procedure.

The Supreme Court considered the following:

I. The case before the Court pertains to recognition in Poland of the decision, issued by the Arbitration Tribunal in Vienna on November 26, 2004, i.e. judgment of a foreign arbitration court. Proceedings for recognition of foreign arbitration court judgments are currently governed by regulations of Title VIII Part V of the Code of Civil Procedure (Art. 1212 through 1217). The regulations became effective on October 17, 2005, pursuant to Art. 3 of the Act of July 28, 2005 on Changing the Act: the Code of Civil Procedure (Journal of Laws, No. 178, item 1478). Pursuant to Art. 2 of the July 28, 2005 Act,

12

proceedings for recognition of arbitration court judgments and for finding of their enforceability filed before the Act becomes effective, should proceed according to the previous law.

The language of the regulation may raise doubt if it also pertains to proceedings for recognition of judgments issued by foreign arbitration courts. That is because Art. 2 of the Act amending the law uses the term "proceedings before the (national) court to recognize the effectiveness of an arbitration court judgments," and "proceedings to recognize the enforceability of an arbitration court judgments" The terms refer to regulations in effect before the Act of July 28, 2005 became law, i.e. to the old Art. 711 § 2-5 of the Code of Civil Procedure where recognition of effectiveness of arbitration court judgments and recognition of enforceability of arbitration court judgments issued in Poland is referred to, and to the old Art. 1150 § 2 of the Code of Civil Procedure that referred to recognition of enforceability of arbitration court judgments issued abroad.

Due to the fact that before the Act of July 28,2005 became effective, the Code of Civil Procedure formally did not contain any regulations pertaining to recognition of foreign arbitration court judgments (the matter is also discussed later on these Grounds), Art. 2 of the Act does not contain specific language in reference to recognition of an arbitration court judgment issued abroad. Nevertheless, considering the fact that recognition of an arbitration court judgments issued abroad was a functional equivalent of recognition of enforceability of an arbitration court judgments (issued in Poland), it should be assumed that when Art. 2 of the Act amending the law specifies procedures for the recognition of arbitration court judgments initiated before the current law took effect, it also covers proceedings for recognition of arbitration court judgments issued abroad. The phrase "proceedings to recognize effectiveness of an arbitration court judgment" used in the referenced regulation also covers recognition of such judgments within the territory of Poland, because only after such recognition of foreign arbitration court judgments they would become effective in Poland. The proceedings in the case before the Court were initiated by Elektrim on December 17, 2004, so there is no doubt that the proceedings should be governed by the law in force

13

before the Act of July 28, 2005 r took effect, i.e. before October 17, 2005. However, the law in effect before October 17, 2005 did not address the issue of recognition of arbitration court judgments issued abroad. Provisions of Art. 1145-1149 of the Code of Civil Procedure have always pertained directly only to decisions of foreign courts. Only the old Art. 1150 § 2 of the Code of Civil Procedure stated that Art. 1150 through 1153 of the Code of Civil Procedure governing enforceability of foreign court decisions will be apply to the recognition of enforceability of arbitration court judgments issued abroad In situations where recognition of foreign arbitration court judgments was included in international agreements, in scholarship, and in case law (see the Supreme Court decision I CZ 10/03, issued on February 20, 2003, non-published), it was assumed that proceedings for recognition of such judgments would be governed by Art. 1145 through 1149 of the Code of Civil Procedure if the international agreement indicated that the law of the country should apply to proceedings for recognition (Art. 1096 of the Code of Civil Procedure). Of course, under such circumstances provisions of the Code of Civil Procedure would apply only where such international agreement did not provide otherwise (e.g. regarding criteria for recognition). The Supreme Court, in its composition as of the beginning of the last resort appeal, agrees with such opinion. Under the circumstances of this case, it should therefore be decided that the previous law, in the meaning of Art. 2 of the Act of July 28, 2005 to amend the Law, applicable to recognition of the Arbitration Tribunal judgment, is Art. 1145 through 1149 of the Code of Civil Procedure, unless provisions of the New York Convention provide otherwise. The first sentence of Art. III of the New York Convention states that each country that is a signatory to the Convention, pursuant to the conditions specified therein, will recognize the arbitration decision as binding and will enforce it according to procedural rules of the territory where the relief mentioned in the decision is sought. The Appellate Court issued its binding decision in the case before this Court on March 29, 2006. Telco, a secondary intervenient in the case, filed the last resort appeal complaint against that decision on August 5, 2006. Both Elektrim, and TMD, which is a party to the case, raised the issue of inadmissibility of such appeal. Therefore, first it has to be decided

14
whether or not the last resort appeal complaint is admissible.

II. The starting point for evaluating the issue must be the opinion adopted above, that the provisions of Art. 1145-1149 of the Code of Civil Procedure apply to the proceedings for recognition of the Arbitration Tribunal judgment, with the exception of contrary provisions of the New York Convention, which take precedence before provisions of the Code. Therefore, the issue of admissibility of the last resort appeal complaint is governed by Art. 1148 § 3 of the Code of Civil Procedure stating that the last resort appeal complaint against an appellate court decision regarding recognition of a foreign decision is admissible.

As the decision of the Appellate Court was issued on March 29, 2006, and the last resort appeal complaint was filed on August 5, 2006, it should be decided under Art. $398^{1}$-$398^{21}$ of the Code of Civil Procedure, in reference to Art. 13 § 2 of the Code of Civil Procedure. This position is grounded in the provisions of the Act of December 22, 2004, amending the Act – the Code of Civil Procedure, and the Act on Courts of General Jurisdiction (Journal of Laws, 2005, No.13, item 98) where the previous "kasacja" [last resort appeal] was substituted with "skarga kasacyjna" [last resort appeal complaint]. The Act took effect on February 6, 2005 r. From that day on, last resort appeal complaints and proceedings initiated by such complaints are governed by Art. $398^{1}$ - $398^{21}$ of the Code of Civil Procedure. Therefore, if a complaint was filed after February 6, 2005, as it was the case here, it should be decided under the above referenced provisions of the Code of Civil Procedure. The exceptions to this provisions mentioned in Art. 3 and 4 of the Act of December 22, 2004 do not apply here. Contrary to assertions of TMD, a party to the proceedings, there are no grounds for applying the law that was in effect prior to February 6, 2005 to the last resort appeal complaint filed by Telco, pursuant to Art. 2 of the Act of July 28, 2005. The provision indicates only when the new provisions should be applied to proceedings for recognition of arbitration court judgments, and does not address the issue what law (the earlier one, or the new one) should be applied when deciding on the admissibility and when deliberating the last resort appeal complaint; this issue, for all cases, including recognition of foreign arbitration court judgments, is governed by Art. 3 through 6 of the Act of December 22, 2004. These provisions state unequivocally that the last resort appeal complaint filed after February 6, 2005 shall be decided under Art. $398^{1}$ - $398^{21}$ of the Code of Civil Procedure.

15

As a consequence, it should be stated that in this matter, the proceedings for recognition of the Arbitration Tribunal judgment are governed by the provision of Art. 1145 through 1149 of the Code of Civil Procedure, as modified by provisions of the New York Convention, while the last resort appeal proceedings are governed by Art. 398-398[21] in reference to Art. 13 § 2 of the Code of Civil Procedure. This is the result of interpretations of intertemporal provision of Acts of July 28, 2005 and of December 22, 2004. Consequently, TMD and Elektrim's assertion that in deciding on the last resort appeal the Supreme Court should evaluate proceedings for recognition of the Arbitration Tribunal decision in the light of Art. 1212 through 1217 of the Code of Civil Procedure is completely incorrect. Under Art. 2 of the July 28, 2005 Act, the deciding factor for application of the previous law, i.e. Art. 1145 through 1149 of the Code of Civil Procedure, should be the fact that the procedure for recognition of the Arbitration Tribunal judgment was initiated prior to October 17, 2005. Even though the final decision of the Appellate Court was issued in the case on March 29, 2006, because the last resort appeal complaint against that decision was admissible, the proceedings should be seen as still unfinished. If the solution suggested by TMD and Elektrim was adopted, the Supreme Court would have to rely on provisions of the New York Convention and provisions of Art. 1212-1217 of the Code of Civil Procedure while evaluating the lawfulness of the Appellate Court actions, and possibly those of the Regional Court – but they issued their decision on the basis of the New York Convention and provisions of Art. 1145 through 1149 of the Code of Civil Procedure. In other words, the Court could accuse those Courts of unlawful actions based on the law that (as to the provisions of the Code of Civil Procedure) was not in effect when these Courts issued their decisions. However, such conclusion would not be acceptable.

TDM and Elektrim argue further that even if the last resort appeal complaint were admissible in this case under Art. 1148 § 3 of the Code of Civil Procedure, applicable in the light of Art. 2 of the July 28, 2005 Act, and Art. III sentence one of the New York Convention, there would be another obstacle to admissibility of the last resort appeal complaint in this case, related to a peculiar interpretation of Art. III sentence two of the New York Convention.

Article III sentence one of the New York Convention indicates applicability of the law of the country in proceedings for recognition of a foreign arbitration decision

16

yet the second sentence states that such recognition may not be subject to imposition of significantly larger burden, or the levy of court and other fees higher that those required for recognition of domestic arbitration decisions. In TMD and Elektrim's opinion, the significantly larger burden also includes the situation where the last resort complaint is not allowed against the Appellate Court decision in the proceedings for recognition (findings of enforceability) of domestic arbitration court decision, while such complaint is allowed against the Appellate Court decision in the proceedings for recognition of foreign arbitration court decision.

The Supreme Court in its opinions during the period of "the last resort appeal" laws maintained that such appeal was inadmissible against the Appellate Court decision in proceedings for enforceability of domestic arbitration court decisions (decisions I CKN 654/99, 2000/3 dated September 22, 1999, and 1 CZ 102/04, dated October 13, 2004, non-published.) Those decisions were issued when Art. 711 of the Code of Civil Procedure has not yet differentiated between findings of effectiveness, and findings of enforceability, for judgments of domestic arbitration courts (the differentiation was introduced in the Act of July 2, 2004). Considering the fact that the proceedings for findings of enforceability, and later, proceedings for findings of effectiveness, and proceedings for findings of enforceability in regard to domestic arbitration court decisions were equivalent to proceedings for recognition of a foreign arbitration court judgment, and proceedings for findings of enforceability of such judgment, TMD and Elektrim assert that if the last resort appeal complaint (last resort appeal) was not allowed in a procedure for findings of enforceability (later: proceedings for findings of effectiveness, and proceedings for findings of enforceability) in regard to the domestic arbitration court decisions, admission of the last resort appeal complaint in a procedure for recognition of the foreign arbitration court judgment under provisions of the New York Convention, and Art. 1145-1149 of the Code of Civil Procedure would violate Art. 111 sentence two of the New York Convention. That is because admission of the last resort appeal complaint would impose a "significantly larger burden" on recognition of foreign arbitration court decisions in comparison to conditions for recognition of a domestic arbitration court decision. However, such a position is unfounded.

17

Assuming – to follow the lead of previous decisions of the Supreme Court – that the decisions of the Appellate Court in regard to findings of effectiveness, or findings of enforceability of a domestic arbitration court decision (the old Art. 711 § 2 through 5 of the Code of Civil Procedure) for procedures initiated prior to the effective date of the July 28, 2005 Act, were not eligible for the last resort appeal complaint (earlier: last resort appeal), we cannot agree with the assertion that admissibility of the last report appeal complaint against the decisions of the Appellate Court in a procedure for recognition of the foreign arbitration court judgments would constitute a "substantial burden" under Art. III sentence two of the New York Convention. Firstly, the admissibility of the last resort appeal complaint is not something that recognition of a foreign arbitration court decision is conditioned upon, because the last resort appeal complaint is only an extraordinary venue for appeal, and a party may or may not take advantage of it. Besides, admissibility of the last resort appeal complaint may, depending on the circumstances of the case, work for or against recognition of the decision. For example, if the Appellate Court dismissed the petition for recognition, filing the last resort appeal complaint might cause the decision to be recognized after all. In the matter under our consideration the opposite is true, i.e. filing the last resort appeal complaint may result in overturning the recognition of the Arbitration Tribunal decision. This, however, does not change the fact that admissibility of the last resort appeal complaint cannot be seen as a "substantial burden" under Art. III sentence two of the New York Convention. Secondly, the decision of the Appellate Court in regard to recognition (formerly: finding of effectiveness) of an arbitration court judgment becomes binding both for court decisions issued in Poland and abroad. In both situations, after proceedings before lower and higher court, the arbitration court decision, whether issued in Poland or abroad, becomes as binding as a decision of a national court. Admissibility of the last report appeal complaint in a procedure for recognition of the foreign arbitration court judgments does not change that, it merely opens a possibility for verification of the binding decision of the Appellate Court regarding the recognition. And thirdly, it is hardly "discrimination" against foreign arbitration court decisions when the last resort appeal complaint is available in proceedings for their recognition: such complaint might be seen

18

as a way of making up for the fact that it is not possible to file a case in a Polish court to appeal a decision of an arbitration court issued abroad.  It should be mentioned that for this argument, it is irrelevant whether or not an appeal against a foreign arbitration court judgment may be filed in the country under whose law the decision was issued.

