# EXHIBIT H

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

# SUMMONS TO APPEAR BEFORE THE

# COMMERCIAL COURT OF PARIS

---

In the year two thousand five, on the

## BY THE PETITION OF:

The company **Vivendi Universal**, a corporation capitalized at 5,899,433,996.50 euros, headquartered at 42, avenue de Friedland 75008 Paris, registered with the Register of Businesses and Companies under number 343 134 763, acting through its legal representative, domiciled in this capacity at the corporate headquarters,

**Represented by:**
**Jean-Michel**
**Darrois Hervé**
**Pisani**
**Matthieu de**
**Boïsséson**
Attorneys at the Paris Bar
Darrois Villey Maillot Brochier
69, avenue Victor Hugo - 75116
Paris
Tel. 01 45 02 19 19 – Locker
R170,

Electing domicile in their law office

## I, THE UNDERSIGNED BAILIFF

**199**

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

**SERVED THE SUMMONS UPON:**

**T-Mobile International AG & Co. KG.**, a company formed under German law, headquartered at Landgrabenweg 151, 53227, Bonn, Germany, with personal service upon its legal representative,

And upon:

**Deutsche Telekom AG**, a company formed under German law, headquartered at Friedrich-Ebert-Allee 140, 5 3U3 Bonn, Germany, with personal service upon its legal representative.

*[Stamp: TRADUTEC, 30 bis rue Emile Menier – 75116 PARIS]*

**200**

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

**To appear on September 9, 2005, at 12:00 p.m., at a hearing before the judges of the Commercial Court of Paris, located at Paris (75004), 1, quai de Corse.**

Informing them that a suit was brought against them for the reasons set forth below,

that they are required to appear at this hearing and that they themselves may attend or be represented by any person of their choice, their representative, if not an attorney, needing special leave to appear,

making clear to them that should they fail to appear or in being represented, they are at risk of a judgment being rendered against them based solely on the facts provided by the plaintiff. The documentary evidence on which the complaint is based is listed at the end of this document.

## SUBJECT OF THE COMPLAINT

**1.**   By maneuvers as underhanded as they are illegal, the defendants are trying, without paying just compensation, to take over PTC, a Polish company in which Vivendi Universal is a 49% indirect shareholder, and in which Vivendi Universal has invested more than 1.8 billion euros.

To bring about this dispossession, the defendants, suddenly and without justification, broke off in bad faith the negotiations that they had long been engaged in, at their initiative, with Vivendi Universal.

**2.**   In order to appreciate the nature and gravity of Deutsche Telekom's actions, it is necessary first of all to describe the general framework in which the actions complained of were committed.

## I.    Review of the facts

### A)    The acquisition of Vivendi's holdings in the Polish company PTC

**3.** The company Polska Telefonia Cyfrowa Sp.zo.o (hereinafter "PTC") was formed in December 1995 to be a mobile telephone operator in Poland. Because Polish law required at that time that the majority of capital be held by a Polish shareholder, 32.5% of PTC was held by the Polish company Elektrim (a conglomerate listed in Warsaw and present in the electricity sector), by two foreign investors (the companies Deutsche Telekom and

**201**

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

US West, each holding 22.5%), with the balance being held by Polish shareholders. The relationship among shareholders of PTC is governed by an agreement.

202

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

As PTC is experiencing rapid growth, the Polish minority shareholders wished to sell their interest to Elektrim in 1999, this deal thereby allowing the latter to become the majority shareholder of PTC. Having encountered financial difficulties, however, Elektrim was unable to acquire these minority interests by itself.

**4.** Elektrim therefore appealed in May 1999 to an investor, in the person of Vivendi Universal, already present in Central Europe in various energy and telecommunications activities. In June 1999, Elektrim and Vivendi Universal entered into an agreement by which Elektrim was to contribute to Telco, a company of which it had 100% control, the shares of PTC that it held, in order to then transfer a part of the Telco shares to Vivendi Universal. Two additional agreements were later concluded, resulting in Telco being held 49% by Vivendi Universal and 49% by Elektrim, with the balance being held by the company Ymer.

The financing provided by Vivendi Universal allowed Elektrim to acquire the minority interests of PTC, and the acquisition by Vivendi Universal of 49% of Telco, after the contribution by Elektrim to Telco of the PTC shares that it held, i.e., 48% of the capital and voting rights of PTC. Thus, at the end of 1999, Vivendi Universal held 49% of the capital of Telco, for a total investment of approximately $1.2 billion.

At that time, Deutsche Telekom acquired US West, which held 22.5% of the shares of PTC, which brought its investment up to 45%, in light of the fact that it could not at that time, as a result of Polish law, hold the majority of capital in PTC.

As a result of these transactions, the simplified employee stock ownership plan of PTC, the foremost mobile telephone operator in Poland, is as follows:



## B)   Deutsche Telekom's challenge and the litigation between the parties

**5.** Unable to take control of PTC, Deutsche Telekom decided to commence various court proceedings in order to challenge the agreements entered into between Vivendi Universal and Elektrim and thus prevent the transfer of PTC shares from Elektrim to Telco.

Deutsche Telekom instituted an initial arbitration proceeding in Vienna, demanding the profit from the right of preemption provided for by the PTC shareholders' agreement.

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

This proceeding failed because it was shown that Deutsche Telekom, which claimed to hold 45% of PTC, had falsely testified, because evidence showed that it surreptitiously held an additional 4% through the company POLPAGER.

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

Being unable, under Polish law, to hold the majority of capital in PTC, it could not therefore seek to exercise its right of preemption.

In December 2000, Deutsche Telekom commenced a second arbitration proceeding against Elektrim and Telco to try to challenge the transfer by Elektrim to Telco of its PTC shares.

### C)    The negotiations between Vivendi Universal and Deutsche Telekom

1.    <u>The negotiations conducted with Deutsche Telekom</u>

**6.** It is in this contentious context that Vivendi Universal and Deutsche Telekom approached one another, on one hand to try to find a resolution to their disputes, and on the other hand to work out their competing interests in PTC.

On August 25, 2003, Deutsche Telekom made an offer to Telco, Vivendi Universal and Elektrim to acquire all the shares of PTC held by Telco, for the price of 1 billion euros, later increased to 1.1 billion euros, then to 1.3 billion euros.

In its response of September 4, 2003, Telco took note of Deutsche Telekom's offer and confirmed its wish to discuss the terms and conditions of the offer.

Negotiations then began and continued for more than a year. They basically took place between Vivendi Universal and Deutsche Telekom (and its subsidiary T-Mobile), but also involved Elektrim and Telco.

**7.** The acquisition process having begun, a process called due diligence ("data room") was started in order to permit Deutsche Telekom to study all the records regarding Telco and PTC. It dealt in particular with financial documents (financial statements), corporate and tax documents and important contracts. In the course of this process, the defendants also had access to documents relating to the pending arbitrations.

In December 2003, Vivendi Universal sent Deutsche Telekom a draft acquisition agreement that received comments by both parties.

On January 9, 2004, Deutsche Telekom sent a two-page memorandum to Vivendi Universal briefly summarizing the matters still needing to be addressed between the parties and to be taken into account in the draft acquisition agreement.

On January 16, 2004, Deutsche Telekom sent Vivendi Universal a modified draft acquisition agreement for the shares of PTC, proposing that the points raised in its January 9, 2004 memorandum be addressed during a meeting on January 26, 2004.

The discussions continued in a constructive manner, and on April 19, 2004, Deutsche Telekom sent a list of 14 issues still to be resolved before arriving at a final agreement.

**205**

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

A review of the exchange between the parties shows that the matters being discussed were standard for this type of transaction and that they did not give rise to material difficulties that would make the transfer of PTC shares to Deutsche Telekom unlikely.

**8.** On May 14, 2004, more than nine months after the beginning of negotiations, Vivendi Universal and Elektrim (shareholders of Telco) sent Deutsche Telekom a joint letter confirming their intention to transfer to Deutsche Telekom the shares of PTC held by Telco. The offer also contained a compromise settlement of all the disputes pending between the parties.

On May 18, 2004, Deutsche Telekom expressed approval of the offer, but asked Vivendi Universal and Elektrim to provide it with all legal documentation in order to verify that no unresolved questions remained.

**9.** Because Poland joined the European Union on May 1, 2004, the parties agreed that the transaction for the acquisition by Deutsche Telekom of the PTC shares had to be submitted to the European Commission for the regulation of mergers. To this end, Deutsche Telekom prepared a draft notice to the European Commission.

**10.** The negotiations continued in June 2004 and July 2004. On August 2, 2004, Deutsche Telekom even proposed that the agreement for the transfer of shares of PTC be concluded before the end of that week, and asked Vivendi Universal to instruct its attorneys to accelerate the drafting of the transfer agreement.

On August 5, at the end of the meeting between the respective counsel for Deutsche Telekom, Vivendi Universal and Elektrim, Vivendi Universal sent to Deutsche Telekom the latest version of the agreement for the acquisition of PTC shares, reflecting the discussions had between the parties.

This contract was still being discussed on August 12, 2004, as Deutsche Telekom was asking Vivendi Universal for two new concessions that were ultimately granted.

2.    The outcome of the negotiations

**11.** On August 27, 2004, Deutsche Telekom sent Vivendi Universal a new version of the agreement ending all the legal actions and proceedings, and asking Vivendi Universal to provide any feedback as soon as possible.

After more than a year of negotiations, the parties exchanged the final versions of the agreement for the acquisition of the shares of PTC and of the guarantee and indemnification contract (guarantees for liabilities). Vivendi Universal sent these documents on September 1, 2004, with a reminder that they were the final versions ("execution versions") of the agreements resulting in particular from the last concessions made by Vivendi Universal to Deutsche Telekom.

There was nothing to foretell what would then be the attitude of Deutsche Telekom.

