# EXHIBIT I

[inked stamp]
Jean-Robert CAMPANA        to  HERNE
Attorney Partner
CAMPANA, RAVET & Partners
24, rue de Prony – 75809 PARIS Cedex 17
Tel. 33 (0) 1 44 29 31 62  Fax 33 (0) 1 44 29 30 30
Bar Association No. P 209

To Their Honors the President and Judges
on the bench of the Paris Commercial Court

Hearing of June 13, 2006   [handwritten] REGUL [illegible]
RG No. 2005/51682

**FOR**:        **Vivendi Corporation**

**Plaintiff in the main lawsuit**
**Defendant in countersuit**

**Attorney:**
**Jean-Robert Compana**
SCP LaFarge Flécheux Campana Le Blevennec
24 rue de Prony – 75017 Paris        P 209

**Pleading through:**
**Jean-Michel Darrois**
**Hervé Pisani**
**Matthieu de Boisséson**
Attorneys at the Paris Bar
Darrois Villey Maillot Brochier
69 avenue Victor Hugo – 75116 Paris
Tel: 01 45 02 19 19        R170

**VS**.  **T-Mobile International AG & Co. KG**
      **Deutsche Telekom**

**Defendants in the main lawsuit**
**Plaintiffs in countersuit**

**Attorney:**
**Pierre HERNE**
Attorney at the Paris Bar
16 rue Gustave Courbet – 75116 Paris
Tel: 01 47 55 12 15        B0835

**240**             1/26

**Pleading Through:**

**Yves REPIQUET**
Chief Attorney of the Attorneys at the Paris Bar
Brandford-Griffith & Partners
9 rue des Pyramides – 75001 Paris
Tel. 01 44 55 44 55                                    R279

**Patrick BERNARD**
Attorney at the Paris Bar
Bernard Hertz Bejot
8, rue Murillo – 75008 Paris
Tel. 01 43 18 80 80                                    P0057

**and Jean-Yves GARAUD**
Attorney at the Paris Bar
Cleary Gottlieb Steen & Hamilton LLP
12 rue de Tilsitt – 75008 Paris
Tel. 01 40 74 68 00                                    J21

## MAY IT PLEASE THE COURT

1. In a lawsuit filed on April 26, 2005, Vivendi asked the Paris Commercial Court, pursuant to Article 1382 of the Civil Code, to hear a suit for civil liability in tort filed against Deutsche Telekom and T-Mobile, due to their abusive behavior in breaking off advanced negotiations which should have led to the sale of an interest in a Polish mobile telephone operator.

In arguments filed on February 21, 2006, the defendants asked the Court:

*"In view of Article 1832 of the Civil Code.*

- *To find and rule that Deutsche Telekom and T-Mobile did not commit an offense by ending the negotiations begun for the purpose of acquiring PTC shares;*

- *To therefore deny all Vivendi Universal's claims, motions and arguments;*

- *To therefore deny Vivendi's request for an order of provisional execution;*

*And as a countersuit;*

- *To find and rule that this lawsuit filed by Vivendi Universal is abusive;*

- *And therefore order Vivendi Universal to pay Deutsche Telekom the amount of two million euros;*

**241**                                    2/26

- *Order Vivendi Universal to pay Deutsche Telekom the amount of three hundred thousand euros under the terms of Article 700 of the New Code of Civil Procedure and to pay full costs;*

- *Order the provisional enforcement of the decision to be issued."*

2. Vivendi intends in this brief to lay out the items of fact and law which demonstrate the inaccurate nature of the defense of Deutsche Telekom and T-Mobile International AG & Co. KG.

First, it should be noted that the multiple procedures are none other than the result of the multiple attacks suffered by Vivendi and initiated by Deutsche Telekom in an attempt to gain control of PTC, one of the main Polish mobile telephone operators, which Deutsche Telekom had no right to acquire.

3. The history of changes in PTC's capital, described on pages 2 and 3 of the summons demonstrates that: When Vivendi bought into Telco's capital, Deutsche Telekom was clearly banned, under Polish law then in effect, from controlling PTC.

Its illegal attempts to gain control of PTC by using front companies, was also punished by the Court of Arbitration of Vienna.

As some founding shareholders of PTC wished to sell their shares and Deutsche Telekom was not allowed to buy them, Elektrim, another founding shareholder of PTC which owned 32.5% of its share capital at that time, approached Vivendi to enable it to buy those shares which it could not alone do because of its financial situation.

Telco, a joint Vivendi and Elektrim company, was approved as the buyer pursuant to PTC's by-laws by a unanimous vote by all the members of PTC's Supervisory Board, with the sole exception of one: the representative of Deutsche Telekom.

It is solely on the basis of a stipulation in PTC's internal regulations, the validity of which under Polish law has been widely debated, that Deutsche Telekom was able to invoke a requirement for a unanimous vote by which it alone was able to thwart the approval to try to prevent an operation which went against its own illegal intentions to gain control of PTC, while the stipulations in the internal regulations could not be applied to Telco or to Vivendi, who were outside parties at that time.

4. Deutsche Telekom has consistently attempted to keep Vivendi from any validly acquired indirect control of PTC, by a strategy of judicial harassment, exploiting all the breaches created by an uncertain legal and judicial environment in Poland and not hesitating – as is the purpose in this case – to lure Vivendi into an illusion of a negotiated settlement, thereby giving themselves the time to set up an aggressive strategy of theft ["spoliation"].

Deutsche Telekom's claim that this case, legitimately filed by Vivendi, is without merit, is therefore abusive.

5. Recent events have thrown an even clearer light upon Deutsche Telekom's conduct. In fact, Deutsche Telekom, Vivendi and Elektrim had met again in January 2006 for the purpose of trying to reach an agreement to bring their various lawsuits relating to PTC to an end, and to confirm the division of PTC

**242**

shares among the parties. The negotiations progressed quickly, as the parties had reached agreement on all the points to be settled. So at the end of March 2006, the various parties and their respective attorneys met in Poland to finalize the wording of the agreements and sign them. Deutsche Telekom, like Vivendi and Elektrim, knew that a decision was to be handed down by a Polish Court of Appeal relating to the partial enforcement ruling for the arbitration decision of November 26, 2006. But they had agreed not to act on that decision because they had reached an agreement bring their various disputes to an end. There remained nothing further to do than sign the documentation putting their agreement down on paper. However, when the decision from the Court of Appeal was issued, to everyone's surprise, the representatives from Deutsche Telekom decided to suspend the meeting a few hours before the agreements were to be signed, to give them time to examine the decision. Now the Court of Appeal had approved the partial enforcement of the arbitration ruling, thereby giving Deutsche Telekom a victory, which therefore decided not to sign the agreements. This new cancellation just a few hours prior to the signature of the agreements about which there was absolutely no uncertainty is additional proof of Deutsche Telekom's desire to gain control by theft ["spoliation"] of Vivendi's interests to the detriment of a negotiated settlement.

After reviewing the facts (I), the pleader will ask the Court to find that the defendants are criminally liable and throw out their countersuit (II).

## I. The Facts

### A) Vivendi's Acquisition of an Interest in PTC

6. As already stated by Vivendi in its complaint, the rapid growth of PTC led some PTC shareholders to sell their shares in 1999. Elektrim was interested in buying those shares, but its financial resources were limited so it made a proposal to Vivendi that they should go into partnership to buy a stake in PTC.

It is unfair for the defendants to try to convince the court that Vivendi bought a stake in PTC in violation of Deutsche Telekom's rights, and particularly its right of preemption:

*"Notwithstanding the rules clearly fixed by the by-laws and PTC's partners' agreement, Elektrim wanted to have Vivendi Universal indirectly buy a stake in PTC, without getting approval from PTC's Supervisory Board, and without allowing Deutsche Telekom (TMO) to exercise its right of preemption"* (arguments, p. 4).

The claim is untrue on several fronts.

7. First of all, the by-laws can only apply to outside parties, of which Vivendi was one. Under no circumstances could the latter have operating rules imposed on it which do not appear in the by-laws.

In this case, the by-laws (Article 7) confer a right of preemption and a procedure for approval by the Supervisory Board.

**243**

In the case of approval by the Supervisory Board, Article 181 of the Polish Commercial Code states that:

"1. *The Articles of Incorporation may make the sale or pledging of shares subject to the approval of the company or may limit them in any other way.*"

In addition, according to Article 215 of the same Code, decisions by the Supervisory Board are approved by a simple majority, unless stipulated otherwise in the Articles of Incorporation.

In this case, approval was given by PTC's Supervisory Board at its meeting held on October 21, 1999, with a majority of 7 votes to one (the vote cast by the representative from Deutsche Telekom (Exhibit No. 45).

Later, Deutsche Telekom tried to claim that this decision by the Supervisory Board needed a unanimous vote, supposedly because a provision in PTC's internal regulations imposed such a requirement.

This claim runs up against two obstacles:

- It does not appear to be possible, under Polish law, to stipulate anywhere other than in the by-laws rules derogating the rule of a simple majority;

- And even assuming that this stipulation is valid in internal order, it cannot be applied to third parties, such as Vivendi or Telco, a company jointly owned by Vivendi and Elektrim.

Contrary to Deutsche Telekom's claims, the sale of the shares to Telco was in fact properly approved by PTC's Supervisory Board.

8.  In the case of the right of preemption, Deutsche Telekom's claim is very surprising.

The  Court of Arbitration in Vienna, in the partial ruling of April 9, 2003 (Exhibit No. 44), found that the right of preemption was actually implemented in resolutions Nos. 139, 140, 141 and 142, which Deutsche Telekom benefited from, just like the other shareholders.

**However, the same Court of Arbitration found that there was not the slightest doubt that Deutsche Telekom's claim to exercise its right of preemption for 3.1269% was illegal.**

In fact, apart from its 45% holding, it appeared during the proceedings that Deutsche Telekom had acquired an additional 4% through a dummy company, thereby raising its actual stake to 49%.

So in application of Article 16(2) 2b of the Polish Law of November 23, 1990, the voting rights held by foreigners in a company in possession of a telecommunications license could not exceed 49%.

**Recognizing the illegal nature of the secret set-up dreamt up by Deutsche Telekom to fraudulently sidestep Polish law, the Court of Arbitration found that Deutsche Telekom could not exercise its right of preemption.**

**244**

It will be of interest to the Court, in the context of this case, to note that the Court of Arbitration was at pains// to state:

*"There is no doubt that DT went beyond the limits expected from any shareholder under the Shareholders' Agreement in its eagerness to acquire control over PTC."*

It appears this was not enough to cool Deutsche Telekom's ardor....

9.  As a result of the above, and contrary to Deutsche Telekom's claims in its briefs, Vivendi's indirect acquisition of a stake in PTC was not carried out in violation of the stipulations in the by-laws and shareholders' agreement of PTC.  The transfer of PTC shares held by Elektrim to Telco was in compliance with the mandatory requirements of Polish law, as confirmed by various legal opinions (Exhibits 40, 41, 42 and 43).

**B)  The Progress of Negotiations: the negotiations between Vivendi and Deutsche Telekom were not three successive negotiations but a single negotiation, the aim of which from the outset was the sale, directly or indirectly, of 51% of PTC's shares to Deutsche Telekom.**

10.  The defendants are imposing an artificial division on the periods of negotiation, inaccurate in terms of the facts and without merit in terms of the law, and flying in the face of the factual description of the negotiations which led to the cancellation that gave rise to this case.

The fact is that there was one single negotiation, the purpose of which was for Deutsche Telekom to gain control of PTC.  The fact that this negotiation was complex and went through what are commonly referred to as "ups and downs" does nothing to detract from this.

**1. The division between the first and second phases of the negotiation claimed by the defendants is artificial.**

11.  According to the argument presented by the defendants, the negotiation which began in August 2003, at Deutsche Telekom's initiative, was interrupted the first time at Vivendi's initiative because of opposition from Elektrim's bondholders.

This statement is absolutely without merit: although it is true that Elektrim's bondholders, after first signing the framework agreement of September 14, 2003, finally withdrew their approval, there was no break in the discussions between Vivendi and Deutsche Telekom, but simply an effort to find a different solution to get round the obstacle posed by Elektrim's financial situation.  This is also shown by the fact that contacts continued from the beginning of October, while the alleged break took place in the last days of the month of September.

**245**

**2. Likewise, there was no interruption in the discussions between the month of January 2004 and August 2004.**

12.  Doubtlessly deciding to press its advantage, Deutsche Telekom hardened its negotiating position in January 2004, focusing on two essential points:  Deutsche Telekom demanded the payment of an indemnity of 250 million euros if Elektrim exercised its right of preemption and refused any compromise settlement in the current arbitration proceedings.

This is why Vivendi sent a letter to Deutsche Telekom on January 20 indicating that it was unable to continue the discussions under such terms.  Vivendi then explained its position further in a letter dated January 26, 2004:  the suspension of discussions while the current arbitration issues were settled but not to end matters completely with Deutsche Telekom (Exhibit No. 58).

13.  In fact, the discussions did not stop, as shown by several exhibits submitted to the court.

In February 2004, Mr. Obermann, President of T-Mobile International confirmed to some Polish journalists (Exhibit No. 59) that Deutsche Telekom was still interested in buying PTC shares.

On April 19, 2004, Deutsche Telekom sent a list of 14 questions to be settled for a final agreement to be reached. **This list was based, as it itself stated, on the contractual documentation exchanged on September 30, 2003,** confirming the continuation of the discussions, contrary to the claim being made today by the defendants (Exhibit No. 5).

An examination of the exchanges between the parties shows that the subjects under discussion were the usual ones in this type of operation and did not uncover any major difficulties that would make the sale of the PTC shares to Deutsche Telekom unlikely.

14.  On May 14, 2004, Vivendi and Elektrim sent Deutsche Telekom a joint letter confirming their intention to sell it the PTC shares owned by Telco.  Contrary to the claims by the defendants, Deutsche Telekom was involved at all stages of the negotiation between Elektrim and Vivendi and was able to make its comments on the draft term sheet before a formal offer was sent to it (Exhibit No. 47).  These comments were also taken into account by Vivendi and Elektrim when the joint proposal sent to Deutsche Telekom was finalized.

On May 18, 2004, Deutsche Telekom accepted the offer but asked Vivendi and Elektrim to provide it with all the legal documentation to make sure that there were no issues still outstanding.

15.  In addition, contrary to the claims by Deutsche Telekom, the negotiations continued into the months of June and July 2004, and involved Deutsche Telekom: the many exchanges between Deutsche Telekom's attorney, Peter Golob, and the attorneys for Vivendi and Elektrim actually took place in May, June and July 2004 in relation not only to the relations between Elektrim and Vivendi, but also the filing schedule for obtaining the necessary permits in relation to competition or anti-trust regulations.  These exchanges are ample evidence of the continuation of negotiations between the three parties (Exhibits Nos. 48, 49, 50 and 51).

**246**

The change in the proposed price cannot be taken as proof of a radical change in the negotiation. In fact, it is not unusual for the price to be updated nine months after the first proposal, particularly as the objections from the bondholders in September 2003 were based on the inadequacy of the proposed price.

**3. The reasons for the abrupt cancellation of the negotiations by Deutsche Telekom have not been explained by the defendants.**

16. There is no doubt that Deutsche Telekom has not responded in its briefs to any of the comments or questions raised by Vivendi in its comments.

We should first of all remember that although there was to be a meeting of Deutsche Telekom's supervisory board on September 3, 2004 to vote on approving the proposed acquisition of the PTC shares, it was only on September 7 that Deutsche Telekom told Vivendi that it would not be going through with the operation. The defendants have not put forward any reasons which could explain this strange delay.

In addition, as the letter of September 7 referred to "*consultation with our Supervisory Board*", Vivendi raised some questions as to the true nature of the matter before the Board.

Astonishingly, the defendants responded to this in an evasive manner, stating that the "*conditions for approval of the operation by Deutsche Telekom's Supervisory Board were (...) not satisfied*" (arguments p. 15).

Does this mean that the Supervisory Board did not actually discuss the matter? But then, why did they lie in the letter of September 7, 2004? Why did they not inform Vivendi of this situation once it became evident that the matter was not submitted to the Supervisory Board on September 3, and why wait until September 7 to inform Vivendi of Deutsche Telekom's position?

If, on the other hand, the Supervisory Board actually did vote on the matter, why did they not state so clearly and send an extract of the minutes of the meeting?

It becomes even more troubling when we read the reasons put forward by the defendants for justifying the cancellation, because none of these reasons was told to Vivendi either before or after the cancellation.

17. First of all, on September 1, 2004, Vivendi is supposed to have sent an ultimatum making a "final offer" to Deutsche Telekom, the conditions of which were not open to further discussion. This late complaint is surprising because on the one hand Deutsche Telekom did not make any protests when it received this letter, which is logical because Vivendi had granted the concessions demanded by the defendants, and on the other hand, this offer met the scheduling constraints fixed by Deutsche Telekom itself (Exhibit No. 52).

18. The defendants are also invoking the position of the bondholders, who this time gave their approval subject to the implementation of a solution protecting their rights.

**247**

Here again, there is no doubt that Deutsche Telekom maintained a deafening silence at the time of these events, which confirms that this difficulty, if we assume that it exists, is only a justification *a posteriori* for a unilateral decision to cancel, separate from the reasons now being claimed by the defendants.

If we assume that the legal difficulties alleged by the defendants existed, if Deutsche Telekom acted in good faith, it would have complained to Vivendi if only after comparing the results of the legal analysis of its own legal experts with those of Vivendi.

