HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

VIVENDI S.A. and
VIVENDI HOLDING I CORP., as the
Assignee of a U.S. Elektrim Bondholder

          Plaintiffs,

          v.

T-MOBILE USA, INC., T-MOBILE
DEUTSCHLAND GMBH, T-MOBILE
INTERNATIONAL AG, DEUTSCHE TELEKOM
AG, AND ZYGMUNT SOLORZ-ZAK,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO.  CV6-1524 JLR

THIRD AMENDED
COMPLAINT

Jury Trial Demanded

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV6-1524-JLR
THIRD AMENDED COMPLAINT - 1

**INTRODUCTION**................................................................................................ 1

      **Phase I** ............................................................................................. 5

      **Phase II** ............................................................................................ 6

**JURISDICTION** ................................................................................................. 9

**PARTIES** ....................................................................................................... 11

**FACTS** ......................................................................................................... 15

        **A.**    **Background** ................................................................. 15

               1.    Defendants' Attempt to Mislead the First Vienna
                    Arbitration Panel ................................................ 18

               2.    Defendants' Misconduct Relating to The Second Vienna
                    Arbitration .......................................................... 20

        **B.**    **Phase I** ....................................................................... 21

               1.    Solorz Gains Control of Elektrim and Begins to Conspire
                    With  T-Mobile ................................................... 21

               2.    As The Second Vienna Arbitration was Proceeding,
                    Defendants Engaged in Their First Episodes of Unlawful
                    Racketeering Conduct ....................................... 22

               3.    Defendants' Unlawful Exploitation of the Second
                    Arbitration Award .............................................. 26

               4.    Elektrim Seizes Control of the PTC Shares in 2005 in
                    Defiance of an Injunction, with the Assistance of T-Mobile ....... 28

               5.    Solorz Strips Elektrim's Assets, and Elektrim's Bondholders
                    Respond By Filing a Bankruptcy Petition Against Elektrim ....... 31

               6.    Vivendi Was Excluded From The Third Vienna
                    Arbitration........................................................... 32

               7.    During the Third Vienna Arbitration, Defendants Again
                    Engaged in Wire Fraud to Deceive Vivendi S.A ...................... 34

        **C.**    **Phase II** ..................................................................... 37

               1.    Elektrim Illegally Transfers Title to the PTC Shares to T-
                    Mobile, and T-Mobile Begins Exercising Full Control over
                    PTC, Contrary to the Holding of the Third Vienna
                    Arbitration Panel and in Defiance of Numerous Injunctions....... 37

               2.    Defendants Use the U.S. Wires to Disseminate False and
                    Misleading Press Releases With the Intent and Effect of
                  Harming U.S. Bondholders. ............................... 40

               3.    Defendants' Misconduct Fraudulently Induces U.S.
                  Bondholders to Support Withdrawal of Bankruptcy Petition
                  Against Elektrim ................................................ 44

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2

4.    Defendants Complete Their Illegal Takeover of the PTC
Shares in Defiance of Decisions of the Supreme Courts of

3    Poland and Austria.......................................................................... 45

4    **D.    Summary of Facts** ................................................................................. **48**

**COUNT I   (RICO Sections 1962(b) and (d))** ....................................................... **51**

5

**COUNT II   (RICO Sections 1962(c) and (d))** ..................................................... **54**

6

**COUNT III (Common Law Fraud)** ......................................................................... **57**

7

**PRAYER  FOR RELIEF** ............................................................................................ **61**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2                        **INTRODUCTION**

3

4        1.       Plaintiffs Vivendi Holding I Corp. ("Vivendi Holding"), as the assignee of

5    General Motors Corp. ("GM") of Detroit, Michigan, and Vivendi S.A. bring this action under the

6    Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(b), (c) and (d) (the

7    "RICO Act") against Defendants Deutsche Telekom AG ("DT") and three T-Mobile subsidiaries

8    (including DT, collectively "T-Mobile"), and against Defendant Zygmunt Solorz-Zak ("Solorz"),

9    a convicted criminal and Polish oligarch with undue influence in Poland.  Defendants engaged in

10   a pattern of racketeering activity, including acts of wire fraud committed in the United States, in

11   order to illegally take over an enterprise, Polska Telefonia Cyfrowa sp. zo.o. ("PTC").  PTC is

12   one of the largest wireless telephone company in eastern Europe and an integral part of the T-

13   Mobile global wireless network based in the United States in Seattle, Washington.  In addition,

14   Defendants have conducted the affairs of the following two enterprises in a corrupt manner

15   through a pattern of racketeering activity (the "Enterprises"): (a) Elektrim S.A. ("Elektrim"), a

16   Polish company controlled by Solorz; and (b) an enterprise-in-fact consisting of the T-Mobile

17   Defendants and Solorz (the "T-Mobile Global Wireless Network Enterprise").  This Enterprise

18   includes the wireless company that Solorz controls (not a defendant in this action), and that is

19   now formally integrated with T-Mobile through a Mobile Virtual Network Operator Agreement.

20

21

22   This racketeering activity has included U.S. wire fraud aimed at stealing Vivendi S.A.'s interest

23   in PTC and stripping assets from Elektrim.  Defendants' racketeering has injured Plaintiffs.

24       2.       In particular, T-Mobile conspired with Solorz and Elektrim (under Solorz's

25   control) to: (a) steal more than $3 billion worth of PTC shares

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2  from Elektrim Telekomunikacja Sp. z o.o ("Telco") -- a joint-venture company that Elektrim and

3  Vivendi S.A. created in 1999 to hold PTC shares -- and to illegally transfer such PTC shares to

4  T-Mobile for a price way below fair market value; (b) strip from Elektrim a substantial portion of

5  its assets for the personal benefit of Solorz as payment for his role in the racketeering; (c)

6  fraudulently induce GM of Detroit, Michigan, through its Miami agent Everest Capital Inc.

7  ("Everest"), to support and not oppose withdrawal of a bankruptcy petition in October 2006

8  against Elektrim, thereby removing an impediment to Defendants' illegal transfer of PTC Shares,

9

10  (d) mislead the bankruptcy court into withdrawing the bankruptcy petition, (e) operate the

11  Enterprises corruptly, enriching Solorz, DT and the broader T-Mobile family of companies by

12  adding PTC to the T-Mobile network through a pattern of racketeering activity; and (f)

13  improperly expand and put T-Mobile in a stronger position where T-Mobile USA, Inc. could

14  acquire (and DT could substantially pay for) $4.182 billion of Advanced Wireless Services

15  spectrum from the U.S. Federal Communications Commission (the "U.S. Spectrum

16

17  Acquisition").  As a direct result of these acts, T-Mobile has ended up controlling PTC, and

18  Solorz – who controls Elektrim – ended up being paid twice (through Elektrim) for selling the

19  same PTC shares twice as well as receiving other benefits.  In contrast, Vivendi S.A. has

20  received nothing for its approximately $2.5 billion investment in Telco, and Vivendi Holding, as

21  the assignee of GM, a U.S. bondholder of Elektrim, has seen its creditor position significantly

22  harmed.

23

24           3.       Defendants' misconduct in furtherance of their racketeering activity occurred in

25  material part in the United States.  Among other things, Defendants and their co-conspirators,

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2  including Elektrim, (a) misled GM (the assignor of claims to Vivendi Holding), causing it not to

3  object to the withdrawal of the bondholders' bankruptcy petition against Elektrim, and thereby

4  clearing the way for T-Mobile's unlawful takeover of PTC Shares worth more than $3 billion, (b)

5  engaged in misleading and fraudulent settlement negotiations with Vivendi S.A. and (c)

6

7  misrepresented DT's financial strength by incorporating PTC's assets and value as part of DT's

8  consolidated financial reports, putting T-Mobile USA, Inc. and DT in a stronger position to

9  accomplish its $4.18 billion U.S. Spectrum Acquisition in competition with other U.S. bidders,

10  and otherwise finance the investment and expansion of T-Mobile USA, Inc.

11          4.      Defendants' misconduct has had substantial adverse effects on U.S. commerce.

12  First, GM lost the right to recover its share of assets (pursuant to an Equity Kicker that gave

13  Elektrim bondholders a portion of Elektrim's assets above $160 million euros) that Solorz had

14  unlawfully stripped from Elektrim as part of the conspiracy, including more than $3 billion of

15  PTC shares.  Second, millions of U.S. consumers who use T-Mobile's international network have

16  been affected by T-Mobile's illegal acquisition of PTC.  Those consumers have lost the benefit of

17

18  PTC's honest services and, upon information and belief, have been deprived of the benefit of

19  roaming rates that would have been lower but for the racketeering.  U.S. consumers are thus

20  paying the functional equivalent of a "corruption tax" to cover the costs that T-Mobile incurred

21  in the unlawful conspiracy alleged herein.  Third, upon information and belief, T-Mobile

22  affirmatively used the U.S. wires to report consolidated financial statements that incorporated

23  PTC's revenues and assets to enhance its investment profile and thereby lower its cost of capital

24  used to improperly expand the T-Mobile USA, Inc. as part of the T-Mobile Global Wireless

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

Network Enterprise by, among other things, effecting the U.S. Spectrum Acquisition at auction.

5.    Defendants' misconduct took place in significant part in the United States.  That misconduct included, but was not limited to, a pattern of U.S. wire fraud that manifested itself on multiple occasions spanning a three-and-one-half year period.  As set forth below, the numerous instances of U.S. wire fraud detailed in this Third Amended Complaint was material and necessary to Defendants' illegitimate takeover of PTC, their theft of PTC shares, and their corrupt operation of the Enterprises.  Consequently, it was a proximate cause of injuries to Vivendi S.A. and Vivendi Holding, as GM's assignee.

6.    Defendants' racketeering conspiracy and the accompanying wire fraud have had two phases.  Phase I occurred in 2003-2005 and involved Defendants' theft of 48% of the shares of PTC from Telco (the "PTC Shares"), the joint-venture entity in which Vivendi S.A. had invested approximately $2.5 billion to acquire a majority of PTC's shares.  Phase I also involved Defendants' stripping of assets from Elektrim for the direct or indirect personal benefit of Solorz.  Phase II, which started in 2006 and continues today, involved (a) the illegal transfer of the PTC Shares from Elektrim to T-Mobile in August 2006, (b) the use of U.S. wires to fraudulently induce GM and Everest not to oppose the dismissal of the bondholders' bankruptcy proceeding against Elektrim, and (c) the use of the theft of the PTC shares to strengthen T-Mobile's ability to fund T-Mobile's further expansion, including (upon information and belief) the $4.18 billion U.S. Spectrum Acquisition.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2 **Phase I**

3     7.     In 2004, Defendants used the U.S. wires to deceive Vivendi S.A. into believing

4 that Elektrim was complying with its fiduciary duties to Vivendi S.A. during a critical arbitration

5 proceeding that T-Mobile had brought against Elektrim and Telco seeking a ruling that

6 Elektrim's 1999 transfer of the PTC shares (the "PTC Shares") to Telco was illegal (the "Second

7 Vienna Arbitration"). In fact, Elektrim (at Solorz's direction) was colluding with T-Mobile to

8 gain control of PTC shares owned by Vivendi and was participating in the T-Mobile Global

9 Wireless Network Enterprise. Had Vivendi S.A. known in 2004 that Defendants and Elektrim

10 were in fact conspiring to strip Vivendi S.A. of its ownership interest in the PTC Shares, Vivendi

11 S.A. would have taken immediate action to preclude the abuse of the Second Vienna Arbitration

12 and thereby protect Vivendi S.A.'s $2.5 billion investment. Among other things, Vivendi S.A.

13 would have (a) increased its 15% stake in Elektrim and blocked Solorz before he was able to

14 consolidate his control over Elektrim, (b) requested court orders to allow Vivendi S.A. to take

15 control of Elektrim's defense in the Second Vienna Arbitration, (c) filed an action in an Austrian

16 court to dissolve the arbitration because the parties who were purportedly adverse were in fact

17 conspiring, (d) filed a declaratory action in Polish court to determine the rightful owners of the

18 PTC Shares, and (e) filed an action in Polish court to enjoin the arbitration before the panel

19 issued its decision.

20     8.     Later, in 2004, Defendants, in furtherance of their racketeering activity, used the

21 U.S. wires to fraudulently induce Vivendi S.A. into sham settlement negotiations in connection

22 with the theft of the PTC Shares. Speaking at the end of these negotiations, in late August 2004,

23

24

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

a top executive of T-Mobile told a top executive of Vivendi S.A. that "we have a deal [to buy out Vivendi S.A.'s stake in PTC] – you can put champagne in the fridge."  He was fraudulently misleading Vivendi S.A. into believing the negotiations were in good faith when in fact they were a facade.  Shortly thereafter, Vivendi S.A. received a two-line letter inexplicably stating that T-Mobile was "unable to conclude [the] proposed transaction at this time."

**Phase II**

9.      On August 28, 2006, disobeying the injunctions of Polish courts and contrary to orders of an arbitration panel in Vienna, Elektrim transferred ownership of the PTC Shares (which properly belonged to Vivendi S.A. through Telco) to T-Mobile and received no payment from T-Mobile at that time.

