**<u>EXHIBIT 4</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 07-21431-CIV-KING/Garber

VIVENDI HOLDING I CORP., as the assignee
of an Elektrim Bondholder,

   Plaintiff,

**JURY TRIAL DEMANDED**

v.

LAW DEBENTURE TRUST CORPORATION, PLC,
and ELEKTRIM S.A.,

   Defendants.

_____/

## AMENDED COMPLAINT

1. Plaintiff Vivendi Holding I Corp. ("Vivendi Holding") -- as the assignee of claims

held by General Motors Corp. ("GM") relating to bonds issued by Elektrim Finance BV

("Elektrim Finance") and guaranteed by its parent Defendant Elektrim S.A. – brings this action

against Law Debenture Trust Corporation ("LDTC"), the Trustee for the bondholders of Elektrim

Finance (the "Elektrim Bondholders") (i) for breach of its fiduciary duty to GM, (ii) for failure

to exercise due care when withdrawing a bankruptcy petition that the Elektrim Bondholders had

filed against Elektrim S.A. and (iii) for conspiring with Defendant Elektrim S.A. to reduce the

total recovery under the bonds in a manner also designed to defraud other creditors of Elektrim.

## JURISDICTION

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

3. Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(a)(3).

## PARTIES

4. Plaintiff Vivendi Holding is a Delaware corporation with its principal place of

business in New York City. Vivendi Holding brings this action as an assignee of claims of GM

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 1

CASE NO. 07-21431-CIV-KING/Garber

pursuant to a May 29, 2007 Assignment Agreement between Vivendi Holding and Everest Capital Inc. ("Everest"). Everest purchased Elektrim Bonds for GM and managed GM's investment in those bonds. GM is a Delaware corporation with its principal place of business in Detroit, Michigan. GM does business in this District, among other ways, by virtue of its relationship with Everest, its financial advisor with respect to the Elektrim Bonds.

5.     Defendant LDTC is a U.K. corporation with its principal place of business in London, England. It maintains U.S. offices in New York and Delaware. It conducts business in this judicial district by among other things doing business with Everest when Everest was the financial advisor for GM and other Elektrim Bondholders.

6.     Defendant Elektrim SA is a Polish company based in Warsaw. It is controlled by Zygmunt Solorz-Zak, a Polish oligarch and two-time convicted criminal. It does business in this District by, among other things, guaranteeing bonds issued to GM by Defendant Elektrim's affiliate, Elektrim Finance BV, and doing business with Everest.

## FACTS

7.     Starting in February 2005 and continuing through June 2006, Everest, located in this District, purchased for both itself and for its clients, including GM, Elektrim Finance 2% bonds due 12/15/2005 (the "Elektrim Bonds"). Defendant Elektrim S.A. guaranteed those Bonds.

8.     Everest purchased the bonds for GM in reliance on representations by Defendant Elektrim S.A. that it owned substantial assets, including (a) shares of PTC now worth more than $3 billion, (b) shares in Zespół Elektrowni Pątnów-Adamów-Konin S.A. (hereinafter "ZE PAK") (one of Poland's leading power generation companies), (c) shares in Port Praski sp. z o.o., a

2

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 2

CASE NO. 07-21431-CIV-KING/Garber

company which owns a significant real estate asset known as Port Praski, and (d) a controlling stake in Rafako, a company producing energy plant equipment.

9.    Everest also relied on a Restructuring Agreement that Defendant Elektrim had entered into with the Elektrim Bondholders in October 2002 that granted the Bondholders a significant portion of the increase in value of Elektrim (the "Equity Kicker"), representing 25% of the net asset value of Elektrim in excess of 160 million Euros, in return for the Bondholders accepting a lower interest rate and extended payment terms.

10.    Shortly after Defendant Elektrim entered into the Restructuring Agreement, Elektrim's controlling shareholder, Solorz-Zak, began stripping assets from Elektrim, thereby undermining the value of the Equity Kicker.

11.    On March 3, 2005, after Elektrim Finance failed to make required principal and interest payments, LDTC, acting on behalf of the Elektrim Bondholders, filed a petition in Polish court (a) to put Defendant Elektrim S.A., the guarantor of the Elektrim Bonds, into bankruptcy, (b) to put an end to the stripping of the assets of Elektrim S.A., (c) to recover assets that had been fraudulently transferred from Elektrim S.A., and (d) to liquidate Elektrim S.A. and use its assets to repay the Bondholders and to enable them to recover the Equity Kicker's full value. (Elektrim Finance BV had insufficient assets to pay the Bondholders.)

12.    The bankruptcy petition posed a major obstacle to Defendant Elektrim's plan to transfer PTC shares to DT for below-fair-market value because the bankruptcy would likely lead to Defendant Elektrim's liquidation and the distribution of the assets to Elektrim's creditors or their sale by a court-supervised auction which would have maximized the cash proceeds.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 3

CASE NO. 07-21431-CIV-KING/Garber

13.    Upon information and belief, Solorz-Zak used his influence in Poland to delay consideration of the bankruptcy petition with the hope that Elektrim would be able to transfer the PTC shares to DT at a price far below market value before Elektrim's liquidation and at the same time keep DT's payment from becoming a part of Defendant Elektrim's estate and thus subject to claims of creditors of Elektrim S.A.

14.    In an effort to provide a patina of legitimacy for the illegal transfer of the PTC shares to DT prior to the liquidation of Elektrim S.A. by the bankruptcy court and prior to judicial rulings that Vivendi S.A. (through an affiliate) was the actual owner of the PTC shares, DT initiated on May 3, 2005, an arbitration in Vienna against Defendant Elektrim S.A. (the "Vienna Arbitration").  In that proceeding, DT sought a formal, declaratory judgment that DT was entitled to exercise a call option on the PTC shares at a price far below market-value, i.e., the right to purchase an asset worth more than $3 billion at a fraction of its value, as a result of an alleged breach by Elektrim S.A. of a shareholder agreement to which Elektrim and DT were parties.

15.    This Vienna Arbitration was in part a set-up, since DT and Defendant Elektrim, upon information and belief, had secretly agreed to transfer the PTC shares to DT in return for at least the book value of the shares, which was only a fraction of their true value.  In fact, DT, Elektrim and Solorz had previously agreed that, if the arbitration panel ruled that the call option had been validly exercised, then the call option would be retroactively deemed exercised as of February 15, 2005 in order to avoid the fraudulent-conveyance period applicable to Defendant Elektrim's bankruptcy.  Elektrim S.A. was willing to transfer the PTC shares at less than fair value because Elektrim S.A. had previously been paid the full market value by Vivendi for the

4

CASE NO. 07-21431-CIV-KING/Garber

same shares. (Pursuant to a racketeering conspiracy that is the subject of another lawsuit, DT, Solorz, and Elektrim stole those shares from Telco, a Vivendi-controlled entity, for no consideration in order to sell them a second time to DT.)

16.    On June 6, 2006, at the joint request of DT and Defendant Elektrim, the Vienna Arbitration panel issued its First Partial Award, ruling that DT had lawfully exercised its call option on February 15, 2005 and that DT "*will* acquire the shares that Elektrim owned in PTC and *will* be their owner." (Emphasis added.) (The arbitration panel did not rule on the number of shares subject to the call option.) Significantly, the First Partial Award *did not authorize or permit Elektrim to transfer the PTC shares to DT.* Rather, the Arbitration Panel *explicitly* stated that the transfer could occur only *in the future, after* the Panel resolved additional issues. The Panel stated that "the Arbitral Panel expects the Parties to file the necessary documentation and to expose the issues relating to the mechanism of transfer of ownership . . . *in preparation for the next substantive award* in the present arbitral proceeding." (Emphasis added.) In particular, the Award provided that "it is important to state in the Operative Part of the present award that as a matter of principle the full transfer of ownership of the shares to DT *will* occur only when the price of those shares is paid to Respondent" and that the price of the shares "*would* be left to a subsequent award" and would be "established by the Arbitral Tribunal." (Emphasis added.) As is clear, the highlighted words from the First Partial Award show that *no* transfer of title could occur until a subsequent decision by an arbitral panel explicitly authorizes it.

17.    The June 6, 2006 First Partial Award was not public, and neither Vivendi, Everest, nor GM had access to it until after October 2006.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 5

CASE NO. 07-21431-CIV-KING/Garber

18.    At the time the Vienna Arbitration Panel issued its First Partial Award, Defendant Elektrim S.A. was subject to an Order of the London Court of International Arbitration ("LCIA") issued on April 28, 2005 and then extended on September 9, 2005, which enjoined Elektrim from "voluntarily seeking to sell, agree to sell, transfer, encumber, or otherwise dispose of or create any interest in the PTC shares." In addition, Elektrim S.A. was subject to an injunction issued on November 23, 2005 by the Commercial Court of Warsaw in the bankruptcy proceeding to secure all PTC shares held by Elektrim. The LDTC was aware of this injunction prior to withdrawing the bondholders' petition and was also aware that the injunction precluded any sale of PTC to DT.

19.    Faced with these injunctions and their failure to obtain an arbitral award authorizing an immediate transfer of the title and full ownership rights relating to the PTC shares and faced with the looming prospect that the bankruptcy court would liquidate Elektrim S.A. and would auction the PTC shares for their fair market value, and/or that Vivendi (through its affiliate Telco) would recover the PTC shares that rightfully belonged to it, DT and Elektrim simply ignored the injunctions and proceeded with their scheme to illegally transfer the PTC shares from Defendant Elektrim S.A. to DT and then conspired with LDTC to defraud other creditors of Elektrim and to withdraw the Elektrim Bondholders' bankruptcy petition without informing either Everest, GM, or the bankruptcy court of the full circumstances and consequences of that action.

20.    On June 27, 2006, the Warsaw District Court issued an order attaching Elektrim's PTC shares as security for Vivendi S.A.'s claims in the LCIA and prohibiting Elektrim S.A. from transferring any of its assets. In particular, the Court granted "interim relief to secure the claim

6

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 6

CASE NO. 07-21431-CIV-KING/Garber

pursued by Vivendi . . . by attaching . . . shares possessed by Elektrim in PTC, National Court Register [NCR] registration number 0000029159." LDTC was aware of this injunction prior to withdrawing the bankruptcy petition, but ignored it.

21.    On July 18, 2006, the Bailiff Court of the District Court of Poland issued an order attaching Defendant Elektrim's property rights in the PTC shares. Defendant LDTC was aware of this attachment prior to withdrawing the bankruptcy petition, but ignored it.

22.    On August 2, 2006, LCIA ordered further interim relief, confirming its original injunction and enjoining Defendant Elektrim from transferring the disputed PTC shares. The LCIA noted that "the dispute [between Vivendi and Elektrim] regarding title to the PTC shares has not yet been entirely resolved" and recognized the real "risk of impending injury and irreparable harm" to Vivendi if such a transfer took place. The LCIA reiterated that "it is the Arbitral Tribunal's duty to ensure that Elektrim does not appropriate the PTC shares without consideration in breach of the TIA [the Third Investment Agreement] between Elektrim and Vivendi." LDTC was aware both of the content of the Third Investment Agreement, including the underlying rights and obligations, and of the LCIA order prior to withdrawing its bankruptcy petition, because Vivendi sent those documents to LDTC.

23.    On August 28, 2006, in violation of outstanding injunctions and the order of the LCIA, Elektrim S.A. transferred the PTC shares in its possession to DT. PTC's sham Management Board (at the direction of DT and Defendant Elektrim S.A.) secretly created a "Shareholders List" for PTC showing that Defendant Elektrim had transferred the PTC shares to DT and that DT held title to the PTC Shares. At that time, DT paid Elektrim no consideration for the PTC shares.

7

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 7

CASE NO. 07-21431-CIV-KING/Garber

24.    After the secret and illegal transfer of PTC Shares from Elektrim to DT on August 28, 2006, under Polish law, PTC was required to file for re-registration of the shares in the public court registry known as the "KRS" within seven days. At the direction of Elektrim S.A., PTC did not do so. Upon information and belief, Elektrim S.A. was concerned that such action might result in disclosure that the stock transfer had been in violation of the First Partial Award of the Vienna Arbitration Panel, various applicable injunctions, and orders of the bankruptcy court.

25.    On September 5, 2006, DT illegally asserted full ownership rights over the PTC shares and appointed two new members of PTC's Supervisory Board.

26.    On September 5, 2006, DT, acting in collusion with Elektrim, issued a materially misleading press release which was carried over U.S. wires and upon which Everest relied. In the release, DT represented that DT had *lawfully* acquired PTC and was exercising control over it *pursuant to an award of the Vienna arbitration panel* (which award was not public and which neither Vivendi, Everest, nor GM had seen), when in fact, DT and Elektrim were acting in a manner that *contradicted* the award rendered by the panel at that time. The First Partial Award expressly stated title could *not* be transferred until subsequent future decisions were made regarding the quantity of the shares to which the call option applied and the value of those shares.

27.    Upon information and belief, the press release was intended to falsely convey to the Elektrim Bondholders (among others) that DT lawfully owned the PTC Shares. As a result, Elektrim and DT hoped and expected, upon information and belief, that the Bondholders would regard a forthcoming offer from DT and Elektrim to be the best chance for repayment of the Elektrim bonds and thus withdraw their bankruptcy petition despite a below-market-value

8

CASE NO. 07-21431-CIV-KING/Garber

payment by DT for the PTC shares and failure to obtain any, much less the fair value of the Equity Kicker (since a large part of the upside is dependent on maximizing the value of the shares).

28.    At approximately the same time, DT and Elektrim jointly requested the Vienna Arbitration Panel to accelerate the proceeding in order to obtain an award before the October 4, bankruptcy hearing in order to attempt a *post-facto* justification of the August 28 illegal transfer. Significantly, neither DT or Elektrim disclosed to the Arbitration panel that Elektrim already had transferred the PTC shares to DT.

29.    At the same time DT and Elektrim were jointly requesting the Vienna Arbitration Panel to accelerate its proceeding, Elektrim and LDTC were colluding to slow down the proceedings in the bankruptcy court.

30.    On October 2, 2006, the Vienna Arbitration Panel issued its Second Partial Award. While the Panel recognized that DT had properly exercised the call option (but noticeably reserved its opinion as to whether Elektrim was the owner of the shares) and that the price for the shares would have to be higher than PTC's net asset value, (but below fair-market value because of a penalty), the Panel did *not* authorize the transfer of the PTC shares from Elektrim to DT before payment. The Second Partial Award noted that DT "acknowledges that both as a matter of fact and company law, full transfer of ownership of the PTC Option Shares will require further steps," including, but not limited to, payment for the stock and determination of the number of shares to which the call option applied. Regarding the payment of the price and the conditions for transfer, the Panel stated as follows in the Second Partial Award:

9

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 9

CASE NO. 07-21431-CIV-KING/Garber

[I]t is not possible to conclude that a share purchase agreement has been validly concluded on 15 February 2005 with the effect of transferring the full legal title to the Option Shares. Rather the exercise by Claimant of the call option under Article 16(1) of the Shareholders Agreement should be deemed the fulfillment of a necessary legal requirement to bring about the transfer of the shares once the determination of their precise number and of their price will have been undertaken in the present arbitral proceeding. . . . *In sum, the exercise of the call option was a necessary but not a sufficient step in the conclusion of the share transfer agreement. The payment of the price, although it had been foreseen to occur 30 days after the formal transfer, is indispensable for the transfer to take place.* [Emphasis added.]

