21.3    Any such Trust Deed or undertaking shall, if so expressed, operate to release the Issuer or the previous substitute as aforesaid from all of its obligations under these presents. Not later than 14 days after the execution of such documents and compliance with such requirements, the New Issuer shall give notice, thereof in a form previously approved by the Trustee to the Bondholders in the manner provided in Condition 16. Upon the execution of such documents and compliance with such requirements, the New Issuer shall be deemed to be named in these presents as the principal debtor in place of the Issuer (or in place of the previous substitute under this Clause) under these presents and these presents shall be deemed to be amended in such manner as shall be necessary to give effect to the above provisions and, without limitation, references in these presents to the Issuer shall, where the context so requires, be deemed to be or include references to the New Issuer.

22.    **Substitution of Guarantor**

22.1    The Trustee may, with the consent of the holders of a majority in principal amount outstanding of the Bonds, at any time agree with the Issuer and the Guarantor to the substitution in place of the Guarantor (or of the previous substitute under this Clause) of any other Guarantor (such substituted Guarantor being hereinafter called the "New Guarantor") provided that a trust deed is executed or some other form of undertaking is given by the New Guarantor and the Issuer in form and manner, satisfactory to the Trustee, agreeing to be bound by the provisions of these presents with any consequential amendments which the Trustee may deem appropriate as fully as if the New Guarantor had been named in these presents in place of the Guarantor (or of the previous substitute under this Clause).

22.2    The following further conditions shall apply to sub-clause 22.1 above:

(A)    on such substitution of a New Guarantor, the Issuer shall continue to comply with the securities laws in the jurisdiction of its incorporation or social seat, which implies that in the case that the New Guarantor is incorporated in The Netherlands, the New Guarantor will comply with the requirements as set out in the Netherlands Act on the Supervision of the Credit System 1992 ("*Wet toezicht kredietwezen 1992*") and in the Netherlands Act on the Supervision of the Securities System 1995 ("*West toezicht effectenverkeer 1995*"), the Issuer acknowledging that on the basis of current laws, any New Guarantor would be required to be its parent company;

(B)    the Guarantor and the New Guarantor shall comply with such other requirements as the Trustee may direct in the interests of the Bondholders;

(C)    where the New Guarantor is incorporated, domiciled or resident in, or subject generally to the taxing jurisdiction of, a territory other than or in addition to the Republic of Poland or any political sub-division thereof or any authority thereof or therein having power to tax, undertakings or covenants shall be given by the New Guarantor in terms corresponding to the provisions of Condition 9 with the substitution for (or, as the case may be, the addition to) the references to the Republic of Poland of references to that other or additional territory in which the

41

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 66

New Guarantor is incorporated, domiciled or resident or to whose taxing jurisdiction it is subject and (where applicable) Condition 6(c) shall be modified accordingly;

(D)  without prejudice to the rights of reliance of the Trustee under the immediately following paragraph (E), the Trustee is satisfied that the relevant transaction is not materially prejudicial to the interests of the Bondholders;

(E)  if two Directors of the New Guarantor (or other officers acceptable to the Trustee) shall certify that the New Guarantor is solvent at the time at which the relevant transaction is proposed to be effected (which certificate the Trustee may rely upon absolutely) the Trustee shall not be under any duty to have regard to the financial condition, profits or prospects of the New Guarantor or to compare the same with those of the Guarantor or the previous substitute under this Clause as applicable; and

(F)  in connection with any such substitution the Trustee may agree to a change in the law governing these presents provided that it is of the opinion that such change would not be materially prejudicial to the interests of the Bondholders.

22.3  Any such Trust Deed or undertaking shall, if so expressed, operate to release the Guarantor or the previous substitute as aforesaid from all of its obligations under these presents. Not later than 14 days after the execution of such documents and compliance with such requirements, the New Guarantor shall give notice thereof in a form previously approved by the Trustee to the Bondholders in the manner provided in Condition 16. Upon the execution of such documents and compliance with such requirements, the New Guarantor shall be deemed to be named in these presents as the guarantor in place of the Guarantor (or in place of the previous substitute under this Clause) under these presents and these presents shall be deemed to be amended in such manner as shall be necessary to give effect to the above provisions and, without limitation, references in these presents to the Guarantor shall, where the context so requires, be deemed to be or include references to the New Guarantor.

23.  **Currency Indemnity**

23.1  The Issuer and the Guarantor shall severally indemnify the Trustee and the Bondholders and keep them indemnified against:

(A)  any Liability incurred by any of them arising from the non-payment by the Issuer or the Guarantor of any amount due to the Trustee or the Bondholders under these presents by reason of any variation in the rates of exchange between those used for the purposes of calculating the amount due under a judgment or order in respect thereof and those prevailing at the date of actual payment by the Issuer or the Guarantor; and

(B)  any deficiency arising or resulting from any variation in rates of exchange between (i) the date as of which the local currency equivalent of the amounts due or contingently due under these presents (other than this Clause) is calculated for the

42

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 67

purposes of any bankruptcy, insolvency or liquidation of the Issuer or the Guarantor and (ii) the final date for ascertaining the amount of claims in such bankruptcy, insolvency or liquidation. The amount of such deficiency shall be deemed not to be reduced by any variation in rates of exchange occurring between the said final date and the date of any distribution of assets in connection with any such bankruptcy, insolvency or liquidation.

The above indemnity shall constitute obligations of the Issuer and the Guarantor separate and independent from its obligations under the other provisions of these presents and shall apply irrespective of any indulgence granted by the Trustee or the Bondholders from time to time and shall continue in full force and effect notwithstanding the judgment or filing of any proof or proofs in any bankruptcy, insolvency or liquidation of the Issuer or the Guarantor for a liquidated sum or sums in respect of amounts due under these presents (other than this Clause). Any such deficiency as aforesaid shall be deemed to constitute a loss suffered by the Bondholders and no proof or evidence of any actual loss shall be required by the Issuer or the Guarantor or its liquidator or liquidators.

24.    **New Trustee, Separate and Co-trustees**

24.1    The power to appoint a new trustee of these presents shall be vested in the Issuer but no person shall be appointed who shall not previously have been approved by an Extraordinary Resolution. One or more persons may hold office as trustee or trustees of these presents but such trustee or trustees shall be or include a Trust Corporation. Whenever there shall be more than two trustees of these presents the majority of such trustees shall be competent to execute and exercise all the duties, powers, trusts, authorities and discretions vested in the Trustee by these presents provided that a Trust Corporation shall be included in such majority. Any appointment of a new trustee of these presents shall as soon as practicable thereafter be notified by the Issuer to the Principal Paying, Transfer and Exchange Agent, the Registrar and the Bondholders.

24.2    Notwithstanding the provisions of sub-clause 24.1 above, the Trustee may, upon giving prior notice to the Issuer (but without the consent of the Issuer or the Bondholders), appoint any person established or resident in any jurisdiction (whether a Trust Corporation or not) to act either as a separate trustee or as a co-trustee jointly with the Trustee:

(A)    if the Trustee considers such appointment to be in the interests of the Bondholders;

(B)    for the purposes of conforming to any legal requirements, restrictions or conditions in any jurisdiction in which any particular act or acts is or are to be performed; or

(C)    for the purposes of obtaining a judgment in any jurisdiction or the enforcement in any jurisdiction of either a judgment already obtained or any of the provisions of these presents against the Issuer.

The Issuer irrevocably appoints the Trustee to be its attorney in its name and on its behalf to execute any such instrument of appointment. Such a person shall (subject always to the provisions of these presents) have such trusts, powers, authorities and discretions (not

43

exceeding those conferred on the Trustee by these presents) and such duties and obligations as shall be conferred or imposed by the instrument of appointment. The Trustee shall have power in like manner to remove any such person. Such reasonable remuneration as the Trustee may pay to any such person, together with any attributable Liabilities incurred by it in performing its function as such separate trustee or co-trustee, shall for the purposes of these presents be treated as Liabilities incurred by the Trustee.

25.    **Trustee's Retirement and Removal**

25.1    A trustee of these presents may retire at any time on giving not less than three months' prior written notice to the Issuer without giving any reason and without being responsible for any Liabilities incurred by reason of such retirement. The Bondholders may by Extraordinary Resolution remove any trustee or trustees for the time being of these presents. The Issuer undertakes that in the event of the only trustee of these presents which is a Trust Corporation giving notice under this Clause or being removed by Extraordinary Resolution it will use all reasonable endeavours to procure that a new trustee of these presents being a Trust Corporation is appointed as soon as reasonably practicable thereafter. The retirement or removal of any such trustee shall not become effective until a successor trustee being a Trust Corporation is appointed.

26.    **Trustee's Powers to Be Additional**

26.1    The powers conferred upon the Trustee by these presents shall be in addition to any powers which may from time to time be vested in the Trustee by the general law or as a holder of any of the Bonds.

27.    **Security**

27.1    The Guarantor will provide the Security to secure all the obligations of the Guarantor under these presents, provided, however, that the Guarantor's obligation to make the Contingent Payment is secured only by the security described in paragraph (vi) of Condition 8(a)). The Security will be provided on the date hereof, except that:

    (i)    in respect of the assignment by way of security of the ET Receivable, (A) as regards the item referred to in paragraph (iii) of the definition of "ET Receivable" in Condition 6(f), the assignment shall be granted by the Guarantor only upon obtaining approval of third parties required under the Third Investment Agreement, (B) as regards the items referred to in paragraphs (iv) and (v) of the definition of "ET Receivable" in Condition 6(f), the assignment shall be granted by the Guarantor only upon obtaining approval of third parties required under the Telco Purchase Agreement, and (C) as regards the item referred to in paragraph (vi) of the definition of "ET Receivable" in Condition 6(f), the assignment shall be granted by the Guarantor only following the execution of a settlement agreement between the Guarantor and Elektrim Telekomunikacja and obtaining

44

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 69

approval of third parties required under the Third Investment Agreement; and

(ii)    in respect of the ordinary and registered pledges over the Guarantor's equity interests in PAK, such pledges will be granted immediately upon obtaining any required approvals.

27.2    The Trustee shall delegate to the Delegate its right to hold the Security, which shall accordingly be held by the Delegate as delegate of the Trustee. Such delegation shall be made upon the terms of the Deed of Delegation and the Security Administration Agreement.

27.3    By voting in favour of the Extraordinary Resolution proposed at the Bondholders' Meeting, the Bondholders have accepted that the Trustee has exercised reasonable care in the selection of the Delegate as its delegate and the Trustee shall not be in any way responsible for any misconduct or default on the part of the Delegate.

By such Extraordinary Resolution, the Bondholders also accept and agree that:

(i)    the Trustee and the Delegate may accept without enquiry, requisition or objection such title as the Guarantor may have to the Security or any part thereof and shall not investigate or make any enquiry as to the title of the Guarantor to the property expressed to be the subject of the Security or any part thereof;

(ii)    neither the Trustee nor the Delegate shall insure any of the Security or any documents of title or other evidence in respect thereof and shall not be responsible for any loss, expense or liability which may be suffered as a result of the lack of or inadequacy of any such insurance;

(iii)    the Trustee shall not be under any obligation to supervise the acts of the Delegate; and

(iv)    the Trustee may, (a) in connection with any release or subordination of any part of the property subject to the Security, act in accordance with the provisions of the Conditions and the Security Administration Agreement, and (b) in the case of any release or subordination of the PAK Loan and/or the PAK Loan Security, act in accordance with the terms of the PAK Loan and/or the PAK Loan Assignment, and in each case shall have no liability by virtue of so doing.

28.    **Notices**

28.1    Any notice or demand to the Issuer, the Guarantor or the Trustee to be given, made or served for any purposes under these presents shall be given, made or served by sending the same by pre-paid post (first class if inland, first class airmail if overseas), telex or facsimile

45

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 70

transmission or by delivering it by hand as follows:

if to the Issuer
Elektrim Finance B.V.
Strawinskylaan 3105, 7th Floor
1077ZX Amsterdam
The Netherlands
(Attention: Administration Department)

Facsimile No. 00 31 20 406 4444

With in each case a copy to the Guarantor

if to the Guarantor:
Elektrim S. A.
ul. Panska 77/79
00-950 Warsaw
Poland
(Attention: Financial Director)

Facsimile No. 00 48 22 65 28 88 8

if to the Trustee:
The Law Debenture Trust Corporation p.l.c.
Fifth Floor
100 Wood Street
London EC2V 7EX
England
(Attention: The Manager, Trust Administration)

Telex No. 888347
Facsimile No. 44 20 7696 5261/44 20 7606 0643

or to such other address, telex or facsimile number as shall have been notified (in accordance with this Clause) to each of the other parties hereto and any notice or demand sent by post as aforesaid shall be deemed to have been given, made or served three days in the case of inland post or seven days in the case of overseas post after despatch and any notice or demand sent by telex or facsimile transmission as aforesaid shall be deemed to have been given, made or served 24 hours after the time of despatch provided that in the case of a notice or demand given by telex or facsimile transmission such notice or demand shall forthwith be confirmed by post. The failure of the addressee to receive such confirmation shall not invalidate the relevant notice or demand given by telex or facsimile transmission.

29.    Governing Law

29.1    These presents are governed by, and shall be construed in accordance with, English law.

46

29.2   Any dispute arising out of or in connection with these presents, the Agency Agreement, the Guarantee and the Bonds (including any question regarding the existence, validity or termination of any of the above) may be submitted by any party to arbitration for final settlement under the arbitration rules of the United Nations Commission on International Law (1976) (the UNCITRAL Arbitration Rules), which rules are deemed to be incorporated by reference into this Clause 29.2.

29.3   The tribunal shall consist of three arbitrators. The Claimant party shall appoint one arbitrator. The Respondent party to the arbitration shall appoint one arbitrator. If there is more than one Claimant party and/or more than one Respondent party, the Claimant parties shall together appoint one arbitrator and the Respondent parties shall together nominate one arbitrator. The Claimant party or parties and the Respondent party or parties to the arbitration jointly shall appoint the third arbitrator who shall be the chairman of the arbitral tribunal. The LCIA (London Court of International Arbitration) shall act as the "appointing authority" under the UNCITRAL Arbitral Rules in the event that:

(A)   any party or parties to the arbitration fail to appoint an arbitrator; or

(B)   the parties to the arbitration fail to appoint jointly the third arbitrator within the time limits specified in the UNCITRAL Arbitration Rules.

29.4   The place of any such arbitration shall be London, and the language of the arbitration shall be English. The decision and award of the arbitrators shall be final and binding and shall be enforceable in any court of competent jurisdiction.

29.5   Save as provided in Clause 29.8 below, the parties exclude the jurisdiction of the courts under Section 45 and 69 of the Arbitration Act 1996.

29.6   The agreement by all the parties to refer all disputes arising out of or in connection with these presents, the Agency Agreement, the Guarantee and the Bonds to arbitration in accordance with Clause 29.2 above is exclusive such that neither the Guarantor nor the Issuer shall be permitted to bring proceedings in any other court or tribunal other than by way of counterclaim in respect of proceedings brought by the Trustee and/or each of the Bondholders in respect of any of the above documents in such other court or tribunal in accordance with this Clause.

29.7   Notwithstanding Clause 29.2, for the exclusive benefit of the Trustee and each of the Bondholders, the Issuer and the Guarantor hereby agree that the Trustee and each of the Bondholders shall have the exclusive right, at their option, to apply to the courts of England, who shall have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with these presents, the Guarantee, the Agency Agreement and the Bonds and that accordingly any suit, action or proceedings (together referred to as "Proceedings") arising out of or in connection with any of the above may be brought in such courts. Nothing contained in this paragraph shall limit any right of the Trustee and/or each of the Bondholders to take Proceedings against the Issuer or the Guarantor in any other court of competent jurisdiction, nor shall the taking of Proceedings in any one or

47

more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not.

29.8    The Guarantor and the Issuer respectively:

(A)    waive objection to the English courts on grounds of inconvenient forum or otherwise as regards Proceedings in connection with these presents, the Agency Agreement, the Bonds and the Guarantee; and

(B)    agree that a judgment or order of an English court in connection with any of these presents, the Agency Agreement, the Bonds and the Guarantee is conclusive and binding on them and may be enforced against them in the courts of any other jurisdiction.

29.9    Each of the Issuer and the Guarantor hereby appoints Law Debenture Corporate Services Limited at its offices for the time being at Fifth Floor, 100 Wood Street, London EC2V 7EX as its agent to receive service of process in any Proceedings in England based on these presents, the Agency Agreement, the Bonds or the Guarantee. If for any reason the appointment of such agent for service of process lapses, each of the Issuer and Guarantor agrees that, it will promptly appoint a substitute process agent (acceptable to the Trustee) and notify the Bondholders in accordance with Condition 16 of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

30.    **Contracts (Rights of Third Parties) Act 1999**

30.1    A person who is not a party to this Trust Deed or any agreement entered into on terms set out in and/or incorporated by reference into this Trust Deed has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Trust Deed or, as the case may be, any such agreement, but this does not affect any right or remedy of a third party that exists or is available apart from that Act.

30.2    No person shall have any right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term or condition of the Bonds, but this does not affect any right or remedy of a third party (including, without limitation, a Bondholder) that exists or is available apart from that Act.

31.    **Counterparts**

31.1    This Trust Deed and any Trust Deed supplemental hereto may be executed and delivered in any number of counterparts, all of which, taken together, shall constitute one and the same deed and any party to this Trust Deed or any Trust Deed supplemental hereto may enter into the same by executing and delivering a counterpart.

