**EXHIBIT 7**

Case Nos: HC07C00763 / HC07C01505

**A**

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand
London WC2A 2LL

**B**

Friday, 28 September 2007

BEFORE:

**MR JUSTICE LEWISON**

**C**

BETWEEN:

**THE LAW DEBENTURE TRUST CORPORATION PLC**

Claimant

- and -

**D**

**(1) CONCORD TRUST**
**(2) ACCIONA SA**
**(3) ELEKTRIM SA**
**(4) VIVENDI HOLDINGS 1 CORP**

Defendants

**E**

MR R MILES QC, MR A CLUTTERBUCK, (instructed by Simmons & Simmons)
appeared on behalf of the Claimant in proceedings HC07C00763

MR R MILLETT QC and MR J KENNY (instructed by Barlow Lyde & Gilbert)
appeared on behalf of the Claimant in proceedings HC07C01505

**F**

MR A MALEK QC and MR D QUEST (instructed by Orrick Herrington & Sutcliffe)
appeared on behalf of the Defendants in both proceedings HC07C00763 and
HC07C01505

**G**

**Proceedings**

Digital Transcript of Wordwave International, a Merrill Communications Company
PO Box 1336  Kingston-Upon-Thames  Surrey KT1 1QT
Tel No: 020 8974 7300  Fax No: 020 8974 7301
(Official Shorthand Writers to the Court)

No of Words: 38,343
No of Folios: 533

**H**

1

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 1

Friday, 28 September 2007

**A**

MR JUSTICE LEWISON:  Yes, Mr Miles.

MR MILES:  My Lord, I think you are aware of the rest --

MR JUSTICE LEWISON:  Some familiar faces.

**B**

### OPENING SUBMISSIONS BY MR MILES

MR MILES:  May I start with the principles applying to the position as between myself and my learned friend Mr Malek's clients.  I am not going to take very long on this because we had set out in our skeleton what we consider the relevant principles to be.  You will probably be familiar with the leading cases on this.

**C**

It starts at paragraph 44 of our skeleton.  We refer to the well-known <u>Société Nationale Industrielle Aérospatiale v Lee Kui Jak</u> [1987] C 871 case in 45 where the four basic principles are set out.  Then we record some observations made by Lord Goff in that case.  I would simply draw your attention to C, that the notions of vexation and oppression should not be restricted by definition.

E is important only, in a sense, historically, because there was a debate about whether, if you showed that England was the natural forum, an injunction would immediately follow.  That debate is now over.  It is quite clear that it is a necessary condition but not a sufficient condition to decide the jurisdiction.

**D**

Then in 47 we make the point that the way that it has been set out as a general rule is that first of all you have to show that England is the natural forum then, in the absence of a contract, you have to show that the pursuit of foreign proceedings is vexatious or oppressive.  Then the question arises whether the plaintiff in those foreign proceedings will be deprived of an advantage in the foreign forum, of which it will be unjust to deprive him.  That is the basic structure of the test.

**E**

The Dicey, Morris and Collins, as one would expect, has a useful summary of the principles.

MR JUSTICE LEWISON:  I have not read any of the authorities for the purpose of this hearing.  Some of them I have read before.

**F**

MR MILES:  Could I just show you that as a useful summary.  We served a bundle of authorities.  In tab 8 you will see on 461, rule 31(5), subject to the regulations and conventions, which we can ignore for present purposes:

> "An English court may restrain a party over whom it has personal jurisdiction from the institution or continuance of proceedings in a foreign court or the enforcement judgments where it is necessarily in the interests of justice for it to do so."

**G**

Going on in this tab to page 500, there is a general summary that the English courts have long had jurisdiction to restrain a party, going back to 1834.

At 12-069:

> "The underlying principle is that the jurisdiction is exercised where it is appropriate to avoid injustice or, as it was once put, where foreign proceedings are contrary to equity and good conscience. Although it is possible to identify certain categories of cases in

**H**

2

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 2

which the jurisdiction has been exercised, the width and flexibility of equity are not to be undermined by categorisation. It was at one stage said that as with any injunction, anti-suit injunction could be granted only to give effect to legal or equitable right not to be sued in a foreign court, with the consequence that all applications from anti-suit injunction would be required to be founded on such a right, but later authority acknowledged that this formulation could not be accepted without significant qualification. In the most recent authoritative formulation of the principles, there is no indication that the other side of discretion is limited by the need to demonstrate a legal or equitable right not to be sued."

Then the authors deal with contract cases. Then over the page at the top of the next page:
"The court will also restrain the proceedings which interfere with due process of the court or with the court's jurisdiction to decide cases pending before it. Thus the court will enjoin proceedings taken abroad to recover foreign assets whereby the party taking them would obtain an unfair advantage over other claimants in the English administration or bankruptcy or winding up. It is also clear that the court may restrain from proceedings which are oppressible or vexatious in the traditional sense."

Then there is the debate which I very quickly summarised about whether it was sufficient to show that England was the natural forum. You will see in the next paragraph, in the Aérospatiale case, the Privy Council heard that:
"It was not right to treat the principles applicable in injunction cases as equivalent of those in *forum non conveniens* cases as developed in Spiliada Maritime Corp v Cansulex Limited. If the principles were the same it would mean a party could be restrained from proceeding in a foreign court on the sole ground that England was the natural forum."

That cannot be right, for reasons which are given.
Then 12-073, over the page:
"In the result, an injunction may be granted if England is the natural forum for resolution of the dispute and the proceedings in the foreign court are vexatious or oppressive. English courts refrain from giving a comprehensive or limiting definition of these expressions. Indeed, they have deliberately refrained from marking the outer limit of their power to act to restrain conduct which may give rise to injustice, or if the need for caution is given its due weight, serious injustice.
It has been held that vexation or oppression may be indicated by the following: subjecting the other party to oppressive procedures in the foreign court, especially a party with no substantial connection with that jurisdiction; bad faith in the institutional proceedings or the institution proceedings which are bound to fail [we obviously rely on that]; extreme inconvenience caused by the foreign proceedings; multiplicity of actions, especially where the

3

A    foreign action might form a further consequential litigation which might not be reconcilable with a foreign decision; bringing proceedings which interfere with or undermine the control of the English court in its own process [and we rely on that]; bringing proceedings which could and should have formed part of an English action brought earlier [we rely on that]; bringing proceedings for no good reason in a court which can disregard an express choice of English law.

B    If a prima facie case for oppression or vexation has been made out by the applicant, the respondent will be entitled to show why it would nevertheless be unjust for an injunction to be granted. The interests of both parties must be borne in mind. The respondent may point to substantive or procedural advantage available to him in the foreign court which would be lost if the injunction was granted. If these advantages are available to him only in a forum

C    which is not the natural forum, they will be given little weight and may even be themselves seen as evidence of oppression."

Those are the broad principles upon which we rest our application.

As we say in our skeleton, it is a notable feature of this case that Vivendi do not seek to identify any procedural or substantive advantage from suing in Miami, and so one does not even reach the third stage which is whether it would be unjust to

D    deprive them of some advantage. We say there are only two issues: (1) is England the natural forum, which is not really an issue at all, and (2) are the Miami proceedings vexatious or oppressive.

My learned friend has referred to a passage --

MR. JUSTICE LEWISON:  Just before you go on, I am not entirely sure that I know

E    now what the Miami proceedings are.

MR. MILES:  That is one of my points. We do not know what the Miami proceedings are.

MR. JUSTICE LEWISON:  I have seen and read the amended complaint. I am not entirely clear (and this is, in a sense, a point directed to Mr Malek) which parts of

F    it are to be abandoned in the disclaimer of pursuing fraud claims against the trustee.

MR. MILES:  Can I tell you what I understand the position to be because it is an important point. If you were to go, first of all, to the amended claim, which is in M1, tab 2, page 76, you will have realised that it is absolutely riddled with allegations of fraud and conspiracy against my clients. The structure of this

G    complaint is that you have the facts starting at paragraph 7 and then count 1 at page 89 of the bundle, breach of fiduciary duty. Count 2, page 92, breach of trust agreement. Those all rely on the earlier allegations of fraud. Then count 3, fraud against defendants Elektrim SA and LDTC.

Then you look at the witness statement of Mr Davis to see what it is that they say they are giving up. That is in I, tab 50, paragraph 5 to begin with. (pause) What

H    he says, having given what he claims is a summary of these claims (it is a pretty incomplete summary):

4

A

> "Although count 3 in its present form refers also to the trustee, it is intended, if the case is allowed to proceed, to amend the complaint so that the claims in count 3 are made only against Elektrim."

Then if you look at paragraph 33:

B

> "As mentioned earlier in this statement, while count 3 of the complaint in its present form refers to both Elektrim and the trustee, it has been decided on the basis of the evidence presently available and without conceding the absence of a good-faith basis and proper purpose to making such claims to pursue these claims [that is to say, count 3] of common law fraud against Elektrim alone. VH1 intends to maintain the allegations in 1 and 2 against LDTC, that they acted negligently and in breach of fiduciary duty or in breach of obligations as a trustee."

C

It is quite clear that he is restricting the withdrawal to count 3. Although he then goes on to say over the page that it intends to maintain the allegations of 1 and 2 that we acted negligently and in breach of fiduciary duty, of course the allegations of breach of fiduciary duty in counts 1 and 2 are called exactly that. They are called breach of fiduciary duty and beach of trust agreement. They are not called fraud claims in counts 1 and 2 and we understand that they are maintaining counts 1 and 2; it is the only sensible meaning of this evidence, which means that they are maintaining these ludicrous allegations of fraud.

D

My learned friend's skeleton says absolutely nothing about these allegations. Again, he is trying to summarise the claim by pretending that they are not there, but they are there and that is the case which we say you should be looking at when deciding whether or not it is a vexatious or oppressive set of proceedings.

E

MR MALEK:   My Lord, I wonder whether I could just clarify, so as to shorten the debate. We are not making any allegations of fraud against the trustee.

MR JUSTICE LEWISON:   Looking, for instance, at paragraph 19 of the amended complaint on page 81, there is an allegation that DT and Elektrim ignored the injunctions and then conspired with the trustee to defraud other creditors. That goes?

F

MR MALEK:   That is gone.

