**A**

MR MILLETT:  My Lord, may I begin by raising a timing matter.  I hope very much that we will finish this afternoon.  Mr Malek is concerned that we might not, in which case that is something we may have to raise with you later in the afternoon.

MR JUSTICE LEWISON:  Let us see how we go.  I was rather hopeful that we will finish this afternoon, even if it is a little late.

**B**

MR MILLETT:  Having taken your Lordship on that tour of the trust deed and the conditions, one comes back to clause 10(ii) and clause 13 of the conditions, which we started with.  One can see straight away, really two things.

First of all the expression "enforcement of the bonds" or "enforce the performance of the bonds", cannot sensibly be limited to claims in debt or specific performance, or even damages for breach of contract.  Otherwise one of course could escape the strictures of clause 10(ii) and 13, and thus frustrate their purpose by framing such a claim in some kind of tort or other delict that one might happen to find in the law books of some distant American law library.

**C**

More importantly, the provisions have to be read in the light of what they are designed to prevent; namely multiplicity of suit at the hands of the bondholders for their aliquot share.  These provisions are designed to prevent competition between the bondholders *inter se*, and they are primarily to protect the bondholders from each other.  They are also designed to protect Elektrim from multiplicity of suit and to protect the trustee from competing with individual bondholders.  There is a tri-fold benefit and purpose.

**D**

They plainly catch any claim by a bondholder to enforce or to vindicate a right that a bondholder has under the bond or in relation to his rights under the bond, by virtue of his status as such.  It does not catch purely personal claims, for example, personal injury of defamation.  Clearly, if a bondholder was tripped up going down the stairs by an employee of Elektrim, that would not be caught.  That is obvious.

**E**

MR JUSTICE LEWISON:  Let me put a slightly different example to you, which derives in part from the amended complaint.  Suppose a bondholder says, "I was assured by Elektrim before I bought my bonds in the market that it had assets of € 3 billion, and on that basis I bought the bonds thinking that there would be a contingency payment in due course.  In fact, the representation was fraudulently made and Elektrim did not have any of those assets at all."  Would he be entitled to say, "That was a fraudulent misrepresentation made to me personally, not as a member of a class but as an individual bondholder?"  I spent X on buying the bonds, which I would not have spent had the representation not been made.  What I sue for is a difference in X, which I spent, and the value of the bonds that I, in fact, bought".

**F**

**G**

MR MILLETT:  Three things about that: first of all, that is not the claim.

MR JUSTICE LEWISON:  No.

MR MILLETT:  You are clear about that.  Secondly, the answer to that is if the representation was made to a person about to buy a bond and he was influenced or induced by that representation made to him personally (and it does not matter for

**H**

35

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 35

this purpose whether it was made to him personally or to a class of people of
whom he is a category), then I quite accept he would have a claim in damages for
deceit, which would fall outside.

The reason for that, what analyses it, is because the claim is not brought by him in
right of a bondholder.

MR JUSTICE LEWISON:  No, he is saying he never would have bought the bond in the
first place.

MR MILLETT:  Exactly.  That is the point.  The claim has to be one, because it is not a
claim that is held in trust, the trustee would have to say, "This is nothing to do
with me".

In a sense, that is my case, because at best that is what this claim is.  In fact, as I
say, there is a shadow of that in the allegations of fact in the amended complaint
we are going to see, but that does not actually translate into a claim for relief.

The claim for relief is put fairly and squarely on the fact that Vivendi said it was
misled into going along with the withdrawal of the petition.

MR JUSTICE LEWISON:  Yes.  There is an allegation about representation of assets,
but looking at the complaint it does not seem to go anywhere.

MR MILLETT:  No, it does not go anywhere.  It runs into the sand.  Can I take you next
to the deed of acceptance, because the deed of acceptance, although, of course, it is
a post-contract document, it cannot be used as a suit of construction, is a very
important clue as to what it was that has been assigned.  I am not on the
construction point in essence here.  I am really looking at what it is, or what *locus*
Vivendi has to make claims, because they can only make the sort claims that they
have bought, and it is important to see what it is that they have bought.

The deed of acceptance is in bundle G, tab 39 at page 351.  You have been shown
this already by Mr Miles this morning for a slightly different point.  I would just
like to ask you to highlight one or two important parts of this.  It starts off,
naturally enough, identifying Everest Capital as the assignor and Vivendi
Holding 1 as the assignee:

> "In the third recital, whereas the assignor proposes to assign to the
> assignee all of the rights to the assignor [et cetera] in the amount
> equal to € 38.3 million, along with any and all rights of assignor
> under the bond documentation, together with all current and
> potential causes of action and claims in law and equity known or
> unknown, but not limited to …"

And then there are some things set out.  At the end of that you see:

> "All the bondholders October 27th withdrawal of their bankruptcy
> petition against Elektrim in Polish court."

Then under section 2, which is the operative assignment:

> "The assignor hereby assigns and sells to the assignee all of the
> rights of the assignor as a holder of the Elektrim bond, to the extent
> of the assigned amount together with all current and potential
> causes of action and claims in law and equity known or unknown,
> including …"

36

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 36

**A**

And it goes on. Then:

> "... and the assignee hereby accepts such assignment from the assignor and assumes all of the obligations of a holder of the Elektrim bonds including all obligations set forth in the bonds documentation."

Then it goes on in the last sentence at the very end to say that:

**B**

> "The assignor secedes to the rights and to be obligated to perform the obligations of a holder of the Elektrim bonds in the assigned amount."

It is quite clear that what is being assigned is the bond and the rights there under, and the reference to all current and potential causes of action are those which go with the bond, they run with the bond. They are claims and causes of action, which are incident to it. It is not any old personal claim that General Motors or those holding the rights on its behalf as the trustee happen to have.

**C**

My Lord, section 5 on page 352, Assignor Representations, really makes that point crystal clear. It says:

> "(a) the assignor is the sole legal and beneficial owner of, and has good title to, the Elektrim bonds."

**D**

That is what it is conveying with good title. They reference there to the claims. That is really the theme, but what Vivendi is acquiring under this assignment is the bonds and the incidental claims, which go with it. That is clear, and for that reason it was not necessary for there to be a separate representation by the assignor that the assignor was the sole legal and beneficial owner of the claims. It was good enough for Vivendi to receive a warranty that the assignor had good title to the bonds, free and clear of any encumbrances.

**E**

Section 8(a) on page 353, Further Assurances:

> "Each of the assignor and assignee acknowledges and agrees that in accordance with the terms of the bond documentation, assignee shall have the same rights and privileges as held by Elektrim bondholders prior to the closing, whose rights and privileges are being assigned to the assignee."

**F**

The closing is obviously the closing of this deed. As Mr Miles said earlier on, (this time I am sure he will associate himself with it) of course it was crucial to this assignment that Mr Torres's representation was true. The claim was all about what Mr Torres did not know, all about Mr Torres not having the award. The main point I make from showing you that is that the claim that Vivendi buys is a bond claim.

**G**

We then turn to the amended complaint, which is in M1, tab 2, page 76. We see how the claim is articulated in Miami proceedings. First of all, page 76, paragraph 1, is brought by plaintiff Vivendi Holding 1 as the assignee of claims relating to bonds. (iii), at the foot of that paragraph, is a very succinct description of what the claim is about:

**H**

> "Conspiring with Elektrim to reduce the total recovery under the bonds, in a manner also designed to defraud other creditors of Elektrim."

37

A

Exactly. If you turn on to paragraph 11, page 78. You will see there is historical reference to 3 March 2005 petition, which was presented by LDTC acting on behalf of the Elektrim bondholders (correctly, that is right) to do a number of things. First of all:

> "To put Elektrim into bankruptcy, (b) to put an end to the assets dripping, alleged assets dripping of Elektrim, (c) to recover assets that had been fraudulently transferred from Elektrim, and (d) to liquidate Elektrim and use its assets to repay the bondholders and enable them to recover the equity kicker's full value."

B

That is what the purpose of the petition was. You see references throughout that paragraph to the bondholders. That is the entire class, the entire corpus of bondholders, and to enable them, the class, to recover the equity kick or contingency payments for full value.

C

I should make the point that this allegation must proceed on the implicit assumption that Elektrim was insolvent, because otherwise it would not be necessary to recover the stripped assets in order to repay the bonds.

We then move on to paragraph 38, which you find on page 86. Your Lordship sees throughout that paragraph continuous reference to the interest of the bondholders, the 4 October hearing, particularly over the page at the top of 87.

> "... even though the adjournment was against the interest of the Elektrim bondholders."

D

Again, it is a class reference. Paragraph 41, a little bit lower down the page, October 27 LDTC:

> "... without disclosing to Everest the knowledge, (you have seen that already) withdrew the bankruptcy petition, irreparably damaging plaintiff."

E

The withdrawal of the bankruptcy petition was something that affected the entire class. You see that it is the pleaded cause of loss. The pleaded cause of loss here is the withdrawal of the bankruptcy petition. That is very important. It is important for a number of reasons. First, the withdrawal was a class event, and I mean by that, that the effect of the withdrawal must have affected all bondholders' legal rights equally in the same way. It may very well be that commercial interests diverged, but their legal rights were affected equivalently.

F

Secondly, as you have already seen, the petition was brought by the trustee on behalf of all the bondholders and it was brought pursuant to clauses 9 and 10(1) of the trust deed. It could be withdrawn by the trustee exercising the same power, and had General Motors known "the truth" as it now calls it or did before the abandonment of that point, it would not have been able to stop the withdrawal. In any case, and I have made this point this morning already, clause 17 binds Elektrim and all the bondholders to that result as a matter of contract.

G

Thirdly, because of the reference I showed you this morning at section 2(1)(g) on page 16 of bundle M1 within the trust deed, the references to proceeding for enforcement of rights of creditors includes bankruptcy proceedings in Poland and therefore, (and again this echoes a point my learned friend, Mr Miles, made this morning) General Motors at that date would not have been able to present its own

H

petition, not only because it would not have had *locus standi* but also because the majority had said withdraw.

Fourthly, the withdrawal was because the petition debt was to be paid in full, (that was the main reason) and it was to be paid in full for the entire benefit of the entire body of bondholders *pari passu* as a class. Had the bankruptcy debt not been paid, which was the flip side of the petition going ahead and not being withdrawn, then the trustee would have had to have proved on behalf of all the bondholders, again as a class.

Therefore the reference to irreparably damaging plaintiff in paragraph 41 is a reference to damage to General Motors *qua* a member of the bondholder class. It was damaged in its right as bondholder, not in any separate right.

Paragraph 45, this, my Lord, is not merely simply sloppy drafting. It is highly telling. It refers to the sale including all current and potential causes of action and claims in law relating to the bonds, and Vivendi make a virtue of this, and they make a virtue of saying that they have the same rights and privileges as held by the Elektrim bondholders prior to the closing. In other words, all the rights as a holder of the bonds as a single package of rights, which includes claims.