**III**. In deciding on the claims raised in the last resort appeal complaint it should be pointed that first of all, it is necessary to differentiate between review of the Appellate Court decision as to correctness of its evaluation of recognition criteria under the New York Convention, and review of its decision from the standpoint of the correctness of procedures before that court in the light of the New York Convention provisions, and – to the extend they are applicable – the provisions of the Code of Civil Procedure governing proceedings for recognition.  The New York Convention sets forth the so-called material conditions for recognition (mostly, Art. IV and V of the Convention), but that does not change the fact that the proceedings for recognition of a foreign arbitration court judgment has to be conducted according to provisions governing such proceedings, included partially in the New York Convention, and as to the rest, in the Code of Civil Procedure (Art. 1145-1149 of the Code of Civil Procedure, exclusive of Art. 1146 of the Code of Civil Procedure dealing with recognition criteria, and procedural provisions pursuant to Art. 13 § 2 of the Code of Civil Procedure). As to grounds for the last resort appeal, the claims in regard to violations of the so-called material conditions for recognition should be raised under the first ground for appeal (Art. 398[3] § 1 clause 1 of the Code of Civil Procedure in reference to Art. 13 § 2 of the Code of Civil Procedure) - provisions governing the criteria are not material-legal provisions but in the proceedings for recognition they play a similar role to that of material-legal provisions in court proceedings, and non-trial proceedings, i.e. they constitute basis for decisions of the court re. merits of the case. The claims in regard to provisions governing proceedings for recognition should be raised under the second ground for appeal (Art. 398[3] § 1 clause 2 of the Code of Civil Procedure in reference to Art. 13 § 2 of the Code of Civil Procedure).

Response to claims raised in the last resort appeal complaint should begin with weighing the claims with the most far-reaching consequences, related

19

to the fact the Appellate Court did not consider ex officio (Art. 378 § 1 of the Code of Civil Procedure and Art. 386 § 2 of the Code of Civil Procedure in reference to Art. 13 § 2 of the Code of Civil Procedure) the invalidity of the proceedings before the lower court. The last resort appeal proceedings review only the proceedings before the Appellate Court, and the decision of that court, and the Supreme Court takes into consideration only the invalidity of the proceedings before the Appellate Court (Art. 398[i3] § 1 of the Code of Civil Procedure, see Supreme Court decisions in the following cases: I CKN 825/97 dated November 21, 1997, OSNC 1998, No. 5, item . 81, and III CK 323/04, dated February 23, 2005, non-published.) However, the claim of violation of procedural provisions by the Appellate Court may stem from the fact that the court did not consider – as it should have (ex officio, or as a result of a claim raised on appeal) -- the invalidity of the proceedings before the lower court. As a consequence, the claim of invalidity of proceedings before the lower court may be raised as grounds for the asserted violations of the procedural provisions by the Appellate Court, i.e. Art. 378 § 1 and Art. 386 § 2 or 3 of the Code of Civil Procedure. That is the situation in this matter, because Telco made a claim in its last resort appeal complaint that the Appellate Court violated Art. 378 § 1 and Art. 386 § 2 of the Code of Civil Procedure, and indicated that the violation consisted in that the Court did not consider two bases for invalidity of the procedure before the lower court.

First of all, the Appellant indicated that it was denied the opportunity to defend itself (Art. 379 item 5 of the Code of Civil Procedure) because it was refused the opportunity to appear before the Regional Court as a party to the case, and also as a primary, or a secondary intervenient.  One has to agree that the Appellant's legal standing in the proceedings before the lower court was unclear. That lack of clarity might have been exacerbated by the fact that the decision as to the merits of the case was issued by the lower court before the binding ruling on Appellant's standing as an intervenient was made. However, it should be stressed that despite the lower court decision dated January 26, 2005, not granting the Appellant standing in the case as a secondary intervenient, it had the standing as a secondary intervenient before the court due to the fact that the decision was not legally binding.  Eventually that standing was confirmed in the Appellate Court's

20

decision issued on 11 May 2005. Even a perfunctory analysis of the Appellant's conduct before the Regional Court shows that with the help of a few professional counsels, it took an active part in the case, submitted numerous, ample trial briefs, and that the Court considered them when issuing the decision for the Vienna Arbitration Tribunal judgment to be upheld. It would be then difficult to argue that the Appellant was denied the right to defend itself: at the most one can say the defense was made more difficult because the main thrust of the Appellant's efforts was directed at procedural issues related to its standing in the procedure, as oppose to the core of the matter, namely whether the foreign arbitration court judgment should be recognized or not. As a consequence, we cannot find that the Appellant was denied the opportunity to defend its rights, which, under Art. 379 clause 5 of the Code of Civil Procedure could be ground for declaring the procedure invalid. Similar arguments go against the assertion that the Appellant was denied the right to defend itself in the proceedings before the Appellate Court. The ample last resort appeal complaint, additional briefs submitted during the appeal, and participation of the Appellant in the hearing through four counsels indicates that it exercised its right to defend itself also during the proceedings before the Supreme Court.

The Appellant also raised the issue of invalidity of the proceeding before the lower court based on the fact that the composition of the court issuing the decision on February 2, 2005 r., was unlawful (Art. 379 clause 4 of the Code of Civil Procedure). The Appellant argued that the composition of the judicial panel of the lower court was in violation of § 64 and 67 of the Minister of Justice Ordinance dated November 19, 1987, the Internal Rules for Proceedings in Public Courts (Journal of Laws, No. 38, item 218, with amendments). However, it is difficult to find this argument justified because the change in the judicial panel, in the circumstances of the case, may be seen as caused by extraordinary circumstances described in § 64 of the referenced Rules, so the composition of the judicial panel of the lower court was not unlawful. However, in the matter under consideration, there was a violation of Article 323 in reference to 361 and 13 § 2 of the Code of Civil Procedure.

As the protocol of the hearing on January 26, 2005 indicates, there was a change in the judicial panel during the court session: a different panel heard the case during the "first"

21

part of the session when the hearing took place, and a different panel [heard] the "second" part. The court, composed of different judges, closed the case, and then issued its decision on February 2, 2005. Article 323 in reference to 361 and 13 § 2 of the Code of Civil Procedure states that the decision regarding petition for recognition of a judgment should be issued by the judges who heard the case immediately before the decision was issued. Art. 323 of the Code of Civil Procedure sets absolute limits for the application of the immediacy principle in the civil procedure. The principle states that the court deciding in the case should become directly familiar with demands, claims of the parties, and evidence in the matter. As opposed to criminal proceedings, (compare to Art. 404 § 2 of the Code of Criminal Procedure), there is no continuity of the case in civil matters, and accordingly, when the case is continued at a new date, it does not start from the beginning but moves forward. At any time the matter may be heard by a court of different composition. But Art. 323 of the Code of Civil Procedure sets the minimum of the immediacy requirement in a civil case: the decision may only be issued by the judges who heard the case immediately before the decision was issued. That principle also embodies the constitutional right to a fair court because it assures that the judge who took part in the final decision participated at least in the hearing preceding its issuance. That is why Art. 323 of the Code of Civil Procedure must be strictly followed. In no way it is just a standard instruction because its violation makes the composition of the judicial panel unlawful, and causes the proceedings to be invalidated (Art. 379 clause 4 of the Code of Civil Procedure; compare to: the Supreme Court decision IV CR 219/77, dated January 19, 1977, non-published). Such interpretation of Art. 323 of the Code of Civil Procedure is reinforced by the fact that the principle of immediacy has been severely limited in the civil proceedings anyway. However, in its limited scope, the principle must be strictly upheld.

Art. 323 of the Code of Civil Procedure requires that the decision be issued by the judges who heard the case immediately before the decision is issued but does not specify the type of their participation. It should be understood, however, as the requirement that a judge takes part in the entire hearing immediately

22

before the decision is issued. It is mainly the literal interpretation of Art. 323 of the Code of Civil Procedure that points to such understanding, because it mentions the judges who heard the case. A judge who participated in only a part of the hearing immediately before the decision was issued may not participate in issuing the decision because such judge did not hear the case, only its part. Allowing for an interpretation that partial participation is still sufficient would make it necessary to decide the ratio between the part of the hearing in which a judge participates to the part in which he does not. Establishing such ratio would not be a simple matter. Art. 323 of the Code of Civil Procedure is not aimed at providing for a merely formal participation of a judge in a small part of the last hearing but at assuring the decision is issued by judges who were assigned to the judicial panel for the last hearing. The goal is to allow the entire panel to become familiar with the entire material that accumulated in the case, and to allow the parties to refer to that material at any time during the hearing before the judges who later issue the judgment (decision) in the case.

The violation of Art. 323 of the Code of Civil Procedure is all the more obvious due to the fact it was a change of the reporting judge. The judicial panel issuing the decision was missing the judge who was most familiar with the complex issues of the case under consideration. The court should have continued the case, not only because of the clear standard imposed by Art. 323 of the Code of Civil Procedure, but also in order for the new judge, as well as for the other judges, to have an opportunity to familiarize themselves with the entire evidence, and select the new date that would allow the judges, and most of all the new judge, to become familiar with the entire material in the case. By allowing the decision to be issued in such a complex case, both legally and factually, in the manner chosen by the Regional Court violated therefore not only Art. 323 of the Code of Civil Procedure but also the constitutionally guaranteed right to a fair trial (Art. 45 section 1 of the Constitution).

Therefore the claim that the Appellate Court violated Art. 378 § 1, Art. 379 clause 4 and Art. 386 § 2 of the Code of Civil Procedure by not considering invalidity of the procedure before the lower court, caused by the fact the decision of the lower court was issued by

23

a judicial panel of an unlawful composition is also valid. The violation materially influenced outcome of the case and it is the basis for overturning the Appellate Court - decision dated March 29, 2006. The fact that the proceedings before the lower court were invalid, justifies the Supreme Court decision to overturn also the Regional Court decision dated February 5, 2005 (At. 398[15] § of the Code of Civil Procedure). It would not make sense for the Supreme Court to limit itself to overturning the decision of the Appellate Court if that Court, considering the fact the proceedings before the lower court were invalid, would – in the correct application of Art. 378 § 1, Art. 379 clause 4 and Art. 386 § 2 of the Code of Civil Procedure – have to overturn the February 2, 2005 decision of the Regional Court, to annul the proceedings, and to send the case for reconsideration.

The fact the Appellant in its last resort appeal complaint raised the claim that the Appellate Court violated Art. 378 § 1, Art. 379 clause 4, and Art. 386 § 2 of the Code of Civil Procedure by not considering the invalidity of the procedure before the lower court, due to the fact the decision of the lower court was issued by a judicial panel of an unlawful composition is sufficient for the validity of the claim, even though it is differently argued in the last resort appeal complaint itself. Besides, the assertion made by the Appellant in the brief dated January 15, 2007 that Art. 323 of the Code of Civil Procedure was violated by the lower court constitutes a new argument for the grounds of the appeal already established in the complaint, and that is admissible under Art. 398[13] § 3 of the Code of Civil Procedure.

IV. The findings that there is grounds for overturning the appealed decision makes it unnecessary to deliberate in detail other claims raised in the last resort appeal complaint. The Supreme Court cannot give detailed direction regarding the further action. Considering the fact that lower courts are bound by the Court position, it would indeed limit the right to have a case heard by a lower, and then a higher court, guaranteed in Art. 176 clause 1 of the Constitution. For the same reason, it is also unjustified to present the legal issue submitted by Telco before the Supreme Court in its expanded composition pursuant to Art. 398[17] of the Code of Civil Procedure,. However, two issues should be brought to the attention, and considered as a condition for the proper character of the new proceedings for recognition of the judgment,

of the Arbitration Tribunal.