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

3.    <u>The sudden and unilateral breaking off of negotiations by Deutsche Telekom</u>

**12.**    Against all expectations, after more than a year of negotiations and when an agreement had at last been reached between the parties regarding all the questions at issue, Deutsche Telekom unilaterally and suddenly ended the deal.

Without giving the least justification or explanation, Deutsche Telekom sent a letter on September 7, 2004 containing two lines stating:

> *"After consultation with our Supervisory Board on Friday, I am writing to advise you that we are not in a position to finalize your draft settlement as it stands."*

Without the least regard for its partners, Deutsche Telekom would not give any other explanation. Worse yet, it seems that the settlement was in reality not even formally presented to Deutsche Telekom's Supervisory Board.

Even though the agreements were drafted in their final versions, and there was not a single point of disagreement between the parties, Deutsche Telekom suddenly changed its strategy. Less than a month after the parties were advised (by a fax sent by the Court of Arbitration on August 12, 2003) that the final decision in the second arbitration proceeding commenced in Vienna by Deutsche Telekom would be issued in October, and as a draft of the decision had already been prepared and needed to be discussed by the arbitrators at the end of September, Deutsche Telekom definitively broke off the negotiations, unilaterally and without prior notice.

It was only beginning in November 2004 that Vivendi Universal understood the true nature of Deutsche Telekom's actions, when the Court of Arbitration rendered its decision, and when Deutsche Telekom, in collusion with the Elektrim, put into play its strategy to attempt to illegally take possession of the shares of PTC without paying even a penny to Vivendi Universal.

The premeditated nature of the breaking off of negotiations was confirmed by a discovery that Vivendi Universal would not make until later: on September 24, 2004, that is to say after the breaking off **but before the arbitration decision was rendered**, Deutsche Telekom, using its subsidiary T-Mobile International AG & Co. KG as an intermediary, notified the European Commission that it had taken control of PTC by exercising a call option. Deutsche Telekom was thus preparing to despoil Vivendi Universal and, to that end, suddenly and wrongfully broke off the negotiations.

**D)    The actions of Deutsche Telekom after the breaking off of negotiations**

**13.**    After four years of proceedings, the arbitration decision rendered on November 26, 2004 held that the transfer of the interest in PTC by Elektrim was "ineffective" with regard to Deutsche Telekom, and declared that Elektrim would be in breach of its commitments if it did not succeed in recovering from Telco the shares of PTC within a period of two months.

But the agreement by the shareholders of PTC provides that in case of "material breach," Deutsche Telekom would have a promise of sale (call option) for the shares of PTC held by Elektrim, at a price well below that which it had negotiated with Vivendi Universal.

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

However, in this same arbitration decision, the Court decided that it did not have any jurisdiction with regard to Telco, sued by Deutsche Telekom. The decision therefore was not legally binding upon Telco, currently the owner of the shares.

This decision finds the existence of a contractual violation committed by Elektrim against Deutsche Telekom without, however, challenging Telco's ownership of the PTC shares , and without deciding as to their return.

**14.** Because the arbitration decision needed to be recognized by a Polish court in order to be binding in Poland, on December 16, 2004, Elektrim submitted to the Warsaw Court an incomplete version of the decision, simply suppressing the part unfavorable to Deutsche Telekom, namely the part of the decision that rejected Deutsche Telekom's claims with regard to Telco.

Paradoxically, this demand for an endorsement of part of the decision, filed by Elektrim, a party to the arbitration, did not give rise to any opposition on the part of Deutsche Telekom, which, to the contrary, joined Elektrim's demand. This behavior reveals the pact between the two parties, who were nonetheless adversaries in the arbitration, to obtain the endorsement of a truncated version of the decision, to the detriment of Telco and therefore of Vivendi Universal.

**15.** In light of these maneuvers, Telco requested from the Court, and obtained on December 30, 2004 an injunction prohibiting any modification to PTC's shareholders' ledger pending a declaratory judgment for the recognition of its ownership.

In spite of this injunction, and with the support of Deutsche Telekom, Elektrim tried without success on two occasions to have the court in charge of the Warsaw Trade Register register it as a shareholder of PTC, finally succeeding on its third try, after producing a false shareholder list. The objective was thus to transfer with a dummy entry, and without payment, the ownership of the shares of PTC transferred by Elektrim to Telco in 1990.  An appeal of the decision of the court in charge of the Trade Register was filed, and that proceeding is currently pending.

Telco tried on four occasions to join the proceeding for a partial enforcement order, in order to assert its rights and to denounce the proceeding as completely counter to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards done in New York in 1958, ratified by Poland. The possibility of Telco participating in the proceeding, to which Elektrim and Deutsche Telekom were jointly opposed, was systematically rejected by the judge deciding the case, despite the obviously legitimate interest of Telco to act to protect its interest in PTC, which Deutsche Telekom and Elektrim were disputing.  It is true that this judge happened to be the former spouse of the attorney for Elektrim's primary shareholder.

Disregarding the letter and the spirit of the New York Convention, a partial enforcement order for the decision was issued on February 2, 2005 by the Court of Warsaw without Telco being able to participate in the proceeding that narrowed the scope of the decision. Telco filed an appeal of that decision.

On February 22, 2005, the regional public prosecutor of Warsaw also filed an appeal of the partial enforcement order.

208

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

Vivendi Universal filed an appeal with the Polish government on February 28, 2005 based on the February 14, 1989 Franco-Polish agreement for the protection of investments. The French authorities intervened to support Vivendi Universal's claim that it was a victim of a real attempt at expropriation and dispossession in Poland.

**16.** Deutsche Telekom and Elektrim, initially adversaries in the arbitration proceeding, now seem to be pursuing a joint fraudulent strategy aimed at dispossessing without compensation Telco and therefore Vivendi Universal of the shares of PTC, which would then allow their transfer to Deutsche Telekom at a very low price.

Deutsche Telekom and Elektrim illegally formed a parallel Supervisory Board, to stand in for the legitimate Supervisory Board. Deutsche Telekom representatives attest to being seated on the two competing bodies, and are fully involved in Elektrim's maneuvers.

The fake Supervisory Board met and appointed a fake Board of Directors who himself drew up on February 23, 2005 a fake list of PTC shareholders, signed by two representatives of Deutsche Telekom, inserting Elektrim in the place of Telco and not reflecting the register for the trading of shares in the corporation. It was by submitting this false list to the court in charge of the Trade Register that Elektrim finally obtained its registration as a shareholder of PTC on the night of February 23 to 24, 2005, in spite of the injunction prohibiting any modification in the shareholding. On the basis of this registration, Elektrim now declares itself the owner of shares without having paid the slightest financial compensation for them.

A criminal complaint was therefore filed with the public prosecutor of Warsaw against the members of the "phantom" Supervisory Board of PTC.

Along the same lines, a request for an injunction against Elektrim was made by Vivendi Universal to a Court of Arbitration based in London, seeking to enjoin Elektrim from forming a parallel Board of Directors and from transferring the shares of PTC. The Court of Arbitration based in London granted Vivendi Universal's request on March 24, 2005 and, as a protective measure, enjoined Elektrim from transferring the shares of PTC and ordered Elektrim to exercise the voting rights attached to these shares in conformity with Telco's instructions.

**17.**    On March 4, 2005, the members of the fake Board of Directors managed to get into the PTC offices and to deny access to the legitimate directors, thus taking control of the PTC company by force.

**It now seems evident, in light of the events very briefly described above, and which the plaintiff reserves the right to elaborate upon in its subsequent submissions, that Deutsche Telekom first lulled the vigilance of Vivendi Universal by engaging in a contractual negotiation that it then suddenly broke off with the sole aim of trying to seize, in collusion with Elektrim, the shares of PTC held by Telco, at the lowest cost and to the detriment of Vivendi Universal.**

[Stamp: Firm of Noel
Agnus and Raynald
Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

## II.    Discussion

### A.    As to the jurisdiction of French courts and the application of French law

**18.** Pursuant to the terms of article 5.3 of the Council regulation no. 44/2001 dated December 22, 2000 "concerning jurisdiction and the recognition and enforcement of judgments in civil and commercial matters," effective March 1, 2002:

> *"A person domiciled in a Member State may be sued in another Member State... in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur."*

This provision of Community regulation is, as the European Court of Justice held, applicable to the obligation to redress injury resulting from an unjustified breaking off of negotiations, *"in matters relating to tort, delict or quasi-delict, pursuant to article 5, point 3 of the Brussels Convention,"* and therefore so is article 5.3 of the regulation dated December 22, 2000, which succeeded it, and the drafting of which, on this point, is identical.

All that remains, therefore, is to determine the *"place where the harmful event occurred."*

According to the case law of the European Court of Justice, as expressed in the matter *Mines de Potasse d'Alsace [Potash Mines of Alsace]* (CJCE November 30, 1976, aff. *21/76, Rec.* 1735, concl. Capotorti), *"The expression 'place where the harmful event occurred' must be understood as meaning both the place where the injury took place, and the place of the causal event. It follows that the defendant may be sued, at the plaintiff's choice, either in the court of the place where the injury took place, or in the court of the place of the causal event giving rise to this injury."*

The plaintiff therefore has the option of choosing jurisdiction either at the place of the action giving rise to the injury or the place of the injury itself.

More specifically, in terms of pre-contractual liability, the harmful action occurs at the place of the reception of the letter breaking off negotiations (Rennes, April 29 1992, SA Vedette industrie et al. vs. Epoux Renault et al., Bull. Joly 1993, 465, note of Professeur Daigre).

**19.** In the case at hand, the plaintiff thus has the right to sue the defendants in the Commercial Court of Paris, since the letter breaking off negotiations sent by Deutsche Telekom was received at Vivendi Universal's headquarters.

More generally, there is no doubt that the injury was sustained in France, since it was sustained by Vivendi Universal, a French company.

The Commercial Court of Paris therefore has jurisdiction to rule on the liability of the defendants for their wrongful actions pursuant to article 1382 of the Civil Code.