In addition, it appears that the question raised by Deutsche Telekom's attorneys was not a new one, because the writer of the opinion quoted by Deutsche Telekom states:

*"In my opinion dated September 2, 2004, I found that there were far from negligible risks associated with the operation to sell 51% of the PTC shares to DT, i.e. a risk that the agreements negotiated at that time would be invalid, in whole or in part, if Elektrim went bankrupt. [...] Although the escrow agreement had no impact on the risk of invalidity under the terms of Article 127 LF (Article 127 invalidates contracts signed by the company in bankruptcy with minimal or no compensation), the new payment procedure being proposed would increase the risks resulting from Articles 527 and 58 of the Civil Code.*

*a) Article 527 of the Civil Code*

*In my opinion, <u>even in the absence of the payment procedure currently under discussion, which would formalize the preferential treatment of the Bondholders and Vivendi</u>[1] (compared to other Elektrim creditors), there is a substantial risk that Elektrim's creditors or the trustee, when examining all Elektrim's contracts relating to the planned operations, would deem them "legal documents" in the sense of Article 527 of the Civil Code and would therefore have grounds to file a revocatory action."*

Contrary to the claims by the defendants, the risk, if we assume it exists, was not therefore associated with the escrow agreement, and Deutsche Telekom had not at that time alerted Vivendi to the existence of a legal difficulty which could constitute an obstacle to the planned agreement.  It is therefore a construction *a posteriori* which does not appear to have dictated Deutsche Telekom's conduct at the time of the cancellation.

19.  Finally, it should be noted that, contrary to the statements by the defendants, the exact schedule of the negotiations was not dictated by Vivendi, as confirmed by the letter sent by Vivendi to Deutsche Telekom on August 30, 2004: "*As I understand it, time is of the essence for you, because the Supervisory Board is scheduled to meet at the beginning of September to approve this operation and the final documentation is required to obtain their approval.*" (Deutsche Telekom Exhibit No. 41).

So, the argument invoked by the defendants to demonstrate that the imposition of the deadline came from Vivendi has no relevance.  According to the defendants, in fact, the urgency came from Vivendi "*which wanted to finalize the operation before the hearing of the Sanctions Committee of the French Financial Markets Authority (AMF) which it had been called to attend on October 28, 2004.*"

---

[1] Our emphasis

20. This argument is devoid of relevance: the case before the Sanctions Committee of the AMF related to the way in which Vivendi's holding in Elektrim Telekomunikacja ("Telco") had been posted for fiscal 2000 and 2001 and was based solely on an analysis of the shareholders' agreement between Vivendi and Elektrim. The possible sale of PTC shares in 2004 had absolutely nothing to do with this case and could not under any circumstances have influenced its outcome. In addition, the Paris Court of Appeal approved the solution defended by Vivendi.

**4. The Defendants' Conduct after the Cancellation**

21. It should first of all be noted that the defendants do not dispute in their documents that T-Mobile International AG & Co. KG notified the European Commission of the takeover of PTC **a few days after the cancellation, but before the arbitration ruling used by the defendants to attempt to gain control of PTC by plundering ["spoliating"] Vivendi had been issued.**

22. Finally, Deutsche Telekom only invokes the ruling issued on November 26, 2004 in the context of a second arbitration proceeding initiated by Deutsche Telekom in 2000 to dispute the validity of the transfer of the PTC shares owned by Elektrim to Telco, in a very partial manner. Now, this ruling found that the transfer of Elektrim's stake in PTC was "ineffective" as far as Deutsche Telekom was concerned, and declared that Elektrim would be defaulting on its commitments if it did not manage to get the PTC shares back from Telco within two months.

The PTC shareholders' agreement stated that in case of "*material default*", Deutsche Telekom would benefit from a promise to sell (purchase option) for the PTC shares owned by Elektrim, at a price quite a bit lower than the price that had been negotiated with Vivendi.

However, in this same arbitration ruling, the Court decided that it had no jurisdiction over Telco, being sued by Deutsche Telekom. **The ruling therefore had no legal effect on Telco, currently the owner of the shares.**

In this regard, based on a complaint filed by Telco, this ruling was partially cancelled by a decision by the Vienna Commercial Court dated December 20, 2005, in favor of Telco (Exhibit No. 57). In fact, the court cancelled the part of the ruling declaring the transfer of the PTC shares "ineffective," thereby confirming Telco's right of ownership over these shares.

23. In its arguments filed on February 21, 2006, Deutsche Telekom does not dispute the maneuvers undertaken based on the arbitration ruling to attempt to plunder Vivendi.

It is content to respond, with nothing to support it, that Vivendi is demonstrating "*deliberate determination*" against it; now as we have demonstrated already, all the legal and arbitration actions filed by Vivendi were for the sole purpose of defending itself against plunder of its investment in Poland.

**249**

24.  Deutsche Telekom very recently gave additional proof of the bad faith with which it acted towards Vivendi.  In fact negotiations were initiated, on a new basis, between the parties at the beginning of 2006 for the purpose of ending all the various lawsuits between them and clarifying the division of the shares in PTC.  These negotiations led to some agreements deemed final by the various parties who met on March 29, 2006, to give them final approval and sign them.  However, as in 2004, and due to a new court decision issued in its favor which ratified the partial enforcement decision for the ruling of November 26, 2004, Deutsche Telekom abruptly retracted during the meeting to finalize the contractual documents, just a few hours before they were due to be signed.   Vivendi therefore initiated new arbitration proceedings in Switzerland against Deutsche Telekom to obtain forced execution of the agreements which had been settled at the time Deutsche Telekom withdrew and refused to sign them.

**Today it seems clear, in the light of the events very briefly described above, that Deutsche Telekom first of all lulled Vivendi into a false sense of security by entering into contractual negotiations which it then abruptly broke off for the sole purpose of trying to get hold of the PTC shares owned by Telco, in collusion with Elektrim, at the lowest cost and to the detriment of Vivendi.**

## II. Discussion

25. Vivendi strongly requests this Court to find Deutsche Telekom and T-Mobile International AG & Co. KG contractually liable (A) and asks for Deutsche Telekom and T-Mobile International AG & Co. KG's countersuit to be denied (B).

### A) Deutsche Telekom's Tort Liability

Deutsche Telekom's tort liability is incurred due to the tort committed during the discussions and the damage resulting from the cancellation suffered by Vivendi.

### 1. The Wrongful Cancellation of the Negotiations by Deutsche Telekom

26. It is clear that the freedom to break off pre-contractual relations is only relative and that its exercise has limits, in particular traditionally, that of abuse. Abuse of the right to cancel negotiations is therefore characterized, and the tort liability of the perpetrator when it occurs:

- either because the cancellation, made abruptly and at an inopportune time, takes place to the detriment of the interests of the business partner, who was legitimately trusting in the upcoming conclusion of the negotiations;

- or, more particularly, when the cancellation is fraudulent and it appears that the prior continuation of negotiations was intentionally deviated from its purpose. This is true in particular when the facts show that the perpetrator of the cancellation had not intended to sign the contract for a long time, and that it had only continued the negotiations with the aim of distracting the attention of its business partner.

The abuse can be characterized otherwise. There is already abuse, objectively accepted, when the state of progress of the negotiations is such that none of the partners can withdraw without giving a good reason, without taking into account the interests of the other partner. There is abuse, *a fortiori*, subjectively accepted this time, when the use of the right to end the negotiations is based on fraud, established by the prior or concomitant intention of a partner to deliberately harm the interests of the other with the signing of the contract.

27. These two dimensions of abuse are clearly characterized in this case.

(a) In fact, from an objective point of view firstly, jurisprudence punishes canceling negotiations when it occurs "*without a legitimate reason, abruptly and unilaterally*" ( Cass. com. March 20, 1972: Bull. IV, No. 93, p. 90).

Now it appears from the facts set forth above, that Deutsche Telekom abruptly ended all relations without notice, after leading Vivendi to think that the negotiations were progressing normally, and without giving any legitimate reason for the cancellation, although the negotiations had gone on for more than a year and they had arrived at the final phase.

**251**

After more than a year of negotiations, when the final versions of the contracts had been sent to the parties, on September 7, 2004, Deutsche Telekom sent a terse letter of two lines ending the negotiations.

At this phase in the negotiations, there were no longer any basic points of disagreement between the parties, and the operation was still a valid possibility, apart from Deutsche Telekom's expectations of a favorable ruling in the near future in the arbitration proceedings.

As Vivendi has already stated, the argument put forth by Deutsche Telekom in its arguments, based on the change in position by the bondholders, cannot be accepted as the reason for justifying this cancellation. It was also only invoked by Deutsche Telekom *a posteriori*, in its documents, and only served as a pretext for the cancellation while other solutions could have been found and the deadline set by the parties postponed.

Therefore nothing could have led Vivendi to think that the negotiations would end like this. Deutsche Telekom had never given Vivendi any inkling of such a decision. In fact very much to the contrary, as Vivendi had made the latest concessions requested by Deutsche Telekom, there was nothing to warn it of such a cancellation.

28. (b) Then, from the subjective point of view this time, jurisprudence sometimes finds that abuse exists based on the intentions of the perpetrator of the cancellation. There is then mention of fraud, unfairness or bad faith with which one of the parties to the negotiation suddenly withdrew, to the surprise and detriment of the other party. According to jurisprudence – but the formula is not exclusive of any other – "*Bad faith consists of ending negotiations, under detrimental conditions, after leading the other party to believe that the contract would be signed.*" (CA Riems, December 13, 1989, cited and analyzed, among other references, by P. Chauvel, note *Dalloz* 1997, Jur. p. 45).

In a straight line from this jurisprudence from the judges on the merits, the Court of Cassation therefore found, based on an assumption that negotiations had secretly been undertaken for a massive sale of shares, which the seller-owners, who had kept the partner's involvement in signing the contract secret, and had only broken off the negotiations *in extremis*, after committing to sell the shares to a third party, "*thereby unilaterally and with bad faith cancelled the negotiations that it had never seemed they would abandon.*" (Cass. com. January 26, 2003, not. in: *Dalloz* 2004, Jur. 869, note Dupré-Dallemagne).

This jurisprudence of principle, rendered in the "Manoukian" case invoked in defense is properly founded and applicable to this case, in terms of characterizing the wrongdoing of cancellation.

In fact, jurisprudence does not allow negotiations to be entered into or conducted for selfish purposes, completely outside the main aim of signing a final contract, and falsely giving the opposite side the appearance and legitimate expectation that the contract will be signed very soon. As Prof. Stoffel-Munck writes, "*these are the wrongdoings of hypocrisy and inconsistency which can be blamed on the negotiator, the fact of leading the opposite side to believe in the good outcome of the operation and misleading his expectations,*" which therefore characterize wrongful cancellation (*Abuse in contracts, testing a theory*, LGDJ thesis 2000, spec. No. 121, cited and approved by Dupré-Dallemagne, note *Dalloz* 2004, op. cit. p. 871; addition in the same sense, O. Deshayes "Pre-contractual Damage," RTD Civ. 2004, 187, No. 31, p. 200, 2nd col. and numerous references cited.)

**252**

29. "*Hypocrisy,*" "*inconsistency,*" "*creation of deceptive appearances,*" "*intentional breach of the opposite side's legitimate confidence,*" all of these descriptions converging to establish an abuse of the cancellation right perfectly describe the facts in this case.

In fact, it has been clearly established that the continuation in the summer of 2004 of the previous negotiations which had been going on for more than a year was for no other reason than to make the other side wait, to the sole benefit of Deutsche Telekom, which was counting on the imminent occurrence of a favorable arbitration ruling and did not seriously intend to sign the deal with Vivendi. By doing so, Deutsche Telekom carried on, and then cancelled the negotiations in a fraudulent manner, with the intention of leading Vivendi to believe that they would soon reach an amicable, permanent settlement for their dispute. There is no question that this was abuse, which results from the intention to harm Vivendi by trying to get hold of the PTC shares, by means of a legal quibble in Polish law and without paying the price to the legitimate owner.

30. In addition, the events after the cancellation – particular those, similar and perfectly clear, in March 2006 – confirmed Deutsche Telekom's fraudulent intent once more and the abuse in the negotiations, which in this case was nothing more than to drag them out, a pretext in their secret path towards gaining control of PTC for a lower cost.

Using its unfair and fraudulent maneuvers set forth in the description of the facts, Deutsche Telekom was trying any means to gain control of PTC and the shares owned by Vivendi's subsidiary, Telco.

It is therefore clear in this case that not only did Deutsche Telekom cancel the negotiations abruptly and for no good reason, but even more that it did so fraudulently to pursue its own illegal ends.

Deutsche Telekom kept stringing Vivendi along by making them think that a settlement would soon be reached. Right up the last moment, it kept asking for some final concessions which Vivendi accepted.

At no time did Deutsche Telekom tell Vivendi that it had reservations about completing the process. Very much to the contrary, it was Deutsche Telekom which on many occasions hurried up the discussions and asked Vivendi to pressure its attorneys.

Therefore, the letter sent by Deutsche Telekom to Vivendi on September 7, 2004, is an abrupt cancellation, with no notice and for no good reason. By doing so, Deutsche Telekom is guilty of abuse of law, committed intentionally for fraudulent purposes.

It is this fraudulent misconduct which is the cause of the damage caused to Vivendi, for which it has good grounds for asking for compensation.

## 2. The Considerable Damage caused to Vivendi by Deutsche Telekom

31. Under such circumstances, Vivendi, the victim of fraudulent prosecution and wrongful cancellation of the negotiations, is entitled to ask for compensation for all the counts of damages which are the direct consequence of Deutsche Telekom's misconduct. Contrary to the argument put forward by the defense, this is not a case of asking for Vivendi to be put in the situation it would have been in if the sale had gone through, but simply to compensate it for the losses and other damage caused by the continuation and the undue cancellation of the negotiations due to Deutsche Telekom's misconduct as we have described.

**253**

And this damage, not yet consolidated in full, is now certain in principle and of considerable size. To wit:

- First of all and chiefly, the loss of the fruits of the investment made in Poland. This damage is a direct result of the fraudulent actions by Deutsche Telekom, which led Vivendi into the false belief that the shares would be sold, to later resort to expropriating them by various arbitration and judicial proceedings in Vienna and in Poland;

- Secondly, for the loss of the opportunity to sell the shares to a third party;

- Also, for the harm to their image and reputation;

- Also, for the loss in the sale of other Vivendi assets;

- And finally in any case, the considerable costs associated with the negotiations which resulted in pure loss for Vivendi.

This Court should therefore confirm the existence, discharge to be completed later, of the amount of damages and interest incurred.

**a) Chiefly, the loss, actual or imminent, of the fruits of the investment in Poland**

32.    Due to the fraud and abuse in the continuation and cancellation of the sales negotiations, which allowed Deutsche Telekom to engage in unfair maneuvers, in collusion with Elektrim in Poland, Vivendi is now deprived of any possibility of enjoying the fruits of its indirect stake in PTC, and selling it to a third party.

Deutsche Telekom strung Vivendi along under the illusion that the discussions would have a favorable outcome, making it useless, and in practice impossible, for Vivendi to look for other solutions, and then abruptly broke off the discussions in such a way that the plaintiff is now unable to find a solution to protect its financial interests.

Vivendi has therefore suffered actual and direct  harm to its core

In the short term, Vivendi could even find itself permanently deprived of this stake if it does not manage to have its rights recognized in Poland, now being flouted by Deutsche Telekom and Elektrim, which are exploiting gaps in the Polish legal system by invoking a truncated reading of an arbitration ruling of November 26, 2004, in spite of the more established rules of international law.

The result is therefore that, if on the date when the court rules on Vivendi's case, Telco's right of ownership of the PTC shares is not recognized in Poland and Deutsche Telekom has appropriated those shares without Vivendi receiving the proper value for them, Vivendi will have suffered damages, due to the wrongful cancellation, in an amount equal to that of its investment, i.e. 1,881,601,161 euros, plus the interest incurred up to the date of the judgment, corresponding to the blockage of the funds invested by Vivendi.

**254**

**b) Secondly, the loss of an opportunity to sell its stake in PTC to a third party**

33. According to jurisprudence, the fact that "*the company has lost (following the useless continuation of negotiations) an opportunity, if it had had one, to find another buyer,*" constitutes a compensatable loss (Cass. com. June 18, 2002, NGM, No. 99-16488, RTD Civ. 2003, p. 282, obs. Mestre and Fages). Doctrine is unanimous in this regard, as shown again by the recent article by Professor Deshayes, partially cited in the defense ("Pre-contractual Damage," RTD Civ. 2004, 187, spec. No. 20, p. 197), who writes on the subject of "damage from the loss of opportunity to sign another contract instead of the aborted contract," in a perfectly clear and convincing manner that:

*"Such damage must indeed be redressed. However, not in all cases. In fact it must be established that there is a causal link between the damage and the wrongdoing (i.e. the circumstances surrounding the cancellation). This condition is satisfied when the pre-contractual wrongdoing consists for example in having wasted one's time with the other negotiator. In this case, it is logical that the loss of opportunity to sign a contract with a third party should be included in the compensatable damage. Because if the wrongdoing had not been committed, the frustrated negotiator would have had more time to find a third party and possibly sign a contract. Likewise, if the wrongdoing consists of attacking the reputation and honor of the other side, it is possible to claim that the latter has lost future opportunities of signing a satisfactory contract with a third party, which are now lost. The amount of the damages and interest awarded will then be the net expected additional amount of the contract which could have been signed with a third party, subject to a reductive weighting// based on the tenor of the lost opportunity."*

These requirements are perfectly met in this case.

By stringing Vivendi along for a year under the illusion that a sale would take place, and wrongfully and abruptly canceling the negotiations, the defendants deprived Vivendi of the opportunity to find a buyer for its indirect stake in PTC or to find another solution for protecting its investment in Poland.

There is no doubt that the causal link between the wrongdoing and the damage is direct here: because in this case Deutsche Telekom was precisely trying to string Vivendi along, by means of drawn out, almost completed negotiations, giving the illusion that approval for the sales agreement was imminent; by doing so, Deutsche Telekom "lulled" Vivendi into a false sense of security in the case of a possibly unfavorable arbitration ruling, and therefore prevented it from engaging in any attempts to pursue a sale or any other measures to protect its Polish investment.