10.      On September 5, 2006, a week after Elektrim had illegally transferred title in the PTC Shares to T-Mobile, and again on October 4, 2006, DT disseminated false press releases representing that T-Mobile had lawfully acquired PTC, and was exercising control over it, *pursuant to an award of the Vienna arbitration panel* (which was not public).  In fact, Defendants were acting in a manner that *contradicted* the award that the panel rendered at that time.  Defendants knew that these press releases would be carried over U.S. wires, and intended them to falsely convey to Vivendi S.A., GM, and Everest that T-Mobile lawfully owned the PTC Shares, and that the consideration that T-Mobile had paid for the PTC Shares could be paid to the bondholders free and clear of any legal impediment and financial risk.  Defendants intended that the misleading press releases would cause GM and Everest not to object to the withdrawal of the bondholders' bankruptcy petition, thereby removing the last

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2   significant obstacle to Defendants' takeover of PTC.  Had the bankruptcy petition remained, all

3   under-value asset transfers (including the PTC Shares transfer and other asset-stripping) that had

4   occurred within the year before the bankruptcy filing could have been voided and bondholders

5   would have realized the full value which included a Contingent Payment entitling the

6   bondholders to 25% of the net asset value of Elektrim in excess of 160 million Euros (the

7   "Equity Kicker").

8

9        11.    Furthermore, in 2006, Defendants engaged in two additional sham negotiating

10  efforts in furtherance of their racketeering and theft of the PTC Shares.  First, in March 2006,

11  Defendants used the U.S. wires to deceive Vivendi S.A. with respect to a settlement negotiated

12  between the parties — this time going so far as to enter into an agreement with full intentions of

13  entirely reneging on the agreed-upon terms of that settlement.  Second, in August and September

14  2006, Defendants used U.S. wires to initiate intentionally misleading negotiations with Vivendi

15  S.A. to deceive it with respect to the disposition of the PTC Shares.  As with the 2004 episode of

16  wire fraud, these further episodes occurred during critical times and facilitated Defendants'

17  racketeering conduct.

18

19       12.    More recently, on January 28, 2007, DT issued a misleading press release that,

20  upon information and belief, was carried over U.S. wires and that, among other things, omitted

21  material information related to the unlawful seizure of PTC.  It also improperly consolidated

22  PTC's earnings and balance sheet into DT's global earnings forecast and balance sheet, thereby

23  misleading U.S. investors and facilitating the improper expansion of T-Mobile USA, Inc.'s

24  spectrum in the United States.

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

13.     As detailed below, Defendants' conspiracy also included (a) use of force to take over the PTC premises, (b) falsification of PTC's shareholder list, (c) making misleading statements to government agencies, (d) stripping Elektrim of its assets, (e) disregarding injunctions and court orders from three countries, including a decision of the Supreme Court of Poland and another of the Supreme Court of Austria and (f) misleading regulators.

14.     Vivendi S.A. and Vivendi Holding come to this Court because it is located in the District where T-Mobile USA, Inc. is headquartered.  This District is the situs of T-Mobile USA, Inc.'s operations, which is the most significant generator of revenues for T-Mobile and the T-Mobile Global Wireless Network Enterprise and the key entity that was integrated with PTC by T-Mobile's then-CFO, Thomas Winkler.  Furthermore, on information and belief, T-Mobile USA, Inc.'s officers and directors were among the decision-makers developing and executing Defendants' racketeering and other illegal conduct for the benefit of T-Mobile USA, Inc. and the T-Mobile Global Wireless Network Enterprise.  Moreover, this is the only forum where Vivendi S.A. and Vivendi Holding can effectively enforce a judgment against T-Mobile.  Defendants have already ignored numerous injunctions and orders issued by tribunals in three other countries – Poland, United Kingdom, and Austria – demonstrating the importance of this action.  Defendants' disregard of European courts and arbitration panels has precluded Vivendi S.A. from having the opportunity to recover its shares in an unbiased legal proceeding whose determination is enforceable against Defendants.

15.     The  remedy and justice that this action seeks are simple: Vivendi S.A. asks this Court to order Defendants to pay Vivendi S.A. the fair market value of the assets that they stole

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    if they do not return to Vivendi S.A. its rightful control of PTC.  Vivendi Holding asks this Court

3    to order Defendants to compensate it for the harm they caused.

4

5                                    **JURISDICTION**

6        16.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 (c) and 28

7    U.S.C. §§ 1331, 1337(a), and 1367.  Defendants' fraud and theft occurred in significant part as a

8    result of a pattern of wire fraud committed in the United States and have had direct, substantial,

9    and reasonably foreseeable effects on U.S. commerce.  Their racketeering conduct has affected

10   T-Mobile's expanding international network, of which the United States is a centerpiece and PTC

11   is now an integral part.  Upon information and belief, Solorz and the T-Mobile Defendants

12   continue to operate the T-Mobile Global Wireless Network Enterprise corruptly and millions of

13   U.S. wireless telephone users who subscribe to T-Mobile USA, Inc.'s services are now paying

14   roaming charges higher than they otherwise would have been when making telephone calls to or

15   from Poland — the functional equivalent of a "corruption tax."  In addition, the racketeering

16   conspiracy has harmed GM by stripping assets from Elektrim and by fraudulently inducing them

17   not to oppose withdrawal of the bondholders' bankruptcy petition against Elektrim thereby

18   foregoing the ability to recoup fraudulently transferred assets and recovering the full value of

19   their investment, including the Equity Kicker.  Defendants' racketeering conspiracy also misled

20

21   U.S. regulators, allowing the conspiracy to flourish when it otherwise would have been detected.

22   Finally, Defendants' fraudulent inclusion of PTC's assets and value on DT's consolidated

23   balance sheet, upon information and belief, put T-Mobile in a stronger position to accomplish

24   (and DT to substantially pay for) the U.S. Spectrum Acquisition,

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2 and to leverage and raise capital to support other commercial and banking transactions in U.S.

3 commerce.

4     17.     Defendants' racketeering conduct proximately caused Plaintiffs' injuries. First,

5 Vivendi Holding, as the assignee of the claims of Everest and GM, would have been in a far

6 better financial position if the bankruptcy petition against Elektrim had not been withdrawn and

7 if the fraudulently conveyed assets had been recovered, thereby protecting the value to the

8 Equity Kicker. Second, but for the wire fraud that Defendants committed in the United States,

9 Plaintiffs would have been able to take timely defensive actions, such as Vivendi S.A. preventing

10 Solorz's takeover of Elektrim and, thus, preventing Defendants' theft of the PTC Shares and

11 takeover of PTC. Third, if DT had accurately described the T-Mobile Defendants' conduct in

12 filings with relevant government agencies, Plaintiffs would have been alerted to take timely

13 defensive action. Fourth, Vivendi S.A. has suffered lost revenues as a direct, proximate result of

14 U.S. customers paying roaming fees to the corrupted T-Mobile Global Wireless Network

15 Enterprise rather than to the legitimate PTC that Vivendi S.A. had controlled before the unlawful

16 takeover. Fifth, Defendants' racketeering has depressed Vivendi S.A.'s share value, increasing its

17 costs of raising capital in the U.S. financial markets, particularly over the last seven years when

18 Vivendi S.A.'s ADRs were traded on the New York Stock Exchange.

19     18.     Venue in this District is proper pursuant to 18 U.S.C. §1965(a) and 28 U.S.C. §§

20 1391(b) and (c).

21

22

23

24

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2

**PARTIES**

3      19.      Vivendi S.A. is a joint-stock company organized and existing under the laws of

4   France.  It is headquartered in Paris and has offices in the United States.  Until mid-2006, it was

5   listed on the New York Stock Exchange.  It derives billions of dollars in revenue from the United

6   States and has thousands of U.S. employees.  Vivendi S.A. owns 100% of Universal Music

7   Group and 20% of NBC Universal, which are U.S. corporations.

8

9      20.      Vivendi Holding is a Delaware corporation with its principal place of business in

10   New York City.  Vivendi Holding brings this action as an assignee of claims of Everest and GM

11   pursuant to a May 29, 2007 Assignment Agreement between Vivendi Holding and Everest.

12   Everest purchased Elektrim bonds for itself and for GM, and Everest managed GM's investment

13   in those bonds.  Everest is located in Miami, Florida.  GM is a Delaware corporation with its

14   principal place of business in Detroit, Michigan.  GM does business in this District.

15

16      21.      Defendant DT is a German corporation that does business in the United States and

17   owns and controls T-Mobile International AG, T-Mobile USA, Inc., and T-Mobile Deutschland

18   GmbH.  DT has offices in the United States.  U.S. investors trade DT's ADRs on the New York

19   Stock Exchange.  DT relies on the U.S. financial markets to raise capital, and directly does other

20   business in the United States.  For example, DT directly paid $3 billion of the 2006 $4.2 billion

21   U.S. Spectrum Acquisition just one month after DT consolidated PTC's assets.  More recently,

22   DT apparently has invested millions of dollars in a company based in Mountain View,

23   California.  Furthermore, DT officers and directors regularly travel to the United States to

24   conduct T-Mobile business in the United States.  DT and certain of its officers and directors are

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

integral operators of, and participants in, the T-Mobile Global Wireless Network Enterprise corruptly for at least three years to perform racketeering and other illegal acts as wire fraud, conspiracy, and theft.

22.     Defendant T-Mobile International AG is a German corporation with substantial interests in the United States, operating in the United States through its agent T-Mobile USA, Inc. under the well-known "T-Mobile" brand.  Furthermore, upon information and belief, T-Mobile International AG officers and directors regularly travel to the United States to conduct T-Mobile business in the United States.  T-Mobile International AG and certain of its officers and directors are integral to the operation of the T-Mobile Global Wireless Network Enterprise.

23.     Defendant T-Mobile USA, Inc. ("T-Mobile USA") is a Delaware corporation with its principal place of business at 12920 S.E. 38th St., Bellevue, Washington.  T-Mobile USA has over 22 million U.S. wireless subscribers (many of whom make calls to Poland), deriving millions of dollars in U.S. revenues and employing thousands of people in the United States.  T-Mobile USA is an integral part of the T-Mobile Global Wireless Network Enterprise.  According to T-Mobile USA's website, the broad T-Mobile family of companies operate as "One Company."  The website continues: "Despite the number of national markets, 'One Company' means one set of purchasing requirements, one technology architecture, one marketing and communications strategy, and one set of customer service standards."  In addition, the website states, "[a]s the competitive landscape of the mobile communications market becomes increasingly international, being 'One Company' is an indispensable prerequisite for the Group's future success."  Thus, there is unity of interest and management among the T-Mobile

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2   Defendants, and T-Mobile USA operates as an agent and instrumentality of Defendants T-

3   Mobile International AG and DT, subject to their control.

4          24.     T-Mobile USA's officers and directors, on information and belief, have been

5   active decision-makers and participants in Defendants' RICO Act violations on T-Mobile USA's

6   behalf.  Robert Dotson, the President and Chief Executive Officer of T-Mobile USA, is on the

7   Board of Management of T-Mobile International.  He also now apparently reports directly to

8   Rene Obermann, the current Chief Executive Officer and Chairman of the Board of Management

9   of DT.  Sue Swenson, the former Chief Operating Officer of T-Mobile USA (from May to

10  October 2005), was on T-Mobile International AG's Board of Management, where one of her

11  projects was "Transatlantic Synergy Projects."  Rene Obermann, DT's CEO and Chairman of its

12  Board of Management since November 13, 2006, has been CEO of T-Mobile International since

13  2002.  Mr. Obermann has also been a member of T-Mobile USA's Board of Directors since

14  January 2003 and Chairman of T-Mobile USA since December 2006.  Kai-Uwe Ricke, the

15  former Chairman of DT's Board of Management until November 12, 2006, also sat on T-Mobile

16  USA's Board of Directors from May 2001 until November 2006, and was Chairman of T-Mobile

17  USA's Board of Directors from August 2004 until December 2006.  In addition, other senior

18  officials of T-Mobile International AG, including its former CFO, Thomas Winkler, sat on the

19  PTC Board and, upon information and belief, traveled to T-Mobile USA's Seattle, Washington

20  headquarters on numerous occasions to coordinate T-Mobile's "One Company" strategy.  Indeed,

21  Mr. Winkler orchestrated the inclusion and integration of PTC into T-Mobile's global wireless

22  network and into the T-Mobile Global Wireless Network Enterprise, as evidenced by (among

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

other things) the public reporting of PTC's revenues as part of T-Mobile's consolidated corporation earnings.

25.     Defendant T-Mobile Deutschland GmbH (formerly DeTe Mobile Deutsche Telekom MobilNet GmbH) is a limited liability company organized under the laws of the Federal Republic of Germany.  It is one of the T-Mobile International AG subsidiaries with which T-Mobile International AG, DT, and T-Mobile USA have conspired and perpetrated material parts of Defendants' misconduct.  In particular, T-Mobile Deutschland GmbH currently holds PTC shares that were stolen from Vivendi S.A.   T-Mobile Deutschland GmbH is an integral participant in the T-Mobile Global Wireless Network Enterprise.

26.     Upon information and belief, the T-Mobile Defendants have acted in a coordinated manner to take over PTC, linking Poland and the United States, thereby increasing the reach of the T-Mobile Global Network Enterprise and the value of the T-Mobile brand.  T-Mobile USA in particular has benefited from Defendants illegal conduct.  Upon information and belief, Defendants' racketeering conduct facilitated the ability of T-Mobile USA to acquire additional U.S. Spectrum.