31.     With respect to the number of shares covered by the call option, the Second

Partial award stated as follows:

Claimant [DT] has appropriately declared that the present title to the Shares is uncertain, and was uncertain at this time of the exercise of the call option. It points out that "it remains unclear whether DT has acquired 226,080 PTC shares (i.e., over 48 percent of the PTC shares), on the one hand, or only a single PTC share, on the other."

32.     The Second Partial Award also summarized the First Partial Award, thus making

clear that Elektrim S.A. had violated the First Partial Award when it transferred the PTC shares

from Elektrim to DT in August 2006 for no consideration.

33.     Upon information and belief, prior to the Second Partial Award, Elektrim S.A.

had met with LDTC and DT and collaborated on a plan whereby LDTC would withdraw the

bankruptcy petition of the Elektrim Bondholders in exchange for receiving the consideration that

DT owed to Elektrim for the PTC shares that had been unlawfully transferred from Elektrim to

DT on or about August 28, 2006.

34.     LDTC did not disclose to Everest or GM material facts relating to this plan,

including LDTC's knowledge that the plan was intended to defraud other creditors of Elektrim

S.A., and that the August 2006 transfer of PTC shares from Elektrim to DT had been in violation

not only of outstanding injunctions, but also of the First Partial Award Vienna Arbitration Panel.

10

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 10

CASE NO. 07-21431-CIV-KING/Garber

35.     On October 4, 2006, without disclosing the full content of the Second Partial

Award, DT (while colluding with Defendant Elektrim) issued another misleading statement to

the press, which upon information and belief, they knew would be carried on U.S. wires and

would mislead the Bondholders. The press release stated:

> In yet another award of October 2, 2006, the Arbitral Tribunal in Vienna conferred the
> ownership title to the disputable 48% of the shares in PTC to Deutsche Telecom [sic]
> (with effect as of February 15, 2005), which remains in concord with the joint stand of
> Elektrim S.A. and Deutsche Telecom presented to date. For this reason Deutsche
> Telekom has paid an amount of more than EUR 600 million, which surely covers the
> current book value of the shares in PTC. [Emphasis added.]

36.     Everest relied on this release, which deceived Everest, acting on behalf of GM,

about the content and effect of the Second Partial Award. In fact, the Award had not "conferred

ownership title" of the PTC shares to DT. Nor had DT paid for the shares at that time. Nor had

the shares been properly registered.

37.     Although LDTC had access to the Second Partial Award, it failed to disclose it to

Everest or GM at any time prior to LDTC's withdrawal of the bankruptcy petition on October 26,

2006.

38.     On October 4, 2006, the Polish bankruptcy court held a hearing to determine

whether to liquidate Defendant Elektrim. At the hearing, Elektrim's lawyer asked for an

adjournment to study what it called new evidence. In fact, upon information and belief, Elektrim

wanted more time so that it could continue to implement its illegal plan with LDTC and DT. At

the hearing, neither Elektrim's attorneys nor DT's attorneys disclosed to the court that the PTC

shares had already been transferred to DT without any compensation having been paid to

Elektrim S.A. Indeed, in its written submission to the court filed on September 28, 2006,

11

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 11

CASE NO. 07-21431-CIV-KING/Garber

Elektrim had affirmatively misrepresented that it still had possession of the PTC shares. Significantly, LDTC supported the adjournment even though the adjournment was against the interest of the Elektrim Bondholders.

39.     On October 23, 2006, in response to Elektrim's request that the LCIA modify its prior order and allow Elektrim to pay to the Elektrim bondholders the proceeds from Elektrim's transfer of the PTC shares to DT, the LCIA ruled that it was for a Polish court to decide whether such a payment could be lawfully made. Accordingly, the LCIA modified its prior order so as not to stand in the way of a Polish court.

40.     On or about October 26, 2006, pursuant to an arrangement between Elektrim, DT, and LDTC, DT, through Elektrim, made a payment of €525 million to LDTC in its capacity as trustee of the Elektrim Bondholders. LDTC did not inform either Everest or GM that it was acting in a manner inconsistent with the orders of the Vienna Arbitration Panel that were then in effect and that it was acting as part of a conspiracy with DT and Elektrim to defraud Vivendi S.A. and other creditors of Elektrim S.A.

41.     On October 27, 2006, LDTC -- without disclosing to Everest or GM its knowledge that DT and Elektrim had engaged in a transaction that was contrary to the direction of the Vienna Arbitration Panel and that LDTC was colluding with Elektrim to defraud other Elektrim creditors -- withdrew the bankruptcy petition, irreparably damaging Plaintiff.

42.     LDTC did not immediately distribute the funds but instead, seeking to insulate itself from liability, filed an action in the English High Court against two of the Elektrim Bondholders seeking permission to distribute the funds. LDTC did not disclose to the High Court that it had colluded with DT and Elektrim S.A. to defraud other Elektrim bondholders.

12

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 12

CASE NO. 07-21431-CIV-KING/Garber

Nor did it disclose that at the time it received the funds it knew the underlying transfer of PTC shares from Elektrim to DT had violated the First Partial Award of the Vienna Arbitration Panel.

43.     On May 1, 2007, the English High Court – without knowing all the facts and without having given Vivendi S.A. any prior opportunity to be heard – held that, although Vivendi might have a claim against Elektrim, Vivendi did not have a "proprietary" claim to the money that DT (either directly or through Elektrim) paid to LDTC as trustee for the Elektrim bondholders. Although LDTC acknowledged that its attorneys were unwilling to advise LDTC that it could lawfully distribute to the Bondholders the money it had received, LDTC did not disclose to the Court the substance of its attorneys' reticence.

44.     Notwithstanding the decision of the English High Court, LDTC still has not distributed the funds to the Elektrim bondholders.

45.     On May 29, 2007, Everest, for itself and on behalf of GM, assigned and sold to Vivendi Holding for valuable consideration all of the Elektrim Bonds held by Everest, including all current and potential causes of action and claims in law and equity relating to the bonds. Under the Assignment and Acceptance Agreement, Vivendi has the same rights and privileges as held by the Elektrim Bondholders prior to the closing.

46.     On June 1, 2007, National Financial Services LLC certified that "as of May 31, 2007, Vivendi Holding I Corp. is a current owner of ELEKTRIM FINANCE BV 38300000 BD REG S 2.000% 12/15/2005, ISINX0099212069" and that the "shares are held in the name of National Financial Services LLC at the Euro clear depository."

13

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 13

CASE NO. 07-21431-CIV-KING/Garber

47.    On June 4, 2007, Plaintiff sought to attend a meeting of the Elektrim bondholders in London, but at the direction of Defendant LDTC was forbidden to attend the meeting even though Plaintiff presented certification that it was a proper bondholder. LDTC asserted that Plaintiff had not provided timely notice of its attendance and thus was not qualified to vote. Plaintiff then sought to attend without voting, but LDTC again blocked Plaintiff from doing so.

## COUNT ONE

### Breach of Fiduciary Duty

### (Against Defendant LDTC Only)

48.    Plaintiff Vivendi Holding, the assignee of GM's claims, incorporates by reference and realleges the allegations of each and every preceding paragraph.

49.    LDTC, by virtue of its role as Trustee for the Elektrim bondholders, owed a fiduciary duty to GM, as an Elektrim bondholder.

50.    LDTC breached its fiduciary duty in the following ways:

a)    failing to disclose to Everest and GM the full contents of the Second Partial Award of the Vienna Arbitration prior to LDTC's withdrawal of the bankruptcy petition as well as the effect of such withdrawal on the total value of the bonds;

b)    failing to obtain from Elektrim and disclose to Plaintiff the full content of the First Partial Award of the Vienna Arbitration before agreeing to withdraw the bankruptcy petition;

c)    failing to disclose to Everest and GM, LDTC's knowledge that DT and Elektrim had engaged in a transaction that was contrary to the direction of the Vienna Arbitration Panel and that LDTC was colluding with Everest and GM to defraud other Elektrim creditors;

d)    Colluding with Elektrim and DT to defraud other Elektrim creditors;

14

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 14

CASE NO. 07-21431-CIV-KING/Garber

    e)   Accepted tainted funds from Elektrim without consulting Everest or GM and without obtaining prior approval of the Elektrim bondholders;

    f)   Failing to disclose to Everest and GM all the risks of accepting tainted money;

    g)   Failing to exercise adequate due diligence prior to withdrawing the bankruptcy petition by failing to conduct a full investigation of the legality of the transaction;

    h)   Acquiescing in delays of the bankruptcy proceeding and

    i)   Withdrawing the bankruptcy petition against Elektrim thereby giving up the right to recapture fraudulently transferred assets and thus to maximize the value of the Equity Kicker.

51.     If Everest, acting on behalf of GM, had known the contents of the First Partial Award and the Second Partial Award – *i.e.*, that the First Award did not permit Elektrim to transfer the PTC shares to DT in August of 2006 and that the Second Award did not sanction that prior transfer – Everest would have opposed the withdrawal of the bankruptcy petition. While Everest and GM wanted to be paid, they did not want to receive tainted money and the possible liability that could come with tainted money.

52.     If Everest had known the LDTC had been colluding with Elektrim S.A. and DT in an illegal manner, Everest would have opposed taking any action that facilitated an unlawful conspiracy.

53.     LDTC had an obligation not only to warn Everest that the conduct was unlawful but also to avoid entering into unlawful transactions. LDTC breached that duty.

54.     Had Everest opposed the withdrawal and explained its reasons for doing so, the withdrawal would not have occurred. The Elektrim bondholders typically required unanimity before making important decisions, and upon information and belief, the other bondholders, like Everest and GM, would not have wanted to participate in an unlawful transaction and incurred

15

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 15

CASE NO. 07-21431-CIV-KING/Garber

the risk of that the funds received by LDTC would have to be disgorged while at the same time

not being able to regain the claw-back protections for fraudulent conveyances that would have

existed if the bankruptcy petition had not been withdrawn.

55.     If Everest had disclosed to the bankruptcy court that the underlying transaction

between Elektrim and DT had taken place in violation of both the LCIA and the First Partial

Award of the Vienna Arbitration Panel, and if the bankruptcy court had known that LDTC was

colluding with Elektrim to defraud the other creditors of Elektrim S.A., the bankruptcy court

would not have permitted the withdrawal of the bankruptcy petition.

56.     GM was harmed by LDTC's breach of fiduciary duty. If LDTC had not

withdrawn the petition for bankruptcy, GM would have been in a substantially better position

than it is now because it would have been able use the bankruptcy proceeding to recapture

fraudulently transferred assets which would have given significant value to the Equity Kicker.

Moreover, it would have been able to recover the principal and interest owed on the bonds

without having to accept tainted money that would be subject to disgorgement.

57.     GM also has been harmed because LDTC's lack of due care has put LDTC in a

position where it cannot lawfully distribute the funds to the bondholders and where the

bondholders themselves, including GM, could be exposed to risk if they accepted the funds.

because any distribution of funds would expose Plaintiff to additional risk.

58.     As a result of LDTC's breach of fiduciary duty, Plaintiff Vivendi Holding, as the

assignee of GM's claims, has suffered damages exceeding $75,000.

16

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 16

CASE NO. 07-21431-CIV-KING/Garber

## COUNT TWO

### Breach of Trust Agreement

### (Against Defendant LDTC Only)

59.     Plaintiff Vivendi Holding, acting as assignee of GM, incorporates by reference and realleges the allegations of each and every preceding paragraph.

60.     As a result of the conduct set forth above, including actual and constructive knowledge of material information that it did not disclose to Everest or GM, LDTC failed to exercise the degree of care and diligence required by Section 18 of the Second Supplemental Trust Deed of which GM was an intended beneficiary.  That provision provides that "[n]othing in these presents shall in any case in which the Trustee has failed to show the degree of care and diligence required of it as trustee having regard to the provisions of these presents conferring on it any trusts, powers, authorities or discretions exempt the Trustee from or indemnify it against any liability for breach of trust."

61.     The Second Supplemental Trust Deed is attached as Exhibit A.

62.     LDTC's conduct described above constitutes a material breach of its obligations to GM under the Second Supplemental Trust Deed.

63.     As a result of LDTC's breach of fiduciary duty, Plaintiff Vivendi Holding, as the assignee of GM's claims, has suffered damages exceeding $75,000.

17

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street ■ Miami, FL 33130 ■ 305-789-3200

CASE NO. 07-21431-CIV-KING/Garber

### COUNT THREE

### Fraud

### (Against Defendants Elektrim S.A. and LDTC )

64.     Plaintiff incorporates by reference and realleges the allegations of each and every preceding paragraph.

65.     As set forth above, Defendant Elektrim S.A. engaged in a pattern of fraud that included (a) fraudulently inducing Everest, on behalf of GM, to purchase the Elektrim Finance bonds based on false statements regarding Elektrim's assets, (b) fraudulently inducing Everest on behalf of GM, to purchase the bonds by representing that it would pay an Equity Kicker when in fact it was allowing assets to be stripped from Elektrim that were material to the calculation of the Equity Kicker, (c) making false statements regarding the legality of its transfer of Elektrim's transfer of PTC shares to DT, and (d) failure to disclose its complicity in the illegal stripping of its assets by Mr. Solorz and DT.

66.     On January 5, 2005, Mr. Solorz, who controls Elektrim S.A., stated that Elektrim is the only legal shareholder of PTC.

67.     Starting in February 2005 and continuing through June 2006, Everest purchased, on GM's behalf, bonds of Elektrim Finance that were guaranteed by Elektrim. Everest made these purchases in reasonable reliance on representations by Defendant Elektrim that it was the lawful owner of PTC Shares. Everest also relied on Elektrim's representations, express and implied in the Restructuring Agreement, that it had a good faith intent to honor the equity-kicker provisions.

18

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 18

CASE NO. 07-21431-CIV-KING/Garber

68.    Defendant Elektrim S.A. engaged in fraud with respect to the transfer of PTC shares to DT.  On or about October 26, 2006, an agreement was reached whereby DT, which was then in unlawful possession of the PTC shares, would pay €525 million to LDTC either directly or through Elektrim, and LDTC would then withdraw the bondholders' petition for bankruptcy. The PTC shares, which are sufficient to convey control over PTC, are worth far more than DT paid for them.  PTC is the leading wireless company in Poland and has a fair market value in the billions of dollars.

69.    Everest's support for the agreement to withdraw the bankruptcy petition was material to achieving the agreement.  In supporting this agreement, Everest reasonably relied upon statements of DT, which upon information and belief were made in conspiracy with Elektrim S.A., that Elektrim's sale of the shares of PTC to DT was lawful and had been authorized and permitted by a Vienna Arbitration Panel.  In particular, Everest relied upon DT's press releases of September 5, 2006 and October 4, 2006, referred to above, which falsely stated that the transfer of PTC shares from Elektrim to DT was made pursuant to orders of the Vienna Arbitration Panel.

70.    All these false statements were made pursuant to a conspiracy between DT, T-Mobile USA, T-Mobile Deutschland GBH, T-Mobile International, Elektrim SA, Elektrim Finance BV, and Solorz to mislead the Elektrim bondholders so as to facilitate the unlawful transfer of PTC shares from Elektrim SA to DT.  As long as the bankruptcy proceeding remained pending, the PTC shares that Elektrim had illegally transferred to DT could have been recaptured as fraudulent conveyances to the benefit of Plaintiff.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 19

CASE NO. 07-21431-CIV-KING/Garber

71.    Neither Elektrim S.A. nor Elektrim Finance BV ever disclosed to Everest that Elektrim SA's transfer of the PTC shares from Elektrim SA to DT that had occurred in August 2006 was not authorized by the Vienna Arbitration Panel.