IN WITNESS whereof this Amended and Restated Trust Deed has been executed as a deed by the Issuer, the Guarantor and the Trustee and delivered on the date first stated on page 1 above.

48

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 73

THE FIRST SCHEDULE

PART I

FORM OF GLOBAL CERTIFICATE

UNRESTRICTED/RESTRICTED GLOBAL CERTIFICATE [delete as appropriate]
representing
€[            ] BONDS DUE 2005

THE BONDS OF ELEKTRIM FINANCE B.V. EVIDENCED HEREBY (THE "BONDS") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE BONDS MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) TO A PERSON WHOM THE BENEFICIAL OWNER AND ANY PERSON ACTING ON ITS BEHALF REASONABLY BELIEVE IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (3) IN ACCORDANCE WITH RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (4) PURSUANT TO ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND OF ANY OTHER JURISDICTION. THE OWNER OF SHARES MAY NOT DEPOSIT OR CAUSE TO BE DEPOSITED SUCH SHARES INTO ANY UNRESTRICTED DEPOSITARY RECEIPT FACILITY ESTABLISHED OR MAINTAINED BY A DEPOSITARY BANK, UNLESS OR UNTIL SUCH TIME AS SUCH SECURITY IS NO LONGER A RESTRICTED SECURITY WITHIN THE MEANING OF RULE 144(a)(3) UNDER THE SECURITIES ACT. EACH HOLDER OF THIS SECURITY, BY ACCEPTANCE HEREOF, REPRESENTS THAT IT UNDERSTANDS, AND AGREES TO COMPLY WITH, THE FOREGOING RESTRICTIONS.*

*This legend shall be on any Restricted Global Certificate

**ELEKTRIM FINANCE B.V.**
(Incorporated in the Netherlands with limited liability
and having its statutory seat in Amsterdam)

I - 1

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 74

Guaranteed Bonds due 2005
guaranteed by Elektrim S.A. (incorporated as a joint stock company
under the laws of the Republic of Poland)

[Restricted    ]
[Unrestricted    ]

Serial No    ...............

This Global Certificate is issued in respect of all or part of a series of Bonds constituted by a Trust Deed (the "Trust Deed") dated 2 July 1999, as amended on 14 July 1999 and 15 November 2002 and as further amended, modified or restated from time to time, made between the Issuer, the Guarantor and The Law Debenture Trust Corporation p.l.c. as trustee for the holders of the Bonds and issued in registered form in the denomination of €1 each or integral multiples thereof.

THIS IS TO CERTIFY that Citivic Nominees Limited (as nominee for Euroclear Bank S.A./N.V., as operator of the Euroclear System and Clearstream, Luxembourg) is the registered holder of Bonds with a principal amount outstanding of €[                    ] and is entitled (i) on 15 December 2005 (or on such earlier date as such amount may become repayable in accordance with the Conditions endorsed hereon as the same may be modified from time to time in accordance with the Trust Deed) to the repayment of the principal amount outstanding in Euro at the Adjusted Principal Amount together with such other amounts (if any) as may be payable, and (ii) on the Contingent Payment Date to the Contingent Payment, all subject to and in accordance with the said Conditions and the provisions of the Trust Deed.

The aggregate principal amount outstanding of Bonds represented by this Global Certificate will change in accordance with the provisions of the Schedules hereto.

Interest is payable on the principal amount outstanding annually in arrears in accordance with the said Conditions and the provisions of the Trust Deed.

This Global Certificate will only be exchangeable for Bonds in definitive form in the circumstances described in, and otherwise in accordance with, the Conditions and the Trust Deed.

This Global Certificate shall be governed by and construed in accordance with English Law.

I - 2

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 75

IN WITNESS whereof the Issuer has caused this Global Certificate to be signed manually or in facsimile by a duly authorised officer on its behalf, and shall not be valid until authenticated by or on behalf of the Principal Paying and Transfer Agent.

ELEKTRIM FINANCE B.V.

By: _____
Name:
Title:

Issued in London, England on 2 July 1999 and 14 July 1999 and amended and restated on 15 November 2002.

**Certificate of authentication**

This Global Certificate is duly authenticated.

By: _____
Duly authorised
for and on behalf of
Citibank, N.A. as Principal Paying and Transfer Agent

I - 3

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 76

### THE SCHEDULE

### PART I

### CHANGES IN AGGREGATE PRINCIPAL AMOUNT OUTSTANDING OF THE BONDS REPRESENTED BY THIS CERTIFICATE AND PAYMENTS OF INTEREST

The following interest payments have been made or changes in the aggregate principal amount outstanding of the Bonds in respect of which this Global Certificate is issued have been made as a result of (i) redemption of the Bonds or (ii) purchase of Bonds or (iii) transfer of Bonds or (iv) Bonds ceasing to be represented by this Global Certificate and being represented by another or vice versa:

| Date made | Interest paid Euro | Principal/premium net proceeds paid Euro | Principal amount outstanding of Bonds redeemed/ purchased/ transferred/ ceasing to be represented/ becoming represented/issued and represented by this Global Certificate | Principal amount outstanding of this Global Certificate following such payment/ redemption/purchase/ transfer/ceasing/ becoming/issue | Notation made on behalf of the Issuer |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

I - 4

I - 5

PART II

EXCHANGES FOR DEFINITIVE BONDS,
PURCHASES AND CANCELLATIONS

The following exchanges of a part of this Global Certificate for definitive Bonds and/or purchases
and cancellations of a part of this Global Certificate have been made:

| Date made | Part of principal amount outstanding of this Global Certificate exchanged Euro | Part of principal amount outstanding of this Global Certificate purchased and cancelled Euro | Remaining principal amount outstanding of this Global Certificate following such exchange or purchase and cancellation Euro | Notation made on behalf of the Issuer |
|---|---|---|---|---|
| | | | | |

I-6

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 79

# PART III

## CONDITIONS OF THE BONDS

### (as set out in the Second Schedule)

I - 7

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 80

## PART II

### FORM OF DEFINITIVE BONDS

THE BONDS OF ELEKTRIM FINANCE B.V. EVIDENCED HEREBY (THE "BONDS") HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE BONDS MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) TO A PERSON WHOM THE BENEFICIAL OWNER AND ANY PERSON ACTING ON ITS BEHALF REASONABLY BELIEVE IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (3) IN ACCORDANCE WITH RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (4) PURSUANT TO ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND OF ANY OTHER JURISDICTION. THE OWNER OF SHARES MAY NOT DEPOSIT OR CAUSE TO BE DEPOSITED SUCH SHARES INTO ANY UNRESTRICTED DEPOSITARY RECEIPT FACILITY ESTABLISHED OR MAINTAINED BY A DEPOSITARY BANK, UNLESS OR UNTIL SUCH TIME AS SUCH SECURITY IS NO LONGER A RESTRICTED SECURITY WITHIN THE MEANING OF RULE 144(a)(3) UNDER THE SECURITIES ACT. EACH HOLDER OF THIS SECURITY, BY ACCEPTANCE HEREOF, REPRESENTS THAT IT UNDERSTANDS, AND AGREES TO COMPLY WITH, THE FOREGOING RESTRICTIONS.*

*This legend shall be on any certificate issued in respect of a Bond transferred pursuant to and in reliance on Rule 144A under the Securities Act.

| [€1 or multiples thereof] | [SERIES] | [SERIAL NO.] |

### ELEKTRIM FINANCE B.V.
**(Incorporated in the Netherlands with limited liability**
**and having its statutory seat in Amsterdam)**
**Guaranteed Bonds due 2005**
**Guaranteed by Elektrim S.A.**
**(incorporated as a joint stock company**
**under the laws of the Republic of Poland)**

This Bond forms one of a series of Bonds constituted by a Trust Deed (the "Trust Deed") dated 2 July 1999, as amended on 14 July 1999 and 15 November 2002 and as further amended, modified or restated from time to time, made between the Issuer, the Guarantor and The Law Debenture Trust Corporation p.l.c. as trustee for the holders of the Bonds and issued in registered form in the

I-8

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 81

denomination of €1 or integral multiples thereof, in an aggregate principal amount of up to €510,000,000.

THIS IS TO CERTIFY that [            ] is/are the registered holder(s) of one Bond in the amount of €[         ] and is/are entitled (i) on 15 December 2005 (or on such earlier date as such principal amount outstanding of such Bond may become repayable in accordance with the Conditions endorsed hereon) to the repayment of the principal amount outstanding at the Adjusted Principal Amount together with such other amounts (if any) as may be payable, and (ii) on the Contingent Payment Date to the Contingent Payment, all subject to and in accordance with the said Conditions and the provisions of the Trust Deed.

Interest is payable on the principal amount outstanding annually in arrears in accordance with the said Conditions and the provisions of the Trust Deed.

IN WITNESS whereof this Bond has been executed on behalf of the Issuer by a duly authorised officer.

ELEKTRIM FINANCE B.V.

By _____
Name:
Title:

Dated [            ]
Issued in [            ] on [            ]
Purchased on [            ]

I - 9

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 82

### THE SECOND SCHEDULE

#### Amended and Restated
#### Terms and Conditions of the Bonds

The issue by Elektrim Finance B.V. (the "Issuer") of the euro-linked Bonds due 2004 in an aggregate principal amount of PLN 1,795,024,000 (the equivalent of €440,000,000 aggregate principal amount) (the "Bonds") was authorised by a resolution of the Management Board of the Issuer passed on June 28, 1999.

PLN 1,631,840,000 (the equivalent of €400,000,000 principal amount of the Bonds) were constituted by a Trust Deed dated July 2, 1999 (the "Original Bond Trust Deed") between the Issuer, Elektrim S.A. as guarantor (the "Guarantor") and The Law Debenture Trust Corporation p.l.c. (the "Bond Trustee", which expression shall include all persons for the time being the trustee or trustees under the Bond Trust Deed as hereinafter defined) as trustee for the holders of the Bonds (the "Bondholders") and issued on that date and PLN 163,184,000 (the equivalent of €40,000,000 principal amount of the Bonds) were constituted by a First Supplemental Trust Deed (the "First Supplemental Bond Trust Deed") dated July 14, 1999 between the same parties and were issued on that date.

Prior to the amendments to the terms thereof pursuant to the Second Supplemental Bond Trust Deed, as hereinafter defined, the Bondholders had the right to exchange the Bonds for euro-linked convertible bonds due 2004 (the "Guarantor Bonds") of the Guarantor. Prior to the amendments to the terms of the Guarantor Bonds pursuant to the First Supplemental Guarantor Trust Deed, as hereinafter defined, the holders of Guarantor Bonds had the right to convert their Guarantor Bonds into ordinary shares with a nominal value of PLN 1.00 each of the capital of the Guarantor (the "Shares"). The Guarantor Bonds were acquired by the Issuer from the Guarantor pursuant to a preliminary purchase agreement dated July 2, 1999 and were constituted by a trust deed dated December 24, 1999 (the "Original Guarantor Trust Deed") between the Guarantor and The Law Debenture Trust Corporation p.l.c. as trustee for the holders of the Guarantor Bonds (in such capacity the "Guarantor Trustee", which expression shall include all persons for the time being the trustee or trustees under the Guarantor Trust Deed as hereinafter defined).

At a meeting of the Bondholders on November 15, 2002 (the "Bondholders' Meeting"), the Bondholders met and passed an Extraordinary Resolution (as defined in the Original Bond Trust Deed), inter alia, sanctioning and approving restructuring terms (the "Restructuring Terms") set out in a proposal document dated October 24, 2002 (the "Proposal Document") and authorising the Bond Trustee to give effect to the Restructuring Terms. Accordingly, in reliance on the Extraordinary Resolution, the Issuer, the Guarantor and the Bond Trustee executed a Second Supplemental Trust Deed dated November 15, 2002 (the "Second Supplemental Bond Trust Deed") to the Original Bond Trust Deed (of which these amended and restated terms and conditions (the "Conditions") form a part) (the Original Bond Trust Deed, the First Supplemental Bond Trust Deed and the Second Supplemental Bond Trust Deed together as amended, modified and restated from time to time, the "Bond Trust Deed"), and the Guarantor Trustee and the Guarantor executed a First Supplemental Guarantor Trust Deed dated November 15, 2002 to the

II - 1

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 83

Original Guarantor Trust Deed (as amended, modified and restated from time to time, the "Guarantor Trust Deed"), to modify the terms and conditions of the Bonds and of the Guarantor Bonds. The date of the Second Supplemental Bond Trust Deed shall be referred to herein as the "Restructuring Date". These Conditions are the terms and conditions of the Bonds as so amended and that shall govern the Bonds with effect from the Restructuring Date. For the avoidance of doubt, these Conditions set out only the terms and conditions of the Bonds that affect the Bonds from the Restructuring Date and do not affect any payment made to the Bondholders prior to the Restructuring Date in accordance with the terms and conditions of the Bonds set out in the Original Bond Trust Deed, as amended by the First Supplemental Bond Trust Deed.

Pursuant to the Second Supplemental Bond Trust Deed, the currency of the Bonds has been redenominated from PLN to euro, so that the principal amount outstanding of the Bonds (prior to any other modifications effected pursuant to the Second Supplemental Bond Trust Deed) is equal to €440,000,000. In addition, pursuant to the Second Supplemental Bond Trust Deed and in accordance with Condition 1(a), the principal amount outstanding of the Bonds has been increased with effect from the Restructuring Date from €440,000,000 to €510,000,000. The minimum denomination of the Bonds has also been reduced to €1.

The statements set out in these Conditions include summaries of, and are subject to, the detailed provisions of the Bond Trust Deed. The Bondholders are entitled to the benefit of, are bound by, and are deemed to have notice of, all the provisions of the Bond Trust Deed and those applicable to them of the First Supplemental Paying and Transfer Agency Agreement dated July 2, 1999, as amended and restated on or about November 15, 2002 (as amended and restated, the "Paying and Transfer Agency Agreement") relating to the Bonds, between the Issuer, the Guarantor, the Bond Trustee, Citibank, N.A., as principal paying agent (the "Principal Paying and Transfer Agent", which expression shall include any successor as principal paying and transfer agent under the Paying and Transfer Agency Agreement), Citibank, N.A. as registrar (the "Registrar", which expression shall include any successor as registrar under the Paying and Transfer Agency Agreement), Dexia Banque Internationale à Luxembourg, société anonyme as Luxembourg paying and transfer agent (the "Luxembourg Paying and Transfer Agent" which expression shall include any successor as paying and transfer agent under the Paying and Transfer Agency Agreement, and together with the Principal Paying and Transfer Agent, the "Paying and Transfer Agents") and Citibank, N.A. as agent bank (the "Agent Bank", which expression shall include any successor as agent bank under the Paying and Transfer Agency Agreement, and together with the Paying and Transfer Agents and the Registrar, the "Agents"). Copies of the Bond Trust Deed, the Paying and Transfer Agency Agreement and the Guarantor Trust Deed are available for inspection during normal business hours at the registered office for the time being of the Bond Trustee (being at the date hereof at Fifth Floor, 100 Wood Street, London EC2V 7EX, England) and at the specified offices of the Agents.

1.    Principal Amount, Form, Denomination and Title

    (a)    Principal Amount Outstanding and Adjusted Principal Amount

    With effect from the Restructuring Date, the debt represented by the Bonds, and the original principal amount outstanding of the Bonds, shall be redenominated in euro and shall be increased from €440,000,000 to €510,000,000 (the "Increased Principal Amount"). References in

II - 2

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 84

these Conditions to the "principal amount outstanding" of the Bonds shall be construed as references to the Increased Principal Amount of the Bonds, as reduced from time to time as a result of pro rata redemptions in the manner described in Condition 6(l).

With effect from the Restructuring Date to the Repayment Maturity Date, the Bonds shall accrete in value at a rate of 1 per cent per annum. In these Conditions, references to the "Adjusted Principal Amount" of the Bonds shall be construed as references to, on any date (the "Determination Date"), an amount equal to the product of the principal amount outstanding of the Bonds and the Accreted Value Percentage. The "Accreted Value Percentage" means 100 per cent on the Restructuring Date, 100.08 per cent on December 15, 2002, 101.08 per cent on December 15, 2003, 102.09 per cent on December 15, 2004 and 103.11 per cent on December 15, 2005 (each such date being referred to as a "Fixed Date"). The calculation of the Accreted Value Percentage for a Determination Date falling other than on a Fixed Date shall be determined in accordance with the following formula:

$$A + ((B-A)(C))$$

where: A =   the Accreted Value Percentage set out above for the relevant Fixed Date immediately preceding such Determination Date;

B =   the Accreted Value Percentage set out above for the relevant Fixed Date immediately following such Determination Date; and

C =   a fraction, (i) the numerator of which is equal to the actual number of days from and including the relevant Fixed Date immediately preceding such Determination Date to but excluding such Determination Date; and (ii) the denominator of which is equal to the number of days from and including the relevant Fixed Date immediately preceding such Determination Date to but excluding the relevant Fixed Date immediately following such Determination Date.

(b)   Form and Denomination

The Bonds are issued in registered form in the denomination of €1 or integral multiples thereof ("authorised denominations"), each without coupons attached. A bond certificate (each a "Certificate") will be issued to each Bondholder in respect of its registered holding of Bonds in the amount of an authorised denomination. Each Certificate will have an identifying number, which will be recorded, on the relevant Certificate and in the register (the "Register") of Bondholders kept by the Registrar.