MR JUSTICE LEWISON:   Just before you go on, can I ask you to look at paragraph 29. It is not put as an allegation of fraud, but it is alleged that Elektrim and the trustee were colluding to slow down proceedings in the bankruptcy court. Is that an allegation that is maintained?

G

MR MALEK:   To the extent that it suggests that there was any dishonest, fraudulent intent on the part of the trustee, that allegation will not be persisted with.

The point is this, and it is perhaps worthwhile spending one minute on this, as it may shorten matters: to the extent that the amended complaint is based on claims based on an allegation that the trustee wrongly paid out monies, i.e. inconsistent with what you directed, we will not be making any allegations in Miami to that effect.

H

5

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 5

Similarly, any allegations against the trustee that appear in the amended complaint suggesting fraudulent or dishonest behaviour will be stripped out.

MR JUSTICE LEWISON:  It would be helpful, if I may say so, if a blue-pencilled complaint could be produced for me to have a look at.

MR MALEK:  Yes, I fully accept that if you do permit the claims to go ahead, i.e. does not grant anti-suit injunctions, it will be necessary for you to see an amended complaint making it clear that those allegations are not there.

MR JUSTICE LEWISON:  I think it goes a little further than that.  I think it would help me to arrive at a decision at all to see what the claims are that you wish to maintain.

MR MALEK:  We will do that.

MR MILES:  I do not want to sound difficult about this but they have had months to do this and it is deeply unfortunate that they are now saying that the way that it is put in their amended complaint is not their case.

If you look at paragraph 50, for example, which is when you get on to the way they summarise their claim, 50(a) is an allegation of non-disclosure of the 2 October award.  But we will deal with that.  That is hopeless for completely different reasons, as is (b) because they did know what the terms of the first partial award were.  (c) is a joke allegation anyway because it is an allegation against themselves because they say that LDC was colluding with Everest and GM to defraud other Elektrim creditors.  But I take that to be a mistake.  This is an example now, presumably, of one of the things which is coming out.  (d) has to come out.  (e) we will come on to what on earth is meant by tainted funds in this context.  (f) is really the same.

Which of these are they actually saying is their case?  Because once you strip away these allegations of fraud, as far as I can see, all you are left with is the allegation of non-disclosure of the awards.  These allegations of fraud are actually a part of this case and it is not good enough for them simply to turn up now and say, "Well, of course we are not going to pursue that".

I also would invite you, if they do try to do this, to ask yourself the question what is the explanation for this conduct.  How can it be proper for somebody to make these sorts of allegations of serious wrongdoing and then simply come before the court and say, "Well, we are not going to pursue that any more"?

It is disgraceful conduct and it brings no credit either on Vivendi, who should never have made these allegations, or indeed their lawyers.  That is something to take into account when assessing whether or not these claims have been brought vexatiously or oppressively.

Can I just go back to the principles, to knock one other point on the head quickly.  My learned friend relies on a passage from a case in which he appeared, which was the Royal Bank of Canada v Rabobank [2004] 1 Lloyd's Rep 471 case.  I do no know whether you have a copy of that.

MR JUSTICE LEWISON:  I probably have.

MR MILES:  I do not know whether it came separately, but --

6

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 6

MR JUSTICE LEWISON:  Wait a minute; I am not sure if I do have it.

MR MILES:  It may be sensible to put it in tab 9 of my bundle, perhaps, just for convenience.  (pause)  This was a case involving an ISDA agreement and there were mirror image proceedings brought in England and New York on consecutive days.  The Royal Bank of Canada contended that because of the terms of a non-exclusive jurisdiction clause, in effect, the parties agreed that England would be the primary jurisdiction and it should only be in exceptional cases that the parties should be allowed to go elsewhere, which was ultimately an argument rejected by the Court of Appeal.

So it is a long way from the case we are looking at but my learned friend relies on the summary given in the judgment of Evans-Lombe J sitting in the Court of Appeal, at paragraph 8, of the relevant principles.  These will now be pretty familiar from the passage that we have been looking at.  He says that that contains the principles.

Just a word of caution about that.  If you go into the judgment of Mance LJ, he is not quite so happy with the attempt to reduce everything to that series of propositions.  If you pick it up at 36, you will see that he comments on the passage.  We rely also on what he says in paragraph 37.

MR JUSTICE LEWISON:  Let me just read those two paragraphs to myself.  (pause)  Yes.

MR MILES:  Can I invite you also to read paragraph 38 and 39.  (pause)

MR JUSTICE LEWISON:  Yes.

MR MILES:  Right at the end of the court, Thorpe LJ agreed with both of the judgments.  So although there is a summary of the principles in the judgment of Evans-Lombe J, for the reasons given by Mance LJ one has to treat them with a little caution.  In the end, we would suggest that the best cause is to go back to the two leading authorities in the speeches of Lord Goff.

You will have seen from that passage that just set out there yet again the three stages in the test.  For present purposes: is England the natural forum; are the foreign proceedings vexatious or oppressive; is there any advantage of which it would be unjust to deprive the plaintiff in foreign proceedings.

I have already made the point that there is no advantage identified by Vivendi of which it would be unjust to deprive them, so that leaves two issues.  As to natural forum, we say that it is beyond argument that England is the natural forum for the determination of these matters, and I do not think that is actually an issue.  It is not an issue in the evidence.  We have made the point in two rounds of evidence and it has not been challenged by Vivendi.  If I could invite you to glance at paragraph 52 of our skeleton and the points made in 53 and 54.

MR JUSTICE LEWISON:  Yes.

MR MILES:  My Lord, a small point of fact where I think my learned friends have just strayed a little from the facts.  As we point out in 54, this company Everest Capital Inc was not the holder of the bonds which were assigned to VH1, it was a

7

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 7

A
Bermudan company, Everest Capital Limited. The only connection with Miami is that Everest Capital Inc was apparently an advisor; it was a fund manager. So the only connection with Miami in this case is that a fund manager of some bonds held by a Bermudan company, apparently for the benefit of General Motors, carried on business in Miami.

B
MR JUSTICE LEWISON: Can you remind me, because I have forgotten, what it means to describe somebody as holding a bond, where they are not the account holder and they are not the person beneficially entitled to the benefits of the bond?

MR MILES: Yes, the bonds are held by custodians. They then hold accounts for people like banks, who are one level down. They then in turn have accounts for people who hold below them, and you may get a series of these chains. To simplify it, as I understand it in this sort of case, Everest Capital Limited would be an account holder in the accounts of some bank or other. That bank would itself be shown in the accounts of somebody higher up in that chain and that person would be holding the bond.

C
The way that it works in practice is that the people lower down the chain can give instructions to the people higher up, and you get what are called blocking instructions where certain bonds are blocked from trading on the basis of instructions given to people higher up and then the trustee will recognise those people, for the purposes of voting, as being the bondholders. I hope that is sufficiently clear.

D
MR JUSTICE LEWISON: I hope so, too; if it is not, I will come back to you.

MR MILES: There is a lot of learning on this, but I believe that as a matter of law, because the bonds are held, either in Belgium or Luxembourg, they do not recognise the concept of trusts and so the relationships are essentially contractual relationships going down the chain. In practice, just in the same as Acciona or Concord were recognised as bondholders for the purpose, for example, of taking part in the part 8 proceedings, in this case at the same level, I think, it would be --

E

MR JUSTICE LEWISON: Everest Capital Limited.

F
MR MILES: Everest Capital Limited.

MR JUSTICE LEWISON: And it would follow from that, would it, that you would accept in principle your clients did owe fiduciary duties of some sort to that level of person in these various chains of interest?

G
MR MILES: I think that must be right, yes, for the present purposes.

MR JUSTICE LEWISON: Would it also apply to General Motors, for instance? Would you also accept that your client owed fiduciary duties to General Motors?

MR MILES: These are quite difficult questions because to say that they owe a duty is quite an easy thing to answer. To say what the duty is becomes much more difficult because one can immediately see that once you get down to the level of these people, i.e. the people right at the bottom, the trustee often has no idea who

H

8

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 8

they are at all. Indeed, that is in evidence: he does not know who the underlying investors are.

When you get into the question of owing fiduciary duties, it becomes quite difficult when you get to the level of saying, "I owe a fiduciary duty to someone I do not even know the identity of," particularly the sort of fiduciary duties we are now trying to create out of -- I will not say out of thin air. There is a duty to advise. Where we seem to have reached in their skeleton (and I will come back to this) is some duty on the bond trustee to advise individual underlying investors, of whose identity the trustee might not even be aware. If it is a duty at all, it would presumably have to be a duty owed to all people at that level.

These are reasons for saying there is not such a duty. If I start by saying that in principle once can say that there is some fiduciary obligation, I do not want it to be taken that I am making any concession about the content of that.

MR JUSTICE LEWISON:    It must be obvious that your clients could not put €525 million in their pocket. The question is who is entitled to complain about it.

MR MILES:    Exactly. That is a good example of why there is some sort of duty, but when you get down to the content of the duty, all of these factors obviously come into play in deciding how far the duties of the trustee go.

The basic position of the trustee in these matters is that he is there to carry out his functions under the trust deed. The trust deed is there, effectively, as a matter of convenience to ensure that there is one person generally speaking to and dealing with the issuer. He is the one person who can enforce the debt and he is the one person who gets money and distributes it. But the idea that he has these kind of advisory duties to this massive class of underlying investors whose identity he does not even know, is far fetched.

I will come back to develop that a bit more in due course, but suffice to say at this stage different investors may of course have completely different interests, completely different priorities. Some may even be in a position which trustees are sometimes faced with where someone has actually sold short. So you may have a fund who has sold short and it is in the interests of that particular fund for the price of bonds, for example, to go down. It is in the interests of other investors for them to go up. There is enormous room for conflict between groups of bondholders and that is the reason why, within these bond trusts, matters are dealt with as a matter of class rights and the trustee is able to take instruction from groups of bondholders.

Going back, then, to our skeleton, we have set out in very broad summary the reasons why we say the Miami proceedings are vexatious or oppressive, in paragraph 55. Dealing with the first of those points, which is the notion that the proceedings were a change and are a change to the existing English process and interfere with the English court process, I would like to make four main points.