We then go to count 3 on page 93, which is the guts of the claim against Elektrim. You have already picked up the allegation at paragraph 67, about the purchasing of the bonds. I have made that point and covered it already. I will not go back to that.

Paragraph 70, page 94:

> "All the false statements were made pursuant to a conspiracy between those identified to mislead the Elektrim bondholders. (and then the last sentence) As long as the bankruptcy proceeding remain pending, the PTC shares that Elektrim have illegally transferred to DT could have been recaptured as fraudulent conveyances to the benefit of the plaintiff."

This is the point again that my learned friend Mr Miles showed your Lordship this morning and made some points about. The key point here is that surely that recapturing would not have been for Vivendi's benefit alone, that the true position is that the PTC shares would have been recovered for the benefit of the entirety of the solvent estate of Elektrim, in which the trustee would have approved for the benefit of all the creditors *pari passu*, and the benefit that they plead, for the benefit of the plaintiff, is simply a better dividend than the winding up. It is not actually the recovery of the assets or their value. It is just a boost to the dividend, because the assets of Elektrim's estate would be swelled by the recovery made of the PTC shares by the trustee.

That is a loss that is felt by GM in its capacity as bondholder. In fact it is actually a loss putatively, on the hypothesis that Elektrim was bankrupt and had gone into bankruptcy, in its capacity as an unsecured creditor.

The same point I make, one finds again and again, paragraphs 73, 74, 75 and 77. If you note the same articulation by Vivendi, this damaged the bondholders, is repeated by Lanny Davis in his second witness statement. (I will just give you the reference. It is paragraph 8 in bundle I, tab 56, page 563)

We say that paragraphs 74 and 77, particularly, of the amended complaint really reveal the truth, or the truth floor, for the loss to General Motors is the loss to the Elektrim estate of the PTC shares. It is not a loss to the individual bondholders.

And one can test it under the absurdity of this claim, or its true nature, by proposing two contrary hypotheses.

If Elektrim became bankrupt (just imagine), it is not the bondholder, any particular bondholder who could use the bankruptcy proceedings to recover the allegedly stripped assets. The trustee in bankruptcy would do that. You cannot have creditors coming in and saying, "I am an unsecured creditor, because I had an expectation of receiving something under the equity kicker, so I am going to come along and see what I can do to get these assets back". The trustee would say, "Go away. That is my job. I will do that for the benefit of everybody and we will see where we get to." The plea at paragraph 74 that General Motors used the procedure is not just bad but it actually reveals the true character of the claim.

That is on one hypothesis. If Elektrim did not become bankrupt, then it is the trustee who recovers the PTC shares or their lost value, and he does that by suing for damages for breach of contract, as he has in London, alleging a breach of clause 15(1)(a) of the trust deed.

In fact, so far as the PTC shares are concerned, those were held by Telco. They were owned by Telco. Telco was owned 49/51; 49 by Elektrim and 51 by Vivendi Universal. The PTC shares represented almost the entirety of the value in Telco, or ET. The Telco shares were, as your Lordship knows, pledged to the trustee under a pledge agreement, which formed part of the security for Elektrim's liabilities as guarantor under the bond.

If the value of those shares was destroyed by Elektrim because Elektrim, as it is alleged, stripped out the PTC shares at an undervalue and sent them off to DT, as part of this conspiracy, then the trustee has a multitude of remedies at its disposal. It sued us in London for damages for breach of contract, but it could have, if it had wanted to, enforce the security; it could have used Citibank as the security agent; it could have appointed a receiver to get the assets back and could have claimed damages for the bond condition 8, which relates to security.

My learned friend makes a lot of the fact that the claim in London does not include a claim in relation to the PTC shares (that seems to be his big point), but it could if the trustee applied successfully to amend it. I am not saying I would not resist that because that is another bit of litigation, but the point is that if the trustee wanted to do that, there is nothing under its powers to stop it. Indeed, the claim is one which the trustee would bring on behalf of the bondholders as a class.

That, my Lord, brings one simply to the following conclusions. General Motors claim, now transferred to Vivendi, is something that it did not have other than in its capacity as a bondholder under the bond, and that was a right to enjoy the full value of the contingent payment.

The loss of that value is a loss to the bondholders as a class, in respect of which only the class through the trustee may sue. It is not a loss in respect of which each bondholder *sui generis* may sue, is not a claim held by each bondholder in his own personal interest, regardless or outside the bond.

The claim is framed in tort, but it is for a loss of contractual rights under the bond and it is caught by the no suit covenant. If it is not, then it exactly identifies the exposure to the problem about double jeopardy that I will come onto in a moment. But as I say, clauses 10(2) and 13 were exactly designed to preclude the bringing of multiple suits by various bondholders for their aliquot share.

It is no answer, as Mr Malek says it is, but it is not. It is no answer for him to say that this could all be dealt with in the Florida court by the giving of some kind of credit. If the purpose of the clause is to stop Elektrim from being harassed by

40

multiplicity of suit, or to stop the other bondholders from having to have the unpleasantness of competition from one of their number, then it does not help Mr Malek to say that the vice is avoided by some court somewhere making a particular order to help out. On that basis, Elektrim could be exposed to multiple claims and actions all over the United States by lots of bondholders, each for their aliquot share. A muddle would result. That is what this clause is designed to stop. My Lord, those are my submissions on my first point. If I am right about that, we need not get to double jeopardy. Let me take double jeopardy very quickly. There is plainly a clear overlap between the trustee's claim in London for the damages for breach of clause 15(1)(a) of the trust deed and the asset stripping claims in the Florida action. My learned friend has no answer to that.

So far as the PTC shares go, we remain in danger, were the trustee to bestir itself, of a claim in relation to the PTC shares. I do not want to speculate about why the trustee has not sought to amend to pursue us in respect of the PTC shares. I shall leave that for another time. But it is for the trustee to decide for itself, in the exercise of its trust powers under the bond, whether to amend to pursue that claim. The suggestion by Mr Malek that we should apply (he says this in his skeleton) to stay the contingent payment proceedings is an odd one, not least because it looks as if you would not be able to achieve the acceptance or consent of the trustee to any such position. So, there would be resistance from the trustee and so I am not going to stay these proceedings. I am going to bring them here and they are jolly good proceedings.

It is a bizarre suggestion that somehow we should apply to the English court to stay proceedings to which Mr Malek's clients are not a party. It is an equally bizarre suggestion that we should apply to the Florida court because we, I imagine, be opposed there.

So far as double jeopardy is concerned, it is of the essence of vexatious behaviour. You have at tab 5 of our Authorities bundle, the ANZ case. Can I just show you? It is an interesting case, if not only from the point of view of history. It is a pre-Angelic Grace case and in a sense has to be read in that light. The facts are quite interesting. It was a case which concerned a Queensland company in Australia.

MR JUSTICE LEWISON: I have actually read this relatively recently. Go on.

MR MILLETT: Very quickly, my Lord, it wanted to raise capital by placing some shares. It entered a placement agreement with the defendant bank and five other brokers. There was a dispute broke out and the plaintiff sued the bank in England without the brokers to recover some fees paid on the basis that there was some kind of proprietary claim an allegation of claim which Hoffman J, as he then was, later rejected.

The bank counterclaimed for damages, namely, its remuneration on a *quantum meruit* basis. There was an order 14 application. That was not pursued. Then the plaintiff invited the defendant to stay the counterclaim and to pursue it in Queensland, which the defendant declined. The plaintiff then, whilst its action in England was proceeding, sued the bank in Queensland, together with the five brokers, alleging breach of the placement agreement plus a whole lot of claims in tort. In fact, there were two other actions as well, which complicated the matter.

The issue of whether the bank was entitled to damages for repudiation of the placement contract arose both in England by way of defence and by way of a

41

**A**

counterclaim as well and in Queensland. The real difference was that the brokers were not a party to the English action but were in Australia. So what happened is that the plaintiff then applied to the English court to stay the bank's counterclaim and offered to stay its claim but the defendant said, "No, I want my claim litigated here". When the application came before the Vice Chancellor, Sir Nicholas Brown-Wilkinson, essentially as a Spiliada stay application, not an anti-suit. That is because in 1989 the Court of Appeal had not yet had its Angelic Grace revelation. It is rather pictorial.

**B**

If your Lordship goes to page 5 of 8 (I am afraid this is a printout), the second paragraph. In fact, to save time, would you mind simply reading the second paragraph down to the end of the penultimate paragraph.

MR JUSTICE LEWISON: Yes. (pause) Yes, I have read to the end of the penultimate paragraph.

**C**

MR MILLETT: I am grateful. That really makes the point. The essence of it is that where a defendant is exposed to two sets of proceedings, and certainly those which cover exactly the same remedies and relief, then the plaintiff is really required to elect which he pursues. It is not simply a question of stay. The action has to be dismissed. My Lord, the key sentence here is actually the one at the end of the first paragraph that I asked you to read, where Vice-Chancellor Brown-Wilkinson says:

**D**

> "In my judgment, where a plaintiff seeks to pursue the same defendant in two jurisdictions in relation to the same subject matter, the proceedings verge on the vexatious. I am not suggesting in any sense that the plaintiff in this case was being deliberately vexatious but the outcome is vexatious."

**E**

We would say that not only would the outcome be vexatious here but actually they are being pursued vexatiously too. But for that purpose I will come back to that. I hang myself on Mr Miles' coattails, as well as on my equity kicker 6(k) point. But even if not intentionally vexatious, the result is vexatious because we are being exactly exposed to double jeopardy. I accept that for the moment, for the time being, the PTC shares are not a part of the contingent payment claim in London. If Mr Miles were to be able to guarantee that they would not be, then that would be a different situation. But he is not and I do not expect him to.

**F**

If Vivendi were to opt out of the contingent payment claim in London, that would not help Elektrim either because the trustee still continues that claim for the benefit of the 92 per cent of the rest of the bondholders. We are still exposed to multiple claims, still exposed to the risk of inconsistent judgments and it is still vexatious. One cannot simply divide up the claim in that way by reference to the possible distribution at the end of the day.

**G**

So, we say that it is entirely vexatious that this claim should be brought in circumstances where the trustee is the guardian of these very claims and is pursuing them.