In the light of the doctrine, it is an established position that the proceedings for recognition of a foreign decision is a special case of jurisdictional proceedings, usually taking an adversarial form. That is why beside the petitioner, for whom the source of active standing in the case is his legal interest (Art. 1147 § 1 of the Code of Civil Procedure), all other entities who participated in foreign proceedings as a party or a participant, must participate in the recognition proceedings, because the material enforceability of the decision affects them.  Therefore, they are entitled to a passive standing in the case. This includes also assignees of the parties, if any, if the material enforceability of the decision affects them. The only acceptable exception from the rule would be a situation when a petition for recognition of a foreign decision would pertain only to parts of the matters of the decision, and that part would not involve all parties, or participants in the proceedings. Under such circumstances, it would be necessary only for the parties or participants in the proceedings who are affected by the part of the decision mentioned in the petition for recognition to participate in the proceedings. It should be mentioned that also provisions of the New York Convention are based on the premise that both the petitioner and the party against whom the decision was taken participate in the proceedings for recognition of a foreign arbitration decision. (Art. IV section 1 and Art. V section 1). Relating these findings to the circumstances of the case, it is found that Telco should participate in the proceedings for recognition of the Arbitration Tribunal decision as a full participant in the proceedings because it is entitled to passive standing in the case. That is because Telco was a party to the proceedings before the Arbitration Tribunal in Vienna, where the decision submitted for recognition was issued. The petition for recognition is limited to a part of the decision but the part contains findings affecting Telco. Proceedings for recognition of a foreign arbitration decision are governed by applicable procedural rules (Art. 13 § 2 of the Code of Civil Procedure) Their special character comes from the fact that the decisions in the case do not pertain to rights and obligations of the parties but to whether a foreign decision should be effective

25

in Poland. That is why the rules for primary and secondary interventions do not apply. According to Art. 75 of the Code of Civil Procedure, the primary intervention makes it possible to act as a plaintiff against both parties in the case, where the matter decided between the parties is an object or a right. The proceedings for recognition of a foreign court decision are not a procedure where rights of parties are directly decided; it boils down to findings, based on a precise set of criteria, if a foreign decision should be recognized. Therefore, that institution should not be used in the proceedings for recognition of a foreign court decision. The secondary intervention may not be used either, for similar reasons. In addition, circumstances of the matter do not create a basis for the use of a secondary intervention because the Appellant's legal interest rests not in deciding the case for one of the parties, but provide the Appellant with the title to appear in the case as a participant.

In the repeated proceedings, it should be considered if the Arbitration Tribunal was authorized to hear the case regarding assessment of validity of ownership transfer by Elektrim of 226,079 PTC shares to Telco. The answer to the question depends on establishing whether the arbitration clause, in such form as it exists in Art. 21 of the PTC shareholder agreement, includes also a decision on validity of a legal action where one entity, a PTC shareholder, transfers the right to its shares onto a different entity who, as a result of this action, becomes a PTC shareholder. To answer this question, first it is necessary to decide what law is applicable to the assessment of the arbitration clause. When deciding on the applicable law for the arbitration clause, Art. V section I of the New York Convention, indicating applicable law for assessing the validity of the clause, should be considered.

Once the applicable law is established, it should become the basis for interpretation of the arbitration clause, to the extent allowed under the law, with regards to both the literal content of the agreement as well as intent of the parties and the purpose of the agreement. In order to decide on the scope of the clause asserting applicability of arbitration to all disputes among the partners, and between the partners and the company, under the partnership agreement, or under other agreements related thereto,

26

it may be important to consider conduct of the parties during the arbitration before the Arbitration Tribunal in Vienna. The statements made before the Tribunal may shed light on the intent of the parties when they entered into the agreement regarding the arbitration of disputes, and what their understanding was in regard to the jurisdiction of the selected arbitration court. Evaluation of that conduct may allow to answer the basic question in the petition for recognition of the Arbitration Tribunal decision, that is, whether or not the Tribunal's jurisdiction included deciding on the validity of Elektrim's statement as an element of a legal procedure resulting in the transfer of PTC shares to Telco.

After that issue is resolved, it will be possible to evaluate other problems related to the recognition of the decision, whether or not it is internally contradictory, whether or not it may be recognized partially, and whether or not it violates the basic public policies of the Republic of Poland.

In consideration of the above, the Supreme Court, pursuant to Art. 398[15] § 1 of the Code of Civil Procedure, decided as above

THE SUPREME COURT
CIVIL SECTION
DEPARTMENT I

The original bears appropriate
signatures
This is a true and correct copy as
certified by:
Senior Clerk of the Court
[signature]
Anna Matura

084

<u>TRANSLATOR'S CERTIFICATE</u>

I, _TOMIAN POPLAWSKI_, declare under penalty of perjury that I am thoroughly competent in both Polish and English, and that the foregoing document is a true and correct translation of the attached document, which I translated from Polish to English, on this ....77...... day of ...MAY.2..., 2007.

.................................................

Translated document:

decision-t-mobile-supreme

Sygn. akt I CSK 330/06

# POSTANOWIENIE

Dnia 18 stycznia 2007 r.

Sąd Najwyższy w składzie :

SSN Józef Frąckowiak (przewodniczący, sprawozdawca)

SSN Henryk Pietrzkowski

SSN Grzegorz Misiurek

Protokolant Ewa Krentzel

w sprawie z wniosku Elektrim S.A. z siedzibą w Warszawie

przy uczestnictwie T-Mobile Deutschland GmbH z siedzibą w Bonn

z udziałem interwenienta ubocznego Elektrim Telekomunikacja

Spółki z o.o. z siedzibą w Warszawie

o uznanie za skuteczny na obszarze Polski wyroku zagranicznego sądu polubownego,

przy udziale Prokuratora Prokuratury Krajowej - Jana Szewczyka

po rozpoznaniu na rozprawie w Izbie Cywilnej w dniu 18 stycznia 2007 r.,

skargi kasacyjnej interwenienta ubocznego

od postanowienia Sądu Apelacyjnego w Warszawie

z dnia 29 marca 2006 r., sygn. akt I ACa 893/05,

**uchyla zaskarżone postanowienie oraz postanowienie Sądu Okręgowego w Warszawie z dnia 2 lutego 2005 r. sygn. akt VII Co 1709/04, znosi postępowanie przed tymi Sądami i przekazuje sprawę Sądowi Okręgowemu w Warszawie do ponownego rozpoznania i rozstrzygnięcia o kosztach postępowania kasacyjnego.**

Na oryginale właściwe podpisy
Za zgodność:
Starszy sekretarz sądowy

*Anna Matura*

2

Uzasadnienie

W związku zapowiedzią wydawania w Polsce koncesji nowym podmiotom, które miałyby świadczyć usługi w sieciach komórkowych oraz rozszerzeniem udziału podmiotów zagranicznych w spółkach telekomunikacji komórkowej, Elektrim S.A. (dalej Elektrim) oraz T - Mobile Deutschland GmbH (dawniej DeTe Mobil Deutsche Telekom Mobilnet Gmbh, dalej zwany TMD) wraz z innymi podmiotami zawarły w dniu 21 grudnia 1995 r. umowę wspólników oraz w dniu 20 grudnia 1995 r. umowę spółki z ograniczoną odpowiedzialnością działającej pod firmą Polska Telefonia Cyfrowa (dalej PTC). W umowie wspólników określono między innymi warunki zbywania udziałów w PTC, uzależniając takie zbycie od wyrażenia na to zgody przez wszystkich członków rady nadzorczej tej spółki oraz zdefiniowano w jej art. 16 tzw. istotne naruszenie umowy i określono co należy rozumieć przez istotne pogorszenie ekonomiczne strony. W tym samym postanowieniu umowy wspólników ustalono także konsekwencje istotnego naruszenia umowy, które ogólnie rzecz ujmując sprowadzały się do przyznania przez każdą ze stron nieodwołalnej opcji nabycia udziałów w spółce PTC po cenie ustalonej w umowie wspólników, w razie dopuszczenie się istotnego naruszenia umowy, prowadzącego do stanu istotnego pogorszenia ekonomicznego strony. Istotne naruszenie umowy miało zostać stwierdzone przez sąd arbitrażowy. Natomiast w art. 21 umowy spółki postanowiono, że w przypadku jakichkolwiek sporów powstałych na podstawie lub w związku z tymi umowami spór taki zostanie rozwiązany, w miarę możliwości drogą negocjacji pomiędzy wspólnikami. W przypadku, gdy negocjacje takie zakończą się niepowodzeniem oraz o ile wspólnicy nie postanowią inaczej, wszelkie spory pomiędzy wspólnikami oraz pomiędzy nimi a spółką powstałe na podstawie umów spółki albo w związku z innymi umowami odnoszącymi się do umowy spółki miały być ostatecznie, wiążąco rozstrzygane przez Sąd Arbitrażowy przy Federalnej Izbie Handlowo – Przemysłowej w Wiedniu, w składzie trzech arbitrów, z zastosowaniem Regulaminu tego sądu. Podobnie brzmiącą klauzulę arbitrażową zawierała także

umowa wspólników.

W wyniku prowadzonych negocjacji i uzgodnień, co do planowanych przez spółkę prawa francuskiego Vivendi S.A. inwestycji w spółkę Elektrim Telekomunikacja Spółka z o.o., (dalej Telco) - której jedynym udziałowcem w tym czasie był Elektrim - spółki te (Elektrim Vivendi i Telco) w celu przejęcia kontroli nad PTC, podpisały w dniu 7 czerwca 1999 r umowę inwestycyjną (zmienioną następnie w dniu 28 lipca, 7 września i 7 grudnia 1999 r.). Wykonując tę umowę Elektrim zobowiązał się przenieść całość swoich udziałów w PTC na rzecz Telco. Udziały PTC stanowiły wkład niepieniężny (aport), który Elektrim miał wnieść na pokrycie udziałów objętych w podwyższonym kapitale zakładowym Telco. W ocenie Elektrimu i Telco, oświadczenie woli stanowiące składnik czynności prawnej, na podstawie której udziały w PTC przeszły na Telco, Elektrim skutecznie złożył w dniu 9 grudnia 1999 r.

W dniu 7 grudnia 2000 r. Trybunałowi Arbitrażowemu w Wiedniu przedstawiony został przez TMD do rozstrzygnięcia spór, z udziałem w charakterze pozwanych Elektrimu i Telco, związany z przeniesieniem należących do Elektrimu udziałów w spółce z ograniczoną odpowiedzialnością PTC na rzecz Telco. TMD domagał się między innymi rozstrzygnięcia czy własność udziałów w PTC została skutecznie przeniesiona na rzecz Telco, zasądzenia od tej spółki odszkodowania oraz stwierdzenia, że Elektrim podejmując próbę zbycia udziałów na rzecz Telco dopuścił się istotnego naruszenia w rozumieniu art. 16 ust. 1 umowy wspólników.

W dniu 26 listopada 2004 r. Trybunał Arbitrażowy przy Międzynarodowym Centrum Arbitrażu Austriackiej Federalnej Izby Gospodarczej w Wiedniu wydał Drugie Częściowe Orzeczenia w sprawie o sygn. SCH - 4750 (dalej powoływanego jako wyrok Trybunału Arbitrażowego), w którym stwierdził, że: 1) zbycie na rzecz Telco jest bezskuteczne i udziały PTC, które były jego przedmiotem pozostawały własnością Elektrimu w każdym właściwym czasie; 2) zbycie udziałów na rzecz Telco nie stanowi jako takie istotnego naruszenia w rozumieniu art. 16. ust. 1 umowy wspólników, ale stanowiłoby (takie istotne naruszenie) gdyby Elektrim nie odzyskał udziałów od Telco w przeciągu najdalej dwóch miesięcy od doręczenia wyroku; 3) żądanie TMD odnośnie do „stanu istotnego pogorszenia" zostaje

4

oddalone; 4) Trybunał Arbitrażowy nie ma jurysdykcji nad Telco i roszczenia TMD względem wspomnianego podmiotu nie mogą być przedmiotem tego arbitrażu; 5) roszczenie TMD o odszkodowanie pieniężne zostało wycofane; 6) kwestia kosztów arbitrażu w odniesieniu do niniejszego postępowania zostaje zastrzeżona do rozstrzygnięcia w odrębnym orzeczeniu; 7) wszelkie inne roszczenia lub roszczenia wzajemne stron zostają oddalone.

We wniosku, skierowanym do Sądu Okręgowego w Warszawie, z dnia 17 grudnia 2004 r. Elektrim jako wnioskodawca, wskazując jako uczestnika postępowania tylko TMD, domagał się uznania za skuteczną na obszarze Polski część przywołanego powyżej orzeczenia Trybunału Arbitrażowego w Wiedniu z dnia 26 listopada 2004 r. Jak wynika z treści wniosku, Elektrim domagał się uznania tylko punktów pierwszego, drugiego i trzeciego tego orzeczenia. Wnioskodawca twierdził, że nie zachodzi żadna z negatywnych przesłanek uznania, o których stanowi Konwencja o uznawaniu i wykonywaniu zagranicznych orzeczeń arbitrażowych, sporządzona w Nowym Jorku dnia 10 czerwca 1958 r. (Dz.U. z 1962 r., nr 9, poz. 41, zwana dalej Konwencją Nowojorską).