210

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

### B.    Deutsche Telekom's liability for wrongdoing

1.    <u>The wrongful breaking off of negotiations by Deutsche Telekom</u>

**20.** It is established that the right to break off precontractual relations is relative and that its exercise has limits.

There is fault and liability when one of the parties to a negotiation suddenly, without prior notice and without good cause brings an end to negotiations that had reached their final phase.

**21.** The facts set forth establish that Deutsche Telekom suddenly brought an end to the relationship without prior notice, after having allowed Vivendi Universal to believe that the negotiations were unfolding normally, and without the justification of any good cause for breaking off the negotiations even though they had lasted more than a year and they had arrived at their final stage.

Moreover, it put an end to these negotiations with the intention of harming Vivendi Universal by trying to take possession of the shares of PTC at the lowest price.

These are the breaches that are the cause of the damage suffered by Vivendi Universal.

**22.** After more than a year of negotiations, even though the final version of the contracts had been sent to the parties, Deutsche Telekom sent a terse, two-line letter on September 7, 2004, to put an end to the negotiations.

At this stage of the negotiations, there had not remained a single point of disagreement between the parties.

Vivendi Universal had no reason to suspect that the negotiations would end in this manner. Deutsche Telekom never alerted Vivendi Universal about such a decision. Quite to the contrary, Vivendi Universal having made the last concessions demanded by Deutsche Telekom, there was nothing to lead it to anticipate such a breaking off of negotiations.

**23.** The events following the breaking off showed that Deutsche Telekom suddenly put an end to the negotiations in order to favor, to the detriment of Vivendi Universal, an alternative means of taking possession of the shares of PTC without paying just compensation to Vivendi Universal.

Through its unfair and fraudulent maneuvers described in the statement of facts, Deutsche Telekom is attempting, by any means possible, to take control of PTC and of the shares held by the subsidiary of Vivendi Universal, the company Telco.

**24.** Case law punishes the breaking off of negotiations when it occurs *"without a legitimate reason, suddenly and unilaterally"* (Cass. com. Feb. 15, 1965, Bull; IV 110123).

In the case at hand, not only did Deutsche Telekom put an end to the discussions without a legitimate reason and abruptly, but it did so in bad faith to pursue a wrongful objective.

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

Deutsche Telekom kept Vivendi Universal convinced of the imminent conclusion of the agreement. Until the last moment, it demanded final concessions that were accepted by Vivendi Universal.

At no moment did Deutsche Telekom apprise Vivendi Universal of its reservations about the completion of the process. Quite to the contrary, it was Deutsche Telekom who, on numerous occasions, hastened the discussions and asked Vivendi Universal to put pressure on its counsel.

Consequently, the letter sent by Deutsche Telekom to Vivendi Universal on September 7, 2004 clearly constitutes a sudden breaking off of negotiations, without prior notice and without grounds. By acting in such a manner, Deutsche Telekom violated the law and committed an offense for which it owes restitution.

**2.** The substantial prejudice caused to Vivendi Universal by Deutsche Telekom

a) The risk of the loss of its investment in Poland caused by the wrongful breaking off of negotiations

As a result of the wrongful breaking off of negotiations, which allowed Deutsche Telekom to undertake its underhanded maneuvers, in collusion with Elektrim, in Poland, Vivendi Universal finds itself deprived of any possibility of enjoying its indirect holding in PTC, and of selling it to a third party.

Deutsche Telekom kept Vivendi Universal under the illusion of a favorable outcome to the discussions, rendering pointless, and in practice impossible, the search by Vivendi Universal of other solutions, in order to bring a sudden end to these discussions in a context that thereafter prevented the plaintiff from implementing a solution preserving its financial interests.

Vivendi Universal could even find itself deprived of this investment if it does not succeed in having its rights recognized in Poland, rights currently scorned by Deutsche Telekom and Elektrim, which are exploiting gaps in the Polish judicial system by taking advantage of a truncated version of the arbitration decision of November 24, 2004, in disregard of the most established rules of international law.

It follows that, if on the day on which the Court rules on Vivendi Universal's claim, the right of Telco's ownership of the PTC shares is not recognized in Poland, and Deutsche Telekom takes possession of said shares without Vivendi Universal receiving their fair value, Vivendi Universal will have suffered, as a result of the wrongful breaking off of negotiations, damage equal to the amount of its investment, to wit 1,881,601,161 euros, plus interest accrued up to the date of the judgment and based upon the deprivation of the sums invested by Vivendi Universal.

b) The loss of the opportunity to transfer its interest in PTC to a third-party or to otherwise protect its investment

According to case law, the fact that *"the company lost [as a result of the vain pursuit of negotiations] an opportunity, be it tenuous, to find another buyer"* constitutes a compensable injury (Cass. com., June 18, 2002, NGM, no. 99-16488, p. 282, obs. Mestre and Fages).

212

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

By keeping Vivendi Universal under the illusion of a transfer for a year and by wrongfully and abruptly putting an end to the negotiations, the defendants deprived Vivendi Universal of the opportunity to find a buyer for its indirect holding in PTC or to put in place any other solution to protect its investment in Poland.

Deutsche Telekom having itself admitted that the valuation of 51% of PTC had at that time increased to 1.3 billion euros, and accounting for a 50% probability of finding an alternative solution to that proposed to Deutsche Telekom, the damage suffered by Vivendi Universal comes to 650 million euros.

This damage, however, is intermixed with that stemming from the loss of the investment by Vivendi Universal in Poland and is not separately indemnifiable except if, by some unlikely chance, this latter injury is not recognized.

c)    The damage suffered by Vivendi Universal to its image

The wrongful breaking off of negotiations and the underhanded behavior of the defendants caused Vivendi Universal substantial damage to its image. The market is very sensitive to Vivendi Universal's investments abroad, with the investment made in telephony in Poland comprising one of its largest.

Vivendi Universal is moreover a company that is watched particularly closely by investors, such that the announcement of the failure of the negotiations and the consequences flowing therefrom have had a significant impact on the company's image.

**25.** This situation weakens Vivendi Universal in terms of its other investments abroad and particularly in the countries of Eastern Europe.

For these reasons, the Court should order the defendants to pay Vivendi Universal the sum of 50 million euros in damages relating to the damage that it suffered to its image.

d)    The transfer of Veolia shares

Relying on the very advanced state of discussions with the defendants, Vivendi Universal included in its financing plan the profit from the transfer of its interest in Telco.

Faced with the sudden breaking off of discussions by the defendants, it had to substitute therefor an accelerated transfer of 61 million shares of Veolia at an average price of 24.54 euros per share, to wit a total profit of 1,496,940,000 euros.

Vivendi Universal was consequently deprived of the increase in value of the Veolia stock, the value of which has been increasing constantly since the beginning of 2005.

Based on the rate on April 21, 2005, which was 28.43 euros, Vivendi Universal was thus deprived of an increase of 3.89 euros per share, to wit a total loss of 237,290,000 euros.

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

e)    The costs incurred due to the negotiation

**26.** Because of the importance of the matter, Vivendi Universal incurred considerable costs in conducting negotiations with Deutsche Telekom.

Vivendi Universal called upon outside counsel, who negotiated for more than a year. They assured that Vivendi Universal's interests were represented at numerous meetings, and they negotiated directly with Deutsche Telekom as well as with Elektrim. They also prepared numerous legal documents in the form of draft contracts and had to prepare legal opinions.

In terms of outside counsel, Vivendi Universal spent 2,525,928 euros in fees.

**27.** Moreover, for the negotiations, Vivendi Universal had to allocate substantial internal resources to the management of these projects. The Chief Financial Officer of Vivendi Universal, Jacques Espinasse, and his deputy, Dominique Gibert, spent the equivalent of approximately 30 full days on them. With the addition of the time spent by other Vivendi Universal personnel, estimated at 60 days/person, the prejudice estimated by Vivendi Universal increases to 375,000 euros.

In addition, numerous trips and meetings took place in Poland with different participants drawn from the highest levels of Vivendi Universal's management. Vivendi Universal thus had to incur expenses to organize the travel of its personnel in Poland. The totality of these expenses is currently estimated at 30,000 euros, the final sum to be determined.

**28.** For the totality of these claims, Vivendi Universal asks the Court to order Deutsche Telekom to pay it damages in the sum of 2,171,822,000 euros.

### 3.    The causal link between the wrongs and the damages

**29.** Deutsche Telekom's wrongful acts, characterized by their nature and their seriousness, were the direct cause of the injuries cited by Vivendi Universal.

First of all, as to the expenses incurred due to the negotiations. Their having been incurred is directly tied to the negotiations, and the damages stem from the breaking off of the negotiations.

In terms of intangible injury and injury to its image, these stem directly from the wrongful breaking off of negotiations in that it was the attitude of Deutsche Telekom that directly undermined the image of Vivendi Universal.

The sale of the Veolia shares having occurred in December only to make up for the absence of profit from the transfer of Telco shares due to the wrongful breaking off of negotiations by Deutsche Telekom even though agreement had been reached on all points in the negotiation, the lost profits suffered by Vivendi Universal were directly caused by this wrongful breaking off of negotiations.

In terms of the injury related to the risk of the loss of the investment in Poland, the facts set forth above show that it would not have come about without the wrongful breaking off of negotiations by the defendants.

214

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

**30.** Finally, equity requires that Deutsche Telekom be ordered to pay Vivendi Universal the sum of 200,000 euros for the costs incurred by the latter in bringing the instant legal action.

215

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

# WHEREFORE

---

In consideration of the facts and law set forth herein,
In consideration of article 1382 of the Civil Code,

The plaintiff prays the Court to:

- Find that Deutsche Telekom is liable for the breaking off of negotiations undertaken for its purchase of the shares of PTC;

- Find that this breaking off of negotiations caused Vivendi Universal financial damages and injury to its image, provisionally set at 2,171,822,000 euros, the final sum to be determined;

Consequently to:

- Order the defendants jointly and severally to pay the plaintiff the sum of 200,000 euros pursuant to article 700 of the New Code of Civil Procedure and to bear all costs;

- Order the provisional enforcement of the decision to be rendered.