As for the damage, Deutsche Telekom itself has admitted that the valuation of 51% of PTC was fixed at the time at 1.3 billion euros, and assuming a probability of finding an alternative solution to the one proposed to Deutsche Telekom at 50%, the damage suffered by Vivendi comes to 650 million euros.

**255**

This damage is also combined with the damage resulting from the loss of Vivendi's investment in Poland and could not be compensated for separately, unless, by some extraordinary chance, the latter was not acknowledged.

### c) In any event, the harm suffered by Vivendi to its image

34.  The wrongful cancellation and the unfair conduct of the defendants caused Vivendi to suffer serious harm to its image.  The market is very sensitive to the quality of Vivendi's investments abroad, and the investment in Poland's telephone market constituted one of its most significant.

Vivendi is also a company which is particularly watched by investors so that the announcement of the failure of the negotiations and the resulting consequences had a significant impact on the company's image.

It is not true to say that this harm is the same as the harm which has accumulated since 1999 due to the lawsuits between Vivendi and Deutsche Telekom.  In fact, the "moral" or immaterial damages suffered by Vivendi resulting directly from the unfair conduct of Deutsche Telekom in its negotiations with Vivendi in 2003 and 2004 is added to the harm already suffered due to the numerous legal disputes between the two parties.

This situation makes Vivendi more vulnerable in its other investments abroad and particularly in Eastern European countries.

For this reason, the Court should order the defendants to pay Vivendi the amount of 50 million euros in damages and interest for the harm it has suffered to its image.

### d) Additionally, the unexpected sale of the Veolia shares

35.  Due to the advanced state of the discussions with the defendants, Vivendi had included the proceeds of the sale of its Telco stake in its financing plan.

Because of the abrupt cancellation of the discussions by the defendants, it had to replace it by an early sale of 61 million Veolia shares in December 2004 at an average price of 24.54 euros per share, giving total proceeds of 1,496,940,000 euros.

Vivendi was therefore deprived of any increase in the Veolia share price, which has consistently gone up since the beginning of 2005.

Based on the share price on April 21, 2005, which was 28.43 euros, Vivendi was therefore deprived of a gain of 3.89 euros per share, which is a total loss of 237,290,000 euros. This loss is a direct result of the fraud and wrongdoing in continuing and then abruptly canceling the negotiations by Deutsche Telekom.  If the negotiations had not been conducted in bad faith by Deutsche Telekom, Vivendi would not have included the proceeds of the sale in its financing plan and would not have had to sell its Veolia shares early following the cancellation of the negotiations.

**256**

36.  The defendants are trying on the one hand to demonstrate that the harm resulting from this early sale is not a result of the cancellation of the negotiations with Deutsche Telekom, due to the existence of call options on some of the Veolia shares since 2002, which demonstrates that regardless of the cancellation of the discussions with Deutsche Telekom, Vivendi intended to sell.  On the other hand, they put forward the existence of a derivative operation with the Société Générale settled in 2005, which would have allowed Vivendi to hedge its risk associated with the missed profits.

Now these two arguments are both incorrect.

In fact, in December 2002, Vivendi sold half its stake in Veolia Environnement at a price of 20.40 euros per share.  At the request of the buyers, Vivendi gave them call options for the balance of its stake in Veolia Environnement (82 million shares), enabling these investors to buy these shares at a unit cost of 26.50 euros until December 24, 2004.  The Veolia Environnement Share price never reached 26.50 euros before that date, so these options were not exercised.  The sale of the 61 million shares is therefore not associated with the existence of these options.

In addition, in December 2004, at the same time as the sale of the 61 million shares, Vivendi agreed on a derivative operation with the Société Générale allowing it to benefit, on a notional amount of 20 million shares, from an increase in the share price for Veolia Environnement above 23.91 euros for a period of three years. This derivative operation therefore only affects 20 million shares while it was on the whole 61 million shares sold which Vivendi could have benefited from the increase in the share price for Veolia Environnement in 2005 if the sale had not occurred at the end of 2004.

**e) Finally, the costs incurred by the negotiation**

37.   In spite of the allegations by the defense, the victim of fraudulent continuation and wrongful cancellation of negotiations has the right to claim compensation for the costs of the negotiations which it incurred as a pure loss, and which it would have been spared if it had been aware of the true intentions of the other side.

Jurisprudence of the judges on the merits (see recently CA Versailles, March 18, 2004, *Bull. Joly* 2004, § 195, p. 970, note Th. Massart) and the Court of Cassation (see again the important above-mentioned ruling, Cass. com. November 26, 2003, *Dalloz* 2004, p. 869, in its response to the first motion in appeal filed by Manoukian: "*The Court of Appeal decided correctly that in the absence of firm, final approval, the harm suffered by A.M. only included the costs incurred by the negotiation and the advance studies which it had ordered[...]*) generally attest to this.

Recent doctrine finds, in the same sense, that: "*Compensation for the negotiation costs is [...] only possible when it can be established that these costs were incurred as a result of the fraudulent circumstances surrounding the cancellation.  Such a situation is not inconceivable.  So, when the pre-contractual wrongdoing consists of knowingly dragging out the negotiations, when the chances of a successful outcome had become zero, the wrongdoing is definitely the cause of new costs: these are all the costs that would not have been incurred if the cancellation had happened sooner.  More generally still, when the wrongdoing consists of entering into negotiations with no intention of signing a contract, the wrongdoing is the cause of the all the costs. Because in the absence of wrongdoing, no costs would have been incurred,*" *(*O. Deshayes, article cited above, RTD Civ. 2004, No. 18, p. 197*)*.

**257**

38.  That is obviously the case here:  Deutsche Telekom only engaged in negotiations to string Vivendi along, while it waited for an arbitration ruling which it expected to be in its favor.  Deutsche Telekom was then happy to put forward fallacious pretexts preventing the signing of the contract which demonstrates that it had no intention whatsoever of buying the shares at the agreed price, but rather quite the opposite that it hoped to get hold of them in a devious manner, for a minimal price, by means of the lawsuit.  Therefore, the costs of negotiation incurred by Vivendi should not have taken place; based on the real intentions of Deutsche Telekom, only disclosed by its later conduct after the cancellation of the negotiations, they should not have been incurred as they were in this case: as pure loss.

Now, due to the size of the deal, Vivendi incurred considerable expenses when conducting the negotiations with Deutsche Telekom.

Vivendi hired outside attorneys who negotiated for more than a year.  They represented Vivendi's interests in numerous meetings, and negotiated directly with Deutsche Telekom and with Elektrim.  They also drew up numerous legal documents in the form of draft contracts and issued numerous legal opinions.

Vivendi paid out 2,525,928 euros in fees to its outside attorneys.

In addition, for the purposes of these negotiations, Vivendi allocated significant internal resources to handle these matters. So, the General Manager in charge of finance at Vivendi, Jacques Espinasse, and his deputy, Dominique Gibert, devoted the equivalent of approximately thirty full days to it.  Added to the time spent by other Vivendi employees estimated at 60 man/days, the damage suffered by Vivendi comes to 375,000 euros.

In addition, there were many trips and meetings in Poland with the various parties involved, mobilizing the highest levels of Vivendi management.  Vivendi therefore had to incur the costs of organizing the travel of its employees to Poland.  All of these costs are currently estimated at 30,000 euros, this amount being subject to change.

39.  For all these claims, Vivendi is therefore asking the Court to order Deutsche Telekom to pay it the sum of 2,171,822,000 euros for damages and interest.

***********

40.  Finally, fairness demands that Deutsche Telekom should be ordered to pay Vivendi the amount of 200,000 euros for the costs incurred by the latter for filing this lawsuit with the courts.

**258**

**B) The Lack of Merit of the Countersuit lodged by Deutsche Telekom**

41. Deutsche Telekom claims, but does not demonstrate, that this lawsuit is abusive because (i) it "*is obviously part of the pressures and legal and financial blackmail*" aimed at forcing Deutsche Telekom to negotiate, and (ii) it "*is part of the general conduct marked by a desire by Vivendi Universal to harm its rival Deutsche Telekom which Vivendi Universal is trying to replace at all costs in the share ownership of PTC, by making claims of all kinds, particularly lawsuits.*"   Deutsche Telekom is therefore asking this Court to order Vivendi to pay it 2 million euros for damages and interest as well as 300,000 euros for the costs incurred by Deutsche Telekom for its defense in this case.

42.  As underlined by Vivendi, there have been many arbitration and court proceedings between Vivendi and the defendants.  However, Vivendi is not behind all these actions.  Of these proceedings, those which were initiated by Vivendi are for the sole purpose, which is completely legitimate, of defending Vivendi's investment against attempts to steal its investment by Deutsche Telekom.  There was no intention to cause harm, or any attempt to "replace Deutsche Telekom in PTC's share capital."  Vivendi did not engage in any "blackmail."  It would at very least be surprising if Vivendi had spent several hundreds of thousands of euros to initiate several lawsuits, in various courts, in different countries, solely for the purpose of putting pressure on Deutsche Telekom and forcing it to negotiate.  These lawsuits were for the sole purpose of reinstating Vivendi in its rights legitimately acquired in Poland, now threatened on all sides.

In this regard, it should be noted that Deutsche Telekom has not hesitated to have recourse to physical means to gain power at PTC.  On February 25, 2005, members of the illegal board of PTC tried to gain access to PTC's offices, accompanied by bodyguards and in the presence of a representative from the German Embassy. They were refused access by the company's security service, provided by the Falk company.

On Thursday, March 3, 2005, the Director of Finance of Deutsche Telekom, Karl Gerhard Eick announced in public that Deutsche Telekom was going to use the services of a security company to prevent Vivendi's representatives from accessing PTC's offices.

On March 4, 2005, the Falk company caved in to pressure from Deutsche Telekom, which is one of its main international customers, and allowed Deutsche Telekom and Elektrim representatives to enter PTC.

On the same day, Falk company employees forced their way into Telco's head offices.  This attack on the property was only stopped by police intervention.

These incidents are proof that it is Deutsche Telekom which is using any means it can to put pressure on Vivendi to achieve its goals, i.e. the theft of the PTC shares held by Telco and the removal of the rights attached to these shares.  Against this background and due to the difficulties which Vivendi has run into in the Polish courts, there is no abuse in Vivendi suing Deutsche Telekom in other competent courts. As

**259**

an example, it should be noted that Telco, the main party involved in the court decision relating to the enforcement of the arbitration ruling of November 26, 2004 (ruling that the transfer of the PTC shares owned by Telco was null and void), was prevented from participating in the first case.

**Therefore, this Court should deny Deutsche Telekom and T-Mobile International AG & Co KG's countersuit.**

## IN VIEW OF THE FOREGOING

In view of the facts and law explained above,
In view of Article 1382 of the Civil Code,

We respectfully ask the Court:

- To find that Deutsche Telekom and T-Mobile International AG & Co. AG [sic] are liable for the cancellation of the negotiations undertaken with a view to its purchase of the PTC shares;

- To find that this cancellation caused harm to Vivendi's finances and image, provisionally fixed at the amount of 2,171,822,000 euros;

- Therefore to order Deutsche Telekom and T-Mobile International AG & Co. KG to pay Vivendi the amount of 2,171,822,000 euros;

- To find and rule that this lawsuit filed by Vivendi is not abusive;

- And to therefore deny all of Deutsche Telekom and T-Mobile International AG & Co. KG's claims, motions and arguments;

- To jointly order the defendants to pay the plaintiff the amount of 200,000 euros pursuant to Article 700 of the New Code of Civil Procedure and to bear the entire costs;

- To order the provisional enforcement of the decision to be issued.


ALL RIGHTS RESERVED


[signature]


**261**

## **LIST OF EXHIBITS PRESENTED**

<u>Exhibits Presented on September 9, 2005</u>:

1.  Offer to buy the PTC shares owned by Telco sent by Deutsche Telekom to Telco and its shareholders (Vivendi and Elektrim) on August 25, 2003.

2.  Telco's response to Deutsche Telekom's offer dated September 4, 2003.

3.  Memorandum sent by Deutsche Telekom to Vivendi dated January 9, 2004

4.  Amended draft of the sales contract for the PTC shares sent by Deutsche Telekom to Vivendi on January 16, 2004.

5.  List of the fourteen outstanding questions sent by Deutsche Telekom dated April 19, 2004.

6.  Joint letter from Vivendi and Elektrim sent to Deutsche Telekom on May 14, 2004

7.  Response from Deutsche Telekom dated May 18, 2004, to the joint letter from Vivendi and Elektrim dated May 14, 2004

8.  E-mail from Deutsche Telekom dated August 2, 2004, relating to the finalization of the sales contract.

9.  Draft sales contract sent by Vivendi to Deutsche Telekom on August 5, 2004, consolidating the discussions between Elektrim, Vivendi and Deutsche Telekom.

10. Draft agreement ending all the lawsuits and claims, sent by Deutsche Telekom to Vivendi on August 27, 2004

11. Final version of the sales contract for the PTC shares and the guarantee and compensation agreement sent by Vivendi to Deutsche Telekom on September 1, 2004.

12. Letter sent by Deutsche Telekom to Vivendi on September 7, 2004 informing it of Deutsche Telekom's decision not to go ahead with the planned purchase

13. Fax sent by the court of arbitration to the parties' attorneys on August 12, 2004, informing them that the arbitration ruling would be issued in October 2004.

14. Extract from the Official Gazette of the European Union dated October 6, 2004, relating to the publication of the advance notification made by T-Mobile on September 24, 2004.

15. Extract from the Official Gazette of the European Union dated November 17, 2004, relating to the publication of the no-objection decision by the European Commission to the concentration operation announced by T-Mobile.

16. Arbitration ruling dated November 26, 2004.

17. Injunction issued by the Warsaw District Court on December 30, 2004, banning any changes to the shareholder registry of PTC.

18. Partial enforcement decision of the ruling issued on February 2, 2005, by the Warsaw Regional Court.

19. Declaration of appeal by Telco against the decision for partial enforcement.

20. Declaration of appeal form the General Prosecutor of Warsaw dated February 22, 2005, against the decision for partial enforcement.

21. Claim filed by Vivendi with the Polish State based on the Franco-Polish agreement on protecting investments dated February 14, 1989.

22. Notification of Elektrim's dismissal of members of PTC's Supervisory Board dated December 10, 2004

23. Notification of Elektrim's appointment of new members of PTC's Supervisory Board dated December 10, 2004

24. Letter sent by Mr. Jacek Nieweglowski (member of PTC's Supervisory Board) to the members of Elektrim's Board of Directors dated December 13, 2004.

25. Letter sent by Mr. Philippe Houdouin (member of PTC's Supervisory Board) to the members of Elektrim's Board of Directors dated December 13, 2004.

26. Letter sent by Mr. Michel Picot (member of PTC's Supervisory Board) to the members of Elektrim's Board of Directors dated December 13, 2004.

27. Fax sent by Mr. Dariusz Oleszczuk (Chairman of PTC's Supervisory Board) to Mr. Mickael Günther (Vice-Chairman of PTC's Supervisory Board) dated December 13, 2004.

28. Fax sent by Mr. Mickael Günther to Mr. Dariusz Oleszczuk dated December 13, 2004.

29. Fax sent by Mr. Mickael Günther to Mr. Dariusz Oleszczuk dated December 20, 2004.

30. Fax sent by Mr. Mickael Günther to members of PTC's Board of Directors announcing a meeting of PTC's Supervisory Board to be held on January 10, 2005.

31. Letter sent by Mr. Dariusz Oleszczuk to Mr. Uli Kühbacher dated January 22, 2005

32. Notice of meeting of PTC's Supervisory Board issued by two Elektrim representatives for a meeting on February 3, 2005.

33. Letter sent by four members of PTC's Board of Directors appointed by Telco to the members of the Supervisory Board dated February 2, 2005.

34. Notification of the appointment by Elektrim of a new member of PTC's Supervisory Board dated February 3, 2005

**263**

35. List of shareholders drawn up on February 23, 2005 by PTC's Board of Directors illegally constituted.

36. Criminal complaint filed with the Warsaw District Prosecutor by Telco against the members of PTC's Supervisory Board illegally constituted.

37. Decision by the court of arbitration sitting in London, dated March 24, 2005, banning Elektrim, as a precautionary measure, from selling the PTC shares.

38. Letter from PTC to the Warsaw court bailiff ("*komornik*") dated April 15, 2005, stating that Telco is not a PTC shareholder.

39. Letter from Deutsche Telekom to the Warsaw court bailiff ("*komornik*") dated April 15, 2005, stating that Deutsche Telekom has owned 48% of PTC's shares since March 24, 2005.

**New Exhibits:**

40. Legal opinion from Professor Strzepka, dated July 3, 2003, concerning the validity of the transfer of PTC shares from Elektrim to Telco.

41. Legal opinion from Professor Koch, dated June 30, 2003, concerning the validity of the transfer of PTC shares from Elektrim to Telco.

42. Legal opinion from Professor Szjajkowski, dated July 4, 2003, concerning the validity of the transfer of PTC shares from Elektrim to Telco.

43. Legal opinion from Professor Pyziol concerning the validity of the transfer of PTC shares from Elektrim to Telco.

44. Judgment issued by the Vienna Court of Arbitration dated April 9, 2003.

45. Minutes of PTC's Supervisory Board meeting of October 21, 1999

46. By-laws of PTC

47. E-mail sent by Deutsche Telekom's attorney (Peter Golob) to Elektrim and Vivendi on May 11, 2004, with his comments on the draft term sheet to be sent by Vivendi and Elektrim to Deutsche Telekom.

48. E-mail sent by Deutsche Telekom's attorney to Vivendi's attorneys on May 27, 2004, concerning the permits required from the appropriate competition authorities.

49. E-mail sent by Deutsche Telekom's attorney to Vivendi's attorneys on June 9, 2004, concerning Deutsche Telekom's comments on the draft escrow agreement to be signed with the bondholders.