27.     Because of their close relationship and conspiratorial conduct, DT, T-Mobile International AG, T-Mobile Deutschland GmbH, and T-Mobile USA are referred to collectively as "T-Mobile."

28.     Defendant Solorz is a Polish citizen and, according to the Fortune 400 list, is a billionaire.  In 1994, he was convicted of two criminal offenses under Austrian law.  In 2003, Solorz began acquiring shares of Elektrim, the Polish energy and telecommunications company

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

through which Solorz and T-Mobile perpetrated RICO Act violations.  As discussed below, Mr.

Solorz has caused U.S. wires to be used pursuant to the illegal scheme set forth herein to defraud

Vivendi S.A. and Vivendi Holding.  Mr. Solorz has operated Elektrim as a corrupt enterprise,

and operates and participates in the T-Mobile Global Wireless Network Enterprise.  On

information and belief, Solorz meets regularly with Elektrim to direct its actions with respect to

the theft of PTC and other illegal and racketeering acts, and meets regularly with DT regarding

the operation of the T-Mobile Global Wireless Network Enterprise.

29.    On information and belief, the T-Mobile Global Wireless Network Enterprise

participants have met, and continue to meet, periodically to receive DT's directions and plan their

corrupt course of action.  They thus are united by a uniform structure that includes wireless

companies owned by Solorz and incorporated into the T-Mobile Global Wireless Network

Enterprise through a Mobile Virtual Network Operator Agreement.

## FACTS

### A.    Background

30.    In 1995, the Polish government granted PTC its first wireless license, and PTC

began operating as a mobile telecommunications provider.  At that time, Poland precluded

foreign investors from holding more than 49% of a Polish telecommunications company's shares.

31.    A 1995 Shareholders Agreement (the "Shareholders Agreement") governs PTC's

shareholders and provides, among other things, that if any shareholder materially breaches the

agreement, certain of the other shareholders have a call option to buy the breaching party's

shares.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

32.     In early 1999, the following companies held the following interests in PTC:

- Elektrim, directly and (through a company called Carcom) indirectly - 37.1%;

- T-Mobile - 22.5%;

- US West International (MediaOne) - 22.5%;

- Polpager - 4%; and

- A group of Polish minority investors comprised of BRE Bank S.A., BRE Fundusz, Kulczyk Holding S.A., and Warta S.A., (the "Polish Minority Investors") - collectively 13.9%.

33.     In 1999, both US West and the Polish Minority Investors decided to seek buyers for their shares. At the same time, both Elektrim and T-Mobile had designs to gain control over PTC. For T-Mobile to accomplish its designs, it had to violate Polish law, which at the time limited foreign ownership of PTC to 49% and, therefore, prohibited T-Mobile from owning and controlling more than 49% of PTC's shares.

34.     Elektrim, which was short of cash, initially approached T-Mobile to jointly acquire the shares of PTC, with Elektrim having majority control over the joint venture in order to comply with Poland's foreign-ownership limitations. T-Mobile, however, secretly intending to gain control of PTC, declined Elektrim's overture.

35.     While declining Elektrim's invitation to form a joint venture, T-Mobile went ahead on its own to acquire 49% of PTC's shares. First, T-Mobile secretly acquired Polpager's 4% stake. Then T-Mobile acquired US West's 22.5% stake by purchasing an intermediary holding company in the Netherlands. Significantly, T-Mobile disguised its purchase of Polpager's shares by using the wife of its Polish lawyer to

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2   organize a sham Polish company ("Holdco") to acquire Polpager and thus control the PTC shares

3   it secretly held.

4          36.     T-Mobile held Holdco out as a Polish company notwithstanding the fact that T-

5   Mobile had provided all of the money for Holdco's purchase of Polpager and controlled every

6   action that Holdco took through T-Mobile's lawyer.  Hoping that no one would learn that it

7   actually controlled Holdco and thus 49% of PTC, T-Mobile represented that it could purchase

8   another 3% from the Polish Minority Investors by exercising rights of first refusal arising from

9   the Shareholders Agreement and still hold only 48% of PTC, ostensibly not violating the 49%

10  ceiling under Polish law.

11

12         37.     While T-Mobile was secretly consolidating this 49% stake in PTC, Elektrim

13  turned to Vivendi S.A., knowing that Vivendi S.A. could provide the capital that Elektrim lacked

14  in order to jointly acquire another 13.9% of PTC shares from the Polish Minority Investors.  That

15  would bring Elektrim's control to 51% of PTC.

16

17         38.     Starting in 1999, Elektrim and Vivendi S.A. entered into a series of investment

18  agreements that established a joint venture to control PTC and that culminated in the Third

19  Amended and Restated Investment Agreement dated September 3, 2001 (the "Joint Venture

20  Agreement").  The joint venture operated through Telco, which came to hold 48% of PTC's

21  shares (the PTC Shares that Defendants ultimately stole), and through Carcom Warsawa Sp.

22  Zo.o. ("Carcom"), a sister joint-venture company holding 3% of PTC's shares.  Initially, Elektrim

23  used funds that Vivendi S.A. provided to acquire the Polish Minority Investors' shares.  It then

24  contributed all of the PTC Shares (48% of PTC's total shares) to Telco, and Vivendi S.A.

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2   acquired 49% of Telco and 50% of Carcom.  Subsequently, in December 2005, Vivendi S.A.

3   acquired an additional 2% of Telco and 1% of Carcom, bringing its respective holdings to 51%

4   of Telco and Carcom.  Over time, Vivendi S.A. has invested approximately $2.5 billion to

5   acquire 51% of Telco.  The following chart sets forth stock holdings in December 2005:

6

7   

8

9

10

11      39.     As a result of the Joint Venture Agreement, Elektrim owed Vivendi S.A. a

12  fiduciary duty of good faith and fair dealing.  The Joint Venture Agreement also contained

13  provisions protecting Vivendi S.A., including (a) a provision allowing Vivendi S.A. to control

14  the defense of any arbitration action brought against Elektrim that could impair Vivendi S.A.'s

15  interest in PTC, and (b) a provision setting forth what would happen under various outcomes of

16

17  arbitration proceedings.

18

19          **1.      Defendants' Attempt to Mislead the First Vienna Arbitration Panel**

20      40.     On October 21, 1999, T-Mobile initiated arbitration under the Shareholders

21  Agreement and PTC's Deed of Formation against Elektrim and the Polish Minority Investors.  T-

22  Mobile brought this arbitration in Vienna, before the International Arbitral Centre of the Austrian

23  Federal Economic Chamber, claiming that T-Mobile was entitled under a right of first refusal to

24  buy a portion of the Polish Minority Investors' shares – a portion that would have provided T-

25  Mobile control over another 3% stake, giving T-Mobile control over a total of more than 52% of

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2   PTC's shares (the "First Vienna Arbitration").

3       41.     As a threshold matter, T-Mobile attempted to mislead the arbitral panel and

4   asserted that it only owned and controlled 45% of PTC's shares.  T-Mobile intentionally

5   concealed from the arbitrators the fact that it actually controlled Holdco's indirect 4% stake and,

6   therefore, 49% of PTC's shares.  Thus, T-Mobile hid the fact that it could not lawfully acquire

7   any more shares without violating Poland's 49% limit on foreign ownership.

8

9       42.     At the same time, to conceal its deception, DT filed false and misleading public

10  filings with the SEC.  For example, on April 19, 2000, DT filed a Form 20-F for the year ending

11  December 31, 1999 that stated the following (the "2000 20-F Statements"):

12      "As part of this transaction, Deutsche Telekom in March 2000 acquired: Media One's 22.5
13      percent interest in [PTC], the leading GSM mobile telecommunications provider in Poland,
        *bringing Deutsche Telekom's total ownership interest in PTC to 45%.*"

14      "Deutsche Telekom has held a 22.5 percent stake in PTC since December 1995 and acquired an
15      additional *22.5 percent stake* in March 2000."

16  DT continued its fraudulent misrepresentations regarding its control of PTC stock in the 20-F

17  Statements that it filed for the years ending December 31, 2000 and December 31, 2001.

18

19      43.     Through discovery, Elektrim and the arbitration panel eventually learned the truth

20  – that T-Mobile controlled Holdco's indirect 4% PTC stake and that granting T-Mobile more

21  shares would violate Poland's 49% foreign ownership limitation.  Indeed, Holdco's only officers

22  and directors appeared to be, at various times, the wife, brother-in-law, and sister-in-law of T-

23  Mobile's Polish lawyer.

24      44.     After being exposed, DT subsequently filed its Form 20-F for the year ending

25  December 31, 2002, finally admitting that it owned 49% of PTC.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    45.    On April 9, 2003, the arbitration panel denied T-Mobile its demand, finding that

3    T-Mobile

4
>    wanted to "achieve a more [sic] 50% holding in PTC" while it was aware that the "foreign
5    ownership restrictions" did not allow it due to the current foreign participation in PTC share
>    capital.  There is no doubt that the Polpager/Holdco structure has been set up by T-Mobile as a
6    tool for achieving a more [sic] 50% holding in PTC.

7

8         **2.    Defendants' Misconduct Relating to The Second Vienna Arbitration**

9    46.    On December 7, 2000, perhaps anticipating defeat in the First Vienna Arbitration,

10   T-Mobile filed a second arbitration in Vienna against Elektrim claiming that Elektrim's transfer

11   of its PTC shares to Telco, pursuant to the Joint Venture Agreement with Vivendi S.A.,

12   materially breached the Shareholders Agreement.  T-Mobile further asserted that, as a result of

13   the alleged breach, it was consequently entitled to exercise a call option to buy all of those PTC

14   shares at book value, which was only a fraction of the fair market value.[1]

15

16   47.    Under the Joint Venture Agreement, Vivendi S.A. was entitled to direct the

17   defense and appoint the law firm representing Elektrim.  It exercised these rights, selecting

18   Watson Farley and Williams as counsel.  Until 2003, Elektrim honored its obligations under the

19   Joint Venture Agreement and mounted a vigorous defense to the Second Vienna Arbitration.

20

21

22

23

24

25

[1] T-Mobile did this with knowledge that as of January 1, 2001, Poland's 49% limit on foreign ownership would be eliminated.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2      **B.      Phase I**

3              **1.      Solorz Gains Control of Elektrim and Begins to Conspire With
                          T-Mobile.**

4

5      48.      In the Spring of 2003, while the Second Vienna Arbitration was still pending,

6      Solorz illegally purchased a significant stock interest in Elektrim in violation of Polish securities

7      and antitrust laws.

8      49.      Upon information and belief, on or about the time that Solorz made his

9      investment in Elektrim, T-Mobile and Solorz entered into secret discussions regarding a plan

10     whereby (i) T-Mobile would take over PTC, (ii) Solorz (through Elektrim) would be unjustly

11     enriched by being paid twice for the PTC Shares that properly belonged to Vivendi S.A., and (iii)

12     Solorz's wireless phone company in Poland would be integrated into the T-Mobile global

13     network.  This relationship between Solorz and the T-Mobile operating companies constituted

14     the T-Mobile Global Wireless Network Enterprise, which continues to this day.

15

16     50.      Upon information and belief, on or about this time, Solorz began operating

17     Elektrim corruptly with the objective of stealing the PTC Shares and stripping Elektrim's assets

18     with the intent of leaving Elektrim a bankrupt shell.

19

20     51.      In order to facilitate Defendants' plan, Solorz, on January 14, 2004, caused

21     Elektrim to terminate Watson Farley and Williams, the legal counsel that had been representing

22     Elektrim in the Second Vienna Arbitration.  And on February 20, 2004, Solorz caused Elektrim

23     to notify Vivendi S.A. that it was unilaterally voiding the Joint Venture Agreement.  (A London

24     arbitration panel later found this purported voidance to be unfounded and null.)

25     52.      While Vivendi S.A. was concerned about these two actions by Solorz, Vivendi

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2   S.A. did not interpret them as evidencing a conspiracy between T-Mobile and Solorz.  Rather,

3   Vivendi S.A. regarded them as business tensions between joint venture partners and tactical

4   moves by Solorz to improve Elektrim's position vis-à-vis Vivendi S.A. at a time when the two

5   parties were discussing the split of proceeds of a joint sale of PTC to T-Mobile.  In hindsight,

6   however, Elektrim's termination of counsel and the other material facts explained below can only

7

8   have resulted from the fraudulent collusion of T-Mobile and Solorz and the operation of the

9   Enterprises.

10

11
            **2.     As The Second Vienna Arbitration was Proceeding, Defendants
                     Engaged in Their First Episodes of Unlawful Racketeering Conduct.**

12          53.     In 2004, Defendants used the U.S. wires to further their conspiracy, fraudulently

13   inducing Vivendi S.A. into wrongly believing that Elektrim was not colluding with T-Mobile,

14   and that Elektrim and T-Mobile were engaged in good-faith settlement negotiations with Vivendi

15   S.A. when neither was the case.

16

17          54.     On multiple occasions in the Spring and Summer of 2004, Elektrim (acting, upon

18   information and belief, at Solorz's direction) and T-Mobile used the wires of the United States to

19   perpetrate their deception on Vivendi S.A.  Specifically, T-Mobile or Solorz, acting through their

20   representatives, engaged in the following fraudulent communications with Vivendi S.A.