72.    If Everest and GM had known that the money paid by DT, either directly or through Elektrim, to LDTC was the fruit of an illegal transaction of which LDTC was aware, Everest, acting for GM, would have opposed the withdrawal of the bondholders' bankruptcy petition because of concern about the legality of the underlying transfer of the PTC shares to DT at a time when it violated injunctions and had not been authorized by the Vienna Arbitration Panel.

73.    Upon information and belief, had Everest opposed the withdrawal and explained its reasons for doing so, the withdrawal would not have occurred because the bondholders had followed a course of conduct in which important decisions had been made by consensus and no bondholder could responsibly be the beneficiary of unlawful conduct.  It would have been Everest's judgment that the bondholders would have been better off if they had availed themselves of the bankruptcy court's procedures for reclaiming fraudulently conveyed assets and thereby received what they were entitled to under the Equity Kicker.

74.    Plaintiff was harmed by Defendants' fraudulent statements and material omissions.  If the Elektrim Bondholders had not withdrawn their petition for bankruptcy, Plaintiff would have been in a substantially better position than it is now because it would have been able use the bankruptcy proceeding to recapture fraudulently transferred assets, including the PTC shares that had been transferred to DT, the value of which is much greater than the amount that DT paid to LDTC.  This would have benefited Plaintiff even after all outstanding

20

CASE NO. 07-21431-CIV-KING/Garber

principal and interest had been paid because Elektrim bondholders were also entitled to the
Equity Kicker in which they share in any growth in value of Elektrim. Moreover, Elektrim
would have avoided legal expenses that would have devalued the Equity Kicker.

75.     Elektrim has also defrauded GM and the other bondholders by aiding and abetting
the illegal stripping and fraudulent transfers at below fair market value of Elektrim assets that
secured the bonds. In particular, Solorz caused Elektrim to be stripped of its shares in ZE PAK,
a 50% State-owned company, by arranging for them to be transferred for little value through an
illegitimate transaction to a company he controlled. In this transaction, Solorz managed to seize
for himself an asset worth many times more than his *de facto* purchase price. Solorz later
engaged in a similar illegitimate transactions with respect to Port Praski and Rafako, positioning
himself to be able to seize Port Praski illegitimately for one of his own companies for a fraction
of its value and causing Rafako to incur a huge capital increase, potentially highly dilutive for
Elektrim, without any precise purpose.

76.     Elektrim's transfer of PTC shares to DT at less than fair market value also
constituted a stripping of Elektrim's assets, as did an earlier transaction in which Elektrim
transferred PTC shares to Mega, another entity controlled by Solorz.

77.     As a result of Defendant Elektrim's failure to resist the asset stripping and its
failure to disclose the full extent of the asset stripping to the bondholders, the bondholders,
including GM, were deprived of assets that could have been used to pay the full value that
Elektrim owed to the bondholders, including the full value of the Equity Kicker.

78.     As a result of this pattern of fraudulent conduct, Plaintiff has suffered damages far
exceeding $75,000.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ■ 150 West Flagler Street ■ Miami, FL 33130 ■ 305-789-3200

CASE NO. 07-21431-CIV-KING/Garber

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court to grant the following relief as appropriate:

a) Order LDTC to hold the proceeds of the illegal transfer of PTC shares in escrow until such time as the unlawful transaction is unwound;

b) Enjoin LDTC from taking any action, such as paying out the proceeds of the illegal transfer of PTC shares, that would waive its right to receive the full value of the Equity Kicker;

c) Declare that LDTC has breached its fiduciary duty to GM;

d) Award to Plaintiff its actual and compensatory damages according to proof at trial;

e) Award to Plaintiff pre- and post-judgment interest as permitted by law; and

f) Award such other relief as the Court deems appropriate.

Dated: June 7, 2007          Respectfully submitted,
       Miami, Florida

                             s/Alexander Angueira
Of Counsel:                  ALEXANDER ANGUEIRA (Florida Bar No. 0716091)
ORRICK, HERRINGTON &         aangueira@swmwas.com
SUTCLIFFE, LLP               STEARNS WEAVER MILLER WEISSLER
Lanny J. Davis               ALHADEFF & SITTERSON, P.A.
Garret G. Rasmussen          Suite 2200, Museum Tower
Washington Harbour           150 West Flagler Street
3050 K Street, Northwest     Miami, Florida 33130
Washington D.C. 20007-5135   Telephone: (305) 789-3200
Telephone: (202) 339-8400    Facsimile: (305) 789-3395
Facsimile: (202) 321-7569    **Attorneys for Plaintiff**

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower ▪ 150 West Flagler Street ▪ Miami, FL 33130 ▪ 305-789-3200

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 22

# EXHIBIT A

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 23

15 November 2002

# Second Supplemental Trust Deed

*between*

## Elektrim Finance B.V.
as the Issuer

## Elektrim S.A.
as the Guarantor

*and*

## The Law Debenture Trust Corporation p.l.c.
as the Trustee

**(inter alia) amending and restating the provisions of the Trust Deed dated 2 July 1999 as amended by the First Supplemental Trust Deed dated 14 July 1999**

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 24

THIS SECOND SUPPLEMENTAL TRUST DEED is dated 15 November 2002 and made

BETWEEN:

(1)    **Elektrim Finance B.V.** (the "Issuer"), a company incorporated under the laws of the Netherlands, whose registered office is at Strawinskylaan 3105, 1077ZX Amsterdam, The Netherlands;

(2)    **Elektrim S.A.** (the "Guarantor"), a company incorporated under the laws of Poland, whose registered office is at ul. Panska 77/79, 00-834 Warsaw, Poland; and

(3)    **The Law Debenture Trust Corporation p.l.c.**, a company incorporated under the laws of England, whose registered office is at Fifth Floor, 100 Wood Street, London EC2V 7EX (the "Trustee", which expression shall, wherever the context so admits, include such company and all other persons or companies for the time being the trustee or trustees of these presents).

BACKGROUND:

(A)    By a trust deed (the "Original Trust Deed") dated 2 July 1999 between the Issuer, the Guarantor and the Trustee, PLN 1,631,840,000 (the equivalent of Euro 400,000,000) 3.75% Euro-Linked Exchangeable Bonds due 2004, irrevocably and unconditionally guaranteed by, and exchangeable into Euro-linked Convertible Bonds due 2004 of, Elektrim S.A., were issued.

(B)    On 14 July 1999, the Original Trust Deed was amended by a First Supplemental Trust Deed (the "First Supplemental Trust Deed", and the Original Trust Deed as amended by the First Supplemental Trust Deed, the "Principal Trust Deed") which constituted the issue on that date of a further PLN 163,184,000 (the equivalent of Euro 40,000,000) of such Exchangeable Bonds and also corrected certain manifest and technical errors in the Original Trust Deed.

(C)    By a resolution of the board of managing directors of the Issuer passed on 24 October 2002, the Issuer resolved to enter into this Second Supplemental Trust Deed (the "Second Supplemental Trust Deed"). By a resolution of the Management Board of the Guarantor passed on 24 October 2002, the Guarantor resolved to enter into this Second Supplemental Trust Deed.

(D)    By a resolution of the Exchangeable Bondholders passed on at a meeting of the Bondholders duly held on 15 November 2002 (the "Bondholders' Meeting"), the Bondholders passed an Extraordinary Resolution, *inter alia*, sanctioning and approving restructuring terms (the "Restructuring Terms") set out in a proposal document dated 24 October 2002 and authorising the Trustee to give effect to the Restructuring Terms by executing this Second Supplemental Trust Deed and such other documents as may be necessary, desirable or expedient to carry out and give effect to the Restructuring Terms.

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 26

**THE PARTIES AGREE THAT:**

1.    **Definitions and Interpretation**

1.1    Unless the context requires otherwise:

    (A)    terms defined in the Principal Trust Deed shall, unless otherwise defined herein bear the same meaning herein (including in the recitals hereto);

    (B)    the rules of interpretation set out in, or applying to, the Principal Trust Deed shall apply to this Second Supplemental Trust Deed.

1.2    Subject to the provisions of this Second Supplemental Trust Deed, the Principal Trust Deed shall remain in full force and effect and shall be read and construed as one document with this Second Supplemental Trust Deed.

1.3    In this Second Supplemental Trust Deed:

    "**Bonds**" means the €510,000,000 2% Bonds due 2005 of the Issuer.

    "**Restructuring Date**" means the date of this Second Supplemental Trust Deed.

2.    **Waiver**

2.1    In accordance with the terms of the Extraordinary Resolution passed at the Bondholders' Meeting, the Trustee waives any right to collection under, and agrees not to seek to enforce or have recognised, any judgments (including the judgement given by the High Court of Justice of England in Claim No. 2002 Folio 33, dated 17 May 2002) that have been or might be awarded in connection with the Issuer's and the Guarantor's failure to pay on 17 December 2001 the principal and premium due on that date in respect of those of the Bonds which had been put in accordance with Condition 7(d) of the terms and conditions of the Bonds (prior to the amendments contained in this Second Supplemental Trust Deed), although, for the avoidance of doubt, this shall not in any way limit or compromise the Trustee's right to take action to enforce its rights or those of the Bondholders or to make a claim against the Issuer or the Guarantor or any other third party under the terms of this Second Supplemental Trust Deed.

2.2    In accordance with the terms of the Extraordinary Resolution passed at the Bondholders' Meeting, the Trustee releases the Guarantor, the Issuer and the members constituting their respective Management Boards and Supervisory Boards from 3 October 2002 through and including 24 October 2002 from any liability that they may have towards the Bondholders or the Trustee in respect of any claims that may have arisen or accrued against them in connection with the Bonds or the Guarantor Bonds on, or at any time prior to, the implementation of the Restructuring Terms.

3.    **Modification of the Trust Deed and the Bonds**

3.1    The parties agree that (a) the Principal Trust Deed shall be amended and restated in the form set forth in the Schedule hereto with effect from the Restructuring Date, and (b) the Bonds shall be deemed to be amended to the extent necessary to be consistent therewith.

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 27

3.2    In accordance with the Restructuring Terms, the Issuer agrees to redenominate the Bonds from PLN to euro, so that the principal amount outstanding of the Bonds (prior to any other modifications effected pursuant to this Second Supplemental Trust Deed) is equal to €440,000,000. The Issuer further agrees to increase the principal amount outstanding of the Bonds with effect from the Restructuring Date from €440,000,000 to €510,000,000. The Issuer further agrees that the minimum denomination of the Bonds shall be reduced to €1.

3.3    The Global Certificates in respect of the Bonds shall be amended and restated by the execution by the Issuer of a Regulation S Global Certificate and a Rule 144A Global Certificate in respect of the Bonds. Upon such Global Certificates being authenticated by the Principal Paying and Transfer Agent and deposited with the Common Depositary in the manner described in the Schedule to this Second Supplemental Trust Deed, the existing Regulation S Global Certificate and the existing Rule 144A Global Certificate in respect of the Bonds shall be cancelled.

4.    **Cancellation of Conversion and Exchange Rights**

4.1    The Trustee consents to the cancellation of the Conversion and Exchange Rights beginning on and including the Restructuring Date.

5.    **Confirmation of Guarantee**

5.1    The Guarantor confirms that its guarantee contained in clause 8 of the amended and restated trust deed scheduled hereto extends to the Bonds.

6.    **Governing Law, Counterparts and Contracts (Rights of Third Parties) Act 1999**

6.1    This Second Supplemental Trust Deed shall be governed by, and construed in accordance with, English law. The provisions of clauses 29, 30 and 31 of the amended and restated trust deed scheduled hereto are incorporated into this Second Supplemental Trust Deed as if set out in full herein and if references to "these presents" or "this Trust Deed" are to this Second Supplemental Trust Deed.

7.    **Polish Version**

7.1    A Polish version of this Second Supplemental Trust Deed has been prepared and executed by the parties hereto. In the event of any conflict between the terms of the two documents, the terms of this English language version shall prevail.

4

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 28

IN WITNESS whereof this Second Supplemental Trust Deed has been executed as a deed by the
Issuer, the Guarantor and the Trustee and delivered on the date first stated on page 1 above.

EXECUTED as a deed        )    ABN AMRO Trust
by ELEKTRIM              )    Company (Nederland) B.V.         witness
FINANCE B.V.             )                              Schah (attorney)
acting by                )
acting under the authority )
of that company in the    )
presence of:              )

    Name:
    Title:                    Alexander D. de Vreeze      U.M. Dramar-Cocchia
                              proxy holder                proxy holder


EXECUTED as a deed        )
by ELEKTRIM S.A.          )
acting by Wojciech Janczyk )
and by Ryszard Opara       )
acting under the authority )
of that company in the    )
presence of:              )

Name:
Title:


THE COMMON SEAL of        )
THE LAW DEBENTURE         )
TRUST CORPORATION         )
p.l.c. was affixed to this )
deed in the presence of:   )


Asst. Director   Indi Ebrington-Poole


Authorised Signatory

IN WITNESS whereof this Second Supplemental Trust Deed has been executed as a deed by the
Issuer, the Guarantor and the Trustee and delivered on the date first stated on page 1 above.

EXECUTED as a deed          )
by ELEKTRIM                 )
FINANCE B.V.                )
acting by                   )
acting under the authority  )
of that company in the      )
presence of:                )

Name:
Title:


EXECUTED as a deed          )
by ELEKTRIM S.A.            )
acting by Wojciech Janczyk  )
and by Ryszard Opara        )
acting under the authority  )
of that company in the      )
presence of:                )

Name:
Title:


THE COMMON SEAL of          )
THE LAW DEBENTURE           )
TRUST CORPORATION           )
p.l.c. was affixed to this  )
deed in the presence of:    )


Director


Authorised Signatory

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 30

SCHEDULE

15 November 2002

# Amended and Restated Trust Deed

*between*

## Elektrim Finance B.V.
as the Issuer

## Elektrim S.A.
as the Guarantor

*and*

## The Law Debenture Trust Corporation p.l.c.
as the Trustee

€510,000,000 2% Bonds due 2005 of Elektrim Finance B.V.

6

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 31

# CONTENTS

| | | |
|---|---|---|
| 1. | Definitions and Interpretation | 9 |
| 2. | Covenant to Repay and to Pay Interest on Bonds | 16 |
| 3. | Form and Issue of Bonds | 19 |
| 4. | Fees, Duties and Taxes | 21 |
| 5. | Covenant of Compliance | 21 |
| 6. | Cancellation of Bonds and Records | 21 |
| 7. | Covenants by the Guarantor | 22 |
| 8. | Guarantee | 22 |
| 9. | Enforcement | 25 |
| 10. | Proceedings, Action and Indemnification | 26 |
| 11. | Application of Moneys | 26 |
| 12. | Notice of Payments | 26 |
| 13. | Investment by Trustee | 27 |
| 14. | Partial Payments | 27 |
| 15. | Covenants by the Issuer and the Guarantor | 27 |
| 16. | Remuneration and Indemnification of Trustee | 32 |
| 17. | Supplement to Trustee Act 1925 | 34 |
| 18. | Trustee's Liability | 38 |
| 19. | Trustee Contracting with Obligors | 38 |
| 20. | Waiver, Authorization and Determination | 39 |
| 21. | Substitution of Issuer | 39 |
| 22. | Substitution of Guarantor | 41 |
| 23. | Currency Indemnity | 42 |
| 24. | New Trustee, Separate and Co-trustees | 43 |
| 25. | Trustee's Retirement and Removal | 44 |
| 26. | Trustee's Powers to Be Additional | 44 |
| 27. | Security | 44 |
| 28. | Notices | 45 |
| 29. | Governing Law | 46 |
| 30. | Contracts (Rights of Third Parties) Act 1999 | 48 |
| 31. | Counterparts | 48 |
| THE FIRST SCHEDULE | | I-1 |
| THE SECOND SCHEDULE | | II-1 |
| THE THIRD SCHEDULE | | III-1 |
| THE FOURTH SCHEDULE | | IV-1 |

7

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 32

**THIS TRUST DEED** is amended and restated on 15 November 2002

**BETWEEN:**

(1) **ELEKTRIM FINANCE B.V.** (the "Issuer"), a company incorporated under the laws of the Netherlands, whose registered office at Strawinskylaan 3105, 1077ZX Amsterdam, The Netherlands;

(2) **ELEKTRIM S.A.** (the "Guarantor"), a company incorporated under the laws of Poland, whose registered office is at ul. Panska 77/79, 00-834 Warsaw, Poland; and

(3) **THE LAW DEBENTURE TRUST CORPORATION p.l.c.** a company incorporated under the laws of England, whose registered office is at Fifth Floor, 100 Wood Street, London EC2V 7EX (the "Trustee", which expression shall, wherever the context so admits, include such company and all other persons or companies for the time being the trustee or trustees of these presents) as trustee for the Bondholders (as defined below).