(c)   Title

Title to the Bonds passes by registration of the name and address of the Bondholder to whom the Bonds are being transferred in the Register and the entry of the name of that Bondholder on a Certificate. For as long as the Bonds are represented by a Global Certificate, "Bondholder" and (in relation to a Bond) "holder" means in relation to the Bonds represented thereby each person who is for the time being shown in the records of Euroclear or Clearstream, Luxembourg as the

II – 3

holder of a particular principal amount outstanding of the Bonds (in which regard any certificate or other document issued by Euroclear or Clearstream, Luxembourg as to the principal amount outstanding of Bonds standing to the account of any person shall be conclusive and binding for all purposes). However, the right to payment of principal, premium (if any) and interest on such Bonds will be vested, as against the Issuer, the Guarantor and the Bond Trustee, solely in the registered holder of the relevant Global Certificate. For the avoidance of doubt, the principal amount outstanding of the Bonds of each person shown in the records of Euroclear or Clearstream, Luxembourg as the holder thereof shall increase or decrease in the same proportion as the principal amount outstanding of all the outstanding Bonds increases or decreases in accordance with Condition 1(a). In respect of any Bond represented by a Certificate in definitive form, "Bondholder" and (in relation to such Bond) "holder" means the person in whose name such Bond is registered. The Bonds are not issuable in bearer form.

2.    **Status and Guarantee**

(a)    The Bonds constitute direct, unconditional and unsecured obligations of the Issuer and rank *pari passu* and rateably without any preference or priority among themselves and at least equally with all other outstanding, unsecured and unsubordinated obligations of the Issuer (other than statutorily preferred obligations), present and future.

(b)    The obligations of the Issuer under the Bonds and under the Bond Trust Deed will be fully, irrevocably and unconditionally guaranteed by the Guarantor pursuant to its guarantee provided in accordance with the terms of the Bond Trust Deed (the "Guarantee") and the obligations of the Guarantor under the Guarantee will be secured by the security for that Guarantee provided in accordance with Condition 8.

3.    **Transfers of Bonds: Issue of Certificates**

(a)    Transfers

A Bond may be transferred by depositing the Certificate issued in respect of that Bond, with the form of transfer on the back duly completed and signed, at the specified office of any Paying and Transfer Agent.

(b)    Delivery of new Certificates

Each new Certificate to be issued upon a transfer of Bonds will, within three business days of receipt by the relevant Paying and Transfer Agent of the form of transfer and the form of Certificate relating to the Bonds to be transferred, be mailed by uninsured mail at the risk of the holder entitled to the Bond to the address specified in the form of transfer. For the purposes of this Condition 3, "business day" shall mean a day on which banks are open for business in the city in which the specified office of the Paying and Transfer Agent with whom a Certificate is deposited in connection with a transfer is located.

Where some but not all the Bonds in respect of which a Certificate is issued are to be transferred or redeemed, a new Certificate in respect of the Bonds not so transferred or redeemed will, within three business days of deposit or surrender of the original Certificate with or to the

II – 4

relevant Paying and Transfer Agent, be mailed by uninsured mail at the risk of the holder of the Bonds not so transferred or redeemed to the address of such holder appearing on the Register.

    (c)    **Formalities free of charge**

    Registration of transfer of Bonds and the issuance of new Certificates will be effected without charge by or on behalf of the Issuer or any of the Agents, subject to payment (or the giving of such indemnity as the Issuer or any of the Agents may reasonably require) in respect of any tax or other governmental charges which may be imposed in relation to it.

    (d)    **No transfer periods**

    No Bondholder may require the transfer of a Bond in definitive form to be registered (i) during the period of 15 days ending on the due date for any payment of principal on the Bond; or (ii) during the period of seven days ending on (and including) any Interest Record Date (as defined in Condition 7(b)).

    The Bonds may not be transferred during the period beginning on the Repayment Maturity Date (as defined in Condition 6(a)) or, if earlier, the date of the final redemption payment in respect of the Bonds and, in each case, ending on the Contingent Payment Date (as defined in Condition 6(k)). On or prior to the final redemption payment in respect of the Bonds, the Principal Paying and Transfer Agent will instruct Euroclear and Clearstream, Luxembourg to block the accounts of the accountholders in respect of the Bonds from the time of the final redemption payment in respect of the Bonds to and including the Contingent Payment Date.

    (e)    **Regulations**

    All transfers of Bonds and entries on the Register will be made subject to the detailed regulations concerning transfer of Bonds set forth in the Paying and Transfer Agency Agreement. The regulations may be changed by the Issuer, with the prior written approval of the Bond Trustee and the Registrar. A copy of the current regulations will be mailed (at the Issuer's expense) by the Registrar to any Bondholder upon written request.

4.    **Interest**

    (a)    **Interest Payment Dates**

    The Bonds bear interest on the principal amount outstanding from and including November 15, 2002 (being the date of the Bondholders' Meeting) to but excluding December 15, 2005, and interest will be payable annually in arrear at a rate of 2 per cent per annum (subject to any step up under Condition 10(e)) on December 15 in each year commencing on December 15, 2003 (each an "Interest Payment Date"). For the avoidance of doubt, the Bonds shall not bear interest from and including December 15, 2001 to but excluding November 15, 2002. To the extent accrued on a Bond or Bonds to be redeemed, interest will be paid on such Bond or Bonds on the due date of such redemption. If any Interest Payment Date would otherwise fall on a day which is not a Business Day (as defined in Condition 4(d)) it shall be postponed to the next day that is a Business Day. Each of the period from and including November 15, 2002 to but excluding the first Interest

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 87

Payment Date and each successive period from and including an Interest Payment Date to but excluding the next succeeding Interest Payment Date is called an "Interest Period".

    (b)    **Interest Accrual**

        Each Bond will cease to bear interest from the due date for redemption unless, upon due presentation, payment of principal, premium (if any) or interest is improperly withheld or refused. In such event such Bond shall continue to bear interest (both before and after judgment) at the rate applicable on the Interest Payment Date immediately preceding the relevant redemption date in the manner provided in the Bond Trust Deed. Interest is required to be calculated on the basis of the actual number of days elapsed in the relevant period and a year of 365 days (or 366 days in a leap year).

    (c)    **Determination of Interest Amount and Adjusted Principal Amount**

        The Agent Bank shall, as soon as practicable after 11:00 a.m. (London time) on each Calculation Date (as defined in Condition 4(d)), but in no event later than the following Business Day, determine (i) in the case of an interest payment, the amount of interest (the "Interest Amount") which is payable in respect of the Bonds for the relevant Interest Period, and (ii) in the case of a redemption payment, the Adjusted Principal Amount which is payable in respect of the Bonds on the relevant redemption date. The Interest Amount and the Adjusted Principal Amount will be payable in immediately available funds on the relevant Interest Payment Date or redemption date, as the case may be, in accordance with Condition 7. So long as any of the Bonds or the Contingent Payment (as defined in Condition 6(k)) remains outstanding, there shall always be an Agent Bank. Notice shall be given by the Issuer to the Bondholders in accordance with Condition 16 in the event of any substitution of the Agent Bank as soon as possible and in any event not later than 14 days after the date of such substitution.

    (d)    **Certain Definitions**

        For purposes of these Conditions, the following terms shall have the meanings specified below:

        "Business Day" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in Amsterdam, Brussels, London, Luxembourg and Warsaw.

        "Calculation Date" means the third Business Day immediately preceding each Interest Payment Date or redemption date, as the case may be.

        "Material Subsidiaries" mean (i) Elektrim Telekomunikacja Sp. z o.o. ("Elektrim Telekomunikacja"), Carcom Warszawa Sp. z o.o. ("Carcom"), Polska Telefonia Cyfrowa Sp. z o.o. ("PTC") and any subsidiary company of the Guarantor that may from time to time hold the Guarantor's interests in Elektrim Telekomunikacja, Carcom and/or PTC or the assets of Elektrim Telekomunikacja, Carcom and/or PTC (the "ET Assets"); (ii) Patnow Adamow Konin S.A. ("PAK") and any subsidiary company of the Guarantor that may from time to time hold the Guarantor's interest in PAK or the assets of PAK (the "PAK Assets"); (iii) any subsidiary company resulting from a restructuring or reorganisation of the ET Assets or the PAK Assets or any

II - 6

investment exceeding €10,000,000 which relates to the ET Assets or the PAK Assets; (iv) Elektrim Volt S.A.; (v) Elektrim Megadex S.A.; (vi) Mostostal Warszawa S.A.; and (vii) Fabryka Kotłów Rafako S.A.

"Subsidiary" means any corporation or other business entity of which the Guarantor owns or controls (either directly or through another Subsidiary or other Subsidiaries) more than 50 per cent of the share capital or other ownership interest having ordinary voting power to elect directors, managers or trustees of such corporations or other business entity or any corporation or other business entity (other than any class or classes which have voting power upon the occurrence of any contingency) which at any time has its accounts consolidated with those of the Guarantor or which under Polish law, regulations or generally accepted accounting principles from time to time should have its accounts consolidated with those of the Guarantor.

(e)    Publication of Rate of Interest and Interest Amount; Records

The Agent Bank shall cause the Interest Amount for each Interest Period and the related Interest Payment Date and the Adjusted Principal Amount for each redemption date to be notified to the Bond Trustee and the Luxembourg Stock Exchange as soon as possible after their determination but in no event later than the Business Day thereafter. The Principal Paying and Transfer Agent shall keep records of the principal amount outstanding of each Bond.

(f)    Notifications, etc. to be Final

All notifications, opinions, determinations, certificates, calculations, quotations and decisions given, expressed, made or obtained for the purposes of the provisions of this Condition by the Agent Bank will (in the absence of wilful default, bad faith, gross negligence or manifest error) be binding on the Guarantor, the Bond Trustee, the Agent Bank, the other Agents and all Bondholders and (in the absence as referred to above) no liability to the Bond Trustee or the Bondholders shall attach to the Agent Bank in connection with the exercise or non-exercise by them of their powers, duties and discretions under this Condition.

5.    No Exchange and Conversion

(a)    No Conversion

The Bonds shall not be exchangeable into Guarantor Bonds, and the Guarantor Bonds shall not be convertible into Shares.

(b)    Observance of Guarantor Trust Deed

The Guarantor has covenanted in the Bond Trust Deed to observe all the provisions of the Guarantor Bonds and the Guarantor Trust Deed, and not to make any amendment thereto without the agreement of the Bond Trustee.

II - 7

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 89

6.    Redemption and Purchase

(a)    Final redemption

Unless previously purchased or redeemed as herein provided, the Bonds will be redeemed at the Adjusted Principal Amount together with accrued interest on December 15, 2005 (the "Repayment Maturity Date"). The Bonds may not be redeemed at the option of the Issuer or the Guarantor other than in accordance with this Condition 6. Although no further amounts of principal or interest will remain owing on the Bonds after redemption in full of the Bonds at the Adjusted Principal Amount together with accrued interest, the Bonds will remain in existence and retain a right to receive the Contingent Payment (if any) on the Contingent Payment Date in accordance with Condition 6(k).

(b)    Redemption at the option of the Issuer

The Issuer may at its option and upon giving not less than 10 nor more than 90 days' notice to the Bondholders in accordance with Condition 16 and to the Bond Trustee, redeem part, on a pro rata basis, or all of the Bonds for the time being outstanding at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption.

(c)    Redemption for taxation reasons

If the Issuer or the Guarantor, as the case may be, has or will become required to pay additional amounts as provided or referred to in Condition 9 and the requirement cannot be avoided by the Issuer or the Guarantor, as the case may be, taking reasonable measures available to it, the Issuer may at its option, having given not less than 45 nor more than 90 days' notice to the Bondholders in accordance with Condition 16 (which notice shall be irrevocable), redeem all, but not less than all, of the Bonds at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption, provided that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or the Guarantor would be required to pay such additional amounts were a payment in respect of the Bonds then due.

Prior to the giving of any notice of redemption pursuant to this paragraph, the Issuer or the Guarantor shall deliver to the Bond Trustee (i) a certificate signed by two Directors of the Guarantor stating that the requirement referred to above cannot be avoided by the Issuer or the Guarantor taking reasonable measures available to them and the Bond Trustee shall be entitled to accept such certificate as sufficient evidence of the satisfaction of the condition precedent set out above in which event it shall be conclusive and binding on the Bondholders and (ii) an opinion satisfactory to the Bond Trustee of independent legal advisers of recognised standing to the effect that the Issuer or the Guarantor has or will become obliged to pay such additional amounts as a result of such change, amendment or interpretation.

Upon the expiry of any such notice, the Issuer or the Guarantor will be bound to redeem the Bonds as aforesaid.

II - 8

(d)     **First Initial Payment**

Five Business Days after the Restructuring Date (the "Initial Payment Date"), the Issuer shall redeem at the Adjusted Principal Amount on a pro rata basis an aggregate principal amount outstanding of Bonds equal to €25,000,000 together with accrued interest to the date fixed for redemption (the "First Initial Payment").

(e)     **Second Initial Payment**

On June 30, 2003, the Issuer shall redeem at the Adjusted Principal Amount on a pro rata basis an aggregate principal amount outstanding of Bonds equal to €32,000,000 together with accrued interest to the date fixed for redemption (the "Second Initial Payment").

(f)     **Mandatory Redemption After Receipt of the ET Receivable**

On any occasion that the Guarantor receives from Elektrim Telekomunikacja payment of part or all of the ET Receivable (as defined below), the Issuer shall, no later than 11 Business Days after the date the Guarantor receives such payment from Elektrim Telekomunikacja (each such date, an "ET Receivable Receipt Date"), apply the ET Receivable Redemption Amount (as defined below) towards the redemption of the Bonds on a pro rata basis at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption. No later than one Business Day after the relevant ET Receivable Receipt Date, the Issuer or the Guarantor shall certify to the Bond Trustee, and give notice to the Bondholders (with a copy to Euroclear, Clearstream, Luxembourg, the Principal Paying and Transfer Agent and the Bond Trustee) of, the ET Receivable Redemption Amount and the date fixed for such mandatory redemption. The Bond Trustee shall be entitled to rely absolutely on the certificate received from the Issuer or the Guarantor, as the case may be, as to, *inter alia*, the ET Receivable Redemption Amount without being obliged to investigate or verify the accuracy thereof. Any such certificate will be binding on the Bond Trustee and the Bondholders in the absence of manifest error.

In these Conditions:

"ET Receivable" means all of the following receivables owing from Elektrim Telekomunikacja to the Guarantor: (i) receivables pursuant to Section 5.1 of the Receivables Sale Agreement dated November 21, 2000 between the Guarantor and Elektrim Telekomunikacja; (ii) receivables pursuant to four shareholder loan agreements between the Guarantor as lender and Elektrim Telekomunikacja as borrower dated January 13, 2000, March 3, 2000, April 11, 2000, and July 7, 2000, respectively, as amended; (iii) receivables pursuant to Section 3.6(b) of the Third Amended and Restated Investment Agreement dated September 3, 2001 between the Guarantor, Elektrim Telekomunikacja, Vivendi Universal S.A., Vivendi Telecom International S.A. and Carcom (the "Third Investment Agreement"); (iv) receivables pursuant to Section 6.1 of the Agreement for the Sale and Purchase of Shares and Receivables dated September 3, 2001 between the Guarantor, Elektrim Telekomunikacja and Vivendi Universal S.A. (the "Telco Purchase Agreement"), in connection with the obligation of Elektrim Telekomunikacja to release the Guarantor from guarantees of credits issued by BRE Bank S.A. and Bank Pekao S.A., respectively; (v) receivables pursuant to Section 1.3(c) of the Telco Purchase Agreement; and (vi) certain other

II - 9

amounts due under the Third Investment Agreement, such amounts being subject to further negotiations with Elektrim Telekomunikacja and Vivendi Universal S.A.; and

"ET Receivable Redemption Amount" on any date for redemption of the Bonds pursuant to this Condition 6(f) shall be a cash amount equal to 70 per cent of the after tax proceeds of any payment received by the Guarantor in respect of the ET Receivable on the relevant ET Receivable Receipt Date.

In accordance with paragraph (ii) of Condition 8(a) below and the Assignment (as defined in Condition 8(a)) in relation to the ET Receivable, the Guarantor shall grant a first ranking assignment by way of security of the ET Receivable, provided that (A) as regards the item referred to in paragraph (iii) of the definition of "ET Receivable" above, such assignment shall be granted by the Guarantor only upon obtaining approval of third parties required under the Third Investment Agreement, (B) as regards the items referred to in paragraphs (iv) and (v) of the definition of "ET Receivable" above, such assignment shall be granted by the Guarantor only upon obtaining approval of third parties required under the Telco Purchase Agreement, and (C) as regards the item referred to in paragraph (vi) of the definition of "ET Receivable" above, such assignment shall be granted by the Guarantor only following the execution of a settlement agreement between the Guarantor and Elektrim Telekomunikacja and obtaining approval of third parties required under the Third Investment Agreement. The Guarantor makes no representation or warranty, and can give no assurance, as to the amount of any receivables referred to the definition of "ET Receivable" above nor as to whether it will reach agreement with Elektrim Telekomunikacja and Vivendi Universal S.A. in respect of the receivables referred to in paragraph (vi) of the definition of "ET Receivable" above.