First, at the time they launched the Miami case, Vivendi and VH1, which was just acting for it, knew all about the English proceedings because they had been served. They also knew that the purpose of these proceedings was to determine as between the trustee and the bondholders when the monies received in October 2006 had been properly received and whether the trustee could now distribute. It was a trust action about that particular fund, that €525 million. Vivendi also knew that the English court had made a representation order appointing Acciona and Concord as

9

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 9

representative bondholders. They knew that not least because paragraph 1 of your judgment of 1 May said so.

**A**

They also knew that the bondholders' position, i.e. the people who were representing them, was that the trustee was an innocent recipient of the funds and that it could and should, therefore, distribute to the fullest extent possible. They also knew that there was about to be a further hearing to determine, finally, those questions.

**B**

In summary, they knew that their interests and their position as a bondholder was being represented by Acciona and Concord, who were instructing solicitors and counsel, and they knew what position was being taken on their behalf.

In those circumstances, Vivendi had the opportunity to apply to the English court and say that the views being put forward by Acciona and Concord did not represent their position and that the monies were subject to a taint and that they should not, therefore, be distributed.

**C**

But instead of doing that, coming before the English court and saying, "We actually dissent from the position being taken by our representatives" they went off to Miami, and that was doing two contradictory things in two places. On the one hand they were acquiescing in the English court process, of which they had full knowledge and where representations were being made on their behalf, and on the other hand they were challenging, in Miami, what was being said on their behalf in England. That is abusive, and they have offered no explanation for it. They have not explained why they did not come before this court and put forward their position.

**D**

The second point is that it is obvious, and, indeed, not contested, that the complaint brought in Miami was brought as an attempt to interfere with the English proceedings. One can see that from the relief which was claimed in the complaint. On the same day or a couple of days after they issued the complaint, before, I think, they had even served it, they issued a press release, which is on M1 page 125. This was put out over the internet on Sunday, 3 June, from their lawyer, telling the world all about this claim and saying, in the middle paragraph:

**E**

> "Attached is a letter I sent on Sunday, 3 June to representatives of Law Debenture notifying it of a law suit and demanding that it maintain a status quo and not release any funds that it received from either Elektrim or Deustche Telekom that relate to the unlawful transfer from Elektrim to Deutsche Telekom of the PTC shares."

**F**

So they are telling the whole world about this.

The reason they are telling the world about it, and let us not make any bones about this, is that this is part of a massive fight that is going on between Vivendi, DT and Elektrim over these PTC shares. There are stories daily about it. I understand that the counter-proceedings is now 50 rather than the 40 mentioned in the evidence. This is what you might call macho, chest-beating litigation which is going on and press releases and PR spin and so on are just as important in that sort of dispute to the parties as what is actually happening in court.

**G**

They try and laugh this point off by saying it is history now because the monies have gone. My learned friend said just now, "Of course we are not saying any longer there was anything wrong with the distribution that was made pursuant to an order of the court".

**H**

10

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 10

My Lord, we say that you cannot just airbrush this event out of history; you cannot just forget about it. It is remarkable that knowing that this court was about to decide this very question of distribution and knowing that bondholders had been appointed by this court to represent them in relation to that very question, they shot off to Miami, a court having no real connection to this dispute, and launched proceedings and issued a press release.

It was a strategy. It is obvious why they took this strategy, because it would be extremely damaging to Elektrim if the monies had not been distributed. It would also have placed Elektrim under still greater pressure from the bondholders. It was an attempt to apply massive leverage over Elektrim, and it failed. It was a pretty crass strategy, but a strategy it was all the same. No excuse or explanation has been given for doing that.

My third point in this area is to do with the allegation that the funds were tainted at the time they were received by my clients. My learned friend in his skeleton now accepts that they order of this court of 1 May is binding on his clients. Therefore, if the allegation that the funds were tainted is covered by that order, this must be a collateral attack on that decision.

He tries to get out of that by saying that "tainted" means something other than Vivendi having a claim to the monies. The way that he now tries to put it, which is an exercise in ingenuity, is to say that "tainted" does not mean subject to possible legal challenge by Vivendi, what it means is subject to the possibility of claw back by a liquidator.

We say that that is completely wrong in terms of the way the case has been put in the amended complaint. It actually says the opposite, and I will show you that in a minute. We also say that if that is their case, it is absolutely nonsensical because, in a nutshell, if the risk that they say they would have been worried about at that point was the risk of claw back by a liquidator, we are then into the real world; we are then into what actually happened, because at the time the money was received there were, of course, two bankruptcy petitions. There was our petition and there was ET's petition. The money was received by us. The way of getting rid of the risk of bankruptcy on our petition is to withdraw the petition, so if you are worried about that risk, you withdraw the petition.

As for the ET petition, that was dismissed on 27 October. There was then the period of a possible appeal by ET against that decision, and that was one of the risks against which we held the money in the real world, but that was a risk that they knew about in the real world. It is not in this hypothetical world, where things would have been different. So if that really is there case, it is a nonsense.

But, my Lord, it is not actually the way that they have put their case. It is quite clear that the allegation was that we should not have received the money because there was a risk that Vivendi would come along and undo the transaction between Elektrim and DT.

Just so that you see the way that my learned friend is putting it, if you look at their skeleton in 63, they say in 63(1) they do not allege that --

MR JUSTICE LEWISON: Sorry, I am not quite there. Yes.

MR MILES: They do not allege that the judgment is not binding on them, they are not seeking to restrain the distribution of the monies, they do not allege that Vivendi had any proprietary interest in the monies, and then this:

11

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 11

A

> "VH1 alleges that Everest would not have wished to receive money which was tainted (see, for example, those paragraphs). However, it is not an argument that the money received from Elektrim was subject to some prior equitable interest, except that is precluded. It is simply a statement about how Everest would have seen the risks in 2006. Moreover, the taint which Everest would have feared is not the assertion of a third-party interest but the possibility that the money could be clawed back, either from a trustee or the bondholder in bankruptcy proceedings."

B

That is clear from paragraph 54 of the complaint and that is what they rely upon. If you go back to the complaint, it very quickly becomes clear that that is just wrong. The amended complaint, first of all at page 90, paragraph 51, is a crucial part of their claim, because it is the allegation that something different would have happened:

C

> "If Everest, acting on behalf of GM, had known the contents of the first partial award and the second partial award, i.e. that those awards did not permit Elektrim to transfer the shares to DT in August and second of all did not sanction that prior transfer, Everest would have proposed the withdrawal of a bank ...(reading to the words)... Whilst Everest and GM wanted to be paid, they did not want to receive tainted money and the possible liability that could come with tainted money."

D

Then, paragraph 52, we are back into conspiracies and so on. Paragraph 53:

> "The trustee had an obligation not only to warn Everest that the conduct was unlawful, but also to avoid entering into unlawful transactions."

E

The unlawful transaction they are talking about there is receiving money arising out of the sale from Elektrim to DT, which, of course, is the sale that we know Vivendi have been screaming about since 2006 and was screaming about at the time that we received the money. So we all knew that there was a dispute and we knew that Vivendi said it was terrible, it was unlawful, it was in breach of umpteen agreements, it was in breach of injunctions and so on. It is exactly the same point which is being made here. They are saying that they should not have taken the money because it was the fruits of an unlawful transaction i.e. one in which Vivendi or ET could have attacked.

F

Paragraph 54, which is the one they now rely on to say that they mean something else, needs to be read carefully:

> "Had Everest opposed the withdrawal and explained its reasons for doing so, the withdrawal would not have occurred. [We will come back to that.] The Elektrim bondholders typically required unanimity before making important decisions and upon information and belief, the other bondholders like Everest and GM would not have wanted to participate in an unlawful transaction and incurred the risk that the funds received by the trustee would have to be disgorged [and then these words] while at the same time not being able to regain the claw-back protections for fraudulent

G

H

12

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 12

A

conveyances that would have existed if the bankruptcy petition had not been withdrawn."

What is being postulated there is precisely the opposite of what my learned friend now says. What is being postulated is the company not going into liquidation, because if it went into liquidation it would be coupled with the claw-back protection of fraudulent conveyances.

B

What they are postulating there is the risk of disgorgement where there is not a liquidation. So whilst they have exercised their ingenuity and desperately crawled around for some word in there document that might help them, I am afraid to say their point is just plain wrong. This pleading is put on exactly the opposite basis, that there was a risk of disgorgement outside a liquidation. If one stands back and say, "Outside a liquidation, what is this risk of disgorgement?" who are the candidates? Elektrim are not going to ask for the money back, DT is not going to ask for the money back. The only candidate is Vivendi/ET, who was saying that this money should not have been paid at the time. That is what this pleading is about. It is not making the point that my learned friend would now suggest, and nothing in the Torres declaration which he refers to, or the Torres witness statement, assists his position on that one jot.

C

My Lord, we say that that is a very short point: that the claim which is being brought is that the trustee was in breach of duty by accepting funds which were subject to a claim by Vivendi/ET, and that is what is meant in this pleading by the funds being tainted. You have decided that question, because you have decided not only that Vivendi did not have a proprietary claim, but you have also decided that the trustee was a bona fide purchaser of the value of the €525 million in October. That is, we say, a short and complete answer to their point.

D

As I said also, supposing for a moment that their position was, as is now set out in the skeleton argument, that what they are saying would have exercised Everest at the time was a risk of liquidation and some sort of claw back by a liquidator (supposing that were the case which it is not), that really is nonsensical. As I said, there were only two possible routes to liquidation. There was the trustee's own petition and ET's petition.

E

As for the trustee's petition, it is such a silly point that it is difficult even to express. If you are worried about the risk of a liquidator being appointed and clawing back the €525 million, what do you do? You withdraw your liquidation petition, your winding-up petition. The last thing you do is wind up the company so that the liquidator as appointed who then says, "I want the money back". It is truly laughable.

F

As for the other winding-up petition, which was that of ET, ET did try to pursue its winding-up petition and everyone knew about that because that was happening in the real world. The trustee took the view straightaway that it was not going to distribute the funds while that petition had not been finally disposed of, and that is exactly what happened. Everest was in the real world; Everest was perfectly happy with that course, so no breach of duty, nothing to complain about.

G

My Lord, I do not really mind whether they do try and put forward the case on that basis, because it is so silly, but we say that is not the way the case has been put and that it is captured by your decision of 1 May. Their concession that they are bound by that decision is fatal to them.