Can I just also show you or perhaps for your note, given the time, just ask you to look very quickly at Glencore International v Exeter Shipping Ltd EWCA Civ 524. That is at tab 7 of our authorities bundle. This is an anti-suit case. I will just read the head note. The facts are extremely complicated. The litigation in which

**H**

it arose was enormous and I do not want to go too deeply into the facts unless you

42

feel it necessary. It is paragraph 3 of the head note on page 3 of the report. It is halfway through the head note, just between C and D:

> "The inference to be drawn in the circumstances of the case was that the year's proceedings were simply part of a deliberate strategy of harassment and vexation designed to wear down the applicant by making it as difficult and as expensive as possible for it to bear the burden of litigation on several fronts. In those circumstances, where the respondents have been able to show no legitimate interest in pursuing their claims in the United States and where not prejudice to them had been or could be suggested if they were restrained from proceeding there, the conclusion that they had acted against conscience was a proper one to reach."

My Lord, we say this: that there is simply no evidence at all before you, or, to my knowledge, in existence, that Vivendi has asked the trustee to amend its Particulars of Claim in London to bring in an allegation of stripping of the PTC shares. There is no evidence that it has even tried to go through the hoops required of it under clause 10(2). There is no evidence as to the legitimacy of the Florida claim at all. No reason is given as to why it is being pursued. I entirely align myself with Mr Miles' submissions in that respect from this morning. What goes for LDTC in that regard goes also for Elektrim. We say, in the circumstances of this quite extraordinary case, there is no legitimate interest in the Miami proceedings. They are designed to harass and vex not just the trustee but Elektrim. Elektrim is exposed already to a claim of exactly this kind. Things might be different if Vivendi had asked the trustee and the trustee had refused to bring his case but he has not and that is that.

Finally I turn to the 6(k) point. We make this point as a third point and a fall-back point but I make it nonetheless for this reason. When one actually understands the claim and actually looks at the bond conditions, it becomes quite clear that the amended complaint is bad on its face and you actually work out really how this claim works, it is completely and utterly unsustainable against Elektrim.

Can I just ask you to go back to bundle M1 of the bond conditions. 6(k) is at page 70. I am going to ask you at the same time to pick up paragraph 53 of my skeleton. We will take this slowly. Before one dives into the mechanics of 6(k), just to repeat or remind you of the logic of the claim, it works, as far as we can see, like this, that if Everest had known, I say, the truth about the sale of the PTC shares and the award, then it would have objected to the withdrawal of the bankruptcy petition. There is a slight problem with that as a premise. But I will not go over that ground.

Secondly, it then says that Elektrim would have been made bankrupt on 27 October and then the trustee could have pursued recovery claims of these assets allegedly stripped out at an undervalue. That would have swelled the bankrupt estate for the benefit of bondholders and that would have meant that there was a bigger dividend. That is the logic of the claim. I am not sure that it is alleged that the recovery of the PTC shares would have put Elektrim back into solvency. I simply do not know. That is possible, I suppose. But it is not alleged either way. But the logic is hopeless. It does not work at all. Leaving aside the facts about whether or not the tail could have wagged the dog and about what Mr Torres knew, which my learned friend Mr Miles has dealt with already, let us just assume

43

for this purpose that somehow a bankruptcy order was made on 27 October because that is the hypothesis on which the entire claim works.

The short answer to that is: the equity kicker was not payable on 27 October. It was therefore, at best, a contingent claim at that date. The effect of the bankruptcy would have prevented the equity kicker from ever falling due. That must be the case if there were an insolvency. As I say, the entire premise of the bankruptcy petition was that Elektrim was insolvent. So it falls to pieces at that point.

But even if it does not, there are three other problems with it, which are all independent. The bond conditions work on the basis that the contingent payment is an extra, if you like. It is something that proceeds on the basis that everything has gone well: Elektrim was solvent, it has repaid the bonds and this is essentially a profit share for the bondholders who have helped Elektrim through its troubled times. That is what this is about.

My Lord, page 70, (k), contingent payment. Let us just chase this through:

> "The guarantor will pay an amount equal to the contingent payment, if any [If any is important. There may not be some.] to the bondholders on the contingent payment date. [That is a defined term.]   The contingent payment will be distributed to the bondholders pro rata to the principal amount outstanding of the bonds that they held immediately prior to the final redemption of the bonds on the repayment maturity date [that is 15 December 2005, see condition 6(a)] in accordance with condition 6(a), or, if earlier, immediately prior to the final redemption payment in respect of the bonds, the final date."

So the contingent payment was to be paid or distributed prior either to final redemption or an earlier redemption, not after.

Then two paragraphs down:

> "The bond trustee shall be entitled to assume that no contingent payment is due under this condition 6(k) unless and until expressly notified to the contrary in writing by the guarantor, and, if so notified, the bond trustee shall be entitled to rely absolutely on any certificate signed by any two directors of the guarantor as to the amount of the contingent payment without being obliged to investigate or verify the accuracy thereof, the certificate binding on the bond trustee and the bondholders in the absence of manifest error. For the avoidance of doubt, the obligation to make the contingent payment under this condition 6(k) is an obligation of the guarantor."

That does not really take one forwards. Then at the top of 71 contingent payment is defined. It is a formula equal to the relevant proportion (that is defined; that is an important definition and we will come to it) of the fair market value minus two things: minus a figure under 2(a) and half the costs of the evaluation exercise of fair market value under 2(b). You can ignore the interest. Then contingent payment date means a business day falling no later than 180 days after the contingent payment termination date, as the guarantor may select and notify as such to the bondholders in accordance with this condition 6(k). Then contingent payment determination date is defined. It is a date falling after but no later than 20 business days after the earlier of:

44

A

"(i) the date on which the guarantor publishes its annual audited consolidated financial statements for the year ended 31 December 2005."

And another date, which, in this particular case did not become relevant.

So, pausing there the contingent payment determination date, which was the date on which the contingent payment was determined, fell within 20 business days after the date of publication of the 31 December 2005 account, which, in this case, was 13 June, as a matter of public record, 13 June 2006. That is when the relevant financial statements were published. That means that the contingent payment determination date fell no later than 3 July 2006. That means that the contingent payment date was a date no later than 180 days after 3 July 2006, namely 30 December 2006.

B

C

What was the position as at 27 October? Answer: the contingent payment determination date had already fallen and therefore Elektrim had to 30 December 2006 to select a contingent payment date, i.e. the date on which it was going to make the payment. (overspeaking) done so --

MR JUSTICE LEWISON: It is not that the determination date had fallen. It is that the period within which the determination date could be selected had been begun to run.

D

MR MILLETT: That is right. Yes. That is right, exactly. That is right. As at 27 October, Elektrim had not selected a contingent payment date and was not yet obliged to have done so because there were still some months to run.

Just pursuing this, I can just identify -- yes, it is worth pointing this out. There is a proviso after the definition of contingent payment determination date that in the event that the bonds had been redeemed in full at the adjusted principal amount, together with the accrued interest, then the guarantor had an election that the contingent payment determination date should be the date of the publication of the accounts for the year immediately following the redemption. But we are not in that territory. Fair market value is the expert determination, effectively. I need not trouble your Lordship with that. Needless to say, none was done.

E

Then over on page 72, relevant portion. You can ignore (1) and (2). It is (3) with which we are concerned. In the event that the final date (and you have seen the definition of that two pages before) occurs on or after 1 January 2005, on or before the repayment maturity date, then the relevant portion was calculated in accordance with the formula set out there. If, therefore, there was no final date, which there would not be if the bonds had not been redeemed prior to the repayment maturity date, then there was no relevant proportion. What that means is, really, two further things. We set these out at paragraphs 58 to 60 of our skeleton. Even if on 27 October Elektrim somehow remained under an obligation to select a contingent payment date, not withstanding that it had gone into bankruptcy, then nothing would be payable at all

F

G

MR JUSTICE LEWISON: Sorry, just before we get there. Can I just ask you to look at 56 of your skeleton. You say the obvious effect of the bankruptcy, the bankruptcy order had been made on 27 October, would be that Elektrim could not thereafter select a contingent payment date.

H

MR MILLETT: Yes.

45

A

MR JUSTICE LEWISON: I have put in the margin, "Why not?"

MR MILLETT: Because it is bankrupt.

MR JUSTICE LEWISON: So what? Why cannot it select a date, being bankrupt? It does not cease to exist. It is not dissolved.

B

MR MILLETT: No. My Lord, that is right. But if it is bankrupt, there is only a point in selecting a payment if they are going to make a payment.

MR JUSTICE LEWISON: So it is not that it could not. It is that there is no point in doing it?

MR MILLETT: Yes.

C

MR JUSTICE LEWISON: This is not an independent point.

MR MILLETT: No. It is because of what happens next.

MR JUSTICE LEWISON: Yes. That is right.

D

MR MILLETT: But I make the point also that there is now a negation by Vivendi as to how it could or would have done.
But we go on. Paragraph 58, even if somehow that was something that could be done, we say, nothing would be payable. That is because, as I have shown you, the contingent payment itself is fixed by reference to a formula involving the relevant proportion. In a nutshell, the relevant proportion is based on the assets as

E

per the audited accounts for the year to 31 December 2005. If Elektrim were insolvent on 27 October, which happened to be the date of the hearing, that would relate back to the date of the petition, which was March 2005, as it must do, because the court would say Elektrim was bankrupt the date of the petition being presented. Therefore there simply would be no net assets in the 2005 accounts to be able to form the basis of the calculation of a contingent payment. There is no plea in the amended complaint to the effect that the accounts showed a net asset

F

surplus. It would be very odd if there were. That plea is critical.

MR JUSTICE LEWISON: This is why I am getting … You were making submissions a few minutes ago about the final date and the relevant proportion. The relevant proportion, as you pointed out, differs according to when the final date occurs. The final date is itself defined by a reference to the final redemption of the bonds.

G

MR MILLETT: That is right.

MR JUSTICE LEWISON: So if the bonds are not finally redeemed there cannot be a final date.

MR MILLETT: That is right, my Lord, yes. That is right. That is the point I am making in paragraph 59, and, indeed, 60. There are two points here and perhaps I am taking them in slightly the wrong order. But the final date point (it is a simple

H

46

A    point; perhaps I have expressed it at greater length in the skeleton) is that in order for the contingent payment obligation ever to be triggered, you have to have a final dates. It does not work without one. There was not a final date in this case because --

MR JUSTICE LEWISON: If Elektrim had not or did not redeem the bonds in full, there never could be.

B    MR MILLETT: Correct. That is not to say, as I have covered it in 60, that the failure could not be traceable to a breach of contract. But all that would mean is that the contingent payment rights would be converted into a secondary claim for damages. What you do not get is the contingent payment rights. You get a damages claim. Those claims, again, are being pursued by the trustee already anyway. But there is nothing extra. But the point is that the original right to the contingent payment claim has gone by reference to the default. That makes commercial sense because

C    the whole basis of this was that it was a contingent payment plan based on Elektrim doing well, or, as Mr Malek's clients have described it, it was an equity kicker. You do not get an equity kicker if the company is in default.

That is the first point, which is the final date point. I expressed it or drafted it as a second point in the skeleton but is does not much matter.