Udział w postępowaniu przed Sądem Okręgowym zgłosiła Telco, składając wniosek o dopuszczenie jej do udziału w postępowaniu w charakterze uczestnika – a po odrzuceniu tego wniosku przez Sąd Okręgowy postanowieniem z dnia 12 stycznia 2005 r. - w dniu 25 stycznia 2005 r. złożyła interwencję uboczną oraz interwencję główną. Sąd Okręgowy, po przeprowadzeniu w dniu 26 stycznia 2005 r. rozprawy, w toku której wnioskodawca zgłosił opozycję, postanowieniem z dnia 26 stycznia 2005 r. nie dopuścił Telco do udziału w sprawie w charakterze interwenienta głównego i ubocznego.

Działając w charakterze interwenienta, do czasu uprawomocnienia się postanowienia o odmowie dopuszczenia do działania w takim charakterze, Telco wniosła o oddalenie wniosku o uznanie orzeczenia Trybunału Arbitrażowego. Interwenient uboczny twierdził, że wspomniane orzeczenie składa się z 7 części i uznanie tylko niektórych z nich wypacza jego sens. Ponadto wskazał, że orzeczenie to narusza zasady porządku publicznego, w szczególności art. 8 Konstytucji RP, prawo do sądu i bezpodstawnie pozbawia go prawa

do 226 079 udziałów w PTC.

W dniu 26 stycznia 2005 r. złożone zostało w Sądzie Okręgowego pismo zawierające interwencję uboczną spółki z o.o. Carcom Warszawa po strome TMD oraz wniosek o oddalenie wniosku o uznanie orzeczenia arbitrażowego. Tego samego dnia, w czasie trwania rozprawy przed Sądem Okręgowym, do akt sprawy wpłynęło pismo spółki Carcom Warszawa zawierające wniosek o wyłączenie sędziego sprawozdawcy. Wniosek ten nie został rozpoznany. Podczas ogłoszonej przerwy w rozprawie zarządzeniem przewodniczącego wydziału dokonano zmiany składu orzekającego przez wprowadzenie w miejsce sędziego przewodniczącego, będącego jednocześnie sprawozdawcą, nowego sędziego, a na sędziego sprawozdawcę wyznaczono innego sędziego z dotychczasowego składu sądu.

Po przerwie Sąd Okręgowy w nowym składzie zamknął rozprawę, a następnie odroczył ogłoszenie postanowienia rozstrzygającego o wniosku o uznanie. Postanowienie to zostało ogłoszone 2 lutego 2005 r. Na mocy tego postanowienia Sąd Okręgowy uwzględnił wniosek o częściowe uznanie wyroku Trybunału Arbitrażowego z 26 listopada 2004 r. w całości. Zdaniem Sądu Okręgowego takie uznanie było w pełni dopuszczalne, gdyż wnioskodawca złożył w postępowaniu, wymagane w art. IV Konwencji Nowojorskiej dokumenty oraz nie zachodziła żadna z przesłanek, która uzasadniałaby odmowę uznania w świetle postanowień tej Konwencji. Sąd po dokonaniu analizy stanowisk uczestniczących w sprawie podmiotów, w tym Telco, której argumenty wobec nieprzyznania jej żadnej pozycji procesowej wziął pod rozwagę z urzędu, doszedł do przekonania, że wspomniany wyrok Trybunału Arbitrażowego nie jest wewnętrznie sprzeczny. Trybunał nie przekroczył swojej kompetencji wynikającej z zapisu na sąd polubowny, wyrok ten nie narusza klauzuli porządku publicznego; a także jego częściowe uznanie, biorąc pod uwagę treść tego wyroku, było dopuszczalne w świetle przepisów Konwencji Nowojorskiej.

Postanowieniem z dnia 11 maja 2005 r. Sąd Apelacyjny uchylił postanowienie Sądu Okręgowego z dnia 26 stycznia 2006 r. w części odmawiającej dopuszczenia Telco do udziału w sprawie w charakterze interwenienta ubocznego

wskazując, że zażalenie złożone przez nią było zażaleniem na postanowienie o niedopuszczenie interwenienta do udziału w sprawie wskutek uwzględnienia opozycji wnioskodawcy.

Postanowienie Sądu Okręgowego w Warszawie w przedmiocie uznania części orzeczenia Trybunału Arbitrażowego w Wiedniu zostało zaskarżone apelacjami złożonymi przez Prokuratora Okręgowego, Carcom Warszawa Sp. z o.o. oraz przez Telco działającej w charakterze uczestnika, interwenienta głównego i interwenienta ubocznego. Apelacje wywiedzione przez Telco w charakterze uczestnika i interwenienta głównego zostały odrzucone postanowieniem Sądu Okręgowego z dnia 17 maja 2005 r. i postanowieniem Sądu Apelacyjnego z dnia 29 marca 2006 r. Apelacja Carcom Warszawa została odrzucona postanowieniem Sądu Apelacyjnego z dnia 20 grudnia 2005 r.

W apelacji złożonej w charakterze interwenienta ubocznego Telco domagała się zmiany zaskarżonego postanowienia i oddalenia wniosku lub uchylenia zaskarżonego postanowienia i przekazania sprawy do ponownego rozpoznania Sądowi Okręgowemu. Zaskarżonemu orzeczeniu Telco zarzuciła w szczególności naruszenie art. 379 pkt 5 k.p.c., przez pozbawienie jej możności obrony swoich praw, co skutkowało nieważnością postępowania oraz art. 1147 § 1 k.p.c. przez niedopuszczenie jej do udziału w sprawie w charakterze uczestnika, czym została pozbawiona możliwości obrony swych praw w postępowaniu o uznanie orzeczenia zagranicznego sądu polubownego. Interwenient zarzucił także naruszenie art. 50 § 3 k.p.c., art. 217 § 2 k.p.c. i 224 § 1 k.p.c. przez zamknięcie rozprawy w sytuacji, gdy nie nastąpiło jeszcze ostateczne ukształtowanie stron postępowania oraz wydania postanowienia o niedopuszczeniu Telco do udziału w postępowaniu w charakterze interwenienta ubocznego przez sędziego, wobec którego złożono wniosek o wyłączenie, jak również w związku z faktem, że w trakcie rozprawy zmienił się skład orzekający i nowy sędzia nie miał możliwości zapoznania się z aktami liczącymi kilkaset stron. Ponadto Telco zarzuciła naruszenie art. III, art. V ust. 2 lit. b i art. V ust. 1 lit. c Konwencji Nowojorskiej przez przyjęcie przez Sąd Okręgowy, że wyrok może być uznany w części, że nie narusza on podstawowych zasad porządku prawnego RP oraz iż nie wykracza poza zakres klauzuli arbitrażowej.

W apelacji Prokuratora Prokuratury Okręgowej zarzucono naruszenie art. 1147 § 1 k.p.c., co doprowadziło do pozbawienia Telco uczestnictwa i obrony jej prawa w postępowaniu przed Sądem Okręgowym oraz naruszenie art. V ust. 1 lit. d Konwencji Nowojorskiej przez wydanie orzeczenia bez zapoznania się z prawem, wedle którego orzeczenie Trybunału Arbitrażowego zostało wydane.

Oddalając apelację Telco Sąd Apelacyjny uznał, że nie zachodzi zarzucana przez interwenienta nieważność postępowania. Telco nie uzyskała co prawda statusu uczestnika w postępowaniu w przedmiocie uznania orzeczenia Trybunału Arbitrażowego, ale miała możliwość obrony swych praw działając jako interwenient uboczny w trakcie praktycznie całego postępowania. Już bowiem w dniu 25 stycznia 2005 r. Telco złożyła pismo zawierające interwencję uboczną, w której, sprzeciwiając się wnioskowi, przedstawiła swoje stanowisko (nie odbiegające od zarzutów apelacji). Stanowisko to zostało podtrzymane w toku rozprawy w dniu 26 stycznia 2005 r. i stan taki istniał w chwili wyrokowania przez Sąd Okręgowy. Jak podkreślił Sąd Apelacyjny z art. 78 § 3 k.p.c. wynika, że osoba trzecia uzyskuje status interwenienta ubocznego już z chwilą wniesienia do sądu pisma. Zatem skarżący status taki uzyskał w dniu 25 stycznia 2005 r. i uwzględniając treść postanowienia Sądu Apelacyjnego z dnia 11 maja 2005 r., status ten zachował do zakończenia postępowania w II instancji.

Nie negując stanowiska przedstawionego w apelacji, że status strony i status interwenienta ubocznego różnią się (uprawnienia procesowe strony są niewątpliwie szersze) Sąd Apelacyjny podkreślił, że dla stwierdzenia czy skarżąca została pozbawiona możności obrony swoich praw niezbędne byłoby wykazanie, że w innym niż przyznanym jej statusie procesowym dokonałaby czynności procesowych lepiej chroniących jej interes prawny. W ocenie Sądu Apelacyjnego skarżąca nie mogłaby podjąć, bardziej niż dokonane, skutecznych czynności procesowych. Skarżąca wypowiadała się w pismach procesowych i na rozprawie, wniosła środek odwoławczy i wszystkich tych czynności procesowych dokonałby także jako uczestnik postępowania delibacyjnego. Różnica w statusie miała charakter formalny, skoro materialnie skarżąca dokonała wszystkich czynności procesowych, możliwych również dla strony, według stanu sprawy.

8

Niezasadne było również powołanie się przez skarżącą na naruszenie art. 1147 § 1 k.p.c., dla uzasadnienia zarzutu pozbawienia jej możności obrony swoich praw. Zdaniem Sądu II instancji powołany przepis rozstrzyga tylko o legitymacji do wszczęcia postępowania delibacyjnego i nie odnosi się do ustalenia tego, czy Telco przysługuje legitymacja bierna w postępowaniu o uznanie w Polsce orzeczenia zagranicznego sądu polubownego.

Za nieskuteczny Sąd Apelacyjny uznał także zarzut naruszenia art. 224 k.p.c. Sąd Okręgowy zamknął rozprawę po wysłuchaniu głosów stron (zgodnie z art. 224 k.p.c.); zamknięciu rozprawy nie stała natomiast na przeszkodzie nieprawomocność postanowienia o niedopuszczeniu skarżącego do udziału w sprawie w charakterze interwenienta ubocznego, a to ze względu na uregulowania zawarte w art. 78 § 3 k.p.c. w zw. z art. 76 k.p.c. Jako nie mające znaczenie dla rozstrzygnie sprawy uznał Sąd Apelacyjny zmiany, które dokonane zostały w składzie sądu na rozprawie poprzedzającej wydanie postanowienia merytorycznie kończącego postępowanie w sprawie. Nie podzielił również Sąd II instancji stanowiska Telco, że ze względu na istotne naruszenia Konwencji Nowojorskiej, Konstytucji RP oraz przepisów k.c. i k.p.c. wyrok Trybunału Arbitrażowego z dnia 24 listopada 2004 r. nie może być uznany zgodnie z wnioskiem Elektrimu.

Oddalając apelację Prokuratora Sąd Apelacyjny wskazał, odsyłając do argumentów, których użył przy rozważaniu takiego samego zarzutu Telco, że nie było ona pozbawiona prawa możności obrony swoich praw. Przytaczając treść powołanego w apelacji art. V ust. I d Konwencji Nowojorskiej Sąd Apelacyjny stwierdził, że interwenient w ogóle nie powoływał się na ten zarzut naruszenia Konwencji, wobec tego Prokurator miał obowiązek przeprowadzenia dowodu istnienia przesłanki przewidzianej wspomnianym postanowieniem Konwencji. Skoro tego nie uczynił, to zarzut taki jest chybiony.

W skardze kasacyjnej interwenient uboczny zarzucił naruszenie licznych przepisów prawa materialnego przez ich niezastosowanie: 1) art. 65 k.c. w zw. z art. 697 § 1 k.p.c. w zw. art. 698 § 2 k.p.c. w zw. art. 1105 § 2 k.p.c.; 2) art. 56 k.c. w zw. z art. 697 § 1 k.p.c. i art. 698 § 1 k.p.c. w zw. art. 1105 § 2 k.p.c.;  3) art. 56

k.c. w zw. z art. 698 § 2 k.p.c. w zw. z art. 697 § 1 k.p.c. w zw. z art. 1105 § 2 k.p.c.
i w związku z art. II Konwencji Nowojorskiej; 4) naruszenie art. 56 i 65 k.c.- zarzuty
w punktach 1-4 sprowadzają się do tego, że Sąd Apelacyjny nie wziął
wspomnianych przepisów pod uwagę przy wykładni zapisu na sąd polubowny
zawarty w umowie spółki PTC; 5) art. 21, 64 oraz art. 45 ust. 1 Konstytucji w zw.
z art. 77 ust. 2 i art. 177 Konstytucji RP w zw. z art. 2 k.p.c. w zw. z art. 1 k.c. -
przepisy te gwarantują skarżącej prawo do 226 079 udziałów w PTC, których wyrok
bezpodstawnie ją pozbawia.