RESERVING ALL RIGHTS


[Stamp: Firm of Noel Agnus and Raynald Parker]

216

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

### LIST OF EXHIBITS

1. Offer for the acquisition of shares of PTC held by Telco sent by Deutsche Telekom to Telco and its shareholders (Vivendi Universal and Elektrim), dated August 25, 2003

2. Response by Telco to the Deutsche Telekom offer, dated September 4, 2003

3. Memorandum sent by Deutsche Telekom to Vivendi Universal, dated January 9, 2004

4. Modified draft acquisition agreement for the shares of PTC, sent by Deutsche Telekom to Vivendi Universal on January 16, 2004

5. List of the fourteen questions remaining to be decided, sent by Deutsche Telekom, dated April 19, 2004

6. Joint letter from Vivendi Universal and Elektrim sent to Deutsche Telekom on May 14, 2004

7. Response from Deutsche Telekom, dated May 18, 2004, to the joint letter from Vivendi Universal and Elektrim dated May 14, 2004

8. E-mail from Deutsche Telekom, dated August 2, 2004, regarding the finalization of the acquisition agreement

9. Draft acquisition agreement sent by Vivendi Universal to Deutsche Telekom on August 5, 2004, reflecting the discussions had between Elektrim, Vivendi Universal and Deutsche Telekom

10. Draft agreement ending all the legal proceedings and procedures, sent by Deutsche Telekom to Vivendi Universal on August 27, 2004

11. Final versions of the agreement for the transfer of shares of PTC and of the guarantee and indemnification contract sent by Vivendi Universal to Deutsche Telekom on September 1, 2004

12. Letter sent by Deutsche Telekom to Vivendi Universal, dated September 7, 2004, informing it of the decision by Deutsche Telekom not to finalize the contemplated acquisition

13. Fax sent by the Court of Arbitration to the counsel for the parties, dated August 12, 2004, informing them that the arbitration decision would be rendered in October 2004

14. Extract of the Official Journal of the European Union from October 6, 2004, concerning publication of the pre-merger notification given by T-Mobile on September 24, 2004

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

15. Extract of the Official Journal of the European Union from November 17, 2004, concerning publication of the decision of non-opposition of the European Commission to the merger transaction noticed by T-Mobile

16. Arbitration decision dated November 26, 2004

17. Injunction from the regional Court of Warsaw, dated December 30, 2004, prohibiting any modification of PTC's shareholders' ledger

18. Partial enforcement order of the decision rendered on February 2, 2005 by the regional Court of Warsaw

19. Notice of appeal by Telco from the partial enforcement order

20. Notice of appeal by the regional attorney general of Warsaw, dated February 22, 2005, from the partial enforcement order

21. Appeal filed by Vivendi Universal with the Polish government, based on the February 14, 1989 Franco-Polish agreement for the protection of investments

22. Notice of dismissal by Elektrim of members of the Supervisory Board of PTC, dated December 10, 2004

23. Notice of the designation by Elektrim of new members of the Supervisory Board of PTC, dated December 10, 2004

24. Letter sent by Jacek Nieweglowski (member of the Supervisory Board of PTC) to the members of the Board of Directors of Elektrim, dated December 13, 2004

25. Letter sent by Philippe Houdouin (member of the Supervisory Board of PTC) to the members of the Board of Directors of Elektrim, dated December 13, 2004

26. Letter sent by Michel Picot (member of the Supervisory Board of PTC) to the members of the Board of Directors of Elektrim, dated December 13, 2004

27. Fax sent by Dariusz Oleszczuk (Chairman of the Supervisory Board of PTC) to Mickael Günther (Vice-Chairman of the Supervisory Board of PTC), dated December 13, 2004

28. Fax sent by Mickael Günther to Dariusz Oleszczuk, dated December 13, 2004

29. Fax sent by Mickael Günther to Dariusz Oleszczuk, dated December 20, 2004

30. Fax sent by Mickael Günther to the members of the Board of Directors of PTC announcing a meeting of the Supervisory Board of PTC on January 10, 2005

31. Letter sent by Dariusz Oleszczuk to Uli Kühbacher, dated January 22, 2005

32. Notice to the Supervisory Board of PTC, sent by two representatives of Elektrim, to attend a meeting on February 3, 2005

[Stamp: Firm of Noel Agnus and Raynald Parker]

[stamp] Official Translator
Paris Circuit Court
P. Bonnefous
30 bis, rue Emile-Menier
75116 PARIS France
TEL: 01 45 53 23 13

33. Letter sent by the four members of the Board of Directors of PTC designated by Telco to the members of the Supervisory Board, dated February 2, 2005

34. Notice of the appointment by Elektrim of a new member of the Supervisory Board of PTC, dated February 3, 2005

35. Shareholder list drawn up on February 23, 2005 by the unlawfully formed Board of Directors of PTC

36. Criminal complaint filed with the regional public prosecutor of Warsaw by Telco against the members of the unlawfully formed Supervisory Board of PTC

37. Decision by the Court of Arbitration based in London, dated March 24, 2005, enjoining Elektrim, as a protective measure, from transferring the shares of PTC

38. Letter from PTC to the Warsaw bailiff (*"komornik"*), dated April 15, 2005, stating that Telco is not a shareholder of PTC

39. Letter from Deutsche Telekom to the Warsaw bailiff (*"komornik"*), dated April 15, 2005, stating that Deutsche Telekom has held 48% of the shares of PTC since March 24, 2005

*[Rubber stamp of Patrice BONNEFOUS, translator]*

[Stamp: Firm of Noel Agnus and Raynald Parker]

219

## TRANSLATOR'S CERTIFICATE

I, HASAN SHAFIQULLAH, declare under penalty of perjury that I am thoroughly competent in both French and English, and that the foregoing document is a true and correct translation of the attached document, which I translated from French to English, on this 2nd day of February, 2007.

Hasan Shafiqullah
Hasan Shafiqullah

220



## ASSIGNATION DEVANT LE
## TRIBUNAL DE COMMERCE DE PARIS

L'an deux mille cinq et le

**A LA DEMANDE DE :**

La société **Vivendi Universal**, société anonyme au capital de 5.899.433.996,50 euros, dont le siège social est situé 42, avenue de Friedland 75008 Paris, immatriculée au registre du commerce et des sociétés de Paris sous le numéro 343 134 763, agissant par son représentant légal, domicilié en cette qualité au siège de la société,

> **Ayant pour avocats :**
> **Jean-Michel Darrois**
> **Hervé Pisani**
> **Matthieu de Boisséson**
> Avocats au Barreau de Paris
> Darrois Villey Maillot Brochier
> 69, avenue Victor Hugo - 75116 Paris
> Tél. 01 45 02 19 19 – Vest. R170,

Elisant domicile en leur cabinet

**J'AI, HUISSIER DE JUSTICE SOUSSIGNÉ**

**DONNÉ ASSIGNATION A :**

La société **T-Mobile International AG & Co. KG.**, société de droit allemand, dont le siège social se situe à Landgrabenweg 151, 53227, Bonn, Allemagne, prise en la personne de son représentant légal,

Et à :

La société **Deutsche Telekom AG**, société de droit allemand dont le siège social se situe Friedrich-Ebert-Allee 140, 5 3113 Bonn, Allemagne, prise en la personne de son représentant légal.

Société Civile Professionnelle
Noël AGNUS et

TRADUTEC
30 bis, rue Émile Menier - 75116 PARIS

221



D'avoir à comparaître le 9 septembre 2005 à 12 heures, à l'audience devant Messieurs les Président et Juges composant le Tribunal de Commerce de Paris, sis à Paris (75004), 1, quai de Corse.

leur indiquant qu'un procès leur est intenté pour les raisons ci-après exposées,

qu'elles sont tenues de comparaître à cette audience et qu'elles peuvent s'y faire assister ou s'y faire représenter par toute personne de leur choix, leur représentant, s'il n'est avocat, devant justifier d'un pouvoir spécial,

leur précisant qu'à défaut de comparaître ou de se faire représenter, elles s'exposent à ce qu'un jugement soit rendu à leur encontre, sur les seuls éléments fournis par la demanderesse. Les pièces sur lesquelles est fondée la demande sont visées en fin d'acte.

·  ·  ·   · · · ·  ·

## OBJET DE LA DEMANDE

**1.**   Par des manœuvres aussi déloyales qu'entachées d'illégalité, les défenderesses tentent, sans en payer le prix de s'emparer de la société PTC, société de droit polonais dans laquelle Vivendi Universal est indirectement actionnaire à hauteur de 49% et dans laquelle elle a investi plus de 1,8 milliard d'euros.

Pour mener à bien cette spoliation, les défenderesses ont brutalement et sans justification, interrompu de mauvaise foi les pourparlers engagés de longue date, à leur initiative, avec Vivendi Universal.

**2.**   Pour permettre d'apprécier la nature et la gravité des comportements de Deutsche Telekom, il importe au préalable de décrire le cadre général dans lequel les actes reprochés ont été commis.

## I.     Rappel des faits

## A)    La prise de participation de Vivendi dans la société polonaise PTC

**3.**   La société Polska Telefonia Cyfrowa Sp.zo.o (ci-après « PTC ») a été constituée en décembre 1995 pour devenir en Pologne un opérateur de téléphonie mobile. La loi polonaise imposant à l'époque que la majorité du capital soit détenue par un actionnariat polonais, PTC était détenue par la société polonaise Elektrim (conglomérat coté à Varsovie présent dans le secteur de l'électricité) à hauteur de 32,5%, par deux investisseurs étrangers (les sociétés Deutsche Telekom et US West détenant chacune 22,5%), le solde étant détenu par des actionnaires polonais. Un pacte régit les relations entre actionnaires au sein de PTC.