50. E-mail sent by Vivendi's attorneys to Deutsche Telekom's attorney on June 14, 2004, concerning the items sent to Elektrim relating to the escrow agreement to be signed with the bondholders.

51. E-mail sent by Vivendi's attorneys to Deutsche Telekom's attorney on July 8, 2004, concerning the latest version of the draft escrow agreement.

52. E-mail (e-mail and fax) sent on July 27, 2004, by Deutsche Telekom to Vivendi and its attorneys relating to the stages in obtaining corporate authorizations within Deutsche Telekom to carry out the planned sale.

53. E-mail sent to Vivendi by its attorneys on August 18, 2004, reporting on the latest negotiations with Deutsche Telekom.

54. E-mail sent to Vivendi and Elektrim by their attorneys on August 5, 2004, reporting on the latest discussions with Deutsche Telekom.

55. E-mail sent on August 19, 2004, by Deutsche Telekom's attorneys to Vivendi and Elektrim's attorneys about the representations and warranties.

56. Newspaper article summarizing the press release published by Elektrim's bondholders on September 3, 2004.

57. Judgment by the Vienna Commercial Court dated December 20, 2005, partially invalidating the ruling issued by the Court of Arbitration on November 26, 2004.

58. E-mail sent by Vivendi to Deutsche Telekom on January 26, 2004.

59. Article published in the Polish newspaper Rzeczpospolita on November 18, 2004.

**265**

<u>TRANSLATOR'S CERTIFICATE</u>

I, *SANDRA STRUBBE*, declare under penalty of perjury that I am thoroughly competent in both French and English, and that the foregoing document is a true and correct translation of the attached document, which I translated from French to English, on this ...3......... day of ...*April*., 2007.

*Sandra Strubbe*

Translated document:

Conclusions VU 13.06.06

266

Jean-Robert CAMPANA
Avocat Associé
CAMPANA · RAVEL & Associés
24, rue de Prony – 75008 Paris Cedex 17
Tel. 01 44 29 22 22 · Fax 01 44 09 92 91
PALAIS P 202

ō  HERNE

A Messieurs les Président et Juges
composant le Tribunal de commerce de Paris

Audience du 13 juin 2006    REGUL   1h two
RG n° 2005/51682

**POUR :**    La société Vivendi

**Demanderesse au principal**
**Défenderesse reconventionnelle**

Ayant pour avocat :
**Jean-Robert Campana**
SCP Lafarge Flécheux Campana Le Blevennec
24 rue de Prony – 75017 Paris                    P209

Plaidant par :
**Jean-Michel Darrois**
**Hervé Pisani**
**Matthieu de Boisséson**
Avocats au Barreau de Paris
Darrois Villey Maillot Brochier
69 avenue Victor Hugo – 75116 Paris
Tél. : 01 45 02 19 19                    R170

**CONTRE :**    **La société T-Mobile International AG & Co. KG**
                **La société Deutsche Telekom**

**Défenderesses au principal**
**Demanderesses reconventionnelles**

Ayant pour avocat :
**Pierre HERNE**
Avocat au Barreau de Paris
16 rue Gustave Courbet – 75116 Paris
Tél : 01 47 55 12 15                    B0835

267

**Et plaidant par :**

**Yves REPIQUET**
Bâtonnier de l'Ordre des avocats au Barreau de Paris
Brandford-Griffith & Associés
9 rue des Pyramides – 75001 Paris
Tél : 01 44 55 44 55                                      R279

**Patrick BERNARD**
Avocat au Barreau de Paris
Bernard Hertz Bejot
8, rue Murillo – 75008 Paris
Tél. : 01 43 18 80 80                                    P0057

**Et Jean-Yves GARAUD**
Avocat au Barreau de Paris
Cleary Gottlieb Steen & Hamilton LLP
12 rue de Tilsitt – 75008 Paris
Tél. : 01 40 74 68 00                                     J21

## PLAISE AU TRIBUNAL

**1.**     Par assignation délivrée le 26 avril 2005, Vivendi a saisi le Tribunal de commerce de
Paris, sur le fondement de l'article 1382 du Code civil, d'une action en responsabilité civile
délictuelle à l'encontre de Deutsche Telekom et T-Mobile, à raison de l'abus commis par
celles-ci dans la rupture de pourparlers avancés, devant mener à la cession d'une participation
au sein d'un opérateur polonais de téléphonie mobile.

Par conclusions régularisées le 21 février 2006, les défenderesses ont demandé au Tribunal
de :

« *Vu l'article 1382 du Code Civil,*

–     *dire et juger que Deutsche Telekom et T-Mobile n'ont pas commis de faute en mettant
un terme aux négociations engagées en vue de l'acquisition des titres PTC ;*

–     *débouter en conséquence Vivendi Universal de l'ensemble de ses fins, moyens et
conclusions ;*

–     *débouter Vivendi Universal de sa demande de voir assortie la condamnation de
l'exécution provisoire ;*

*Et reconventionnellement,*

–     *dire et juger que la présente procédure engagée par Vivendi Universal est abusive ;*

–     *condamner en conséquence Vivendi Universal à payer à Deutsche Telekom une somme
de deux millions d'euros ;*

**268**

— *condamner Vivendi Universal à payer à Deutsche Telekom une somme de trois cent mille euros au titre de l'article 700 du Nouveau Code de procédure civile et à supporter les entiers dépens ;*

— *ordonner l'exécution provisoire de la décision à intervenir.* »

**2.** Vivendi entend par les présentes écritures préciser les éléments de fait et de droit qui démontrent le caractère inexact de la défense de Deutsche Telekom et T-Mobile International AG & Co. KG.

A titre liminaire, il doit être observé que la multiplication des procédures n'est que le résultat de la multiplication des attaques subies par Vivendi et initiées par Deutsche Telekom, à la recherche d'un contrôle sur PTC, l'un des principaux opérateurs polonais de téléphonie mobile, que Deutsche Telekom n'était pas en droit d'acquérir.

**3.** L'historique de l'évolution du capital de PTC, décrit pages 2 et 3 de l'assignation le démontre : Deutsche Telekom avait, au moment de l'entrée de Vivendi dans le capital de Telco, l'interdiction claire, en application du droit polonais alors en vigueur, de contrôler PTC.

Sa tentative illicite de prendre le contrôle de PTC, par recours à des sociétés écrans, a d'ailleurs été sanctionnée par le tribunal arbitral de Vienne.

Certains des actionnaires fondateurs de PTC ayant souhaité céder leurs actions, et Deutsche Telekom n'ayant pas le droit de les acquérir, Elektrim, autre associé fondateur de PTC et qui détenait alors 32,5% du capital de cette dernière, s'est tournée vers Vivendi pour lui permettre de participer à cette acquisition, qu'elle ne pouvait mener seule compte tenu de sa situation financière.

L'entrée de Telco, société réunissant Vivendi et Elektrim a été agréée conformément aux statuts de PTC par le Conseil de surveillance de PTC à l'unanimité de tous les membres, sauf une voix : celle du représentant de Deutsche Telekom.

C'est uniquement sur la base d'un stipulation du règlement intérieur de PTC dont la validité en droit polonais est amplement débattue, que Deutsche Telekom s'est prévalue d'une règle d'unanimité à laquelle elle seule a fait échec pour tenter d'empêcher une opération qui contrariait ses visées illicites sur le contrôle de PTC, alors que les stipulations du règlement intérieur ne pouvaient être opposées ni à Telco ni à Vivendi, qui étaient alors des tiers.

**4.** De manière constante, Deutsche Telekom a tenté de priver Vivendi d'un contrôle indirect de PTC, valablement acquis, par une stratégie de harcèlement judiciaire, exploitant toutes les brèches créées par un environnement juridique et judiciaire incertain en Pologne et n'hésitant pas – c'est l'objet de la présente instance – à entretenir Vivendi dans l'illusion d'une solution négociée, le temps de finaliser une stratégie agressive de spoliation.

Deutsche Telekom est donc mal fondée à considérer que la présente procédure, légitimement engagée par Vivendi, est abusive.

**5.** Les évènements récents jettent une lumière encore plus crue sur le comportement de Deutsche Telekom. En effet, Deutsche Telekom, Vivendi et Elektrim s'étaient rapprochées, à nouveau, en janvier 2006, afin de trouver un accord mettant fin à leurs différents litiges

concernant PTC et confirmer la répartition des actions PTC entre les parties. Les négociations avancèrent rapidement, les parties ayant trouvé un accord sur tous les points à régler. C'est ainsi qu'à la fin du mois de mars 2006, les différentes parties et leurs conseils respectifs se sont rencontrés en Pologne en vue de finaliser la rédaction des accords et de les signer. Deutsche Telekom, comme Vivendi et Elektrim, savait qu'une décision devait être rendue par une Cour d'appel polonaise concernant la décision d'exequatur partiel de la sentence arbitrale du 26 novembre 2006. Mais elles étaient convenues de ne pas prendre en compte cette décision, car elles avaient trouvé un accord mettant un terme à tous leurs différends. Il ne restait plus qu'à signer la documentation matérialisant cet accord. Pourtant, lorsque la décision de la Cour d'appel fut rendue, à la surprise générale, les représentants de Deutsche Telekom décidèrent de suspendre la réunion, quelques heures avant la signature des accords, afin d'examiner la décision. Or la Cour d'appel avait validé l'exequatur partiel de la sentence arbitrale, marquant ainsi une victoire pour Deutsche Telekom qui décida, en conséquence, de ne pas signer les accords. Cette nouvelle rupture à quelques heures à peine de la signature d'accords sur lesquels il n'existait plus aucune incertitude est une preuve supplémentaire de la volonté de Deutsche Telekom de privilégier une prise de contrôle spoliatrice des intérêts de Vivendi au détriment d'une solution négociée.

La concluante, après le rappel des faits (I), sollicitera du Tribunal qu'il juge que les défenderesses ont engagé leur responsabilité délictuelle et qu'il les déboute de leur demande reconventionnelle (II).

## I.    **Sur les faits**

### A)    **Sur la prise de participation de Vivendi dans la société polonaise PTC**

**6.**    Ainsi que cela a déjà été exposé par Vivendi dans son assignation, le développement rapide de PTC a conduit certains actionnaires de PTC à céder leur participation en 1999. Elektrim qui souhaitait acquérir ces titres, mais dont la capacité financière était limitée, proposa à Vivendi de s'associer à elle dans le capital de PTC.

C'est de manière déloyale que les défenderesses tentent de convaincre le tribunal que Vivendi serait entrée dans le capital de PTC en violation des droits de Deutsche Telekom, et notamment de son droit de préemption :

« *Nonobstant les règles très clairement fixées par les statuts et le pacte d'associés de PTC, Elektrim a voulu faire rentrer Vivendi Universal, indirectement, au capital de PTC, sans obtenir l'accord du Conseil de Surveillance de PTC, et sans permettre à Deutsche Telekom (TMO) d'exercer son droit de préemption* » (conclusions, p. 4).

Cette affirmation est fausse à plusieurs titres.

**7.**    Tout d'abord, seules les règles statutaires peuvent être opposées aux tiers, dont Vivendi. En aucun cas, cette dernière ne peut se voir opposer des règles de fonctionnement ne figurant pas dans les statuts.

Au cas présent, les statuts organisent (art. 7) un droit de préemption et une procédure d'agrément par le Conseil de surveillance.

**270**

S'agissant de l'agrément par le Conseil de surveillance, l'article 181 du Code de commerce polonais dispose que :

> « 1.    L'acte constitutif peut soumettre la cession ou le nantissement des actions à l'obtention de l'accord de la société ou peut la limiter de toute autre manière »

En outre, selon l'article 215 du même Code, les décisions du Conseil de surveillance sont prises à la majorité simple, sauf stipulation contraire de l'acte constitutif.

En l'espèce, l'agrément fut donné par le Conseil de surveillance de PTC, lors de sa réunion du 21 octobre 1999, à la majorité de 7 votes pour et un vote contre (celui du représentant de Deutsche Telekom (Pièce n° 45).

Ultérieurement, Deutsche Telekom a tenté de faire prévaloir l'idée que cette décision du Conseil de surveillance devait être adoptée à l'unanimité, au motif qu'une disposition du règlement intérieur de PTC imposerait une telle règle.

Cette prétention se heurte à deux obstacles :

– il ne semble pas possible, en droit polonais, de prévoir ailleurs que dans les statuts des règles dérogatoires à la règle de majorité simple :

– à supposer même que cette stipulation soit valable dans l'ordre interne, elle ne peut être opposée à des tiers, tels que Vivendi ou Telco, société commune à Vivendi et Elektrim.

Contrairement aux affirmations de Deutsche Telekom, la cession des titres à Telco a donc bien été approuvée par la Conseil de surveillance de PTC.

**8.**    S'agissant du droit de préemption, l'affirmation de Deutsche Telekom a de quoi étonner.

Il a été jugé par le Tribunal arbitral de Vienne, dans sa sentence partielle du 9 avril 2003 (Pièce n° 44), que le droit de préemption a été effectivement mis en œuvre à l'occasion des résolutions n°$^{os}$ 139, 140, 141 et 142, dont Deutsche Telekom a bénéficié au même titre que les autres actionnaires.

**Toutefois, le même tribunal arbitral a jugé, sans la moindre ambiguïté, que la prétention de Deutsche Telekom à exercer son droit de préemption à concurrence de 3,1269 % était illicite.**

En effet, outre sa participation de 45 %, il est apparu au cours de la procédure que Deutsche Telekom avait acquis au moyen d'un prête-nom, 4 % supplémentaires portant ainsi sa participation réelle à 49 %.

Or, en application de l'article 16(2) 2b de la loi polonaise du 23 novembre 1990, les droits de vote détenus par des étrangers dans une société détentrice d'une licence de télécommunication ne devaient pas excéder 49 %.

**Reconnaissant le caractère illicite du montage occulte imaginé par Deutsche Telekom pour contourner de manière frauduleuse la loi polonaise, le tribunal arbitral a donc jugé que Deutsche Telekom ne pouvait pas exercer son droit de préemption.**

On relèvera avec intérêt, dans le cadre de la présente instance, que le tribunal arbitral avait pris soin de relever :

> « There is no doubt that DT went beyond the limits expected from any shareholder under the Shareholders Agreement in its eagerness to acquire control over PTC. »

A l'évidence, cela n'a pas suffi à refreiner les ardeurs de Deutsche Telekom…

**9.**     En conséquence de ce qui précède, et contrairement à ce que soutient Deutsche Telekom dans ses écritures, la prise de participation indirecte de Vivendi dans PTC n'a pas été effectuée en violation des stipulations des statuts et du pacte d'actionnaires de PTC. Le transfert des actions PTC détenues par Elektrim à Telco était en conformité avec les dispositions impératives du droit polonais, comme le confirment différentes opinions juridiques (Pièces n° 40, 41, 42 et 43).

**B)    Sur le déroulement des négociations : les négociations menées entre Vivendi et Deutsche Telekom ne sont pas trois négociations successives mais une seule négociation ayant dès le départ pour but la cession, directe ou indirecte, de 51% des actions PTC à Deutsche Telekom**

**10.**     Au récit factuel des négociations ayant conduit à la rupture à l'origine de la présente procédure, les défenderesses opposent un découpage artificiel des périodes de négociation, inexact quant aux faits et inopérant quant au droit.

Il s'agit bien, en réalité, d'une seule et même négociation, dont l'objectif était la prise de contrôle de PTC par Deutsche Telekom. Que cette négociation ait été complexe et qu'elle ait connu ce que le langage commun désigne comme des « hauts et des bas » ne retire rien à ce constat.

**1.    Le découpage opéré par les défenderesses entre la première phase de la négociation et la deuxième phase est artificiel.**

**11.**     Selon la thèse présentée par les défenderesses, la négociation engagée au mois d'août 2003, à l'initiative de Deutsche Telekom se serait interrompue une première fois à l'initiative de Vivendi du fait de l'opposition des créanciers obligataires d'Elektrim.

Cette affirmation est dépourvue de fondement : s'il est vrai que les créanciers obligataires d'Elektrim, après avoir dans un premier temps signé l'accord-cadre du 14 septembre 2003, ont finalement retiré leur accord, il n'y a pas eu de rupture des discussions entre Vivendi et Deutsche Telekom, mais simplement la recherche d'une solution différente, permettant de contourner l'obstacle lié à la situation financière d'Elektrim. Ceci est d'ailleurs démontré par le fait que les contacts se poursuivirent dès le début du mois d'octobre, alors que la rupture alléguée aurait eu lieu dans les tous derniers jours du mois de septembre.

**2.    De la même manière, il n'y a pas d'interruption des discussions entre le mois de janvier 2004 et le mois d'août 2004.**

**12.**   Estimant sans doute le rapport de force en sa faveur, Deutsche Telekom durcit sa position de négociation au mois de janvier 2004, en revenant notamment sur deux points essentiels : Deutsche Telekom demandait le paiement d'une indemnité de 250 millions d'euros dans l'hypothèse où Elektrim exercerait son droit de préemption et refusait tout règlement transactionnel de la procédure d'arbitrage en cours.

C'est la raison pour laquelle Vivendi envoyait une lettre le 20 janvier à Deutsche Telekom lui indiquant qu'elle n'était pas en mesure de poursuivre les discussions dans ces conditions. Vivendi précisait ensuite sa position par un courrier du 26 janvier 2004 : il s'agissait de suspendre les discussions afin de régler la question des arbitrages en cours et non de mettre un terme définitif avec Deutsche Telekom (Pièce n° 58).

**13.**   Au demeurant, les discussions ne cessèrent pas, comme l'attestent plusieurs pièces du dossier.

Monsieur Obermann, Président de T-Mobile International confirmait ainsi, au mois de février 2004, à des journalistes polonais (Pièce n° 59), que Deutsche Telekom était toujours intéressée par l'achat des actions PTC.