21   representatives when at least one of their representatives was in the United States:

22

23          •       On May 11, 2004, Monika Halupczak of Elektrim emailed David Syed, an
                    attorney representing Vivendi S.A. who was then in the United States, stating that
24                  Elektrim was prepared to sign a Term Sheet pursuant to which Elektrim and
                    Vivendi S.A. would suspend litigation against T-Mobile while exploring a joint
25                  sale of their PTC stock to T-Mobile.  The Term Sheet is very detailed, proposing
                    specific terms of the transaction. There is no mention in the email of any

CV6-1452-JLR
THIRD AMENDED COMPLAINT - 25

1

2    cooperation, much less collaboration, between T-Mobile and Elektrim.  These
     negotiations created the knowingly false impression that T-Mobile was actually
3    negotiating when in fact it was not.

4    •   On or about May 11, 2004, Ms. Halupczak had a telephone conversation with
         David Syed regarding the Term Sheet.  The discussion was sufficiently detailed to
5        cause Mr. Syed to reasonably believe that Elektrim was acting in good faith and
         actually negotiating.

6    •   On May 13, 2004, Peter Golob, an authorized representative of T-Mobile, sent
         several emails to Mr. Syed in the United States.  In the first, he "interpolate[d] the
7        position on what should be my understanding be the last significant issue between
         the two sides regarding the term sheet."   Mr. Golob attached a revised Term
8        Sheet for the Sale of PTC to his email.  In the second, he proposed several
         alternatives to overcome disagreement.  In the third, he proposed an approach to
9        "nail down the term sheet."  These negotiations and all of Mr. Golob's statements
         created the knowingly false impression that T-Mobile was actually negotiating in
10       when in fact it was not.

11   •   On June 7, 2004, Mr. Golob, while in the United States, telephoned Mr. Syed,
         informing him that T-Mobile had executed a revised version of the Term Sheet.
12       Mr. Syed and Mr. Golob then exchanged views on an escrow agreement.  Mr.
13       Golob's statements were specific and substantive, reasonably conveying the
         impression to Mr. Syed that T-Mobile was negotiating in good faith and was
14       committed to a settlement, when in fact, it was not.

15   •   On June 9, 2004, Mr. Golob, while in the United States, sent a long email to
         George Rigo, another attorney for Vivendi S.A., and to Mr. Syed, providing
16       detailed comments on a draft Escrow Agreement.  The next day, Mr. Syed and
         Mr. Golob had a telephone conversation on the same subject.  Once again, Mr.
17       Golob conveyed the false impression that T-Mobile was actually negotiating
         when it was not.

18   •   On June 10, 2004, Mr. Golob, while in the United States, telephoned Mr. Syed to
         address other potential terms of a settlement.  Once again, Mr. Golob's behavior
19       conveyed the false impression that T-Mobile was actually negotiating when in
         fact it was not.
20
     •   On July 15, 2004, Mr. Golob, while in the United States, sent Mr. Syed another
21       email concerning timing and pricing of the proposed transaction.  Once again, this
         use of the wires conveyed the false impression that T-Mobile was actually
22       negotiating when it was not.

23   •   On July 27, 2004, Mr. Golob, while in the United States, emailed Messrs. Syed
         and Rigo a copy of a letter that Thomas Winkler of T-Mobile had written to
24       Jacques Espinasse, Vivendi S.A.'s CFO, stating that a "fully documented
         [settlement] offer would be presented to T-Mobile management board" on August
25       4, 2004.  Mr. Golob expressed hope that Vivendi S.A. would be able to resolve
         matters with Solorz-Elektrim.  Messrs. Syed and Rigo believed that Mr. Golob
         was being truthful, that Solorz-Elektrim was then

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    still a loyal joint-venture partner of Vivendi S.A., and that the negotiations were
     being conducted in good faith.  In fact, they were not.

3    •    On August 24, 2004, Marcin Olechowski on behalf of Elektrim sent two emails to
          Mr. Syed in the United States setting forth more terms of a proposed settlement

4         and attaching a draft Guarantee and Indemnity Agreement between Elektrim and
          Vivendi S.A. on one hand and T-Mobile on the other.

5    •    On August 25, 2004, Mr. Winkler of T-Mobile, while in Seattle visiting T-Mobile

6         USA, Inc., sent a text message to Mr. Espinasse regarding settlement negotiations.
          Upon information and belief, Mr. Winkler was in Seattle to make plans for the

7         integration of both T-Mobile USA and PTC into the same international T-Mobile
          network.  Mr. Winkler's use of the U.S. wires conveyed the impression that T-

8         Mobile was actually negotiating when in fact it was intentionally deceiving and
          lulling Vivendi S.A.

9

10       55.    In late August 2004, a senior T-Mobile official told Mr. Espinasse (Vivendi S.A.'s

11   CFO) that the settlement "deal" along the aforementioned terms was "done" and that he could

12   "put the champagne in the fridge."  Mr. Espinasse understood this to mean that the remaining

13   review of the deal by T-Mobile's Supervisory Board was *pro forma* and that there was definitely

14   a settlement agreement.  On information and belief, this statement, and all of the settlement

15   negotiations that had preceded it from April 2003 through September 2004, were a knowingly

16   false and deceitful ruse in furtherance of the conspiracy between Solorz and T-Mobile to strip

17   Vivendi S.A. of its ownership of PTC.  As set forth below, Vivendi S.A. relied on these

18   deceptions, reasonably believing T-Mobile was actually negotiating when it was not.

19

20       56.    On September 7, 2004, T-Mobile, which upon information and belief had advance

21   notice of the pending decision in the Second Vienna Arbitration, sent Vivendi S.A. a two-line

22   letter inexplicably stating that T-Mobile was "unable to conclude [the] proposed transaction at

23   this time."  Thereafter, on September 29, 2004, Solorz caused Elektrim to send a letter to PTC

24   purporting to revoke Telco's appointees to PTC's Management Board and replace them with

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    Elektrim appointees.  Absent advance information regarding the award, Solorz would not have

3    taken this action before the panel in the Second Vienna Arbitration issued its award.

4        57.    The T-Mobile and Elektrim communications with Vivendi S.A. during this time

5    period falsely expressed a desire to settle, falsely presented T-Mobile and Elektrim as acting

6    independently, and falsely presented Defendants as negotiating terms that Defendants were

7    actually considering.  In none of these communications did T-Mobile or Elektrim (acting under

8

9    Solorz's control) disclose their collusion or otherwise counter the misleading impression that the

10   negotiations were genuine and not a facade to hide the conspiracy.

11       58.    Vivendi S.A. reasonably and detrimentally relied on the communications from

12   Defendants set forth in the preceding paragraphs and did not take steps that it could have taken to

13   lawfully protect its $2.5 billion investment in PTC against Defendants' scheme.  Among the

14   things that Vivendi S.A. could have done but for Defendants' wire fraud and illegal scheme were

15   the following:

16

17

18       •    Block Solorz's efforts to take over Elektrim by, among other options, increasing
             Vivendi S.A.'s 15% stake in Elektrim;
19       •    Enforce its right under the Joint Venture Agreement to control Elektrim's defense
             of the Second Vienna Arbitration;
20       •    Call the arbitrators' attention to the collusion between the purportedly adverse
             parties;
21       •    File a declaratory action in a Polish court to confirm ownership of Telco; and
22       •    File actions in Austrian and Polish courts to enjoin the arbitration before the panel
             issued its decision.
23

24       59.    By fraudulently inducing Vivendi S.A. into active settlement negotiations during

25   this critical time, Defendants gave themselves sufficient time and opportunity to implement their

scheme to influence the outcome of the Second Arbitration

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

Proceeding and for Solorz to consolidate his control over Elektrim, facilitating Defendants' theft of Vivendi's PTC shares and illegal takeover of the PTC enterprise and making it more difficult and costly for Vivendi S.A. to protect and ultimately vindicate its legal rights.

**3.    Defendants' Unlawful Exploitation of the Second Arbitration Award.**

60.    On November 26, 2004, the Second Vienna Arbitration panel issued an award that in part held that Elektrim's transfer of the PTC Shares to Telco violated the Shareholders Agreement.  The panel further ruled that, if Elektrim did not recover the shares from Telco within two months of the service of the decision on Elektrim, *i.e.*, by February 9, 2005, Elektrim would be in material breach of the Shareholders Agreement, which necessarily would mean that Elektrim would become subject to a damage action.  *Finally, and of great significance, the arbitration panel ruled that it lacked jurisdiction over Telco*.  Accordingly, the panel dismissed all of T-Mobile's claims against Telco, as Telco had argued since the arbitration had begun.  As a result, the panel did not order Telco to return the PTC Shares, and Telco was not otherwise required to do so and did not do so.  Thus, Telco's control over the PTC Shares should have remained secure and the shares could not have been lawfully transferred without Telco's consent..

61.    While the decision of the Second Vienna Arbitration panel exposed Elektrim to a damage action by T-Mobile, it did *not* issue any ruling that legally affected Telco's holding of the PTC Shares.

62.    After the Second Vienna Arbitration panel issued its award, Elektrim, under the control of Solorz and with T-Mobile's collaboration pursuant to

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

the T-Mobile Global Wireless Network Enterprise, sought, on December 17, 2004, truncated partial recognition and enforcement in the Warsaw Regional Court of that part of the arbitration award that was adverse to Elektrim, entirely omitting the ruling with respect to lack of jurisdiction over Telco which was favorable to both Elektrim and Vivendi S.A. Defendants thereby sought to alter the meaning and scope of the Second Vienna Award so that it could be used improperly by Elektrim (under Solorz's control) to "repossess" the shares from Telco and to set the stage for Elektrim's transfer of the PTC Shares to T-Mobile and the stripping of Elektrim's assets. Defendants also joined forces to bar Telco (and thus Vivendi S.A.) from participating in this truncated partial recognition proceeding even though Telco was the registered owner of the PTC Shares.

63.    It was at this point that Vivendi S.A. realized for the first time with certainty that it had been the victim of collusion between T-Mobile and Solorz. To be sure, Elektrim and Vivendi S.A. had not always agreed on all issues relating to the Joint Venture Agreement, but until that point, there had been no clear evidence that T-Mobile and Solorz had been conspiring against Vivendi S.A. and that Elektrim had become a corrupted enterprise.

64.    On December 30, 2004, at Vivendi S.A.'s direction, Telco obtained an injunction from a different chamber of the Warsaw Regional Court, restraining PTC from making changes to its share registry, including changing the Telco-owned PTC Shares to Elektrim's name.

65.    Despite repeated motions by Telco, opposed by both T-Mobile and Elektrim, the Warsaw Regional Court (in a decision that was later reversed) did not permit Telco to participate as a party in the truncated partial recognition proceeding. Upon information and belief, Solorz

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2   exercised undue influence over the Warsaw Regional Court.

3       66.    On February 2, 2005, the Warsaw Regional Court granted Elektrim's and T-

4   Mobile's petition and, having expressly denied Telco's right to be heard, recognized only that

5   part of the Second Vienna Award that had ruled that the transfer of PTC stock from Elektrim to

6   Telco was ineffective.  Thus, at Defendants' behest, without affording Vivendi S.A. (through

7   Telco) any hearing, and for presently unknown reasons, a Polish court issued an opinion that

8   Defendants misused to illegally strip Telco (and thus Vivendi S.A.) of its $2.5 billion investment

9   in the PTC Shares without any compensation.  (As discussed below, this decision was overturned

10  by the Polish Supreme Court on January 18, 2007, because of irregularities in the proceedings

11  and the lack of the required legal analysis for allowing the recognition of such a decision in

12

13  Poland.)

14

15          **4.      Elektrim Seizes Control of the PTC Shares in 2005 in Defiance of an
                     Injunction, with the Assistance of T-Mobile.**
16

17      67.    As noted above, the decision in the truncated partial recognition proceeding did

18  not, and could not, compel Telco to transfer the PTC Shares to Elektrim.  Moreover, the

19  December 30, 2004 injunction precluded PTC from making any change in its share registry.

20  Thus, Vivendi S.A.'s $2.5 billion investment should not have been subject to seizure.

21      68.    Although Telco was under no legal obligation to return the PTC Shares to

22  Elektrim, Telco made a good faith offer to Elektrim to retransfer the shares for fair

23  compensation.  However, Elektrim (under Solorz's control) rejected this offer, claiming that

24  Telco had no right to compensation, and thus did not recover ownership of the PTC Shares

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2 within the two-month period referenced in the truncated partial recognition proceeding award.

3      69.    On February 22, 2005, the Polish Public Prosecutor joined Telco in appealing the

4 February 2, 2005 decision of the Warsaw Regional Court that partially recognized the Second

5 Vienna Arbitration Award, thereby suspending the effects of the recognition decision (and the

6 effects of the Second Vienna Arbitration Award in Poland). As discussed below, this appeal

7 later proved successful before the Polish Supreme Court.

8

9      70.    In or around January 2005, T-Mobile and Elektrim (under Solorz's direction)

10 created its own sham, illegitimate Supervisory Board of PTC and purported to appoint new

11 members of the Management Board and to revoke Telco's and Vivendi S.A.'s appointees. On

12 February 23, 2005, the new "Management Board" drew up a false and inaccurate shareholder list

13 not reflecting the actual PTC share register. The inaccurate list made it appear that Elektrim, not

14 Telco, owned the PTC Shares. Defendants did this notwithstanding that Telco was still the legal

15 shareholder of the PTC Shares. Defendants had no legal right to assume *de facto* control of PTC

16 or to draw up a fictitious list of shareholders, and such actions violated the December 30, 2004

17 injunction and constituted illegal conversion of the PTC Shares that lawfully belonged to Telco

18 (and thus to Vivendi S.A.).