**BACKGROUND:**

(A) By a trust deed (the "Original Trust Deed") dated 2 July 1999 between the Issuer, the Guarantor and the Trustee, PLN 1,631,840,000 (the equivalent of Euro 400,000,000) 3.75% Euro-Linked Exchangeable Bonds due 2004, irrevocably and unconditionally guaranteed by, and exchangeable into Euro-linked Convertible Bonds due 2004 of, Elektrim S.A., were issued.

(B) On 14 July 1999, the Original Trust Deed was amended by a First Supplemental Trust Deed (the "First Supplemental Trust Deed", and the Original Trust Deed as amended by the First Supplemental Trust Deed, the "Principal Trust Deed") which constituted the issue on that date of a further PLN 163,184,000 (the equivalent of Euro 40,000,000) of such Exchangeable Bonds and also corrected certain manifest and technical errors in the Principal Trust Deed.

(C) By a resolution of the board of managing directors of the Issuer passed on 24 October 2002 and a resolution of the Management Board of the Guarantor passed on 24 October 2002, the Issuer and the Guarantor respectively approved (1) the publication of a notice to convene a meeting of the holders of the Bonds to pass an Extraordinary Resolution approving certain modifications to the terms of the Bonds, and (2) subject to the passing of such Extraordinary Resolution, approved the amendment and restatement of the Principal Trust Deed.

(D) By a resolution of the Exchangeable Bondholders passed at a meeting of the Exchangeable Bondholders duly held on 15 November 2002 (the "Bondholders' Meeting"), the Exchangeable Bondholders passed an Extraordinary Resolution, *inter alia*, sanctioning and approving restructuring terms (the "Restructuring Terms") set out in a proposal document dated 24 October 2002 and authorising the Trustee to give effect to the Restructuring Terms by executing an amendment and restatement of the Principal Trust Deed and such other documents as may be necessary, desirable or expedient to carry out and give effect to the Restructuring Terms.

8

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 33

(E)     Pursuant to the Second Supplemental Bond Trust Deed, the Issuer, *inter alia*, redenominated the Bonds from PLN to euro, so that the principal amount outstanding of the Bonds (prior to any other modifications effected pursuant to the Second Supplemental Bond Trust Deed) was equal to €440,000,000. The Issuer also agreed to increase the principal amount outstanding of the Bonds with effect from the Restructuring Date from €440,000,000 to €510,000,000. The Issuer also agreed that the minimum denomination of the Bonds be reduced to €1.

(F)     This Trust Deed amends and restates the Principal Trust Deed as of the date hereof in the terms set out below.

**NOW THIS TRUST DEED WITNESSES AND IT IS AGREED AND DECLARED** as follows:

1.     **Definitions and Interpretation**

1.1     **Definitions**

In these presents unless there is anything in the subject or context inconsistent therewith the following expressions shall have the following meanings:

"Agency Agreement" means the agreement dated 2 July 1999 appointing the initial Paying and Transfer Agents and the Agent Bank and the Registrar in relation to the Bonds and any other agreement for the time being in force appointing Successor Paying and Transfer Agents, Agent Banks and Registrars in relation to the Bonds, or in connection with their duties, the terms of which have been approved in writing by the Trustee, together with a first supplemental agreement dated the date hereof and any agreement for the time being in force amending or modifying with the prior written approval of the Trustee any of the aforesaid agreements in relation to the Bonds;

"Agent Bank" means the institution at its specified office initially appointed as agent bank in relation to the Bonds by the Issuer pursuant to the Agency Agreement, or if applicable, any Successor Agent Bank in relation to the Bonds;

"Appointee" means any attorney, manager, agent, delegate or other person appointed by the Trustee under these presents;

"Assignments" has the meaning specified in Condition 8(a);

"Auditors" means the auditors for the time being of the Issuer or the Guarantor, as appropriate, or, in the event of their being unable or unwilling promptly to carry out any action requested of them pursuant to the provisions of these presents, such other firm of accountants as may be nominated or approved by the Trustee;

"Bondholders" means the several persons whose names are entered in the register of holders of the Bonds as the holders thereof which expression shall, whilst any Global Certificate remains outstanding, mean in relation to the Bonds represented thereby each person who is for the time being shown in the records of Euroclear or of Clearstream, Luxembourg as the holder of a particular principal amount of the Bonds (in which regard any certificate or other document issued

9

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 34

by Euroclear or Clearstream, Luxembourg as to the principal amount of Bonds represented by a Global Certificate standing to the account of any person shall be conclusive and binding for all purposes) for all purposes other than with respect to the payment of Principal, premium (if any), interest and any other amounts payable on the Bonds, the right to which shall be vested, as against the Issuer, the Guarantor and the Trustee, solely in the registered holder of such Global Certificate in accordance with and subject to its terms and the terms of these presents and the words "holder" and "holders" and related expressions shall (where appropriate) be construed accordingly;

"Bonds" means the Bonds in registered form comprising Euro 510,000,000 2% Bonds due 2005 of the Issuer hereby constituted or the principal amount outstanding from time to time or, as the context may require, a specific number thereof and includes any replacements for Bonds issued pursuant to Condition 14 and (except for the purposes of Clause 3) the Global Certificates;

"Conditions", means, in relation to the Global Certificates, the Conditions endorsed on the relevant Global Certificates in the form or substantially in the form set out in the Second Schedule and, if applicable, means those Conditions, to be endorsed on the Definitive Bonds pursuant to Clause 3 or otherwise pursuant to these presents as, in each case, the same may from time to time be modified in accordance with these presents and any reference in these presents to a particular specified Condition or paragraph of a Condition shall in relation to the Bonds be construed accordingly;

"Custodian" means Citibank, N.A. as custodian of the Guarantor Bonds;

"Deed of Delegation" has the meaning specified in Condition 8(a);

"Definitive Bonds" means the definitive Bonds in registered form in the form set out in Part II of the First Schedule to be issued in exchange for the relevant Global Certificate pursuant to, but only in the limited circumstances specified in, Clause 3 and includes any replacements for Definitive Bonds issued pursuant to Condition 14;

"Delegate" means Citibank, N.A.;

"Euroclear" means Euroclear Bank S.A./N.V., as operator of the Euroclear System;

"Event of Default" means any of the conditions, events or acts provided in Condition 12 to be events upon the happening of which the Bonds would, subject only to notice by the Trustee as therein provided, become immediately due and repayable;

"Extraordinary Resolution" has the meaning set out in paragraph 20 of the Fourth Schedule;

"Global Certificates" means the Restricted Global Certificate and the Unrestricted Global Certificate, if any, issued in respect of the Bonds and "Global Certificate" means any of them;

"Group" means the Guarantor and its Subsidiaries, taken as a whole;

"Guarantor Bonds" means the Euro 510,000,000 2% Bonds due 2005 of the Guarantor;

10

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 35

"Guarantor Bond Trust Deed" means the trust deed between the Guarantor and The Law Debenture Trust Corporation p.l.c., as trustee for the holders of the Guarantor Bonds, constituting the Guarantor Bonds, as amended and restated by the first supplemental trust deed dated the date hereof;

"Interest Payment Date" has the meaning set out in Condition 4(a);

"Interest Amount" has the meaning set out in Condition 4(c);

"Interest Period" has the meaning set out in Condition 4(a);

"Latest Consolidated Accounts" means, at any date, the latest consolidated accounts of the Guarantor that have been audited and reported on by the Auditors of the Guarantor;

"Liability" means any loss, damage, cost, charge, claim, demand, expense, judgment, action, proceeding or other liability whatsoever (including, without limitation, in respect of taxes, duties, levies, imposts and other charges) and including any value added tax or similar tax charged or chargeable in respect thereof and legal fees and expenses properly incurred on a full indemnity basis;

"Material Subsidiaries" has the meaning set out in Condition 4(d);

"Mortgages" has the meaning specified in Condition 8(e);

"Obligors" means the Issuer and the Guarantor and "Obligor" means any of them;

"outstanding" means in relation to the Bonds all the Bonds issued other than:

    (A)    those Bonds which have been redeemed pursuant to these presents;

    (B)    those Bonds in respect of which the date for redemption in accordance with the Conditions has occurred and the redemption moneys (including premium (if any) and all interest payable thereon) have been duly paid to the Trustee or to the Principal Paying and Transfer Agent in the manner provided in the Agency Agreement (and where appropriate notice to that effect has been given to the Bondholders in accordance with Condition 16) and remain available for payment against presentation of the Bonds;

    (C)    those Bonds which have been purchased and cancelled in accordance with Condition 6;

    (D)    those Bonds in respect of which claims have become prescribed under Condition 11;

    (E)    those mutilated or defaced Bonds which have been surrendered and cancelled and in respect of which replacements have been issued pursuant to Condition 14;

11

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 36

(F)  (for the purpose only of ascertaining the principal amount outstanding of the Bonds from time to time and without prejudice to the status for any other purpose of the Bonds) those Bonds which are alleged to have been lost, stolen or destroyed and in respect of which replacements have been issued pursuant to Condition 14; and

(G)  each Global Certificate to the extent that it shall have been exchanged for Definitive Bonds pursuant to its provisions.

**PROVIDED THAT** for each of the following purposes, namely:

(1)  the right to attend and vote at any meeting of the Bondholders or any of them;

(2)  the determination of how many and which Bonds are for the time being outstanding for the purposes of Clauses 9 and 10, Conditions 8(d), 8(e), 10(d), 10(e), 12, 13 and 15 and paragraphs 2, 5, 6 and 9 of the Fourth Schedule;

(3)  any discretion, power or authority (whether contained in these presents or vested by operation of law) which the Trustee is required, expressly or impliedly, to exercise in or by reference to the interests of the Bondholders or any of them; and

(4)  the determination by the Trustee whether any event, circumstance, matter or thing is, in its opinion, materially prejudicial to the interests of the Bondholders or any of them,

those Bonds (if any) that are for the time being held by, for the benefit of, or on behalf of, the Issuer or the Guarantor or any Subsidiary of the Guarantor shall (unless and until ceasing to be so held) be deemed not to remain outstanding;

"PAK Loan" shall have the meaning ascribed to it in the Security Administration Agreement;

"PAK Loan Assignment" shall have the meaning ascribed to it in the Security Administration Agreement;

"PAK Loan Security" shall have the meaning ascribed to it in the Security Administration Agreement;

"Paying and Transfer Agents" means the several institutions (including where the context permits the Principal Paying and Transfer Agent) at their respective specified offices initially appointed as paying and transfer agents in relation to the Bonds by the Issuer pursuant to the relative Agency Agreement and/or, if applicable, any Successor Paying and Transfer Agents in relation to the Bonds;

"Pledge Agreements" has the meaning specified in Condition 8(a);

"Potential Event of Default" means any condition, event or act which, with the lapse of time and/or the issue, making or giving of any notice, certification, declaration, demand, determination and/or

12

request and/or the taking of any similar action and/or the fulfilment of any similar condition, would constitute an Event of Default;

"Preliminary Purchase Agreement" means the preliminary purchase agreement dated 2 July 1999 between the Issuer and the Guarantor in relation to the purchase of the Guarantor Bonds;

"Principal" has the meaning set out in Clause 2.2;

"Principal Paying and Transfer Agent" means the institution at its specified office initially appointed as principal paying, transfer and exchange agent in relation to the Bonds by the Issuer pursuant to the Agency Agreement or, if applicable, any Successor Principal Paying and Transfer Agent in relation to the Bonds;

"Registrar" means the institution at its specified office initially appointed as registrar in relation to the Bonds by the Issuer pursuant to the Agency Agreement or, if applicable, any Successor Registrar in relation to the Bonds;

"Relevant Date" has the meaning set out in Condition 9;

"Restricted Global Certificate" means Global Certificates substantially in the form set out in Part 1 of the First Schedule bearing the Securities Act Legend and any other legends required by the relevant clearing system;

"repay", "redeem" and "pay" shall each include both the others and cognate expressions shall be construed accordingly;

"Securities Act" means the U.S. Securities Act of 1933, as amended;

"Securities Act Legend" means the legend set out in Part 1 of the First Schedule that is stated to be required on any Restricted Global Certificate;

"Security" means the security granted by the Guarantor to secure its obligations under the Bonds and these presents, as described in Condition 8;

"Security Account Assignment" means the security account assignment dated the Restructuring Date between the Guarantor and the Security Agent in relation to the Guarantor's account with Bank Handlowy w Warszawie S.A.;

"Security Administration Agreement" has the meaning specified in Condition 8(a);

"Security Agent" has the meaning specified in Condition 8(a);

"Security Agent Submission to Execution" means the notarial deed dated the date hereof executed by the Guarantor containing a submission to execution by the Guarantor in favour of the Security Agent;

13

"Security Documents" means the Deed of Delegation, the Pledge Agreements, the Mortgages, the Assignments, the Security Account Assignment, the Security Administration Agreement and the Submissions to Execution;

"Shares" means Ordinary Shares of PLN 1.00 each in the capital of the Guarantor (and all (if any) shares or stock resulting from any sub-division, consolidation or re-classification of such shares);

"Submissions to Execution" means each of the Security Agent Submission to Execution and the Trustee Submission to Execution;

"Subsidiary" has the meaning set out in Condition 4(d);

"Successor" means, in relation to the Principal Paying and Transfer Agent, the other Paying and Transfer Agents, the Agent Bank and the Registrar and any successor to any one or more of them in relation to the Bonds which shall become such pursuant to the provisions of these presents, the Agency Agreement (as the case may be) and/or such other or further principal paying, transfer and exchange agent, paying, transfer and exchange agents and/or registrar (as the case may be) in relation to the Bonds as may (with the prior approval of, and on terms previously approved by, the Trustee in writing) from time to time be appointed as such, and/or, if applicable, such other or further specified offices (in the former case being within the same city as those for which they are substituted) as may from time to time be nominated, in each case by the Issuer, and (except in the case of the initial appointments and specified offices made under and specified in the Conditions, the Agency Agreement, as the case may be) notice of whose appointment or, as the case may be, nomination has been given to the Bondholders pursuant to Clause 15.1(L) in accordance with Condition 16;

"these presents" means this Trust Deed and the Schedules and any Trust Deed supplemental hereto and the Schedules (if any) thereto and the Bonds and the Conditions, all as from time to time modified in accordance with the provisions herein or therein contained;

"Trust Corporation" means a trust corporation (as defined in the Law of Property Act 1925) or a corporation entitled to act as a trustee pursuant to any other applicable legislation relating to trustees;

"Trustee Submission to Execution" means the notarial deed dated the date hereof executed by the Guarantor containing a submission to execution by the Guarantor in favour of the Trustee;

"Unrestricted Global Certificate" means Global Certificates in the form or substantially in the form set out in the First Schedule;

words denoting the singular shall include the plural and vice versa;

words denoting one gender only shall include the other genders; and

words denoting persons only shall include firms and corporations and vice versa.