(g)     Mandatory Redemption After Receipt of any ET Share Proceeds

On any occasion that the Guarantor receives from Elektrim Telekomunikacja payment of any ET Share Proceeds (as defined below), the Issuer shall, no later than 11 Business Days after the date the Guarantor receives such payment from Elektrim Telekomunikacja (each such date, an "ET Share Proceeds Receipt Date"), apply the ET Share Proceeds towards the redemption of the Bonds on a pro rata basis at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption. No later than one Business Day after the relevant ET Share Proceeds Receipt Date, the Issuer or the Guarantor shall certify to the Bond Trustee, and give notice to the Bondholders (with a copy to Euroclear, Clearstream, Luxembourg, the Principal Paying and Transfer Agent and the Bond Trustee) of, the amount of the ET Share Proceeds and the date fixed for such mandatory redemption. The Bond Trustee shall be entitled to rely absolutely on the certificate received from the Issuer or the Guarantor, as the case may be, as to, *inter alia*, the amount of the ET Share Proceeds without being obliged to investigate or verify the accuracy thereof. Any such certificate will be binding on the Bond Trustee and the Bondholders in the absence of manifest error.

In these Conditions, "ET Share Proceeds" means any cash proceeds of the ET Shares or the Carcom Shares (each as defined in Condition 6(h)) received by the Guarantor from Elektrim Telekomunikacja, including (i) any dividends received by the Guarantor resulting from the ownership of the ET Shares or the Carcom Shares, as the case may be, (ii) any amounts paid to the Guarantor in connection with a redemption by Elektrim Telekomunikacja of the ET Shares or a

II - 10

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 92

redemption by Carcom of the Carcom Shares, and (iii) any proceeds received by the Guarantor upon a distribution of the assets of Elektrim Telekomunikacja or Carcom after the dissolution of Elektrim Telekomunikacja or Carcom, respectively (all such proceeds being assigned by the Guarantor to the Security Agent pursuant to the ordinary pledge agreement in relation to the ET Shares dated the Restructuring Date between the Guarantor and the Security Agent (the "ET Ordinary Pledge Agreement") and the ordinary pledge agreement in relation to the Carcom Shares dated the Restructuring Date between the Guarantor and the Security Agent (the "Carcom Ordinary Pledge Agreement")).

In accordance with paragraph (i) of Condition 8(a) below, the ET Ordinary Pledge Agreement and the Carcom Ordinary Pledge Agreement, the Guarantor shall grant a first ranking assignment by way of security of all proceeds, payments, dividends or other distributions, either in cash or in other form, of the ET Shares and the Carcom Shares received by the Guarantor from Elektrim Telekomunikacja.

(h)    Mandatory Redemption Upon a Sale of the Guarantor's Holding of Shares in Elektrim Telekomunikacja or PAK

In the event that the Guarantor completes a sale of all or part of its holding of shares in Elektrim Telekomunikacja (currently 49 per cent of the issued share capital) (the "ET Shares"), the Issuer, shall, no later than 11 Business Days after the date the Guarantor (or any of its Subsidiaries) receives the proceeds of sale of the ET Shares (the "ET Sale Completion Date"), apply all or part (as required) of the Sale Proceeds Redemption Amount (as defined below) towards the redemption of all (but not part only) of the Bonds then outstanding at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption. No later than one Business Day after the ET Sale Completion Date, the Issuer or the Guarantor shall give notice to the Bondholders (with a copy to Euroclear, Clearstream, Luxembourg, the Principal Paying and Transfer Agent and the Bond Trustee) of the Sale Proceeds Redemption Amount, the date fixed for such mandatory redemption and the amount that the Issuer will apply to redeem all the Bonds then outstanding at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption.

In the event that the Guarantor completes a sale of its holding of shares in Carcom (currently 49 percent of the issued share capital) (the "Carcom Shares"), the sale of the Carcom Shares shall be treated as related to the sale of the ET Shares, and the Issuer will apply the proceeds of the sale of the Carcom Shares in the same manner as contemplated in respect of the proceeds of the sale of the ET Shares pursuant to this Condition 6(h).

In the event that the Guarantor completes a sale of all or part of its holding of shares in PAK (currently 38.55 per cent of the issued share capital) (the "PAK Shares"), the Issuer shall, no later than 11 Business Days after the date the Guarantor (or any of its Subsidiaries) receives the proceeds of sale of the PAK Shares (the "PAK Sale Completion Date"), apply all or part (as required) of the Sale Proceeds Redemption Amount (as defined below) towards the redemption of the Bonds then outstanding on a pro rata basis (if the Bonds cannot be redeemed in full) at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption. No later than one Business Day after the PAK Sale Completion Date, the Issuer shall give notice to the Bondholders (with a copy to Euroclear, Clearstream, Luxembourg, the Principal Paying and Transfer Agent and the Bond Trustee) of the Sale Proceeds Redemption Amount, the date fixed for

II - 11

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 93

such mandatory redemption and the amount that the Issuer will apply to redeem the Bonds at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption.

In these Conditions, the "Sale Proceeds Redemption Amount" shall be an amount equal to the cash proceeds of the sale of the ET Shares or the PAK Shares, as the case may be, received by the Guarantor.

(i)    Purchase by the Guarantor, the Issuer or any Subsidiary

None of the Guarantor, the Issuer or any Subsidiary of the Guarantor may at any time purchase Bonds (other than by private treaty as part consideration for a sale of any of its assets or in an offer or redemption proposal to all Bondholders).

(j)    Cancellation

Bonds purchased by the Guarantor, the Issuer or any Subsidiary of the Guarantor must be immediately surrendered to the Registrar for cancellation, and may not be reissued or resold. All Bonds redeemed or purchased and surrendered for cancellation by the Issuer or by the Guarantor or any Subsidiary of the Guarantor to the Registrar pursuant to any of the foregoing provisions must be immediately cancelled, and may not be reissued or resold.

(k)    Contingent Payment

The Guarantor will pay an amount equal to the Contingent Payment (if any) to the Bondholders on the Contingent Payment Date. The Contingent Payment will be distributed to Bondholders pro rata to the principal amount outstanding of the Bonds that they held immediately prior to the final redemption of the Bonds on the Repayment Maturity Date in accordance with Condition 6(a) or, if earlier, immediately prior to the final redemption payment in respect of the Bonds (the "Final Date").

Within five Business Days of the Contingent Payment Determination Date, the Guarantor shall give notice to the Bondholders (with a copy to Euroclear, Clearstream, Luxembourg, the Principal Paying and Transfer Agent and the Bond Trustee) of the size of the Contingent Payment (if any) and of the date fixed as the Contingent Payment Date.

The Bond Trustee shall be entitled to assume that no Contingent Payment is due under this Condition 6(k) unless and until expressly notified to the contrary in writing by the Guarantor and, if so notified, the Bond Trustee shall be entitled to rely absolutely on any certificate signed by any two directors of the Guarantor as to the amount of the Contingent Payment without being obliged to investigate or verify the accuracy thereof. Any such certificate will be binding on the Bond Trustee and the Bondholders in the absence of manifest error.

For the avoidance of doubt, the obligation to make the Contingent Payment under this Condition 6(k) is an obligation of the Guarantor and not of the Issuer. The Guarantor's obligation to make the Contingent Payment is secured only by the security described in paragraph (vi) of Condition 8(a) below.

II - 12

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 94

In this Condition 6(k):

"Contingent Payment" means an amount calculated by the Guarantor that is equal to the Relevant Portion of:

(i)     the Fair Market Value; minus

(ii)    (a)    €160,000,000 less (x) any payments made by the Guarantor in respect of purchases or redemptions of its own shares, and (y) the amount of any loans to the Guarantor's shareholders made or acquired by the Guarantor, in each case before the Contingent Payment Determination Date; and

        (b)    50 per cent of the costs incurred by the Guarantor of engaging the investment banks appointed to determine the Fair Market Value.

For the avoidance of doubt, no interest shall accrue on the Contingent Payment during the period between the Contingent Payment Determination Date and the Contingent Payment Date;

"Contingent Payment Date" means such date (being a Business Day) falling no later than 180 days after the Contingent Payment Determination Date as the Guarantor may select and notify as such to the Bondholders in accordance with this Condition 6(k);

"Contingent Payment Determination Date" means a date falling after, but no later than 20 Business Days after, the earlier of:

(i)     the date on which the Guarantor publishes its annual audited consolidated financial statements for the year ending December 31, 2005; and

(ii)    the date on which the Guarantor publishes its annual audited consolidated financial statements for the year ending on the December 31 immediately following the disposal of its interests in the ET Shares, the Carcom Shares and the PAK Shares,

provided that, in the event that the Bonds have been redeemed in full at the Adjusted Principal Amount together with accrued interest, the Guarantor may elect that the Contingent Payment Determination Date shall be the date on which the Guarantor publishes its annual audited consolidated financial statements for the year ending on the December 31 immediately following such redemption;

"Fair Market Value" means the fair market value of the assets of the Guarantor (including, without limitation, the Guarantor's interest in any affiliates, but excluding the receivables from any loans to the Guarantor's shareholders made by the Guarantor) after deduction of any debt (but excluding contingent liabilities or amounts due in respect of working capital) and assuming that the Guarantor has no obligations in respect of the Contingent Payment, as determined (by reference to the most recent annual audited consolidated financial statements of the Guarantor) on the Contingent Payment Determination Date by two leading investment banks of international repute, appointed by, and at the expense of, the Guarantor, one chosen by the Guarantor and one chosen by the Bond Trustee, on the basis that:

II - 13

(i)    if the higher of the two valuations is less than 15 per cent greater than the lower valuation or the two valuations are the same, then the Fair Market Value shall be the arithmetical mean of the two valuations;

(ii)    if the higher of the two valuations is 15 per cent or more greater than the lower valuation, then the Guarantor shall, at the expense of the Guarantor, appoint a third investment bank chosen jointly by the Guarantor and the Bond Trustee to determine the Fair Market Value, which valuation must be no higher than the higher valuation and no lower than the lower valuation determined by the original two investment banks and which valuation shall be conclusive and binding on the Issuer, the Guarantor, the Bond Trustee and the Bondholders; and

(iii)    the investment banks shall act as experts and not as arbitrators, and their determinations and findings shall be conclusive and binding on the Issuer, the Guarantor, the Bond Trustee and the Bondholders; and

"Relevant Portion" means:

(i)    in the event that the Final Date occurs in the year ending December 31, 2003, 10 per cent;

(ii)    in the event that the Final Date occurs on or after January 1, 2004 but on or before December 31, 2004, the sum of (A) 10 per cent, plus (B) the percentage rate obtained by multiplying 10 per cent by a fraction (i) the numerator of which is equal to the actual number of days from and including January 1, 2004 to but excluding the Final Date, and (ii) the denominator of which is 366; and

(iii)    in the event that the Final Date occurs on or after January 1, 2005 but on or before the Repayment Maturity Date, the sum of (A) 20 per cent, plus (B) the percentage rate obtained by multiplying 5 per cent by a fraction (i) the numerator of which is equal to the actual number of days from and including January 1, 2005 to but excluding the Final Date, and (ii) the denominator of which is 349.

This Condition 6(k) is subject to Condition 10(e).

(l)    **Pro Rata Redemptions**

References in these Conditions to a partial redemption of the Bonds on a pro rata basis shall be effected by way of a pro rata redemption of all of the Bonds. The funds available to be applied towards such redemption (excluding the amount representing the premium resulting from the application of the Accreted Value Percentage) shall be applied to reduce the principal amount outstanding of each of the Bonds. So long as the Bonds are in global form, such partial redemptions shall be made in accordance with the relevant procedures of Euroclear and Clearstream, Luxembourg. References in these Conditions to the "principal amount outstanding" of the Bonds shall be construed as references to the principal amount of the Bonds, as reduced from time to time as a result of such pro rata redemptions. Whenever there is a pro rata redemption of the Bonds in part, but not in whole, the remaining principal amount outstanding of the Bonds after such partial redemption shall be calculated by:

II – 14

(i)     multiplying the Euro amount paid in respect of the Bonds by way of principal and premium on such redemption by a fraction, of which the numerator shall be 100, and the denominator shall be the Accreted Value Percentage (expressed solely as a number, for example 100.08) as at the redemption date; and

(ii)    (x)    if the partial redemption is the first redemption made of the Bonds after the Restructuring Date, subtracting that amount from the Increased Principal Amount; or

         (y)    if the partial payment is not the first redemption made of the Bonds after the Restructuring Date, subtracting that amount from the Increased Principal Amount as so reduced by previous partial payments.

The Adjusted Principal Amount of that part of the Bonds remaining outstanding shall be calculated by performing once again the calculations made previously but by reference to the new principal amount outstanding rather than the original principal amount outstanding.

7.     **Payments**

(a)     Payment of principal, interest and the Contingent Payment (if any) will be made in euro by credit or transfer to the registered euro account of the Bondholder (or to any other account to which euro may be credited) or by cheque in euro mailed to the registered address of the Bondholder if it does not have a registered account. Payments of the Contingent Payment (if any) will only be made after surrender of the relevant Certificate at the specified office of any Paying and Transfer Agent.

        References in these Conditions, the Bond Trust Deed and the Paying and Transfer Agency Agreement to principal in respect of any Bond shall, where the context so permits, be deemed to include a reference to any premium payable thereon.

(b)     Interest on Bonds due on an Interest Payment Date will be paid, subject to Condition 4, on the due date for the payment of interest to the holder shown on the Register at the close of business on the fifteenth day before the due date for the payment of interest (the "Interest Record Date"). The Contingent Payment (if any) due on the Contingent Payment Date will be paid, subject to Condition 6(k), to the holders shown on the Register immediately prior to the Final Date.

(c)     A Bondholder's registered account means the euro account maintained by or on behalf of it, details of which appear on the Register at the close of business on the second business day (as defined below) before the due date for payment and a Bondholder's registered address means its address appearing on the Register at that time.

(d)     All payments in respect of the Bonds are subject in all cases to any applicable fiscal or other laws or regulations (without limitation to the provisions of Condition 9). No commissions or expenses shall be charged to the Bondholders in respect of such payments.

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 97

(e)     Where payment is to be made by transfer to a registered account, payment instructions (for value the due date or, if that is not a business day, for value the first following day which is a business day) will be initiated and, where payment is to be made by cheque, the cheque will be mailed (at the risk and, if mailed at the request of the holder otherwise than by ordinary uninsured mail, expense of the holder) on the business day preceding the due date for payment or, in the case of a payment of the Contingent Payment (if any) on the business day on which the relevant Certificate is surrendered at the specified office of the Paying and Transfer Agent.

(f)     Bondholders will not be entitled to any interest or other payment for any delay after the due date in receiving the amount due if the due date is not a business day, if the Bondholder is late in surrendering its Certificate (if required to do so) or if a cheque mailed in accordance with this Condition arrives after the due date for payment.

(g)     In this Condition, "business day" means, in the case of payment by transfer to a euro account as referred to above, a day on which the Trans-European Automated Real-time Gross Settlement Express Transfer (TARGET) System is operating and, in the case of the surrender of a Certificate, a day on which commercial banks are open for business in the place where the Certificate is surrendered.

(h)     If the amount of principal, premium, interest or the Contingent Payment, if any, which is due on the Bonds is not paid in full, the Registrar will annotate the Register with a record of the amount of principal, premium, interest or the Contingent Payment, if any, in fact paid.

8.    Security

(a)    Assets Encumbered

The Guarantor, in accordance with a deed of delegation (the "Deed of Delegation") dated the Restructuring Date between the Issuer, the Guarantor, the Bond Trustee and Citibank, N.A. (the "Security Agent"), the pledge agreements (the "Pledge Agreements") dated the Restructuring Date between the Guarantor and the Security Agent, the mortgages (the "Mortgages") dated the Restructuring Date executed by the Guarantor, the assignment agreements (the "Assignments") in relation to the PAK Loan (as defined below) and the ET Receivable dated the Restructuring Date between the Guarantor and the Security Agent and a security administration agreement (the "Security Administration Agreement") dated the Restructuring Date between the Issuer, the Guarantor, the Bond Trustee and the Security Agent, has granted security in favour of the Security Agent with respect to a guarantee in the Deed of Delegation in relation to the Bonds and the Bond Trust Deed (w) for itself, and (x) on behalf of the Bond Trustee for itself and as trustee for the Bondholders, to secure all obligations of the Guarantor in respect of the Bonds, the Bond Trust Deed, the Security Administration Agreement and the Deed of Delegation (provided, however, that the Guarantor's obligation to make the Contingent Payment in accordance with Condition 6(k) is secured only by the security described in paragraph (vi) below). The following security shall be granted with respect to the above obligations:

II - 16

(i)     subject to Condition 8(b), first ranking ordinary and registered pledges over the ET Shares and the Carcom Shares, accompanied by a first ranking assignment by way of security of all proceeds, payments, dividends or other distributions, either in cash or in other form, of the ET Shares and the Carcom Shares received by the Guarantor from Elektrim Telekomunikacja;

(ii)    a first ranking assignment by way of security of the ET Receivable, provided that (A) as regards the item referred to in paragraph (iii) of the definition of "ET Receivable" in Condition 6(f) above, such assignment shall be granted by the Guarantor only upon obtaining approval of third parties required under the Third Investment Agreement, (B) as regards the items referred to in paragraphs (iv) and (v) of the definition of "ET Receivable" in Condition 6(f) above, such assignment shall be granted by the Guarantor only upon obtaining approval of third parties required under the Telco Purchase Agreement, and (C) as regards the item referred to in paragraph (vi) of the definition of "ET Receivable" in Condition 6(f) above, such assignment shall be granted by the Guarantor only following the execution of a settlement agreement between the Guarantor and Elektrim Telekomunikacja and obtaining approval of third parties required under the Third Investment Agreement (before an Event of Default has occurred in relation to the Bonds and the security over the ET Receivable has become enforceable, the Security Agent shall only retain the ET Receivable Redemption Amount from proceeds of the ET Receivable and shall pay the balance promptly to the Guarantor, who may apply it for any purpose);

(iii)   a first ranking assignment by way of security of the receivables under the loan (the "PAK Loan") from the Guarantor to PAK or one of its subsidiaries (together, the "PAK Group") in an amount of €32,000,000 pursuant to a loan agreement dated November 6, 2002 (as amended from time to time) (including an assignment of any security granted by PAK to secure its obligations under the PAK Loan);

(iv)    subject to any first ranking ordinary or registered pledges granted in accordance with Conditions 8(d) or 8(f), first ranking ordinary and registered pledges over the Guarantor's equity interests in Elektrim Volt S.A., Elektrim Megadex S.A., Port Praski Sp. Z o.o., Mostostal Warszawa S.A. and Fabryka Kotłów Rafako S.A. (together, the "Small Assets");

(v)     subject to any first ranking mortgages granted in accordance with Condition 8(d), a first ranking mortgage over the Guarantor's Real Estate Assets (as defined in Condition 8(d)); and

(vi)    subject to and immediately upon obtaining any required approvals and subject to any first ranking ordinary or registered pledge granted in accordance with Condition 8(f), first ranking ordinary and registered pledges over the Guarantor's equity interests in PAK (including any PAK Shares acquired by the Guarantor after the Restructuring Date) (the "Pledged PAK Shares").