H

The fourth point I wish to make under this heading is that even if I am wrong on that and that the claims they now make are not strictly covered by your 1 May

13

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 13

order, we say that the claims could and should have been brought anyway in the part 8 proceedings and it is an abuse to go off to Miami and bring the claims over there rather than bringing them in English action in which they were, as bondholders, being represented at the time when they brought those very proceedings.

I have already made the point that they were taking two completely contradictory stances by allowing the English proceedings to continue where they were represented by Acciona and Concord and at the same time going off to Miami and taking precisely the opposite position.

Can I also show you paragraphs 42 and 43 of the amended complaint. You will say that they actually say there that we did not distribute the funds but instead:

> "Seeking to insulate itself from liability, filed an action in the English High Court against two of the Elektrim bondholders, seeking permission to distribute funds [actually against all of the bondholders]. The trustee did not disclose to the High Court that it had colluded with DT and Elektrim SA to defraud other Elektrim bondholders. [No, we did not tell you that.] Nor did it disclose at the time it received the funds it knew the underlying transfer of the PTC shares from Elektrim to DT had violated the …(reading to the words)… [And then this:] on 1 May 2007, the English High Court, without knowing all the facts and without having given Vivendi SA any proper opportunity to be heard, held that although Vivendi might have claim against Elektrim, it did not have a proprietary claim to the money. Although LDTC acknowledged the attorneys were unwilling to advise it that it could not lawfully distribute the monies, it did not disclose the …(reading to the words)… substance of the attorney's reticence. Notwithstanding the decision of the English High Court, it has still not distributed the fund too Elektrim bondholders."

That is an attack on your decision in terms, but, more than that, what it shows is that Vivendi is there acknowledging that it could have participated in those proceedings and that the judgment would have been different had they done so. They are saying that we put the case on a false basis, that we did not tell the court the whole facts and we did not give them an opportunity to be heard. It is an implicit acknowledgement that they could have come along and participated and the result would have been different.

We have set out the history of the part 8 proceedings in our skeleton, which you will know of. You will remember the fact that they were served with notice of the 1 May judgment, and we wrote that letter of 4 June, just after it kicked off in Miami, so they were not going to come to this court because … well, because.

MR JUSTICE LEWISON: Yes.

MR MILES: Because they did not feel like it, I suppose.

If they were going to make the allegations that they are now making that the trustee was liable or potentially liable because of the circumstances of the receipt of the monies in October 2006, that could and should have been raised in the English proceedings from the moment they knew about them.

14

MR JUSTICE LEWISON: Potentially liable to someone other than a bondholder.

MR MILES: Yes, because that is part of their case. But indeed we would go further than that and say, actually, potentially liable to them because it might well have affected the questions which you were dealing with, which were the distribution of the fund. If they can say they have some claim to damages against the trustee, that may itself have affected the question of whether or not the trustee ought to be making full distribution, otherwise (several inaudible words), to bondholders, because there would then have been questions of retention and so on. Should the trustee have been making retention against the possibility that it might have to pay out its slug of money to these bondholders over and above the capital and interest that it has to pay anyway under the bonds.

MR JUSTICE LEWISON: How does that work? If you are liable for breach of duty as trustee …

MR MILES: I suppose it slightly depends on the nature of the breach of duty. We have very broad indemnity, as you will remember, which cover, in terms, more or less everything we do. I can see if it was a case of fraud it would be different, but if it is a case, for example, of some error short of fraud, we have extremely broad indemnities against Elektrim, but those then feed back, under clause 11 of the bonds, because we are entitled, effectively, to a first charge over the assets in respect of our indemnities. So one can see that it would have come into play at that stage if these had been claims that were made.

The point about the part 8 proceedings is that they were supposed to deal with all questions relating to the €525 million and the distribution thereof. These are points which should have been raised in those proceedings, and could have been.

They have given no reason whatsoever for waiting and not raising the point in these proceedings because going off to Miami and taking the case over there. It is a remarkable thing in a case of this kind. Generally, where someone has gone off and taken proceedings abroad, they come to the court and explain why they have done it and what legitimate reason they had and what disadvantage they are going to suffer if the injunction was granted, but they have not done that at all. All they have said is that they claim that they did it because they could, but that is not good enough.

I will just give you one other reference which I should have given you under the heading when dealing with the point about the meaning of "tainted" and what was meant by "tainted funds". If you look at the prayer for relief in the amended complaint, which is on page 97 in M1, tab 2, the first form of relief they are seeking is to order as to hold the proceeds, and then this:

> "Of the illegal transfer of PTC shares in escrow until such time as
> the unlawful transaction is unwound."

The unlawful transaction they are talking about there is clearly the sale from Elektrim to DT. They call it unlawful throughout this pleading. What they are saying is that we should be ordered to hold on to the monies until that unlawful transaction is unwound. "Unwound" in that context means as the result of the multiplicity of proceedings brought by Vivendi. It clearly does not mean unwound by some liquidator. They are saying this is a current state of affairs, that this will be unwound in one or other of these sets of proceedings and we should hold the

15

**A**

money until it is. That again shows that what they are saying was that when we received the monies there was a risk that the transaction would be unwound and therefore the monies would be vulnerable. And they are saying when they issue these proceedings we should hold onto the monies until that happens.

The next group of submissions I had were on the point that the case is utterly devoid of merit and is vexatious on that ground also.

**B**

In relation to the allegation of breach, to begin with, the fraud allegations are apparently going, I will just say this about them: they are a concoction without a shred of evidence to support them and it will not do for Vivendi or its lawyers to hind behind this ludicrous phrase: "On information or belief" which appears to be a sort of fig leaf that they try and use when they do not have a single fact to support their claim. Those are disgraceful allegations which should not have been advanced and they are literally absurd.

**C**

The second point is that the allegation that the trustee withheld the 2 October award from the bondholders is key to this claim and it is just wrong as a matter of fact, as they now acknowledge. So the factual substratum of the claim has been shot away.

The third point is that they have now come up yet again in their skeleton with this notion that even if a trustee did disclose the 2 October award, it should have advised Everest about the discrepancies between that and the press statement or something. In other words, some sort of direct advisory duty owed directly by the trustee to Everest, and that the trustee breached that duty. That is, again, for reasons I will expand on a little, although they hardly need it, a ludicrous allegation.

**D**

The fourth point is the case that things would have been different had anyone held up the 2 October award against the DT press release. They think that that would have made some sort of radical difference to people's thinking at the time. It is again a ludicrous allegation, and I use those words advisedly.

**E**

I am not just putting a high forensic position. I am saying that this is one of those rare cases where someone has made utterly absurd allegations. The reason they have done so is very obvious: it is being done for tactical and strategic reasons, not because there is any belief in the case. The factual basis of the case has just gone once it is acknowledged that the 2 October award was disclosed.

**F**

I have already dealt with fraud allegations. My second point had to do with 2 October award. If I could take you back to the amended complaint, you will see that at paragraph 37 a very clear allegation is made, on page 86, that although we had access to it, we failed to disclose it to them at any time prior to the withdrawal of the petition on 26 October.

That then feeds through when you come to the paragraph we have already looked at, paragraph 50. The main allegation which is made in (a) is that we failed to disclose the full contents of that award. (b) we failed to disclose the content of the first partial award. (c) and (d) we are now told are gone; (e), excepting tainted funds. All that is meant by tainted funds, as we have seen, is that they arise out of this transaction which they say was unlawful because DT had received the shares before it should have done. That is really what it comes down to.

**G**

But the key allegation in this complaint is that we held back the 2 October award. That is just completely wrong as a matter of fact and it is now acknowledged to be wrong. Paragraphs 53 and 63 of Davies 5, I will not ask you to turn it up now …

**H**

MR JUSTICE LEWISON: Just give me a reference.

16

A

MR MILES:  Bundle I, 54, 541 and 544.

MR JUSTICE LEWISON:  That recognises that the second partial award was disclosed, does it?

MR MILES:  That is our evidence; that is Mr Davies.  He is saying it and that has now been accepted.  If you look at paragraph 45 of their skeleton, you will see the way that they now put it.

B

They are accepting not only was it disclosed to the bondholders' committee and their counsel, but Mr Torres himself accepts that it was sent to him but says that he did not appreciate its significance.  They then go on, and this is what I will come back to in a moment, to say: "This does not excuse the trustee's breach of duty".  Quite what the breach of duty is in those circumstances where it has now accepted that it did pass it on:

C

"Everest was entitled to rely on the trustee not only to pass on relevant information but to draw its attention how its interest under the bonds might be affect."

That is what I call the advisory role, the sort of family solicitor role to Everest.

MR JUSTICE LEWISON:  Is that something that is pleaded in the amended complaint?

D

MR MILES:  Not that I can see.  For reasons I will come back to, it is an absurdity.

It is interesting to see how VH1 thought that it could make this case and it is also interesting to see just how important this point was to VH1 when it made the case (that is that this had not even been disclosed).  If you look in G, tab 39.  (pause) This is the assignment whereby Everest Capital sold to VH1.  At page 354 of clause 8(c), you will see that:

E

"It is agreed that the assignor shall execute and deliver the declarations [that is Torres giving evidence] which assignee may use as needed in any litigation without limitation, including the Vivendi litigation and other litigation, provided that such litigation has been or is filed in good faith and not adverse to the assignor.  Upon assignee's request, assignor will co-operate and so on.  [And then this:] assignor further represents it is unaware of any evidence that contradicts his statements in the attached operation.  In particular, assignor represents it has not seen either 6 June partial award or the 2 October partial award."

F

That was a specific representation that was given and that is because they recognise just how key this point was.  So you can see how VH1 have come into this situation but the fact is that that representation made by Mr Torres or made on his behalf by Everest was just not true.

G

They may have an interesting claim against Mr Torres and Everest Capital under that assignment.  I can see yet more litigation involving Vivendi.  The important point for present purposes is it shows how important this point was to them, that they actually had an express representation about it and it was false.  That point is really at the heart of their claim.