The other point, which I set out at paragraph 58 is a calculation point based on

D    what would be due. We say, and, again, simplifying it, if Elektrim was insolvent on 27 October 2006, which one has to assume, on the basis of Vivendi's case, then there certainly would not be any net assets at that date. There would not be any as at 31 December either because, of course, the whole hypothesis of the petition was that Elektrim was insolvent when the petition was presented, which was in March or 2005. That means that there is no plea and can be no plea that the 31 December 2005 accounts could show a net asset surplus. If they do not show a net asset surplus then you do not get a contingent payment claim. The reason why

E    you do not get a contingent payment claim is because of the definition of fair market value, which I have not shown you and I will. Fair market value means the fair market value of the assets of the guarantor, including, without limitation, the guarantor's interest in any affiliates but excluding the receivables after deduction of any debt but excluding contingent liabilities or amounts given in respect of working capital and assuming that the guarantor has no obligations in respect of the contingent payment (so you discount that) as determined on the contingent

F    payment determination date by two leading investment banks of international repute. The mechanics of how they get to their two valuations and join them up is then set out.

The key point is that it is based on the fair market value of the assets of the guarantor after deduction of, essentially, liabilities as described. If, therefore, the guarantor does not have assets after deduction of debt, which, on the hypothesis of petition it did not, based on the relevant accounts, nothing due, as simple as that.

G    This a very interesting intellectual puzzle perhaps for the trustee to grapple with at some later stage. But at the moment I am dealing only with the claim before you, namely, the amended complaint. There is no hint of any explanation as to how this is to be grappled with by Vivendi in its amended complaint. It just says that, "We lost the value of the equity kicker". But you can see from the contract -- all

H    you have look at is the contract and the fact of the bankruptcy petition and its basis

47

A   in order to see that, *ex facie*, this claim is hopeless, hopeless for any one of those reasons.

Finally I do align myself entirely with what Mr Miles said this morning about the claim so far as his clients are concerned because what goes for his clients also goes for my clients. For those reasons; all of those reasons or any of those reasons, you should continue this injunction.

Finally, in the very last paragraph, I think, of my skeleton argument we have invited your Lordship to make the order a final order, a permanent injunction on the basis that this is the trial of the action. There has not been any debate about that yet and perhaps we will come to that at a later stage maybe.

MR JUSTICE LEWISON:  I can do that by consent or I can do it on a part 24 application. But those are my only powers, I think. That is probably right.

MR MILLETT:  Unless I can assist your Lordship further, those are my submissions.

MR JUSTICE LEWISON:  Thank you very much.

Yes, Mr Malek.

## SUBMISSIONS BY MR MALEK

MR MALEK:  Thank you, my Lord. What I propose to do is to cover four areas: first of all to make some general points, secondly to deal with the principles relating to anti-suit injunctions. I will then consider Elektrim's anti-suit injunction and then I will look at the trustee last of all. I know time is tight and I know that you read our brief submissions.

MR JUSTICE LEWISON:  I have, yes.

MR MALEK:  So I am going to do my best not to repeat them. Against that background I hope I shall be able to take points briefly. As far as the general points are concerned, the first point I think I have probably covered already, which is confirming that we are not pursuing fraud allegations against the trustee. What I had hoped to do was to give up to your Lordship a blue pencil amendment complaint and although I think I am almost in a position to do so (Mr Quest has been working on it) I would like to look at it. What I will do, if this is satisfactory to your Lordship, is to provide you with one of those documents as soon as possible. But I do not think I am going to be able to do it this afternoon.

MR JUSTICE LEWISON:  Not least in view of the time, I am not going to give a judgment this afternoon, so --

MR MALEK:  Yes. So you will have it on Monday.

MR JUSTICE LEWISON:  Yes, fine.

MR MALEK:  What we will do is simply do it with a blue pencil just to make it clear that the fraud allegations are not being pursued against the trustee. It is not going to be an amended complaint. It is just that we are going to be dealing with that.

48

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 48

**A**

MR JUSTICE LEWISON:  No, I follow.  But there are allegations of fraud in the narrative --

MR MALEK:  Exactly.

MR JUSTICE LEWISON:  -- which are in formal terms incorporated into counts 1 and 2 and I just want to see which of those, if any, are still relied on.

**B**

MR MALEK:  You are right to raise that point and we will deal with it.
The second point, related to the first point, is, in fact, the scope of the claim, that we are not seeking any relief in connection with the trustee having distributed the monies that your Lordship is aware of.  If we are allowed to proceed with the Miami amended complaint, the complaint will not have allegations dealing with that, or, for that matter, any other suggestion that the 1 May order was improperly obtained.

**C**

The third point is to answer the question: why have we brought proceedings in Miami?  What is the motivation?  This is covered in our evidence but we accept that acquiring the bonds is not purely commercial.  Mr Lanny Davis explains the position.  He deals with the history of the dealings with Everest and he explains why the Miami proceedings are not a reaction to the 1 May order.  That is explained but the short answer, in my submission, to the report is that if the claim is well founded the question of motivation is irrelevant but if, on the other hand, your Lordship accedes to the submissions that have been made against us that the claims in Miami can be dismissed at this stage as being utterly hopeless, I think questions of motivation do not come into it.

**D**

So, in my submission, the question of motivation is not a relevant factor.  No one is suggesting that the assignment can be struck down on grounds of public policy or that it is (inaudible) or that somehow it is ineffective and does not take effect in accordance with its terms.  As my learned friend correctly pointed out, the relevant issues are natural forum and the question of whether or not the proceedings are vexatious or oppressive.  We have not identified any legitimate advantages, which we would say that we would be deprived of in a trial in London rather than a trial in Miami.  We are not extolling the virtues of jury trials in Miami as a reason why we should go ahead.  It is simply a question of whether or not your Lordship is satisfied that at this stage it can be said that the proceedings are vexatious.

**E**

**F**

MR JUSTICE LEWISON:  Yes.  It is more or less common ground is it not, that England is the natural forum for these proceedings?

MR MALEK:  Yes.

**G**

MR JUSTICE LEWISON:  Miami may or may not have jurisdiction but even if it does it is ...

MR MALEK:  That was going to be my third point but it may be that there is a difference between the two types of claim.  One can see that in relation to the way that the claim is formulated against the trustee, which in essence is a claim based on breach of fiduciary duty; that you have an English trustee and on that type of claim England is a natural forum.  But where the claim is based on deceit in relation to Elektrim and the theory that the relevant fraudulent statements were

**H**

49

A

received and acted upon in Miami there may be a distinction between the two. But you are right, the thrust of my argument is directed to the question of whether or not the proceedings can be said to be vexatious or oppressive.

And the fourth point I was going to make is the one of jurisdiction, which is that there is a dispute and we said in our submission - and this is in paragraph 84-85 - when court cannot decide and is not asked to decide jurisdiction and it appears that that is common ground. My learned friend in his submission at paragraph 119 says the court is not invited to determine that question at this hearing. So it cannot

B

be said that the Miami court does not have jurisdiction and that allows me then to move onto the second topic, which is the question relating to principles of anti-suit injunctions.

It does not appear that there is much of a dispute on this. There are two classes of case. There is first of all the proceedings -- whether the proceedings were a breach of contract and here that affects, as I understand it, only Elektrim's position and as I have said, your Lordship knows. The question here is really one of contract interpretation. Are the proceedings in breach?

C

Then, at the second area, is a question of whether the foreign proceedings are said to be vexatious or oppressive, and we set out the relevant principles. My learned friend draws your attention to the Rabobank case and the remarks of Mance LJ, who in turn commented on what Evans-Lombe J said. I am very happy that he draw that passage to your Lordship's attention but it is right that the passage from the judgement of Evans-Lombe J have been cited in other cases and I think they do

D

give some assistance to your Lordship.

But fundamentally there is really very little difference between us. The only thing I would like to say in terms of the relevant principles is just to say a few words about when can foreign proceedings be said to be vexatious or oppressive? The claims are a rare category and in our submission the test is a high one. I think my learned friend in his skeleton refers to the "utterly absurd", and that seems to be

E

the relevant test and one can see that from the Aerospatiale case and it is worthwhile looking at that very briefly. That is in Mr Miles' skeleton bundle of authority at tab 2. The relevant passage in the opinion of the Privy Council is at 893 and this appears to be where the phrase comes from. It is at (H), <u>Peruvian Guano</u> (several inaudible words) where the Master of the Rolls gave two examples of vexatious proceedings. One, which he called pure vexation, occurs when the proceedings are so utterly absurd that they cannot possibly succeed, and then

F

another occurs when the plaintiff is not intending to (inaudible) and then that is quoted.

The quote from <u>Peruvian Guano</u> at 230 (hopefully I have brought a copy of that). Can I hand up to your Lordship the <u>Peruvian Guano</u> case?

MR JUSTICE LEWISON: Yes.

G

MR MALEK: Just to see how the matter was to apply the Master of the Rolls, and it is quoted at 230. It is at the top of page 230, four or five lines ...

MR JUSTICE LEWISON: I can it, yes.

MR MALEK:

H

"It may be so utterly absurd that the judge sees it cannot possibly succeed and that it is brought only for annoyance."

50

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 50

A    If your Lordship concludes that this claim is utterly absurd, that it cannot possibly succeed and that it is brought for annoyance, then one is within this jurisdiction. In my respectful submission, it is a rare jurisdiction, and the passage from the <u>Maxwell</u> case, which we have quoted in our skeleton submission, makes it clear. This is the passage of paragraph 75 of our skeleton, and what Hoffman J was making clear in that case, in our submission, was that one must ask this question.

B    Why not leave it up to the foreign court to decide this issue? What he says is if a quality of common sense suggest that the foreign judge is usually the best person to decide whether in his own court he should accept or decline jurisdiction stay or allow them to continue.

    Then over the top of skeleton page 3, in other words there must be a good reason why the decision to stop the foreign proceedings should be made here rather than there. That, we submit, is instructive because it does highlight an important point,

C    which is that the question is raised why not leave it to the Americans if these submissions that are being contended are right? That this is utterly hopeless. Then why not leave it to the Americans to decide? In our submission it is considerations of comity that are important and as Hoffman J has therefore said, it is not whether we regard by our standards that the proceedings are vexatious or oppressive that is the relevant test.

    So we come on to the last point I wanted to make by way of comment on the relevant principles.

D    MR JUSTICE LEWISON: Sorry, just before you go on. Might there be a difference between the claim against the trustee, which is a claim for breaches of duties arising under an English trustee governed by English law where an English judge might be better placed to decide whether it is good, bad or indifferent, and a claim which is based on the Florida law of tort where your point may have more force

E    that a Floridian judge may be better placed to decide whether it is good, bad or indifferent?