Ponadto interwenient uboczny zarzucił naruszenie przepisów postępowania:
1) art. V ust. I litera c Konwencji o Uznawaniu i Wykonywaniu Zagranicznych
Orzeczeń Arbitrażowych polegające na uznaniu skuteczności wyroku Trybunału
Arbitrażowego z dnia 26 listopada 2004 r. podczas gdy zawarte w nim
rozstrzygnięcie o bezskuteczności czynności prawnej przenoszącej udziały
z dotychczasowego wspólnika na Skarżącą przekracza zakres zapisu na sąd
polubowny zawartego w art. 21 ust. 2 Umowy Spółki Polska Telefonia Cyfrowa Sp.
z o.o.; 2) art. III oraz art. V ust. 1 litera c Konwencji Nowojorskiej i art. 1145 § 1
k.p.c. polegające na zdeformowaniu Wyroku w toku postępowaniu delibacyjnego
przez uznanie za dopuszczalne częściowego uznania Wyroku i przez
przekroczenie uprawnień przez Sąd Apelacyjny; 3) art. V ust. 2 litera b Konwencji
Nowojorskiej w zw. z art. 325 k.p.c. w zw. z art. 2 Konstytucji RP w zw. z art. 2
k.p.c. w zw. z art. 1 k.c. w zw. z art. 697 k.p.c. i w zw. z art. 1105 § 2 k.p.c. –
w związku z naruszeniem przepisów prawa materialnego przez ich
niezastosowanie, tj. art. 21, art. 64, art. 177, art. 45 ust. 1, art. 77 ust. 2 Konstytucji
RP, polegające na błędnym uznaniu przez Sąd Apelacyjny zgodności Wyroku
z polskim porządkiem publicznym; 4) art. III Konwencji Nowojorskiej w zw. z art. V
ust. 1 litera c Konwencji Nowojorskiej w zw. z art. 7 Konstytucji RP i w zw. z art. 1
k.p.c. przez zaniechanie ustalenia i analizy prawa, wedle którego przedmiotowe
orzeczenie zostało wydane, tzn. bez ustalenia podmiotowego i przedmiotowego
zakresu prawomocności Wyroku według prawa miejsca wydania (prawa
austriackiego); 5) art. IV ust. I litera b Konwencji Nowojorskiej w zw. z art. V ust. 1
litera c Konwencji Nowojorskiej, polegające na uznaniu, że „warunki z art. IV
Konwencji" zostały spełnione; podczas gdy nie przedłożono ani oryginału ani

10

uwierzytelnionego odpisu tej umowy zawierającej zapis na sąd polubowny, a niezależnie od tego Skarżąca nie zawarła nigdy takiej umowy i nie jest jej stroną; 6) art. 72 § 2 k.p.c. i art. 73 k.p.c. w zw. z art. 195 k.p.c. w zw. z art. 13 § 2 k.p.c. w zw. z art. 1147 i art. 1148 k.p.c. przez ich błędną wykładnię polegającą na przyjęciu, że osoba uczestnicząca w charakterze pozwanego w zagranicznym postępowaniu arbitrażowym nie jest koniecznym uczestnikiem postępowania delibacyjnego w przedmiocie uznania orzeczenia zapadłego w tymże postępowaniu arbitrażowym; 7) art. 378 § 1 k.p.c. i art. 379 pkt 5 k.p.c. i art. 386 § 2 k.p.c., w zw. art. 72 § 2 k.p.c.. art. 78 § 2 i 3 k.p.c., art. 128 k.p.c., art. 156 k.p.c., art. 195 § 2 k.p.c., art. 215 k.p.c., art. 224 k.p.c., art. 225 k.p.c. i art. 316 k.p.c. w zw. z art. 13 § 2 k.p.c. polegające na błędnym uznaniu, iż nie zachodziła nieważność postępowania przed Sądem Okręgowym, wynikającym z nieprawidłowego przyjęcia, że nie doszło do pozbawienia Skarżącej możności obrony jej praw w postępowaniu przed Sądem Okręgowym; 8) art. 378 § 1 k.p.c., art. 379 pkt 5 k.p.c. i art. 386 § 2 k.p.c. w zw. z art. 13 § 2 k.p.c. i naruszenie art. 32 ust. 1 Konstytucji RP polegające na nieuwzględnieniu przez Sąd Apelacyjny w skarżonym postanowieniu naruszenia przez sąd pierwszej instancji zasady równości stron i zasady kontradyktoryjności postępowania delibacyjnego; 9) art. 378 § 1 k.p.c., art. 379 pkt 4 k.p.c. i art. 386 § 2 k.p.c. w zw. z art. 13 § 2 k.p.c., polegające na nie wzięciu pod uwagę z urzędu, iż zachodzi nieważność postępowania przed Sądem Okręgowym w Warszawie, wynikająca ze sprzeczności składu orzekającego z przepisami prawa, tj. § 64 i § 67 ust. 1 pkt 2 Regulaminu wewnętrznego urzędowania sądów powszechnych, a to wobec dokonania w toku rozprawy zmiany składu orzekającego (sędziego referenta) bez zaistnienia przesłanki „wyjątkowości" oraz w taki sposób, iż nowy członek tego składu nie miał możliwości zaznajomienia się z aktami sprawy; 10) art. 378 § I k.p.c., art. 379 pkt 5 k.p.c. i art. 386 § 2 k.p.c. w zw. z art. 45 ust. 1 Konstytucji RP w zw. z art. 13 § 2 k.p.c. w zw. z naruszeniem art. 6 ust. I Konwencji o ochronie praw człowieka i podstawowych wolności sporządzonej w Rzymie dnia 4 listopada 1950 roku, polegające na nieuwzględnieniu tego, że Skarżąca została pobawiona możności obrony jej praw w postępowaniu przed sądem pierwszej instancji także na skutek naruszenia prawa do rzetelnego i sprawiedliwego procesu przed bezstronnym sądem; 11) art. 380

k.p.c. w zw. z art. 378 § 1 k.p.c. w zw. z art. 13 § 2 k.p.c.; 12) art. 386 § 6 k.p.c. w zw. z art. 397 § 2 k.p.c. w zw. z art. 13 § 2 k.p.c. polegające na przyjęciu przez Sąd Apelacyjny przy wydawaniu zaskarżonego postanowienia odmiennej oceny prawnej co do koniecznego udziału Skarżącej w niniejszym postępowaniu, niż wyrażona w uzasadnieniu postanowienia tegoż sądu z dnia 11 maja 2005 roku (sygn. akt I A Cz 449/05), pomimo że Sąd Apelacyjny uznał się związany oceną prawną zawartą w uzasadnieniu tegoż postanowienia.

Wnioskodawca i uczestnik postępowania w odpowiedzi na skargę kasacyjną wnieśli o jej odrzucenie jako niedopuszczalnej ewentualnie wskazując, że podniesione w skardze kasacyjnej zarzuty są całkowicie nieuzasadnione, o jej oddalenie.

Skarżąca w piśmie procesowym z dnia 8 stycznia złożyła wniosek aby, na zasadzie art. 398[17] § 1 k.p.c., przekazać do rozstrzygnięcia przez powiększony skład Sądu Najwyższego występujących w niniejszej sprawie i budzących poważne wątpliwości prawne zagadnień przedstawionych w skardze kasacyjnej i w tym piśmie.

Ponadto już w trakcie postępowania kasacyjnego zarówno Telco jak i Elektrim i TMD przedstawiły obszerne pisma stanowiące uzupełnieni ich stanowisk zawartych w skardze kasacyjnej i w odpowiedziach na tę skargę. Między innymi w piśmie procesowym z 15 stycznia 2007 r. Telco przedstawiła dodatkowe uzasadnienie zarzutu nieważności postępowania przed sądem I instancji wskazując, że skład sądu nie był właściwy w rozumieniu art. 323 k.p.c.

Sąd Najwyższy zważył, co następuje:

I. Rozpoznawana sprawa dotyczy uznania w Polsce wyroku Trybunału Arbitrażowego z dnia 26 listopada 2004 r. wydanego w Wiedniu, a więc wyroku sądu polubownego zapadłego za granicą. Postępowanie w sprawach o uznanie wyroków zagranicznych sądów polubownych jest uregulowane obecnie w przepisach Tytułu VIII Części V k.p.c. (art. 1212 do 1217). Wspomniane przepisy, zgodnie z art. 3 ustawy z dnia 28 lipca 2005 r. o zmianie ustawy – Kodeks postępowania cywilnego (Dz.U. Nr 178, poz. 1478), weszły w życie z dniem 17 października 2005 r. Jak wynika z art. 2 ustawy z dnia 28 lipca 2005 r.,

postępowania o stwierdzenie skuteczności wyroku sądu polubownego lub stwierdzenie jego wykonalności, wszczęte przed wejściem w życie tej ustawy, toczą się według przepisów dotychczasowych.

Z uwagi na sformułowanie tego przepisu może powstać wątpliwość, czy dotyczy on także postępowań o uznanie wyroków zagranicznych sądów polubownych. Przepis art. 2 ustawy nowelizującej posługuje się bowiem pojęciem postępowań przed sądami (państwowymi) co do stwierdzenia skuteczności wyroku sądu polubownego i postępowań co do stwierdzenia wykonalności wyroku sądu polubownego. Terminologia ta nawiązuje do unormowań obowiązujących przed wejściem w życie ustawy z dnia 28 lipca 2005 r., tj. do dawnego art. 711 § 2-5 k.p.c., w którym mowa była o stwierdzeniu skuteczności oraz o stwierdzeniu wykonalności wyroków sądów polubownych wydanych w Polsce, oraz do dawnego art. 1150 § 2 k.p.c., który odnosił się do stwierdzenia wykonalności wyroków sądów polubownych wydanych za granicą.

W związku z tym, że przed wejściem w życie ustawy z dnia 28 lipca 2005 r. kodeks postępowania cywilnego formalnie nie zawierał unormowań dotyczących uznania wyroków sądów polubownych wydanych za granicą (o tej kwestii zob. dalszą część uzasadnienia), w art. 2 tej ustawy nie znalazło się wyraźne określenie nawiązujące do postępowania o uznanie wyroku sądu polubownego wydanego za granicą. Niemniej mając na uwadze fakt, że uznanie wyroku sądu polubownego wydanego za granicą stanowiło funkcjonalny odpowiednik stwierdzenia skuteczności wyroku sądu polubownego (wydanego w kraju), trzeba przyjąć, że art. 2 ustawy nowelizującej, nakazując stosować do postępowań co do stwierdzenia skuteczności wyroku sądu polubownego, wszczętych przed wejściem tej ustawy w życie przepisy dotychczasowe, obejmuje swym zakresem także postępowania co do uznania wyroku sądu polubownego wydanego za granicą. Użyte we wspomnianym przepisie sformułowanie „postępowanie o stwierdzenie skuteczności wyroku sądu polubownego" oznacza więc także postępowanie o uznanie takiego wyroku na terenie Polski, gdyż dopiero po takim uznaniu wyrok zagranicznego sądu polubownego będzie skuteczny w Polsce. Postępowanie w rozpoznawanej sprawie zostało wszczęte na skutek wniosku Elektrimu w dniu 17 grudnia 2004 r. Nie ulega więc wątpliwości, że do tego postępowania należy stosować przepisy obowiązujące

przed wejściem w życie ustawy z dnia 28 lipca 2005 r., tj. przed dniem 17 października 2005 r.