222



PTC connaissant un développement rapide, les actionnaires minoritaires polonais souhaitèrent céder en 1999 leur participation à Elektrim, cette opération permettant à cette dernière de devenir l'actionnaire majoritaire de PTC. Rencontrant cependant des difficultés financières importantes, Elektrim n'était pas en mesure d'acquérir seule ces participations minoritaires.

4. ̄Elektrim fit donc appel en mai 1999 à un investisseur en la personne de Vivendi Universal, déjà présent en Europe centrale dans diverses activités d'énergie et de télécommunications. C'est ainsi qu'Elektrim et Vivendi Universal conclurent en juin 1999 un accord en vertu duquel Elektrim devait apporter à Telco, société qu'elle contrôlait alors à 100%, les titres de PTC qu'elle détenait pour ensuite céder une partie des titres Telco à Vivendi Universal. Deux accords complémentaires furent conclus postérieurement aboutissant à une détention de Telco à 49% par Vivendi Universal et à 49% par Elektrim, le solde étant détenu par la société Ymer.

Les financements apportés par Vivendi Universal permirent à Elektrim d'acquérir les participations minoritaires de PTC, puis l'acquisition par Vivendi Universal de 49% de Telco, après apport par Elektrim à Telco des titres PTC qu'elle détenait, soit 48% du capital et des droits de vote de PTC. Ainsi, fin 1999, Vivendi Universal détenait 49% du capital de Telco pour un investissement total d'environ 1,2 milliard de dollars.

A cette époque, Deutsche Telekom acquit US West, détenteur de 22,5% des actions PTC, ce qui porta sa participation à 45%, étant rappelé qu'elle ne pouvait à cette époque, détenir la majorité du capital de PTC du fait de la législation polonaise.

En conséquence de ces opérations, l'actionnariat simplifié de PTC, premier opérateur de téléphonie mobile en Pologne, est le suivant :



## B)    L'opposition de Deutsche Telekom et les litiges entre les parties

5.    Ne pouvant pas prendre le contrôle de PTC, Deutsche Telekom décida alors d'engager de multiples procédures afin de s'opposer à la mise en œuvre des accords conclus entre Vivendi Universal et Elektrim et ainsi empêcher le transfert des actions PTC d'Elektrim à Telco.

Deutsche Telekom introduisit ainsi une première procédure d'arbitrage à Vienne revendiquant le bénéfice du droit de préemption prévu par le pacte d'actionnaires de PTC.

Cette procédure échoua car il fut démontré que Deutsche Telekom, qui affirmait détenir 45% de PTC, commettait une fausse déclaration, les faits démontrant qu'elle détenait de manière dissimulée 4% de plus par l'intermédiaire de la société POLPAGER.

223



Ne pouvant, en application du droit polonais, détenir la majorité du capital de PTC, elle ne pouvait donc pas prétendre exercer son droit de préemption.

En décembre 2000, Deutsche Telekom introduisit une seconde procédure d'arbitrage contre Elektrim et Telco pour tenter d'obtenir la remise en cause de l'apport par Elektrim à Telco de ses titres PTC.

### C)    Les négociations entre Vivendi Universal et Deutsche Telekom

#### 1.    Les négociations menées avec Deutsche Telekom

**6.**  C'est dans ce contexte contentieux que Vivendi Universal et Deutsche Telekom se rapprochèrent d'une part pour tenter de trouver une issue à leurs litiges et d'autre part pour régler le sort de leur participation dans la société PTC.

Le 25 août 2003, Deutsche Telekom adressa à Telco, Vivendi Universal et Elektrim une offre pour acquérir la totalité des titres PTC détenus par la société Telco, pour un prix de 1 milliard d'euros, ultérieurement porté à 1,1 milliard d'euros, puis à 1,3 milliard d'euros.

Par réponse du 4 septembre 2003, Telco prit acte de l'offre de Deutsche Telekom et confirma sa volonté de discuter des termes et conditions de l'offre.

Les négociations commencèrent alors pour durer plus d'une année. Elles se déroulèrent essentiellement entre Vivendi Universal et Deutsche Telekom (et sa filiale T-Mobile), mais impliquèrent également Elektrim et Telco.

**7.**  Le processus d'acquisition lancé, une procédure dite de *due diligence* (« data room ») débuta afin de permettre à Deutsche Telekom d'étudier l'ensemble de la documentation relative à Telco et PTC. Il s'agissait notamment de documents de nature financière (comptes sociaux), sociale et fiscale et des contrats importants. Dans ce cadre, les défenderesses eurent également accès aux documents relatifs aux arbitrages en cours.

Au mois de décembre 2003, Vivendi Universal adressa à Deutsche Telekom un projet de contrat d'acquisition qui fit l'objet de commentaires de part et d'autre.

Deutsche Telekom envoya le 9 janvier 2004 un mémorandum de deux pages à Vivendi Universal résumant brièvement les sujets devant encore être traités entre les parties et pris en compte dans le projet de contrat d'acquisition.

Deutsche Telekom adressa le 16 janvier suivant à Vivendi Universal un projet modifié de contrat d'acquisition pour les titres PTC, proposant que les points évoqués dans son mémorandum du 9 janvier 2004 soient abordés au cours d'une réunion le 26 janvier 2004.

Les discussions se poursuivirent de manière constructive et le 19 avril 2004, Deutsche Telekom fit parvenir une liste des 14 questions restant à régler pour parvenir à un accord final.

Société Civile Professionnelle
Noël AGNUS et
Raynald PARKER

L'examen des échanges entre les parties établit que les sujets en discussion furent habituels pour ce type d'opération et qu'ils ne firent pas apparaître de difficultés majeures rendant improbable la réalisation de la cession des actions PTC à Deutsche Telekom.

**8.** Le 14 mai 2004, soit plus de 9 mois après le début des négociations, Vivendi Universal et Elektrim (actionnaires de Telco) adressèrent à Deutsche Telekom une lettre conjointe confirmant leur intention de céder à Deutsche Telekom les actions PTC détenues par Telco. L'offre contenait également un règlement transactionnel de l'ensemble des litiges en cours entre les parties.

Le 18 mai 2004, Deutsche Telekom se félicitait de l'offre mais demandait à Vivendi Universal et Elektrim de lui fournir l'ensemble de la documentation juridique afin de s'assurer qu'il ne reste aucune question non réglée.

**9.** La Pologne ayant rejoint l'Union européenne le 1er mai 2004, les parties convinrent que l'opération d'acquisition par Deutsche Telekom des titres PTC devait être soumise à la Commission européenne au titre du contrôle des concentrations. Dans cette perspective, Deutsche Telekom prépara un projet de notification à la Commission européenne.

**10.** Les négociations se poursuivirent aux mois de juin 2004 et juillet 2004. Le 2 août 2004, Deutsche Telekom proposa même que le contrat de cession des actions PTC soit terminé avant la fin de la semaine en cours et demanda à Vivendi Universal d'instruire ses conseils afin que la rédaction du contrat de cession soit accélérée.

Le 5 août, à l'issue de la réunion entre les conseils respectifs de Deutsche Telekom, Vivendi Universal et Elektrim, Vivendi Universal transmirent à Deutsche Telekom la dernière version du contrat d'acquisition des titres PTC, consolidant les discussions intervenues entre les parties.

Ce contrat sera encore discuté le 12 août suivant, Deutsche Telekom demandant à Vivendi Universal deux nouvelles concessions qui lui seront finalement accordées.

2.    L'aboutissement des négociations

**11.** Deutsche Telekom adressa à Vivendi Universal le 27 août 2004, une nouvelle version de l'accord mettant un terme à toutes les poursuites et procédures et demanda à celle-ci de lui faire part au plus vite de ses observations.

Après plus d'un an de négociations, les parties échangèrent la version définitive du contrat de cession des actions PTC et du contrat de garantie et d'indemnisation (les garanties de passif). Vivendi Universal adressa ainsi ces documents le 1er septembre 2004 en rappelant qu'il s'agit de la version définitive (« *execution version* ») des contrats résultant notamment des dernières concessions faites par Vivendi Universal à Deutsche Telekom.

Rien ne pouvait alors laisser présager ce que serait ensuite l'attitude de Deutsche Telekom.



### 3.    La rupture brutale et unilatérale par Deutsche Telekom

**12.**    Contre toute attente, après plus d'un an de négociations et alors qu'un accord avait enfin été trouvé entre les parties sur l'ensemble des questions, Deutsche Telekom mit unilatéralement et brutalement fin à l'opération.

Sans donner la moindre justification ou explication, Deutsche Telekom adresse le 7 septembre 2004 une lettre de deux lignes indiquant :

> « *Après consultation de notre conseil de surveillance vendredi, je vous écris pour confirmer que nous ne sommes pas en mesure de conclure votre projet de transaction en l'état* ».

Sans le moindre égard pour ses partenaires, Deutsche Telekom ne donnera aucune autre explication. Pire encore, il semble que l'opération n'aurait en réalité même pas été formellement présentée au conseil de surveillance de Deutsche Telekom.

Alors que les conventions étaient rédigées dans leur version définitive, qu'il n'existait plus aucun point de désaccord entre les parties, Deutsche Telekom change brutalement de stratégie. Moins d'un mois après que les parties aient été avisées (par une télécopie adressée par le tribunal arbitral le 12 août 2003), que la sentence finale dans la seconde procédure arbitrale initiée à Vienne par Deutsche Telekom devrait intervenir au mois d'octobre, un projet de sentence ayant déjà été préparé et devant être discuté par les arbitres à la fin du mois de septembre, Deutsche Telekom rompt les négociations de manière définitive, unilatéralement et sans préavis.

Ce n'est qu'à partir du mois de novembre 2004 que Vivendi Universal comprit la véritable nature des agissements de Deutsche Telekom, lorsque le tribunal arbitral rendit sa décision et que Deutsche Telekom, en collusion avec Elektrim, mit en oeuvre sa stratégie pour tenter de prendre illégalement possession des actions PTC sans verser le moindre centime à Vivendi Universal.