Le 19 avril 2004, Deutsche Telekom fit parvenir une liste des 14 questions restant à régler pour parvenir à un accord final. **Cette liste était fondée, selon ses propres termes, sur la documentation contractuelle échangée le 30 septembre 2003**, confirmant la continuité des discussions, contrairement à la thèse aujourd'hui soutenue par les défenderesses (Pièce n° 5).

L'examen des échanges entre les parties établit que les sujets en discussion furent habituels pour ce type d'opération et qu'ils ne firent pas apparaître de difficultés majeures rendant improbable la réalisation de la cession des actions PTC à Deutsche Telekom.

**14.**   Le 14 mai 2004, Vivendi et Elektrim adressèrent à Deutsche Telekom une lettre conjointe confirmant leur intention de lui céder les actions PTC détenues par Telco. Contrairement à ce que soutiennent les défenderesses, Deutsche Telekom a été impliquée dans toutes les étapes de la négociation intervenue entre Elektrim et Vivendi et a pu faire des commentaires sur le projet de *term sheet* avant qu'une offre formelle ne lui soit envoyée (Pièce n° 47). Ces observations ont d'ailleurs été prises en compte par Vivendi et Elektrim dans la finalisation de la proposition conjointe qui fut envoyée à Deutsche Telekom.

Le 18 mai 2004, Deutsche Telekom se félicitait de l'offre mais demandait à Vivendi et Elektrim de lui fournir l'ensemble de la documentation juridique afin de s'assurer qu'il ne reste aucune question non réglée.

**15.**   En outre, contrairement à ce qu'allègue Deutsche Telekom, les négociations se poursuivirent aux mois de juin 2004 et juillet 2004 et impliquèrent Deutsche Telekom : de nombreux échanges entre le conseil de Deutsche Telekom, Peter Golob, et les conseils de Vivendi et Elektrim ont en effet eu lieu aux mois de mai, juin et juillet 2004 concernant, non seulement les relations entre Elektrim et Vivendi, ainsi que le contrat de séquestre proposé aux obligataires, mais également le calendrier de notification en vue de l'obtention des autorisations nécessaires en matière de droit de la concurrence. Ces échanges attestent bien de la continuité des négociations entre les trois parties (Pièces n° 48, 49, 50 et 51).

273

Le changement de prix proposé ne peut être retenu comme preuve d'une modification radicale de négociation. Il n'est pas anormal, en effet, que le prix soit actualisé, neuf mois après la première proposition, d'autant que l'opposition des obligataires en septembre 2003 était fondée sur l'insuffisance du prix proposé.

**3.    Les motifs de la rupture brutale des négociations par Deutsche Telekom demeurent inexpliqués par les défenderesses.**

**16.**    Force est de constater que Deutsche Telekom ne répond dans ses écritures à aucune des observations ou interrogations formulées par Vivendi dans ses observations.

Il doit être d'abord rappelé qu'alors qu'un conseil de surveillance de Deutsche Telekom devait se réunir le 3 septembre 2004 pour statuer sur le projet d'acquisition des actions PTC, ce n'est que le 7 septembre que Deutsche Telekom annonçait à Vivendi qu'elle ne conclurait pas cette opération. Les défenderesses n'avancent aucune explication susceptible d'expliquer ce curieux retard.

En outre, alors que la lettre du 7 septembre évoquait la « *consultation de notre conseil de surveillance* », Vivendi faisait état d'un doute quant à la réalité de la saisine dudit conseil.

De manière étonnante, les défenderesses répondent à ce doute de manière évasive, indiquant que « *les conditions d'approbation de l'opération par le Conseil de Surveillance de Deutsche Telekom n'étaient (...) pas réunies* » (conclusions, p 15).

Est-ce à dire que le conseil de surveillance n'a effectivement pas traité de la question ? Mais alors, pourquoi avoir menti dans le courrier du 7 septembre 2004 ? Pourquoi ne pas avoir informé Vivendi de cette situation dès qu'il est apparu évident que le sujet ne serait pas soumis au conseil de surveillance du 3 septembre, et pourquoi avoir attendu le 7 septembre pour faire connaître à Vivendi la position de Deutsche Telekom ?

Si, en revanche, le conseil de surveillance a effectivement statué sur cette question, pourquoi ne pas l'indiquer clairement et communiquer l'extrait du procès-verbal de cette réunion ?

Le trouble grandit encore à la lecture des prétextes invoqués par les défenderesses pour justifier la rupture, car aucun de ces prétextes n'a été formulé auprès de Vivendi ni avant, ni après la rupture.

**17.**    Tout d'abord, Vivendi aurait imposé le 1er septembre 2004 un ultimatum en adressant à Deutsche Telekom une « offre définitive », dont les conditions ne pouvaient être davantage discutées. Ce reproche tardif est étonnant car d'une part Deutsche Telekom n'a élevé aucune protestation à la réception de ce courrier, ce qui est d'ailleurs logique, Vivendi ayant consenti aux concessions exigées par les défenderesses, et d'autre part, cette offre répondait aux contraintes de calendriers fixées par Deutsche Telekom elle-même (Pièce n° 52).

**18.**    Les défenderesses invoquent également la position des créanciers obligataires, qui avaient, cette fois, donné leur accord sous réserve de la mise en place d'une solution préservant leurs droits.

Ici encore, il ne peut être que constaté que Deutsche Telekom a conservé, à l'époque des faits un silence assourdissant, ce qui confirme que cette difficulté, à supposer qu'elle existe, n'est qu'une justification *a posteriori* d'une décision de rupture unilatérale, détachée des raisons aujourd'hui alléguées par les défenderesses.

A supposer que les difficultés d'ordre juridique alléguées par les défenderesses aient existé, si Deutsche Telekom avait agi de bonne foi, elle se serait rapprochée de Vivendi ne serait-ce que pour confronter les résultats de l'analyse juridique de ses conseils avec ceux de Vivendi.

Au surplus, il semble que la question soulevée par les conseils de Deutsche Telekom n'était pas nouvelle, car ainsi que l'indique l'auteur de la consultation cité par Deutsche Telekom :

> « *Dans ma consultation en date du 2 septembre 2004, je concluais à l'existence de risques non négligeables associés à l'opération de vente de 51% des actions PTC à DT, à savoir un risque d'invalidité des accords actuellement négociés, en tout ou partie, en cas de faillite d'Elektrim. [...] Bien que le contrat de séquestre n'ait aucun impact sur le risque d'invalidité aux termes de l'Article 127 LF(l'Article 127 invalide les actes effectués par la société mise en faillite gratuitement ou pour une contrepartie dérisoire), le nouveau dispositif de paiement proposé augmenterait les risques découlant des Articles 527 et 58 du Code Civil.*
>
> *a) L'Article 527 du Code Civil*
>
> *De mon point de vue, <u>même en l'absence du dispositif de paiement actuellement en discussion, qui formaliserait le traitement préférentiel des Obligataires et de Vivendi</u>[1] (par rapport aux autres créanciers d'Elektrim), il existe un risque substantiel que les créanciers d'Elektrim ou le fiduciaire, examinant l'ensemble des actes d'Elektrim liés aux opérations envisagées, les considèrent comme des « actes juridiques » au sens de l'Article 527 du Code Civil, et qu'ils soient ainsi fondés à introduire une action paulienne.* »

Contrairement à ce qu'affirment les défenderesses, le risque, à supposer qu'il existe, n'était donc pas lié à la convention de séquestre, et Deutsche Telekom n'avait pas, à l'époque, alerté Vivendi sur l'existence d'une difficulté juridique pouvant constituer un obstacle au rapprochement envisagé. Il s'agit là, en réalité, d'une construction *a posteriori* qui ne paraît pas avoir dicté le comportement de Deutsche Telekom au moment de la rupture.

19.    Enfin, il doit être observé que, contrairement à ce qu'indiquent les défenderesses, le calendrier précis des négociations n'a pas été dicté par Vivendi, comme le confirme d'ailleurs la lettre adressée par Vivendi à Deutsche Telekom le 30 août 2004 : « *D'après ce que j'ai compris, le temps est essentiel pour vous, dans la mesure où un Conseil de Surveillance est prévu pour le début du mois de septembre pour approuver cette opération et que la documentation finale est requise pour obtenir une telle approbation* ». (Pièce Deutsche Telekom n° 41)

Au demeurant, l'argument invoqué par les défenderesses pour démontrer que l'imposition du délai provenait de Vivendi est dépourvu de pertinence. Selon les défenderesses, en effet, l'urgence émanait de Vivendi « *qui souhaitait finaliser l'opération avant l'audience de la*

---

[1] Souligné par nos soins.

*Commission des sanctions de l'Autorité des Marchés Financiers (AMF) à laquelle elle était convoquée pour le 28 octobre 2004 ».*

**20.**    L'argument est dénué de portée : la procédure devant la Commission des sanctions de l'AMF avait trait au mode de comptabilisation de la participation de Vivendi dans Elektrim Telekomunikacja (« Telco ») pour les exercices 2000 et 2001 et dépendait exclusivement de l'analyse du pacte d'actionnaires liant Vivendi et Elektrim. La vente éventuelle d'actions PTC en 2004 était absolument sans rapport avec cette instance et n'aurait pu en aucune manière influencer son issue. Au surplus, la Cour d'appel de Paris a validé la solution défendue par Vivendi.

#### 4.    Le comportement des défenderesses après la rupture

**21.**    Il doit tout d'abord être pris acte que les défenderesses ne contestent pas, dans leurs écritures, que T-Mobile International AG & Co. KG a notifié à la Commission européenne la prise de contrôle de PTC, **quelques jours après la rupture, mais avant que la sentence arbitrale utilisée par les défenderesses pour tenter de prendre le contrôle de PTC en spoliant Vivendi ne soit rendue.**

**22.**    Enfin, Deutsche Telekom n'évoque la sentence rendue le 26 novembre 2004 dans le cadre du second arbitrage entamé par Deutsche Telekom en 2000 pour contester la validité du transfert des actions PTC détenues par Elektrim à Telco, que de manière très partielle. Or, cette sentence jugeait que le transfert de la participation dans PTC par Elektrim était « ineffectif » vis-à-vis de Deutsche Telekom, et déclarait qu'Elektrim serait en défaut de ses engagements si elle ne réussissait pas à récupérer auprès de Telco les titres PTC dans un délai de deux mois.

Le pacte d'actionnaires de PTC prévoit qu'en cas de « *défaut matériel* », Deutsche Telekom bénéficie d'une promesse de vente (option d'achat) sur les actions PTC détenues par Elektrim, et ce à un prix bien inférieur à celui qui était négocié avec Vivendi.

Cependant, dans cette même sentence arbitrale, le Tribunal décidait qu'il n'avait aucune compétence vis-à-vis de Telco, mise en cause par Deutsche Telekom. **La sentence ne produit donc pas d'effet juridique à l'égard de Telco, actuellement propriétaire des titres.**

A cet égard, sur le fondement d'une demande présentée par Telco, cette sentence fut partiellement annulée par une décision du Tribunal de commerce de Vienne en date du 20 décembre 2005, en faveur de Telco (Pièce n° 57). En effet, le Tribunal a annulé la partie de la sentence ayant déclaré le transfert des actions PTC « ineffectif », confirmant ainsi le droit de propriété de Telco sur ces actions.

**23.**    Dans ses conclusions régularisées le 21 février 2006, Deutsche Telekom ne conteste pas les manœuvres entreprises sur la base de la sentence arbitrale pour tenter de spolier Vivendi.

Elle se contente de répondre, sans aucune démonstration à l'appui, que Vivendi marque un « acharnement délibéré » à son encontre ; or comme cela a déjà été démontré, toutes les actions judiciaires et arbitrales menées par Vivendi ont eu pour seul but de se défendre contre la spoliation de son investissement en Pologne.

**276**

**24.** Deutsche Telekom a tout récemment donné une preuve supplémentaire de la mauvaise foi avec laquelle elle agit envers Vivendi. En effet, des négociations ont été entamées, sur des bases nouvelles, entre les parties au début de l'année 2006 avec pour but de mettre un terme aux différentes procédures les opposant et de clarifier la répartition de l'actionnariat de PTC. Ces négociations ont donné lieu à des accords considérés comme définitifs par les différentes parties qui se sont réunies le 29 mars 2006 en vue de leur finalisation matérielle et de leur signature. Toutefois, comme en 2004, et en raison d'une nouvelle décision de justice rendue en sa faveur qui a entériné la décision d'exequatur partiel de la sentence du 26 novembre 2004, Deutsche Telekom s'est brutalement rétractée durant la réunion de finalisation des documents contractuels, à peine quelques heures avant leur signature. Vivendi a en conséquence initié une nouvelle procédure d'arbitrage en Suisse contre Deutsche Telekom en vue d'obtenir l'exécution forcée des accords qui étaient achevés au moment où Deutsche Telekom s'est rétractée et a refusé de les signer.

**Il apparaît aujourd'hui évident, à la lumière des évènements très brièvement décrits ci-dessus, que Deutsche Telekom a d'abord endormi la vigilance de Vivendi en engageant une négociation contractuelle qu'elle a ensuite brutalement rompue dans le seul but de tenter de s'emparer, en collusion avec Elektrim, des actions PTC détenues par Telco à moindre coût et au détriment de Vivendi.**

277

## II.  Discussion

**25.**  Vivendi sollicite de plus fort du Tribunal de céans qu'il juge que Deutsche Telekom et T-Mobile International AG &Co. KG ont engagé leur responsabilité délictuelle (A) et demande que Deutsche Telekom Deutsche Telekom et T-Mobile International AG &Co. KG soient déboutées de leur demande reconventionnelle (B).

### A)  Sur la responsabilité pour faute de Deutsche Telekom

La responsabilité civile délictuelle de Deutsche Telekom est engagée, à raison de sa faute commise à l'occasion des pourparlers et du dommage consécutif à leur rupture subi par Vivendi.

### 1.  La rupture fautive des pourparlers par Deutsche Telekom

**26.**  Il est constant que la liberté de rompre des relations précontractuelles n'est que relative et que son exercice connaît des limites, notamment celle, traditionnelle, de l'abus. Un abus du droit de rompre les négociations est ainsi caractérisé, et la responsabilité délictuelle de son auteur engagée, lorsqu'il apparaît :

- soit que la rupture, effectuée brutalement et à contretemps, a été entreprise en nuisant aux intérêts du partenaire commercial, qui était légitimement confiant dans l'aboutissement prochain des pourparlers ;

- soit, plus spécialement, lorsque cette rupture est dolosive et qu'il apparaît que la poursuite antérieure des négociations a été détournée de sa fonction. Il en va spécialement ainsi lorsque les faits démontrent que l'auteur de la rupture n'entendait pas depuis longtemps, conclure le contrat, et qu'il n'a poursuivi les négociations que dans le but de détourner l'attention de son partenaire commercial.

L'abus est ainsi diversement susceptible d'être caractérisé. Il y a déjà abus, dans une acception objective, lorsque l'état d'avancement des négociations est tel qu'il ne permet plus à chacun des partenaires de se retirer sans motifs, sans tenir compte des intérêts de l'autre partenaire. Il y a *a fortiori* abus, dans une acception subjective cette fois, lorsque l'utilisation du droit de mettre fin aux négociations confine à la fraude, établie par l'intention antérieure ou concomitante d'un partenaire de porter délibérément atteinte à l'intérêt de l'autre à la conclusion du contrat.

**27.**  Ces deux dimensions de l'abus sont, en l'espèce, nettement caractérisées.

(a)  En effet, d'un point de vue objectif tout d'abord, la jurisprudence sanctionne la rupture de pourparlers lorsque celle-ci est intervenue *« sans raison légitime, brutalement et unilatéralement »* (Cass. com. 20 mars 1972 : *Bull.* IV, n° 93, p. 90).

Or il ressort des faits exposés que Deutsche Telekom a brutalement mis fin à toute relation sans préavis, après avoir laissé penser à Vivendi que les négociations se déroulaient normalement, et sans justifier d'aucun motif légitime pour rompre alors que les négociations avaient duré plus d'un an et qu'elles étaient parvenues à leur stade ultime.

278

Après plus d'un an de négociations, alors que les versions définitives des contrats avaient été adressées aux parties, Deutsche Telekom a envoyé le 7 septembre 2004 une lettre lapidaire de deux lignes pour mettre un terme aux négociations.

A ce stade des négociations, il n'existait plus aucun point de désaccord de fond entre les parties, et l'opération gardait tout son intérêt, sauf la prescience de Deutsche Telekom de l'issue prochainement favorable de la procédure arbitrale.

Comme Vivendi l'a déjà souligné, l'argument avancé par Deutsche Telekom dans ses conclusions, tiré du changement de position des obligataires ne peut être retenu pour justifier cette rupture. Il n'a d'ailleurs été évoqué par Deutsche Telekom qu'a posteriori, dans ses écritures, et n'a servi que de prétexte pour la rupture alors que d'autres solutions pouvaient être envisagées et le délai fixé par les parties reporté.

Rien ne pouvait donc laisser penser à Vivendi que les négociations se termineraient de la sorte. Jamais Deutsche Telekom n'avait mis en garde Vivendi contre une telle décision. Bien au contraire, Vivendi ayant fait les dernières concessions demandées par Deutsche Telekom, rien ne lui permettait d'anticiper une telle rupture.

**28.   (b)**   Ensuite, d'un point de vue subjectif cette fois, la jurisprudence déduit parfois des intentions de l'auteur de la rupture l'existence d'un abus. Il est alors fait mention du dol, de la déloyauté, ou de la mauvaise foi, avec laquelle l'une des parties à la négociation s'est soudainement retirée des négociations, à la surprise et au préjudice de son partenaire. Selon la jurisprudence – mais la formule n'est pas exclusive de toute autre – « *la mauvaise foi consiste à mettre fin, dans des conditions dommageables, aux pourparlers, après avoir fait croire à son partenaire qu'on allait conclure le contrat* » (CA Reims, 13 décembre 1989, cité et analysé, entre autres références, par P. Chauvel, note *Dalloz* 1997, Jur. p. 45).