19

20      71.    Elektrim (under Solorz's direction) and T-Mobile jointly, through the sham PTC

21 Management Board, filed a request (using the false shareholder list referenced above) with the

22 Regional Court to change the government's official share register, the KRS without disclosing

23 that Vivendi S.A. was challenging the Second Vienna Award. On February 24, 2005, a Regional

24 Court judge, without affording Vivendi or Telco a hearing, ordered that the KRS be changed in

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

Elektrim's favor, notwithstanding the outstanding injunction and the fact that the recognition decision had been appealed and was therefore not effective and not final.  (In a subsequent interview with a Polish official investigating the judge's improper conduct, the judge acknowledged that the sham PTC Management Board made up of Elektrim's appointees had misled him and caused him to believe that it was a legitimate Management Board and that their fictitious list of shareholders correctly reflected the shareholders as entered in the PTC share register.)

72.    Purposefully relying on this improper and unfounded ex parte ruling, Elektrim (under Solorz's control) and T-Mobile jointly seized control of PTC on or about March 4, 2005, using brute force to physically remove and then bar Telco and Vivendi S.A. representatives from PTC's premises.  Elektrim (under Solorz's control) also took control of PTC's bank accounts.

73.    On or about March 7, 2005, Telco filed a criminal report regarding the takeover. On the same day, Vivendi S.A. filed a Notice of Dispute pursuant to the treaty between the French Republic and the Republic of Poland on reciprocal encouragement and protection of investments.  However, these actions had no deterrent effect on Defendants and the Polish authorities have done nothing to return control of PTC to Telco and Vivendi S.A.

**5.    Solorz Strips Elektrim's Assets, and Elektrim's Bondholders Respond By Filing a Bankruptcy Petition Against Elektrim.**

74.    Starting in February 2005 and continuing through June 2006, Everest, located in Miami, Florida, purchased for both itself and for its clients (including GM) Elektrim Finance 2% bonds due 12/15/2005 and issued by Elektrim Finance BV, an affiliate of Elektrim (the

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    "Bonds").  Elektrim guaranteed the Bonds.

3    75.    Everest purchased the bonds for GM in reliance on representations by Elektrim

4    that it owned substantial assets, including (a) shares of PTC now worth more than $3 billion, (b)

5    shares in Zespół Elektrowni Pątnów-Adamów-Konin S.A. (hereinafter "ZE PAK") (one of

6    Poland's leading power generation companies), (c) shares in Port Praski sp. z o.o., a company

7    which owns a significant real estate asset known as Port Praski, and (d) a controlling stake in

8

9    Rafako, a company producing energy plant equipment.

10    76.    Everest also relied on a Restructuring Agreement that Elektrim had entered into

11    with holders of the Bonds (the "Bondholders") in October 2002.  In return for Bondholders'

12    agreement to extend the Bonds' repayment date and to lower their interest rate, the Restructuring

13    Agreement requires Elektrim to pay the Bondholders 25% of the net asset value of Elektrim in

14    excess of 160 million Euros  -- the Equity Kicker.

15

16    77.    Shortly after Elektrim entered into the Restructuring Agreement, however, Solorz

17    began stripping assets (including ZE PAK, Port Praski, and Rafako) from Elektrim, thereby

18    undermining the value of the Equity Kicker.  The asset-stripping, which also included the illegal

19    transfer of the PTC Shares to T-Mobile, was an integral part of Defendants' scheme -- decreasing

20    or eliminating any Equity Kicker payment and creating a judgment-proof entity, allowing Solorz

21    to enrich himself through the T-Mobile Global Wireless Network Enterprise without fear of

22    being held accountable.

23

24    78.    On March 3, 2005, after Elektrim Finance BV failed to make required principal

25    and interest payments, the Law Debenture Trust Corporation ("LDTC"), the Trustee for the

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

Bonds, filed a petition in Polish court to (a) put Elektrim, the guarantor of the Bonds, into bankruptcy, (b) stop the asset-stripping, (c) recover the assets that had been fraudulently transferred from Elektrim, and (d) liquidate Elektrim and use its assets to repay the Bondholders and enable them to recover the Equity Kicker's full value.

79.    The bankruptcy petition posed a major obstacle to Defendants' plan to transfer the PTC Shares to T-Mobile for below-fair-market value and to facilitate Solorz's stripping of Elektrim's other assets because the bankruptcy would stop fraudulent transfers below market value.  Indeed, the bankruptcy would likely result in Elektrim's liquidation, the recovery of fraudulently transferred assets for the Bondholders' benefit, and either the distribution of Elektrim's assets to Elektrim's creditors or their sale by a court-supervised auction that would have maximized the cash proceeds and the value of the bondholders' Equity Kicker.  Thus, a bankruptcy most certainly would have prevented the illegal PTC Shares transfer to T-Mobile and stopped Defendants in their tracks.

### 6.    Vivendi Was Excluded From The Third Vienna Arbitration.

80.    In an effort to provide a patina of legitimacy for the illegal transfer of the PTC Shares to T-Mobile before the liquidation of Elektrim by the bankruptcy court and before judicial rulings that Telco was the actual owner of the PTC shares, T-Mobile initiated on May 3, 2005 a third arbitration in Vienna against Elektrim (the "Third Vienna Arbitration").  In that proceeding, DT sought a formal, declaratory judgment that the Shareholders Agreement entitled T-Mobile to exercise the call option on the PTC Shares at a price far below market value, *i.e.*, the right to

CV6-1452-JLR
THIRD AMENDED COMPLAINT - 35

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

purchase an asset worth more than $3 billion at a fraction of its value.

81.    The Third Vienna Arbitration was in part a set-up, since T-Mobile and Elektrim, upon information and belief, had secretly agreed to transfer the PTC Shares to T-Mobile in return for at least their book value, which was only a fraction of their true value. In fact, T-Mobile and Solorz had previously agreed that, if the arbitration panel ruled that the call option had been validly exercised, then the call option would be retroactively deemed exercised as of February 15, 2005 in order to avoid the fraudulent-conveyance period applicable to Elektrim's bankruptcy. Elektrim was willing to transfer the PTC Shares at less than fair value because Vivendi S.A. had previously paid Elektrim the full market value for the same shares.

82.    On June 6, 2006, at the joint request of T-Mobile and Elektrim, the Third Vienna Arbitration panel issued its First Partial Award, ruling that T-Mobile had lawfully exercised its call option on February 15, 2005 and that T-Mobile "*will* acquire the shares that Elektrim owned in PTC and *will* be their owner." (Emphasis added.) (The arbitration panel did not rule on the number of shares subject to the call option.) Significantly, the First Partial Award *did not authorize or permit Elektrim to transfer the PTC shares to T-Mobile.* Rather, the Third Vienna Arbitration panel *explicitly* stated that the transfer could occur only *in the future, after* the panel resolved additional issues. The panel stated that "the Arbitral Panel expects the Parties to file the necessary documentation and to expose the issues relating to the mechanism of transfer of ownership . . . *in preparation for the next substantive award* in the present arbitral proceeding." (Emphasis added.) In particular, the First Partial Award provided that "it is important to state in the Operative Part of the present award that as a matter of principle the full transfer of ownership

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

of the shares to DT *will* occur only when the price of those shares is paid to Respondent" and that the price of the shares "*would* be left to a subsequent award" and would be "established by the Arbitral Tribunal."  (Emphasis added.)  As is clear, the highlighted words from the First Partial Award showed that *no* transfer of title could occur until a subsequent decision by an arbitral panel explicitly authorized it.

83.    The June 6, 2006 First Partial Award was not public.

### 7.    During the Third Vienna Arbitration, Defendants Again Engaged in Wire Fraud to Deceive Vivendi S.A.

84.    During the course of the Third Vienna Arbitration, in December 2005, Defendants approached Vivendi S.A. purporting to seek a settlement and an agreement through which Vivendi S.A. could recoup much of its investment and T-Mobile could increase its shareholdings in PTC.  Despite its misgivings, Vivendi S.A. participated in the negotiations because DT's Chairman and Chief Executive Officer had initiated the talks, was personally involved, and had assured Vivendi S.A.'s Chairman and Chief Executive Officer of Defendants' good faith.  In fact, however, as set forth below, Defendants were engaged in a ruse designed to gain time for the Third Vienna Arbitration to issue a decision in the sham proceeding and to otherwise fraudulently mislead Vivendi S.A. during a critical time period.

85.    On March 7, 2006, Kai-Uwe Ricke and Dr. Karl Gerhard Eick, DT's then Chief Executive Officer and Deputy Chief Executive Officer, respectively, spoke over U.S. wires to Jean-Bernard Levy, Vivendi S.A.'s Chief Executive Officer, while Mr. Levy was in the United States.  During this conversation, the T-Mobile executives made false and misleading statements

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2 about T-Mobile's relationship with Solorz and Elektrim in an attempt to disguise the T-Mobile

3 Global Wireless Network Enterprise.  In particular, Messrs. Ricke and Eick assured Mr. Levy

4 that T-Mobile had not agreed that PTC would provide Solorz (through PTC) with an agreement

5 known as a Mobile Virtual Network Operator Agreement ("MVNO") – an agreement that would

6 allow one of Solorz's companies to compete with PTC by using PTC's cellular network for its

7 own customers.  On information and belief, Messrs. Ricke and Eick did not tell the truth to Mr.

8 Levy because three months later, on June 8, 2006, PTC's Supervisory Board (which included

9 four T-Mobile representatives) approved granting Solorz's company an MVNO, thus

10 perpetuating and enforcing the structure of the T-Mobile Global Wireless Network Enterprise.

11 T-Mobile's deception and bad faith negotiations materially contributed to Defendants'

12 conspiracy.

13

14 86.    The negotiations proceeded, and an agreement was reached.  On March 25, 2006,

15 representatives of Vivendi S.A. and Defendants traveled to Poland to finalize in writing the terms

16 on which they had previously agreed.

17

18 87.    On the morning of March 29, 2006, Defendants and Vivendi S.A. met in the

19 offices of Vivendi S.A.'s lawyer to resolve the few minor remaining issues and to sign the

20 settlement agreement.  The parties knew that the Polish Court of Appeal would decide that

21 afternoon whether to uphold the lower court's truncated partial recognition of the Second Vienna

22 Award.

23

24 88.    At approximately 1:00 p.m. on March 29, 2006, it was proposed to Vivendi S.A.

25 that the parties make a joint application to stay the Court of Appeal's proceedings to ensure that

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

any decision did not interfere with the implementation of the agreed-upon settlement.  However, T-Mobile's chief legal counsel and Elektrim's principal counsel both asserted that it was unnecessary because an agreement had been reached and T-Mobile and Elektrim were bound regardless of the Court of Appeal's decision.  In fact, however, Defendants had no intention of honoring the agreement in the event they received a favorable Court of Appeal decision.  T-Mobile's communications during the 2006 settlement negotiations were made in bad faith and were fraudulent.

89.    One or two hours before the settlement was to be signed, the parties learned that the Court of Appeal had upheld the lower court's truncated partial recognition decision.  Despite the months of communications asserting its good faith and its clear statements that very day, T-Mobile asserted that it was withdrawing its agreement and backing out of the deal.

90.    Vivendi S.A. reasonably relied on these false and misleading communications and did not take steps that it could have taken to better protect its $2.5 billion investment in PTC against T-Mobile's misconduct.  Among other things, because of T-Mobile's deception, Vivendi S.A. did not move to suspend the Court of Appeal's decision.

**C.    Phase II**

        **1.    Elektrim Illegally Transfers Title to the PTC Shares to T-Mobile, and T-Mobile Begins Exercising Full Control over PTC, Contrary to the Holding of the Third Vienna Arbitration Panel and in Defiance of Numerous Injunctions.**

91.    At the time that the Third Vienna Arbitration panel issued its First Partial Award, Elektrim was subject to an Order of the London Court of International Arbitration ("LCIA") issued on April 28, 2005 and then extended on September 9,

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

2005, that enjoined Elektrim from "voluntarily seeking to sell, agree to sell, transfer, encumber, or otherwise dispose of or create any interest in the PTC shares."  In addition, Elektrim was subject to an injunction issued on November 23, 2005 by the Commercial Court of Warsaw in the bankruptcy proceeding to secure all PTC shares held by Elektrim.

92.    Faced with these injunctions and Defendants' failure to obtain an arbitral award authorizing an immediate transfer of the title and full ownership rights relating to the PTC Shares, and faced with the looming prospect that the bankruptcy court would either liquidate Elektrim and auction the PTC Shares for their fair market value, or that Vivendi S.A. (through its affiliate Telco) would recover the PTC Shares that rightfully belonged to it, Defendants simply ignored the injunctions, proceeded with their scheme to illegally transfer the PTC Shares from Elektrim to T-Mobile, and then misled the Bondholders' into withdrawing the bankruptcy petition without informing either Everest, GM, or the bankruptcy court of the full circumstances and consequences of that action.

93.    On June 27, 2006, the Warsaw District Court issued an order attaching Elektrim's PTC shares as security for Vivendi S.A.'s claims in the LCIA and prohibiting Elektrim from transferring any of its assets.  In particular, the Court granted "interim relief to secure the claim pursued by Vivendi . . . by attaching . . . shares possessed by Elektrim in PTC, National Court Register [NCR] registration number 0000029159."