14

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 39

1.2    Interpretation

(A)    Unless otherwise defined, capitalised terms defined in the Conditions shall bear the same meaning when used in these presents.

(B)    All references in these presents to Principal and/or premium and/or interest in respect of the Bonds or to any moneys payable by the Issuer or the Guarantor under these presents shall be deemed to include a reference to any additional amounts which may be payable under Condition 9 or, if applicable, under any undertaking or covenant given pursuant to Clause 15.1(N) or Clause 21.2(C) or Clause 22.2(C).

(C)    All references in these presents to "principal amount outstanding" shall be interpreted in the manner set out in Condition 1(a).

(D)    All references in these presents to (a) "Euro" or the sign "€" shall be construed as references to the currency introduced at the start of the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community as amended by the Treaty on European Union; and (b) "zloty" or the sign "PLN" shall be construed as references to the lawful currency for the time being of the Republic of Poland.

(E)    All references in these presents to any statute or any provision of any statute shall be deemed also to refer to any statutory modification or re-enactment thereof or any statutory instrument, order or regulation made thereunder or under any such modification or re-enactment.

(F)    All references in these presents to guarantees or to an obligation being guaranteed shall be deemed to include respectively references to indemnities or to an indemnity being given in respect thereof.

(G)    All references in these presents to any action, remedy or method of proceeding for the enforcement of the rights of creditors shall be deemed to include, in respect of any jurisdiction other than England, references to such action, remedy or method of proceeding for the enforcement of the rights of creditors available or appropriate in such jurisdiction as shall most nearly approximate to such action, remedy or method of proceeding described or referred to in these presents.

(H)    All references in these presents to taking proceedings against the Issuer or the Guarantor shall be deemed to include references to proving in the winding up of the Issuer or the Guarantor.

(I)    If at any time any provision of these presents is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of these presents nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

15

(J) In this Trust Deed references to Schedules, Clauses, sub-clauses, paragraphs and sub-paragraphs shall be construed as references to the Schedules to this Trust Deed and to the Clauses, sub-clauses, paragraphs and sub-paragraphs of this Trust Deed respectively.

(K) In these presents tables of contents and Clause headings are included for ease of reference and shall not affect the construction of these presents.

## 2. Covenant to Repay and to Pay Interest on Bonds

2.1 The aggregate principal amount of the Bonds is limited to Euro 510,000,000.

2.2 The Issuer covenants with the Trustee that it will, in accordance with these presents, on the due date for the final maturity of the Bonds provided for in the Conditions, or on such earlier date as the same or any part thereof may become immediately due and repayable thereunder, pay or procure to be paid unconditionally to or to the order of the Trustee or to such account as the Trustee may direct in Euro in immediately available funds the Adjusted Principal Amount ("Principal") as the Conditions may require of the Bonds repayable on that date and shall in the meantime and until such date (both before and after any judgment or other order of a court of competent jurisdiction) pay or procure to be paid unconditionally to or to the order of the Trustee as aforesaid the Interest Amount (which shall accrue from day to day) on the principal amount outstanding of the Bonds, payable on each Interest Payment Date for each Interest Period as set forth in Condition 4 and on each other date on which the same shall be payable in accordance with the Conditions PROVIDED THAT:

(A) every payment of Principal, premium (if any) or interest in respect of the Bonds to or to the account of the Principal Paying and Transfer Agent in the manner provided in the Agency Agreement shall operate in satisfaction *pro tanto* of the relative covenant by the Issuer in this Clause except to the extent that there is default in the subsequent payment thereof in accordance with the Conditions to the Bondholders;

(B) in any case where payment of Principal or premium (if any) is not made to the Trustee or the Principal Paying and Transfer Agent on or before the due date, interest shall continue to accrue on the principal amount outstanding of the Bonds (both before and after any judgment or other order of a court of competent jurisdiction) at the rate aforesaid (or, if higher, the rate of interest on judgment debts for the time being provided by English law) up to and including the date which the Trustee determines to be the date on and after which payment is to be made to the Bondholders in respect thereof as stated in a notice given to the Bondholders in accordance with Condition 16 (such date to be not later than 30 days after the day on which the whole of such Principal amount and premium (if any), together with an amount equal to the interest which has accrued and is to accrue pursuant to this proviso up to and including that date, has been received by the Trustee or the Principal Paying and Transfer Agent); and

16

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 41

(C)   in any case where payment of the whole or any part of the Principal or premium (if any) of any Bond is improperly withheld or refused upon due presentation thereof (other than in circumstances contemplated by proviso (B) above) interest shall accrue on that Principal or premium (if any) payment of which has been so withheld or refused (both before and after any judgment or other order of a court of competent jurisdiction) at the rate aforesaid (or, if higher, the rate of interest on judgment debts for the time being provided by English law) from and including the date of such withholding or refusal up to and including the date on which, upon further presentation of the Bond, payment of the full amount (including interest as aforesaid) in Euro payable in respect of such Bond is made or (if earlier) the seventh day after notice is given to the Bondholder (either individually or in accordance with Condition 16) that the full amount (including interest as aforesaid) in Euro payable in respect of such Bond is available for payment, provided that, upon further presentation thereof being duly made, such payment is made.

2.3   The Guarantor covenants with the Trustee that it will, in accordance with these presents, on the Contingent Payment Date pay or procure to be paid unconditionally to or to the order of the Trustee or to such account as the Trustee may direct in Euro in immediately available funds the Contingent Payment PROVIDED THAT:

(A)   every payment of the Contingent Payment to or to the account of the Principal Paying and Transfer Agent in the manner provided in the Agency Agreement shall operate in satisfaction *pro tanto* of the relative covenant by the Guarantor in this Clause except to the extent that there is default in the subsequent payment thereof in accordance with the Conditions to the Bondholders;

(B)   in any case where payment of the Contingent Payment is not made to the Trustee or the Principal Paying and Transfer Agent on or before the Contingent Payment Date, interest shall start to accrue on the Contingent Payment (both before and after any judgment or other order of a court of competent jurisdiction) at the rate that was applicable to the Bonds immediately prior to their final redemption (or, if higher, the rate of interest on judgment debts for the time being provided by English law) up to and including the date which the Trustee determines to be the date on and after which payment is to be made to the Bondholders in respect thereof as stated in a notice given to the Bondholders in accordance with Condition 16 (such date to be not later than 30 days after the day on which the whole of the Contingent Payment, together with an amount equal to the interest which has accrued and is to accrue pursuant to this proviso up to and including that date, has been received by the Trustee or the Principal Paying and Transfer Agent); and

(C)   in any case where payment of the whole or any part of the Contingent Payment is improperly withheld or refused upon due presentation thereof (other than in circumstances contemplated by proviso (D) above) interest shall accrue on that part of the Contingent Payment, payment of which has been so withheld or refused (both before and after any judgment or other order of a court of competent jurisdiction) at the rate that was applicable to the Bonds immediately prior to their final redemption (or, if higher, the rate of interest on judgment debts for the time being provided by

17

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 42

English law) from and including the date of such withholding or refusal up to and including the date on which, upon further presentation of the Bond, payment of the full amount (including interest as aforesaid) in Euro payable in respect of the Contingent Payment is made or (if earlier) the seventh day after notice is given to the Bondholder (either individually or in accordance with Condition 16) that the full amount (including interest as aforesaid) in Euro payable in respect of the Contingent Payment is available for payment, provided that, upon further presentation thereof being duly made, such payment is made.

2.4     Trustee's Requirements Regarding Paying and Transfer Agents, the Agent Bank and Registrar

At any time after an Event of Default or a Potential Event of Default shall have occurred or the Bonds shall otherwise have become due and repayable or the Trustee shall have received any money that it proposes to pay under Clause 11 to the Bondholders, the Trustee may:

(A)     by notice in writing to the Issuer, the Guarantor, the Principal Paying and Transfer Agent, the other Paying and Transfer Agents (if any), the Agent Bank and the Registrar require the Principal Paying and Transfer Agent, the other Paying and Transfer Agents (if any), the Agent Bank and the Registrar pursuant to the Agency Agreement:

(1)     to act thereafter as Principal Paying and Transfer Agent, Paying and Transfer Agents (if any), the Agent Bank and Registrar, respectively, of the Trustee in relation to payments to be made by or on behalf of the Trustee under the provisions of these presents mutatis mutandis on the terms provided in the Agency Agreement (save that the Trustee's liability under any provisions thereof for the indemnification, remuneration and payment of out-of-pocket expenses of the Paying and Transfer Agents, the Agent Bank and the Registrar shall be limited to the amounts for the time being held by the Trustee on the trusts of these presents relating to the Bonds) and thereafter to hold all Bonds and all sums, documents and records held by them in respect of the Bonds on behalf of the Trustee; or

(2)     to deliver up all Bonds and all sums, documents and records held by them in respect of the Bonds to the Trustee or as the Trustee shall direct in such notice provided that such notice shall be deemed not to apply to any documents or records which the relative Paying and Transfer Agent, the Agent Bank or, as the case may be, the Registrar is obliged not to release by any law or regulation; and

(B)     by notice in writing to the Issuer and the Guarantor require each of them to make all subsequent payments in respect of the Bonds to or to the order of the Trustee and not to the Principal Paying and Transfer Agent; with effect from the issue of any such notice to the Issuer and the Guarantor and until such notice is withdrawn provisos (A) and (B) to each of sub-clauses 2.2 and 2.3 of this Clause relating to the

18

Bonds shall cease to have effect.

### 3:     Form and Issue of Bonds

3.1     The Bonds shall be represented by the Global Certificates issued on the date hereof which the Issuer shall issue and deliver to a common depositary (the "Common Depositary") for, and registered in the name of a common nominee for, Euroclear and Clearstream, Luxembourg. The Global Certificates shall be typed, printed or lithographed in the form or substantially in the form set out in Part 1 of the First Schedule and shall be in the aggregate principal amount of Euro 510,000,000. The Global Certificates will be exchangeable for Definitive Bonds as set out in Clause 3.6 below. The Global Certificates shall be signed manually or in facsimile by a duly authorised officer of the Issuer and shall be authenticated by or on behalf of the Principal Paying and Transfer Agent. The Global Certificates shall be delivered on terms that the Common Depositary and nominee shall hold the same for the account of Euroclear and Clearstream, Luxembourg who will credit the accounts of the persons who would be entitled to receive Definitive Bonds if the provisions of Clause 3.6 below were then to apply and the successors in title to such persons as appearing in the respective records of Euroclear and Clearstream, Luxembourg for the time being.

3.2     Payments in respect of Bonds represented by a Global Certificate will be made against presentation for endorsement and, if no further payment falls to be made in respect of the Bonds, against surrender of the relevant Global Certificate to or to the order of the Principal Paying and Transfer Agent. A record of each payment so made will be noted on the appropriate schedule to the appropriate Global Certificate, which endorsement will be *prima facie* evidence that such payment has been made in respect of the Bonds.

3.3     Cancellation of any Bond following payment of the Contingent Payment or the purchase of the Bond, as the case may be, will be effected by the presentation of the relevant Global Certificate to or to the order of the Principal Paying and Transfer Agent for notation of such cancellation and, in the case of a purchase of the Bond, by a corresponding reduction in the principal amount of the Bonds shown in the register maintained by the Registrar in relation to the Bonds.

3.4     So long as the Bonds are represented by the Global Certificates and the Global Certificates are held by or on behalf of one or more clearing systems, notices to Bondholders shall be given by delivery of the relevant notice to that clearing system for communication by it to its accountholders in substitution for notification as required by the Conditions.

3.5     In considering the interests of Bondholders while any Bonds are represented by a Global Certificate held on behalf of Euroclear or Clearstream, Luxembourg, the Trustee may have regard to any information provided to it by such clearing system as to the identity (either individually or by category) of its accountholders which are entitled to beneficial interests in the Bonds represented by a Global Certificate and may consider such interests as if such accountholders were the holders of the Bonds represented by such Global Certificate.

19

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 44

3.6   If:

(A)   either Euroclear or Clearstream, Luxembourg is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so and no alternative clearing system approved by the Trustee is available; or

(B)   on the occasion of the next payment in respect of the Bonds, the Issuer, the Guarantor or any Paying and Transfer Agent would be required to make any deduction or withholding from any payment in respect of the Bonds which would not be required were the Bonds in definitive form;

then the Issuer will (in each case at the expense of the Issuer) issue Definitive Bonds (in exchange for the relevant Global Certificate) within 45 days of the occurrence of the relevant event in (A) or (B) above.

3.7   The Issuer shall notify the Trustee forthwith upon the occurrence of any of the events referred to in (A) or (B) of sub-clause 3.6 above and shall, unless the Trustee agrees otherwise, promptly give notice thereof and of its obligation to issue Definitive Bonds to the relevant Bondholders in accordance with Condition 16. The Conditions, these presents and the Agency Agreement will be amended in such manner as the Issuer and the Trustee may agree to be appropriate to take account of the issue of the Definitive Bonds and details of such amendments and notification of the availability of Definitive Bonds shall be given to the Bondholders by the Issuer in accordance with Condition 16 as soon as reasonably practicable.

3.8   The Definitive Bonds shall be in registered form in the form or substantially in the form set out in Part II of the First Schedule and the Definitive Bonds shall be issued in the denominations of Euro 1 each or integral multiples thereof and shall be endorsed with the Conditions amended pursuant to sub-clause 3.7 of this Clause. Title to the Definitive Bonds shall pass upon the registration of transfers in respect thereof in accordance with these presents, the Conditions and the Agency Agreement (in each case amended as aforesaid).

3.9   The Definitive Bonds shall be signed manually or in facsimile by a duly authorised officer of the Issuer and shall be authenticated by or on behalf of the Principal Paying and Transfer Agent. The Issuer may use the facsimile signature of any person who at the date of the issue of the Definitive Bonds is a duly authorised officer of the Issuer notwithstanding that at the time of delivery of such Definitive Bonds he may have ceased for any reason to be the holder of such office and the Definitive Bonds so executed shall, subject to authentication as provided above, be binding and valid obligations of the Issuer.

3.10   Neither the foregoing provisions of this Clause nor the provisions of the Global Certificate shall alter or impair the obligation of the Issuer which is absolute and unconditional to pay the Principal or premium (if any) of, and interest on, the Definitive Bonds in accordance with the Conditions amended as aforesaid.

20

4.    <u>Fees, Duties and Taxes</u>

4.1    The Issuer, failing whom the Guarantor, will pay any stamp, issue, registration, documentary and other fees, duties and taxes, including interest and penalties, payable in Poland, the Netherlands, the United Kingdom, Belgium or Luxembourg, in connection with the matters described in sub-paragraphs (A) and (B) below and in any jurisdiction, in the case of the matters referred to in sub-paragraph (C) below on or in connection with:

(A)    the execution and delivery of these presents and the Security Documents;

(B)    the constitution and original issue of the Bonds; and

(C)    any action taken by or on behalf of the Trustee or (where permitted under these presents so to do) any Bondholder to enforce, or to resolve any doubt concerning, or for any other purpose in relation to, these presents and the Security Documents.