II - 17

The Guarantor has also established an account with Bank Handlowy w Warszawie S.A., and has assigned its rights to and in respect of such account, including all amounts standing at any time to the credit of such account, to the Security Agent pursuant to a security account assignment dated the Restructuring Date between the Guarantor and the Security Agent.

All references in these Conditions to an assignment by way of security are references either (i) to an assignment by way of security of the Guarantor's rights in, to and under the relevant asset, or (ii) to a remittance (in accordance with Art. 921(1) of the Polish Civil Code) of the Guarantor's right to receive payment under the terms of the relevant asset.

(b)    Release Upon Sale of ET Shares, Carcom Shares or Pledged PAK Shares

The pledges over the ET Shares and the Carcom Shares shall be released in accordance with the terms of the Security Administration Agreement and the relevant Pledge Agreements upon completion of the sale of the ET Shares and the Carcom Shares, provided that the proceeds therefrom exceed the amount required to redeem all (but not part only) of the Bonds then outstanding at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption and such proceeds are applied in accordance with Condition 6(h).

The pledge over the Pledged PAK Shares shall be released in accordance with the terms of the Security Administration Agreement and the relevant Pledge Agreements upon completion of the sale of the Pledged PAK Shares, provided that the proceeds therefrom are applied to redeem the Bonds then outstanding on a pro rata basis (if the Bonds cannot be redeemed in full) at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption in accordance with Condition 6(h).

In connection with a merger or restructuring of the interests of Elektrim Telekomunikacja in PTC, a first ranking pledge securing the Bonds shall be granted by the holder of the relevant asset over all of the Guarantor's interest, direct or indirect and of whatever nature, in or against PTC (or any successor entity) or any other consideration received in such restructuring (the "ET Replacement Security"). In such circumstances, all references to the ET Shares in Conditions 6(g), 6(h), 6(k) and 10(e) shall be interpreted as if those Conditions instead contained a reference to the ET Replacement Security.

(c)    Repayment of PAK Loan

Upon receipt by the Security Agent of the proceeds of the PAK Loan, the Security Agent shall apply such proceeds towards the Second Initial Payment in accordance with Condition 6(e) and shall, if no unremedied Event of Default has occurred in relation to the Bonds and the security over the PAK Loan has not become enforceable, pay the balance of such proceeds promptly to the Guarantor.

(d)    Additional Pledges Over Small Assets or Real Estate Assets

If the Guarantor or any of its Subsidiaries enters into a secured loan (a "Qualifying Secured Loan") where:

II - 18

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 100

(i)     any pledge (in the form of a registered pledge and/or an ordinary pledge) (a "Pledge") over a Small Asset or a mortgage over a Real Estate Asset has been agreed to be granted in favour of the lender of such loan;

(ii)    the amount of such loan is equal to or greater than 50 per cent of the Hurdle Value (as defined below) in relation to such Small Asset or Real Estate Asset; and

(iii)   the security granted with respect to such loan contains a term, *inter alia*, to the effect that the lender in respect thereof may not, in connection with an enforcement of such security, take over the ownership or possession of such Small Asset or Real Estate Asset,

then, so long as there is no unremedied Event of Default at the time such Pledge or mortgage is granted, the security granted with respect to the Bonds over such Small Asset or Real Estate Asset shall rank behind such Pledge or mortgage in accordance with the procedure described in the Security Administration Agreement. For the avoidance of doubt, the Guarantor and its Subsidiaries shall be free to apply the proceeds of any Qualifying Secured Loan in their sole discretion.

In the event that the Guarantor or any of its Subsidiaries proposes to enter into a loan (a "Non Qualifying Secured Loan") where any Pledge over a Small Asset or mortgage over a Real Estate Asset has been agreed to be granted in favour of the lender of such Non Qualifying Secured Loan, but either of the conditions in paragraphs (ii) or (iii) above will not be satisfied, then the Guarantor may notify the Bondholders of such Non Qualifying Secured Loan in accordance with Condition 16 and request that the Bondholders, within 14 days of such notice, notify their approval of such Non Qualifying Secured Loan to the Bond Trustee. Such approval will be deemed to have been given if the holders of at least 50 per cent of the principal amount outstanding of the Bonds notify their approval of such Non Qualifying Secured Loan to the Bond Trustee. In the event that such approval is given by the Bondholders, so long as there is no unremedied Event of Default at the time such Pledge or mortgage is granted, the Guarantor or any of its Subsidiaries may enter into such Non Qualifying Secured Loan and the security granted with respect to the Bonds over the relevant Small Asset or Real Estate Asset shall rank behind such Pledge or mortgage in accordance with the procedure described in the Security Administration Agreement. For the avoidance of doubt, the Guarantor and its Subsidiaries shall be free to apply the proceeds of any Non Qualifying Secured Loan in their sole discretion.

In these Conditions, "Hurdle Value" shall mean:

(i)     with respect to Elektrim Volt S.A., PLN 20,000,000;

(ii)    with respect to Elektrim Megadex S.A., PLN 45,000,000;

(iii)   with respect to Port Praski Sp. Z o.o., PLN 70,000,000;

(iv)    with respect to Mostostal Warszawa S.A., PLN 20,000,000;

(v)     with respect to Fabryka Kotłów Rafako S.A., PLN 20,000,000; and

II - 19

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 101

(vi)    with respect to certain real estate assets (together, the "Real Estate Assets"), (x) in relation to the real estate at Chalubinskiego 8, PLN 15,000,000, and (y) in relation to the real estate at Ul. Panska 85, PLN 4,000,000.

(e)    Release Upon Disposal of Small Asset or Real Estate Asset

So long as there is no unremedied Event of Default, the security granted with respect to the Bonds over any Small Asset or Real Estate Asset shall be released if the Guarantor disposes of its interest in such Small Asset or Real Estate Asset for a total consideration equal to or greater than the relevant Hurdle Value (a "Qualifying Sale"). The Bond Trustee and the Security Agent shall release the security over such Small Asset or Real Estate Asset (conditional upon completion of the Qualifying Sale and payment for the relevant Small Asset or Real Estate Asset, as the case may be) in accordance with the procedure described in the Security Administration Agreement. For the avoidance of doubt, the Guarantor and its Subsidiaries shall be free to apply the proceeds of any Qualifying Sale in their sole discretion.

In the event that the Guarantor proposes to dispose of its interest in a Small Asset or a Real Estate Asset for a total consideration less than the relevant Hurdle Value (a "Non Qualifying Sale"), then the Guarantor may notify the Bondholders of such Non Qualifying Sale in accordance with Condition 16 and request that the Bondholders, within 14 days of such notice, notify their approval of such Non Qualifying Sale to the Bond Trustee. Such approval will be deemed to have been given if the holders of at least 50 per cent of the principal amount outstanding of the Bonds notify their approval of such Non Qualifying Sale to the Bond Trustee. In the event that such approval is given by the Bondholders, the Guarantor may, so long as there is no unremedied Event of Default, carry out the Non Qualifying Sale and the Bond Trustee and the Security Agent shall release the security over such Small Asset or Real Estate Asset (conditional upon completion of the Non Qualifying Sale and payment for the relevant Small Asset or Real Estate Asset, as the case may be) in accordance with the procedure described in the Security Administration Agreement. For the avoidance of doubt, the Guarantor and its Subsidiaries shall be free to apply the proceeds of any Non Qualifying Sale in their sole discretion.

(f)    Additional Pledges Over Pledged PAK Shares

If, with respect to any loan to finance the investment and capital expenditure commitments of any member of the PAK Group, the Guarantor agrees to grant any Pledge over the Pledged PAK Shares in favour of the lender of any such loan on terms to the effect that, *inter alia*, such lender may not, in connection with an enforcement of such security, take over the ownership or possession of the Pledged PAK Shares (a "Qualifying PAK Loan"), then, so long as there is no unremedied Event of Default at the time such Pledge is granted, the security granted with respect to the Bonds over the Pledged PAK Shares shall rank behind such Pledge in accordance with the procedure described in the Security Administration Agreement.

(g)    Power of Attorney in Relation to the Pledged PAK Shares

On the Restructuring Date, pursuant to a power of attorney dated on or prior to the Restructuring Date, the Guarantor appointed the Bond Trustee as its attorney for the purpose of completing any acts necessary to grant to the Security Agent (subject to any first ranking ordinary

II - 20

or registered pledge granted in accordance with Condition 8(f)) first ranking ordinary and registered pledges over the Pledged PAK Shares immediately upon the Guarantor obtaining any required approvals in connection therewith and notifying the Bond Trustee thereof, and for the purpose of registering and perfecting such pledges.

(h)    No Foreclosure on Second Ranking Pledges and Mortgages

Where the first ranking pledge over a Small Asset or the Pledged PAK Shares or the first ranking mortgage over a Real Estate Asset with respect to the Bonds is made to rank behind a pledge or mortgage granted over any such asset in connection with any Qualifying Secured Loan, Qualifying PAK Loan or Non Qualifying Secured Loan (in accordance with Conditions 8(d), 8(e) and 8(f) and the procedure described in the Security Administration Agreement), it shall be a term of the second ranking pledge or mortgage securing the Bonds that the Security Agent may not, in connection with an enforcement of any such pledge or mortgage, take over the ownership or possession of such asset unless and until the first ranking pledge has been discharged in full.

(i)    Final Release of Security

Subject to Conditions 8(b), 8(c), 8(d), 8(e) and 8(f), all security granted with respect to the Bonds shall be released upon the redemption in full of the Bonds, provided, however, that:

(i)    in the event that the Second Initial Payment has been made but PAK has not fulfilled its obligations under the PAK Loan as at the date of the Second Initial Payment, the Security Agent shall re-assign to Elektrim its right, title and interest in, to and under the PAK Loan and the security granted by PAK to secure its obligations under the PAK Loan; and

(ii)    if the Guarantor has not disposed of the Pledged PAK Shares by the date of the redemption in full of the Bonds, the security over the Pledged PAK Shares shall not be released until the Contingent Payment Date.

(j)    Direction of Security Agent

The Security Administration Agreement provides that the Bond Trustee, acting on behalf of the Bondholders, shall have authority to direct the Security Agent in relation to enforcement of the terms of the Security Administration Agreement. The Security Administration Agreement and the Bond Trust Deed provide that the Bond Trustee shall not be obliged to give any such direction to the Security Agent unless and until it has been instructed in writing to do so by the holders of not less than 30 per cent in principal amount outstanding of the Bonds and it has been indemnified to its satisfaction against any liabilities it or the Security Agent may incur as a result of giving such direction.

9.    Taxation

(a)    All payments in respect of the Bonds by the Issuer or the Guarantor, as the case may be, shall be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or on behalf of the Republic of Poland or The

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 103

Netherlands, or any political sub-division of, or any authority in, or of, the Republic of Poland or The Netherlands, having power to tax ("Taxes"), unless the withholding or deduction of Taxes is required by law.

(b)    In the event that the withholding or deduction of Taxes is required by law, the Issuer or the Guarantor, as the case may be, will pay such additional amounts as may be necessary in order that the net amounts received by the Bondholders after such withholding or deduction shall equal the amounts which would have been receivable in respect of the Bonds in the absence of the withholding or deduction; provided that the Issuer or the Guarantor, as the case may be, shall not be obligated to pay any such additional amounts:

(i)    in respect of Bonds held by a Bondholder unless such Bondholder shall have provided the Issuer or the Guarantor, as the case may be, with written certification of its tax residence and if such tax residence is a state having a treaty with the Republic of Poland or The Netherlands providing a zero or reduced rate of withholding, such Bondholder shall have taken such additional steps required by the relevant treaty to permit a reduced withholding obligation (provided that where any such certification has been received, the Issuer or the Guarantor, as the case may be, will make payments subject only to the withholding provisions of the relevant treaty);

(ii)    to, or on behalf of, a holder who is subject to such taxes, duties, assessments or governmental charges in respect of such Bond by reason of his being connected with the Republic of Poland or The Netherlands otherwise than merely by holding such Bond or by the receipt of principal, premium (if any) or interest in respect of the Bonds; or

(iii)    if the Certificate in respect of such Bond is surrendered more than 30 days after the Relevant Date (as defined below) except to the extent that the holder would have been entitled to such additional amount on surrendering the relevant Certificate for payment on the last day of such 30-day period.

For this purpose, the "Relevant Date" in relation to any Bond means (A) the due date for payment in respect thereof or (B) (if the full amount of the moneys payable on such due date has not been received by the Bond Trustee or the Principal Paying and Transfer Agent on or prior to such due date) the date on which notice is duly given to the Bondholders that such moneys have been so received.

10.    Covenants

(a)    Limitation on Issuer Activities

The Issuer will not engage in any business activity or undertake any other activity, except any activity relating to the offering, sale or issuance of indebtedness or the lending or otherwise advancing the proceeds thereof to the Guarantor or any Subsidiary of the Guarantor and any other activities in connection therewith.

II - 22

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 104

**(b)    Information**

So long as any of the Bonds remain outstanding, the Guarantor will make available to the Bondholders (i) audited annual consolidated financial statements in accordance with International Auditing Standards, including balance sheet, profit and loss and cash flow statements; (ii) unaudited quarterly consolidated summary financial information and (iii) if the Guarantor obtains all approvals required in order to pledge its equity interest in PAK, audited annual consolidated financial statements and unaudited quarterly consolidated summary financial information for PAK. Such information will be made available at Euroclear and Clearstream, Luxembourg and at the specified offices of the Guarantor, the Paying and Transfer Agents and the Bond Trustee.

**(c)    Limitation on Dividends, Share Buy Backs and Shareholder Loans**

The Management Board of the Guarantor shall not recommend that the Guarantor declare, make or pay any dividend or distribution in respect of any of its shares until after the Contingent Payment Date, if any, and the Guarantor shall not declare, make or pay any interim dividend or distribution in respect of any of its shares until after the Contingent Payment Date, if any.

Subject to the following proviso, the Guarantor shall not (i) purchase, redeem or agree to purchase or redeem any of its shares until after the redemption in full of the Bonds, or (ii) make or acquire any loans to its shareholders until after the redemption in full of the Bonds, provided that any purchases, redemptions or loans made or acquired during the period from the Restructuring Date until the Contingent Payment Determination Date shall not exceed in the aggregate €160,000,000.

**(d)    Member of Management Board Appointed by the Bondholders**

So long as the principal amount outstanding of the Bonds exceeds €150,000,000, the Bond Trustee, acting on the written instructions of the holders of at least 25 per cent in principal amount outstanding of the Bonds (an "Instructing Bondholder Group"), shall have the right to require the Supervisory Board of the Guarantor to have appointed one member to the Management Board of the Guarantor nominated by such Instructing Bondholder Group (the "Bondholder Nominated Director"). The Supervisory Board shall have the right to reject any individual nominated by an Instructing Bondholder Group, provided that it shall give reasonable written justification to the Bond Trustee and to the Bondholders in accordance with Condition 16 for such rejection on grounds that (a) the nominee (including any replacement thereof selected by such Instructing Bondholder Group):

(i)    has insufficient experience;

(ii)    has a conflict of interest that would prevent the nominee properly conducting the function of a management board member;

(iii)    is of unsound mind;

(iv)    is an undischarged bankrupt; or

(v)    is not a full-time resident of Poland,

II - 23

or (b) the Supervisory Board reasonably considers that the Management Board so constituted could not reasonably be expected to operate on a consensual basis. In the event that the individual nominated by an Instructing Bondholder Group is rejected by the Supervisory Board on the grounds specified in paragraph (b) above, any alternative individual nominated by an Instructing Bondholder Group (with respect to that particular appointment) may only be rejected by the Supervisory Board on one of the grounds specified in paragraph (a) above or on the grounds that the nominee is reasonably considered by the Supervisory Board to be so objectionable (on grounds other than those stated in paragraph (a) above) that it would be impossible for the Management Board to operate on a consensual basis.