H

A

You would think, in ordinary litigation, that that point having gone, they would accept that they do not have a case. Instead of that, they invent a new allegation in their skeleton argument, which is the one we have just looked at at paragraph 45, that somehow the duty of the trustee was to draw the attention of an underlying bondholder, Everest, to how its interests under the bonds might be affected by the award. It has not been pleaded and it only has to be examined for a moment to be seen to be as hopeless as their other allegations.

B

One only has to think a bit about the context. The role of the trustee is to act in the performance of its trust. It is no part of its function to advise bondholders as to the wisdom of commercial transactions or as to their interests, as it is put. Investors in these markets, particularly where you have distressed debt, are far from being babes in arms.

They are the most aggressive groups of investors that one comes across; they are often known as vulture funds, and for good reason. They crawl over this stuff; they are looking for any chance they can find to get leverage over issuers or indeed trustees. They employ their own counsel. In this case, they had Clifford Chance

C

in Poland and Bingham McCutchen in England. They also had German counsel, they had Dutch counsel, they had a great team of people who were crawling over this material, and the lawyers, as you know, charged getting on for €7 million for doing that. That was work done for the bondholders' committee, including Everest.

D

I again refer you to the evidence of Mr Davies, paragraphs 17 to 42, which starts on I 54, 534.

Just in relation this very point, there is some specific evidence. If you could take up that bundle, I, tab 54 at page 539. (pause) At paragraphs 40 to 42 he is dealing specifically with his question of the 2 October award. He exhibits, which is in bundle M4, tab 24, 1359, which I do not think you need to turn up because he summarises is, an email sent on behalf of the bondholders' committee from Bingham McCutchen immediately prior to the 4 October bankruptcy hearings.

E

In that email, Bingham McCutchen referred trustee the bondholders' committee:

"Wishing the trustee to press for an adjournment of the bankruptcy hearing from 4 October so that the implication of the 2 October decision might be more fully understood. This is generally indicative of the way in which relationships between the trustee and the bondholders' committee stood in connection with the bankruptcy petition. The bondholders' committee called the shots

F

subject to the trustee protecting its right of indemnity. I would also note that the 4 October email also continued approval for the acceptance of €525 million."

That is the second point. Then:

G

"In order to give instructions of this nature, Bingham McCutchen, Clifford Chance and members of the bondholders' committee must have been analysing closely all information available. During the period between 4 October and 27 October, the bondholder's committee, through Bingham McCutchen and Clifford Chance in Poland were closely involved, also, no doubt, considering any further threats by Vivendi. After receipt by the trustee of the payment on the 26th, Simmons & Simmons on behalf of the trustee

H

discussed with Bingham McCutchen what the bondholders'

18

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 18

A

committee wished to be done at the bankruptcy hearing fixed for the next day. The position of the members of the bondholders' on the morning of the hearing was that two institutions holding well in excess of 30 per cent had given their approval to the trustee withdrawing the bankruptcy petition in terms which were complied with this."

Then he exhibits that, bundle 4, tab 24 again.

B

There you have specific evidence that the bondholders and their lawyers actually asked for an adjournment of the hearing on 4 October in order that they could consider the 2 October award and its implications. Then, in paragraph 53, he gives evidence explaining that it was disclosed on or about 4 October.

So the situation is that the trustee gets a copy of the award at a hearing. It immediately makes it available to the bondholders' committee. The bondholders' committee has already said that it wants to spend some time carefully considering the terms of the 2 October award and its implications, and they are doing so with their counsel.

C

None of that evidence has been disputed. They had about three weeks in which to consider the terms of that award and its implications before the money was received.

Against that background, if one then looks again at what they say in paragraph 45 of their skeleton, that the trustee was not only under a duty to pass on the information but it was under a duty to Everest to draw to its attention how its interests under the bonds might be affected, it is a ludicrous allegation. They had their own people looking at this; they had at least two firms of extremely experienced solicitors. Also, they know what their own interests are. The trustee does not know what their interests are; it cannot know. Their interests may be different from the interests of some other group of bondholders.

D

E

So, my Lord, we say that it is ridiculous to suggest that there is any duty which could extend as far as that. They do not, of course, actually identify any express duty in the bond documentation. All they rely upon is what they have set out in paragraph 40, which is a saving or preservation in clause 18 of the trust deed which says:

> "Nothing …(reading to the words)… shall in any case in which the trustee has failed to show a degree of care and diligence required of it as trustee having regard to the provisions of these precedents conferring on any trust the powers, authorities or discretions exempt the trustee from or indemnify it against any liability of breach of trust."

F

That is simply the wording transposed of section 192 of the Companies Act, which provides exactly that in relation to debentures of bonds issued by companies. It simply tracks the wording of section 192.

G

That does not create any sort of separate or self-standing duty. It does not create some sort of roving advisory duty at large. What it is saying is that in exercising its duties, powers and authorities, it has a duty of care. Well, yes. But you cannot get out of that some sort of duty of the kind that they are alleging.

Just to give a couple of examples (again, I will not ask you to turn them up now), in clause 17.1(l) of the trust deed, which is in M1, tab 1, the first document, the trustee is not even required to disseminate information. As it happened, it did in

H

19

A

this case in providing a copy of the award to bondholders, but it is not even required to do that. It is not even required itself to obtain legal advice on any matter and it should not be liable for a failure to obtain legal advice.

It has limited functions. You have already seen, a number of times, clause 10.1 which says there is no need to act without instructions and indemnity. Where can they spell out then this sort of duty to advise as part of this "on the hoof" development of their case?

B

We say that it cannot be got out of the terms of the trust deed and we say that it is just utterly bizarre to suggest that the trustee is under a duty to provide what is essentially legal advice to individual underlying investors about their own interests. It is still more bizarre when placed in context, namely, that the bondholders themselves have instructed their own lawyers who are crawling all over these documents and who have actually asked for an adjournment of the bankruptcy proceedings in order to do so.

C

If this so-called duty arose at all, it would be a duty owed to all people at the level of Everest. That is to say every underlying investor way down the chain in circumstances where the body of investors of that kind is changing every day (these are trade instruments); where the trustee does not even know the identity and cannot know the identity of the underlying bondholders unless there are block voting instructions (so he does not have access to that information); where the interests of specific bondholders may conflict with those of other bondholders; and where, indeed, at times, the position of the bondholders themselves can be at odds with that of the trustee, as we see in this very litigation where they have been taking a different stance on certain points than the trustee has.

D

This would be an entire rewriting of the relationship between trustees and bondholders in capital markets. It would make trustees into general advisors to investors and it is a simply hopeless suggestion. We say that is another ridiculous point and, taking all of these points together, the idea that the trustee was in breach of duty to the bondholders is fanciful.

E

There is yet another reason why even at the level of breach the claim is utterly devoid of merit. If you look at the award itself, which is in M3 --

MR JUSTICE LEWISON: This is the 2 October award, is it?

F

MR MILES: Yes. M3, tab 17. You start from now, from knowing that the bondholders actually have this. First of all, on page 514, the 6 June award is set out and it is fully set out, the award itself; obviously not the reasoning because we did not have the 6 June award itself. It says, first of all, that DT did validly exercise the call option and as a result of that, in (2):

> "DT will, upon payment of the price as determined in 73 below, acquire the shares in PTC. The price payable is [to summarise] something that will be specified by the arbitral tribunal in the light of further developments and submissions. Elektrim is in material default. Elektrim is not entitled to exercise call option and costs."

G

What is it is saying is that the key point is that they have found in favour of DT. DT is the winner of this arbitration. It has to make the payment but it is going to get the shares. Then at the back of this award, on page 532 (this is now the operative part of the 2 October award), paragraph 45:

H

20

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 20

A

"On the basis of the foregoing, the arbitral tribunal decides that: (1) the payment will apply legal title to the shares upon payment of current book value [and then an additional provision]; and (2) Elektrim is ordered to transfer full and factual control [as it is called] over the option shares to the claimant by enabling the claimant, to the extent the respondent may exert control over the claimant on these points] to exercise full ownerships rights and power attaching to these shares, including by ensuring that the claimant be listed as the owner of the shares in the register ..."

B

MR JUSTICE LEWISON: I assume that option shares are defined somewhere. I think one of Mr Malek's points is that it is not clear whether that is one share or 48 per cent.

MR MILES: Yes. But, of course, it would be great from the point of view of the bondholders if it is just one share. I am just looking ... They seem to think it is, to plumb(?) as it were, a term of art. If you go back to 517, they are talking there about the way the case has been put but they do not actually seem themselves to tell us what the -- I suppose since this is an arbitration award, the parties know what is meant by option shares. They are looking at the pleadings here. What is interesting in the operative part is that it is saying that even before payment, it appears, the respondent is ordered to give full factual control over the shares to DT. I suppose what we would think of as being equitable title. That is not the way that it is looked at. Legal title itself only passes on payment in full.

C

D

MR JUSTICE LEWISON: No, actually. It is payment of book value plus an undertaking.

MR MILES: Sorry, that is absolutely right.

E

MR JUSTICE LEWISON: Not payment in full.

MR MILES: Yes. Just looking at this from the point of view of a bondholder or trustee for a minute, rather than Vivendi in their dispute with DT, what would the trustee or bondholders get from this? They would discover that DT have won and was therefore entitled to the shares in return for payment. If we think about the position of the bondholders and the trustee for a moment, they are being offered from Elektrim the proceeds of the sale of the shares.
There is nothing in this award as to the timing of payment. There is nothing in here saying that DT cannot pay some money on account. So the bondholders or the trustee reading this would take this as confirmation that DT is entitled to the shares and Elektrim is entitled to the price. That is what they would get out of it. The bondholders and the trustee are not concerned with the precise moment at which DT get full legal title. They could not care less.
It may be that through some error or other DT never gets full legal title. Who cares? This is saying that DT was entitled to buy the shares from Elektrim and what Elektrim is offering to the bondholders is the proceeds of a sale which has been ordered by an arbitral tribunal. It is not of interest to the bondholders or the trustee whether or not and when exactly DT gets title. If it wants to pay some money up front, that is a matter for it.

F

G

H

21

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 21

You then ask yourself the question, "Well, what, reading this award, would have caused the bondholders or the trustee to question the receipt of 525 million or to put it on notice of some illegality?" which is what they are alleging. The moment you scrutinise any of the things they are saying, they just collapse. There is nothing in it.