    MR MALEK: Yes, I accept that. I can see the force that if the question is what are the duties under an English trust governed by English Law, then questions of interference are perhaps less because standing back one might say, well, I am better placed for obvious reasons in determining the question of what the duties

F    are. But I still submit that when it comes to exercising this jurisdiction, which is to be used sparingly, and where the complaint is that the claim is so utterly absurd, there needs to be good reason to show why the matter is being dealt with here rather than in the foreign court. But your observation is right, that that consideration is less powerful when one is dealing with a matter of pure English Law and then the question is, are there any other facts out there that might be relevant and which would need to be investigated before expressing a view finally

G    on the particular point?

    The last point I was going to make is the question of to what extent should your Lordship get involved in what we would submit is a mini-trial because we contend that the merits of a foreign plan are matters for the foreign court. In our submission the task before your Lordship is not to examine the merits of the Miami claim to determine whether they are right or even whether they have reasonable prospects of success and what you cannot do is to look at the evidence,

H    pick out points which are not challenged at this stage, form a view as to who might

51

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 51

win and, in our submission, the relevant enquiry is a very limited one and using the language of the Master of the Rolls is whether or not you can say that the claim cannot possibly succeed and is brought only for annoyance.

Now, the third topic is Elektrim and whether or not the Miami proceedings are a breach of contract and the argument here is that VH1 is contractually prohibited by clause 10 of the trustee from bringing the Miami proceedings. Our submissions on that point are covered in paragraph starting at 53 and the key points are that we are not bringing a contractual claim in Miami against Elektrim, we are not seeking to enforce any contractual provision and that the essence of the claim is that Elektrim made representation that affected the way that the negotiations were conducted that meant that Everest was misled as to Elektrim's asset position and it affected its question to the approach as to whether or not the company should go into bankruptcy.

The simple answer to the question is just simply looking at the language of the contract. Our claims are not to enforce the performance of the provisions of the trustee. That is it, the complete answer. My learned friend has not identified the provisions that we say we are seeking to enforce. Our claim is simply one in fraud and you gave a good example of what happens if there was a pre-contract statement to a bondholder, or for that matter, all the bondholders. Would that be caught? And I think my learned friend accepted that it would be caught because it is not to enforce the performance of the provisions of the trustee.

That is the pre-contract. Let us have a post-contract representation. Let us imagine that Elektrim made a statement to the world and let us assume that that statement to the world satisfies all the requirements of a claim for a fraudulent statement. There was a statement, there was reliance, and there was detriment, causation of damages. It was made to all the bondholders, it was not simply to one bondholder and that affected the way that the bondholders acted. For example, that they decided to either withdraw the bankruptcy or to put it into bankruptcy but let us assume that there was a claim arising out of the fraudulent statement that was made after the bond was entered into and it was made to all the bondholders. My submission, if one looks at the language of clause 10.2, that is not a claim to enforce the performance of the provisions of the trustee and there is nothing to suggest that there is a prohibition of bringing claims of that nature. My learned friend would need much wider language if the intention was to embargo not only claims to enforce provisions of the trust deed but all claims of whatever nature, whether fraud, tort, breach of fiduciary duty, whatever, in relation to the bond and the fact that they are bondholders is neither here nor there. You just have to ask yourself, looking at clause 10, is what is proposed to happen in Miami there to enforce the performance of the provisions of the trustee? In my submission the answer is no.

My friend has come up with a whole series of arguments based on democracy amongst bondholders and the like but, with respect, those arguments take him absolutely nowhere. I suppose it could be put that there might be some sort of implied term but he has not argued that there is an implied term. His argument is based solely on construction and in my submission, if one looks at it solely as a matter of construction, and your Lordship is well placed to apply those principles, there is nothing to indicate that what is happening in Miami is to enforce the provisions of the bond and the points that we made to make that point good are set out in our skeleton starting at 55. We make the point that I do not think has been

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 52

A  advanced by anyone at this stage, which is whether it is enough if the amended complaint covers the same ground as covered by the trustee's existing procedures. We comment on that at 57 and then at 57 going over the page we point out all the differences between the various claims which indicate that although the Miami proceedings and the trustee proceedings have in common that they both seek damages arising out of the loss of the benefit of the equity figure, they raise completely different questions of facts of law and those are the points that we set out at subparagraphs (a) to (e) and I will not repeat them.

B  Similarly the arguments that the Miami complaint are in substance to enforce the terms of the bond, or that the claims could have been formulated in contractual claims, or that we are seeking damages based on a contractual measure not a tort measure. But that is simply not correct. It is a claim tort. We were deprived of access and we are looking at the position absent the deceit. The deceit may have resulted in the loss of contractual rights but it is not a contract claim.

C  That is all I was going to say on the 10.2 point. As far as whether the proceedings are vexatious or oppressive and I am dealing here now only with my learned friend Mr Millett's submission, we deal with that at 65 of our skeleton and the argument is that Elektrim is exposed to double jeopardy.

The first point we make is that this is novel ground for granting an anti-suit injunction. The authorities that my learned friend refers to in his skeleton have nothing to do with anti-suit injunctions and he seeks to explain his lead case (the Australian Commercial Research case) on the basis of well, that was a case that was decided prior to the Angelic Grace. Now, the Angelic Grace (your Lordship has that authority at tab 1 of my learned friend's authorities) it breaks absolutely no new ground at all. It refers to the Continental Bank case and the Australian Commercial case was brought in 1989 which is after Continental Bank and (inaudible) and you see that at column 1 of page 88 so that the timing is Australian Commercial Research (overspeaking)

E  The point we make in our written argument is that this argument based on double jeopardy does not appear in any of the cases dealing with anti-suit injunctions. No one has been given an anti-suit injunction based on the fact well, I am subject to double jeopardy and the authorities that my learned friend cites in his skeleton submissions have nothing to do with anti-suit injunctions. The explanation that he gives for that is that he refers to Australian Commercial Research, which was decided in 1989 and all I am saying is that although he is right to refer to the Angelic Grace, which you will find at tab 1. (overspeaking) the Angelic Grace does not establish any new principle. It does not purport to do. It just simply makes the point that if you have a contractual right not to be sued in the context of the jurisdiction agreement it is easier to get anti-suit injunctions because considerations of comity have less importance because you are simply holding the party to their bargain. But if the anti-suit injunction is not granted then you are depriving the other party of the benefit of the bargain.

G  As far as the double jeopardy point is concerned we deal with that in our submissions in paragraphs 65 and 66 and we make the points in paragraphs 67-72 which indicate that this is not a ground to get an anti-suit injunction and if there is a genuine fear of double jeopardy the appropriate course is not to seek anti-suit injunctions but to apply for a stay of one or other of the proceedings.

H  The last area that I need to cover on Elektrim's case is the question of whether or not the claim in Miami is doomed to failure and if we look at Mr Millett's argument at 52 it seems that the points come down to three areas.

53

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 53

A    The first one is the point at 53 about the effect of majority rule; that we could not have prevented the majority bondholders from taking the course that they did and the answer to that is that that is a factual issue. We set out the case on the facts of paragraph 38 of our submission and that is largely dependent on Mr Torres' evidence about the way that the trustee and the bondholders acted by consensus.

B    The second point (and again this is 53 of Mr Millett's submission) is that it is inconceivable that the Polish Court would have to proceeded to bankrupt Elektrim when it tendered the petition debt. The answer to that is in the complaint at paragraph 33 where the point is made that the money was only made available on the basis of the petition with the withdrawal and that is backed up, if I can give your Lordship the reference, by Torres, paragraph 12 I-57-584.

C    And then the third point he makes is clause 6(k), the point being that the equity kicker would never have become due. Now, your Lordship has heard my learned friend's submissions on that. The first time this point was made was in the skeleton. Let us just go and see if we can understand what the point is. The first point to make is that if this point is valid it affects the trustee as well but what Mr Millett has said is that he has made it clear to my learned friend Mr Miles, that if your Lordship finds in his favour on that he is not going to hold that against Mr Miles' clients in a later case (overspeaking).

D    MR JUSTICE LEWISON: I am not sure I quite understand why it affects Mr Miles. Mr Miles' case, as I understand it, is you, Elektrim, have allowed or caused assets to be removed, thereby not operating your business in whatever the responsible way is that the trustee requires. Therefore you have fewer assets now than you ought to have done. I, trustee, do not say you are bankrupt or should have become bankrupt. All I say is you should have had more assets now than you in fact do. Mr Millett's argument is all predicated on Elektrim being made bankrupt. That is not part of Mr Miles' case so I do not quite understand. I know Mr Millett said that it might affect Mr Miles but I do not at the moment quite understand why.

E    MR MILLETT: My Lord, I said it because Mr Miles wanted me to. I was giving him comfort. I just did not know where the argument was going to go so it was just out of an abundance of caution.

F    MR JUSTICE LEWISON: Yes. At the moment I do not see that it does affect just this aspect.

MR MALEK: That is fine. If that is not the case then and that problem goes away but let us just see if I can follow the argument. It starts off at paragraph 54 and the point being made here is that the contingent payment never fell due and never could have fallen due; therefore there is no loss. The first point is at 56 where it said if the bankruptcy order had been made on 27 October Elektrim could not thereafter select a contingent payment date. But, in my submission, that is a non sequitur. Why would a bankruptcy order prevent Elektrim selecting a contingent payment date? The obligation does not disappear on bankruptcy otherwise Elektrim could always avoid any obligation to make this payment by declaring itself bankrupt.

H    As for Elektrim selecting the contingent payment date, it is clear from the wording itself that if it does not select an earlier date we would submit it is clear that it must

54

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 54

A  fall 180 days after the contingent payment determination date because there would
be no other reason for having a cut-off.
The second point that he makes in 58 is that since Elektrim was insolvent on
27 October there were no assets as at that date or 31 December 2005. The answer
to that is the reason there was an insolvency was that the PTC shares and the other
assets had been transferred out. He says that the contingent payment date was
July 2006 (and that is in paragraph 55.5) but the shares at that date, on the material
before the court, were in Elektrim and therefore the equity kicker was payable.

B  The matters that took place which we complain of took place after July 2006 and
that is the point that is made in the complaint at paragraph 74 where it makes the
point about the transfer of assets out. In my submission, the key point is to look at
the contingent payment date of July 2006, but at that stage the shares were, on
Elektrim's case, still there.
The last point that Mr Millett makes at 59, where he says it was a pre-condition of
the contingent payment obligation that the bonds have been redeemed, or at least

C  final redemption payment has been made. We say that this would make a
nonsense of the structure of this part of the contract, that there is nothing that
makes it a pre-condition that the bonds have actually been redeemed. It only
makes sense if the final date is when the bonds should have been redeemed. The
fact that Elektrim has defaulted on the bonds does not mean that the bondholders
should be deprived of the equity kicker.