Przepisy obowiązujące przed dniem 17 października 2005 r. nie regulowały jednak uznawania wyroków sądów polubownych wydanych za granicą. Postanowienia art. 1145-1149 k.p.c. odnosiły i nadal odnoszą się bowiem wprost jedynie do zagranicznych orzeczeń sądowych. Jedynie dawny art. 1150 § 2 k.p.c. stanowił, że do stwierdzenia wykonalności wyroków sądów polubownych wydanych za granicą odpowiednio zastosowanie miały przepisy art. 1150-1153 k.p.c., regulujące wykonalność zagranicznych orzeczeń sądowych. W sytuacjach, w których uznanie wyroków sądów polubownych przewidziane było w umowach międzynarodowych, w nauce i orzecznictwie (por. postanowienie Sądu Najwyższego z 20 lutego 2003 r., I CZ 10/03, nie publ.) przyjmowano jednak, że do postępowania w sprawie uznania takich wyroków odpowiednie zastosowanie miały art. 1145-1149 k.p.c., jeżeli umowa międzynarodowa wskazywała na właściwość przepisów krajowych w zakresie postępowania o uznanie (art. 1096 k.p.c.). Oczywiście w sytuacji takiej przepisy kodeksu postępowania cywilnego miały zastosowanie jedynie w zakresie, w którym ta umowa międzynarodowa nie stanowiła inaczej (np. w zakresie przesłanek uznania). Sąd Najwyższy w składzie rozpoznającym skargę kasacyjną zgadza się z takim poglądem. Wobec tego należy przyjąć, że – w okolicznościach niniejszej sprawy – przepisami dotychczasowymi, w rozumieniu art. 2 ustawy nowelizującej z 28 lipca 2005 r., które znajdą zastosowanie do uznania wyroku Trybunału Arbitrażowego są art. 1145-1149 k.p.c. w zakresie, w którym przepisy Konwencji Nowojorskiej nie stanowią inaczej. Jak wynika bowiem z art. III zd. pierwsze Konwencji Nowojorskiej, każde z państw będących stroną tej Konwencji – zgodnie z ustalonymi w niej warunkami – uzna orzeczenie arbitrażowe za wiążące i wykona jest zgodnie z regułami procedury obowiązującej na obszarze, na którym dochodzi się praw z orzeczenia.

Sąd Apelacyjny wydał prawomocne postanowienie w rozpoznawanej sprawie w dniu 29 marca 2006 r. Od tego postanowienia, występująca w sprawie jako interwenient uboczny Telco, wniosła skargę kasacyjną w dniu 5 sierpnia 2006 r. Zarówno Elektrim jak i uczestnik postępowania TMD podniosły zarzut niedopuszczalności takiej skargi. Należy więc w pierwszym rzędzie rozważyć,

czy  skarga kasacyjna jest dopuszczalna.

II. Punktem wyjścia dla oceny tego zagadnienia musi być przyjęte powyżej stwierdzenie, że do postępowania o uznanie wyroku Trybunału Arbitrażowego zastosowanie mają przepisy art. 1145-1149 k.p.c., z zastrzeżeniem odrębnych unormowań Konwencji Nowojorskiej, mających pierwszeństwo przed uregulowaniami kodeksowymi. O dopuszczalności skargi kasacyjnej w niniejszej sprawie rozstrzyga zatem art. 1148 § 3 k.p.c., stanowiący, że dopuszczalna jest skarga kasacyjna od postanowienia sądu apelacyjnego wydanego w przedmiocie uznania orzeczenia zagranicznego.

W związku z tym, że postanowienie Sądu Apelacyjnego wydane zostało 29 marca 2006 r., a skarga kasacyjna wniesiona została 5 sierpnia 2006 r., do jej rozpoznania zastosowanie mają przepisy art. $398^{1}$-$398^{21}$ k.p.c. w zw. z art. 13 § 2 k.p.c. Stanowisko takie znajduje swoje uzasadnienie w przepisach ustawy z dnia 22 grudnia 2004 r. o zmianie ustawy - Kodeks postępowania cywilnego oraz ustawy – Prawo o ustroju sądów powszechnych (Dz.U. z 2005 r. Nr 13, poz. 98), na mocy której dotychczasowa kasacja zastąpiona została skargą kasacyjną. Ustawa ta weszła w życie 6 lutego 2005 r. Od tego dnia do wnoszenia skargi kasacyjnej i postępowania, które ona wszczyna, stosuje się przepisy art. $398^{1}$ - $398^{21}$ k.p.c. Jeżeli więc skarga kasacyjna została wniesiona po 6 lutym 2005 r., tak jak w tej sprawie, to do jej rozpoznania należy stosować powołane wyżej przepisy k.p.c. Nie wchodzą bowiem w grę wyjątki od obowiązywania tych przepisów, o których mowa w art. 3 i 4 ustawy z 22 grudnia 2004 r. Wbrew twierdzeniom uczestnika postępowania TMD brak natomiast podstaw do stosowania przepisów obowiązujących przed 6 lutym 2005 r. do skargi kasacyjnej wniesionej przez Telco, na podstawie art. 2 ustawy z dnia 28 lipca 2005 r. Przepis ten wskazuje jedynie, od kiedy należy stosować nowe przepisy do postępowania o uznanie wyroku sądu polubownego i nie odnosi się do kwestii, jakie przepisy (stare czy nowe) stosować do oceny dopuszczalności i rozpoznania skargi kasacyjnej, gdyż tę kwestię dla każdego rodzaju spraw, w tym spraw o uznanie wyroku zagranicznego sądu polubownego, regulują przepisy art. 3 do 6 ustawy z dnia z 22 grudnia 2004 r. Z tych przepisów wynika jednoznacznie, że skargę kasacyjną wniesioną po 6 lutym 2005 r. rozpoznaje się na podstawie przepisów art. $398^{1}$ - $398^{21}$ k.p.c.

W konsekwencji należy stwierdzić, że w niniejszej sprawie postępowanie co do uznania wyroku Trybunału Arbitrażowego toczy się według przepisów art. 1145-1149 k.p.c. ze zmianami wynikającymi z postanowień Konwencji Nowojorskiej, natomiast postępowanie kasacyjne podlega art. 398$^1$-398$^{21}$ w zw. z art. 13 § 2 k.p.c. Taki jest rezultat wykładni przepisów intertemporalnych ustaw z dnia 28 lipca 2005 r. oraz 22 grudnia 2004 r. Wobec tego nie ma jakichkolwiek podstaw twierdzenie TMD i Elektrimu, że Sąd Najwyższy rozpoznając skargę kasacyjną powinien w niniejszej sprawie oceniać prawidłowość postępowania o uznanie wyroku Trybunału Arbitrażowego przy zastosowaniu art. 1212-1217 k.p.c. W świetle art. 2 ustawy z dnia 28 lipca 2005 r. za decydujące dla stosowania przepisów dotychczasowych, tj. art. 1145-1149 k.p.c., uznać należy to, że postępowanie o uznanie wyroku Trybunału Arbitrażowego zostało wszczęte przed 17 października 2005 r. Wprawdzie w postępowaniu tym 29 marca 2006 r. zapadło prawomocne postanowienie Sądu Apelacyjnego, ale wobec dopuszczalności skargi kasacyjnej od tego postanowienia i jej wniesienia należy przyjąć, że postępowanie to nie zostało jeszcze zakończone. Przyjęcie rozwiązania proponowanego przez TMD i Elektrim prowadzić musiałoby do wniosku, że Sąd Najwyższy, oceniając zgodność z prawem działań Sądu Apelacyjnego i ewentualnie Sądu Okręgowego, które orzekały na podstawie przepisów Konwencji Nowojorskiej i przepisów 1145-1149 k.p.c., oceny tej musiałby dokonywać z punktu widzenia przepisów Konwencji Nowojorskiej oraz art. 1212-1217 k.p.c. Innymi słowy, mógłby postawić tym Sądom zarzuty działania niezgodnego z prawem, które (w części obejmującej przepisy kodeksu postępowania cywilnego) nie obowiązywało w chwili orzekania przez te Sądy. Wniosek taki byłby jednak nie do przyjęcia.

Nawet jednak uznając, że dopuszczalność skargi kasacyjnej w niniejszej sprawie wynika z art. 1148 § 3 k.p.c., mającego zastosowanie w związku z art. 2 ustawy z dnia 28 lipca 2005 r. i art. III zd. pierwsze Konwencji Nowojorskiej – TMD i Elektrim, podnoszą kolejny argument, który ich zdaniem stoi na przeszkodzie w dopuszczalności skargi kasacyjnej w niniejszej sprawie, związany ze swoiście rozumianym art. III zd. drugie Konwencji Nowojorskiej.

Artykuł III zd. pierwsze Konwencji Nowojorskiej przewiduje właściwość przepisów krajowych w postępowaniu o uznanie zagranicznego orzeczenia

arbitrażowego, ale jednocześnie w zdaniu drugim stanowi, że uznanie takie nie może zostać uzależnione od spełnienia warunków istotnie uciążliwszych ani od poniesienia należności sądowych lub opłat istotnie wyższych, niż wymagane dla uznania krajowych orzeczeń arbitrażowych. Zdaniem TMD i Elektrimu, przez warunki istotnie uciążliwsze można także rozumieć sytuację, w której od postanowienia sądu II instancji w postępowaniu o uznanie (stwierdzenie skuteczności) orzeczenia krajowego sądu polubownego nie przysługuje skarga kasacyjna, natomiast od postanowienia sądu II instancji w postępowaniu o uznanie orzeczenia zagranicznego sądu polubownego skarga byłaby dopuszczalna.

Sąd Najwyższy w swoim orzecznictwie pod rządami przepisów o kasacji, przyjął, że była ona niedopuszczalna od postanowienia sądu II instancji w postępowaniu o stwierdzenie wykonalności orzeczenia krajowego sądu polubownego (postanowienia z dnia 22 września 1999 r. I CKN 654/99, 2000/3 oraz z dnia 13 października 2004 r., I CZ 102/04 niepubl.) Orzecznictwo to ukształtowało się w czasie, gdy art. 711 k.p.c. nie rozróżniał jeszcze instytucji stwierdzenia skuteczności i stwierdzenia wykonalności wyroków krajowych sądów polubownych (rozróżnienie takie zostało wprowadzone ustawą z dnia 2 lipca 2004 r.). Zważywszy na fakt, że postępowanie o stwierdzenie wykonalności, a potem postępowanie o stwierdzenie skuteczności i postępowanie o stwierdzenie wykonalności wyroków krajowych sądów polubownych były odpowiednikiem postępowania o uznanie wyroku zagranicznego sądu polubownego i postępowania o stwierdzenie wykonalności takiego wyroku, TMD i Elektrim twierdzą, że skoro skarga kasacyjna (kasacja) była niedopuszczalna w postępowaniu o stwierdzenie wykonalności (potem: postępowaniu o stwierdzenie skuteczności i postępowaniu o stwierdzenie wykonalności) wyroków krajowych sądów polubownych, to dopuszczenie skargi kasacyjnej w postępowaniu o uznanie wyroku zagranicznego sądu polubownego, prowadzonego według postanowień Konwencji Nowojorskiej i art. 1145-1149 k.p.c., stanowiłoby naruszenie art. III zd. drugie Konwencji Nowojorskiej. Dopuszczenie skargi kasacyjnej miałoby bowiem oznaczać, że uznanie wyroku zagranicznego sądu polubownego byłoby uzależnione od warunku „istotnie uciążliwszego" niż warunki wymagane dla uznania wyroku krajowego sądu polubownego. Stanowisko takie nie jest jednak uzasadnione.

Przyjmując – w ślad za dotychczasowym orzecznictwem Sądu Najwyższego
– że na postanowienie sądu II instancji co do stwierdzenia skuteczności albo co do
stwierdzenia wykonalności wyroku krajowego sądu polubownego (dawny art. 711
§ 2-5 k.p.c.) w postępowaniach wszczętych przed wejściem w życie ustawy
z 28 lipca 2005 r. skarga kasacyjna (wcześniej kasacja) nie była dopuszczalna,
nie można zgodzić się z twierdzeniem, jakoby dopuszczalność skargi kasacyjnej od
postanowienia sądu II instancji co do uznania wyroku sądu polubownego wydanego
za granicą stanowiła warunek „istotnie uciążliwszy" w rozumieniu art. III zd. drugie
Konwencji Nowojorskiej. Po pierwsze, dopuszczalność skargi kasacyjnej nie jest
okolicznością warunkującą uznanie wyroku sądu polubownego wydanego za
granicą, ponieważ skarga kasacyjna stanowi jedynie nadzwyczajny środek
zaskarżenia, z którego strona może skorzystać albo nie. Dopuszczalność skargi
kasacyjnej może przy tym, w zależności od okoliczności sprawy, działać na korzyść
albo niekorzyść uznania wyroku. Przykładowo, jeśli sąd drugiej instancji oddaliłby
wniosek o uznanie, wniesienie skargi kasacyjnej mogłoby to doprowadzić do tego,
że wyrok zostałby jednak uznany. W rozpoznawanej sprawie sytuacja przedstawia
się odwrotnie, tj. wniesienie skargi kasacyjnej może powodować uchyleniu
postanowienia o uznaniu wyroku Trybunału Arbitrażowego. Nie zmienia to jednak
faktu, że generalnie dopuszczalność skargi kasacyjnej nie może być traktowana
jako warunek „istotnie uciążliwszy" w rozumieniu art. III zd. drugie Konwencji
Nowojorskiej. Po drugie, orzeczenie sądu drugiej instancji w przedmiocie uznania
staje się prawomocne bez względu na to, czy chodzi o uznanie (dawniej
stwierdzenie skuteczności) wyroku sądu polubownego wydanego w Polsce, czy też
o uznanie wyroku sądu polubownego wydanego za granicą. W obu wypadkach, po
dwuinstancyjnym postępowaniu, wyrok sądu polubownego, czy to wydany
w Polsce, czy to za granicą, zostaje prawomocnie zrównany z wyrokiem sądu
państwowego. Dopuszczalność skargi kasacyjnej w wypadku postępowania
o uznanie wyroku sądu polubownego wydanego za granicą tego nie zmienia, lecz
tylko otwiera możliwość weryfikacji prawomocnego postanowienia sądu drugiej
instancji co do uznania. Po trzecie wreszcie, trudno mówić o „dyskryminacji"
wyroków zagranicznych sądów polubownych z powodu dopuszczalności skargi
kasacyjnej w postępowaniu o ich uznanie, skoro skarga taka może być postrzegana

18

jako swoisty „ekwiwalent" braku możliwości wniesienia przed sąd Polski skargi o uchylenie wyroku sądu polubownego wydanego za granicą. Podnieść przy tym należy, że z tego punktu widzenia nie ma znaczenia to, czy skarga o uchylenie wyroku sądu polubownego wydanego za granicą mogłaby zostać wniesiona w państwie, w którym albo według prawa którego wyrok został wydany.