Le caractère organisé de la rupture des négociations est confirmé par une découverte que Vivendi Universal ne fera que plus tard : le 24 septembre 2004, c'est-à-dire après la rupture **mais avant que la sentence arbitrale ne soit rendue**, Deutsche Telekom, par l'intermédiaire de sa filiale T-Mobile International AG & Co. KG, notifie à la Commission européenne la prise de contrôle de PTC par exercice d'une option d'achat. Deutsche Telekom se préparait donc à spolier Vivendi Universal et, à cette fin, a rompu brutalement et abusivement les négociations.

### D)    Les agissements de Deutsche Telekom après la rupture des négociations

**13.** Après quatre années de procédure, la sentence arbitrale rendue le 26 novembre 2004, jugeait que le transfert de la participation dans PTC par Elektrim était « ineffectif » vis-à-vis de Deutsche Telekom, et déclarait qu'Elektrim serait en défaut de ses engagements si elle ne réussissait pas à récupérer auprès de Telco les titres PTC dans un délai de deux mois.

Or le pacte d'actionnaires de PTC prévoit qu'en cas de « *défaut matériel* », Deutsche Telekom bénéficie d'une promesse de vente (option d'achat) sur les actions PTC détenues par Elektrim, et ce à un prix bien inférieur à celui qui était négocié avec Vivendi Universal.



Cependant, dans cette même sentence arbitrale, le Tribunal décidait qu'il n'avait aucune compétence vis-à-vis de Telco, mise en cause par Deutsche Telekom. La sentence ne produit donc pas d'effet juridique à l'égard de Telco, actuellement propriétaire des titres.

Cette sentence constate l'existence d'une violation contractuelle commise par Elektrim envers Deutsche Telekom sans pour autant remettre en cause la propriété des titres PTC par Telco, ni en décider la restitution.

**14.** La sentence arbitrale devant faire l'objet d'une reconnaissance par un tribunal polonais pour s'appliquer en Pologne, Elektrim soumit le 16 décembre 2004, au tribunal de Varsovie une version incomplète de la sentence en occultant simplement la partie défavorable à Deutsche Telekom, à savoir la partie du dispositif qui rejette les demandes de Deutsche Telekom vis-à-vis de Telco.

Paradoxalement, cette action en reconnaissance partielle de la sentence, initiée par Elektrim, partie succombant à l'arbitrage, ne fit l'objet d'aucune opposition de la part de Deutsche Telekom qui, au contraire, se joignit à la demande d'Elektrim. Ce comportement traduit l'alliance des deux parties, pourtant adversaires dans le cadre de cet arbitrage, pour obtenir, au détriment de Telco et donc de Vivendi Universal, une reconnaissance tronquée de la sentence.

**15.** Au vu de ces manœuvres, Telco demanda à un tribunal, et obtint le 30 décembre 2004, une injonction interdisant toute modification du registre d'actionnaires de PTC en attendant un jugement déclaratif pour faire reconnaître sa propriété.

Malgré cette injonction, et avec l'appui de Deutsche Telekom, Elektrim tenta sans succès à deux reprises d'obtenir du tribunal en charge du Registre du Commerce de Varsovie son inscription en qualité d'actionnaire de PTC pour finalement l'obtenir lors de sa troisième tentative en produisant une fausse liste d'actionnaires. L'objectif était ainsi de se faire transférer par simple jeu d'écriture, et sans paiement, la propriété des actions PTC cédées par Elektrim à Telco en 1999. Un appel de la décision du tribunal en charge du Registre du Commerce fut interjeté et cette procédure est actuellement en cours.

Telco a tenté à quatre reprises de se joindre à la procédure d'exequatur partiel pour faire valoir ses droits et dénoncer cette procédure totalement contraire à la convention de New York de 1958 sur la reconnaissance et l'exécution des sentences arbitrales en matière d'arbitrage international, pourtant ratifiée par la Pologne. La possibilité de Telco de participer à la procédure, à laquelle se sont conjointement opposées Elektrim et Deutsche Telekom, fut systématiquement rejetée par le magistrat saisi du dossier, malgré l'intérêt légitime évident de Telco à agir pour protéger sa participation dans PTC que Deutsche Telekom et Elektrim lui disputent. Il est vrai que ce magistrat se trouvait être l'ancienne épouse de l'avocat du principal actionnaire d'Elektrim.

Au mépris de la lettre et de l'esprit de la convention de New York, l'exequatur partiel de la sentence fut prononcé le 2 février 2005 par le Tribunal de Varsovie sans que Telco n'ait pu participer à la procédure qui détourne la portée de la sentence. Telco a interjeté appel de cette décision.

Le 22 février 2005, le procureur régional de Varsovie interjeta également appel de la décision d'exequatur partiel.

Société Civile Professionnelle
Noël ACNUS et

227



Vivendi Universal a déposé auprès de l'Etat polonais le 28 février 2005 un recours sur le fondement de l'accord franco-polonais sur la protection des investissements du 14 février 1989. Les pouvoirs publics français sont intervenus pour appuyer la demande de Vivendi Universal qui se trouve victime d'une véritable tentative d'expropriation et de spoliation en Pologne.

**16.** Deutsche Telekom et Elektrim, initialement adversaires dans la procédure d'arbitrage, semblent aujourd'hui conduire une stratégie commune frauduleuse ayant pour but de déposséder sans contrepartie Telco et donc Vivendi Universal des titres PTC, ce qui permettra ensuite de les céder à Deutsche Telekom, à vil prix.

Deutsche Telekom et Elektrim ont constitué de manière illégale un conseil de surveillance parallèle, doublant le conseil de surveillance légitime. Les représentants de Deutsche Telekom affirment siéger aux deux organes concurrents et s'associent pleinement aux manœuvres d'Elektrim.

Le faux conseil de surveillance s'est réuni et a nommé un faux directoire qui lui-même a établi le 23 février 2005 une fausse liste d'actionnaires de PTC signée par deux représentants de Deutsche Telekom, incluant Elektrim à la place de Telco et ne reflétant pas le registre de mouvements de titres de la société. C'est en soumettant cette fausse liste au tribunal en charge du Registre du Commerce qu'Elektrim a finalement obtenu son inscription comme actionnaire de PTC dans la nuit du 23 au 24 février 2005, en dépit de l'injonction interdisant toute modification de l'actionnariat. Sur la base de cet enregistrement, Elektrim se proclame aujourd'hui propriétaire d'actions sans en avoir acquitté la moindre contrepartie financière.

Une plainte pénale a donc été déposée auprès du Procureur de Varsovie contre les membres de ce conseil de surveillance « *fantôme* » de PTC.

Aux mêmes fins, une demande d'injonction a été adressée par Vivendi Universal à un tribunal arbitral constitué à Londres contre Elektrim ayant pour objet d'interdire à Elektrim de constituer un directoire parallèle et de disposer des titres PTC. Le tribunal arbitral siégeant à Londres a fait droit à la demande de Vivendi Universal le 24 mars 2005 et, à titre conservatoire, a interdit à Elektrim de céder les titres PTC et a ordonné à Elektrim d'exercer les droits de vote attachés à ces actions conformément aux instructions de Telco.

**17.** Le 4 mars 2005, les membres du faux directoire ont réussi à pénétrer dans les locaux de PTC et à en interdire l'accès aux dirigeants légitimes, prenant ainsi par la force le contrôle de la société PTC.

Il apparaît aujourd'hui évident, à la lumière des évènements très brièvement décrits ci-dessus et que la demanderesse se réserve de développer dans ses écritures subséquentes, que Deutsche Telekom a d'abord endormi la vigilance de Vivendi Universal en engageant une négociation contractuelle qu'elle a ensuite brutalement rompue dans le seul but de tenter de s'emparer, en collusion avec Elektrim, des actions PTC détenues par Telco à moindre coût et au détriment de Vivendi Universal.

Société Civile Professionnelle
Noël AGNUS et



## II.  Discussion

### A.  Sur la compétence des juridictions françaises et l'application du droit français

**18.** Aux termes de l'article 5.3 du règlement n°44/2001 du Conseil du 22 décembre 2000 *« concernant la compétence judicaire, la reconnaissance et l'exécution des décisions en matière civile et commerciale »*, en vigueur le 1er mars 2002 :

> *« Une personne domiciliée sur le territoire d'un Etat membre peut être attraite, dans un autre Etat membre (...) en matière délictuelle ou quasi délictuelle, devant le tribunal du lieu où le fait dommageable s'est produit ou risque de se produire ».*

Cette disposition du règlement communautaire est, ainsi que l'a jugé la Cour de Justice des communautés européennes, applicable à l'obligation de réparer le préjudice résultant d'une rupture injustifiée des négociations, qui *« relève de la matière délictuelle ou quasi-délictuelle, au sens de l'article 5, point 3 de la convention de Bruxelles »*, et donc de l'article 5.3 du règlement du 22 décembre 2000, qui lui succède et, dont la rédaction est, sur ce point, identique.

Il reste donc à déterminer quel est le *« lieu où le fait dommageable s'est produit »*.

Selon la jurisprudence de la Cour de justice des Communautés européennes, telle qu'exprimée dans l'affaire *Mines de Potasse d'Alsace* (CJCE 30 novembre 1976, aff. 21/76, *Rec.* 1735, concl. Capotorti), *« L'expression "lieu où le fait dommageable s'est produit" doit être entendue en ce sens qu'elle vise à la fois le lieu où le dommage est survenu et le lieu de l'événement causal. Il en résulte que le défendeur peut être attrait, au choix du demandeur, devant le tribunal soit du lieu où le dommage est survenu, soit du lieu de l'événement causal qui est à l'origine de ce dommage ».*

C'est donc d'une option de compétence dont dispose alors le demandeur entre le lieu où le fait générateur du dommage est survenu ou le lieu du dommage lui-même.