Dans la droite ligne de cette jurisprudence des juges du fond, la Cour de cassation a ainsi jugé, dans une hypothèse de négociations secrètement parallèles entreprises pour la cession massive d'actions, que les propriétaires-vendeurs, qui avaient maintenu la confiance du partenaire dans la conclusion du contrat et n'avaient rompu les pourparlers qu'*in extremis*, après s'être engagés à la vente auprès d'un tiers, « *avaient ainsi rompu unilatéralement et avec mauvaise foi des pourparlers qu'ils n'avaient jamais paru abandonner* » (Cass. com. 26 janvier 2003, not. *in* : *Dalloz* 2004, Jur. 869, note Dupré-Dallemagne).

Cette jurisprudence de principe, rendue dans l'affaire « Manoukian » invoquée en défense, est parfaitement fondée et transposable en l'espèce, s'agissant de caractériser la faute de rupture.

En effet, la jurisprudence n'admet pas que les négociations soient entreprises ou poursuivies dans un but égoïste, parfaitement extérieur à l'objectif primordial de conclusion d'un contrat définitif, en créant faussement auprès de son partenaire l'apparence et l'attente légitime d'une conclusion imminente du contrat. Comme l'écrit le professeur Stoffel-Munck, « *ce sont les fautes d'hypocrisie et d'incohérence reprochables au négociateur, le fait de laisser le partenaire croire en la bonne fin de l'opération et décevoir son attente* » qui caractérisent alors la rupture abusive (*L'abus dans les contrats, Essai d'une théorie*, thèse LGDJ 2000, spéc. n° 121, cité et approuvé par Dupré-Dallemagne, note *Dalloz* 2004, précitée, p. 871 ; *adde*, dans le même sens, O. Deshayes, « Le dommage précontractuel », *RTD Civ.* 2004.187, n° 31, p. 200, 2ᵉ col. et les nombreuses réf. cit.).

**279**

**29.** « Hypocrisie », « incohérence », « création d'une apparence trompeuse », « atteinte intentionnelle à la confiance légitime du partenaire » : toutes ces qualifications, convergentes dans l'établissement d'un abus du droit de rompre, conviennent parfaitement aux faits de l'espèce.

En effet, il est clairement établi que la continuation, à l'été 2004, des négociations vieilles de plus d'un an, n'ont eu pour seul but que de créer une situation d'attente, au seul bénéfice de Deutsche Telekom, qui escomptait la survenance imminente d'une sentence arbitrale favorable et n'entendait pas sérieusement conclure la transaction avec Vivendi. Ce faisant, Deutsche Telekom a poursuivi, puis rompu, les négociations de manière dolosive, dans l'intention de faire croire à Vivendi l'arrivée prochaine d'une solution amiable et définitive de leur différend. L'abus est alors indiscutable, qui procède de l'intention de nuire à Vivendi en tentant de s'emparer des titres PTC, au moyen d'une argutie juridique de droit polonais et sans en payer le prix à son légitime propriétaire.

**30.** Du reste, les évènements postérieurs à la rupture – notamment ceux, similaires et parfaitement clairs, de mars 2006 – ont encore confirmé le dol de Deutsche Telekom et l'abus dans la négociation, qui n'était en l'espèce qu'atermoiement, prétexte dans sa course secrète pour l'acquisition du contrôle, à moindre coût, de PTC.

Par ses manœuvres déloyales et frauduleuses décrites dans l'exposé des faits, Deutsche Telekom tente, par tous moyens, de prendre le contrôle de PTC et des actions détenues par la filiale de Vivendi, la société Telco.

Il apparaît donc bien, en l'espèce, non seulement que Deutsche Telekom a mis fin sans raison légitime et de manière abrupte aux discussions, mais encore qu'elle l'a fait de manière dolosive pour poursuivre un objectif illégitime.

Deutsche Telekom a entretenu Vivendi dans la certitude de la conclusion proche de la transaction. Elle a, jusqu'au dernier moment, demandé d'ultimes concessions qui ont été acceptées par Vivendi.

A aucun moment Deutsche Telekom ne fit part à Vivendi de réserves sur l'achèvement de ce processus. Bien au contraire, c'est Deutsche Telekom qui a, à de multiples reprises, hâté les discussions et demandé à Vivendi de presser ses conseils.

En conséquence, la lettre adressée par Deutsche Telekom à Vivendi le 7 septembre 2004 constitue bien une rupture brutale, sans préavis et sans motifs. En agissant de la sorte, Deutsche Telekom s'est rendue coupable d'un abus de droit, commis intentionnellement dans un but frauduleux.

Ce sont ces manquements fautifs qui sont la cause des préjudices subis par Vivendi, dont elle est bien fondée à demander réparation.

## 2.    Le préjudice considérable causé à Vivendi par Deutsche Telekom

**31.** En pareilles circonstances, Vivendi, victime de la poursuite dolosive et de la rupture abusive des négociations, est en droit de demander réparation de l'ensemble des chefs de préjudice qui sont la conséquence directement du comportement fautif de Deutsche Telekom. Ce faisant, il ne s'agit pas, contrairement à l'argument agité en défense, de demander d'être

placé dans la situation où se serait trouvée Vivendi si la cession avait été conclue, mais simplement de compenser les pertes et autres préjudices, occasionnés par la poursuite et la rupture indue des négociations, du chef de la faute caractérisée de Deutsche Telekom.

Et ces préjudices, pour partie non encore consolidés, sont d'ores et déjà certains dans leur principe, et considérables dans leur montant. Il s'agit :

- tout d'abord et principalement, de la perte du fruit de l'investissement effectué en Pologne. Ce préjudice est une suite directe des agissements fautifs de Deutsche Telekom, qui a entretenu Vivendi dans la fausse croyance d'une cession des actions, pour ultérieurement entreprendre de l'en exproprier au moyen des diverses procédures arbitrales et judiciaires entreprises à Vienne et en Pologne ;

- subsidiairement, d'une perte de chance de céder les actions à un tiers ;

- à titre complémentaire, d'un préjudice d'image et de réputation ;

- à titre complémentaire encore, d'un préjudice de moins-value de cession d'autres éléments d'actifs de Vivendi ;

- enfin et en tout état de cause, les frais considérables de négociation occasionnés en pure perte pour Vivendi.

Le Tribunal de céans devra en constater l'existence, quitte à parfaire ultérieurement, le montant des dommages et intérêts définitivement liquidés.

**a)    A titre principal, la perte, actuelle ou imminente, du fruit de l'investissement en Pologne**

32.    Du fait du dol et de l'abus dans la continuation et la rupture des pourparlers de cession, qui a permis à Deutsche Telekom d'entreprendre des manœuvres déloyales, en collusion avec Elektrim, en Pologne, Vivendi se trouve actuellement privée de toute possibilité de jouir de sa participation indirecte dans PTC, et de la vendre à un tiers.

Deutsche Telekom a entretenu Vivendi dans l'illusion d'une issue favorable des discussions rendant inutile, et en pratique impossible, la recherche par Vivendi d'autres solutions, pour mettre un terme brutal à ces discussions dans un contexte interdisant désormais à la demanderesse de mettre en œuvre une solution préservant ses intérêts financiers.

Vivendi subit de ce chef un préjudice certain dans son principe, actuel et direct.

A court terme, Vivendi pourrait même se trouver définitivement privée de cette participation si elle ne parvient pas à faire reconnaître ses droits en Pologne, aujourd'hui bafoués par Deutsche Telekom et Elektrim qui exploitent les lacunes du système judiciaire polonais en se prévalant d'une lecture tronquée de la sentence arbitrale du 26 novembre 2004, au mépris des règles les plus établies du droit international.

Il en résulte que, si à la date à laquelle le tribunal statuera sur la demande de Vivendi, le droit de propriété de Telco sur les titres de PTC n'est pas reconnu en Pologne et que Deutsche Telekom s'est appropriée lesdits titres sans que Vivendi n'en reçoive la juste valeur, Vivendi

aura subi, du fait de la rupture fautive, un préjudice d'un montant égal à celui de son investissement, soit 1.881.601.161 euros, majoré des intérêts courus jusqu'à la date du jugement et correspondant à l'immobilisation des sommes investies par Vivendi.

**b)    Subsidiairement, la perte d'une chance de céder à un tiers sa participation dans PTC**

**33.**    Selon la jurisprudence, le fait que « *la société a perdu [par suite de la vaine poursuite de pourparlers] une chance, fût-elle ténue, de trouver un autre repreneur* » constitue un préjudice réparable (Cass. com., 18 juin 2002, NGM, n° 99-16488, *RTD Civ.* 2003, p. 282, obs. Mestre et Fages). La doctrine est unanimement en ce sens, comme le montre encore le récent article du professeur Deshayes, partiellement cité en défense (« Le dommage précontractuel », *RTD Civ.* 2004.187, spéc. n° 20, p. 197), qui écrit, au sujet du « préjudice correspondant à la perte de chance de conclure un autre contrat que le contrat avorté », de manière parfaitement claire et convaincante que :

> « *Un tel préjudice devrait effectivement pouvoir être réparé. Pas dans tous les cas cependant. Il faut en effet établir que le dommage est lié par un lien de causalité avec la faute (c'est-à-dire aux circonstances entourant la rupture). Cette condition est remplie lorsque la faute précontractuelle consiste par exemple à avoir fait perdre son temps à l'autre négociateur. Dans ce cas, il est logique que la perte de la chance de conclure un contrat avec un tiers soit incluse dans le dommage réparable. Car si la faute n'avait pas été commise, le négociateur frustré aurait eu d'avantage de temps pour se rapprocher de tiers et éventuellement conclure un contrat. De même, si la faute consiste à avoir porté atteinte à la réputation et à l'honneur du partenaire, il est possible d'affirmer que ce dernier a perdu, pour l'avenir, des chances de conclure un contrat satisfaisant avec des tiers, rendus méfiants. Le montant des dommages-intérêts alloués sera alors le montant de l'avantage net attendu du contrat qui aurait pu être conclu avec le tiers, affecté d'un coefficient de minoration qui est fonction de la teneur de la chance perdue.* »

Ces considérations se vérifient parfaitement au cas d'espèce.

En entretenant pendant un an Vivendi dans l'illusion d'une cession et en mettant abusivement et abruptement fin aux négociations, les défenderesses ont privé Vivendi de la chance de trouver un acquéreur pour sa participation indirecte dans PTC ou de mettre en place toute autre solution pour protéger son investissement en Pologne.

Incontestablement, le lien de causalité entre la faute et le préjudice est ici direct : car c'est précisément ce que recherchait Deutsche Telekom en l'espèce que de faire patienter Vivendi, en entretenant, au moyen de pourparlers longs et quasi-finalisés, l'illusion d'une conclusion imminente de l'accord de cession ; ce faisant, Deutsche Telekom « endormait » bien la vigilance de Vivendi sur l'issue éventuelle d'une sentence arbitrale défavorable et on la prévenait de toute velléité de cession ou d'autre mesure de protection de son investissement polonais.

Quant au dommage, Deutsche Telekom ayant elle-même admis que la valorisation de 51% de PTC s'établissait à l'époque à 1,3 milliard d'euros, et en retenant une probabilité de trouver une solution alternative à celle proposée à Deutsche Telekom de 50%, le préjudice subi par Vivendi s'établit à 650 millions d'euros.

**282**

Ce préjudice se confond toutefois avec celui résultant de la perte de l'investissement de Vivendi en Pologne et ne serait indemnisable de manière séparée que si, par extraordinaire, ce dernier n'était pas reconnu.

### c)    En tout état de cause, le préjudice d'image subi par Vivendi

**34.**    La rupture abusive et le comportement déloyal des défenderesses ont causé à Vivendi un préjudice d'image important. Le marché est très sensible à la qualité des investissements de Vivendi à l'étranger, l'investissement réalisé dans la téléphonie en Pologne constituant l'un des plus importants.

Vivendi est de plus une société qui est particulièrement surveillée par les investisseurs de telle sorte que l'annonce de l'échec des négociations et les conséquences qui s'en sont suivies ont eu un impact significatif sur l'image de la société.

Il est inexact de dire que ce préjudice se confond avec celui, accumulé depuis 1999, en conséquence des litiges qui opposent Vivendi à Deutsche Telekom. En effet, le préjudice moral subi par Vivendi et qui résulte directement du comportement déloyal de Deutsche Telekom dans les négociations avec Vivendi en 2003 et 2004 s'ajoute au dommage déjà subi du fait des nombreuses procédures contentieuses opposant les deux parties.

Cette situation fragilise Vivendi pour ses autres investissements à l'étranger et notamment dans les pays d'Europe de l'Est.

Pour ces motifs, le Tribunal condamnera les défenderesses à verser à Vivendi la somme de 50 millions d'euros à titre de dommages intérêts correspondant au préjudice d'image qu'elle a subi.

### d)    A titre complémentaire, sur la cession imprévue des actions Veolia

**35.**    Compte tenu de l'état très avancé des discussions avec les défenderesses, Vivendi avait intégré le produit de cession de sa participation dans Telco dans son plan de financement.

Confrontée à la rupture brutale des discussions par les défenderesses, elle a dû y substituer en décembre 2004 une cession par anticipation de 61 millions de titres Veolia à un prix moyen de 24,54 euros par action, soit un produit total de 1.496.940.000 euros.

Vivendi a en conséquence été privée de l'amélioration de l'action Veolia, en augmentation constante depuis le début de l'année 2005.

Sur la base du cours au 21 avril 2005, qui s'établit à 28,43 euros, Vivendi a ainsi été privée d'un gain de 3,89 euros par action, soit une perte totale de 237.290.000 euros. Cette perte découle directement du dol et de l'abus dans la continuation puis la rupture brutale des négociations par Deutsche Telekom. Les négociations n'auraient pas été menées de mauvaise foi par Deutsche Telekom, Vivendi n'aurait pas intégré le produit de la cession dans son plan de financement et n'aurait pas dû, à la suite de la rupture des négociations, vendre ses actions Veolia, de manière anticipée.

**36.**   Les défenderesses tentent d'une part de démontrer que le préjudice résultant de cette cession anticipée ne résulte pas de la rupture des négociations avec Deutsche Telekom, en raison de l'existence d'options d'achat sur certains des titres Veolia dès 2002 qui démontrerait qu'indépendamment de la rupture des pourparlers avec Deutsche Telekom Vivendi avait l'intention. D'autre part, elles avancent l'existence d'une opération dérivée avec la Société Générale dénouée en 2005 qui aurait permis à Vivendi de couvrir son risque lié au manque à gagner.

Or ces deux arguments sont inexacts.

En effet, en décembre 2002 Vivendi a cédé la moitié de sa participation dans Veolia Environnement au prix de 20,40 euros par action. A la demande des acquéreurs Vivendi leur a consenti en même temps des options d'achat portant sur le solde de sa participation dans Veolia Environnement (82 millions d'actions), permettant à ces investisseurs d'acheter ces actions au prix unitaire de 26,50 € jusqu'au 24 décembre 2004. Le cours de l'action Veolia Environnement n'ayant jamais atteint le prix de 26,50 € avant cette date, les options n'ont pas été exercées. La cession des 61 millions d'actions n'est donc pas liée à l'existence de ces options.

En outre, en décembre 2004, concomitamment à la cession des 61 millions d'actions, Vivendi a conclu avec la Société Générale une opération dérivée lui permettant de bénéficier, sur un notionnel de 20 millions d'actions, de la hausse du cours de l'action Veolia Environnement au-delà de 23,91 euros pendant une période de trois ans. Cette opération dérivée ne porte donc que sur 20 millions d'actions alors que c'est sur la totalité des 61 millions d'actions cédées que Vivendi aurait pu bénéficier de la hausse du cours de l'action Veolia Environnement en 2005 si leur cession n'était pas intervenue fin 2004.

### e)   Enfin, sur les frais occasionnés par la négociation

**37.**   En dépit des allégations de la défense, la victime d'une poursuite dolosive et d'une rupture abusive des pourparlers est en droit de demander indemnisation des frais de négociation qu'elle a occasionnés en pure perte, et qu'elle se serait épargnée, si elle avait été consciente du véritable dessein de son partenaire.

La jurisprudence des juges du fond (v. récemment CA Versailles, 18 mars 2004, *Bull. Joly* 2004, § 195, p. 970, note Th. Massart) comme de la Cour de cassation (v. encore l'important arrêt précité, Cass. com. 26 novembre 2003, *Dalloz* 2004, p. 869, dans sa réponse au premier moyen du pourvoi formé par la société Manoukian : « *la cour d'appel a décidé à bon droit qu'en l'absence d'accord ferme et définitif, le préjudice subi par la société A.M. n'incluait que les frais occasionnés par la négociation et les études préalables auxquelles elle avait fait procéder [...]* ») l'atteste communément.

Une doctrine récente considère, dans le même sens, que : « *l'indemnisation des frais de négociation n'est [...] concevable que lorsqu'il est établi que ces frais ont été engagés en conséquence des circonstances fautives entourant la rupture. Une telle hypothèse n'est pas inconcevable. Ainsi, lorsque la faute précontractuelle consiste à avoir sciemment fait durer des négociations dont les chances de succès étaient devenues nulles, la faute est bien la cause de frais nouveaux : ce sont tous les frais qui n'auraient pas été engagés si la rupture était intervenue plus tôt. Plus généralement encore, lorsque la faute consiste à être entré en pourparlers sans aucune intention de contracter, la faute est la cause de tous les frais. Car en*

**284**

*l'absence de faute, aucune dépense n'aurait été engagée* » (O. Deshayes, art. précité, *RTD Civ.* 2004, n° 18, p. 197).