94.    On July 18, 2006, the Bailiff Court of the District Court of Poland issued an order attaching Elektrim's property rights in the PTC Shares.

95.    On August 2, 2006, the LCIA ordered further interim relief, confirming its

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2  original injunction and enjoining Elektrim from transferring the disputed PTC shares.  The LCIA

3  noted that "the dispute [between Vivendi and Elektrim] regarding title to the PTC shares has not

4  yet been entirely resolved" and recognized the real "risk of impending injury and irreparable

5  harm" to Vivendi if such a transfer took place.  The LCIA reiterated that "it is the Arbitral

6  Tribunal's duty to ensure that Elektrim does not appropriate the PTC shares without

7

8  consideration in breach of the TIA [the Third Investment Agreement] between Elektrim and

9  Vivendi."

10      96.     On August 28, 2006, in violation of outstanding injunctions and the order of the

11  LCIA, Elektrim transferred the PTC Shares in its possession to T-Mobile.  PTC's sham

12  Management Board (at the direction of DT and Elektrim) secretly created a "Shareholders List"

13  for PTC showing that Elektrim had transferred the PTC shares to T-Mobile and that T-Mobile

14  held title to the PTC Shares without even obtaining consideration from DT for the PTC Shares.

15

16      97.     After the secret and illegal transfer of the PTC Shares from Elektrim to T-Mobile

17  on August 28, 2006, under Polish law, PTC was required to file for re-registration of the shares

18  in the KRS public court registry within seven days.  At the direction of Elektrim (under Solorz's

19  control) and T-Mobile, PTC did not do so.  Upon information and belief, Defendants were

20  concerned that such action might result in disclosure that the stock transfer had been in violation

21  of the First Partial Award of the Third Vienna Arbitration panel, various applicable injunctions,

22  and orders of the bankruptcy court.

23

24      98.     On September 5, 2006, T-Mobile illegally asserted full ownership rights over the

25  PTC Shares and appointed two new members of PTC's Supervisory Board.  Among the new

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

members was Thomas Winkler, who upon information and belief conducted business in the United States at T-Mobile USA's Seattle, Washington headquarters to, among other things, integrate both T-Mobile USA and PTC into the same global wireless network. Indeed, Mr. Winkler resigned as CFO of T-Mobile International in January 2007 amid praise of his integration of T-Mobile USA. This is the same Thomas Winkler who fraudulently used the U.S. wires in August 2004 as part of the conspiracy to transfer the PTC Shares back to Elektrim.

99. On September 18, 2006, Elektrim (under Solorz's control) caused Elektrim's attorney, Professor Soltysinski, to telephone Robert de Metz of Vivendi S.A. and cause an email to be sent to de Metz in the United States that misleadingly represented that Solorz and T-Mobile had an interest in settling the matter and implying that the PTC Shares had not yet been transferred to T-Mobile.

100. The next day, while in the United States, Mr. de Metz returned the call. During that call, Prof. Soltysinski made intentionally misleading statements regarding both his and T-Mobile's intentions.

**2. Defendants Use the U.S. Wires to Disseminate False and Misleading Press Releases With the Intent and Effect of Harming U.S. Bondholders.**

101. On September 5, 2006, DT, acting in collusion with Elektrim, issued a materially misleading press release which was carried over U.S. wires upon which Everest relied. In the release, DT represented that T-Mobile had *lawfully* acquired PTC and was exercising control over it *pursuant to an award of the Vienna arbitration panel* (which award was not public and which neither Vivendi, Everest, nor GM had seen), when, in fact, DT and Elektrim were acting

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

in a manner that *contradicted* the award rendered by the panel at that time. The First Partial Award expressly stated title could *not* be transferred until subsequent future decisions were made regarding the quantity of the shares to which the call option applied and the value of those shares.

102.    Upon information and belief, the press release was intended to falsely convey to Everest and the U.S. Bondholders that T-Mobile lawfully owned the PTC Shares. As a result, Defendants hoped and expected, upon information and belief, that Everest and GM would regard a forthcoming offer from T-Mobile and Elektrim to be the best chance for repayment of the Bonds and thus support withdraw of the Bondholders' bankruptcy petition despite a below-market-value payment by T-Mobile for the PTC Shares and failure to obtain any, much less the fair value of the Equity Kicker (since a large part of the upside is dependent on maximizing the value of the PTC Shares).

103.    T-Mobile's misleading press release was also intended to mislead Vivendi S.A. (who also did not have a copy of the June 6, 2006 arbitration decision) into believing that it had lost its fight for PTC thus hoping to cause Vivendi S.A. to accept a low settlement offer from Elektrim in September 2006.

104.    At approximately the same time, T-Mobile and Elektrim jointly requested the Third Vienna Arbitration panel to accelerate the proceeding in order to obtain an award before the October 4, bankruptcy hearing in order to attempt a *post-facto* justification of the August 28 illegal transfer. Significantly, neither T-Mobile nor Elektrim disclosed to the panel that Elektrim already had transferred the PTC Shares to T-Mobile.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2          105.    On October 2, 2006, the Third Vienna Arbitration panel issued its Second Partial

3    Award.  While the panel recognized that T-Mobile had properly exercised the call option (but

4    noticeably reserved its opinion as to whether Elektrim was the owner of the shares) and that the

5    price for the shares would  have to be higher than PTC's net asset value (but below fair-market

6    value because of a penalty), the panel did *not* authorize the transfer of the PTC Shares from

7    Elektrim to T-Mobile before payment.  The Second Partial Award noted that T-Mobile

8    "acknowledges that both as a matter of fact and company law, full transfer of ownership of the

9    PTC Option Shares will require further steps," including, but not limited to, payment for the

10   stock and determination of the number of shares to which the call option applied.   Regarding the

11   payment of the price and the conditions for transfer, the panel stated as follows in the Second

12   Partial Award:

13   
14        [I]t is *not* possible to conclude that a share purchase agreement has been validly concluded
          on 15 February 2005 with the effect of transferring the full legal title to the Option
15        Shares.  Rather the exercise by Claimant of the call option under Article 16(1) of the
          Shareholders Agreement should be deemed the fulfillment of a necessary legal
16        requirement to bring about the transfer of the shares *once* the determination of their
          precise number and of their price *will* have been undertaken in the present arbitral
17        proceeding. . . .  *In sum, the exercise of the call option was a necessary but not a
          sufficient step in the conclusion of the share transfer agreement.  The payment of the
18        price, although it had been foreseen to occur 30 days after the formal transfer, is
          indispensable for the transfer to take place.*  [Emphasis added.]

19
20        106.    With respect to the number of shares covered by the call option, the Second

21   
22   Partial award stated as follows:

23
24        Claimant [DT] has appropriately declared that the present title to the Shares is uncertain,
          and was uncertain at this time of the exercise of the call option.  It points out that "it
25        remains unclear whether DT has acquired 226,080 PTC shares (i.e., over 48 percent of
          the PTC shares), on the one hand, or only a single PTC share, on the other."

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

107.    The Second Partial Award also included, pursuant to an agreement between T-Mobile and Elektrim, a provision adopting the parties' proposal that would deem the transfer, once accomplished in accordance with Award, to have retroactive effect in an effort to escape the claw-back provisions of the Polish bankruptcy laws and to escape the reach of injunctions that Vivendi has secured in Polish court protecting its rights.

108.    Upon information and belief, before the Second Partial Award, Solorz, T-Mobile, and Elektrim collaborated, through the T-Mobile Global Wireless Network Enterprise, on a plan whereby they would pay the Bondholders' trustee a portion of the proceeds of the illegal transfer of the PTC Shares, mislead Everest and GM as to the transaction's legality, and fraudulently induce Everest and GM into supporting withdrawal of the Bondholders' bankruptcy petition in return for tainted funds from an illegal transaction.

109.    On October 4, 2006, while colluding with Solorz, T-Mobile issued another deceptive statement to the press, which upon information and belief, T-Mobile knew would be carried on U.S. wires and would mislead Everest and GM.  The press release stated:

> In yet another award of October 2, 2006, the Arbitral Tribunal in Vienna conferred the ownership title to the disputable 48% of the shares in PTC to Deutsche Telecom [sic] (with effect as of February 15, 2005), which remains in concord with the joint stand of Elektrim S.A. and Deutsche Telecom presented to date.  For this reason Deutsche Telekom has paid an amount of more than EUR 600 million, which surely covers the current book value of the shares in PTC. [Emphasis added.]

110.    In addition to its deception, this release was noteworthy because it publicly acknowledged that Defendants had a "common position" to hand over ownership of Telco's (and Vivendi S.A.'s) PTC Shares to T-Mobile for a fraction of its worth with retroactive effect,

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

confirming the previously existing collusion between Elektrim and T-Mobile.

111.    The substance of this release was carried on U.S. wires, which Everest relied upon in concluding that the transaction between Elektrim and T-Mobile was authorized by the Vienna Arbitration Panel when in fact it was not.  The Second Partial Award had not "conferred ownership title" of the PTC Shares on T-Mobile.  Nor had DT paid for the PTC Shares at that time.  Nor had the PTC Shares been properly registered.

112.    On October 4, 2006, the Polish bankruptcy court held a hearing to determine whether to liquidate Elektrim.  At the hearing, Elektrim's lawyer asked for an adjournment to study what it called new evidence.  In fact, upon information and belief, Elektrim wanted more time so that it could continue to implement Defendants' illegal plan.  At the hearing, neither Elektrim's attorneys nor T-Mobile's attorneys disclosed to the court that the PTC Shares had already been transferred to T-Mobile without any compensation having been paid to Elektrim.  Indeed, in its written submission to the court filed on September 28, 2006, Elektrim had affirmatively misrepresented that it still had possession of the PTC Shares.  Thus, Defendants misrepresented the fact most critical to the bankruptcy court, Elektrim's net value, leading the bankruptcy court to believe that Elektrim had a positive net asset value when, in truth, that value was negative.

113.    On October 23, 2006, in response to Elektrim's request that the LCIA modify its prior order and allow Elektrim to pay the Bondholders the proceeds from Elektrim's transfer of the PTC Shares to T-Mobile, the LCIA ruled that it was for a Polish court to decide whether such a payment could be lawfully made.  Accordingly, the LCIA modified its prior order so as not to

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    stand in the way of a Polish court.

3

4            **3.**      **Defendants' Misconduct Fraudulently Induces U.S. Bondholders to Support Withdrawal of Bankruptcy Petition Against Elektrim.**

5         114.    On or about October 26, 2006 -- pursuant to an arrangement between Defendants,

6    Elektrim, and LDTC -- DT paid €643 million to Elektrim, of which €525 million went to LDTC

7    (as Bondholder trustee) and €118 million went to Elektrim in violation of the LCIA order which

8    required it to be put in escrow.  Upon information and belief, a portion of T-Mobile's payment

9

10   also went to Solorz.

11        115.    On October 27, 2006, with Defendants having misled Everest and the U.S.

12   Bondholders, LDTC withdrew the bankruptcy petition, irreparably damaging Vivendi Holding

13   by forever precluding them from maximizing the Equity Kicker's value.

14

15        116.    Faced with Vivendi S.A.'s notification to LDTC regarding the illegality of both

16   the PTC Shares transfer and LDTC's acceptance of such transfer's proceeds, LDTC did not

17   immediately distribute the funds but instead, seeking to insulate itself from liability, filed an

18   action in the English High Court against two cooperating Bondholders that sought permission to

19   distribute the funds.

20        117.    On May 1, 2007, the English High Court – without knowing all the facts, without

21   understanding the importance of the Equity Kicker, and without having given Vivendi S.A. any

22   prior opportunity to be heard – held that, although Vivendi S.A. might have a claim against

23   Elektrim, Vivendi S.A. did not have a "proprietary" claim to the money that T-Mobile (either

24   directly or through Elektrim) paid to LDTC as Bondholder trustee.  This conclusion reflected the

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

position unanimously taken by the parties to the proceeding -- LDTC and the two Bondholders, who shared an interest in denying Vivendi S.A.'s rights -- and which was uncontested because of the absence of Vivendi S.A. from the proceeding. This proceeding, among other things, was an end-run around the LCIA proceeding, which has at its heart this precise issue in a true adversarial setting. Furthermore, while LDTC remarkably acknowledged to the court that its own attorneys were unwilling to advise LDTC that it could lawfully distribute the money it had received, LDTC did not disclose to the Court the substance of its attorneys' reticence, nor LDTC's failure to exercise due care for the interests of the U.S. Bondholders who were seeking to realize the Equity Kicker's fair value.

118.    If Everest had known (i) that  Elektrim had in fact transferred the PTC Shares to T-Mobile in August 2006 in violation of the First Partial Award of the Third Vienna Arbitration, (ii) that T-Mobile had failed to register the shares on the KRS as required by Polish law, and (iii) that T-Mobile's press releases of September 5, 2007 and October 4, 2007 were false, Everest would have blown the whistle on the withdrawal of the bankruptcy petition.

### 4.    Defendants Complete Their Illegal Takeover of the PTC Shares in Defiance of Decisions of the Supreme Courts of Poland and Austria.