5.    <u>Covenant of Compliance</u>

5.1    Each of the Issuer and the Guarantor jointly and severally covenants with the Trustee that it will comply with and perform and observe all the provisions of these presents and the Security Documents which are expressed to be binding on it. The Conditions shall be binding on the Issuer, the Guarantor and the Bondholders. The Trustee shall be entitled to enforce the obligations of the Issuer and the Guarantor under the Bonds, including the Conditions, as if the same were set out and contained herein constituting the same, which shall be read and construed as one document with the Bonds.

6.    <u>Cancellation of Bonds and Records</u>

6.1    The Issuer shall procure that all Bonds (i) redeemed, purchased or held by or on behalf of the Issuer, the Guarantor or any Subsidiary of the Guarantor or (ii) which, being mutilated or defaced, have been surrendered and replaced pursuant to Condition 14 shall forthwith be cancelled by or on behalf of the Issuer and a certificate stating:

(A)    the aggregate principal amount of Bonds which have been redeemed;

(B)    the serial numbers of such Bonds in definitive form;

(C)    the aggregate amount of interest paid (and the due dates of such payments) on the Global Certificate and Bonds in definitive form;

(D)    the aggregate principal amount of Bonds (if any) which have been purchased by or on behalf of the Issuer or the Guarantor or any Subsidiary of the Guarantor and cancelled and the serial numbers of such Bonds in definitive form; and

(E)    the aggregate principal amounts of Bonds which have been so surrendered and replaced and the serial numbers of such Bonds in definitive form,

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 46

shall be given to the Trustee by or on behalf of the Issuer as soon as possible and in any event within four months after the date of such redemption, occurrence, purchase, payment or replacement (as the case may be). The Trustee may accept such certificate as conclusive evidence of redemption, exchange, purchase or replacement *pro tanto* of the Bonds or payment of interest thereon and of cancellation of the Bonds.

6.2    The Issuer shall use all reasonable endeavours to procure:

    (A)    that the Principal Paying and Transfer Agent shall keep a full and complete record of all Bonds and of their redemption, purchase by or on behalf of the Issuer, the Guarantor or any Subsidiary of the Guarantor, cancellation or payment and of all replacement securities issued in substitution for lost, stolen, mutilated, defaced or destroyed Bonds; and

    (B)    that such records shall be made available to the Trustee at all reasonable times.

7.    **Covenants by the Guarantor**

7.1    The Guarantor hereby covenants with the Trustee that:

    (A)    it will not dispose of or otherwise deal with, and that it will remain the beneficial owner of all of the issued share capital of the Issuer and that it will not take any steps to wind up or instigate any other insolvency proceedings in relation to the Issuer while any of the Bonds are outstanding;

    (B)    whenever it gives a notice to the holders of the Guarantor Bonds pursuant to the terms and conditions of the Guarantor Bonds or the Guarantor Bond Trust Deed or otherwise, it shall simultaneously give such notice to the Trustee and the Bondholders in accordance with Condition 16;

    (C)    it will procure the compliance by the Issuer with all the Issuer's obligations under the Bonds and this Trust Deed;

    (D)    it will comply with and perform and observe all the provisions of the Guarantor Bond Trust Deed and the Guarantor Bonds to be performed by it and it will not make any amendment to the Guarantor Bond Trust Deed or the terms and conditions of the Guarantor Bonds without the agreement of the Trustee;

    (E)    it will not take any action to redeem, purchase, repay or prepay any of the Guarantor Bonds prior to the Contingent Payment Date, save as may be required to fund redemption of the Bonds; and

    (F)    will comply with its obligations under the Preliminary Purchase Agreement.

8.    **Guarantee**

8.1    The Guarantor hereby irrevocably and unconditionally guarantees to the Trustee:

22

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 47

    (A)    the due and punctual payment in accordance with the provisions of these presents of the Principal of and premium and interest on the Bonds and of any other amounts payable by the Issuer under the Bonds or otherwise under these presents;

    (B)    the due and punctual performance and observance by the Issuer of each of the other provisions of these presents on the Issuer's part to be performed or observed.

8.2    If the Issuer fails for any reason whatsoever punctually to pay any such Principal, interest or other amount, the Guarantor shall cause each and every such payment to be made as if the Guarantor instead of the Issuer was expressed to be the primary obligor under these presents and not merely as surety (but without affecting the Issuer's obligations) to the intent that the Bondholders will receive the same amounts in respect of Principal, premium, interest or such other amount as would have been receivable had such payment been made by the Issuer PROVIDED THAT:

    (A)    where the Issuer is or would be required to deduct or withhold from such payment any amount for or on account of any withholding taxes, upon a call being made under this Clause, the Guarantor shall pay the full amount due to the Trustee as if no withholding or deduction was required to be made by the Issuer; and

    (B)    where the Guarantor is required to deduct or withhold any amount for or on account of any withholding taxes, the Guarantor shall pay the amount due to the Trustee under deduction of any withholding taxes, together with such additional amounts as may be necessary to ensure that the Trustee receives a net amount equal to the full amount which it would have received had payment not been made subject to tax.

8.3    If any payment received by the Trustee or any Bondholder under the provisions of these presents shall (whether on the subsequent bankruptcy, insolvency or corporate reorganisation of the Issuer or, without limitation, on any other event) be avoided or set aside for any reason, such payment shall not be considered as discharging or diminishing the liability of the Guarantor and this guarantee shall continue to apply as if such payment had at all times remained owing by the Issuer and the Guarantor shall indemnify the Trustee and the Bondholders in respect thereof.

8.4    The Guarantor hereby agrees that its obligations under this Clause shall be unconditional and that the Guarantor shall be fully liable irrespective of the validity, regularity, legality or enforceability against the Issuer of, or of any defence or counter-claim whatsoever available to the Issuer in relation to, its obligations under these presents, whether or not any action has been taken to enforce the same or any judgment obtained against the Issuer, whether or not any of the other provisions of these presents have been modified, whether or not any time, indulgence, waiver, authorisation or consent has been granted to the Issuer by or on behalf of the Bondholders or the Trustee, whether or not any determination has been made by the Trustee pursuant to Clauses 21 or 22, whether or not there have been any dealings or transactions between the Issuer, any of the Bondholders or the Trustee, whether or not the Issuer has been dissolved, liquidated, merged, consolidated, bankrupted or has changed its status, functions, control or ownership, whether or not the Issuer has been prevented from making payment by foreign exchange provisions applicable at its place of registration or

23

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 48

incorporation and whether or not any other circumstances have occurred which might otherwise constitute a legal or equitable discharge of or defence to a guarantor. Accordingly the validity of this guarantee shall not be affected by reason of any invalidity, irregularity, illegality or unenforceability of all or any of the obligations of the Issuer under these presents and this guarantee shall not be discharged nor shall the liability of the Guarantor under these presents be affected by any act, thing or omission or means whatever whereby its liability would not have been discharged if it had been the principal debtor.

8.5    Without prejudice to the provisions of Clauses 10 and 11 the Trustee may determine from time to time whether or not it will enforce this guarantee which it may do without making any demand of or taking any proceedings against the Issuer and may from time to time make any arrangement or compromise with the Guarantor in relation to this guarantee which the Trustee may consider expedient in the interests of the Bondholders.

8.6    The Guarantor waives diligence, presentment, demand of payment, filing of claims with a court in the event of dissolution, liquidation, merger or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest or notice with respect to these presents or the indebtedness evidenced thereby and all demands whatsoever and covenants that this guarantee shall be a continuing guarantee, shall extend to the ultimate balance of all sums payable and obligations owed by the Issuer under these presents, shall not be discharged except by complete performance of the obligations in these presents and is additional to, and not instead of, any security or other guarantee or indemnity at any time existing in favour of any person, whether from the Guarantor or otherwise.

8.7    The Guarantor hereby waives irrevocably and unconditionally:

(A)    all rights of subrogation, indemnity, contribution or otherwise (arising under common law, equity, statute or otherwise howsoever) which it might otherwise have against the Issuer by virtue of any payment made by the Guarantor pursuant to this guarantee;

(B)    in respect of any other money for the time being due to the Guarantor by the Issuer any claim for payment thereof or any rights to exercise or seek to exercise any other rights or remedy whatsoever;

(including in either case claiming the benefit of any security or right of set-off or, on the liquidation of the Issuer, proving in competition with the Trustee). If, notwithstanding the foregoing, upon the bankruptcy, insolvency or liquidation of the Issuer, any payment or distribution of assets of the Issuer of any kind or character, whether in cash, property or securities, shall be received by the Guarantor or if the Guarantor is able to exercise any set off rights against the Issuer before payment in full of all amounts payable under these presents shall have been made to the Bondholders and the Trustee, such payment or distribution and/or an amount equal to the amount so set-off shall be received by the Guarantor and shall be held by the Guarantor on trust to pay the same over immediately to the Trustee for the Bondholders.

24

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 49

8.8    The obligations of the Guarantor under these presents constitute direct, unconditional and secured obligations of the Guarantor and (subject as aforesaid) rank and will rank *pari passu* with all other outstanding secured and unsubordinated obligations of the Guarantor, present and future, but, in the event of insolvency, only to the extent permitted by applicable laws relating to creditors' rights.

9.    Enforcement

9.1    The Trustee may at any time, at its discretion and without notice, take such proceedings and/or other action as it may think fit against or in relation to the Issuer or the Guarantor to enforce their respective obligations under these presents.

9.2    Proof that as regards any specified Bond the Issuer or the Guarantor has made default in paying any amount due in respect of such Bond shall (unless the contrary be proved) be sufficient evidence that the same default has been made as regards all other Bonds in respect of which the relevant amount is due and payable.

9.3    In case of an Event of Default, the Trustee may, and shall if requested to do so in writing by holders of at least thirty per cent. in principal amount outstanding of the Bonds or if so directed by an Extraordinary Resolution of the holders of the Bonds and, in either case, subject to it being secured and/or indemnified to its satisfaction, direct the Security Agent to enforce the security created in the Security Documents in favour of the Bondholders, subject to the terms of the Security Administration Agreement and subject, in the case of the Submissions to Execution, to Clauses 9.4 and 9.5 below.

9.4    The Submissions to Execution shall only be enforceable in the event that:

(A)    an Event of Default occurs under Condition 12(i);

(B)    the Trustee has given notice to the Issuer and the Guarantor of the occurrence of an Event of Default under Condition 12(i) in accordance with Clause 28; and

(C)    the Trustee has initiated enforcement proceedings in relation to the Bonds in accordance with Condition 13 or has received a request in writing from holders of at least thirty per cent in principal amount outstanding of the Bonds or has been directed by an Extraordinary Resolution, in each case to enforce all or any of the Security Documents.

9.5    The value of assets and/or cash which may be foreclosed upon under both the Trustee Submission to Execution and the Security Agent Submission to Execution shall together not exceed €725,000,000.

9.6    If, following an Event of Default and in connection with any enforcement of any of the shares comprised in the Security, the Trustee instructs the Security Agent to take over the title to any shares (the "Relevant Shares") in accordance with the provisions of the Polish Act on Registered Pledge and the Registry of Pledges dated December 6, 1996 and to dispose of the Relevant Shares in accordance with the Trustee's instructions, then the

25

Trustee shall, and shall instruct the Security Agent to, apply any proceeds in accordance with Clause 11.

10.    **Proceedings, Action and Indemnification**

10.1    The Trustee shall not be bound to take any proceedings mentioned in Clause 9 or any other action in relation to these presents unless respectively directed or requested to do so (i) by an Extraordinary Resolution of the holders of the Bonds or (ii) in writing by the holders of at least thirty per cent in principal amount outstanding of the Bonds and in either (i) or (ii) then only if it shall be indemnified to its satisfaction against all Liabilities to which it may thereby render itself liable or which it may incur by so doing.

10.2    Only the Trustee may enforce (i) by written instruction pursuant to the terms of the Security Administration Agreement, the security created in favour of the Security Agent for the benefit of the Trustee for itself and for the benefit of the Bondholders by, and contained in, the Pledge Agreements or (ii) the provisions of these presents. No Bondholder shall be entitled to proceed directly against the Issuer or the Guarantor to enforce the performance of any of the provisions of these presents unless the Trustee having become bound as aforesaid to take proceedings fails to do so within a reasonable period and such failure is continuing.

10.3    The Trustee shall not be obliged to give any such direction to the Security Agent unless and until it has been instructed in writing to do so by the holders of not less than 30 per cent in principal amount outstanding of the Bonds and it has been indemnified to its satisfaction against any liabilities it or the Security Agent may incur as a result of giving such direction.

11.    **Application of Moneys**

11.1    All moneys received by the Trustee under these presents and/or under the Security Documents shall be held by the Trustee upon trust to apply them (subject to Clause 13):

(A)    first in payment or satisfaction of all amounts then due and unpaid under Clauses 16 and/or 17(J) to the Trustee;

(B)    secondly in or towards payment pari passu and rateably of all Principal, premium (if any), interest and any other amounts then due and unpaid in respect of the Bonds; and

(C)    thirdly in payment of the balance (if any) to the Issuer or the Guarantor (without prejudice to, or liability in respect of, any question as to how such payment to the Issuer or the Guarantor shall be dealt with as between the Issuer or the Guarantor and any other person).

12.    **Notice of Payments**

12.1    The Trustee shall give notice to the relevant Bondholders in accordance with Condition 16 of the day fixed for any payment to them under Clause 11. Such payment may be made in

26

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 51

accordance with Condition 7 and any payment so made shall be a good discharge to the Trustee.

13.    **Investment by Trustee**

13.1    If the amount of the moneys at any time available for the payment of Principal, premium (if any) and interest in respect of the Bonds under Clause 11 shall be less than 10 per cent. of the principal amount outstanding of the Bonds the Trustee may at its discretion invest such moneys in some or one of the investments authorised below. The Trustee at its discretion may vary such investments and may accumulate such investments and the resulting income until the accumulations, together with any other funds for the time being under the control of the Trustee and available for such purpose, amount to at least 10 per cent. of the principal amount outstanding of the Bonds and then such accumulations and funds shall be applied under Clause 11.

13.2    Any moneys which under the trusts of these presents ought to or may be invested by the Trustee may be invested in the name or under the control of the Trustee in any investments or other assets in any part of the world whether or not they produce income or by placing the same on deposit in the name or under the control of the Trustee at such bank or other financial institution and in such currency as the Trustee may think fit. The Trustee may at any time vary any such investments for or into other investments or convert any moneys so deposited into any other currency and shall not be responsible for any loss resulting from any such investments or deposits, whether due to depreciation in value, fluctuations in exchange rates or otherwise.

14.    **Partial Payments**

14.1    Upon any payment under Clause 11 (other than payment in full against surrender of a Bond) the Bond in respect of which such payment is made shall be produced to the Trustee or the Paying and Transfer Agent or, as the case may be, the Registrar by or through whom such payment is made and the Trustee shall or shall cause such Paying and Transfer Agent or, as the case may be, the Registrar to enface thereon a memorandum of the amount and the date of payment but the Trustee may in any particular case or generally dispense with such production and enfacement upon such indemnity being given as it shall think sufficient.