If the Bondholder Nominated Director shall resign or become incapable of acting or if the Bond Trustee is requested in writing by the holders of at least 50 per cent in principal amount outstanding of the Bonds to request that the Supervisory Board dismiss the Bondholder Nominated Director, then the Bond Trustee, acting on the written instructions of an Instructing Bondholder Group, shall have the right to require the Supervisory Board to appoint a replacement member nominated by such Instructing Bondholder Group (subject to the Supervisory Board's right to reject any individual nominated by an Instructing Bondholder Group as described in the first paragraph of this Condition 10(d)).

The Guarantor agrees that its Management Board will consist of two or three members having positions, status and benefits commensurate with their role in the joint management of the Guarantor. Material decisions of the Guarantor and all financial decisions relating to amounts exceeding €25,000 may only be taken with the consensus of the entire Management Board.

In the event of any impasse or deadlock of the Management Board that the Supervisory Board reasonably believes to be prejudicial to the interests of the Guarantor, the Supervisory Board may dismiss the entire Management Board or any two members of the Management Board and appoint other persons in their place. In the event that only two members of the Management Board are to be dismissed of which one is the Bondholder Nominated Director, the Bond Trustee, acting on the written instructions of an Instructing Bondholder Group, may direct the Supervisory Board as to which of the two members (who are not the Bondholder Nominated Director) shall be dismissed. In addition, the Bond Trustee, acting on the written instructions of an Instructing Bondholder Group, shall have the right to require the Supervisory Board to appoint a replacement member nominated by the Bondholders (subject to the Supervisory Board's right to reject any individual nominated by an Instructing Bondholder Group as described in the first paragraph of this Condition 10(d)).

If the Supervisory Board considers that, with respect to material decisions, the Bondholder Nominated Director has acted in breach of his Polish law duty to act in the best interests of the Guarantor, the Supervisory Board may dismiss the Bondholder Nominated Director, provided that the Supervisory Board also dismisses one other member of the Management Board (such member to be chosen in the Supervisory Board's sole discretion). The Bond Trustee, acting on the written instructions of an Instructing Bondholder Group, shall have the right to require the Supervisory Board to appoint a replacement member nominated by the Bondholders (subject to the Supervisory Board's right to reject any individual nominated by an Instructing Bondholder Group as described in the first paragraph of this Condition 10(d)).

II - 24

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 106

If the Supervisory Board dismisses the Bondholder Nominated Director on the grounds referred to in the previous paragraph, the dismissed Bondholder Nominated Director or the Guarantor shall be able to commence an arbitration procedure (the "Arbitration Procedure") to determine whether the dismissed Bondholder Nominated Director had, with respect to material decisions, acted in breach of his Polish law duty to act in the best interest of the Guarantor. Immediately upon dismissing the Bondholder Nominated Director, the Guarantor will notify the Bond Trustee. Upon receipt of such notice, the Bond Trustee will notify the Bondholders in accordance with Condition 16, inviting them to nominate a beneficial holder of the Bonds (the "Bondholder Participant") who may observe or otherwise participate in the Arbitration Procedure alongside the dismissed Bondholder Nominated Director. The Bond Trustee shall, acting on the instructions of an Instructing Bondholder Group, notify the Guarantor, the dismissed Bondholder Nominated Director and the Bondholders of the identity of the Bondholder Participant. The Guarantor shall select an independent arbitrator, approved by the dismissed Bondholder Nominated Director (acting reasonably), failing which the independent arbitrator shall be appointed by the London Court of International Arbitration. If the independent arbitrator determines that the dismissed Bondholder Nominated Director has, with respect to material decisions, acted in breach of his Polish law duty to act in the best interests of the Guarantor, (i) the new Bondholder Nominated Director shall remain a member of the Management Board, (ii) the Supervisory Board shall be entitled to resolve that future decisions of the Guarantor may be taken by two out of three members of the Management Board (instead of by consensus of the entire Management Board), and (iii) the costs of the Bondholder Nominated Director in connection with the arbitration shall be borne by the Guarantor (but, for the avoidance of doubt, the Bondholder Participant shall in all cases bear its own legal and other costs in connection with the arbitration).

Whenever a Bondholder Nominated Director is to be nominated pursuant to this Condition 10(d), the Bond Trustee shall act only upon the written instructions of an Instructing Bondholder Group and, in all cases, subject to it being indemnified to its satisfaction against any liabilities which it may incur in so acting. The Bondholder Nominated Director shall be appointed purely by the relevant Instructing Bondholder Group, and the Bond Trustee shall not be involved in assessing the suitability of any nominee. The Bond Trustee shall not be responsible to the Issuer, the Guarantor, the Bondholders or any third party for the actions of any Bondholder Nominated Director nor for any failure by the Guarantor to effect any appointments or dismissals.

On any occasion where a Bondholder Nominated Director is to be appointed, the Issuer shall notify the Bond Trustee and the Bond Trustee shall give notice thereof to the Bondholders in accordance with Condition 16 and shall invite nominations from the Bondholders, such nominations to be received by the Bond Trustee within 10 days of the date of the notice. If, in connection with any appointment, the Bond Trustee receives conflicting written instructions from more than one Instructing Bondholder Group, the Bond Trustee shall follow the instructions of the Instructing Bondholder Group which comprises the holders of the highest principal amount outstanding of Bonds (provided always that such Instructing Bondholder Group comprises holders of at least 25 per cent in principal amount outstanding of the Bonds). Once such appointment has been made, the Bondholders shall not be entitled to instruct the Bond Trustee to require the Supervisory Board of the Guarantor to make any further appointments, except in the case of a valid dismissal of the Bondholder Nominated Director in one of the circumstances described in this Condition 10(d). If the Bond Trustee does not receive any nominations from a Bondholder Instructing Group, then no Bondholder Nominated Director shall be proposed to the Supervisory

II - 25

Board for appointment to the Management Board until such time as a nomination has been made by a Bondholder Instructing Group.

In any circumstances where a Bondholder Nominated Director is dismissed in accordance with this Condition 10(d), the dismissal of such Bondholder Nominated Director shall be on terms that such dismissal shall not be effective until a new Bondholder Nominated Director has been appointed, provided that the Bond Trustee notifies the Supervisory Board of the identity of the proposed new Bondholder Nominated Director within 21 days of being notified of the proposed dismissal by the Supervisory Board of the existing Bondholder Nominated Director.

Notwithstanding this Condition 10(d), the first Bondholder Nominated Director appointed to the Management Board of the Guarantor (with effect from the Restructuring Date) was nominated by a Bondholder Instructing Group prior to the Bondholders' Meeting and his nomination subsequently approved by an Extraordinary Resolution of the Bondholders at the Bondholder's Meeting.

(e)    Auction of Elektrim Telekomunikacja

So long as the principal amount outstanding of the Bonds exceeds €300,000,000, the Bond Trustee, acting on the written instructions of the holders of at least 50 per cent in principal amount outstanding of the Bonds, shall have the right on one occasion only during the term of the Bonds to require (the "Bondholders' Request") the Management Board of the Guarantor to appoint, at the expense of the Guarantor, a leading investment bank of international repute to arrange and complete an auction of the Guarantor's interest in the ET Shares and the Carcom Shares and the ET Receivable (the "ET Auction"). The Guarantor shall procure that such investment bank carries out the ET Auction during a period of no more than six months following the date of receipt of the Bondholders' Request, provided that the Management Board may extend such period by up to three months if it considers it appropriate to do so.

In the event that (i) the ET Auction results in the Guarantor receiving a Binding Offer (as defined below), and (ii) the Guarantor accepts such Binding Offer, the Issuer shall apply the ET Auction Minimum Consideration (as defined below) towards a redemption of the Bonds at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption. Such redemption shall take place in accordance with the terms of Condition 6(h). In such circumstances, the Bonds shall no longer carry a right to receive the Contingent Payment and Condition 6(k) shall be of no effect.

In the event that (i) the ET Auction results in the Guarantor receiving a Binding Offer, and (ii) the Guarantor rejects such Binding Offer, the rate of interest accruing on the Bonds shall step up from 2 per cent per annum to 4 per cent per annum with effect from the date falling three months after the receipt by the Guarantor of such Binding Offer.

In the event that the ET Auction does not result in the Guarantor receiving a Binding Offer, the amount of the Contingent Payment to be paid to the Bondholders on the Contingent Payment Date in accordance with Condition 6(k) shall be reduced by 50 per cent.

The Guarantor shall notify the Bondholders in accordance with Condition 16 if its Management Board determines to extend the period for the auction process for up to three months

II - 26

beyond the period ending six months following the date of receipt of the Bondholders' Request. Upon completion of the auction process, the Guarantor shall provide the Bond Trustee with a certificate confirming, and the Issuer shall notify the Bondholders in accordance with Condition 16, whether a Binding Offer has been received and, if received, whether the Guarantor intends to accept or reject such Binding Offer. The Bond Trustee may accept such certificate as conclusive evidence of the information set out therein and the Bond Trustee shall not be bound to call for further evidence or be responsible for any loss that may be occasioned by it relying and acting upon such certificate.

For the avoidance of doubt, this Condition 10(e) is subject to Condition 6(h), such that any sale of the ET Shares following the ET Auction may only be completed if the Guarantor receives sale proceeds in an amount sufficient to redeem all (but not part only) of the Bonds then outstanding at the Adjusted Principal Amount together with accrued interest to the date fixed for redemption in accordance with Condition 6(h).

In this Condition 10(e):

"ET Auction Minimum Consideration" means, with respect to the date of receipt of any Binding Offer (the "Offer Date"), an amount that is equal to (i) €450,000,000 as increased by an annual rate of 15 per cent per annum from the Restructuring Date to the Offer Date, minus (ii) the amount of any sums received by the Guarantor from Elektrim Telekomunikacja under the terms of the ET Receivable prior to the Offer Date; and

"Binding Offer" means an unconditional and fully financed binding offer for the purchase of the Guarantor's interest in the ET Shares, the Carcom Shares and the ET Receivable for a consideration equal to or greater than the ET Auction Minimum Consideration on terms that are without any recourse to the Guarantor or any seller of the ET Shares after completion and that includes, *inter alia*, an agreement by the offeror to assume any remaining direct or indirect liabilities of the Guarantor (contingent or otherwise) in respect of PTC and Elektrim Telekomunikacja.

(f)    **Application for Approvals in Connection with PAK Pledged Shares and ET Receivable**

The Guarantor shall apply for any approvals required to pledge the PAK Pledged Shares to secure the Bonds in accordance with Condition 8 and shall notify the Bond Trustee immediately upon such approvals being obtained.

The Guarantor shall seek and use all reasonable commercial endeavours to obtain (A) the approvals required under the terms of the Third Investment Agreement in order to grant a first ranking assignment by way of security of the receivables referred to in paragraphs (iii) and (vi) of the definition of "ET Receivable" in Condition 6(f) above, and (B) the approvals required under the terms of the Telco Purchase Agreement in order to grant a first ranking assignment by way of security of the receivables referred to in paragraphs (iv) and (v) of the definition of "ET Receivable" in Condition 6(f) above. Immediately upon obtaining such approvals and, in the case of the receivables referred to in paragraph (vi) of the definition of "ET Receivable" in Condition 6(f) above, upon executing a settlement agreement between the Guarantor and Elektrim

II - 27

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 109

Telekomunikacja, the Guarantor shall notify the Bond Trustee and shall grant a first ranking assignment to the Security Agent by way of security of the relevant receivables.

### 11. Prescription

Claims against the Issuer or the Guarantor in respect of principal or premium (if any) in respect of the Bonds or the Contingent Payment (if any) will become void unless made within ten years from the Relevant Date (as defined in Condition 9) therefor. Claims against the Issuer or the Guarantor in respect of interest in respect of the Bonds will become void unless made within five years from the Relevant Date therefore.

### 12. Events of Default

The Bond Trustee at its discretion may, and if so requested in writing by the holders of at least thirty per cent in principal amount outstanding of the Bonds or if so directed by an Extraordinary Resolution of the Bondholders shall (subject in each case to being indemnified to its satisfaction), give notice to the Issuer and the Guarantor that the Bonds are, and they shall accordingly immediately become, due and repayable at their relevant redemption value, together with the accrued Interest Amount as provided in the Bond Trust Deed, upon the occurrence of any of the following events ("Events of Default"):

(i) if default is made for seven days or more in the payment of any principal and premium (if any) or default is made for more than fourteen days in the payment of interest due on any Bond; or

(ii) if either the Issuer or Guarantor fails to perform or observe any of its other respective obligations under the Bonds, the Bond Trust Deed, the Pledge Agreements, the Mortgages, the Assignments, the Security Administration Agreement or the Deed of Delegation or if any event occurs or any action is taken or fails to be taken which is (or but for the provisions of any applicable law would be) a breach of any of the covenants referred to in Condition 10 and in any such case (except where the Bond Trustee considers the same to be incapable of remedy when no such continuation or notice as is hereinafter referred to will be required) the same continues for the period of 30 days (or such longer period as the Bond Trustee may permit) next following the service by the Bond Trustee on the Issuer or Guarantor of notice requiring the same to be remedied, except in the case of the Issuer failing to make the First Initial Payment and such failure continuing for a period of three days next following the service by the Bond Trustee on the Issuer or Guarantor of notice requiring the same to be remedied; or

(iii) if, after the Restructuring Date, any Indebtedness of the Issuer, of the Guarantor or any of its Material Subsidiaries becomes due and repayable prematurely by reason of an event of default (however described) or the Issuer, the Guarantor or any of its Material Subsidiaries fails to make any payment in respect of any such Indebtedness on the due date for payment or any security given by the Issuer, the Guarantor or any of its Material

II - 28

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 110

Subsidiaries for any such Indebtedness becomes enforceable or if default is made by the Guarantor or any of its Material Subsidiaries in making any payment due under any guarantee or indemnity given by it in relation to any Indebtedness of any other person provided that the aggregate amount of all relevant Indebtedness, guarantees or indemnities in respect of which one or more of the events mentioned above in this paragraph (iii) have occurred exceeds €10,000,000 or its equivalent in other currencies; or

(iv)  if any governmental authorisation necessary for the performance of any (i) payment obligation of the Issuer or the Guarantor under the Bonds or (ii) any material obligation of the Issuer or the Guarantor under the Bond Trust Deed or the Paying and Transfer Agency Agreement (other than any approvals required in connection with the pledge over the Pledged PAK Shares) fails to take full force and effect or remain valid and subsisting; or

(v)   if an order of a court of competent jurisdiction is made or an effective resolution is passed for winding up the Issuer, the Guarantor or any Material Subsidiary of the Guarantor, except (a) a winding up for the purpose of a consolidation, merger, reconstruction or amalgamation the terms of which have previously been approved in writing by the Bond Trustee or by an Extraordinary Resolution of the Bondholders, or (b) in the case of a solvent winding up of a Subsidiary of the Guarantor (other than the Issuer) where the undertaking and assets of the Subsidiary are transferred to or otherwise vested in the Guarantor or another of its Subsidiaries; or

(vi)  if, after the Restructuring Date, an encumbrancer takes possession, or a receiver, manager or administrator is appointed, of the Issuer, the Guarantor or any Material Subsidiary of the Guarantor or of the whole or of any part of the undertaking or assets of any of them (being substantial in relation to the undertaking or assets of the Guarantor and its Subsidiaries taken as a whole) or if a distress, execution, attachment, sequestration or other process is levied or enforced upon or sued out or put in force against the whole or any part of the undertaking or assets of the Issuer, the Guarantor or any Material Subsidiary of the Guarantor (being substantial in relation to the undertaking or assets of the Guarantor and its Subsidiaries taken as a whole) and is not removed, discharged or paid out within 14 days (or such longer period as the Bond Trustee may consider appropriate in relation to the jurisdiction concerned); or

(vii) if, after the Restructuring Date, the Issuer, the Guarantor or any Material Subsidiary stops or threatens to stop payment (within the meaning of Dutch, Polish or any other applicable bankruptcy law) of its debts or ceases or through an official action of the Management Board or the Board of Directors of the relevant company threatens to cease to carry on the whole or a substantial part of its business or is unable to, or admits inability to, or is deemed unable to, pay its debts as and when they fall due (in each case, otherwise than for the purposes of a consolidation, merger, reconstruction or

II - 29

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 111

amalgamation, the terms of which have previously been approved in writing by the Bond Trustee or by an Extraordinary Resolution of the Bondholders); or

(viii) if, after the Restructuring Date, proceedings shall have been initiated against the Issuer, the Guarantor or any Material Subsidiary of the Guarantor under any applicable bankruptcy, reorganisation or insolvency law or the Issuer, the Guarantor or any Material Subsidiary of the Guarantor initiates or consents to proceedings relating to itself under any applicable bankruptcy, reorganisation or insolvency law or makes a conveyance or assignment for the benefit of, or enters into any composition or other arrangement with, its creditors generally (or any class of its creditors) or any meeting is convened to consider a proposal for a composition or other arrangement with its creditors generally (or any class of its creditors); or

(ix) if, after the Restructuring Date, any event occurs which under the laws of the Republic of Poland or the laws of The Netherlands has an analogous effect to any of the events referred to in paragraphs (v) to (viii) above; or

(x) other than judgment(s) or order(s) (i) in connection with any claims arising or proceedings initiated prior to the Restructuring Date in connection with the Bonds or (ii) arising as a result of a failure of the Management Board of the Guarantor to reach a consensus with regard to any material decisions in respect of the arbitration brought against the Guarantor by Deutsche Telekom at the International Arbitration Centre for the Austrian Federal Economic Chamber in Vienna, Austria, if one or more judgment(s) or order(s) for the payment of any amount in excess of €10,000,000 (or its equivalent in other currencies) are rendered against the Issuer or the Guarantor or any Material Subsidiary of the Guarantor in respect of which the Guarantor or any Material Subsidiary of the Guarantor is not otherwise secured, through a guarantee or surety, or indemnified, and such judgment(s) or order(s) continue unsatisfied for a period of 90 consecutive days after the date of such judgment(s) or order(s) or, if later, the date (if any) specified for payment in such judgment(s) or order(s), except to the extent that such judgment(s) or order(s) are stayed or suspended pending appeal or judicial review; or

(xi) if there shall occur any material adverse change in the business, assets, regulation or financial condition of the Guarantor, its Material Subsidiaries and the Issuer taken as a whole from that at the Restructuring Date which, in the sole discretion of the Bond Trustee, would be likely to have a material adverse effect on the Issuer's or Guarantor's ability to perform or comply with its payment obligations under the Bonds or the Bond Trust Deed; or

(xii) if (i) it is or will become unlawful for the Issuer or the Guarantor to perform or comply with any one or more of its payment obligations under the Bonds, its other material obligations under the Bond Trust Deed, the Security

II - 30

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 112

Documents or the Guarantee or (ii) the validity of the Bonds, the Guarantee or the Security Documents is contested by the Issuer or the Guarantor or either the Issuer or the Guarantor denies any of its obligations under the Bonds, the Guarantee or the Security Documents or (iii) any one of more of such obligations becomes unenforceable or invalid; or

(xiii)   if (i) all or any part of the undertaking, assets and revenues of the Guarantor, the Issuer or any Material Subsidiary is condemned, seized or otherwise appropriated by any person acting under the authority of any national, regional or local government or any political sub-division thereof or (ii) the Guarantor, the Issuer or any Material Subsidiary is prevented by any such person from exercising control over all or any material part of its undertaking, assets and revenues; or

(xiv)   if an event of default specified in the Guarantor Trust Deed occurs,

provided that in the case of paragraphs (ii), (iv) or (xiv) or, in relation to a Material Subsidiary other than paragraphs (v) to (ix) (inclusive) or (xiii), the Bond Trustee shall have certified that such event is materially prejudicial to the interests of the Bondholders.