They try and get round that by saying, "Oh, well, there were these two lies because there were two lying press reports (which appear at tab 18) which make all the difference". This is just piling absurdity on absurdity because, if you look at these, at page 554 there is a press release put out by DT about the whole question of the PTC stake and that says, second block up from the bottom:

> "The new management pointed at PTC as a direct consequence of DT's acquisition of a 48 per cent stake. The acquisition is based on the call option awarded to Deutsche Telekom by the Court of Arbitration."

So what? This is a business press release about filling top management positions in central Europe. It is telling everyone about who is going where. The idea that, once they have the 2 October award, anyone is going to think that this document told them anything useful, is simply laughable.

Then you get on to the next page, this is a translation of another press release put out by DT and you see what that says about the history and then it says, about halfway down:

> "Another award issued by the arbitral tribunal this year [that is the June award] found that Deutsche Telekom effectively exercised the call option as of 15 February 2005. [That is true.] In yet another award of 2 October 2006 the arbitral tribunal in Vienna conferred the ownership title to Deutsche Telekom which remains in concord with the joint standard of Elektrim and Deutsche Telekom presented to date. For this reason, Deutsche Telekom has paid an amount of more than € 600 million which surely covers the current book value of the shares in PTC. The said amount constitutes only a portion of the total price of the shares due as a result of the exercise of the call option, which will be determined by the arbitral tribunal under another award."

Where is the lie in that? It did say that. It said that DT gets the ownership of these shares. Remarkably perhaps from English standards, it actually ordered Elektrim to agree the registration of DT as the owner of the shares but where is the lie in that? I mean, it is just typical of the way that Vivendi have put together this case, that they just throw around allegations of fraud left, right and centre and it has become a sort of habit of theirs. But reading that, one cannot see where the lie is. I would invite you to bear in mind also that these are press releases put out by DT who are in the middle of this great big dispute with Vivendi, which we know about.

Bearing all of that in mind, what is now suggested is that somehow if the trustee had held up the press release in one hand and studied the 2 October award in the other hand, he would have seem some whopping great lie in this which should have led him to realise that the whole of this sale by DT to Elektrim was a fraud. It is just a nonsense, there is nothing in this that leads to that conclusion.

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 22

A   But more than that, in the real world rather than the fantasy created by Vivendi, who is going to rely on a press release put out by DT purporting to summarise the effect of the award when they have the award itself? This is put out on 4 October, the same day that we all obtained the 2 October award and distributed it to the bondholders. Who in their right mind is going to say, "Oh, right, well, I'm going to base my entire strategy and investment decisions on something that DT said in a press release" when they have the document itself to look at and three weeks to think about it with their lawyers? It is an absurdity.

B   Again, this case is a sort of soufflé which then collapses when it is exposed to the light and you cannot ...

MR JUSTICE LEWISON: To the air, I think.

MR MILES: Yes, that is probably right. Once you have a collapsed soufflé, there is nothing you can do about it. They tried desperately to resurrect their collapsed soufflé but I am afraid it is as flat as a pancake.

C   When it comes to taking the money, as you have seen, the trustee then acted on the instructions of the bondholders. It acted on the instructions of 38 per cent of the bondholders and the bondholders had jolly good reason for doing that. They wanted the money. Their petition to wind up Elektrim because Elektrim was not paying them that money, it was then offered the ... everything in these awards was consistent with the sale being a proper one. At the hearing, a Polish court blessed the payment of the money, the LCIA had blessed the payment of money and we

D   have been told that at the hearing on 27 October.

MR JUSTICE LEWISON: That is the seventh interim measure, is it?

MR MILES: Exactly, and that was disclosed at the hearing on 27 October by the Elektrim lawyers. The fact of it was not (overspeaking)

E   MR JUSTICE LEWISON: It was the terms of that interim measure, if I recall, which led me to the conclusion that there was no proprietary claim to the money.

MR MILES: Exactly. I think your judgment is wider than that in the sense that there is no other evidence of a proprietary claim. That was the only show in town, as it were, and that was hopeless; so that was basically your decision but is broader, I think, than just an analysis of that order. We were told about that at the hearing on 27 October and, my Lord, the instructions that had been given to the trustee by the bondholders was to withdraw as long as the --

F   MR JUSTICE LEWISON: Payment was best.

G   MR MILES: -- payment was best, which it was. That really is the end of it. There is nothing in this history which gives rise to any remotely arguable case that the trustee did anything wrong in any of this. If they are relying on duty of care, what they have to show is not only that the trustee did something they now disagree with but he acted in a way that no trustee, acting reasonably, could have done or would have done in the circumstances. They are a million miles away from putting before the court any fact which could possibly lead to that conclusion.

H   This is an utterly hopeless case.

23

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 23

A

Can I just deal with a comment made in my learned friend's skeleton at paragraph 82 where he refers to some remarks of Thomas J in <u>Shell International Petroleum Co Limited v Coral Oil Co Limited</u> [1999] 2 Lloyd's Reports 606 about it only being in extremely rare cases where the court would reach this conclusion. I am not sure about "extremely". I am not sure that the authorities support that. "Rare" will do. But there are rare cases where this happens and this is one of them.

B

Thomas J certainly did not say "never" and indeed, in the case before him, he came to that conclusion. This is another of the cases. It is vexatious in the sense of being completely hopeless. The judge in that case made the point that the facts were not as pleaded. You can see that in the passage that is referred to. That is true of this case; the facts are not as pleaded in this amended complaint. The key fact in the amended complaint is that we did not disclose the 2 October award. That is false.

C

The other allegations in the amended complaint include that we did not disclose the terms of the 6 June award. That is false because we have seen that they are recited in the 2 October award. It is pleaded that we colluded and so on with DT and Elektrim to do down the bondholders and other creditors. That is false. The factual basis of this claim is a false one and it is an utterly absurd case. It is bound to fail.

D

I have so far really made points about the merits of the case on breach of duty. We say, for reasons which we have given in our skeleton, that they are equally hopeless when it comes to causation. The trustee was instructed to do this by 38 per cent of the bondholders. They have put in witness statements saying that they would have made exactly the same decision had they known this stuff (whatever it is now that is set out in the amended complaint) and that evidence is not, as it were, self-serving evidence which should be treated with any sort of scepticism or caution. It makes absolute sense. They wanted the money.

E

The last thing they wanted to do when they received the money was put the company into liquidation. No petitioning creditor ever will countenance the company who has just paid on a winding up petition being put into insolvency because the liquidator will ask for the money back. The position taken by the bondholders who wanted to get their money was completely rational and the evidence that they give cannot be sensibly attacked.

F

It is then said, "Oh, well, I suppose that even if 38 per cent or more of the bondholders had instructed the trustee to attend the hearing and withdraw the petition, Everest could have gone along on its own and opposed the withdrawal of the petition." That is their next point. That, again, with respect, is a ridiculous point. The petition was a petition of the trustee --

MR JUSTICE LEWISON: I cannot see what *locus standi* would have had to --

G

MR MILES: Exactly. But at clause (a) under -- they would not have *locus standi* because they were not a petitioner but at (b), my Lord, there is a clause in the contract which my learned friend Mr Millett has gone on about for pages and pages saying that only the trustee may bring claims under the bonds.

MR JUSTICE LEWISON: The Polish court seems to have taken quite a strict view of who it would listen to.

H

24

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 24

MR MILES:  Yes, and they are not the parties.  It is not just *locus standi* because the Polish court would also be confronted with this really bizarre situation where the trustee would have been saying on the one hand, "Oh, well, this is my petition and I would like to withdraw it please," but someone popping up and saying, "Oh, well, I am an underlying bondholder holding this chain of contracts.  I would like to tell you the story of Vivendi against DT in three volumes."  The Polish court is not going to pay any attention to that person.  It is going to say to the trustee, "What do you want to do with your petition?"

That is just fanciful and now it is said for the first time in my learned friend's skeleton another brand new point, "Oh, well, it might have been open to Everest and thus the 30 per cent of bondholders going the other way and we might have been able to instruct the trustee to carry on the petition."  Really, there must be a limit to how many new points can be plucked out of the air by my learned friend.

This case has been in the course of preparation for months now.  We made this point in our evidence.  We have served two statements from other bondholders saying what they would have done.  These people know who the other main bondholders on the committee were.  They have not put in a scrap of evidence to support this idea that anyone else would have come in behind them.  Of course they would not because, let us face it, this case is nothing to do with a bondholder claim.  This case is about Vivendi.  If they are going to make those sorts of points they need evidence and they do not have a scrap of evidence to make them.  In any case, if there had been conflicting --

MR JUSTICE LEWISON:  What does the complaint say?

MR MILES:  The complaint just says that they always acted unanimously, which is not true, and that they would have required unanimity.  We put in evidence which refutes that but that is the only it is made in the complaint.  They do not make any of these brand new points.  It is in paragraph 54.  I mean, it is simply not true to say that they typically required unanimity.  Can I give you one big example.  On the decision to issue the winding up petition, the largest single creditor, who is Acciona, did not support the decision.  It is just not true.  And the other bondholders -- Acciona have now put in a statement and Trafalgar have put in a statement saying that they do not consider it to be the case.

But in any case, the trustee would have acted in accordance with the terms of the trust deed, which state in terms that if more than 30 per cent of the bondholders direct or request them to do something the trustee will do it.

MR JUSTICE LEWISON:  I think Mr Malek's point is that if you have 30 per cent saying X and 30 per cent saying not X --

MR MILES:  Then they cancel one another out.

MR JUSTICE LEWISON:  Yes.

MR MILES:  That is his new invention, not supported by any evidence.  All you are left with then is the merest speculation that that is a possibility made by counsel, not something which is supported by any of the evidence before the court.  They know who the other bondholders are.  They could have gone and asked them for some evidence to support this contention.

25

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 25

A        Supposing that there had been that sort of process of cancelling out, in that circumstance the trustee would just have been thrown back on his discretion and there is evidence before the court, it is in paragraphs 69 to 71 of Davis 5 (I do not ask you to turn it up now) at bundle I, 545 to 6 that (1) the trustee would have made the same decision anyway and (2) that the petition would have been dismissed anyway by the Polish court.