D  This is the kind of detail of argument that, in our submission, is inappropriate on
an application of this nature. But, in our submission, you cannot say at this stage,
certainly, that the claim can be dismissed as utterly absurd on the arguments based
on condition 6(k).
The last part of my submission is to deal with the position of the trustee. If we
turn to my learned friend's submission at paragraph 55.

E  MR JUSTICE LEWISON: Mr Millett or Mr Miles?

MR MALEK: Mr Miles. He very helpfully sets out the various factors which render the
proceedings vexatious or oppressive, and what I propose to do is to go through
those briefly by reference to the points that I have made in my skeleton, so that
you have our case on those various factors.

F  The first factor is that we have interfered with the distribution to the bondholders
and that we are somehow acting against the English court process. What my
learned friend says in his submissions at paragraph 60, this relates to the scope of
what you decided on 1 May and what is said is this (this is the last sentence):
      "The court has decided not just that there was no proprietary claim
      but that the trustee was a bona fide purchaser of a value without
      notice of any claim and therefore decided as against the

G  bondholders and Vivendi and Elektrim, that the funds were not
      vulnerable to being recovered."

Although you have seen that there were aspects of the Miami complaint, which, in
effect, sought to deal with matters that were covered in your judgment of 1 May,
we made it clear that we are not pursuing those claims. So really the issue comes
down to —

H

55

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 55

MR JUSTICE LEWISON:  That would include the claim for relief for restraining the trustee from distributing funds; that is all going to go I take it?

MR MALEK:  That is all going to go.  It is our submission that that is, effectively all you decided.  That the matters that we wished to argue based on the alleged breaches of fiduciary duty by the trustee were not the subject matter of the proceedings before you.

You were concerned, in essence, to determine whether or not there was a proprietary claim to the funds held by the trustee and a further question as to whether or not any claim could be met by a bona fide purchase of a value defence.  In the 1 May decision you made it clear that you did so hold, but in my respectful submissions once we strip out the challenges that affected your judgment of 1 May, the arguments based on breaches of fiduciary duty on the part of the trustee, and I will come to how we formulate those matters in a moment, is not a collateral attack, which is the way that the matter is put.  We have dealt with that argument at paragraphs 58 through to 64 of our written submission.

That really ties into the second point which is made against us, which is collateral attack and, in essence, they involve the same or similar issues.  You have read through from 58 onwards, and I do not need to read it out now.

The third point is that the claim could and should have been brought in Part 8 proceedings.  What my learned friend says in his submission at 67 is this, and this really highlights the point in dispute:

> "Second, and in any event, the claims brought in Miami proceedings could and should have been raised in the Part 8 proceedings, the proceedings between the trustee and all the bondholders and the proceedings expressly concern the issue whether the trustee might be liable in respect of the events of October 2006."

In my submission, there is nothing in the material to suggest that was the matter that was being decided; whether or not the trustee had any liability in respect of the events of October 2006.  The proceedings were concerned with a proprietary claim and the question of whether or not there was a defence of bona fide purchase of the value.  They were not that broad and, in my submission, there is nothing in the papers to indicate that the bondholders should have realised that what your Lordship is going to decide was a question of whether or not there might be any liability on the part of the trustee in respect of the events of October 2006.

That leads on to the next factor, which is you should hold now that the Miami proceedings are bound to fail against the trustee and, as I have said, the relevant test is whether or not the claim can be said to be so utterly absurd in the sense that that phrase is being used.

MR JUSTICE LEWISON:  What does that mean?  So utterly absurd that they are bound to fail?

MR MALEK:  It cannot possibly succeed, yes.

MR JUSTICE LEWISON:  Is that not the same as "bound to fail"?  We are just playing with words, are we not?  If I think they are bound to fail then --

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 56

MR MALEK:  You are right.  It is utterly absurd, yes.  That is the test, and bound to fail comes to the same thing.

The point that my learned friend made and which is, I think, a point you were raising with me a moment ago, is the question of whether or not there was any duty of disclosure on the part of the trustee.  There is some common ground between us because the trustee is not saying that he did not owe any duties at all.  What he does say is at paragraph 71, second sentence, of his submission:

"That the duty of care, like any duty, needs to be placed in context."

So the question that arises here is can the question of duty be decided, in effect, at this stage as being bound to fail when, in our submission, there are important facts which we say the court would need to consider before reaching a decision that this claim was so hopeless that it should be, in effect, stopped at this stage and stopped by the English court.

That raises a question of what are the elements of the claim against the trustee in Miami, and the elements are, first of all, that he did owe a duty of reasonable care and skill, and that the scope and extent of that duty is to be determined in context and is susceptible to a factual enquiry.

The second point is although the trustee was bound to act on the instructions of 30 per cent of the bondholders we contend his duty was not only to wait passively for instructions but to ensure that the bondholders were sufficiently informed so that they could act in order to protect their own interests.

The third point is that even though one might say in most cases that this duty may not exist, one needs to look at the present case, which was unusual because of a number of unusual circumstances.  The trustee knew that the PTC shares were a very valuable asset worth between $2 billion to $3 billion.  He knew that if they belonged to Elektrim or to Telco on the contingent payment date, which is supposed to be July 2006, then a substantial equity kicker was payable, and if they still belonged to Elektrim that it would have the means to pay it.  That DT claimed to have acquired the PTC shares for book value pursuant to an arbitration award.  He knew that Elektrim had been engaged in asset stripping activities, as shown by the proceedings in relation to Mega.  He knew that from the 2 October arbitration award the book value of the PTC shares was much less than their market value and that the arbitrators had not, in fact, conferred the rights to 40 per cent of the PTC shares on DT book value, or at all, and that the position remains uncertain.  He knew or ought to have concluded that if the PTC shares had been acquired at book value by DT then there appears to be a significant undervalue and that the sale might be set aside in bankruptcy and, in that case, the large equity kicker payment might be recovered.

The point that we make is that had Everest appreciated these matters then it would have made sense to push on to bankruptcy and to persuade the other bondholders as to its views.  We contend that in those circumstances the duty of the trustee was not simply to wait for instructions, it included a duty to ensure that the bondholders were sufficiently informed in order to give proper instructions.  The pleaded case is at 49 of the amended complaint where the fiduciary duty is pleaded and:

"(c) Failing to disclose Everest's knowledge that DT and Elektrim had gained from the transactions, contrary to the directions of the Vivendi Arbitration Panel."

57

A

Then your Lordship will have to receive a document which crosses out the rest of that. Similarly, over the page:

"Failing to exercise adequate due diligence prior to withdrawing the bankruptcy [that is (g) and (i)]."

It is our submission, that it is a claim doomed to failure. Our answer to that is that that is, first of all, a matter to be determined by the Miami Court but, more importantly, it should be determined by the Miami Court in the light of all the relevant considerations and that it would be wrong, in principle, to say at this stage that that plea, in terms of the breach of duty, is so weak that your Lordship can say now that it is doomed to failure and that it is vexatious to even ask the Miami Court to have that matter determined.

B

There are a number of other points which I need to cover, which I believe I can deal with relatively quickly because I think, to some extent, the submissions repeat and to a large extent anticipate what the other side are going to say. But just to go through the remaining course, if you would turn to Mr Miles' skeleton at 92, the trustee was bound to act on the instructions of the bondholders. Our case, as your Lordship knows, is had the trustee discharged his duties those instructions would not have been given. We covered that in our skeleton submission.

C

The next point is at 94 when it says that it did not have the July award until February 2007, but as we pointed out in our skeleton at 42, the obligate(?) part of the June award was quoted in the October award. The next point which is related to that is at 95. It says while Everest had 2 October award it could have drawn the same conclusions as the trustee should have done. The answer to that is; that is true but the fact that Everest did not draw those conclusions and the fact that it could or should have done does not excuse, we would submit, the trustee discharging its own duties although, no doubt, that would be relevant to an argument based on contributory fault.

D

The next point is at 98 when it is said that it was of no interest:

"No part of the trustee publishing to an Inquiry as to the legality or otherwise of the sale of the PTC shares that was of interest to the parties disputing the PTC shares, chiefly Vivendi, but was of no interest to the trustee."

E

We do not accept that is correct, that it was on no interest to the trustee. The question of whether Elektrim had disposed of the PTC shares was of great consequence and relevant to the question of the equity kicker. In my learned friend's submissions, 99-100 deals with the facts about the notice sent out to the bondholders and the terms of the rewards being known to the lawyers, in our submission, comes to the same question. Yes, Everest did not appreciate those matters but, in our submission, that does not discharge the trustee's duties.

F

Similarly, the next point, in terms of the press statements, which I think is at 102, about the press release of 5 September. The answer to that is that here we are dealing with Elektrim's principal asset and we contended that those matters were highly relevant. Similarly, the next point at 105, which is about the failure to register the transfer of the PTC shares within the 7 days. We accept that the relevance of this allegation is not against the trustee but what it does show is that it shows DT's intention to conceal the terms of the transfer and that is the point we made in paragraph 15 of our skeleton.

G

H

58

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 58

A

Then the last point as to whether it would have made any difference. That is at a 110 of my learned friend's submission, to which we respond, at paragraph 46, as to why we say it did make a difference. Similarly, whether the loss was fanciful, which is at 116. We deal with that at paragraph 47.

The only other two points that are made -- I do not have the cross-reference but it is an important part of my learned friend's argument that the bankruptcy was commercially absurd. I think he makes that point at 126. Our answer to that is that if bankruptcy had taken place there were good prospects of recovering the market value of the PTC shares for Elektrim, swelling its estate by over a billion dollars. We would say that that is not a commercial absurdity.

B

Then the point about the Polish Court dismissing the bankruptcy in any event; we dispute that. But it is hardly surprising if the court dismissed bankruptcy when the principal creditor of the trustee was not pressing his petition. In our case, had the trustee been persuaded or instructed to act differently and to address the court on the PTC share transfer there might have been a different outcome.

C

My Lord, I have dealt with it quite quickly. I know you want to finish the day and more importantly, we have set out our case in writing. Unless I can assist you further, those are our submissions.

MR JUSTICE LEWISON: Thank you very much, Mr Malek.
    Which of Mr Millett and Mr Miles is going next?

D

### SUBMISSIONS BY MR MILES

MR MILES: I guess that is me. I will not take very long. On the relevant principles the only points I would make are that the point about being utterly absurd and so on, that is just one of the examples in vexation and oppression, obviously. That is what is being called pure vexation. The other kinds of vexation and oppression are set out in Dicey and Morris. But it is very important that there is not a limit on the concept and it has not been defined anywhere.

E

Secondly, the suggestion is made, why do we not leave it up to the foreign courts to decide? I endorse your Lordship's observations. This court is in a particularly good position to assess these claims. Secondly, the answer is that the test is, of course, a high one. We have to show (a) that England is a natural forum and (b) that this is vexatious or oppressive. If you get to that stage then to say why do you not leave it to a foreign court to decide these questions, it is rather self-defeating. If we are over the hurdles of showing that an injunction should lie then this court will grant an injunction.