III. Przystępując do rozpoznania zarzutów podniesionych w skardze kasacyjnej należy w pierwszej kolejności zwrócić uwagę, że konieczne jest odróżnienie kontroli zaskarżonego postanowienia Sądu Apelacyjnego z punktu widzenia prawidłowej oceny przesłanek uznania określonych w Konwencji Nowojorskiej od kontroli tego postanowienia pod względem prawidłowości postępowania przed tym sądem z punktu widzenia unormowań Konwencji Nowojorskiej oraz -- w zakresie, w którym mają zastosowanie – przepisów kodeksu postępowania cywilnego regulujących postępowanie o uznanie. Okoliczność bowiem, że Konwencja Nowojorska określa tzw. materialne warunki uznania (por. przede wszystkim art. IV i V Konwencji), nie zmienia faktu, że postępowanie o uznanie zagranicznego wyroku arbitrażowego musi być przeprowadzone z zachowaniem przepisów regulujących tok tego postępowania, zawartych częściowo w Konwencji Nowojorskiej, a w pozostałym zakresie w kodeksie postępowania cywilnego (art. 1145-1149 k.p.c., z wyłączeniem art. 1146 k.p.c., dotyczącego przesłanek uznania, oraz przepisy o procesie na podstawie art. 13 § 2 k.p.c.). Z punktu widzenia podstaw kasacyjnych należy przyjąć, że zarzuty dotyczące naruszenia tzw. materialnych warunków uznania powinny być podnoszone w ramach pierwszej podstawy kasacyjnej (art. $398^3$ § 1 pkt 1 k.p.c. w zw. z art. 13 § 2 k.p.c.) – przepisy regulujące te przesłanki nie są przepisami materialnoprawnymi, ale pełnią w postępowaniu o uznanie funkcję analogiczną do tej, którą spełniają przepisy materialnoprawne w procesie i w postępowaniu nieprocesowym, tj. stanowią podstawę merytorycznego orzekania przez sąd. Natomiast zarzuty dotyczące przepisów regulujących tok postępowania o uznanie powinny być podnoszone w ramach drugiej podstawy kasacyjnej (art. $398^3$ § 1 pkt 2 k.p.c. w zw. z art. 13 § 2 k.p.c.).

Ustosunkowanie się do zarzutów przedstawionych w skardze kasacyjnej należy rozpocząć od rozważania najdalej idących w skutkach zarzutów związanych

z niewzięciem przez Sąd Apelacyjny pod rozwagę z urzędu (art. 378 § 1 k.p.c. i art. 386 § 2 k.p.c. w zw. z art. 13 § 2 k.p.c.) nieważności postępowania przed sądem pierwszej instancji. Przedmiotem kontroli w postępowaniu kasacyjnym jest wyłącznie postępowanie przed sądem drugiej instancji oraz orzeczenie tego sądu, a Sąd Najwyższy bierze pod uwagę z urzędu jedynie nieważność postępowania przed sądem drugiej instancji (art. 398[13] § 1 k.p.c.; por. wyroki Sądu Najwyższego z 21 listopada 1997 r., I CKN 825/97, OSNC 1998, nr 5, poz. 81 i z 23 lutego 2005 r., III CK 323/04, nie publ.). Zarzut naruszenia przepisów procesowych przez sąd drugiej instancji może jednak polegać także na tym, że sąd ten nie rozważył – mimo, że powinien (z urzędu albo wskutek zarzutu podniesionego w apelacji) – nieważności postępowania przed sądem pierwszej instancji. W konsekwencji twierdzenie o nieważności postępowania przed sądem pierwszej instancji może być podnoszone jako uzasadnienie naruszenia przez sąd drugiej instancji, przepisów postępowania tj. art. 378 § 1 i art. 386 § 2 lub 3 k.p.c. Sytuacja taka występuje w niniejszej sprawie, gdyż w skardze kasacyjnej Telco podniosła zarzut naruszenia art. 378 § 1 i art. 386 § 2 k.p.c. przez Sąd Apelacyjny wskazując, że naruszenie to polegało na tym, iż Sąd ten nie wziął pod uwagę dwóch podstaw nieważności postępowania przed sądem pierwszej instancji.

Przede wszystkim skarżąca wskazała, że została pozbawiona możności obrony (art. 379 pkt 5 k.p.c.) wskutek tego, iż odmówiono jej prawa występowania przez Sądem Okręgowym w charakterze uczestnika postępowania, a także w charakterze interwenienta głównego lub interwenienta ubocznego. Zgodzić się należy, że sytuacja procesowa skarżącej w postępowaniu przed sądem I instancji była niejasna. Niejasność tę mogła przy tym pogłębić okoliczność, że postanowienie merytoryczne zostało wydane przez sąd pierwszej instancji, zanim prawomocnie rozstrzygnięta została kwestia, czy skarżąca może występować w sprawie w charakterze interwenienta. Trzeba jednak podkreślić, że mimo wydania przez sąd pierwszej instancji postanowienia z 26 stycznia 2005 r. o niedopuszczeniu skarżącej do udziału w postępowaniu w charakterze interwenienta ubocznego, miała ona w postępowaniu przed tym sądem status interwenienta ubocznego ze względu na nieprawomocność tego postanowienia. Następnie status taki został potwierdzony wskutek wydaniu przez Sąd Apelacyjny

20

postanowienia z dnia 11 maja 2005 r. Pobieżna nawet analiza zachowania skarżącej w postępowaniu przed Sądem Okręgowym wskazuje, że działając przez kilku profesjonalnych pełnomocników brała ona aktywny udział w rozprawie, złożyła liczne, obszerne pisma procesowe, do których Sąd ten odniósł się wydając postanowienie o uznaniu wyroku Trybunału Arbitrażowego w Wiedniu. Trudno więc uznać, że skarżącą została pozbawiona prawa do obrony, co najwyżej można stwierdzić, że realizacja prawa do obrony została w jej wypadku utrudniona, gdyż główna energia skarżącej musiała się skoncentrować na sprawach procesowych związanych z jej statusem w postępowaniu zamiast na zasadniczym problemie, czy wyrok zagranicznego sądu polubownego nadaje się do uznania. W konsekwencji nie można jednak uznać, że w procesie przed sądem I instancji skarżąca była pozbawiona możliwości obrony swych praw, co zgodnie z art. 379 pkt 5 k.p.c. mogłoby uzasadniać nieważność postępowania. Podobne argumenty przemawiają przeciwko tezie, że skarżąca była pozbawiona prawa do obrony w postępowaniu przed Sądem Apelacyjnym. Obszerna skarga kasacyjna, liczne dodatkowe pisma złożone w postępowaniu kasacyjnym i udział skarżącej przez czterech pełnomocników na rozprawie wskazuje, że realizowała ona swoje prawo do obrony również w postępowaniu przed Sądem Najwyższym.

Skarżąca podniosła także, że nieważność postępowania przed sądem pierwszej instancji wynikała z tego, że skład sądu, który wydał postanowienie z 2 lutego 2005 r., był sprzeczny z przepisami prawa (art. 379 pkt 4 k.p.c.). Niezgodności z prawem składu sędziowskiego sądu I instancji skarżąca dopatrywała się w naruszeniu § 64 i 67 Rozporządzenia Ministra Sprawiedliwości z dnia 19 listopada 1987 r. Regulaminu wewnętrznego urzędowania sądów powszechnych (Dz.U. Nr 38, poz. 218 ze zm.). Zarzut ten trudno jednak uznać za usprawiedliwiony, gdyż zmiana składu sędziowskiego w okolicznościach sprawy, mogła być oceniana w kategoriach sytuacji nadzwyczajnej, o której mowa w § 64 wspomnianego Regulaminu nie było więc sprzeczności składu orzekającego w sprawie w pierwszej instancji z przepisami prawa. W rozpoznawanej sprawie doszło natomiast do naruszenia art. 323 w zw. z 361 i 13 § 2 k.p.c.

Jak wynika z protokołu rozprawy z 26 stycznia 2005 r., w czasie posiedzenia dokonano zmiany składu sądu – inny skład rozpoznawał sprawę w „pierwszej"

części posiedzenia wyznaczonego na rozprawę, a inny w jego „drugiej" części. Sąd w zmienionym już składzie dokonał zamknięcia rozprawy, a następnie wydał postanowienie z dnia 2 lutego 2005 r. Tymczasem z art. 323 w zw. z 361 i 13 § 2 k.p.c. wynika, że postanowienie rozstrzygające o wniosku o uznanie wyroku powinno było zostać wydane przez sędziów, przed którymi odbyła się rozprawa bezpośrednio poprzedzająca wydanie postanowienia. Przepis art. 323 k.p.c. ustala nieprzekraczalne granice realizacji zasady bezpośredniości w postępowaniu cywilnym. Zasada ta polega na tym, że sąd orzekający, tj. sąd, który wydaje rozstrzygnięcie w sprawie, powinien bezpośrednio zapoznać się z żądaniami stron i twierdzeniami uczestników postępowania oraz dowodami. Inaczej niż postępowanie karne (por. art. 404 § 2 k.p.k.) postępowanie cywilne nie zna ciągłości rozprawy, co sprawia, że w wypadkach odroczenia rozprawy jest ona prowadzona w nowym terminie nie od początku, lecz w dalszym ciągu. W każdym terminie rozprawa może się toczyć przed innym składem sądu. Niemniej przepis art. 323 k.p.c. wyznacza minimalny zakres, w którym zasada bezpośredniości musi być bezwzględnie zachowana w sprawie cywilnej – orzeczenie może być wydane tylko przez tych sędziów, przed którymi odbyła się rozprawa bezpośrednio poprzedzająca jego wydanie. Realizuje on także konstytucyjnie gwarantowane prawo do rzetelnego sądu, gdyż zapewnia aby sędzia, który decyduje o końcowym orzeczeniu, brał udział przynajmniej w rozprawie poprzedzającej jego wydanie. Z tego względu art. 323 k.p.c. musi być bezwzględnie przestrzegany. Nie ma on w żadnym razie charakteru normy instrukcyjnej, gdyż jego naruszenie oznacza sprzeczność składu orzekającego z przepisami prawa i powoduje nieważność postępowania (art. 379 pkt 4 k.p.c.; por. wyrok Sądu Najwyższego z 19 stycznia 1977 r., IV CR 219/77, nie publ.). Za takim znaczeniem art. 323 k.p.c. przemawia to, że zasada bezpośredniości została i tak bardzo ograniczona w postępowaniu cywilnym. W ograniczonym zakresie, w którym zasada ta obowiązuje, musi być jednak ściśle przestrzegana.