S'agissant plus précisément de responsabilité pré-contractuelle, le fait dommageable se produit au lieu de réception de la lettre de rupture (Rennes, 29 avril 1992 SA Vedette industrie et autre c/ Epoux Renault et autres, Bull. Joly 1993, 465, note du Professeur Daigre).

**19.** En l'espèce, la demanderesse dispose ainsi du droit d'attraire les défenderesses devant le Tribunal de commerce de Paris dès lors que la lettre de rupture adressée par Deutsche Telekom a été reçue au siège de Vivendi Universal.

Plus généralement, il ne fait aucun doute que le dommage est subi en France puisqu'il l'est par Vivendi Universal, société française.

Le Tribunal de commerce de Paris est donc compétent pour statuer sur la responsabilité des défenderesses pour leurs agissements fautifs sur le fondement de l'article 1382 du Code civil.

**229**

VEREIDIGTER UEBERSETZERIN
P. BONNEFOUS
30 bis, rue Émile-Menier
75116 PARIS FRANCE
☎ 01 45 53 23 13
AM PARISER BERUFUNGSGERICHT

**B.    La responsabilité pour faute de Deutsche Telekom**

**1.    La rupture fautive des pourparlers par Deutsche Telekom**

**20.** Il est constant que la liberté de rompre des relations précontractuelles n'est que relative et que son exercice connaît des limites.

Il y a faute et responsabilité lorsque l'une des parties à la négociation met brutalement, sans préavis et sans motifs légitimes, un terme à des pourparlers qui étaient arrivés dans la phase terminale de conclusion.

**21.** Or il ressort des faits exposés que Deutsche Telekom a brutalement mis fin à toute relation sans préavis après avoir laissé penser à Vivendi Universal que les négociations se déroulaient normalement, et sans justifier d'aucun motif légitime pour rompre alors que les négociations avaient duré plus d'un an et qu'elles étaient parvenues à leur stade ultime.

Au surplus, elle a mis fin à ces négociations avec l'intention de nuire à Vivendi Universal en tentant de s'emparer, à moindre coût, des titres PTC.

Ce sont ces manquements qui sont la cause des préjudices subis par Vivendi Universal.

**22.** Après plus d'un an de négociations, alors que les versions définitives des contrats avaient été adressées aux parties, Deutsche Telekom a envoyé le 7 septembre 2004 une lettre lapidaire de deux lignes pour mettre un terme aux négociations.

A ce stade des négociations, il n'existait plus aucun point de désaccord entre les parties.

Rien ne pouvait donc laisser penser à Vivendi Universal que les négociations se termineraient de la sorte. Jamais Deutsche Telekom n'avait mis en garde Vivendi Universal contre une telle décision. Bien au contraire, Vivendi Universal ayant fait les dernières concessions demandées par Deutsche Telekom, rien ne lui permettait d'anticiper une telle rupture.

**23.** Les évènements postérieurs à la rupture ont démontré que Deutsche Telekom a brutalement mis fin aux pourparlers afin de privilégier, au détriment de Vivendi Universal, une voie alternative pour s'approprier les actions PTC sans en payer le prix à Vivendi Universal.

Par ses manœuvres déloyales et frauduleuses décrites dans l'exposé des faits, Deutsche Telekom tente, par tous moyens, de prendre le contrôle de PTC et des actions détenues par la filiale de Vivendi Universal, la société Telco.

**24.** La jurisprudence sanctionne la rupture de pourparlers lorsque celle-ci est intervenue *« sans raison légitime, brutalement et unilatéralement »* (Cass. com. 15 fév. 1965, Bull ; IV 110123).

En l'espèce, non seulement Deutsche Telekom a mis fin sans raison légitime et de manière abrupte aux discussions, mais encore elle l'a fait de mauvaise foi pour poursuivre un objectif illégitime.

Société Civile Professionnelle
Noël AGNÈS et



Deutsche Telekom a entretenu Vivendi Universal dans la certitude de la conclusion proche de la transaction. Elle a, jusqu'au dernier moment, demandé d'ultimes concessions qui ont été acceptées par Vivendi Universal.

A aucun moment Deutsche Telekom ne fit part à Vivendi Universal de réserves sur l'achèvement de ce processus. Bien au contraire, c'est Deutsche Telekom qui a, à de multiples reprises, hâté les discussions et demandé à Vivendi Universal de presser ses conseils.

En conséquence, la lettre adressée par Deutsche Telekom à Vivendi Universal le 7 septembre 2004 constitue bien une rupture brutale, sans préavis et sans motifs. En agissant de la sorte, Deutsche Telekom s'est rendue coupable d'un abus de droit et a commis une faute dont elle doit réparation.

### 2.    Le préjudice considérable causé à Vivendi Universal par Deutsche Telekom

#### a)    Le risque de perte de son investissement en Pologne occasionnée par la rupture fautive

Du fait de cette rupture abusive, qui a permis à Deutsche Telekom d'entreprendre des manœuvres déloyales, en collusion avec Elektrim, en Pologne, Vivendi Universal se trouve privée de toute possibilité de jouir de sa participation indirecte dans PTC, et de la vendre à un tiers.

Deutsche Telekom a entretenu Vivendi Universal dans l'illusion d'une issue favorable des discussions rendant inutile, et en pratique impossible, la recherche par Vivendi Universal d'autres solutions, pour mettre un terme brutal à ces discussions dans un contexte interdisant désormais à la demanderesse de mettre en œuvre une solution préservant ses intérêts financiers.

Vivendi Universal pourrait même se trouver privée de cette participation si elle ne parvient pas à faire reconnaître ses droits en Pologne, aujourd'hui bafoués par Deutsche Telekom et Elektrim qui exploitent les lacunes du système judiciaire polonais en se prévalant d'une lecture tronquée de la sentence arbitrale du 24 novembre 2004, au mépris des règles les plus établies du droit international.

Il en résulte que, si à la date à laquelle le tribunal statuera sur la demande de Vivendi Universal, le droit de propriété de Telco sur les titres de PTC n'est pas reconnu en Pologne et que Deutsche Telekom s'est appropriée lesdits titres sans que Vivendi Universal n'en reçoive la juste valeur, Vivendi Universal aura subi, du fait de la rupture fautive, un préjudice égal au montant de son investissement, soit 1.881.601.161 euros, majoré des intérêts courus jusqu'à la date du jugement et correspondant à l'immobilisation des sommes investies par Vivendi Universal.

#### b)    La perte d'une chance de céder à un tiers sa participation dans PTC ou de protéger autrement son investissement

Selon la jurisprudence, le fait que « la société a perdu [par suite de la vaine poursuite de pourparlers] une chance, fût-elle ténue, de trouver un autre repreneur » constitue un préjudice réparable (Cass. com., 18 juin 2002, NGM, n° 99-16488, p. 282, obs. Mestre et Fages).

Société Civile Professionnelle



En entretenant pendant un an Vivendi Universal dans l'illusion d'une cession et en mettant abusivement et abruptement fin aux négociations, les défenderesses ont privé Vivendi Universal de la chance de trouver un acquéreur pour sa participation indirecte dans PTC ou de mettre en place toute autre solution pour protéger son investissement en Pologne.

Deutsche Telekom ayant elle-même admis que la valorisation de 51% de PTC s'établissait à l'époque à 1,3 milliard d'euros, et en retenant une probabilité de trouver une solution alternative à celle proposée à celle proposée à Deutsche Telekom de 50%, le préjudice subi par Vivendi Universal s'établit à 650 millions d'euros.

Ce préjudice se confond toutefois avec celui résultant de la perte de l'investissement de Vivendi Universal en Pologne et ne serait indemnisable de manière séparée que si, par extraordinaire, ce dernier n'était pas reconnu.

c)    Le préjudice d'image subi par Vivendi Universal

La rupture abusive et le comportement déloyal des défenderesses ont causé à Vivendi Universal un préjudice d'image important. Le marché est très sensible à la qualité des investissements de Vivendi Universal à l'étranger, l'investissement réalisé dans la téléphonie en Pologne constituant l'un des plus importants.

Vivendi Universal est de plus une société qui est particulièrement surveillée par les investisseurs de telle sorte que l'annonce de l'échec des négociations et les conséquences qui s'en sont suivies ont eu un impact significatif sur l'image de la société.

**25.** Cette situation fragilise Vivendi Universal pour ses autres investissements à l'étranger et notamment dans les pays d'Europe de l'Est.

Pour ces motifs, le Tribunal condamnera les défenderesses à verser à Vivendi Universal la somme de 50 millions d'euros à titre de dommages intérêts correspondant au préjudice d'image qu'elle a subi.

d)    La cession des actions Veolia

Compte tenu de l'état très avancé des discussions avec les défenderesses, Vivendi Universal avait intégré le produit de cession de sa participation dans Telco dans son plan de financement.

Confrontée à la rupture brutale des discussions par les défenderesses, elle a dû y substituer en décembre 2004 une cession par anticipation de 61 millions de titres Veolia à un prix moyen de 24,54 euros par action, soit un produit total de 1.496.940.000 euros.

Vivendi Universal a en conséquence été privée de l'amélioration de l'action Veolia, en augmentation constante depuis le début de l'année 2005.

Sur la base du cours au 21 avril 2005, qui s'établit à 28,43 euros, Vivendi Universal a ainsi été privée d'un gain de 3,89 euros par action, soit une perte totale de 237.290.000 euros.

Société Civile Professionnelle
Naël AGRUS et



e)   Les frais occasionnés par la négociation

**26.** En raison de l'importance de l'affaire, Vivendi Universal a engagé des frais considérables pour conduire les négociations avec Deutsche Telekom.

Vivendi Universal a ainsi fait appel à des conseils extérieurs qui ont négocié pendant plus d'un an. Ils ont assuré la représentation des intérêts de Vivendi Universal dans de nombreuses réunions, ils ont directement négocié tant avec Deutsche Telekom qu'avec Elektrim. Ils ont également préparé de nombreux documents juridiques prenant la forme de projets de contrat et ont dû rédiger des consultations juridiques.