**38.**  Il en va évidemment de la sorte en l'espèce : Deutsche Telekom n'était entrée en pourparlers que pour mieux faire patienter Vivendi, dans l'attente d'une sentence arbitrale qu'elle espérait lui être favorable. Deutsche Telekom s'est par suite contentée d'avancer des prétextes fallacieux à la non-conclusion du contrat qui démontrent qu'elle n'entendait nullement acheter les actions au prix convenu, mais qu'elle espérait au contraire les obtenir de manière détournée, à un prix dérisoire, par la voie contentieuse. Dès lors, les frais de négociation engagés par Vivendi n'avaient pas lieu d'être ; eu égard aux intentions réelles de Deutsche Telekom, seulement révélées par son comportement ultérieur à la rupture des négociations, ils n'auraient pas dû être exposés comme en l'espèce : en pure perte.

Or, en raison de l'importance de l'affaire, Vivendi a engagé des frais considérables pour conduire les négociations avec Deutsche Telekom.

Vivendi a ainsi fait appel à des conseils extérieurs qui ont négocié pendant plus d'un an. Ils ont assuré la représentation des intérêts de Vivendi dans de nombreuses réunions, ils ont directement négocié tant avec Deutsche Telekom qu'avec Elektrim. Ils ont également préparé de nombreux documents juridiques prenant la forme de projets de contrats et ont dû rédiger de nombreuses consultations juridiques.

S'agissant des conseils externes, Vivendi a réglé 2.525.928 euros d'honoraires.

En outre, pour les besoins de ces pourparlers, Vivendi a dû affecter des ressources internes importantes à la conduite de ces dossiers. Ainsi, le directeur général en charge des finances de Vivendi, Jacques Espinasse, et son adjoint, Dominique Gibert, vont y consacrer l'équivalent d'environ trente jours pleins. Augmenté du temps passé par d'autres collaborateurs de Vivendi estimé à 60 jours/homme, le préjudice estimé par Vivendi s'élève à 375.000 euros.

De même, de nombreux voyages et réunions ont eu lieu en Pologne avec les différents intervenants mobilisant la direction de Vivendi à son plus haut niveau. Vivendi a donc dû engager des frais pour organiser les déplacements de ses personnels en Pologne. L'ensemble de ces frais est aujourd'hui estimé à 30.000 euros, somme à parfaire.

**39.**  Pour l'ensemble de ces demandes, Vivendi demande donc au Tribunal de condamner à ce titre Deutsche Telekom à lui verser à titre de dommages intérêts la somme de 2.171.822.000 euros.

\* \* \*

**40.**  Enfin, l'équité commande que Deutsche Telekom soit condamnée à payer à Vivendi la somme de 200.000 euros au titre des frais supportés par cette dernière pour introduire la présente action en justice.

**285**

**B)    Sur le caractère mal fondé de la demande reconventionnelle de Deutsche Telekom**

**41.**    Deutsche Telekom affirme, sans le démontrer, que la présente procédure est abusive car (i) elle « *s'inscrit manifestement dans le contexte des pressions et chantages judiciaires et financiers* » visant à forcer Deutsche Telekom à négocier, et (ii) elle « *participe du comportement général marqué par l'intention de nuire de Vivendi Universal à l'encontre de son rival Deutsche Telekom que Vivendi Universal cherche à supplanter à tout prix au capital de PTC, en multipliant les recours de toutes sortes, et en particulier les procédures judiciaires.* » Deutsche Telekom demande en conséquence au Tribunal de céans de condamner Vivendi à lui verser la somme de 2 millions d'euros à titre de dommages intérêts ainsi que 300.000 euros au titre des frais supportés par Deutsche Telekom pour sa défense dans la présente procédure.

**42.**    Comme cela a été souligné par Vivendi, de nombreuses procédures arbitrales et judiciaires opposent Vivendi aux défenderesses. Toutefois, Vivendi n'est pas à l'origine de l'intégralité de ces actions. Parmi ces procédures, celles qui ont été initiées par Vivendi poursuivent, un seul but, tout à fait légitime : la protection de l'investissement de Vivendi contre les tentatives de spoliation de son investissement par Deutsche Telekom. Il n'y a là aucune intention de nuire, ni aucune tentative de « supplanter Deutsche Telekom au capital de PTC ». Aucun « chantage » n'est effectué par Vivendi. Il serait pour le moins surprenant que Vivendi dépense plusieurs centaines de milliers d'euros en initiant plusieurs procédures, devant des juridictions différentes, dans des pays différents, uniquement dans le but de faire pression sur Deutsche Telekom et l'obliger à négocier. Ces procédures ont pour seul fin le rétablissement de Vivendi dans ses droits légitimement acquis en Pologne, aujourd'hui de toutes parts menacés.

A cet égard, il convient de rappeler que Deutsche Telekom n'hésite pas à avoir recours à des voies de fait pour s'emparer du pouvoir au sein de PTC. C'est ainsi que dès le 25 février 2005, les membres du faux directoire de PTC ont tenté de pénétrer dans les locaux de PTC accompagnés de gardes du corps et en présence d'un représentant de l'ambassade d'Allemagne. L'accès leur est refusé par le gardiennage de l'entreprise, assuré par la société Falk.

Le jeudi 3 mars 2005, le directeur financier de Deutsche Telekom, Karl Gerhard Eick, déclare publiquement que Deutsche Telekom va utiliser les services d'une société de sécurité pour empêcher l'accès aux locaux de PTC aux représentants de Vivendi.

Le 4 mars 2005, la société Falk cède aux pressions de Deutsche Telekom qui est un de ses principaux clients internationaux et fait pénétrer les représentants de Deutsche Telekom et Elektrim chez PTC.

Le même jour, des salariés de la société Falk pénètrent par la force au siège social de Telco. Cette atteinte à la propriété n'est arrêtée que grâce à l'intervention de la police.

Ces incidents sont la preuve que c'est Deutsche Telekom qui a recours à tout moyen de pression contre Vivendi, pour arriver à ses fins, à savoir, la spoliation des actions PTC détenues par Telco et la privation des droits attachés à ces actions. Dans un tel contexte et en raison des difficultés rencontrées par Vivendi auprès des juridictions polonaises, il n'est pas abusif de la part de Vivendi de poursuivre Deutsche Telekom auprès d'autres juridictions compétentes. A titre d'exemple, il convient de rappeler que Telco, principale intéressée par la décision judiciaire relative à l'exequatur de la sentence arbitrale du 26 novembre 2004 (ayant

**286**

jugé que le transfert des titres PTC dont Telco a été bénéficiaire est ineffectif), a été empêchée de participer à la première instance.

**En conséquence, le Tribunal de céans déboutera Deutsche Telekom et T-Mobile International AG & Co KG de leur demande reconventionnelle.**

287

## PAR CES MOTIFS

Vu les moyens de fait et de droit exposés,
Vu l'article 1382 du Code civil,

Il est demandé au Tribunal de :

– Constater que Deutsche Telekom et T-Mobile International AG & Co. AG sont responsables de la rupture des négociations engagées en vue de l'achat par elle des actions PTC ;

– Constater que cette rupture a causé à Vivendi un préjudice tant financier que d'image, provisoirement fixé à 2.171.822.000 euros ;

– En conséquence condamner Deutsche Telekom et T-Mobile International AG&Co. KG à payer la somme de 2.171.822.000 euros, à Vivendi ;

– Dire et juger que la présente procédure engagée par Vivendi n'est pas abusive ;

– Débouter en conséquence Deutsche Telekom et T-Mobile International AG&Co. KG de l'ensemble de leurs fins, moyens et conclusions ;

– Condamner solidairement les défenderesses à verser à la demanderesse la somme de 200.000 euros au titre de l'article 700 du Nouveau Code de Procédure Civile et à supporter les entiers dépens ;

– Ordonner l'exécution provisoire de la décision à intervenir.


SOUS TOUTES RESERVES

**288**

## BORDEREAU DE PIECES COMMUNIQUEES

Pièces communiquées le 9 septembre 2005 :

1.  Offre d'acquisition des titres PTC détenus par Telco adressée par Deutsche Telekom à Telco et ses actionnaires (Vivendi et Elektrim) en date du 25 août 2003

2.  Réponse de Telco à l'offre de Deutsche Telekom en date du 4 septembre 2003

3.  Mémorandum envoyé par Deutsche Telekom à Vivendi en date du 9 janvier 2004

4.  Projet modifié de contrat d'acquisition des titres PTC envoyé par Deutsche Telekom à Vivendi le 16 janvier 2004

5.  Liste des quatorze questions restant à régler envoyée par Deutsche Telekom en date du 19 avril 2004

6.  Lettre conjointe de Vivendi et Elektrim envoyée à Deutsche Telekom le 14 mai 2004

7.  Réponse de Deutsche Telekom en date du 18 mai 2004 à la lettre conjointe de Vivendi et Elektrim en date du 14 mai 2004

8.  Courriel de Deutsche Telekom en date du 2 août 2004 en vue de la finalisation du contrat d'acquisition

9.  Projet de contrat d'acquisition envoyé par Vivendi à Deutsche Telekom le 5 août 2004, consolidant les discussions intervenues entre Elektrim, Vivendi et Deutsche Telekom

10. Projet d'accord mettant un terme à toutes les poursuites et procédures envoyé par Deutsche Telekom à Vivendi le 27 août 2004

11. Version définitive du contrat de cession d'actions de PTC et du contrat de garantie et d'indemnisation adressée par Vivendi à Deutsche Telekom le 1er septembre 2004

12. Lettre adressée par Deutsche Telekom à Vivendi en date du 7 septembre 2004 l'informant de la décision de Deutsche Telekom de ne pas conclure l'acquisition envisagée

13. Télécopie adressée par le tribunal arbitral aux conseils des parties en date du 12 août 2004 les informant que la sentence arbitrale devrait être rendue au mois d'octobre 2004

14. Extrait du Journal officiel de l'Union européenne du 6 octobre 2004 portant publication de la notification préalable effectuée par T-Mobile le 24 septembre 2004

15. Extrait du Journal officiel de l'Union européenne du 17 novembre 2004 portant publication de la décision de non-opposition de la Commission européenne à l'opération de concentration notifiée par T-Mobile

16. Sentence arbitrale en date du 26 novembre 2004

17. Injonction du tribunal régional de Varsovie en date du 30 décembre 2004 interdisant toute modification du registre d'actionnaires de PTC

18. Décision d'exequatur partiel de la sentence rendue le 2 février 2005 par le tribunal régional de Varsovie

19. Déclaration d'appel par Telco contre la décision d'exequatur partiel

20. Déclaration d'appel du Procureur Général de Varsovie en date du 22 février 2005 contre la décision d'exequatur partiel

21. Recours déposé par Vivendi auprès de l'Etat polonais sur le fondement de l'accord franco-polonais sur la protection des investissements du 14 février 1989

22. Notification de révocation par Elektrim de membres du Conseil de surveillance de PTC en date du 10 décembre 2004

23. Notification de désignation par Elektrim de nouveaux membres du Conseil de surveillance de PTC en date du 10 décembre 2004

24. Lettre adressée par Monsieur Jacek Nieweglowski (membre du Conseil de surveillance de PTC) aux membres du Directoire d'Elektrim en date du 13 décembre 2004

25. Lettre adressée par Monsieur Philippe Houdouin (membre du Conseil de surveillance de PTC) aux membres du Directoire d'Elektrim en date du 13 décembre 2004

26. Lettre adressée par Monsieur Michel Picot (membre du Conseil de surveillance de PTC) aux membres du Directoire d'Elektrim en date du 13 décembre 2004

27. Fax adressé par Monsieur Dariusz Oleszczuk (Président du Conseil de surveillance de PTC) à Monsieur Mickael Günther (Vice-Président du Conseil de surveillance de PTC) en date du 13 décembre 2004

28. Fax adressé par Monsieur Mickael Günther à Monsieur Dariusz Oleszczuk en date du 13 décembre 2004

29. Fax adressé par Monsieur Mickael Günther à Monsieur Dariusz Oleszczuk en date du 20 décembre 2004

30. Fax adressé par Monsieur Mickael Günther aux membres du Directoire de PTC annonçant la tenue d'un Conseil de Surveillance de PTC le 10 janvier 2005

31. Lettre adressée par M. Dariusz Oleszczuk à M. Uli Kühbacher en date du 22 janvier 2005

32. Convocation du Conseil de surveillance de PTC par deux représentants d'Elektrim à une réunion le 3 février 2005

33. Lettre adressée par les quatre membres du Directoire de PTC désignés par Telco aux membres du Conseil de surveillance en date du 2 février 2005

34. Notification de désignation par Elektrim d'un nouveau membre du Conseil de surveillance de PTC en date du 3 février 2005

35.  Liste d'actionnaires établie le 23 février 2005 par le directoire de PTC irrégulièrement constitué

36.  Plainte pénale déposée auprès du Procureur Régional de Varsovie par Telco contre les membres du conseil de surveillance de PTC irrégulièrement constitué

37.  Décision du tribunal arbitral siégeant à Londres en date du 24 mars 2005 interdisant à Elektrim, à titre conservatoire, de céder les titres PTC

38.  Lettre de PTC à l'huissier de justice de Varsovie (« komornik ») en date du 15 avril 2005 indiquant que la société Telco n'est pas actionnaire de PTC

39.  Lettre de Deutsche Telekom à l'huissier de justice de Varsovie (« komornik ») en date du 15 avril 2005 indiquant que Deutsche Telekom détient 48% des actions PTC depuis le 24 mars 2005


Nouvelles pièces :

40.  Opinion juridique du Professeur Strzepka en date du 3 juillet 2003 concernant la validité du transfert des actions PTC d'Elektrim à Telco

41.  Opinion juridique du Professeur Koch en date du 30 juin 2003 concernant la validité du transfert des actions PTC d'Elektrim à Telco

42.  Opinion juridique du Professeur Szjajkowski en date du 4 juillet 2003 concernant la validité du transfert des actions PTC d'Elektrim à Telco

43.  Opinion juridique du Professeur Pyziol concernant la validité du transfert des actions PTC d'Elektrim à Telco

44.  Sentence rendue par le tribunal arbitral de Vienne en date du 9 avril 2003

45.  Procès-verbal du conseil de surveillance de PTC en date du 21 octobre 1999

46.  Statuts de PTC

47.  Courriel adressé par le conseil de Deutsche Telekom (Peter Golob) à Elektrim et Vivendi le 11 mai 2004 avec ses commentaires sur le projet de term sheet devant être adressé par Vivendi et Elektrim à Deutsche Telekom

48.  Courriel adressé par le conseil de Deutsche Telekom aux conseils de Vivendi le 27 mai 2004 concernant les autorisations à obtenir auprès des autorités de concurrence compétentes

49.  Courriel adressé par le conseil de Deutsche Telekom aux conseils de Vivendi le 9 juin 2004 concernant les commentaires de Deutsche Telekom sur le projet de contrat de séquestre à signer avec les obligataires

50.  Courriel adressé par les conseils de Vivendi au conseil de Deutsche Telekom le 14 juin 2004 concernant les éléments envoyés à Elektrim relatifs au contrat de séquestre à signer avec les obligataires

51.  Courriel adressé par les conseils de Vivendi au conseil de Deutsche Telekom le 8 juillet 2004 concernant la dernière version du projet de contrat de séquestre

52.  Courrier (courriel et télécopie) envoyé le 27 juillet 2004 par Deutsche Telekom à Vivendi et ses conseils concernant les étapes de l'obtention des autorisations sociales au sein de Deutsche Telekom pour la réalisation de la cession envisagée

53.  Courriel envoyé à Vivendi par ses conseils le 18 août 2004 faisant un compte-rendu des dernières négociations avec Deutsche Telekom

54.  Courriel adressé à Vivendi et Elektrim par leurs conseils le 5 août 2004 faisant un compte-rendu des dernières discussions avec Deutsche Telekom

55.  Courriel envoyé le 19 août 2004 par les conseils de Deutsche Telekom aux conseils de Vivendi et Elektrim concernant la garantie de passif

56.  Article de presse résumant le communiqué publié par les obligataires d'Elektrim en date du 3 septembre 2004

57.  Jugement du Tribunal de commerce de Vienne en date du 20 décembre 2005 invalidant partiellement la sentence rendue par le Tribunal arbitral le 26 novembre 2004

58.  Courrier adressé par Vivendi à Deutsche Telekom en date du 26 janvier 2004

59.  Article paru dans le journal polonais Rzeczpospolita en date du 18 novembre 2004

292

# EXHIBIT J

**Regional Court Hamburg**

Civil Chambers 24

324 O 753/06



Sievekingplatz 1
20355 Hamburg
Phone: 040/ 42843 2653
Fax:      040/ 42843 3935
**Fax under deadline:**
**040/ 42843 4318 or 4319**

### O R D E R

dated 11/7/2006

In the matter of

[stamp:]
Regional Court Hamburg
229 Hamburg

**Vivendi S.A.,**
represented by Jean-Bernard Levy,
42 avenue de Friedland, 75380 Paris, France

– Petitioner –

Attorneys of record:

**Görg**, Attorneys-at-Law
Sachsenring 81, 50677 Cologne
No.: 52209-06 00010 DOKO,

versus

**Deutsche Telekom AG,**
represented by its Board of Directors, itself
represented by its Chairperson, Kai-Uwe Ricke,
Friedrich-Ebert-Allee 140, 53113 Bonn

– Respondent –

Attorneys of record:

**Hengeler Mueller**, Attorneys-at-Law
Bockenheimer Landstr. 51, 60325
Frankfurt am Main, No. 3462305,

the **Regional Court Hamburg, Civil Chambers 24** has ordered by

Chairing Justice of the Regional Court Buske

Justice of the Regional Court Dr. Weyhe

Justice of the Regional Court Dr. Korte

**294**

324 O 753/06                                                                                    – 2 –

**The petition dated October 10, 2006 for temporary injunction shall be rejected.**

**Petitioner shall be responsible for the costs of the proceeding, set at € 60,000.00.**

### Justification

I. The petition for a temporary injunction, by which Petitioner seeks to prohibit Respondent

from disseminating that Respondent and/or its corporation, T-Mobile, are now owners of the 48% shares of PTC that formerly belonged to the Polish corporation Elektrim in the following manner:

"The new configuration of PTC's management is the result of the acquisition of 48% of PTC's shares which formerly belonged to the Polish corporation Elektrim by Deutsche Telekom/T-Mobile. This ownership is based on a call option awarded to Deutsche Telekom by a court of arbitration,"

is permissible but not justified in its substance. Petitioner is not entitled to injunction relief.