119.    On November 2, 2006 – almost two months beyond Polish law requirements for disclosure and after the Bondholders' bankruptcy petition had been withdrawn – PTC filed an application with the KRS to change the KRS ownership for the PTC Shares to T-Mobile.

120.    Beginning at least as of November 2006, T-Mobile began to publicly report PTC's earnings and assets as part of T-Mobile's consolidated financial asset base, which compounded

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2   Defendants' repeated (and continuing) acts of wire fraud, and facilitated T-Mobile's use of that

3   inflated asset base to put T-Mobile in a stronger position to accomplish the U.S. Spectrum

4   Acquisition and, upon information and belief, used the false reports to leverage and raise capital

5   to support commercial and banking transactions in U.S. commerce.

6

7          121.    On December 18, 2006, the Austrian Supreme Court, the highest judicial body

8   with jurisdiction over the location of the seat of the Second Vienna Arbitration, conclusively

9   reaffirmed that Telco was not a party to the Second Vienna Arbitration, and that the Second

10  Vienna Award could not, in any event, compel Telco to give up its ownership of the PTC Shares.

11         122.    On January 18, 2007, the Polish Supreme Court handed down a decision vacating

12  the partial recognition of the Second Vienna Award in Poland (the "Polish Supreme Court

13  Decision").  The Polish Supreme Court Decision vacated all previous decisions by Polish lower

14  courts that had relied on the Second Vienna Award.  This means that there is no valid Polish

15  judgment that can be used as a pretext for denying Telco's ownership rights in the PTC Shares.

16  However, T-Mobile has not relinquished control over the PTC Shares or PTC.

17

18         123.    On January 23, 2007,  Vivendi S.A.'s Deputy General Counsel in New York City

19  transmitted a formal written demand on T-Mobile demanding that it (a) discontinue its

20  unjustified interference with PTC's legitimate management, (b) discontinue its illegal occupation

21  of PTC's premises, and (c) otherwise cease its racketeering.  The letter added that each day of

22  delay in taking these actions causes irreparable injury to Vivendi S.A. and millions of users of

23  the T-Mobile network in the United States.  The letter also noted that "[g]iven the definitive and

24

25  unambiguous statements of both the Polish and Austrian Supreme Courts, DT's [Deutsche

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

Telekom's] interpretation of the decision as set forth in The Wall Street Journal – that the decision has no impact on the ownership of PTC – is intentionally false and misleading."

124.    On January 26, 2007, T-Mobile responded by denying the clear meaning and legal effect of the Polish Supreme Court Decision, which vacated all prior Polish court decisions, and, instead, speculated without foundation that "the [Second Vienna Arbitration] Award "will again be recognized in Poland."  However, even if the Second Vienna Arbitration Award were to be fully recognized in Poland, it would have no legal effect on Telco's rights to the PTC Shares.  T-Mobile refused to return control of PTC to Vivendi S.A. and continues to maintain control of PTC through use of lawless force.

125.    On January 28, 2007, T-Mobile used the U.S. wires to issue misleading press releases in furtherance of DT's continuing illegal operation of the corrupt T-Mobile Global Wireless Network Enterprise.  The press releases attributed an increase in the number of T-Mobile customers, in part, to "the PTC consolidation in Poland."  The press releases stated that DT incorporated PTC's assets and revenues into consolidated financial statements even though T-Mobile did not lawfully own PTC.  The press releases omitted the material information that Elektrim's transfer of the PTC Shares (under Solorz' control) was contrary to the ruling of the Third Vienna Arbitration.

126.    On May 29, 2007, Everest, for itself and on behalf of GM, assigned and sold to Vivendi Holding for valuable consideration all of the Bonds held by Everest (including GM's Bonds), including all current and potential causes of action and claims in law and equity relating to the Bonds.  Under the Assignment and Acceptance Agreement, Vivendi Holding has the same

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    rights and privileges as held by the Bondholders before the closing.

3        127.    On June 1, 2007, National Financial Services LLC certified that "as of May 31,

4    2007, Vivendi Holding I Corp. is a current owner of ELEKTRIM FINANCE BV 38300000 BD

5    REG S 2.000% 12/15/2005, ISINX0099212069" and that the "shares are held in the name of

6

7    National Financial Services LLC at the Euroclear depository."

8        128.    On June 4, 2007, Vivendi Holding sought to attend a meeting of the Bondholders

9    in London, but LDTC forbade Vivendi Holding from attending the meeting even though Vivendi

10   Holding presented certification that it was a proper Bondholder.  LDTC asserted that Vivendi

11   Holding had not provided timely notice of its attendance and thus was not qualified to vote.

12   Vivendi Holding then sought to attend without voting, but LDTC again blocked Vivendi Holding

13   from doing so.

14

15       **D.      Summary of Facts**

16       129.    As explained in this Third Amended Complaint, Defendants engaged in a

17   massive, multi-year racketeering conspiracy whereby Defendants (i) violated RICO sections

18   1962(b) and (d) by secretly and illegally seizing PTC, which allowed Solorz to illegally enrich

19   himself at the expense of Vivendi S.A. and GM, and in defiance of the Supreme Courts of

20

21   Poland and Austria, and (ii) violated RICO sections 1962(c) and (d) by corruptly operating two

22   enterprises — the T-Mobile Global Wireless Network Enterprise and Elektrim.

23       130.    With respect to Solorz and Elektrim, the hallmark of their post-2003 misconduct

24   is that Solorz operated Elektrim in a manner that went against Elektrim's own, objective self-

25   interest and against the interests of Elektrim's bondholders – a fact

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

that can only be explained by the joint racketeering of Solorz and T-Mobile through the operation of the T-Mobile Global Wireless Network Enterprise.  Simply put, it was not in the self-interest of a non-corrupt Elektrim to: (a) seek a partial recognition of the Second Vienna Award and to exclude Telco from the proceedings; (b) defy and appeal the Vienna Commercial Court's annulment of the aspects of the Second Vienna Award that Elektrim had lost, (c) strip itself of valuable assets; (d) breach its obligations to Vivendi S.A. under the Joint Venture Agreement; (e) violate Polish court orders and injunctions; (f) violate arbitral rulings in the London Arbitration; (g) expedite the implementation of the call option at book value; (h) mislead the Bondholders; and (h) defy the Polish Supreme Court.

131.    Vivendi S.A. does not currently know all the inducements T-Mobile provided to Solorz as part of the operation of the T-Mobile Global Wireless Network Enterprise.  However, as mentioned above, T-Mobile recently caused PTC to grant to one of Solorz's companies an incredibly valuable benefit – the MVNO.  The MVNO demonstrates the continuing nature and structure of the T-Mobile Global Wireless Network Enterprise.  Also, as a result of the unlawful scheme to defraud Vivendi S.A., Elektrim was paid twice for the PTC Shares and, upon information and belief, some of this money found its way to Solorz.

132.    After a three-year conspiracy, and notwithstanding the ruling of the Polish Supreme Court, Defendants' racketeering continues (including the on-going operation of the Enterprises to solidify the PTC Shares theft and the asset-stripping).  Defendants have defied the Supreme Courts of two European countries – Austria and Poland – and ignored orders issued by a London arbitration panel.  Notwithstanding these decisions, T-Mobile still possesses the PTC

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2  Shares and controls PTC, and Defendants are still conducting the affairs of the T-Mobile Global

3  Wireless Network Enterprise in a corrupt manner.  The corrupt Elektrim and Solorz still retain

4  the money that Elektrim received for the double payment for the PTC Shares, which Elektrim

5  first sold to Vivendi S.A. and then stole back and resold to T-Mobile.  Even after LDTC releases

6  the funds it is now holding, the U.S. Bondholders have forever lost the ability to obtain fair value

7  for the Equity Kicker because they will never again have the same recapture rights that came

8  with the now-dismissed bankruptcy petition.  This is classic racketeering conduct — including

9  mobster-type physical seizure and expulsion of Telco personnel by a hired security force, as

10  described above.  As a result, Vivendi S.A., the U.S. Bondholders, and U.S. users of the T-

11  Mobile network remain victims of Defendants' racketeering.

12

13      133.    This District is the proper forum for this action because it is the site of the

14  headquarters of T-Mobile USA.  T-Mobile USA's officers and directors, acting on its behalf, are

15  still operating (and participating in) the T-Mobile Global Wireless Network Enterprise.  This

16  District is where conduct integral to the racketeering activity occurred in furtherance of the

17  conspiracy.  T-Mobile USA's operations constitute the most significant generator of revenues for

18  DT, which corrupted T-Mobile USA and operated it to perform illegal acts.  Moreover, having

19  exhausted its efforts elsewhere, Vivendi S.A. brings this action in the United States in a

20  jurisdiction where it can get a fair hearing and enforce a judgment against T-Mobile.  Plaintiffs

21  could not get jurisdiction over T-Mobile USA outside the United States, and Elektrim is now

22  effectively judgment proof as a result of the racketeering, rendering the LCIA proceeding

23  inadequate to address the wrongs that Vivendi S.A. has suffered.

24

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

134.    This is not the only time that T-Mobile has used corruption to take over a central European company.  In the late 1980's T-Mobile engaged in corrupt practices to take over the Czech mobile phone company.  Moreover, DT's auditors refused to certify the 2005 accounts of DT's Hungarian subsidiary as presented by the management because of illegitimate contracts. The CFO of the Hungarian subsidiary, Mr. Hartman, has recently been appointed by T-Mobile as CEO of PTC.

## COUNT I

### RICO Sections 1962(b) and (d)

### (Brought by Vivendi S.A.)

135.    Vivendi S.A. incorporates by reference and realleges the allegations of each and every preceding paragraph.

136.    As set forth above, Defendants engaged in and conspired to engage in a pattern of related and continuous predicate, criminal acts to steal Vivendi S.A.'s interest in PTC and illegally acquire control of PTC in violation of 18 U.S.C. §§1962(b) and (d).

137.    As set forth above, from May through August 2004, during the course of the Second Vienna Arbitration, Solorz caused Elektrim to make misleading and deceptive statements in emails and phone calls to Vivendi S.A. officials and agents in the United States, misleading Vivendi S.A. officials into believing that Elektrim was protecting the interests of its joint venture partner in PTC (Vivendi S.A.) rather than conspiring with T-Mobile to exclude Vivendi S.A. These communications, on which Vivendi S.A. relied, were part of Defendants' scheme to steal the PTC Shares and take over and corrupt PTC, and they constituted wire fraud in violation of 18

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    U.S.C. § 1343.

3        138.    As set forth above, during 2004, T-Mobile used the U.S. wires to give Vivendi

4    S.A. the misleading impression that T-Mobile was engaged in good-faith settlement negotiations

5    with Vivendi, S.A. when that was not the case.

6

7        139.    As set forth above, on March 7, 2006, during the course of the Third Vienna

8    Arbitration, T-Mobile made misleading statements involving U.S. wires as part of its scheme to

9    take over and corrupt PTC.  These communications constituted wire fraud in violation of 18

10    U.S.C. § 1343.

11        140.    As set forth above, on September 5, 2006, and again on October 4, 2006, T-

12    Mobile issued misleading press releases, which upon information and belief, were carried over

13    U.S. wires to the U.S. Bondholders and which misled both Vivendi S.A. and Everest to their

14    detriment.  Indeed, had Everest known that the press releases were false, Everest would have

15    blown the whistle on the withdrawal of the bankruptcy petition, which was the last step in

16    Defendants' unlawful theft of PTC.  This conduct as well as other conduct set forth above

17

18    constituted wire fraud in violation of 18 U.S.C. § 1343.

19        141.    Defendants' racketeering conduct took place in significant part in the United

20    States and has had, and threatens to have, substantial effects on United States commerce.  PTC is

21    Poland's leading mobile telecommunications provider, and millions of U.S. citizens do business

22    with it when making wireless phone calls to Poland on the T-Mobile global network.  The

23    corruption of PTC and the T-Mobile Global Wireless Network Enterprise harms these U.S.

24    citizens (to whom T-Mobile owes a duty of good faith and fair dealing) by depriving them of

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

honest services when making wireless telephone calls to Poland. If Vivendi S.A. had not been stripped of its ownership interest in PTC by Defendants' unlawful conduct, U.S. consumers would not have been injured and the revenues T-Mobile is now receiving would have belonged to Vivendi S.A. Upon information and belief, PTC's roaming rates would have been lower than they currently are but for Defendants' unlawful conduct.

142.    Moreover, as a result of Defendants' racketeering, the U.S. Bondholders, including GM and its assignee Vivendi Holding have lost the Equity Kicker's fair value. But for Defendants' illegal conduct, the U.S. Bondholders would have recovered not only the face value of the bonds and accrued interest, but also an Equity Kicker amount based on the recapture of stripped Elektrim assets, which were of significant value.

143.    Upon information and belief, Mr. Winkler engaged in material conduct in the United States to further Defendants' corrupt scheme by integrating T-Mobile USA with PTC. Indeed, Mr. Winker has been referred to as the "global integrator."

144.    Defendants' pattern of racketeering is likely to continue into the future. As set forth in paragraph 137 above, this is not the first time that T-Mobile has engaged in corrupt practices to take over a central European telephone company.