15.    **Covenants by the Issuer and the Guarantor**

15.1    So long as any of the Bonds remains outstanding (or, in the case of paragraphs (H), (I), (L), (M) and (O), so long as any of the Bonds remains liable to prescription) each of the Issuer and the Guarantor covenants with the Trustee that it shall:

(A)    at all times carry on and conduct its affairs and procure that its Subsidiaries carry on and conduct their respective affairs in a proper and efficient manner;

(B)    give or procure to be given to the Trustee such opinions, certificates, information and evidence as it shall require and in such form as it shall require (including without limitation the procurement by the Issuer of all such certificates called for by

27

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 52

the Trustee pursuant to Clause 17(C)) for the purpose of the discharge or exercise of the duties, trusts, powers, authorities and discretions vested in it under these presents or by operation of law;

(C)    cause to be prepared and certified by the Auditors in respect of each financial accounting period accounts in such form as will comply with all relevant legal and accounting requirements;

(D)    at all times keep and procure its Subsidiaries to keep proper books of account and allow and procure its Subsidiaries to allow the Trustee and any person appointed by the Trustee to whom the Issuer shall have no reasonable objection free access to its books of account at all reasonable times during normal business hours;

(E)    send to the Trustee (in addition to any copies to which it may be entitled as a holder of any securities of the Issuer) two copies in English of every balance sheet, profit and loss account, report, circular and notice of general meeting and every other document issued or sent to its shareholders together with any of the foregoing, and every document issued or sent to holders of securities other than its shareholders (including the Bondholders) as soon as practicable after the issue or publication thereof;

(F)    forthwith give notice in writing to the Trustee of the occurrence of any Event of Default or any Potential Event of Default;

(G)    give to the Trustee (a) within 14 days after demand by the Trustee therefor and (b) (without the necessity for any such demand) promptly after the publication of its annual audited consolidated accounts in respect of each financial period commencing with the financial period ending 31st December 1999 and in any event not later than 180 days after the end of each such financial period a certificate of each of the Issuer and the Guarantor signed by the Managing Director of the Issuer and two directors of the Guarantor to the effect that to the best of the knowledge, information and belief of the Directors signing the Certificate as at a date not more than seven days before delivering such certificate (the "relevant date") there did not exist and had not existed since the relevant date of the previous certificate (or in the case of the first such certificate the date hereof) any Event of Default or any Potential Event of Default (or if such exists or existed specifying the same) and that during the period from and including the relevant date of the last such certificate (or in the case of the first such certificate the date hereof) to and including the relevant date of such certificate each of the Issuer and the Guarantor has complied with all its obligations contained in these presents or (if such is not the case) specifying the respects in which it has not complied;

(H)    at all times execute and do all such further documents, acts and things as may be necessary at any time or times in the opinion of the Trustee to give effect to these presents;

28

(I)    at all times maintain Paying and Transfer Agents, an Agent Bank and a Registrar in accordance with the Conditions;

(J)    use its reasonable endeavours to procure the Principal Paying and Transfer Agent to notify the Trustee forthwith in the event that it does not, on or before the due date for any payment in respect of the Bonds or any of them, receive unconditionally pursuant to the Agency Agreement payment of the full amount in the requisite currency of the moneys payable on such due date on all such Bonds as the case may be;

(K)    in the event of the unconditional payment to the Principal Paying and Transfer Agent of any sum due in respect of the Bonds or any of them being made after the due date for payment thereof forthwith give or procure to be given notice to the relevant Bondholders in accordance with Condition 16 that such payment has been made;

(L)    give notice to the Bondholders in accordance with Condition 16 of any appointment, resignation or removal of any Paying and Transfer Agent, the Agent Bank or Registrar (other than the appointment of the initial Paying and Transfer Agents and Registrar) after having obtained the approval of the Trustee thereto or any change of any Paying and Transfer Agent's or Registrar's specified office and (except as provided by the Agency Agreement or the Conditions) at least 30 days prior to such event taking effect; PROVIDED ALWAYS THAT so long as any of the Bonds remains outstanding (in the case of the termination of the appointment of the Registrar) or so long as any of the Bonds remains liable to prescription (in the case of the termination of the appointment of the Principal Paying and Transfer Agent) no such termination shall take effect until a new Registrar or Principal Paying and Transfer Agent (as the case may be) has been appointed on terms approved by the Trustee;

(M)    obtain the prior written approval of the Trustee to, and promptly give to the Trustee two copies of, the form of every notice given to the Bondholders in accordance with Condition 16 (such approval, unless so expressed, not to constitute approval for the purposes of Section 21 of the Financial Services and Markets Act 2000 of the United Kingdom of any such notice which is an investment advertisement (as therein defined));

(N)    if payments of Principal, premium, interest or any other amount in respect of the Bonds by the Issuer or payments by the Guarantor shall become subject generally to the taxing jurisdiction of any territory or any political sub-division thereof or any authority thereof or therein having power to tax other than or in addition to the Netherlands or Poland, as the case may be, or any such political sub-division thereof or any such authority thereof or therein, immediately upon becoming aware thereof notify the Trustee of such event and (unless the Trustee otherwise agrees) enter forthwith into a trust deed supplemental to this Trust Deed, giving to the Trustee an undertaking or covenant in form and manner satisfactory to the Trustee in terms corresponding to the terms of Condition 9 with the substitution for (or, as the case

29

may be, the addition to) the references therein to the Netherlands or Poland, as the case may be, or any political sub-division thereof or any authority thereof or therein having power to tax of references to that other or additional territory or any political sub-division thereof or any authority thereof or therein having power to tax to whose taxing jurisdiction such payments shall have become subject as aforesaid such trust deed also (where applicable) to modify Condition 6(c) so that such Condition shall make reference to the other or additional territory, any political sub-division thereof and any authority thereof or therein having power to tax;

(Q)     comply with and perform all its obligations under the Agency Agreement and use its best endeavours to procure that the Paying and Transfer Agents, the Agent Bank and the Registrar comply with and perform all their respective obligations thereunder and (in the case of the Paying and Transfer Agents) any notice given by the Trustee pursuant to Clause 2.4(A) and not make any amendment or modification to such Agreement without the prior written approval of the Trustee;

(P)     in order to enable the Trustee to ascertain the principal amount outstanding of Bonds from time to time for any of the purposes referred to in the proviso to the definition of "outstanding" in Clause 1, deliver to the Trustee promptly upon being so requested in writing by the Trustee a certificate in writing signed by two Directors of the Guarantor setting out the total number and aggregate principal amount of the Bonds which:

(1)     up to and including the date of such certificate have been purchased by the Issuer, the Guarantor or any Subsidiary of the Guarantor and cancelled; and

(2)     are at the date of such certificate held by, for the benefit of, or on behalf of, the Issuer, the Guarantor or any Subsidiary of the Guarantor;

(Q)     use its best endeavours to procure that each of the Paying and Transfer Agents makes available for inspection by Bondholders at its specified office copies of these presents, the Agency Agreement, the Security Documents and the Latest Consolidated Accounts;

(R)     give to the Trustee at the same time as sending to it the certificates referred to in paragraph (G) above and in any event not later than 180 days after the last day of each financial period of the Company, a certificate by the Auditors listing those Subsidiaries of the Company which as at such last day were Material Subsidiaries;

(S)     give to the Trustee, as soon as reasonably practicable after the acquisition or disposal of any company which thereby becomes or ceases to be a Material Subsidiary or after any transfer is made to any Subsidiary of the Company which thereby becomes a Material Subsidiary, a certificate by the Auditors to such effect;

(T)     ensure that each Bond to be issued or other transaction to be effected under these presents shall comply with all applicable laws and regulations of any governmental or other regulatory authority of the country of any relevant currency for the purposes of any relevant Bond and that all necessary consents and approvals of, and

30

registrations or filings with, any such authority in connection therewith are obtained and maintained in full force and effect and copies thereof are promptly provided to the Trustee;

(U) give to the Trustee promptly upon being so requested by the Trustee a certificate by the Auditors in connection with such matters relating to these presents as the Trustee may require;

(V) for so long as any Bonds are restricted securities within the meaning of Rule 144(a)(3) under the Securities Act, unless it becomes subject to and complies with the reporting requirements of Sections 13 or 15(d) of the Securities Exchange Act of 1934, as amended, or the information furnishing requirements of Rule 12g3-2(b) thereunder, provide to any holder of such restricted securities or to a prospective purchaser of such restricted securities designated by a holder upon the request of such holder or prospective purchaser, any information required to be provided by Rule 144A(d)(4) under the Securities Act;

(W) in the event of the payment under the Bonds of any sum thereunder being made after the due date for payment thereof, immediately give notice to the Bondholders in accordance with Condition 16 that such payment has been made;

(X) procure that the Issuer will not engage in any business activity or undertake any other activity, except any activity relating to the offering, sale or issuance of indebtedness or the lending or otherwise advancing the proceeds thereof to the Guarantor or any Subsidiary of the Guarantor and any other activities in connection therewith;

(Y) take or procure to be taken such steps as it can take or procure to be taken to minimise any tax liability in connection with the activities of the Issuer in the Netherlands;

(Z) at all times comply with the provisions of the Ministerial Regulation of 4th February 1993 (BGW 93/6) in implementation of article 1, paragraph 3 of the 1992 Act on the Supervision of the credit system of the Netherlands;

(AA) execute the Security Documents and execute such further documents and take such further action as may be necessary to give effect to those agreements and comply with all its obligations under the same;

(BB) seek the approvals, if any, to pledge the Guarantor's holding of shares in Zespół Elektrowni Pątnów-Adamów-Konin S.A. ("PAK") in favour of the Security Agent, and notify the Trustee and the Paying and Transfer Agents forthwith upon receiving such approvals;

(CC) immediately upon receiving the approvals referred to in sub-clause (BB) above, execute ordinary and registered pledge agreements with the Security Agent (as delegate of the Trustee) in relation to the Guarantor's holding of shares in PAK in accordance with any requirements of Polish law;

31

(DD)  seek and use all reasonable commercial endeavours to obtain (A) the approvals required under the terms of the Third Investment Agreement in order to grant a first ranking assignment by way of security of the receivables referred to in paragraphs (iii) and (vi) of the definition of "ET Receivable" in Condition 6(f), and (B) the approvals required under the terms of the Telco Purchase Agreement in order to grant a first ranking assignment by way of security of the receivables referred to in paragraphs (iv) and (v) of the definition of "ET Receivable" in Condition 6(f). Immediately upon obtaining such approvals and, in the case of the receivables referred to in paragraph (vi) of the definition of "ET Receivable" in Condition 6(f), upon executing a settlement agreement between the Guarantor and Elektrim Telekomunikacja, the Guarantor covenants with the Trustee that it shall notify the Trustee and shall grant a first ranking assignment to the Security Agent by way of security of the relevant receivables; and

(EE)  immediately upon receiving the approvals referred to in sub-clause (DD) above and, in the case of the receivables referred to in paragraph (vi) of the definition of "ET Receivable" in Condition 6(f), upon executing a settlement agreement between the Guarantor and Elektrim Telekomunikacja, execute an assignment agreement with the Security Agent (as delegate of the Trustee) in relation to the relevant receivables in accordance with any requirements of Polish law.

16.     **Remuneration and Indemnification of Trustee**

16.1    The Issuer, failing whom the Guarantor, shall pay to the Trustee remuneration for its services as trustee as from the date of this Trust Deed, such remuneration to be at such rate and payable at such times as may from time to time be agreed between the Issuer and the Trustee.  Such remuneration shall accrue from day to day and be payable (in priority to payments to the Bondholders) up to and including the date when, all the Bonds having become due for redemption, the redemption moneys and interest thereon to the date of redemption have been paid to the Principal Paying and Transfer Agent or the Trustee PROVIDED THAT if, upon due presentation of any Bond or any cheque, payment of the moneys due in respect thereof is improperly withheld or refused, remuneration will commence again to accrue.

16.2    In the event of the occurrence of an Event of Default or a Potential Event of Default or the Trustee considering it expedient or necessary or being requested by the Issuer to undertake duties which the Trustee and the Issuer agree to be of an exceptional nature or otherwise outside the scope of the normal duties of the Trustee under these presents the Issuer shall pay to the Trustee such additional remuneration as shall be agreed between them.

16.3    The Issuer shall in addition pay to the Trustee an amount equal to the amount of any value added tax or similar tax chargeable in respect of its remuneration under these presents.

16.4    In the event of the Trustee and the Issuer failing to agree:

(A)     (in a case to which sub-clause 16.1 above applies) upon the amount of the remuneration; or

32

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 57

(B)    (in a case to which sub-clause 16.2 above applies) upon whether such duties shall be of an exceptional nature or otherwise outside the scope of the normal duties of the Trustee under these presents, or upon such additional remuneration,

such matters shall be determined by a merchant bank (acting as an expert and not as an arbitrator) selected by the Trustee and approved by the Issuer or, failing such approval, nominated (on the application of the Trustee) by the President for the time being of The Law Society of England and Wales (the expenses involved in such nomination and the fees of such merchant bank being payable by the Issuer) and the determination of any such merchant bank shall be final and binding upon the Trustee and the Issuer.

16.5    The Issuer shall also pay or discharge all Liabilities properly incurred by the Trustee in relation to the preparation and execution of, the exercise of its powers and the performance of its duties under, and in any other manner in relation to, these presents and the Security Documents (including all Liabilities properly incurred by the Trustee in relation to the preparation and execution of any supplemental deeds, including but not limited to legal and travelling expenses and any stamp, issue, registration, documentary and other taxes or duties paid or payable by the Trustee in connection with any action taken or contemplated by or on behalf of the Trustee for enforcing, or resolving any doubt concerning, or for any other purpose in relation to, these presents. The Issuer and the Guarantor confirm that all amounts payable by the Trustee to the Security Agent under the Security Documents shall be Liabilities.

16.6    All amounts payable pursuant to sub-clause 16.5 above and/or Clause 17(J) shall be payable by the Issuer on the date specified in a demand by the Trustee and in the case of payments actually made by the Trustee prior to such demand shall (if not paid within three days after such demand and the Trustee so requires) carry interest at the rate of two per cent per annum above the Base Rate from time to time of The Royal Bank of Scotland Plc from the date specified in such demand, and in all other cases shall (if not paid on the date specified in such demand or, if later, within three days after such demand and, in either case, the Trustee so requires) carry interest at such rate from the date specified in such demand. All remuneration payable to the Trustee shall carry interest at such rate from the due date therefor.

16.7    Unless otherwise specifically stated in any discharge of these presents the provisions of this Clause and Clause 17(J) shall continue in full force and effect notwithstanding such discharge.

16.8.    All payments to be made by the Issuer to the Trustee under these presents shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or within any relevant jurisdiction or any authority therein or thereof having power to tax, unless such withholding or deduction is required by law. In that event, the Issuer, shall pay such additional amounts as would have been received by it had no such withholding or deduction been required.

33

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 58

17.    Supplement to Trustee Act 1925

17.1    The Trustee shall have all the powers conferred upon trustees by the Trustee Act 1925 of England and Wales and by way of supplement thereto it is expressly declared as follows:

(A)    The Trustee may in relation to these presents and the Security Documents act on the advice or opinion of or any information obtained from any lawyer, valuer, accountant, surveyor, banker, broker, auctioneer or other expert considered by the Trustee to be of good repute whether obtained by the Issuer, the Guarantor, the Trustee or otherwise and shall not be responsible for any loss occasioned by so acting.  The Trustee may rely, without liability to the Bondholders, on any certificate or report prepared by the Auditors pursuant to these presents or the Security Documents whether or not addressed to the Trustee.

(B)    Any such advice, opinion or information may be sent or obtained by letter, telex, telegram, facsimile transmission or cable and the Trustee shall not be liable for acting on any advice, opinion or information purporting to be conveyed by any such letter, telex, telegram, facsimile transmission or cable although the same shall contain some error or shall not be authentic.

(C)    The Trustee may call for and shall be at liberty to accept as sufficient evidence of any fact or matter or the expediency of any transaction or thing a certificate signed by the Managing Director of the Issuer and/or by any two directors of the Guarantor and the Trustee shall not be bound in any such case to call for further evidence or be responsible for any Liability that may be occasioned by it or any other person acting on such certificate.