For the purposes of paragraphs (iii) and (x) of this Condition, any Indebtedness or judgment or order which is in a currency other than euro shall be translated into euro at the spot rate for the sale of euros against the purchase of the relevant currency quoted by any leading bank selected by the Bond Trustee on any day when the Bond Trustee requests such a quotation for such purposes. For purposes of paragraph (iii) of this Condition, "Indebtedness" of any person means any indebtedness or obligation of such person (whether present or future, actual or contingent, and including any guarantee or indemnity) for or in respect of monies borrowed or raised (including monies raised by leasing).

13.   **Enforcement of Rights**

At any time after the Bonds become due and repayable, the Bond Trustee may, at its discretion and without further notice, institute such proceedings against the Issuer or the Guarantor as it may think fit to enforce the Bonds and the provisions of the Bond Trust Deed, but it need not take any such proceedings unless (i) it shall have been so directed by an Extraordinary Resolution of the Bondholders or so requested in writing by holders of at least thirty per cent in principal amount outstanding of the Bonds and (ii) it shall have been indemnified to its satisfaction. No Bondholder may proceed directly against the Issuer or the Guarantor unless the Bond Trustee, having become bound to proceed, fails to do so within a reasonable time and such failure is continuing.

The Bond Trust Deed also provides that, in case of an Event of Default, the Bond Trustee may, and shall if requested to do so in writing by holders of at least thirty per cent in principal amount outstanding of the Bonds or if so directed by an Extraordinary Resolution of the Bondholders and, in either case, subject to it being secured and/or indemnified to its satisfaction, direct the Security Agent to enforce the security created in the Security Documents in favour of the Bondholders.

II - 31

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 113

14. **Replacement of Certificates**

Should any Certificate be lost, stolen, mutilated, defaced or destroyed, it may be replaced at the office of the Registrar or of any Paying and Transfer Agent, at least one of which shall be located in Luxembourg, in each case upon payment by the claimant of the expenses, taxes and duties incurred in connection therewith and on such terms as to evidence, indemnity and security as the Issuer may reasonably require. A mutilated or defaced Certificate must be surrendered before a replacement will be issued.

15. **Meetings of Bondholders; Modifications; Waiver; Substitution**

The Bond Trust Deed contains provisions for convening meetings of Bondholders to consider any matter affecting their interests, including the modification by Extraordinary Resolution of these Conditions or the provisions of the Bond Trust Deed. The quorum at any such meeting for passing an Extraordinary Resolution will be one or more persons holding or representing one-third in principal amount outstanding of the Bonds or at any adjourned meeting one or more persons being or representing Bondholders whatever the principal amount outstanding of Bonds so held or represented, provided that at any meeting the business of which includes consideration of proposals, *inter alia*, (i) to change the maturity date of the Bonds or any date for payment of interest thereon, (ii) to reduce or cancel the amount of principal or the rate of interest payable in respect of the Bonds, (iii) to change the currency of payment of the Bonds, (iv) to modify the provisions concerning the quorum required at any meeting of the Bondholders or the majority required to pass an Extraordinary Resolution, or (v) to agree to any of the above in respect of the Guarantor Bonds, the necessary quorum for passing an Extraordinary Resolution will be one or more persons holding or representing not less than two-thirds, or at any adjourned such meeting not less than one-third, of the principal amount outstanding of the Bonds. An Extraordinary Resolution duly passed in accordance with the provisions of the Bond Trust Deed at any meeting of Bondholders will be binding on all Bondholders, whether or not they are present at the meeting and whether or not they vote in favour.

A resolution in writing executed by or on behalf of the holders of at least 75 per cent in aggregate principal amount outstanding of the Bonds shall be as effective as an Extraordinary Resolution passed at a meeting of the Bondholders duly convened and held and may consist of several instruments in like form, each executed by or on behalf of one or more of the Bondholders.

The Bond Trustee may agree without the consent of the Bondholders to any modification of any of these Conditions or any of the provisions of the Bond Trust Deed or any modification of the Guarantor Bonds or the terms of the Guarantor Trust Deed which in its opinion is of a formal, minor or technical nature, is made to correct a manifest error or (not being such a modification as is mentioned in the proviso to the second sentence of the first paragraph of this Condition 15) is not materially prejudicial to the interests of the Bondholders. The Bond Trustee may also agree without the consent of the Bondholders but only if in its opinion so to do will not be materially prejudicial to the interests of the Bondholders (i) to the waiver or authorisation of any breach or proposed breach of any of the provisions of the Bond Trust Deed or of these Conditions or any modification of the Guarantor Bonds or the terms of the Guarantor Trust Deed or (ii) that any Event of Default or any event, condition or act which, with the giving of notice and/or lapse of time and/or issue of certificate, would be an Event of Default shall not be treated as such.

II - 32

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 114

The Bond Trust Deed contains provisions permitting the Bond Trustee to agree, subject to such amendment of the Bond Trust Deed and such other conditions as the Bond Trustee may require (but, in the case of a substitution of the Issuer, without the consent of the Bondholders and, in the case of a substitution of the Guarantor, with the consent of the holders of a majority in principal amount outstanding of the Bonds), which may include the giving of a guarantee, to the substitution of any other company in place of the Issuer or the Guarantor, as the case may be, or any previously substituted company, as principal debtor or guarantor, as the case may be, under the Bond Trust Deed and the Bonds. In the case of such a substitution the Bond Trustee may agree, without the consent of the Bondholders, to a change of the law governing the Bonds and/or the Bond Trust Deed, provided that such change would in the opinion of the Bond Trustee not be materially prejudicial to the interests of the Bondholders.

Any such modification, waiver, authorisation or substitution shall be binding on the Bondholders and, unless the Bond Trustee agrees otherwise, shall be notified to the Bondholders by the Issuer in accordance with Condition 16 as soon as practicable.

In connection with the exercise of its powers, trusts, authorities or discretions (including but not limited to those in relation to any proposed modification, waiver, authorisation, determination or substitution as aforesaid) the Bond Trustee shall have regard to the interests of the Bondholders as a class and shall not have regard to the consequences of such exercise for individual Bondholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory and the Bond Trustee shall not be entitled to require, nor shall any Bondholder be entitled to claim from the Issuer, the Guarantor or the Bond Trustee, any indemnification or payment in respect of any tax consequences of any such exercise upon individual Bondholders except to the extent provided for in Condition 9 and/or in any undertakings given in addition thereto or in substitution therefor pursuant to the Bond Trust Deed.

## 16.    Notices

### (a)    Notices to Bondholders

Notices to Bondholders will be validly given if published in a leading newspaper having general circulation in London (which is expected to be *The Financial Times*) and mailed to them at their respective addresses in the Register. So long as the Bonds are listed on the Luxembourg Stock Exchange and the rules of such exchange so require, all notices to Bondholders will be published in a leading daily newspaper having a general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*). Such notices shall be deemed to be given on the later of the date of such publication and the seventh day after being so mailed.

So long as the Bonds are represented by certificates in global form (the Global Certificates") and the Global Certificates are held by or on behalf of one or more clearing systems, notice to the Bondholders shall be given by delivery of the relevant notice to that clearing system for communication by it to accountholders in substitution for notification by publication in a leading newspaper having general circulation in London, except that, so long as the Bonds are listed on the Luxembourg Stock Exchange and the rules of such exchange so require, all notices to

II - 33

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 115

Bondholders will be published in a leading daily newspaper having a general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*).

    (b)   Notices by Bondholders

    Each Bondholder shall provide written notification to the Registrar (i) of the acquisition by such Bondholder and/or any entity which it controls, directly through its ownership of Shares or otherwise, of five per cent of the total voting equity securities of the Guarantor; and (ii) from and after the date that such Bondholder and/or any entity which it controls, becomes a holder, directly or indirectly through its ownership of Shares or otherwise, of ten per cent or more of the total voting equity securities of the Guarantor, of the acquisition by such Bondholder and/or any entity which it controls, directly through its ownership of Shares or otherwise, of any change in the number of voting equity securities held directly or indirectly by such Bondholder to the extent that such acquisition changes the number of votes to which such Bondholder is entitled by two per cent or more. Each such notice shall be made within seven days of such acquisition, specifying such Bondholder's name and the number of Shares held directly or indirectly by such Bondholder.

    The Registrar shall forward such notices as it receives to the Issuer and the Guarantor, and each of the Issuer or the Guarantor shall promptly forward such notices as it receives from the Registrar to the Polish Securities and Exchange Commission.

17.    Agents

    The names of the initial Registrar, the initial Paying and Transfer Agent, the initial Principal Paying and Transfer Agent, and the initial Agent Bank and their specified offices are set out at the end of these Conditions. The Issuer reserves the right (with the prior approval of the Bond Trustee), subject to the provisions of the Paying and Transfer Agency Agreement, at any time to vary or terminate the appointment of any Agent, and to appoint further or other Agents, provided that the Issuer will at all times maintain a Registrar and a Paying and Transfer Agent having specified offices in a Western European financial centre, which so long as the Bonds are listed on the Luxembourg Stock Exchange shall be Luxembourg. Notice of any such termination or appointment, of any changes in the specified offices of the Agents or of any change in the identity of specified office of the Registrar, the Principal Paying and Transfer Agent, the Paying and Transfer Agent or the Agent Bank will be given promptly by the Issuer to the Bondholders and the Bond Trustee in accordance with Condition 16.

18.    **Indemnification of the Bond Trustee**

    The Bond Trust Deed contains provisions for the indemnification of the Bond Trustee and for its relief from responsibility, including provisions relieving it from taking action unless indemnified to its satisfaction. The Bond Trustee is entitled to enter into business transactions with the Guarantor and any of the Subsidiaries without accounting for any profit.

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 116

19.    Governing Law and Jurisdiction

(a)    Governing Law

The Bond Trust Deed, the Paying and Transfer Agency Agreement, the Bonds and the Guarantee are governed by, and shall be construed in accordance with, English law.

(b)    Jurisdiction

(i)    Any dispute arising out of or in connection with the Bond Trust Deed, the Paying and Transfer Agency Agreement, the Guarantee and the Bonds (including any question regarding the existence, validity or termination of any of the above) may be submitted by any party to arbitration for final settlement under the arbitration rules of the United Nations Commission on International Law (1976) (the "UNCITRAL Arbitration Rules"), which rules are deemed to be incorporated by reference into this Condition 19.

(ii)    The tribunal shall consist of three arbitrators. The claimant party shall appoint one arbitrator. The respondent party to the arbitration shall appoint one arbitrator. If there is more than one claimant party and/or more than one respondent party, the claimant parties shall together appoint one arbitrator and the respondent parties shall together nominate one arbitrator. The claimant party or parties and the respondent party or parties to the arbitration jointly shall appoint the third arbitrator who shall be the chairman of the arbitral tribunal. The LCIA (London Court of International Arbitration) shall act as the "appointing authority" under the UNCITRAL Arbitral Rules in the event that:

(x)    any party or parties to the arbitration fail to appoint an arbitrator; or

(y)    the parties to the arbitration fail to appoint jointly the third arbitrator within the time limits specified in the UNCITRAL Arbitration Rules.

(iii)    The place of any such arbitration shall be London, and the language of the arbitration shall be English. The decision and award of the arbitrators shall be final and binding and shall be enforceable in any court of competent jurisdiction.

(iv)    Save as provided in paragraph (vii) below, the parties exclude the jurisdiction of the courts under Section 45 and 69 of the Arbitration Act 1996.

(v)    The agreement by all the parties to refer all disputes arising out of or in connection with the Bond Trust Deed, the Paying and Transfer Agency Agreement, the Guarantee and the Bonds to arbitration in accordance with paragraph (i) above is exclusive such that neither the Guarantor nor the Issuer shall be permitted to bring proceedings in any other court or tribunal other than by way of counterclaim in respect of proceedings brought by the

II - 35

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 117

Bond Trustee and/or each of the Bondholders in respect of any of the above documents in such other court or tribunal in accordance with this Condition.

(vi)    Notwithstanding paragraph (i), for the exclusive benefit of the Bond Trustee and each of the Bondholders, the Issuer and the Guarantor hereby agree that the Bond Trustee and each of the Bondholders shall have the exclusive right, at their option, to apply to the courts of England, who shall have non-exclusive jurisdiction to settle any disputes which may arise out of or in connection with the Bond Trust Deed, the Guarantee, the Paying and Transfer Agency Agreement and the Bonds and that accordingly any suit, action or proceedings (together referred to as "Proceedings") arising out of or in connection with any of the above may be brought in such courts. Nothing contained in this paragraph shall limit any right of the Bond Trustee and/or each of the Bondholders to take Proceedings against the Issuer or the Guarantor in any other court of competent jurisdiction, nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not.

(vii)    The Guarantor and the Issuer respectively:

(x)    waive objection to the English courts on grounds of inconvenient forum or otherwise as regard Proceedings in connection with the Bond Trust Deed, the Paying and Transfer Agency Agreement, the Bonds and the Guarantee; and

(y)    agree that a judgment or order of an English court in connection with any of the Bond Trust Deed, the Paying Agency Agreement, the Bonds and the Guarantee is conclusive and binding on them and may be enforced against them in the courts of any other jurisdiction.

(c)    Agent for Service of Process

Each of the Issuer and the Guarantor has appointed Law Debenture Corporate Services Limited at its offices for the time being at Fifth Floor, 100 Wood Street, London EC2V 7EX as its agent to receive service of process in any Proceedings in England based on the Bond Trust Deed, the Paying and Transfer Agency Agreement, the Bonds or the Guarantee. If for any reason the appointment of such agent for service of process lapses, each of the Issuer and Guarantor has agreed it will appoint a substitute process agent (acceptable to the Bond Trustee) and notify the Bondholders in accordance with Condition 16 of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

20.    Guarantor's Obligations with Respect to the Guarantor Bonds

The Guarantor has agreed in the Bond Trust Deed not to take any action to redeem, purchase, repay or prepay any of the Guarantor Bonds prior to their maturity date, save as may be required to fund the redemption of the Bonds.

II - 36

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 118

### PRINCIPAL PAYING AND TRANSFER AGENT AND AGENT BANK

Citibank, N.A.
5 Carmelite Street
London EC4Y 0PA
England

### PAYING AND TRANSFER AGENT

Dexia Banque Internationale à Luxembourg, société anonyme
69 route d'Esch
L-1470 Luxembourg

### REGISTRAR

Citibank AG
Reuterweg 16
60323 Frankfurt am Main
Germany

and/or such other or further Paying and Transfer Agents, Agent Bank and/or Registrar and/or specified offices as may from time to time be appointed by the Issuer with the approval of the Trustee and notice of which has been given to the Bondholders.

II – 37

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 119

## THE THIRD SCHEDULE

### REGISTER AND TRANSFER OF BONDS

1. The Issuer shall at all times ensure that the Registrar maintains at its specified office, or at such other place as the Trustee may agree, a register showing the amount of the Bonds from time to time outstanding and the dates of issue and all subsequent transfers and changes of ownership thereof and the names and addresses of the holders of the Bonds. The Trustee and the holders of the Bonds or any of them and any person authorised by it or any of them may at all reasonable times during office hours inspect the register and take copies of or extracts from it. The register may be closed by the Issuer for such periods at such times (not exceeding in total 30 days in any one year) as it may see fit.