B    MR JUSTICE LEWISON:  Yes.  I mean, if it had been an English bankruptcy petition and the company turned up saying, "Here is the money", it would be very peculiar if the petitioning creditor said, "Oh, no, I do not want the money, thank you very much."

C    MR MILES:  Yes, in circumstances where the court also says, "Well, you can have the money."  Again, it is just fanciful to suggest that anything else would actually have happened.

         Again, I am not going to go through it again, but we have also made points about why the claim for loss and damages is a bizarre one.  That is paragraphs 116 and 117 of our skeleton.  The very highest it could be put is that this is a totally speculative claim for damages.

D    MR JUSTICE LEWISON:  Again, if it were an English claim, you would say, would you not, that what Everest had lost was the chance of persuading everybody else not to withdraw the petition and if that chance had materialised, there would then have been another chance of recapturing assets.  If those two chances had materialised then, subject to Mr Millett's argument about no contingent payment anyway, then there is a further chance that if the assets exceeded the liabilities there would have been (overspeaking)

E    MR MILES:  Might have something.  Exactly.  You pile chance upon chance and we say this is one of those cases where, even on the most generous loss of a chance sort of basis, the Allied Maples Group v Simmons & Simmons [1995] 1 WLR 1602 sort of basis, this is so speculative you do not even get into the serious ... well, I cannot even remember the precise wording of the test now but you do not even get into there being a serious chance, if you like.  It is so speculative and so remote.

F    MR JUSTICE LEWISON:  There are about four chances, are there not?

      MR MILES:  Yes.

      MR JUSTICE LEWISON:  Different decision, Polish court does not insist on dismissing the petition, claw back of assets plus excess of assets over liabilities.  All those things need to coincide.

G    MR MILES:  Yes, and plus time, I suppose.  I think my learned friend is muttering about solvency but your third point was solvency of Elektrim, that it has ... I am not sure whether it was actually.  Perhaps it is a ...

H    MR JUSTICE LEWISON:  I said excess of assets over liabilities but that may be slightly different, I do not know.

WordWave International
www.wordwave.co.uk

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 26

A

MR MILES:  Yes, but I think you had in mind that they have to have some means to pay.

MR JUSTICE LEWISON:  Yes.

MR MILES:  And it is not just the paying obviously this contingent payment claim, it is paying --

B

MR JUSTICE LEWISON:  All the creditors.

MR MILES:  -- all the creditors.  So, my Lord, you have a whole stack of possibilities, probabilities, whatever they are, mounting up and we say if you take all of that together, you do not even get over the threshold hurdle of showing that there is a reasonable prospect.
I will look up over lunchtime what the phrase is in the Allied Maples case but I think you know the point I am making, that you have to get over even the threshold before the court will say that you can bring a loss of a chance case and we say they were nowhere near reaching that threshold.  I think my friend is saying "real chance", I think that rings a bell with me.
My Lord, those are really my submissions.

C

MR JUSTICE LEWISON:  Yes, thank you.
Yes, Mr Millett.

D

### OPENING SUBMISSIONS BY MR MILLETT

MR MILLETT:  My Lord, we make three points; that as a result of this morning there has been a maturity into a fourth as well, which I will come to shortly, which broadly echoes my learned friend Mr Miles' submissions about hopelessness as arising out of the facts but I am not going to take time on that.  I am going to focus, if I may, on my main three points and they are these.
First, that the claim brought by VH1, call it Vivendi, in Miami is caught by the contractual provisions of the trust deed and the bond conditions by which they are bound as a result of the assignment not to sue us, unless of course they have asked the trustee and gone through the hoops and the trustee has failed.  We are, therefore, entitled to an injunction almost as of right.
Vivendi do not suggest any basis upon which if we were to succeed in showing that those provisions apply, that there is any basis nonetheless for refusing the relief sought and you will know from the case law that the discretion is an extremely narrow one in this kind of anti-suit injunction.  Of course, I do not think I need to make it clear to you (perhaps I should) that we are dealing here with the anti-suit injunction based on a contract.

E

F

G

MR JUSTICE LEWISON:  Yes.  No, I have done that and I think Mr Malek more or less accepts that if you are right about contract then the probability is that the suit will be stopped.

H

MR MILLETT:  The simple point, and it is a simple point, is that the claim made in Miami by Vivendi is for loss of the putative or potential benefits payable under the

27

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 27

bond. If I am right about all of that, we do not need to go on to consider my second and third points.

My second point is that the claim in Miami results in double jeopardy to Elektrim because of the clear overlap between the facts and issues in Miami and in the trustee's London contingent payment proceedings.

The third point is that, in any event, the claim is hopeless as a matter of causation and loss. They lost nothing, Vivendi, even assuming a fraud, simply because the equity kicker or contingent payment rights had already gone or would have gone immediately Elektrim was placed in bankruptcy. That exercise is an exercise I will do purely on the bond condition.

MR JUSTICE LEWISON: When you do it, Mr Millett, I would like you to do it fairly slowly because I have read that bit of your skeleton two or three times now and I have not quite understood it.

MR MILLETT: My Lord, I will. May I make it very clear right at the outset, because Mr Miles is worried about this because he does have a contingent payment claim, that the judgment that you should give in relation to that would not create a problem for him in that claim and I make that clear.

What we are going to look at is really very little by way of material. We are going to look at the bond, the deed of assignment and acceptance, the amended complaint, the contingent payment claim and perhaps two cases on double jeopardy. Everything except the deed of assignment and acceptance are contained in bundle M1.

Can I take you, therefore, to the bond to start with, the trust deed which is in bundle M1, page 1. Before I do that, can I just make one or two points about why I am showing you this, and this goes obviously to my primary or first point. The purpose of the tour is so that you can see the no-suit covenant contained in the trust deed and the conditions in their full contractual context. In essence, I am asking you to perform an exercise in construction. The context really breaks down into a number of points.

The first is that the bondholders are a class of creditor and they are treated as such vis-à-vis the trustee throughout the entirety of the contractual documents.

Secondly, as a general point, they operate functionally as a class on the basis of majority rule. The premise of their capacity and role under the trust deed and conditions is commercial democracy. Commercial democracy.

Thirdly, there is an extremely sound commercial reason for having commercial democracy. It stops competition between bondholders in respect of the enforcement of their rights (and I emphasise the word "rights") and it protects Elektrim from multiple claims and multiple demands from bondholders. It also allows the trustee to get on with the job of being a trustee on their behalf.

Fourthly, these bonds are traded in a highly liquid bond market. That is an important commercial context. It means that the composition of the class is constantly shifting. They all have to be treated in the same way and, to borrow from the legal concept of class in perhaps another context (one with which I know you are familiar, the context of constituting class meetings under section 425 of the Companies Act) bondholders are members of a class because they have equal and identical rights. The fact that they may have divergent interests, commercial or otherwise, is not relevant. You will also know that these clauses are very common.

28

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 28

A

Against that background can I take you to the trust deed, bundle M1, page 1, and go straight to clause 10.2 on page 27. I hope that you will forgive from taking this construction exercise a little slowly. One begins with clause 10 and its heading: "Proceedings, Action and Indemnification". Clause 10.1 says that:

> "The trustee shall not be bound to take any proceedings mentioned in Clause 9 [which is on the page before] or any other action in relation to these presents [and I would ask you to underline that expression - "any other action in relation to these presents" - it is a very wide expression] unless respectively directed or requested to do so: (i) by an extraordinary resolution of the holders of the bonds --"

B

MR JUSTICE LEWISON: Extraordinary resolution is what?

MR MILLETT: 75 per cent:

C

> "Or (ii) by the holders of at least 30 per cent in principal amount outstanding of the bonds and in either (i) or (ii) then if only it shall be indemnified to its satisfaction against all liabilities to which it may thereby render itself or which it may incur by so doing."

We say that clause 10.1 is at least part of but an important part of the background to clause 10.2 and in fact one cannot understand 10.2 without understanding 10.1. One has to read them as a whole. 10.2:

D

> "Only the trustee may enforce (i) by written instruction pursuant to the terms of the security administration agreement the security [and we may come back to that] ... or (ii) the provisions of these presents."

These presents is defined and I will show you the definition in a moment:

E

> "No bondholder shall be entitled to proceed directly against the issuer or the guarantor to enforce the performance of any of the provisions of these presents unless the trustee, having become bound as aforesaid to take proceedings, fails to do so within a reasonable period and such failure is continuing."

F

The reference to "become bound as aforesaid to take proceedings" is a reference back to clause 10.1. It is a reference back to proceedings mentioned in clause 9 or any other action in relation to these presents. That is an important link.

Our submission, in a nutshell, is that the negative covenant in the second sentence of 10.2, which is what I found my anti-suit injunction on, is based on proceedings. In other words, such proceedings as is referred to in 10.1 and you read the expression "proceed to enforce the performance of any of the provisions of these presents" in the earlier part of the second sentence of 10.2 in that light and not differently from or more restrictively than proceedings referred to in 10.1.

G

We then go back to clause 9, just because we are told to at least for part of the reason, clause 9 is not the only sort of action that the trustee shall not be bound to take under 10.1 because 10.1 says "or any other action in relation to these presents" but 9.1 is a useful guide. 9.1, at page 26, "Enforcement":

H

> "The trustee may at any time at its discretion, without notice, take such proceedings and/or other action as it may think fit against or

29

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 29

A

in relation to the issuer or the guarantor to enforce their respective obligations under these presents.

9.2  Proof that as regards any specified bond the issuer or the guarantor has made default in paying any amount due in respect of such bond shall (unless the contrary to be proved) be sufficient evidence that the same default has been made as regards all other bonds in respect of which the relevant amount is due and payable."

B

Clause 9.2 is a clue and an expression of the "all for one and one for all" principle. It is an identification of the class flavour of this.

But, if I may, just going back to 10.1 for the moment, clause 9 certainly refers to enforcing the respective obligations under these presents. That should not be read restrictively but even if it were to be read restrictively and to be restricted to claims for breach of contract, which in my submission it is not, but even if it is in 10.1 the expression "or any other action relation relating to these presents" widens 10.1 completely.

C

MR JUSTICE LEWISON:  Sorry, 9.1 you say should not be read restrictively?

MR MILLETT:  No, 9.1 should not be read restrictively.