F

If my learned friend was right about that the court would never grant an anti-suit injunction. We accept that the jurisdiction is to be exercised with caution, obviously, but this is an appropriate case. It then said that you should not get involved in a mini trial. You are not involved in a mini trial. If anything it is a micro hearing. We went through all of the points for showing why this case was hopeless in a couple of hours. We will have gone through the whole thing in a day. If there is nothing in this case, there is nothing in the case and you can reach a view on that. It is not a question about who might or might not win at trial. We accept the test is a high one on this particular limb, pure vexation, is it hopeless or not? We say we easily meet that standard.

G

H

**A**

My Lord, on the question of whether this is a collateral attack; you have to base the decision on the way that they have brought this claim because that is the only thing we have.

MR JUSTICE LEWISON:  Just pause there.  You mean on the amended complaint as it appears in the bundle or are you going to allow Mr Malek to run his blue pencil over it and give me something different?

**B**

MR MILES:  I am certainly not happy if he then changes it.  I am happy if he crosses stuff out but I am certainly not happy if he is starts introducing anything new.  That should be very clear, that he can cross out -- I would say he should put a blue pencil through everything --

MR JUSTICE LEWISON:  I know, but he does not agree with you.

**C**

MR MILES:  He does not go that far -- then, my Lord, you will just be left with whatever there is left after he has crossed stuff out.  But he should not be allowed to now start any more.

MR JUSTICE LEWISON:  On collateral attack, which is what you were coming on to, the reason I raised the question is that insofar as the complaint, as it appears in the bundle, was impugning my decision directly in the pleading and seeking orders restraining the trustee from distribution, it was obvious that it was a collateral attack.  If all that goes, it is, shall we say, less obvious.

**D**

MR MILES:  Less obvious, but that is exactly the point I was going to come on to.  Even if you have crossed those bits out we say it remains a collateral attack and the reason really comes down to this: it has to be part of their case (this is the point I really made this morning) that the trustee should not have taken these funds because they were tainted and "tainted" has become a bit of a weasel word in my learned friend's case.  But tainted, subject to legal challenge, vulnerable, whatever formulation you like, it has to be part of his case.  We saw that in the way the amended complaint is brought because otherwise there is no reason why the trustee should not just get on and act in accordance with instructions.  That runs through the whole of their case.  The funds somehow have to be vulnerable, tainted, whatever you want to call it.  It is not a question of getting hung up on language.  That is an essential element of their claim.

**E**

**F**

You decided in May that the funds were not subject to any claim by Vivendi and that the trustee was a bona fide purchaser of the value of the funds without notice of any claims by Vivendi.  To try and escape this, as we saw this morning, they say -- and this is really the key paragraph on this point, paragraph 63 of their skeleton, (1) and (2) deal with the point you have made to me; (3) they are now saying that they do not allege that Vivendi has a proprietary interest.  But it is (4) which is the key thing.  Unless they are right on (4) then there remains a collateral attack.  What they say in (4) is that it is not a point about a claim by Vivendi.  They are saying (halfway down the paragraph) the taint which Everest would have feared is not the assertion of a third party interest but the possibility that the money could be pulled back in bankruptcy proceedings in Poland.  Then they say that is clear in paragraph 54 of the complaint.

**G**

**H**

WordWave International
www.wordwave.co.uk

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 60

My Lord, I show you 54, in fact, it postulates exactly the opposite. It postulates a claim by someone where the company is not bankrupt. Equally, as I explained this morning, this case is an absurd one because, first of all, there was the real world bankruptcy petition by ET. That has been dealt with in the real world and everyone knew about that. Secondly, on this hypothesis, this would have been the only bankruptcy petition in town which was the trustees' own bankruptcy petition and the way of getting rid of that risk, that so-called taint, as they are now putting it, was to withdraw the petition. There was no other bankruptcy petition. There has been no other bankruptcy petition. There was no other such taint, as they put it. They are really caught on the horns of a dilemma. Either they accept, as they really should, that when they talk about taint, in paragraph 54, they are talking about a claim by Vivendi because, again, there are no other claims in town. That is one horn of the dilemma. The other horn of the dilemma is, as they say here, that what they were concerned with was the possibility of bankruptcy proceedings, in which case the case is just silly. It is an absurdity. Either it is a collateral attack or it is hopeless. My Lord, my learned friend did not actually deal with that argument at all. He has not sought to justify his reliance on paragraph 54 of the complaint. It is a hopeless point. We say, as I say, it is one thing or the other. We are saying it is actually both.

We then say, my Lord, that you cannot airbrush out history. It is a point I made this morning. They brought this case as an absolutely blatant and naked attempt to interfere with the processes of this court. That is what this case really is. There is nothing really left in it when that goes and the truth is they just will not back off because, as I said this morning, this is just chest beating and macho litigation. They cannot back off because then everyone will say they have backed off. If your Lordship restrains them, well they will just say that some judge restrained them. That is the way it will appear in the press and that is why they put out press releases about this claim. This is the reality of this case. It is not a real piece of litigation. It was tactical.

We then say on the merits and why it is bound to fail, the way my learned friend just put it to you was that (1) the trustee is under some sort of duty to disclose and has a duty of care in that respect, and (2) that there was a breach of that duty. He then lists a whole lot of things which were unusual circumstances but the trustee knew that the PTC shares were valuable. If they belonged to Elektrim or Telco then there would be a substantial value to get back. But DT claim to have received them for book value and so on and so forth. A whole shocking list of points. They knew every single one of those points. They knew all of those points because they had a copy of 2 October award. If there is a duty of disclosure, we disclosed. We performed that duty.

He then says that he accepts now that they had all of that information but he says they did not appreciate it or something. But this is, again, getting back into the realms of absurdity because the duty of disclosure on my clients, they performed that duty. They have to say that there is some sort of handholding duty that goes way beyond the duty of disclosure. It has not been identified. For all the reasons I gave this morning, it was an extraordinary idea that a trustee in this situation has to go round holding the hands of experienced, sophisticated investors who have their own advice and where the trustee does not even know who the members or the clients are. It is a ludicrous allegation and, my Lord, you could decide that point and you have all the material to do so. There is nothing left once that point is decided.

61

A

My learned friend then mentioned the press releases and said that they were highly relevant to the claim. What he did not deal with, and I will just remind you of this, was the point that I made that when you look at those press releases -- two points, first when you look at those press releases, where is this great lie? It is a very striking fact that he did not come back on that. Secondly, he did not deal with my submission that no one, in these circumstances, would have been looking at some press release put out by an interested party weeks before the relevant events, which did nothing more than purport to summarise documents we actually had. They only looked at the documents and the evidence, the evidence I took you to this morning, showed that the bondholders were looking very carefully at 2 October award. That was the very reason why the hearing of 4 October was adjourned at the behest of the bondholders. Again, it is a ludicrous allegation.

B

As to the question of causation, you have my submissions. As to loss, we have found the relevant passage in the Allied Maples case which is at and I will not ask you to look at it now, but it is at 1614. We will provide of this and the way it is put is:

C

> "In my judgment, the plaintiff must prove, as a matter of causation, that he has a real or substantial chance as opposed to speculative one."

We say that they fall on the wrong side of that. They would have to show first that if the trustee had done this handholding exercise they say they should have done, Everest would have acted differently. Secondly, if it had acted differently, it would persuaded more than 30 per cent of the bondholders to go against withdrawal. Third, even if they had done, the company would have been wound up and that itself is very improbable. I gave you the reference. It is I, tab 54, 545 to 546 when Mr Davies says that the Polish Court would almost certainly have kicked out the petition anyway at this stage and contrary to what my learned friend says, that has not been contradicted in the evidence. We have to get over that. That if a liquidator had been appointed, that he would have succeeded in getting assets back and fifth, that Elektrim in liquidation would have had sufficient assets to pay all the creditors in full and this, of course, would have been a hugely complex liquidation where everyone, DT, ET and the bondholders, would have been scrapping over the assets.

D

E

F

When you pile up those various improbabilities, one falls, very clearly we say, into the area of a speculative chance rather than a real or substantial one. Those are my submissions.

MR JUSTICE LEWISON: Thank you.

## SUBMISSIONS BY MR MILLETT

G

MR MILLETT: My Lord, the last six minutes should cover it. The first point made against me by Mr Malek was in relation to 10.2 in respect of which he said, "Well just look at the language. Look, it says enforced provisions of the trust and the claim, if you look at the amended complaint, is not". That is a very narrow black letter approach to three or four words in a very long document set, not only in its own setting as a matter of context, but an important commercial setting, all of which my learned friend chose to ignore in his submissions. It is the kind of

H

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 62

A

approach to construction that went out before even Lord Wilberforce and it is just not the way you ought to approach it as a matter of principle.

But even the words, the words he relies on, the language, are even a pointer, which, to some extent, they are, then this is, as a matter of substance, a claim to enforce the provisions of the trust deed on any view. Really what my learned friend is focusing on is cause of action. He says in essence, "My cause of action in Florida is in deceit" and that is not a claim to enforce the provisions of the trust.

B

As a matter of strict English forms of action law, that may well be right but that is an extremely technical and impractical approach to this problem. At the end of the day, it is actually a claim to enforce the provisions of the trust because it is a claim to vindicate his rights under it. What is lost is the value of, or the existence of, alleged rights under the bond trust and the bond conditions. It comes to the same thing.

C

MR JUSTICE LEWISON: I did wonder there might be some analogy with the corporate reflective loss principle. I mean, it has been said in Johnson v Gore Wood [2001] 2 WLR 72 for instance, that where a duty is owed both to a company and to a shareholder and breaches of both those duties result in the same loss, and even though the shareholder has his own cause of action, at least in theory, he cannot enforce it or cannot run it, because the loss that he has suffered, even though it arises an independent wrong done to him, is the same loss that the company has suffered. I know that shareholders and companies are not

D

the same as bondholders and trustee, but you have the same feature to two people, as it were, or two categories of people suffering similar loss.

MR MILLETT: If there is an analogy there, it would take me more than six minutes to explore with your Lordship. I do not think it quite works, to be honest, because Johnson v Gore Wood is really all about the rule in Salomon v Salomon (1896), [1897] A.C. 22 (H.L.) and the rule of Foss v Harbottle (1843) 2 Ha. 461 in respect of wrongs done to the company and then the company may sue. But, at heart,

E

there is an overriding principle which is that the parties have structured their arrangements in such a way, heart of which essentially is contractual. In the case of a company, it is the articles of association and its constitutional document but, in the case of these arrangements, it is the trustee and bond conditions. But in those circumstances where the parties have commercially arranged themselves in that way, only one of them should be able to sue and the analogy does work,

F

certainly to this extent, my Lord, and I want to embrace if it may, to this extent at least, which is that the effect is the same. The company in the Johnson v Gore Wood or Giles v Rhind [2002] 4 All ER 977 approach makes the claim. It inures to the benefit of the shareholders under their arrangements with the company *inter se* by way either of a dividend or an increased capital value of their shareholding.