Art. 323 k.p.c., wymagając, aby wyrok wydany został przez tych sędziów, przed którymi odbyła się rozprawa bezpośrednio poprzedzające wydanie wyroku, nie precyzuje, co należy rozumieć przez ten udział. Przyjąć jednak należy, że chodzi tu o konieczność udziału sędziego w całej rozprawie bezpośrednio

poprzedzającej wydanie orzeczenia. Przemawia za tym przede wszystkim
wykładnia literalna art. 323 k.p.c. gdyż mowa w nim o sędziach, przed którymi
odbyła się rozprawa. Sędzia, przed którym odbyła się tylko część rozprawy
bezpośrednio poprzedzającej wydanie orzeczenia, nie może uczestniczyć w jego
wydaniu, bo nie odbyła się przed nim rozprawa, a tylko jej część. Dopuszczenie do
interpretacji, że chodzi tylko o udział w części rozprawy, prowadziłoby do
konieczności ustalenia, jaka ma być proporcja pomiędzy tą części rozprawy,
w której sędzia uczestniczył, a tą w której nie wziął udziału. Rozpatrywanie tych
proporcji nie byłoby wcale sprawą prostą. Art. 323 k.p.c. ma na celu nie tyle
zapewnienie tego, aby sędzia jedynie formalnie brał udział w niewielkiej części
ostatniej rozprawy, ale aby wyrok został wydany przez sędziów, którzy zostali
wyznaczeni do składu sądzącego ostatniej rozprawy. Ma to umożliwić całemu
składowi sądzącemu możliwość zapoznania się z całokształtem materiału
zebranego w sprawie a stronom możliwość odniesieniem się do tego materiału
w każdym momencie rozprawy, w której udział biorą sędziowie wydający następnie
na tej podstawie wyrok (postanowienie).

Naruszenie art. 323 k.p.c. jest tym bardziej oczywiste, że zmiana sędziego
dotyczyła sędziego sprawozdawcy. W ten sposób w składzie wydającym
orzeczenie zabrakło sędziego, który był najlepiej zorientowany w całej niezwykle
złożonej problematyce rozpoznawanej sprawy. Sąd powinien, nie tylko ze względu
na wyraźną normę art. 323 k.p.c., ale także po to, aby nowy sędzia, a także
pozostali sędziowie mieli okazję do zapoznania się z całokształtem materiału
dowodowego, rozprawę odroczyć i to na taki termin, który umożliwiałby zapoznanie
się sędziom, a przede wszystkim nowemu sędziemu sprawozdawcy
z całokształtem materiału sprawy. Dopuszczenie do orzekania w tak złożonej
prawnie i faktycznie sprawie w sposób, w jaki uczynił to Sąd Okręgowy, naruszało
więc nie tylko art. 323 k.p.c., ale i konstytucyjnie zagwarantowane prawo uczestnika
do rzetelnego procesu (art. 45 ust. 1 Konstytucji).

Za zasadny uznać więc należy zarzut naruszenia przez Sąd Apelacyjny art.
378 § 1, art. 379 pkt 4 i art. 386 § 2 k.p.c., polegający na tym, że Sąd ten nie wziął
pod rozwagę nieważności postępowania przed sądem pierwszej instancji
spowodowanej tym, że postanowienie w pierwszej instancji wydane zostało przez

**107**

skład sądu sprzeczny z przepisami prawa. Naruszenie to miało istotny wpływ na wynik sprawy i stanowi podstawę do uchylenia zaskarżonego postanowienia Sądu Apelacyjnego z 29 marca 2006 r. Okoliczność, że postępowanie przed sądem pierwszej instancji dotknięte było nieważnością, uzasadnia ponadto uchylenie przez Sąd Najwyższy także postanowienia Sądu Okręgowego z 5 lutego 2005 r. (art. 398[15] § 1 k.p.c.). Nie byłoby celowe, aby Sąd Najwyższy ograniczył się do uchylenia postanowienia Sądu Apelacyjnego, skoro Sąd ten, wobec tego, że postępowanie w pierwszej instancji dotknięte było nieważnością, musiałby i tak – stosując prawidłowo art. 378 § 1, art. 379 pkt 4 i art. 386 § 2 k.p.c. – uchylić postanowienie Sądu Okręgowego z 2 lutego 2005 r., znieść postępowanie i przekazać sprawę do ponownego rozpoznania.

Okoliczność, że skarżąca w skardze kasacyjnej podniosła zarzut naruszenia przez Sąd Apelacyjny art. 378 § 1, art. 379 pkt 4 i art. 386 § 2 k.p.c., powołując się na to, że Sąd ten nie wziął pod uwagę nieważności postępowania przed sądem pierwszej instancji spowodowanej jego składem sprzecznym z przepisami prawa, jest wystarczająca dla uwzględnienia tego zarzutu, mimo jego odmiennego uzasadnienia w samej skardze kasacyjnej. Zawarte w piśmie procesowym z 15 stycznia 2007 r. twierdzenie o naruszeniu art. 323 k.p.c. przez sąd pierwszej instancji stanowi zresztą przytoczenie przez skarżącą nowego uzasadnienia podstawy kasacyjnej powołanej w skardze i zgodnie z art. 398[13] § 3 k.p.c. było dopuszczalne.

IV. Przyjęcie, że istnieje podstawa do uchylenia zaskarżonych postanowień zwalnia z konieczności szczegółowego rozważenia pozostałych zarzutów zawartych w skardze kasacyjnej. Sąd Najwyższy nie może udzielać szczegółowych wskazówek co do dalszego postępowania. Biorąc pod uwagę związanie sądów niższej instancji jego stanowiskiem, byłoby to w istocie ograniczeniem prawa do rozpoznania sprawy przez dwuinstancyjny sąd, co gwarantuje stronom art. 176 ust. 1 Konstytucji. Z tego względu nieuzasadnione jest także zwrócenie się do powiększonego składu Sądu Najwyższego z zagadnieniami prawnymi przedstawionymi przez Telco na podstawie art. 398[17] k.p.c. Celowe jednak jest zwrócenie uwagi na dwa zagadnienia, które stanowić powinny przesłankę należytego przeprowadzenia na nowo postępowania o uznanie wyroku

Trybunału Arbitrażowego.

W świetle poglądów doktryny za utrwalone uznać należy stanowisko, że postępowanie w przedmiocie uznania zagranicznego orzeczenia jest szczególnego rodzaju postępowaniem jurysdykcyjnym, przybierającym z reguły postać dwustronną. Muszą w nim zatem uczestniczyć, obok wnioskodawcy, którego źródłem czynnej legitymacji procesowej jest interes prawny (art. 1147 § 1 k.p.c.), wszystkie osoby, które brały udział w postępowaniu zagranicznym w charakterze strony lub uczestnika postępowania, albowiem działa wobec nich prawomocność materialna orzeczenia. Przysługuje im wtedy legitymacja procesowa bierna. Dotyczy to odpowiednio ewentualnych następców prawnych tych podmiotów, jeżeli są oni objęci prawomocnością materialną uznawanego orzeczenia. Wyjątek od tej zasady możnaby dopuścić jedynie w sytuacji, w której wniosek o uznanie orzeczenia zagranicznego dotyczyłby części rozstrzygnięcia zawartego w tym orzeczeniu i byłaby to część, która nie odnosiłaby się do wszystkich stron lub uczestników postępowania. W takiej sytuacji za konieczny uznać należałoby udział w postępowaniu o uznanie jedynie tych stron lub uczestników postępowania zagranicznego, do których odnosiłaby się ta część orzeczenia, która objęta zostałby wnioskiem o uznanie. Dodać należy, że także postanowienia Konwencji Nowojorskiej oparte są na założeniu, że postępowanie o uznanie zagranicznego orzeczenia arbitrażowego toczy się z udziałem wnioskodawcy i strony, przeciwko której orzeczenie jest skierowane (art. IV ust. 1 i art. V ust. 1). Odnosząc te ustalenia do okoliczności niniejszej sprawy, należy przyjąć, że Telco powinno brać udział w postępowaniu o uznanie wyroku Trybunału Arbitrażowego jako pełnoprawny uczestnik tego postępowania, ponieważ przysługuje mu bierna legitymacja procesowa. Telco było bowiem stroną postępowania przed Trybunałem Arbitrażowym w Wiedniu, w którym wydany został wyrok przedstawiony do uznania. Wniosek o uznanie jest wprawdzie ograniczony do części wyroku, ale jest to część, która zawiera rozstrzygnięcie dotyczące Telco.

Do postępowania w przedmiocie uznania zagranicznego orzeczenia stosuje się odpowiednio przepisy o procesie (art. 13 § 2 k.p.c.). Szczególny charakter tego postępowania polega na tym, że rozstrzyga się w nim nie o prawach stron i ich obowiązkach, lecz o tym, czy wydane za granicą orzeczenie ma być skuteczne

w Polce. Z tego względu przepisy o interwencji zarówno głównej jak i ubocznej nie mogą znaleźć zastosowania. Z art. 75 k.p.c. wynika, że interwencja główna umożliwia wystąpienie z powództwem przeciwko obu stronom procesu, który toczy się o rzecz lub prawo pomiędzy tymi stronami. Postępowanie delibacyjne nie jest postępowaniem, które bezpośrednio rozstrzyga o prawach stron, a jedynie sprowadza się do oceny, czy na podstawie ściśle określonych przesłanek można uznać orzeczenie zagraniczne. Instytucja ta nie może więc być stosowana w postępowaniu delibacyjnym. Z podobnych względów nie można stosować także przepisów o interwencji ubocznej. Dodatkowo w okolicznościach sprawy brak podstaw do stosowania przepisów o interwencji ubocznej, gdyż skarżąca ma nie tyle interes prawny w tym, aby sprawa została rozstrzygnięta na korzyść jednej ze stron, lecz ma własną legitymację procesową do występowania w sprawie w charakterze uczestnika.

W powtórzonym postępowaniu, należy zwrócić uwagę na to, czy Trybunał Arbitrażowy był uprawniony do rozpoznania sprawy dotyczącej oceny ważności czynności dokonanej z udziałem Elektrimu, której skutkiem miało być przejście prawa do 226 079 udziałów w PTC na Telco. Odpowiedź na to pytanie zależy od tego, czy zapis na sąd polubowny, tak sformułowany jak to wynika z art. 21 umowy spółki PTC, obejmuje także możliwość decydowania o ważności czynności prawnej, na podstawie której jedna osoba będąca wspólnikiem PTC przenosi prawo do należących do niej udziałów na inną osobę, która w wyniku tej czynności ma uzyskać pozycję wspólnika w PTC. Rozstrzygniecie tej kwestii zależy w pierwszym rzędzie od ustalenia, jakie prawo powinno być właściwe dla oceny zapisu na sąd arbitrażowy. Przy ustalaniu prawa właściwego dla zapisu na sąd polubowny, należy wziąć pod uwagę art. V ust. I a Konwencji Nowojorskiej, wskazujący prawo właściwe dla oceny ważności takiego zapisu.

Po ustaleniu prawa właściwego, na jego tle należy ocenić, jak rozumieć zapis na sąd polubowny biorąc pod uwagę, w zakresie dopuszczalnym przez to prawo, nie tylko dosłowną treść umowy ale także to, jaki był zamiar stron i cel umowy. Dla ustalenia zakresu klauzuli, stwierdzającej, że arbitraż jest właściwy dla wszelkich sporów pomiędzy wspólnikami oraz pomiędzy nimi a spółką powstałych na podstawie umowy spółki albo w związku z innymi umowami odnoszącymi się do

26

tej umowy, istotne znaczenie może mieć zachowanie stron w trakcie postępowania arbitrażowego przed Trybunałem w Wiedniu. Składane przed tym Trybunałem oświadczenia mogą bowiem wskazywać, jaki był zamiar stron w chwili, gdy zawierały umowę o poddanie sporów pod rozstrzygnięcie sądu polubownego i jak go rozumiały, gdy przyszło do określania zakresu kognicji wybranego przez niej sądu arbitrażowego. Ocena tych zachowań może dać odpowiedź na zasadnicze dla rozstrzygniecie wniosku o uznanie wyroku Trybunału Arbitrażowego pytanie, czy jurysdykcja tego Trybunału obejmuje także rozpoznanie sprawy o stwierdzenie ważności oświadczenia Elektrimu, stanowiącego składnik czynności prawnej, której skutkiem miało być przeniesienie na Telco udziałów w spółce PTC.

Przesądzenie wskazanej kwestii pozwoli na ocenę dalszych problemów, które wyłaniają się w związku z uznaniem wyroku, tego czy jest on wewnętrznie sprzeczny oraz czy może być uznany częściowo, a także czy nie narusza podstawowych zasad porządku prawnego Rzeczypospolitej Polskiej.

Biorąc pod uwagę powyższe względy, Sąd Najwyższy, na podstawie art. 398$^{15}$ § 1 k.p.c., orzekł jak w sentencji postanowienia.

SĄD NAJWYŻSZY
IZBA CYWILNA
WYDZIAŁ I

Na oryginale właściwe podpisy
Za zgodność:
Starszy sekretarz sądowy

*Anna Matura*

jz