S'agissant des conseils externes, Vivendi Universal a réglé 2.525.928 euros d'honoraires.

**27.** En outre, pour les besoins de ces pourparlers, Vivendi Universal a dû affecter des ressources internes importantes à la conduite de ces dossiers. Ainsi, le directeur général en charge des finances de Vivendi Universal, Jacques Espinasse, et son adjoint, Dominique Gibert, vont y consacrer l'équivalent d'environ trente jours pleins. Augmenté du temps passé par d'autres collaborateurs de Vivendi Universal estimé à 60 jours/homme, le préjudice estimé par Vivendi Universal s'élève à 375.000 euros.

De même, de nombreux voyages et réunions ont eu lieu en Pologne avec les différents intervenants mobilisant la direction de Vivendi Universal à son plus haut niveau. Vivendi Universal a donc dû engager des frais pour organiser les déplacements de ses personnels en Pologne. L'ensemble de ces frais est aujourd'hui estimé à 30.000 euros, somme à parfaire.

**28.** Pour l'ensemble de ces demandes, Vivendi Universal demande donc au Tribunal de condamner à ce titre Deutsche Telekom à lui verser à titre de dommages intérêts la somme de 2.171.822.000 euros.

**3.     Le lien de causalité entre les fautes et les dommages**

**29.** Les fautes de Deutsche Telekom, caractérisées dans leur nature et leur gravité ont directement causé les préjudices invoqués par Vivendi Universal.

Il s'agit tout d'abord des frais occasionnés par les négociations. Leur engagement est directement lié aux négociations et la rupture des pourparlers en constitue le dommage.

En ce qui concerne le préjudice moral et d'image, il résulte directement de la rupture abusive des pourparlers dans la mesure où c'est l'attitude de Deutsche Telekom qui a directement porté atteinte à l'image de Vivendi Universal.

La vente des titres Veolia n'étant intervenue au mois de décembre que pour faire face à l'absence du produit de cession des actions Telco du fait de la rupture abusive des négociations par Deutsche Telekom alors qu'un accord était intervenu sur tous les points en négociation, le manque à gagner subi par Vivendi Universal trouve sa cause directe dans cette rupture abusive.

S'agissant enfin du préjudice correspondant au risque de perte de l'investissement en Pologne, les développements qui précèdent démontrent qu'il n'aurait pu se produire sans la rupture fautive des négociations par les demanderesses.

Société Civile Professionnelle
Noël A/COUIS et



**30.** Enfin, l'équité commande que Deutsche Telekom soit condamnée à payer à Vivendi Universal la somme de 200.000 euros au titre des frais supportés par cette dernière pour introduire la présente action en justice.

VEREIDIGTER UEBERSETZER(E)
P. BONNEFOUS
30 bis, rue Emile-Menier
75116 PARIS FRANCE
☎ 01 45 53 23 13
AM PARISER BERUFUNGSGERICHT

## PAR CES MOTIFS

Vu les moyens de fait et de droit exposés,
Vu l'article 1382 du Code civil,

Il est demandé au Tribunal de :

- Constater que Deutsche Telekom est responsable de la rupture des négociations engagées en vue de l'achat par elle des actions PTC ;

- Constater que cette rupture a causé à Vivendi Universal un préjudice tant financier que d'image, provisoirement fixé à 2.171.822.000 euros, somme à parfaire ;

En conséquence :

- Condamner solidairement les défenderesses à verser à la demanderesse la somme de 200.000 euros au titre de l'article 700 du Nouveau Code de Procédure Civile et à supporter les entiers dépens ;

- Ordonner l'exécution provisoire de la décision à intervenir.

SOUS TOUTES RESERVES

Société Civile Professionnelle
Noël AGNUS et



### LISTE DES PIÈCES

1.  Offre d'acquisition des titres PTC détenus par Telco adressée par Deutsche Telekom à Telco et ses actionnaires (Vivendi Universal et Elektrim) en date du 25 août 2003

2.  Réponse de Telco à l'offre de Deutsche Telekom en date du 4 septembre 2003

3.  Mémorandum envoyé par Deutsche Telekom à Vivendi Universal en date du 9 janvier 2004

4.  Projet modifié de contrat d'acquisition des titres PTC envoyé par Deutsche Telekom à Vivendi Universal le 16 janvier 2004

5.  Liste des quatorze questions restant à régler envoyée par Deutsche Telekom en date du 19 avril 2004

6.  Lettre conjointe de Vivendi Universal et Elektrim envoyée à Deutsche Telekom le 14 mai 2004

7.  Réponse de Deutsche Telekom en date du 18 mai 2004 à la lettre conjointe de Vivendi Universal et Elektrim en date du 14 mai 2004

8.  Courriel de Deutsche Telekom en date du 2 août 2004 en vue de la finalisation du contrat d'acquisition

9.  Projet de contrat d'acquisition envoyé par Vivendi Universal à Deutsche Telekom le 5 août 2004, consolidant les discussions intervenues entre Elektrim, Vivendi Universal et Deutsche Telekom

10. Projet d'accord mettant un terme à toutes les poursuites et procédures envoyé par Deutsche Telekom à Vivendi Universal le 27 août 2004

11. Version définitive du contrat de cession d'actions de PTC et du contrat de garantie et d'indemnisation adressée par Vivendi Universal à Deutsche Telekom le 1er septembre 2004

12. Lettre adressée par Deutsche Telekom à Vivendi Universal en date du 7 septembre 2004 l'informant de la décision de Deutsche Telekom de ne pas conclure l'acquisition envisagée

13. Télécopie adressée par le tribunal arbitral aux conseils des parties en date du 12 août 2004 les informant que la sentence arbitrale devrait être rendue au mois d'octobre 2004

14. Extrait du Journal officiel de l'Union européenne du 6 octobre 2004 portant publication de la notification préalable effectuée par T-Mobile le 24 septembre 2004

Société Civile Professionnelle
Noël AGNUS et

**236**



15. Extrait du Journal officiel de l'Union européenne du 17 novembre 2004 portant publication de la décision de non-opposition de la Commission européenne à l'opération de concentration notifiée par T-Mobile

16. Sentence arbitrale en date du 26 novembre 2004

17. Injonction du tribunal régional de Varsovie en date du 30 décembre 2004 interdisant toute modification du registre d'actionnaires de PTC

18. Décision d'exequatur partiel de la sentence rendue le 2 février 2005 par le tribunal régional de Varsovie

19. Déclaration d'appel par Telco contre la décision d'exequatur partiel

20. Déclaration d'appel du Procureur Général de Varsovie en date du 22 février 2005 contre la décision d'exequatur partiel

21. Recours déposé par Vivendi Universal auprès de l'Etat polonais sur le fondement de l'accord franco-polonais sur la protection des investissements du 14 février 1989

22. Notification de révocation par Elektrim de membres du Conseil de surveillance de PTC en date du 10 décembre 2004

23. Notification de désignation par Elektrim de nouveaux membres du Conseil de surveillance de PTC en date du 10 décembre 2004

24. Lettre adressée par Monsieur Jacek Nieweglowski (membre du Conseil de surveillance de PTC) aux membres du Directoire d'Elektrim en date du 13 décembre 2004

25. Lettre adressée par Monsieur Philippe Houdouin (membre du Conseil de surveillance de PTC) aux membres du Directoire d'Elektrim en date du 13 décembre 2004

26. Lettre adressée par Monsieur Michel Picot (membre du Conseil de surveillance de PTC) aux membres du Directoire d'Elektrim en date du 13 décembre 2004

27. Fax adressé par Monsieur Dariusz Oleszczuk (Président du Conseil de surveillance de PTC) à Monsieur Mickael Günther (Vice-Président du Conseil de surveillance de PTC) en date du 13 décembre 2004

28. Fax adressé par Monsieur Mickael Günther à Monsieur Dariusz Oleszczuk en date du 13 décembre 2004

29. Fax adressé par Monsieur Mickael Günther à Monsieur Dariusz Oleszczuk en date du 20 décembre 2004

30. Fax adressé par Monsieur Mickael Günther aux membres du Directoire de PTC annonçant la tenue d'un Conseil de Surveillance de PTC le 10 janvier 2005

31. Lettre adressée par M. Dariusz Oleszczuk à M. Uli Kühbacher en date du 22 janvier 2005

32. Convocation du Conseil de surveillance de PTC par deux représentants d'Elektrim à une réunion le 3 février 2005

Société Civile Professionnelle
NoEl AGNES et

33.   Lettre adressée par les quatre membres du Directoire de PTC désignés par Telco aux membres du Conseil de surveillance en date du 2 février 2005

34.   Notification de désignation par Elektrim d'un nouveau membre du Conseil de surveillance de PTC en date du 3 février 2005

35.   Liste d'actionnaires établie le 23 février 2005 par le directoire de PTC irrégulièrement constitué

36.   Plainte pénale déposée auprès du Procureur Régional de Varsovie par Telco contre les membres du conseil de surveillance de PTC irrégulièrement constitué

37.   Décision du tribunal arbitral siégeant à Londres en date du 24 mars 2005 interdisant à Elektrim, à titre conservatoire, de céder les titres PTC

38.   Lettre de PTC à l'huissier de justice de Varsovie (« *komornik* ») en date du 15 avril 2005 indiquant que la société Telco n'est pas actionnaire de PTC

39.   Lettre de Deutsche Telekom à l'huissier de justice de Varsovie (« *komornik* ») en date du 15 avril 2005 indiquant que Deutsche Telekom détient 48% des actions PTC depuis le 24 mars 2005

VEREIDIGTER UEBERSETZER(E)
P. BONNEFOUS
30 bis, rue Emile-Menier
75116 PARIS FRANCE
☎ 01 45 53 23 13
AM PARISER BERUFUNGSGERICHT

Société Civile Professionnelle
N°21 AGNUS et
Reynald PARKER

238