1. In particular, such claim does not follow from §1004, Sec. 1, Para. 2 BGB [*Bürgerliches Gesetzbuch,* German Civil Code], analogous to §824, Sec. 1 BGB, because the contested statement, which is contained in a press release by Respondent, to the extent that it refers to Petitioner, does not represent a statement of fact, but an expression of opinion.

a. The background for both the contested statement and Petitioner's assertions is the fact that Respondent and the Polish company Elektrim S.A. were shareholders of the Polish corporation PTC, with 45% and 48% of shares, respectively. Respondent was also granted an option for the acquisition of the shares held by Elektrim S.A. There is another company, Telco, in which Elektrim S.A. and Petitioner hold 49% and 51% of shares, respectively. After Elektrim S.A. had transferred its shares in PTC to Telco, Respondent challenged this and obtained an arbitration judgment, according to which this transfer is void, and it retained its option right. The validity of this arbitration

**295**

judgment, in particular its effectiveness in regard to Telco, is being challenged by Respondent.

Any statement, that a person is the "acquirer" or "owner" of an object is, in principle, a statement of opinion; because the question as to who the "owner" of an object "is" depends materially upon an assessment of that person's status. Such an assessment includes not only legal considerations, but also depends on other factors, in that in contexts outside of judicial texts, there may be references to "economic," "factual" or "intellectual" ownership. The fact that an extra-judicial meaning plays into the reception of the contested statement follows from the fact that Respondent selected the expression "ownership," even though, in regard to the stipulation in §§903, 90 BGB—which differs from French (C.c. art. 529) and possibly from Polish law—based on German law, there can be no "ownership" of corporate shares as such. In addition, the extent to which the question of who should have "ownership" of the PTC shares depends on value assessments, even from a purely judicial point of view, is evident from the fact that the parties to this proceeding and other involved parties have been disputing the validity of the various transactions at an obviously high legal level and with variable (partial) success. It is not the duty of this Court to add yet another legal opinion to the substance of these disputes.

b. However, it may be granted, following the petition, that an expression such as, a person is "owner of the house," could at least possibly be taken as factual information, because it elicits in the recipient an idea of a concrete process (Burkhardt in Wenzel, *Das Recht der Wort- und Bildberichterstattung* ["The Law of Reporting in Words and Images"], 5th Edition, No. 62 – however, for the source for this opinion referenced here and in the previous editions, the attribution is erroneous); and it may further be granted that here the payment of remuneration by Respondent to Elektrim S.A. for exercising the option could be regarded as a type of actual concrete process that could be the cause of Respondent's "ownership" of the disputed shares, even though this has not yet occurred, according to Petitioner. But regardless of the fact that this view also presupposes the accuracy of certain judicial assessments—for example, under French law, the "ownership" to rights of any kind passes to the purchaser upon execution of the purchase agreement

– 4 –

without the necessity for any transfer procedure or even payment of the purchase price (C.c. art.
1583)—Petitioner here invokes a process whose existence is precisely not elicited in the reader of
Respondent's press release; for in it, its assumption of a leading role in PTC's management is
cited as such a concrete process, in which its "ownership" of PTC shares is manifested.
Respondent derives its ability to appoint one of its employees to the position of Chief Executive
Officer of PTC, a top management position according to Respondent, from its "ownership" of the
PTC shares. In so doing, "ownership" is defined as a position from which Respondent has now
become the one who has a "say" in PTC, and based on that, it is now allegedly able to direct who
should have a leadership role in PTC. Petitioner has not shown that Respondent does not in fact
have such a position at PTC, which would typically correspond to a position of "ownership".

Further, it seems dubious in any case whether Petitioner is even affected by the contested
statement, in that the contested statement simply implies actual facts in regard to the status of the
execution of an agreement regarding the PTC shares between Respondent and Elektrim S.A. For
this process of executing the agreement has nothing to do with the question of whether
Petitioner—via its subsidiary, Telco—is itself the holder of the disputed PTC shares. Petitioner
can only be affected in its own rights by the contested statement to the extent that it can argue
successfully that it is itself the holder of the disputed shares; it does not have any justified interest
in determining ownership or participation interests in corporations held by third parties. In regard
to this question of whether Petitioner—for example, due to the continued effectiveness of the
transfer of the PTC shares from Elektrim S.A. to Telco—itself has acquired indirect "ownership"
of the PTC shares, this is again a mere expression of opinion, in regard to which Respondent
cannot be prohibited from publicly expressing a different opinion than Petitioner's opinion for the
same reasons as in item 2 above.

2. Entitlement to an injunction against dissemination of the contested statement pursuant to
§§823, Sec. 1, 1004, Para. 1, Sentence 2, BGB, analogous to Petitioner's general

corporate rights is also to be excluded. Although even dissemination of a statement of opinion regarding substantive facts may be unlawful, the prerequisite in regard to freedom of opinion as protected by the Constitution pursuant to Art. 5, Para. 1, Sentence 1 GG [*Grundgesetz,* German Basic Constitutional Law] is that there must be a lack of adequate related facts in regard to the contested statement of opinion. This is not the case, however, in view of the wealth of arguments brought both for and against the parties' legal stance.

3. No adequate arguments have been brought to substantiate the requirements for an injunction claim pursuant to §§1004, Sec. 1, Para. 2 BGB, analogous to §826 BGB. The basis for any claims due to violations of competition has also not been substantiated.

II. The cost determination is based on §91, Para. 1 ZPO; the determination of the amount in controversy is based on §3 ZPO.

Buske                        Dr. Weyhe                                Dr. Korte

[seal]
**By:**
[signature]
Clerk of the Court
Protocol Officer

TRANSLATOR'S CERTIFICATE

I, Ulrike Emigh, declare under penalty of perjury that I am thoroughly competent in both German and English, and that the foregoing document is a true and correct translation of the attached document, which I translated from German to English, on this 27th day of March, 2007.

.................................................

Translated document:

Hamburg Sentence

299

## Landgericht Hamburg

Zivilkammer 24

<div style="border:1px solid;">

**Eingegangen**

**1 0. Nov. 2006**

**HENGELER MUELLER**

</div>

Sievekingplatz 1
20355 Hamburg
Telefon: 040/ 42843 2653
Telefax: 040/ 42843 3935
**fristwahrendes Telefax:**
040/ 42843 4318 o. -19

<u>324 O 753/06</u>

**B E S C H L U S S**

vom 7.11.2006

In der Sache

**Vivendi S.A.,**
vertreten durch Jean-Bernard Levy,
42 avenue de Friedland, 75380 Paris, Frankreich

- Antragstellerin -

Prozessbevollmächtigte        Rechtsanwälte Görg pp.,
                              Sachsenring 81, 50677 Köln,
                              Gz.: 52209-06 00010 DOKO,

gegen

**Deutsche Telekom AG,**
vertreten durch ihren Vorstand, dieser vertreten
durch den Vorstandsvorsitzenden Kai-Uwe Ricke,
Friedrich-Ebert-Allee 140, 53113 Bonn

- Antragsgegnerin -

Prozessbevollmächtigte        Rechtsanwälte Hengeler Mueller,
                              Bockenheimer Landstr. 51, 60325
                              Frankfurt am Main, Gz.: 3462305,

beschließt das Landgericht Hamburg, Zivilkammer 24 durch

den Vorsitzenden Richter am Landgericht Buske

den Richter am Landgericht Dr. Weyhe

den Richter am Landgericht Dr. Korte



324 O 753/06                                                                  - 2 -

**Der Antrag vom 10. Oktober 2006 auf Erlass einer einstweiligen Verfügung wird zurückgewiesen.**

**Die Kosten des Verfahrens hat die Antragstellerin zu tragen nach einem Wert von € 60.000,00.**

### Gründe

I. Der Antrag auf Erlass einer einstweiligen Verfügung, mit der die Antragstellerin begehrt, es der Antragsgegnerin zu untersagen

in der folgenden Weise zu verbreiten, die Antragsgegnerin oder ihre Konzerngesellschaft T-Mobile sei Eigentümerin der vormals der polnischen Elektrim gehörenden 48 % Anteile der PTC geworden:

„Die Neubesetzung der PTC-Führung ist Konsequenz des Erwerbs der vormals der polnischen Elektrim gehörenden 48 % Anteile der PTC durch die Deutsche Telekom / T-Mobile. Das Eigentum beruht auf einer Call-Option, die der Deutschen Telekom durch ein Schiedsgericht zugesprochen worden war",

ist zulässig, aber in der Sache nicht begründet. Der Antragstellerin steht der geltend gemachte Unterlassungsanspruch nicht zu.

1. Er folgt insbesondere nicht aus § 1004 Abs. 1 Satz 2 BGB analog in Verbindung mit § 824 Abs. 1 BGB, denn bei der angegriffenen Äußerung, die in einer Pressemitteilung der Antragsgegnerin enthalten ist, handelt es sich, soweit die Antragstellerin von ihr betroffen ist, nicht um eine Tatsachenbehauptung, sondern um eine Meinungsäußerung.

a. Hintergrund der angegriffenen Äußerung wie des Vorbringens der Antragstellerin ist der Umstand, dass die Antragsgegnerin und die polnische Gesellschaft Elektrim S.A. zu 45 % bzw. 48 % an der polnischen Gesellschaft PTC beteiligt waren. Der Antragsgegnerin stand eine Option auf Erwerb der von der Elektrim S.A gehaltenen Anteile zu. Daneben gibt es die Gesellschaft Telco, an der die Elektrim S.A. und die Antragstellerin zu 49 % bzw. 51 % beteiligt sind. Nachdem die Elektrim S.A. ihre Anteile an der PTC auf die auf die Telco übertragen hatte, beanstandete die Antragsgegnerin dies und erwirkte einen Schiedsspruch, wonach diese Übertragung unwirksam sei und ihr die Option weiterhin zustehe. Die Wirksamkeit dieses Schieds-

301

324 O 753/06                                    - 3 -

spruchs, insbesondere dessen Verbindlichkeit im Verhältnis zur Telco, nimmt die An-
tragsgegnerin in Abrede.

Bei der Äußerung, dass eine Person „Erwerber" oder „Eigentümer" eines Gegens-
tandes sei, handelt es sich im Grundsatz um eine Meinungsäußerung; denn die Fra-
ge, wer der „Eigentümer" eines Gegenstands „ist", hängt wesentlich von einer Bewer-
tung des Status der betreffenden Person ab. Diese Bewertung richtet sich dabei nicht
allein nach rechtlichen Kriterien, sondern hängt auch von sonstigen Faktoren ab, in-
dem außerhalb juristischer Fachtexte etwa auch von einem „wirtschaftlichen", einem
„faktischen" oder einem „geistigen" Eigentum gesprochen wird. Dass auch eine au-
ßerjuristische Sichtweise in das Verständnis der angegriffenen Äußerung hinein-
spielt, ergibt sich hier bereits daraus, dass die Antragsgegnerin die Bezeichnung „Ei-
gentum" gewählt hat, obwohl es im Hinblick auf die Regelung in §§ 903, 90 BGB –
anders allerdings als im französischen (C.c. art. 529) und möglicherweise im polni-
schen Recht – bei Zugrundelegung des deutschen Rechts ein „Eigentum" an Gesell-
schaftsanteilen nicht geben kann. Wie sehr die Frage, wem die Gesellschaftsanteile
an der PTC als „Eigentümer" zustehen, auch bei rein juristischer Betrachtung von
Wertungen abhängt, ergibt sich zudem daraus, dass die Parteien und sonstigen Be-
teiligten auf ersichtlich hohem juristischen Niveau und mit wechselnden (Teil-) Erfol-
gen über die Wirksamkeit der einzelnen Transaktionen streiten. Es kann indessen
nicht Aufgabe dieses Gerichts sein, dem Stoff dieser Auseinandersetzungen eine
weitere Rechtsmeinung hinzuzufügen.

b. Der Antragstellerin ist allerdings zuzugeben, dass es denkbar ist, eine Äußerung
wie die, eine Person sei „Eigentümer des Hauses", als Tatsachenmitteilung zu ver-
stehen sei, weil sie dem Adressaten die Vorstellung von konkreten Vorgängen ver-
mittle (Burkhardt in Wenzel, Das Recht der Wort- und Bildberichterstattung, 5. Aufl.,
Rdnr. 62 – bei der dort und in den Vorauflagen in Bezug genommenen Quelle dieser
Auffassung handelt es sich allerdings um ein Fehlzitat); und ihr ist weiter zuzugeben,
dass als ein konkreter tatsächlicher Vorgang, von dem das „Eigentum" der Antrags-
gegnerin an den streitigen Gesellschaftsanteilen abhängen könnte, hier die Zahlung
des Entgelts für die Ausübung der Option durch die Antragsgegnerin an die Elektrim
S.A. in Betracht kommt, die nach dem Vortrag der Antragstellerin noch nicht erfolgt
ist. Aber abgesehen davon, dass auch die Richtigkeit diese Sichtweise wiederum
rechtliche Beurteilungen voraussetzt – so ginge etwa nach französischem Recht das
„Eigentum" an Rechten aller Art bereits mit Abschluss des Kaufvertrages auf den

Käufer über, ohne dass es eines Übertragungsaktes oder auch nur der Zahlung des Kaufpreises bedürfte (C.c. art. 1583) –, stellt die Antragstellerin mit ihr auf einen Vorgang ab, dessen Gegebensein dem Leser der Pressemitteilung der Antragsgegnerin gerade nicht vermittelt wird; denn in dieser wird als konkreter Vorgang, in dem ihr „Eigentum" an den Anteilen an der PTC sich manifestiere, die Besetzung einer Führungsposition bei der PTC benannt. Die Antragsgegnerin berühmt sich in der beanstandeten Pressemitteilung der Fähigkeit, aufgrund ihres „Eigentums" an den Anteilen an der PTC die als „Top-Managementposten" bezeichnete Position des „Chief Executive Officer" bei der PTC mit einem ihrer Mitarbeiter zu besetzen. Damit wird als „Eigentum" eine Stellung umschrieben, aus der heraus die Antragsgegnerin es sei, die bei der PTC nunmehr „das Sagen" habe und aufgrund der sie in der Lage sei zu bestimmen, wer in dem Unternehmen der PTC die Führungsaufgaben wahrnehme. Dass die Antragsgegnerin eine solche Stellung, die typischerweise mit der Innehabung des „Eigentums" einhergeht, bei der PTC tatsächlich nicht einnehmen würde, hat die Antragstellerin nicht dargelegt.

Im Übrigen erscheint ohnehin zweifelhaft, ob die Antragstellerin von der angegriffenen Äußerung überhaupt betroffen ist, soweit die angegriffene Äußerung lediglich tatsächliche Umstände betreffend den Stand der Abwicklung des Vertrages zwischen der Antragsgegnerin und der Elektrim S.A. über die Anteile an der PTC impliziert. Denn der Vorgang dieser Vertragsabwicklung hat mit der Frage, ob die Antragstellerin selbst – vermittelt über ihre Tochtergesellschaft Telco – Inhaber der streitigen Gesellschaftsanteile an der PTC sei, nichts zu tun. In ihren eigenen Rechten betroffen sein kann die Antragstellerin von der angegriffenen Äußerung nur insoweit, als sie erfolgreich geltend machen könnte, dass sie selbst Inhaber der streitigen Gesellschaftsanteile sei; an der Feststellung der Eigentums- oder Beteiligungsverhältnisse an Unternehmen dritter Inhaber hat sie kein berechtigtes Interesse. Bei dieser Frage, ob – wegen einer etwa fortdauernden Wirksamkeit der Übertragung der Anteile an der PTC von der Elektrim S.A. auf die Telco – die Antragstellerin mittelbarer „Eigentümer" der Anteile an der PTC geworden sei, handelt es sich aber wiederum um eine bloße Meinungsäußerung, hinsichtlich der aus den unter 2. genannten Gründen der Antragsgegnerin nicht verboten werden kann, öffentlich eine andere Auffassung zu vertreten als die Antragstellerin.

2. Ein Anspruch auf Unterlassung der Verbreitung der angegriffenen Äußerung aus §§ 823 Abs. 1, 1004 Abs. 1 Satz 2 BGB analog in Verbindung mit dem allgemeinen

324 O 753/06                                                           - 5 -

Unternehmenspersönlichkeitsrecht der Antragstellerin scheidet ebenfalls aus. Danach kann zwar die Verbreitung auch der Äußerung einer Meinung über einen Sachverhalt unzulässig sein; dies setzt im Hinblick auf die aus Art. 5 Abs. 1 Satz 1 GG grundrechtlich geschützte Meinungsfreiheit aber voraus, dass es für die angegriffene Meinungsäußerung an hinreichenden Anknüpfungstatsachen fehlt. Das ist indessen angesichts der jeweils für und gegen die Rechtsauffassungen der Parteien vorgebrachten gewichtigen Argumente nicht der Fall.

3. Für das Vorliegen der Voraussetzungen eines Unterlassungsanspruchs aus §§ 1004 Abs. 1 Satz 2 BGB analog in Verbindung mit § 826 BGB ist nicht hinreichend vorgetragen. Auch Grundlagen, aus denen sich Ansprüche wettbewerbsrechtlicher Natur ergeben könnten, sind nicht dargelegt.

II. Die Kostenentscheidung folgt aus § 91 Abs. 1 ZPO; die Streitwertfestsetzung beruht auf § 3 ZPO.

Buske                    Dr. Weyhe                    Dr. Korte

Ausgefertigt
Justizangestellte
als Urkundsbeamtin der Geschäftsstelle

304