145.    Defendants' unlawful conduct has caused injury to Vivendi S.A.'s business and property. Among other damages, Vivendi S.A. has (a) lost the fair market value of its investment in PTC (through Telco) which has a fair market value of at least $2.5 billion and (b) lost revenue and profits it otherwise would have earned, including revenue from roaming charges relating to calls to and from the United States.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

146.     Vivendi S.A.'s injury is caused by the same adverse effect of Defendants' unlawful conduct that harms U.S. commerce and consumers.  U.S. consumers are exposed to higher roaming rates than otherwise would be the case, and have been deprived of the honest services they are owed, because Defendants' unlawful conduct has precluded them from doing business with a non-corrupt PTC controlled by Vivendi S.A.

147.     Given T-Mobile USA's presence in the district and the regular involvement of the other T-Mobile Defendants in the affairs of T-Mobile, this is the proper forum for resolution of this dispute.  Both Poland and Germany are also signatories to the Hague convention, thus facilitating efficient discovery.  Moreover, Vivendi S.A. has been unable to enforce awards in all the other fora where litigation has taken place, and T-Mobile is now ignoring decisions from the Supreme Courts of two countries and an arbitral proceeding of a third county.

## **COUNT II**

### **RICO Sections 1962(c) and (d)**

### **(Brought by Plaintiffs Vivendi S.A. and Vivendi Holding)**

148.     Vivendi S.A. and Vivendi Holding incorporate by reference and reallege the allegations of each and every preceding paragraph.

149.     As set forth above, Defendants have illegally conducted the affairs of two separate enterprises – Elektrim and the T-Mobile Global Wireless Network Enterprise -- in violation of 18 U.S.C. §§1962(c) and (d) through a pattern of racketeering activity.  Specifically, Plaintiffs bring their claims under these RICO Act sections against Solorz, for operating Elektrim as a corrupt enterprise, and against all Defendants for operating the T-Mobile Global Wireless

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    Network Enterprise.

3        150.    In conducting the affairs of the applicable Enterprises, Defendants engaged in a

4    pattern of racketeering activity, including wire fraud and use of the U.S. wires in furtherance of

5    the theft of the PTC shares, as detailed above.   In particular, Defendants' wire fraud included

6    without limitation (a) issuing a false press releases on September 5, 2006 and October 4, 2006 as

7    set forth above, (b) communications with Everest (acting on behalf of U.S. Bondholders) that

8    misled Everest into believing that Elektrim's transfer of the PTC Shares to T-Mobile was

9    authorized by the Third Vienna Arbitration panel, and (c) all of the other predicate acts of wire

10    fraud that occurred in 2004-07, including (but not limited to) communications with Everest that

11    were materially misleading because they failed to disclose the stripping of Elektrim's assets and

12    communications with Vivendi S.A. that gave the false impression that T-Mobile was actually

13    negotiating to settle the dispute while in fact it was pursuing its illegal scheme to takeover PTC

14    and reward Solorz.  Through these and other acts, Defendants operated and expanded the T-

15    Mobile global family of companies, as well as the T-Mobile Global Wireless Network

16    Enterprise, through the addition of PTC through a pattern of racketeering activity.

17        151.    Moreover, Defendants' corrupt operation of the T-Mobile Global Wireless

18    Network Enterprise involved acts of wire fraud including, but not limited to, Defendants'

19    fraudulent inclusion of PTC's assets on DT's consolidated balance sheet to, upon information

20    and belief, put T-Mobile in a stronger position to accomplish the U.S. Spectrum Acquisition for

21    the benefit of T-Mobile USA, and to leverage and raise capital to support other commercial and

22    banking transactions in U.S. commerce.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2      152.     Defendants' corrupt operation of the T-Mobile Global Wireless Network

3   Enterprise and Solorz' corrupt operation of Elektrim included acts of wire-fraud including

4   causing a letter from Elektrim Finance BV to be faxed to the lawyer for the U.S. Bondholders'

5   and then forwarded to Everest on July 3, 2006, falsely stating and implying that Elektrim had

6   not, since the execution of the First Supplemental Trust Deed dated 15 November 2002,

7   dissipated or otherwise conveyed its assets including, the inter-company indebtedness between

8
9   Elektrim Finance BV and Elektrim SA under the Trust Deed.  In fact, Everest has now learned

10   that, in addition to stripping other assets, Elektrim SA, apparently sold the PTC Shares to T-

11   Mobile without receiving any consideration less than two weeks before the July 3, 2006 letter

12   was faxed to Everest.

13      153.     Defendants unlawful conduct is likely to continue in the future as the T-Mobile

14
15   Global Wireless Network Enterprise continues to expand.

16      154.     Defendants' unlawful conduct has caused injury to Vivendi S.A.'s business and

17   property.  Among other damages, Vivendi S.A. has (a) lost the fair market value of its

18   investment in PTC (through Telco), which has a fair market value of at least $2.5 billion, and (b)

19   lost revenue and profits it otherwise would have earned, including revenue from roaming charges

20   relating to calls to and from the United States.

21      155.     Vivendi S.A.'s injury is caused by the same adverse effect of Defendants'

22
23   unlawful conduct that harms U.S. commerce and consumers.  United States consumers are

24   exposed to higher roaming rates than otherwise would be the case, and have been deprived of the

25   honest services they are owed, because Defendants' unlawful conduct has precluded them from

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1
2  doing business with a non-corrupt PTC controlled by Vivendi S.A.

3      156.    Vivendi Holding, as the assignee of the claims held by U.S. Bondholders

4  including GM has also suffered substantial injury as a result of Defendants' unlawful conduct.

5  Among other harm, the illegal conspiracy to strip Elektrim's assets greatly injured the ability of

6  Vivendi Holding (as GM's assignee) to recover the full value of the Equity Kicker to which it is

7

8  entitled.

9      157.    Given T-Mobile USA's presence in the district and the regular involvement of the

10  other T-Mobile Defendants in the affairs of T-Mobile, this is the proper forum for resolution of

11  this dispute.  Both Poland and Germany are also signatories to the Hague convention, thus

12  facilitating efficient discovery.  Moreover, Vivendi S.A. has been unable to enforce awards in all

13  the other fora where litigation has taken place, and T-Mobile is now ignoring decisions from the

14  Supreme Courts of two countries and an arbitral proceeding of a third county.

15

16                              **COUNT III**

17                          **(Common Law Fraud)**

18                      **(Brought by Vivendi Holding)**

19      158.    Vivendi Holding incorporates by reference and re-alleges the allegations of each

20  and every preceding paragraph.

21

22      159.    As set forth above, Defendants engaged in a conspiracy to (a) make false

23  statements regarding the legality of Elektrim's transfer of the PTC Shares to T-Mobile, and (b)

24  fraudulently induce Everest (on GM's behalf) to support withdrawal of the Bondholders'

25  bankruptcy petition.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

160.    On January 5, 2005, Solorz stated that Elektrim is the only legal shareholder of PTC.

161.    Starting in February 2005 and continuing through June 2006, Everest purchased, on GM's behalf, bonds of Elektrim Finance BV that were guaranteed by Elektrim.  Everest made these purchases in reasonable reliance on the documents underlying the issuance and restructuring of the Bonds, including Elektrim's obligation of good faith to comply with the Equity Kicker provisions.

162.    Defendants engaged in fraud with respect to the transfer of the PTC Shares to T-Mobile.  On or about October 26, 2006, an agreement was reached whereby T-Mobile, which was then in unlawful possession of the PTC Shares, would pay €525 million to LDTC either directly or through Elektrim, and LDTC would then withdraw the Bondholders' petition for bankruptcy.  The PTC Shares, which are sufficient to convey control over PTC, are worth far more than T-Mobile paid for them.  PTC is the leading wireless company in Poland and has a fair market value in the billions of dollars.

163.    Everest's support for the agreement to withdraw the bankruptcy petition was material to achieving the agreement.  If Everest had blown the whistle and opposed withdrawal of the bankruptcy petition, the bankruptcy court could not have permitted the withdrawal.

164.    Everest reasonably relied upon statements of T-Mobile, which upon information and belief were made in conspiracy with Elektrim (under Solorz's control), that Elektrim's sale of the PTC Shares to T-Mobile was lawful and had been authorized and permitted by the Third Vienna Arbitration panel.  In particular, Everest relied upon T-Mobile's press releases of

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

September 5, 2006 and October 4, 2006, referred to above as reported over the U.S. wires, which falsely stated that the transfer of the PTC Shares from Elektrim to T-Mobile was made pursuant to orders of the Third Vienna Arbitration panel.

165.    All these false statements were made pursuant to a conspiracy between Defendants to mislead the Bondholders so as to facilitate the unlawful transfer of the PTC Shares from Elektrim to T-Mobile.  As long as the bankruptcy proceeding remained pending, the PTC Shares that Elektrim had illegally transferred to T-Mobile could have been recaptured as fraudulent conveyances to the benefit of Vivendi Holding.

166.    Elektrim and the T-Mobile Defendants misled Everest into believing that Elektrim 's transfer of the PTC Shares to T-Mobile that had occurred in August 2006 was authorized by the Third Vienna Arbitration panel, when in fact it was not, and that the September 5, 2006 and October 4, 2006, press releases were true, when in fact they were not.  If Everest had known these facts, it would have disclosed them to the other bondholders and to the bankruptcy court, and it would not have supported the withdrawal of the bankruptcy proceeding.  Upon information and belief, the bankruptcy court would not have permitted the withdrawal of the bankruptcy petition in the face of such an objection by a bondholder.

167.    If Everest and GM had known that the money paid by T-Mobile, either directly or through Elektrim, to LDTC was the fruit of an illegal transaction, Everest, acting for GM, would have blown the whistle and opposed the withdrawal of the Bondholders' bankruptcy petition because of concern about the legality of the underlying transfer of the PTC Shares to T-Mobile that had not been authorized by the Third Vienna Arbitration panel.

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2      168.     Vivendi Holding was harmed by Defendants' fraudulent statements and material

3    omissions.  If the bankruptcy petition had not been withdrawn, Vivendi Holding (as the assignee

4    of GM's claims), would have been in a substantially better position than it is now because it

5    would have been able use the bankruptcy proceeding to recapture fraudulently transferred assets,

6    including the PTC Shares that had been transferred to T-Mobile, the value of which is much

7    greater than the amount that T-Mobile paid to LDTC.  This would have benefited Vivendi

8    Holding (as the assignee of GM), even after all outstanding principal and interest had been paid,

9    because the bondholders were also entitled to the Equity Kicker in which they share in any

10   growth in Elektrim's value.  Moreover, Elektrim would have avoided legal expenses that have

11   devalued the Equity Kicker.

12

13      169.     Defendants also defrauded GM and the other Bondholders by conspiring to strip

14   Elektrim assets and by fraudulently transferring Elektrim assets at below-fair-market value.  In

15   particular, Solorz caused Elektrim to be stripped of its shares in ZE PAK, a 50% State-owned

16   company, by arranging for them to be transferred for little value through an illegitimate

17   transaction to a company he controlled.  In this transaction, Solorz managed to seize for himself

18   an asset worth many times more than his *de facto* purchase price.  Solorz later engaged in similar

19   illegitimate transactions with respect to Port Praski and Rafako, positioning himself to be able to

20   seize Port Praski illegitimately for one of his own companies for a fraction of its value and

21   causing Rafako to incur a huge capital increase, potentially highly dilutive for Elektrim, without

22   any precise purpose.

23

24      170.     Elektrim's transfer of the PTC Shares to T-Mobile at less than fair market value

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2    also constituted a stripping of Elektrim's assets, as did an earlier transaction in which Elektrim

3    purported to transfer PTC shares to Mega, another entity controlled by Solorz.

4
         171.    As a result of Defendants' unlawful conduct, Vivendi Holding, as the assignee of
5
     GM, was deprived of assets that could have been used to pay the full value that Elektrim owed to
6
7    the Bondholders, including the full value of the Equity Kicker.

8                                  **PRAYER FOR RELIEF**

9
         WHEREFORE, Vivendi S.A. and Vivendi Holding pray this Court to grant the following
10
     relief as appropriate:
11

12        a)   Award to Vivendi S.A. and Vivendi Holding, respectively, their actual and
               compensatory damages according to proof at trial;
13
14        b)   Award to Vivendi S.A. and Vivendi Holding, respectively, three times their
               damages in accordance with 18 U.S.C. §1964(c);
15
          c)   Award to Vivendi S.A. and Vivendi Holding, respectively, pre- and post-
16             judgment interest as permitted by law;

17        d)   Award Vivendi S.A. and Vivendi Holding, respectively, their reasonable
               attorneys' fees and costs of suit as allowed by law; and
18
19        e)   Award such other relief as the Court deems appropriate, including return of the
               stolen PTC shares to Telco to the extent permitted by law.

20

21

22

23

24

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353

1

2          DATED this 25th day of June 2007

3                                Respectfully submitted,

4    Of Counsel

5    ORRICK, HERRINGTON &              ROHDE & VAN KAMPEN, PLLC
     SUTCLIFFE, LLP

6

7    /Lanny J. Davis/                  /Robert E. Rohde/
8    Lanny J. Davis                    Robert E. Rohde, WSBA #12809
     Washington Harbour                1001 Fourth Avenue, Suite 4050
9    3050 K Street, Northwest          Seattle, WA  98154-1000
     Washington D.C. 20007-5135        206-386-7353
10   Attorneys for Plaintiff Vivendi S.A. S.A.    Attorneys for Plaintiff Vivendi S.A. S.A.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ROHDE & VAN KAMPEN PLLC
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154-1000
(206) 386-7353