(D)    The Trustee shall be at liberty to hold or to place these presents and any other documents relating thereto in any part of the world with any banker or banking company or company whose business includes undertaking the safe custody of documents considered by the Trustee to be of good repute or lawyer or firm of lawyers considered by the Trustee to be of good repute and the Trustee shall not be responsible for or required to insure against any Liability incurred in connection with any such deposit and may pay all sums required to be paid on account of or in respect of any such deposit provided that, unless it is required in connection with the enforcement of any obligation of the Issuer or the Guarantor under the Trust Deed, the Agency Agreement, the Bonds or otherwise in connection with the performance of the duties of the Trustee hereunder or thereunder, the Trustee may not take such action if a liability to stamp duty or other duties or taxes would thereby arise.

(E)    The Trustee shall not be responsible for the receipt or application of the proceeds of the issue of any of the Bonds by the Issuer, the exchange of the Global Certificates for Definitive Bonds or the delivery of the Global Certificates or Definitive Bonds to the person(s) entitled to it or them.

34

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 59

(F)  The Trustee shall not be bound to give notice to any person of the execution of any documents comprised or referred to in these presents or to take any steps to ascertain whether any Event of Default or any Potential Event of Default has occurred and, until it shall have actual knowledge or express notice to the contrary, the Trustee shall be entitled to assume that no Event of Default or Potential Event of Default has occurred and that the Issuer and the Guarantor are observing and performing all their obligations under these presents and the Security Documents.

(G)  Save as expressly otherwise provided in these presents, the Trustee shall have absolute and uncontrolled discretion as to the exercise of its trusts, powers, authorities and discretions under these presents and the Security Documents (the exercise of which as between the Trustee and the Bondholders shall be conclusive and binding on the Bondholders) and shall not be responsible for any Liability which may result from their exercise or non-exercise.

(H)  The Trustee shall not be liable to any person by reason of having acted in good faith upon any resolution purporting to have been passed at any meeting of the Bondholders in respect whereof minutes have been made and signed even though subsequent to its acting it may be found that there was some defect in the constitution of the meeting or the passing of the resolution or that for any reason the resolution was not valid or binding upon such Bondholders.

(I)  The Trustee shall not be liable to any person by reason of having accepted as valid or not having rejected any Bond purporting to be such and subsequently found to be forged or not authentic.

(J)  Without prejudice to the right of indemnity by law given to trustees, the Issuer and the Guarantor shall indemnify the Trustee and every Appointee (including the Security Agent) and keep it or him indemnified against all Liabilities to which it or he may be or become subject or which may be incurred by it or him in the execution or purported execution of any of its or his trusts, powers, authorities and discretions under these presents or its or his functions under any such appointment or in respect of any other matter or thing done or omitted in any way relating to these presents.

(K)  Any consent or approval given by the Trustee for the purposes of these presents or the Security Documents may be given on such terms and subject to such conditions (if any) as the Trustee thinks fit and notwithstanding anything to the contrary in these presents may be given retrospectively.

(L)  The Trustee shall not (unless and to the extent ordered so to do by a court of competent jurisdiction) be required to disclose to any Bondholder any information (including, without limitation, information of a confidential, financial or price sensitive nature) made available to the Trustee by the Issuer or any other person in connection with these presents or the Security Documents and no Bondholder shall be entitled to take any action to obtain from the Trustee any such information.

35

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 60

(M)  Where it is necessary or desirable for any purpose in connection with these presents or the Security Documents to convert any sum from one currency to another it shall (unless otherwise provided by these presents or the Security Documents or required by law) be converted at such rate or rates, in accordance with such method and as at such date for the determination of such rate of exchange, as may be agreed by the Trustee in consultation with the Issuer or the Guarantor (as relevant) and any rate, method and date so agreed shall be binding on the Issuer, the Guarantor and the Bondholders.

(N)  The Trustee as between itself and the Bondholders may determine all questions and doubts arising in relation to any of the provisions of these presents and the Security Documents. Every such determination, whether or not relating in whole or in part to the acts or proceedings of the Trustee, shall be conclusive and shall bind the Trustee and the Bondholders.

(O)  In connection with the exercise by it of any of its trusts, powers, authorities and discretions under these presents and the Security Documents (including, without limitation, any modification, waiver, authorisation, determination or substitution), the Trustee shall have regard to the interests of the Bondholders as a class and, in particular but without limitation, shall not have regard to the consequences of such exercise for individual Bondholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or any political sub-division thereof and the Trustee shall not be entitled to require, nor shall any Bondholder be entitled to claim, from the Issuer, the Guarantor, the Trustee or any other person any indemnification or payment in respect of any tax consequence of any such exercise upon individual Bondholders except to the extent already provided for in Condition 9 and/or any undertaking given in addition thereto or in substitution therefor under these presents.

(P)  Any trustee of these presents being a lawyer, accountant, broker or other person engaged in any profession or business shall be entitled to charge and be paid all usual professional and other charges for business transacted and acts done by him or his firm in connection with the trusts of these presents and the Security Documents and also his reasonable charges in addition to disbursements for all other work and business done and all time spent by him or his firm in connection with matters arising in connection with these presents.

(Q)  The Trustee may whenever it thinks fit delegate by power of attorney or otherwise to any person or persons or fluctuating body of persons (whether being a joint trustee of these presents or not) all or any of its trusts, powers, authorities and discretions under these presents and the Security Documents. Such delegation may be made upon such terms (including power to sub-delegate) and subject to such conditions and regulations as the Trustee may in the interests of the Bondholders think fit. If the Trustee exercises reasonable care in the selection of such delegate, the Trustee shall not be under any obligation to supervise the proceedings or acts of any such delegate or sub-delegate or be in any way responsible for any Liability

36

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 61

incurred by reason of any misconduct or default on the part of any such delegate or sub-delegate. The Trustee shall within a reasonable time after any such delegation or any renewal, extension or termination thereof give notice thereof to the Issuer.

(R)   The Trustee may in the conduct of the trusts of these presents and the Security Documents instead of acting personally employ and pay an agent (whether being a lawyer or other professional person) to transact or conduct, or concur in transacting or conducting, any business and to do, or concur in doing, all acts required to be done in connection with these presents (including the receipt and payment of money). If the Trustee exercises reasonable care in the selection of such agent, the Trustee shall not be in any way responsible for any Liability incurred by reason of any misconduct or default on the part of any such agent or be bound to supervise the proceedings or acts of any such agent.

(S)   The Trustee shall not be responsible for the execution, delivery, legality, effectiveness, adequacy, genuineness, validity, enforceability or admissibility in evidence of these presents or the Security Documents or any other document relating thereto and shall not be liable for any failure to obtain any licence, consent or other authority for the execution, delivery, legality, effectiveness, adequacy, genuineness, validity, performance, enforceability or admissibility in evidence of these presents or the Security Documents or any other document relating thereto.

(T)   The Trustee shall have no responsibility to Bondholders or any other person in the event that it fails to request, require or receive any legal opinion relating to the Bonds.

(U)   Notwithstanding anything else herein contained, the Trustee may refrain from doing anything which would or might in its reasonable opinion be contrary to any law of any jurisdiction or any directive or regulation of any agency or any state or which would or might otherwise render it liable to any person and may do anything which is, in its opinion, necessary to comply with any such law, directive or regulation.

(V)   The Trustee may act upon (i) the certification of the Auditors as to the accuracy of any financial statements (whether audited or unaudited and whether or not translated and/or converted into any currency other than zlotys) and compliance or otherwise by the Issuer and the Guarantor with the covenants and undertakings of the Issuer and the Guarantor set forth in these presents and (ii) any other certification provided hereunder and shall not be responsible to the Bondholders for any loss occasioned by so acting or any loss occasioned to the Bondholders for failure to call for any such certificate, confirmation or accounts at any particular time. Such certification or confirmation may be sent or obtained by letter, telex or facsimile transmission and the Trustee shall not be liable to the Bondholders for acting in good faith on such certification, accounts or confirmation purporting to be conveyed by such means even though it shall contain some error or shall not be authentic.

37

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 62

(W)   The Trustee shall be under no obligation to monitor or supervise the functions of any other person under the Agency Agreement, the Bonds, the Security Documents or any other agreement or document relating to the transactions herein or therein contemplated and shall be entitled, in the absence of actual knowledge of a breach of obligation, to assume that each such person is properly performing and complying with its obligations.

(X)   Notwithstanding anything contained in these presents, to the extent required by any applicable law, if the Trustee is or will be required to make any deduction or withholding from any distribution or payment made by it hereunder or under the Security Documents or if the Trustee is or will be otherwise charged to, or is or may become liable to, tax as a consequence of performing its duties hereunder whether as principal, agent or otherwise, and whether by reason of any assessment, prospective assessment or other imposition of liability to taxation of whatsoever nature and whensoever made upon the Trustee, and whether in connection with or arising from any sums received or distributed by it or to which it may be entitled under these presents (other than in connection with its remuneration as provided for herein) or under the Security Documents or any investments or deposits from time to time representing the same, including any income or gains arising therefrom or any action of the Trustee in connection with the trusts of these presents (other than the remuneration herein specified) or under the Security Documents or otherwise, then the Trustee shall be entitled to make such deduction or withholding or, as the case may be, to retain out of sums received by it an amount sufficient to discharge any liability to tax which relates to sums so received or distributed or to discharge any such other liability of the Trustee to tax from the funds held by the Trustee upon the trusts of these presents.

18.   <u>Trustee's Liability</u>

18.1  Nothing in these presents shall in any case in which the Trustee has failed to show the degree of care and diligence required of it as trustee having regard to the provisions of these presents conferring on it any trusts, powers, authorities or discretions exempt the Trustee from or indemnify it against any liability for breach of trust.

19.   <u>Trustee Contracting with Obligors</u>

19.1  Neither the Trustee nor any director or officer of a corporation acting as a trustee under these presents shall by reason of its or his fiduciary position be in any way precluded from:

(A)   entering into or being interested in any contract or financial or other transaction or arrangement with an Obligor or any person or body corporate associated with an Obligor (including without limitation any contract, transaction or arrangement of a banking or insurance nature or any contract, transaction or arrangement in relation to the making of loans or the provision of financial facilities to, or the purchase, placing or underwriting of or the subscribing or procuring subscriptions for or otherwise acquiring, holding or dealing with the Bonds or any other bonds or any stocks, shares (including, without limiting the foregoing, the Shares), debenture

38

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 63

stock, debentures, bonds or other securities of, an Obligor or any person or body corporate associated as aforesaid); or

(B)    accepting or holding the trusteeship of any other trust deed constituting or securing any other securities issued by or relating to an Obligor or any such person or body corporate so associated or any other office of profit under an Obligor or any such person or body corporate so associated, and shall be entitled to retain and shall not be in any way liable to account for any profit made or share of brokerage or commission or remuneration or other benefit received thereby or in connection therewith.

20.    **Waiver, Authorization and Determination**

20.1    The Trustee may without prejudice to its rights in respect of any subsequent breach, Event of Default or Potential Event of Default from time to time and at any time but only if and in so far as in its opinion the interests of the Bondholders shall not be materially prejudiced thereby waive or authorise any breach or proposed breach by the Issuer or the Guarantor of any of the covenants or provisions contained in these presents or the Security Documents or determine that any Event of Default or Potential Event of Default shall not be treated as such for the purposes of these presents PROVIDED ALWAYS THAT the Trustee shall not exercise any powers conferred on it by this Clause in contravention of any express direction given by Extraordinary Resolution or by a request under Condition 12 but so that no such direction or request shall affect any waiver, authorisation or determination previously given or made. Any such waiver, authorisation or determination may be given or made on such terms and subject to such conditions (if any) as the Trustee may determine, shall be binding on the Bondholders and, unless the Trustee agrees otherwise, shall be notified by the Issuer to the Bondholders in accordance with Condition 16 as soon as practicable thereafter.

20.2    The Trustee may without the consent of the Bondholders at any time and from time to time concur with the Issuer and the Guarantor in making any modification (i) to any of the Conditions or to these presents or the Security Documents or any modification of the Guarantor Bonds or the terms of the Guarantor Bond Trust Deed (other than the proviso to paragraph 5 of the Fourth Schedule or any matters referred to in that proviso) which in the opinion of the Trustee it may be proper to make PROVIDED THAT the Trustee is of the opinion that such modification will not be materially prejudicial to the interests of the Bondholders or (ii) to any of the Conditions or to these presents or the Security Documents or the Guarantor Bonds or the terms of the Guarantor Bond Trust Deed if in the opinion of the Trustee such modification is of a formal, minor or technical nature or to correct a manifest error. Any such modification may be made on such terms and subject to such conditions (if any) as the Trustee may determine, shall be binding upon the Bondholders and, unless the Trustee agrees otherwise, shall be notified by the Issuer to the Bondholders in accordance with Condition 16 as soon as practicable thereafter.

21.    **Substitution of Issuer**

21.1    The Trustee may without the consent of the Bondholders at any time agree with the Issuer and the Guarantor to the substitution in place of the Issuer (or of the previous substitute

39

under this Clause) as the principal debtor under these presents of any other Issuer (such substituted Issuer being hereinafter called the "New Issuer") provided that a trust deed is executed or some other form of undertaking is given by the New Issuer and the Guarantor in form and manner, satisfactory to the Trustee, agreeing to be bound by the provisions of these presents with any consequential amendments which the Trustee may deem appropriate as fully as if the New Issuer had been named in these presents as the principal debtor in place of the Issuer (or of the previous substitute under this Clause) and provided further that if the Trustee shall so require all amounts payable under these presents are unconditionally and irrevocably guaranteed to the satisfaction of the Trustee.

21.2    The following further conditions shall apply to sub-clause 21.1 above:

(A)    the New Issuer shall comply with the securities laws in the jurisdiction of its incorporation or social seat, which implies that in the case that the New Issuer is incorporated in The Netherlands, the New Issuer will comply with the requirements as set out in the Netherlands Act on the Supervision of the Credit System 1992 (*"Wet toezicht kredietwezen 1992"*) and in the Netherlands Act on the Supervision of the Securities System 1995 (*"Wet toezicht effectenverkeer 1995"*);

(B)    the Issuer and the New Issuer shall comply with such other requirements as the Trustee may direct in the interests of the Bondholders;

(C)    where the New Issuer is incorporated, domiciled or resident in, or subject generally to the taxing jurisdiction of, a territory other than or in addition to the Netherlands or any political sub-division thereof or any authority thereof or therein having power to tax, undertakings or covenants shall be given by the New Issuer in terms corresponding to the provisions of Condition 9 with the substitution for (or, as the case may be, the addition to) the references to the Netherlands of references to that other or additional territory in which the New Issuer is incorporated, domiciled or resident or to whose taxing jurisdiction it is subject and (where applicable) Condition 6(c) shall be modified accordingly;

(D)    without prejudice to the rights of reliance of the Trustee under the immediately following paragraph (E), the Trustee is satisfied that the relevant transaction is not materially prejudicial to the interests of the Bondholders;

(E)    if two Directors of the New Issuer (or other officers acceptable to the Trustee) shall certify that the New Issuer is solvent at the time at which the relevant transaction is proposed to be effected (which certificate the Trustee may rely upon absolutely) the Trustee shall not be under any duty to have regard to the financial condition, profits or prospects of the New Issuer or to compare the same with those of the Issuer or the previous substitute under this Clause as applicable; and

(F)    in connection with any such substitution the Trustee may agree to a change in the law governing these presents provided that it is of the opinion that such change would not be materially prejudicial to the interests of the Bondholders.

40

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 65