2. Each Bond shall have an identifying serial number which shall be entered on the register.

3. The Bonds are transferable by execution of a form of transfer in the form (for the time being current) obtainable from the specified office of the Registrar under the hand of the transferor or, where the transferor is a corporation, under its common seal or under the hand of two of its officers duly authorised in writing.

4. The Bonds to be transferred must be delivered for registration to the specified office of the Registrar with the form of transfer duly completed and executed and must be accompanied by such documents, evidence and information as may be required pursuant to the Conditions and such other evidence as the Issuer may reasonably require to prove the title of the transferor or his right to transfer the Bonds and, if the form of transfer is executed by some other person on his behalf or in the case of the execution of a form of transfer on behalf of a corporation by its officers, the authority of that person or those persons to do so.

5. The executors or administrators of a deceased holder of Bonds (not being one of several joint holders) and in the case of the death of one or more of several joint holders the survivor or survivors of such joint holders shall be the only person or persons recognised by the Issuer as having any title to such Bonds.

6. Any person becoming entitled to Bonds in consequence of the death or bankruptcy of the holder of such Bonds may upon producing such evidence that he holds the position in respect of which he proposes to act under this paragraph or of his title as the Issuer shall require be registered himself as the holder of such Bonds or, subject to the preceding paragraphs as to transfer, may transfer such Bonds. The Issuer shall be at liberty to retain any amount payable upon the Bonds to which any person is so entitled until such person shall be registered as aforesaid or shall duly transfer the Bonds.

7. The joint holders of Bonds shall be entitled to one Bond only in respect of their joint holding of such Bonds which shall, except where they otherwise direct, be delivered to the joint holder whose name appears first in the register of the holders of Bonds in respect of such joint holding.

III - 1

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 120

8.   Subject as provided in the Conditions, where a holder of Bonds has transferred part only of his holding of the Bonds there shall be delivered to him without charge Bonds in respect of the balance of such holding.

9.   Subject to the provisions of these presents, the holder of a Bond may (to the fullest extent permitted by applicable laws) be treated at all times, by all persons and for all purposes as the absolute owner of such Bond notwithstanding any notice any person may have of the right, title, interest or claim of any other person thereto.  The Issuer and the Trustee shall not be bound to see to the execution of any trust to which any Bond may be subject and no notice of any trust shall be entered on the register.  The holder of a Bond will be recognised by the Issuer as entitled to his Bond free from any equity, set-off or counterclaim on the part of the Issuer against the original or any intermediate holder of such Bond

III - 2

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 121

## THE FOURTH SCHEDULE

### PROVISIONS FOR MEETINGS OF BONDHOLDERS

1.  Proxies and Representatives

1.1 A holder of Bonds may, by an instrument in writing in the English language (a "form of proxy") signed by the holder or, in the case of a corporation, executed under its common seal or signed on its behalf by an attorney or a duly authorised officer of the corporation and delivered to the specified office of the Registrar not less than 48 hours before the time fixed for the relevant meeting, appoint any person (a "proxy") to act on his or its behalf in connection with any meeting of the Bondholders and any adjourned such meeting.

1.2 Any holder of Bonds which is a corporation may by resolution of its directors or other governing body authorise any person to act as its representative (a "representative") in connection with any meeting of the Bondholders and any adjourned such meeting.

1.3 Any proxy appointed pursuant to sub-paragraph 1.1 above or representative appointed pursuant to sub-paragraph 1.2 above shall so long as such appointment remains in force be deemed, for all purposes in connection with the relevant meeting or adjourned meeting of the Bondholders, to be the holder of the Bonds to which such appointment relates and the holder of the Bonds shall be deemed for such purposes not to be the holder.

2.  The Issuer or the Trustee may at any time and the Issuer shall upon a requisition in writing signed by the holders of not less than one-tenth in principal amount outstanding of the Bonds of any series convene a meeting of the Bondholders and if the Issuer makes default for a period of seven days in convening such a meeting the same may be convened by the Trustee or the requisitionists. Every such meeting shall be held at such time and place as the Trustee may appoint or approve.

3.  At least 21 days' notice (exclusive of the day on which the notice is given and the day on which the meeting is to be held) specifying the place, day and hour of meeting shall be given to the Bondholders prior to any meeting of the Bondholders in the manner provided by Condition 16. Such notice, which shall be in the English language, shall state generally the nature of the business to be transacted at the meeting thereby convened but (except for an Extraordinary Resolution) it shall not be necessary to specify in such notice the terms of any resolution to be proposed. Such notice shall include statements, if applicable, to the effect that the holders of Bonds may appoint proxies by executing and delivering a form of proxy in the English language to the specified office of the Registrar not less than 48 hours before the time fixed for the meeting or, in the case of corporations, may appoint representatives by resolution of their directors or other governing body. A copy of the notice shall be sent by post to the Trustee (unless the meeting is convened by the Trustee) and to the Issuer (unless the meeting is convened by the Issuer).

4.  A person (who may but need not be a Bondholder) nominated in writing by the Trustee shall be entitled to take the chair at the relevant meeting or adjourned meeting but if no

IV – 1

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 122

such nomination is made or if at any meeting or adjourned meeting the person nominated shall not be present within fifteen minutes after the time appointed for holding the meeting or adjourned meeting the Bondholders present shall choose one of their number to be Chairman. The Chairman of an adjourned meeting need not be the same person as was Chairman of the meeting from which the adjournment took place.

5.    At any such meeting one or more persons present holding Bonds or being proxies or representatives and holding or representing not less than one-twentieth of the principal amount outstanding of the Bonds shall (except for the purpose of passing an Extraordinary Resolution) form a quorum for the transaction of business and no business (other than the choosing of a Chairman) shall be transacted at any meeting unless the requisite quorum be present at the commencement of the relevant business. The quorum at any such meeting for passing an Extraordinary Resolution shall (subject as provided below) be one or more persons present holding Bonds or being proxies or representatives and holding or representing in the aggregate one-third in principal amount outstanding of the Bonds PROVIDED THAT at any meeting the business of which includes any of the following matters (each of which shall, subject only to Clause 20.2(ii), only be capable of being effected after having been approved by Extraordinary Resolution) namely:

(1)    change to the maturity date of the Bonds or the date for redemption at the option of Bondholders or any date for payment of interest thereon;

(2)    reduction or cancellation of the amount of principal or the rate of interest payable in respect of the Bonds;

(3)    to change the currency of payment of the Bonds;

(4)    modification of the provisions concerning the quorum required at any meeting of the Bondholders or the majorities required to pass an Extraordinary Resolution; and

(5)    agreement to any of the above in respect of the Guarantor Bonds;

the quorum shall be one or more persons present holding Bonds or being proxies or representatives and holding or representing in the aggregate not less than two-thirds of the principal amount outstanding of the Bonds.

6.    If within fifteen minutes (or such longer period not exceeding thirty minutes as the Chairman may decide) after the time appointed for any such meeting a quorum is not present for the transaction of any particular business, then, subject and without prejudice to the transaction of the business (if any) for which a quorum is present, the meeting shall if convened upon the requisition of Bondholders be dissolved. In any other case it shall stand adjourned to the same day in the next week (or if such day is a public holiday the next succeeding business day) at the same time and place (except in the case of a meeting at which an Extraordinary Resolution is to be proposed in which case it shall stand adjourned for such period, being not less than 14 clear days nor more than 42 clear days, and to such place as may be appointed by the Chairman either at or subsequent to such meeting and approved by the Trustee). If within fifteen minutes (or such longer period not exceeding

IV - 2

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 123

thirty minutes as the Chairman may decide) after the time appointed for any adjourned meeting a quorum is not present for the transaction of any particular business, then, subject and without prejudice to the transaction of the business (if any) for which a quorum is present, the Chairman may either (with the approval of the Trustee) dissolve such meeting or adjourn the same for such period, being not less than 14 clear days, and to such place as may be appointed by the Chairman either at or subsequent to such adjourned meeting and approved by the Trustee, and the provisions of this sentence shall apply to all further adjourned such meetings. At any adjourned meeting one or more persons present holding Bonds or being proxies or representatives (whatever the principal amount of the Bonds so held or represented by them) shall (subject as provided below) form a quorum and shall (subject as provided below) have power to pass any Extraordinary or other resolution and to decide upon all matters which could properly have been dealt with at the meeting from which the adjournment took place had the requisite quorum been present PROVIDED THAT at any adjourned meeting the quorum for the transaction of business comprising any of the matters specified in the proviso to paragraph 5 above shall be one or more persons present holding Bonds or being proxies or representatives and holding or representing in the aggregate not less than one-third of the principal amount outstanding of the Bonds.

7.   Notice of any adjourned meeting at which an Extraordinary Resolution is to be submitted shall be given in the same manner as notice of an original meeting but as if 10 were substituted for 21 in paragraph 3 above and such notice shall state the relevant quorum. Subject as aforesaid it shall not be necessary to give any notice of an adjourned meeting.

8.   Every question submitted to a meeting shall be decided in the first instance by a show of hands and in case of equality of votes the Chairman shall both on a show of hands and on a poll have a casting vote in addition to the vote or votes (if any) to which he may be entitled as a Bondholder or as a proxy or as a representative.

9.   At any meeting unless a poll is (before or on the declaration of the result of the show of hands) demanded by the Chairman, the Issuer, the Trustee or any person present holding a Bond or being a proxy or representative (whatever the principal amount of the Bonds so held or represented by him) a declaration by the Chairman that a resolution has been carried or carried by a particular majority or lost or not carried by a particular majority shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

10.  Subject to paragraph 12 below, if at any such meeting a poll is so demanded it shall be taken in such manner and subject as hereinafter provided either at once or after an adjournment as the Chairman directs and the result of such poll shall be deemed to be the resolution of the meeting at which the poll was demanded as at the date of the taking of the poll. The demand for a poll shall not prevent the continuance of the meeting for the transaction of any business other than the motion on which the poll has been demanded.

11.  The Chairman may with the consent of (and shall if directed by) any such meeting adjourn the same from time to time and from place to place but no business shall be transacted at any adjourned meeting except business that might lawfully (but for lack of required quorum) have been transacted at the meeting from which the adjournment took place.

IV - 3

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 124

12. Any poll demanded at any such meeting on the election of a Chairman or on any question of adjournment shall be taken at the meeting without adjournment.

13. The Trustee and its lawyers and any director, officer or employee of a corporation being a trustee of these presents and any director or officer of the Issuer and its lawyers and any other person authorised in that behalf by the Trustee may attend and speak at any meeting. Save as aforesaid, but without prejudice to the proviso to the definition of "outstanding" in Clause 1, no person shall be entitled to attend and speak nor shall any person be entitled to vote at any meeting of the Bondholders or join with others in requesting the convening of such a meeting or to exercise the rights conferred on the Bondholders by Conditions 12 and 13 unless he is a proxy or a representative or is the holder of a Bond or Bonds. No person shall be entitled to vote at any meeting in respect of Bonds held by, for the benefit of, or on behalf of, the Guarantor, the Issuer, or any Subsidiary of the Issuer. Nothing herein shall prevent any of the proxies named in any form of proxy or any representative from being a director, officer or representative of or otherwise connected with the Issuer.

14. Subject as provided in paragraph 13 hereof at any meeting:

(1) on a show of hands every person who is present in person and is a holder of Bonds or is a proxy or representative shall have one vote; and

(2) on a poll every person who is so present shall have one vote in respect of each €1.00 or such other amount as the Trustee may in its absolute discretion stipulate (or, in the case of meetings of holders of Bonds denominated in another currency, such amount in such other currency as the Trustee in its absolute discretion may stipulate) in principal amount of the Bonds in respect of which he is a proxy or representative or in respect of which he is the holder.

Without prejudice to the obligations of the proxies named in any form of proxy any person entitled to more than one vote need not use all his votes or cast all the votes to which he is entitled in the same way.

15. The proxies named in any form of proxy and representatives need not be Bondholders.

16. Each form of proxy shall be deposited by the Registrar at such place as the Trustee shall approve not less than 24 hours before the time appointed for holding the meeting or adjourned meeting at which the proxies named in the form of proxy propose to vote and in default the form of proxy shall not be treated as valid unless the Chairman of the meeting decides otherwise before such meeting or adjourned meeting proceeds to business. A notarially certified copy of each form of proxy shall be deposited with the Trustee before the commencement of the meeting or adjourned meeting but the Trustee shall not thereby be obliged to investigate or be concerned with the validity of or the authority of the proxies named in any such form of proxy.

17. Any vote given in accordance with the terms of a form of proxy shall be valid notwithstanding the previous revocation or amendment of the form of proxy or of any of the Bondholders' instructions pursuant to which it was executed provided that no

IV – 4

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 125

intimation in writing of such revocation or amendment shall have been received from the holder thereof in each case by the Issuer at its registered office (or such other place as may have been required or approved by the Trustee for the purpose) by the time being 48 hours before the time appointed for holding the meeting or adjourned meeting at which the form of proxy is to be used.

18.  A meeting of the Bondholders shall in addition to the powers hereinbefore given have the following powers exercisable only by Extraordinary Resolution (subject to the provisions relating to quorum contained in paragraphs 5 and 6 above) namely:

(1)    Power to sanction any compromise or arrangement proposed to be made between the Issuer, the Guarantor, the Trustee, any Appointee and the Bondholders or any of them.

(2)    Power to sanction any abrogation, modification, compromise or arrangement in respect of the rights of the Trustee, any Appointee, the Bondholders, the Guarantor or the Issuer against any other or others of them or against any of their property whether such rights shall arise under these presents or otherwise.

(3)    Power to assent to any modification of the provisions of these presents which shall be proposed by the Issuer, the Guarantor, the Trustee or any Bondholders.

(4)    Power to give any authority or sanction which under the provisions of these presents is required to be given by Extraordinary Resolution.

(5)    Power to appoint any persons (whether Bondholders or not) as a committee or committees to represent the interests of the Bondholders and to confer upon such committee or committees any powers or discretions which the Bondholders could themselves exercise by Extraordinary Resolution.

(6)    Power to approve of a person to be appointed a trustee and power to remove any trustee or trustees for the time being of these presents.

(7)    Power to discharge or exonerate the Trustee and/or any Appointee from all liability in respect of any act or omission for which the Trustee and/or such Appointee may have become responsible under these presents.

(8)    Power to authorise the Trustee and/or any Appointee to concur in and execute and do all such deeds, instruments, acts and things as may be necessary to carry out and give effect to any Extraordinary Resolution.

(9)    Power to sanction any scheme or proposal for the exchange or sale of the Bonds for or the conversion of the Bonds into or the cancellation of the Bonds in consideration of shares, stock, bonds, notes, debentures, debenture stock and/or other obligations and/or securities of the Issuer or any other Issuer formed or to be formed, or for or into or in consideration of cash, or partly for or into or in consideration of such shares, stock, bonds, notes, debentures, debenture stock

IV - 5

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 126

and/or other obligations and/or securities as aforesaid and partly for or into or in consideration of cash.

19.  Any resolution passed at a meeting of the Bondholders duly convened and held in accordance with these presents shall be binding upon all the Bondholders whether present or not present at such meeting and whether or not voting and each of them shall be bound to give effect thereto accordingly and the passing of any such resolution shall be conclusive evidence that the circumstances justify the passing thereof. Notice of the result of the voting on any resolution duly considered by the Bondholders shall be published in accordance with Condition 16 by the Issuer within 14 days of such result being known PROVIDED THAT the non-publication of such notice shall not invalidate such result.

20.  The expression "Extraordinary Resolution" when used in these presents means a resolution passed at a meeting of the Bondholders duly convened and held in accordance with these presents by a majority consisting of not less than three-fourths of the persons voting thereat upon a show of hands or if a poll is duly demanded by a majority consisting of not less than three-fourths of the votes cast on such poll.

21.  Minutes of all resolutions and proceedings at every meeting of the Bondholders shall be made and entered in books to be from time to time provided for that purpose by the Issuer and any such Minutes as aforesaid if purporting to be signed by the Chairman of the meeting at which such resolutions were passed or proceedings transacted shall be conclusive evidence of the matters therein contained and until the contrary is proved every such meeting in respect of the proceedings of which Minutes have been made shall be deemed to have been duly held and convened and all resolutions passed or proceedings transacted thereat to have been duly passed or transacted.

22.  Subject to all other provisions of these presents the Trustee may without the consent of the Issuer or the Bondholders prescribe such further regulations regarding the requisitioning and/or the holding of meetings of Bondholders and attendance and voting thereat as the Trustee may in its sole discretion think fit.

23.  A resolution in writing executed by or on behalf of the holders of at least 75 per cent in aggregate principal amount of the Bonds shall be as effective as an Extraordinary Resolution passed at a meeting of the Bondholders duly convened and held and may consist of several instruments in like form, each executed by or on behalf of one or more of such Bondholders.

IV – 6

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 127

EXECUTED as a deed )
by ELEKTRIM )
FINANCE B.V. )
acting by )
acting under the authority )
of that company in the )
presence of: )

Name:

Title:

Name:

Title:

EXECUTED as a deed )
by ELEKTRIM S.A. )
acting by )
acting under the authority )
of that company in the )
presence of: )

Name:

Title:

Name:

Title:

THE COMMON SEAL of )
THE LAW DEBENTURE )
TRUST CORPORATION )
p.l.c. was affixed to this )
deed in the presence of: )

Director

Authorised Signatory

2293RS_12-London Server 1A - MSW

LLOYD-LEWIS DEC.
EXHIBIT 4, PAGE 128