MR JUSTICE LEWISON:  If you read it literally it does not appear to include, does it, a claim for damages for breach of contract?

D

MR MILLETT:  No.  Exactly, that is part of the problem.  If you read it literally, it is restricted to a claim for specific performance or debt, I suppose.

MR JUSTICE LEWISON:  Yes.  I suppose if you adopt the Diplock theory of anticipatory secondly obligations or whatever it is you might say they are enforcing obligations but ... yes.

E

MR MILLETT:  I actually have a point on that later but -- a lot later, at least in terms of the argument if not in terms of time.  But, yes, that is right.  But we say you cannot restrict it that way and there is no commercially good reason, given the background, to restrict 9.1 but even if you could (and you cannot, but even if you could) 10.1 opens it up completely and it would be absurd, in our submission, to have the second sentence of 10.2 re-restricted.

F

I am now going to go a little bit wider and focus on the class question, just so that you have the full instrument and its related documents in the context of the points I was making before.  If you begin at page 10, there is a definition of bondholders at the foot of the page and this ties in exactly with the description of the way these bonds are traded that Mr Miles gave you rather elegantly earlier this morning.  The bondholders are:

G

"... the several persons whose names are entered in the register of holders of the bonds as holders thereof which expression shall, whilst any Global Certificate remains outstanding, mean in relation to the bonds represented thereby each person who is for the time being shown in the records of Euroclear or of Clearstream, Luxembourg as the holder of particular principal amounts of the bonds ..."

H

30

WordWave International
www.wordwave.co.uk

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 30

Then you see that is to be:

> "... conclusive and binding for all purposes ... other than with respect to the payment of Principal, premium (if any), interest and other amounts payable on the bonds, the right to which will be vested, as against the issuer, guarantor and the trustee, solely in the registered holder of such global certificate in accordance with and subject to its terms and the terms of these presents and the word "holder" and "holders" shall (where appropriate) be construed accordingly."

What we get out of that is that the bondholders are those people on the register from time to time, and they change constantly. The bondholder status, if you like, is one which is derived from registration.

Page 15 is the definition of these presents which is:

> "The trust deed and the schedules and any trust deed supplemental hereto ... and the bonds and the conditions ..."

Then the next page is interpretation 1.2 and in that connection, (G) and (H) are both highly relevant. (G) tells you that:

> "All references in these presents to any action, remedy or method of proceeding for the enforcement of the rights of creditors shall be deemed to include, in respect of any jurisdiction other than England, references to such action, remedy or method of proceeding for the enforcement of the rights of creditors available or appropriate in such jurisdiction as shall most nearly approximate to such action, remedy or method of proceeding described or referred to in these presents."

That is very wide, "the rights of creditors". (H):

> "All references in these presents to taking proceedings against the issuer or the guarantor shall be deemed to include references to proving in the winding up of the issuer or the guarantor."

That is an important expression of the subordination of the rights of individual bondholders to the rights of the bondholders as a class and particularly the subordination of the rights of the bondholders as a class to the rights of the trustee. The point is that this is extremely wide. It does not tell you that this only refers to proof in respect of a judgment or award for damages for breach of contract or debt. It is anything.

Moving on; page 18, this is clause 2.3 of the trust deed which is the covenant made by my clients:

> "The guarantor covenants with the trustee that it will, in accordance with these presents, on the contingent payment date, pay or procure to be paid unconditionally to or to the order of the trustee or to such account as the trustee may direct in euro in immediately available funds the contingent payment provided that ..."

Then there are some provisions.

31

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 31

That is the primary obligation to pay the contingent payment claim. We then move on through the bond to clause 5.1. Clause 3 is about the form and issue of the bonds and that my learned friend Mr Miles has touched on already. 5.1 is "Covenant of Compliance" and the third sentence of that is relevant, "The trustee shall be entitled ..." Perhaps I should read the whole thing:

> "Each of the issuer and guarantor jointly and severally covenants with the trustee that it will comply and perform and observe all the provisions of these presents [and that obviously includes 2.3, the contingent payment obligation] ... These conditions shall be binding on the issuer, the guarantor and the bondholders. The trustee shall be entitled to enforce the obligations of the issuer and the guarantor under the bonds, including the conditions, as if the same were set out and contained herein constituting the same, which shall be read and construed as one document with the bonds."

Then on page 28, going past 9 and 10, I have shown you already, clause 15, "Covenants by the issuer and the guarantor":

> "So long as any of the bonds remain outstanding ... each of the issuer and the guarantor covenants with the trustee that it shall (A) at all times carry on and conduct its affairs and procure that its subsidiaries carry on and conduct their respect affairs in a proper and efficient manner; (B) give or procure to be given to the trustee such opinions, certificates, information and evidence as it shall require ... and in such form as it shall require ... (D) at all times keep and procure its subsidiaries to keep proper books of account ... and access for inspection purposes."

Just pausing there, the contingent payment claim, as we will see, involves an allegation by the trustee that Elektrim has breached clause 15.1 and is therefore liable for the loss of the value of that covenant measured by the loss of the contingent payment rights.

In passing through this and in connection with the point made by my learned friend Mr Miles, page 36 is part of clause 17, which is the supplement to the Trustee Act 1935. I just draw your attention to letters (G) and (H) which are the trustee's absolute and uncontrolled discretion as to the exercise of its trusts. Sorry, I am on (H):

> "Save otherwise provided, the trustee shall absolute and uncontrolled discretion as to the exercise of its trusts, powers, authorities and discretions under these presents and the security documents the exercise of which as between the trustee and the bondholders shall be conclusive and binding on the bondholders and shall not be responsible for any liability which may result from their exercise or non-exercise. The trustee shall not be liable to any person by reason of having acted in good faith upon any resolution purporting to be past at any meeting of the bondholders."

That is relevant to what my learned friend was saying earlier on about the exoneration of his clients. Put simply, in the absence of an allegation of fraud against the trustee, those two provisions are a complete answer to the case against

32

A    the trustee. They also provide (and I will come to it) a complete answer in the circumstances to the claim against my clients; simply that the trustee was entitled to do what he did, that is withdraw the petition.

MR MILES: My Lord, I do not associate myself with that submission. I am not sure that is actually right, with respect.

MR JUSTICE LEWISON: What, that the clients were entitled to withdraw the petition or that these clauses give you a complete answer?

B

MR MILES: No, that these clauses are a complete answer because they have to be read as subject to clause 18. I do not go that far.

MR MILLETT: Right, well, I do.

C

MR MILES: Even though (inaudible) to do so.

MR MILLETT: I thought I was giving Mr Miles a helping hand but, fair enough, he does not want it. So far as my clients are concerned it is a helping hand because if there is any problem about the trustee being liable for failing to show under 18 the degree of care and diligence required, it does not affect my clients. My clients signed up to (N) and (O) which said that the bondholder, provided that he was acting in exercise of those trust (inaudible) could withdraw the petition and the bondholders signed up to it. If it does not help Mr Miles' client, it certainly helps mine.

D

We then come on to the bond conditions, which start on page 59. These form part of the second schedule to the trust deed. Just scampering through these, if I may. This will, I think, be a little familiar to you from earlier in the summer, page 66, clause 6(A) "Redemption and Purchase":

E

> "Final Redemption. Unless previously purchased or redeemed as herein provided, the bonds will be redeemed as the adjusted principal amount together with accrued interest on 15 December 2005, the repayment maturity date."

I just ask you to mark that because we will come back to it in the context of 6(K) argument. My Lord, 6(K) is at pages 70, 71 and 72 but I will come back to that later on. Page 74 deals with security and the covenants given in relation to that. Condition 12 on page 86 is the events of default and the important point about that is that it is the trustee who declares default. It says:

F

> "The bond trustee at its discretion may, and if so requested in writing by the holders of at least 30 per cent in principal amount outstanding of the bonds, or as so directed by an extraordinary resolution of the bondholders, shall, subject in each case to its being indemnified to its satisfaction, give notice to the issuer and the guarantor that the bonds are and they shall accordingly immediately become due and payable at their relevant redemption value together with the accrued interest."

G

It is the trustee who gives notice, not each individual bondholder. If you then go on to clause 13 on page 89, we have a repeat, in effect, of clause 10.1 and 10.2. It

H

33

is in very slightly different language but not materially so; the same point applies. The last sentence says that:

> "No bondholder may proceed directly against the issuer or guarantor unless the bond trustee, having become bound to proceed, fails to do so."

That is an echo back, essentially, to 10.1. It is compressed a little bit more in 13. The first part of 13 refers to the bond trustee:

> "... at its direction and without further notice institute such proceedings as it may think fit to enforce the bonds and the provisions of the bond trust deed."

No reference, curiously, there to enforcing the terms of the bonds or specific provisions. It simply refers to the bonds. It does not refer to the guarantee, curiously, but it must include that.

Then at page 90, condition 15 deals with meetings of bondholders, modifications, et cetera. That is where you get the provisions about quorum and all the provisions dealing with convening meetings of bondholders. The second sentence of 15 says:

> "The quorum of any such meeting for passing an extraordinary resolution will be one more persons holding or representing one-third in principal amount outstanding of the bonds ..."

Then halfway down the page, at the paragraph break, "a resolution in writing of 75 per cent shall be effective as an extraordinary resolution", although I am paraphrasing. Then at 91, in the last paragraph of 15, in the middle of the page:

> "In connection with the exercise of its powers, trusts, authorities or discretions, including but not limited to those in relation to any proposed quantification, waiver, authorisation ... the bond trustee shall have regard to the interests of the bondholders as a class [as a class] and shall not have regard to the consequences of such exercise for individual bondholders resulting from their being for any purpose domiciled or resident in or otherwise connected with or subject to the jurisdiction of any particular territory ..."

We say that that is a very clear statement, in fact a binding agreement that the trustee could ignore Everest. It was only obliged to have regard to the majority in the commercial democracy. That is the bond trust and the bond conditions.

My Lord, would that a convenient moment?

MR JUSTICE LEWISON:    Are you going on to something else now, are you, Mr Millett?

MR MILLETT: I am going on to make a number of submissions about that.

MR JUSTICE LEWISON: All right. Let us break there and resume again at 2.00pm.

(The short adjournment)

SUBMISSIONS BY MR MILLETT (continued)

34

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 34