G

MR JUSTICE LEWISON: The point that I had in mind with the Johnson v Gore Wood is not the strict rule in Foss v Harbottle which is quite different, so to speak, but it is where the same loss is both a wrong done to the company and a wrong done to the shareholder. There are two wrongs but it is the same loss.

H

MR MILLETT: But it is the loss that is the key.

63

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 63

MR JUSTICE LEWISON:  Yes, exactly.

MR MILLETT:  It is a loss based rule.  That is certainly right and the effect of the arrangements is that, in respect of that loss, only the company may sue.  But it is also important that is reflected loss because, in fact, the wrong may be done and it is to this extent, my Lord, that the analogy is absolutely in point, the wrong may be done to the shareholder, but the loss is felt actually by the company.  It is reflected onto the shareholder by reason of his shareholding and his capacity as such.  Again, similar.  Same here.  The wrong is done to the trustee and it is felt reflectively by the bondholder so he cannot sue in respect of that loss.  That is certainly one way of looking at the problem which clause 10(2) and condition 13 were intended to solve.  Another way of looking at it is the usual rule in respect of all trusts which is that the trustee, who is the guardian of claims in respect of claims owned by the trust estate or wrong done to the trust estate and although, of course, beneficiaries can sue *sui generis* they need to get either the permission of the court to do so on their own or join the trustee, but they cannot simply wander into a court on their own and say, "I am a beneficiary under a trust and the trustee will not pursue the claim, or rather I have not asked the trustee yet but I want to pursue it myself".  You cannot do that.  Either which way you look at it, the no-suit clause in this trust deed is certainly worse as an expression of either or both of those principles.

My learned friend also accused me of not having identified any provisions that we were seeking to enforce.

MR JUSTICE LEWISON:  That he was seeking to enforce?

MR MILLETT:  That he was seeking to enforce.  That is not quite right.  He is actually seeking to enforce clause 15.1(a).  That is the essence of his complaint.  Clause 15.1(a), if your Lordship has it, is at M1, page 28.

MR JUSTICE LEWISON:  Yes.  I remember it.

MR MILLETT:  The asset stripping allegation, whether it is PTC or any other, is all about a complaint about the failure by Elektrim to procure that Teleo carried on its affairs in a proper and efficient manner because it managed to lose the PTC shares.  That is how the asset stripping was done, allegedly.  That is the complaint.  So if need be, that is what the claim would be.  In fact, as I said, it is open to the trustee, subject to any points I would wish to make later against Mr Miles, to amend his claim in the contingent payment claim in London to make those allegations.

On that point (you will have seen it because I do not think I took time now showing you the document), the contingent payment, particularly there is a payment actually issued on 15 December 2005, the repayment date.  So they are in a different position.

MR JUSTICE LEWISON:  Yes.  It was one of things you asked me to pre-read and I did.

MR MILLETT:  I am grateful.  Thank you for that.  But I did not take time on it.

So the black letter approach taken by my friend is unrealistic, unfashionable, unhelpful and wrong.  He then said, by reference to paragraph 57 of his skeleton,

64

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 64

that the claim in Florida does not cover the same ground as the contingent payment claim in London. I accepted at the outset that, as yet, the contingent payment claim does not include the payment in respect of the PTC shares. But all that has happened is that in Florida he has made a deceit claim, a deceit allegation, really, as an entry route into a claim for loss of bond rights. That is all it is. To say that it does not cover the same ground is simply another way of saying that the trustee in London has not made the same absurd allegations that he has chosen to make in Florida.

In addition to that, what deceit? Now that Mr Torres has been revealed as having seen the October award, three weeks, it now seems, prior to the decision to withdraw the bankruptcy petition, it is very difficult to see what deceit there was, at least, what operative deceit there was which founds the basis of the claim in respect of the withdrawal of the petition, which is what it is. It forms the basis of the claim for this loss.

So far as double jeopardy is concerned, my learned friend referred to the ANZ case and made great play of the fact that, as he said, it is not an anti-suit case. That is right. I made that point. But he misunderstood entirely the point I was making. The point about ANZ is that it is a case about vexation. It is a case in which the vice-chancellor, in essence, defines double jeopardy as the essence of vexation. That is what it is about. This is not about anti-suits based on contracts. It is simply an example of when the court will find vexatious conduct. He did not and could not get away from that as a conclusion.

We have the Court of Appeal decision in the Angelic Grace here. May I hand up a copy?

MR JUSTICE LEWISON: Yes.

(handed)

MR MILLETT: With apologies that it did not get into your Lordship's bundle. Just two very short points on it. The first is to correct a point of chronology that my learned friend made. I think my learned friend said that the Continental Bank case was decided before ANZ in 1989. In fact, the Continental Bank case was decided in 1994, five years after the ANZ case. You will see that from the first column on page 28.

The second point is that actually the Angelic Grace did represent something of a Damascan conversion. You will see at page 96 in the judgment of Millet LJ in the second paragraph, a paragraph which has now become trite, I am afraid. So I apologise for citing it to you. But it says:

"In my judgment the time has come to lay aside the rigid incantation that this is a jurisdiction which should only be exercised sparingly and with great caution."

That was, at the time, seen to be and is still seen to be a turning point. Some judges later have called it the high water mark. But it is certainly the case that prior --

MR JUSTICE LEWISON: Yes. That is in a contract case.

MR MILLETT: In a contract case, absolutely. That is right.

65

WordWave International
www.wordwave.co.uk

**A**

That is double jeopardy. Then, finally, on 6(k), I am not going to deal with how it affects the trustee. The pleasure of that may or may not await a later time.

Two short points, the first about the final date. I think what my learned friend was saying is that I cannot rely on my own wrong. He says that if you are in default --

MR JUSTICE LEWISON: That is what I wrote in the margin. Yes, I think that is what he was saying.

**B**

MR MILLETT: The answer to that is the one we provided in our skeleton, actually, which is that it is not about relying on your own wrong. The short point is that the default means that the contingent payment claim simply never gets to be made. That liability is extinguished. It is replaced by the secondary liability to pay damages for its loss. That is exactly the claim that is being pursued by the trustee in London. It does not remain, it does not survive the termination date and cannot, as a matter of the mechanics of clause 6(k). That is an unanswerable point. The primary liability has just disappeared.

**C**

The second point he made was by way of attack on my fair valuation point because he said the asset stripping would have occurred post July. That is just wrong as a matter of chronology. The way it works is that the contingent payment determination date fell during a period between 13 June 2006, which was when the 2005 accounts were published, and 3 July 2006, which was 20 business days thereafter. During that period the expert values, putatively, would have had to have come up with a fair market value. But those dates, that range, postdates the publication of the 6 June award. The 6 June award, which is actually pleaded (is the best way of referring to it) at paragraph 16 of the amended complaint in bundle M1 at page 80, actually says that the PTC shares have to go back to DT, retrospectively as of 15 February 2005 in return for their book value plus some other money yet to be determined.

**D**

**E**

The point is that, as it were, the assets have already been stripped by the time the experts would have come around to doing to the valuation. They would have done so on the basis of the 2005 accounts plus taking into account matters up to the date of their valuation. They would been bound to have taken into account the awards. So, factually, my learned friend is simply wrong about that. That is what we say about 6(k).

Unless I can assist your Lordship further, those are my submissions in reply.

**F**

MR JUSTICE LEWISON: Thank you very much.

MR MALEK: My Lord can I just note about the submission to me, just two points, first of all on the blue pencil. We will provide that on Monday. My learned fiends Mr Miles said that he does not want us rewriting or anything like that and I totally accept that. The only point is that my crossing out destroys the sense of some of the sentences. So with your permission what we will do is not make any substantive changes but if it is necessary to add a couple of words just to make the document --

**G**

MR JUSTICE LEWISON: Grammatical, yes.

**H**

MR MALEK: -- grammatical, we would wish to be able to do that.

MR JUSTICE LEWISON:  Yes.

**A**  MR MALEK:  The second thing is that it has been drawn to my attention that my clients are required to attend a hearing before the Miami judge this Tuesday to explain why the complaint has not yet been served.  So we have given undertakings, which, of course I will continue until your Lordship gives judgment in this matter. But what we would ask you to do is to permit us to explain to the Miami judge, as a matter of courtesy, that we cannot take any steps in Miami pending the outcome of the anti-suit judgment.

**B**  MR JUSTICE LEWISON:  Yes.  I cannot see that there would be any objection to that.

MR MALEK:  I am obliged.

**C**  MR MILES:  Is there any chance of us just clearing up that one tail end procedural point as to whether or not this could be treated, effectively, as the trial of this application, treated as the trial of the action?  As far as we are concerned, we would prefer that.  I make it clear that if we lose then we have lost.  We do not have another bite at the cherry.  Equally, if they lose, then there should a final injunction.  Otherwise, what we will do is serve a part 24 application.

**D**  MR JUSTICE LEWISON:  Either it has to be by agreement or it has to be a part 24.

MR MILES:  That is right.  I just wondered whether my learned friend was able to say anything about that before your Lordship rose.

**E**  MR MALEK:  I regret I have not actually discussed that with anyone within my team. Does your Lordship need an answer to that question now or can we do it at the time you hand down the judgment.

MR JUSTICE LEWISON:  I would rather that you dealt with it before you knew what the judgement was going to be because once you know what the judgment is going to be, whoever loses will no doubt not agree.  So can we get that cleared up before I deliver a judgment?

**F**  MR MALEK:  Yes.  If we could write to your Lordship's clerk, copy to everybody, I say Tuesday, to make that point clear.

MR JUSTICE LEWISON:  Yes.  I think that will have to do, Mr Miles.

MR MILES:  My Lord, yes.  Absolutely.  That is helpful.

**G**  MR MILLETT:  The same goes for me as well.  Just to make that point formally, because it is a different action.  But presumably that (overspeaking)

MR JUSTICE LEWISON:  Yes.  But you are also asking Mr Malek to agree to your application being treated as a trial of your action.

**H**  MR MILLETT:  Yes, yes.

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 67

A    MR JUSTICE LEWISON:  Yes.  All right.  I will reserve judgment and there will be a
draft in the usual way and we will arrange a time to hand it down.  I hope it will
not be too long.

<u>(Hearing concluded)</u>

B

C

D

E

F

G

H

LLOYD-LEWIS DEC.
EXHIBIT 7, PAGE 68