**EXHIBIT 8**



Neutral Citation Number: [2007] EWHC 2255 (Ch)

Case No: HC07C00763 and HC07C01505

**IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 12 October 2007

Before :

**MR JUSTICE LEWISON**

- - - - - - - - - - - - - - - - - - - -

Between :

|  |  |
|---|---|
| **THE LAW DEBENTURE TRUST CORPORATION PLC** | **Claimant** |
| - and - | |
| **(1) CONCORD TRUST**<br>**(2) ACCIONA SA**<br>**(3) ELEKTRIM SA (IN BANKRUPTCY)**<br>**(4) VIVENDI HOLDING 1 CORP** | **Defendants** |

And Between:

|  |  |
|---|---|
| **ELEKTRIM SA (IN BANKRUPTCY)** | **Claimant** |
| -and- | |
| **VIVENDI HOLDINGS 1 CORP** | **Defendant** |

- - - - - - - - - - - - - - - - - - - -

Mr Robert Miles QC and Mr Andrew Clutterbuck (instructed by Simmons & Simmons) for the Claimant.
Mr Richard Millett QC and Mr Julian Kenny (instructed by Barlow Lyde & Gilbert) for the third defendant (claimant in the anti-suit injunction).
Mr Ali Malek QC and Mr David Quest (instructed by Orrick Herrington & Sutcliffe) for the fourth defendant (defendant in the anti-suit injunction).

Hearing dates: 28th September 2007

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

*Kim Lewison*

THE HONOURABLE MR JUSTICE LEWISON

**Mr Justice Lewison:**

Introduction ......................................................................................................... 2
The relevant terms of the Trust Deed and the bond conditions................................. 3
The background to the claim ................................................................................... 4
The contingent payment claim ................................................................................ 7
The Part 8 proceedings .......................................................................................... 7
Anti-suit injunctions: the principles ........................................................................ 8
The amended complaint in Miami .......................................................................... 10
    The amended complaint .................................................................................... 10
    The claim against the Trustee............................................................................ 10
    The claim against Elektrim................................................................................. 14
Result................................................................................................................... 17

**Introduction**

1.     The Law Debenture Trust Corporation plc is the Trustee of €510,000,000 2% Bonds ("the bonds") issued by Elektrim Finance BV and guaranteed by Elektrim S.A. ("Elektrim") pursuant to a supplemental Trust Deed dated 15 November 2002 ("the Trust Deed"). The bonds were due for redemption on 15 December 2005.

2.     As is usual with bonds of this kind, the powers and duties of the Trustee are regulated by the Trust Deed. The bonds are subject to bond conditions, which incorporate all the terms of the Trust Deed. The bonds are in registered form and are held through the two principal clearing systems of eurobonds, Euroclear and Clearstream. At Euroclear and Clearstream banks and brokers maintain securities accounts through which they hold bonds either on their own behalf or as nominees on behalf of others. The bonds are freely tradable, and are likely to be bought by or on behalf of sophisticated investors. The tradable nature of the bonds, and the method of registration of account holders in the clearing system, has the effect that the Trustee will often be unaware of the identity of the person entitled to the bonds. Since early 2001 the bondholders have been represented by a bondholders' committee. The committee has in turn been represented by Bingham McCutchen LLP, an international law firm.

3.     One of the bondholders was Everest Capital Ltd ("Everest"). Apparently, it held the bonds for the benefit of General Motors. At the times relevant to the events I will describe, Everest (or one of its associated companies) was a member of the bondholders' committee. It was represented by Mr Richard Torres. On 29 May 2007 Everest entered into an Assignment Agreement (in which it was described as a "sophisticated investor") which assigned its bonds to Vivendi Holdings 1 Corp ("VH1"), together with certain claims arising out of its position as bondholder.

4.     On 1 June 2007 VH1 filed a complaint in Miami. The complaint was amended on 7 June. By the amended complaint VH1 claims relief against the Trustee and against Elektrim. The applications before me are applications to continue the anti-suit injunctions that I granted against VH1 on 8 June. No applications for final orders have been made under Part 24; and VH1 is unwilling to agree that the applications be treated as the trial of the actions.

LLOYD-LEWIS DEC.
EXHIBIT 8, PAGE 2

**The relevant terms of the Trust Deed and the bond conditions**

5.  The terms of the Trust Deed were incorporated into bond conditions, with the effect that any bondholder became bound by the terms of the Trust Deed as well as by the bond conditions. Among the terms of the Trust Deed are the following:

> "9. Enforcement
>
> 9.1    The Trustee may at any time, at its discretion and without notice, take such proceedings and/or other action as it may think fit against or in relation to [Elektrim Finance] or [Elektrim] to enforce their respective obligations under these presents...
>
> 10. Proceedings, Action and Indemnification
>
> 10.1    The Trustee shall not be bound to take any proceedings mentioned in clause 9 or any other action in relation to these presents unless respectively directed or requested to do so (i) by an Extraordinary Resolution of the holders of the Bonds or (ii) in writing by the holders of at least 30 percent in principal amount outstanding of the Bonds and in either (i) or (ii) then only if it shall be indemnified to its satisfaction against all Liabilities to which it may thereby render itself liable or which it may incur by so doing.
>
> 10.2    Only the Trustee may enforce (i) [against the security provided by Elektrim] or (ii) the provisions of these presents. No Bondholder shall be entitled to proceed directly against [Elektrim Finance] or [Elektrim] to enforce the performance of any of the provisions of these presents unless the Trustee having become bound as aforesaid to take proceedings fails to do so within a reasonable time and such failure is continuing."

6.  Clause 1.2 (H) of the Trust Deed said that any references to taking proceedings included proving in a winding up. By clause 1.2 (A) this extended definition also applied to the bond conditions.

7.  The bond conditions contained a term to similar effect:

> "13. Enforcement of Rights
>
> At any time after the Bonds become due and repayable, the Bond Trustee may, at its discretion and without further notice, institute such proceedings against [Elektrim Finance] or [Elektrim] as it may think fit to enforce the Bonds and the provisions of the [Trust Deed], but it need not take any such proceedings unless (i) it shall have been so directed by an Extraordinary Resolution of the Bondholders or so requested by in writing by holders of at least thirty percent in principal amount outstanding of the Bonds and (ii) it shall have been

indemnified to its satisfaction. No Bondholder may proceed directly against [Elektrim Finance] or [Elektrim] unless the Bond Trustee, having become bound to proceed, fails to do so within a reasonable time and such failure is continuing."

8.    Condition 6 (k) of the bond conditions required Elektrim (as principal) to pay a contingent payment on the Contingent Payment Date. A covenant to the same effect is contained in the Trust Deed. The contingent payment has also been referred to as the "equity kicker". In very broad (and so to some extent inaccurate) terms the amount of the Contingent Payment is the difference between:

   i)    The fair market value of Elektrim's net assets (i.e. its assets after deduction of debt apart from contingent liabilities) as determined on the Contingent Payment Date and

   ii)   €160 million.

9.    Under clause 15.1(A) of the Trust Deed, Elektrim and Elektrim Finance both covenanted with the Trustee that each of them would "at all times carry on and conduct its affairs and procure that its Subsidiaries carry on and conduct their respective affairs in a proper and efficient manner".

**The background to the claim**

10.    Elektrim's principal asset is or was its shareholding in a Polish telecommunications company known as PTC. A major French media company called Vivendi Universal SA ("Vivendi") has been in dispute with Elektrim and with Deutsche Telekom AG ("DT"), a major German media company, for several years about the PTC stake. Vivendi alleges that it has invested over €2bn under various agreements and is entitled, through a Polish company which it controls, known as ET or Telco, to the PTC stake. Elektrim and DT, on the other hand, allege that Elektrim was entitled to the PTC stake and that, by virtue of various awards of a Vienna arbitral tribunal, Elektrim is obliged to transfer the stake to DT. The battle for control of the PTC stake has been fought in numerous proceedings, including arbitrations in Vienna, Switzerland and London, and Court proceedings in Poland.

11.    While these various proceedings were pending, the bonds fell due for redemption. Elektrim did not pay. On the instructions of the bondholders, the Trustee began insolvency proceedings against Elektrim in Poland on 3 March 2005 petitioning for Elektrim's bankruptcy. The petition was founded on the sum of €434,541,700.20 plus interest and other amounts being due and payable. The petition was issued pursuant to instructions given to the Trustee under clause 10.1 of the Trust Deed. The petition was presented by the Trustee on behalf of (and as trustee for) the entire class of bondholders. Elektrim fought the petition hard. It initially succeeded in having it dismissed. That was overturned on appeal. It then persuaded the Polish Bankruptcy Court to require a report into its solvency. This all took many months. ET had also issued a bankruptcy petition of its own against Elektrim.

12.    On 2 August 2006 the London Court of International Arbitration ("LCIA") made its Order on Interim Measures No 6 in the arbitration between Vivendi and Elektrim. Paragraph 2 of the order enjoined Elektrim from voluntarily selling or agreeing to sell

the PTC Shares. On 21 September 2006 the district court of Warsaw enjoined Elektrim from disposing of its assets. This order appears to have been granted on the trustee's application.

13. On 5 September 2006 DT issued a press release stating that a DT group employee had been appointed chief executive of PTC and that:

> "The new management appointment at PTC is a direct consequence of Deutsche Telekom's acquisition of the 48 per cent stake of PTC formerly held by the Polish company Elektrim. The acquisition is based on a call option awarded to Deutsche Telekom by a Court of Arbitration."

14. The Court of Arbitration referred to was in fact the Vienna Court of Arbitration, and the award referred to was an award of 6 June 2006. On 2 October 2006 the Vienna Arbitration Court issued a Second Partial Award in the arbitration between Elektrim and DT. That award recited the operative parts of the earlier award of 6 June 2006 in which the Court had held that DT had validly exercised an option over Elektrim's shareholding in PTC. It further declared that on payment of the price to be determined, DT would acquire that shareholding. In the body of its Second Partial Award of 2 October the Arbitration Court said:

> "32. In the present case, [DT] itself admits that a great uncertainty shrouds both the thing to be sold and the price for which it should be deemed to have been sold on 15 February 2005.

> 33. First, as regards the Option Shares, [DT] has appropriately declared that the present title to the Shares is uncertain, and was uncertain at the time of the exercise of the call option. It points out that "it remains unclear whether DT has acquired 226,080 PTC shares (i.e., over 48% of the PTC shares), on the one hand, or only a single PTC share, on the other" [referring to DT's submissions]. It is known that at least one parallel arbitration between different parties bears on the title on those shares. The Arbitral Tribunal is not informed about those proceedings nor concerning any finding of the other Arbitral Tribunal, so that the above mentioned uncertainty perdures to the fullest extent conceivable. Therefore the validity of the so-called "share purchase agreement" that would have been concluded on 15 February 2005 is put to doubt by reason of the indetermination of its very subject matter, an indetermination which the present proceeding at the present stage cannot lift in any meaningful way…

> 34. Second, as concerns the price of the shares whichever they are, this price is neither determined nor determinable at the present time."

15. It concluded that the exercise by DT of its option fulfilled the requirement to bring about the transfer of the shares once the determination of the precise number and price

had been determined. The order made by the Court was that DT would acquire full legal title to the shares on payment of an amount in cash not less than the current book value of the shares and the provision of an undertaking to pay any subsequent adjustment of the price. It also ordered Elektrim to transfer "full factual control over the Option Shares" to DT. This Partial Award was sent to the bondholders' committee; and was seen by Everest acting by Mr Torres.

16.    The hearing of the bankruptcy petition against Elektrim was due for hearing on 4 October 2006. On that day Bingham McCutchen sent an e-mail to the Trustee's lawyers saying that the bondholders committee (which expressly included Everest) confirmed that they approved of the Trustee applying for an adjournment of the petition to enable them to consider "the implications of the Vienna award" and/or the acceptance of €525 million out of the funds paid by DT on terms that the bankruptcy petition was withdrawn. The hearing was duly adjourned to a further hearing on 27 October in the face of opposition from ET. Also on 4 October 2006, DT issued another press release stating:

> "In yet another award of October 2, 2006, the Arbitral Tribunal in Vienna conferred the ownership title to the disputable 48% of the shares in PTC to [DT] (with effect as of February 15, 2005), which remains in concord with the joint stand of [Elektrim] and [DT] presented to date. For this reason [DT] has paid an amount of more than Euro600m, which surely covers the current book value of the shares in PTC."

17.    On 12 October 2006 an application by ET for an attachment over Elektrim's receivable from DT was rejected by the Polish bankruptcy court. In the Justification for the court's decision the judge explained that Polish law did not prevent a debtor from paying his debts. He also said that the Trustee represented essentially all Elektrim's creditors whose rights had been determined by a final court ruling; and that to prevent Elektrim from paying what it owed the Trustee would in effect decide the bankruptcy proceedings against Elektrim.

18.    At a meeting on 20 October 2006 the Trustee's Polish lawyers learnt of a proposal for DT to make payments into an escrow account.

19.    On 23 October 2006 the LCIA made Order on Interim Measures No 7 in the arbitration between Vivendi and Elektrim. By that order the LCIA declared that their Order on Interim Measures No 6 did not prevent Elektrim from applying the sum of €600 million paid or payable by DT in discharge of Elektrim's liability to the bondholders who had presented the bankruptcy petition. The sum of €600 million was the book value of the PTC shares, payment of which had been contemplated by Order on Interim Measures No 6.

20.    On 24 October 2006 Bingham McCutchen were asked for bank account details, so that Elektrim might pay off the petition debt. Elektrim paid €525 million to the Trustee on 26 October 2006 without prior agreement or notice. On the morning of 27 October 2006 Bingham McCutchen sent an e-mail to the Trustee's lawyers. It confirmed instructions from Acciona and Trafalgar (bondholders who, between them, held about 38 per cent in value of the bonds and who together with Everest were members of the bondholders' committee). The e-mail said that the bondholders

THE HONOURABLE MR JUSTICE LEWISON          The Law Debenture Trust Corp. -v- Concord Trust & others
Approved Judgment

approved of the Trustee applying to the bankruptcy court for a direction that the payment by Elektrim was lawful; and if that direction was obtained, to permit the petition to be dismissed or to withdraw it. The Trustee was also to attempt to have ET's bankruptcy petition dismissed. At the hearing on that day the Polish bankruptcy court ruled that the payment was lawful. Among the points made by the court in its written ruling were the following:

i)      It had become superfluous to hear the Trustee's petition;

ii)     There was nothing to prevent a debtor from paying off a creditor's claim;

iii)    Although ET opposed withdrawal of the petition it advanced no substantial grounds for its opposition;

iv)     Transfer of the shares was not a voluntary act of Elektrim because DT was exercising a pre-existing right, and hence was not in breach of any court order;

v)      The Trustee represented all the creditors of Elektrim. ET was not a creditor because it had not filed for Elektrim's bankruptcy;

vi)     If the petitioner decides he no longer has an interest in pursuing the bankruptcy, he is entitled to withdraw the petition;

vii)    A genuinely disputed claim cannot lead to a bankruptcy;

viii)   Bankruptcy cannot be declared on the ground that the petitioner is concerned that, in the future, a claim, if established will not be able to be met.

21.     In the light of the court's ruling, the petition was withdrawn and the Trustee retained the money. However, it did not immediately distribute the money to the bondholders because of its concern that ET might appeal against the dismissal of bankruptcy proceedings, resulting in Elektrim's liquidation and a possible claim by a liquidator for the return of the €525 million under "claw-back" provisions in Polish bankruptcy legislation. ET did attempt to appeal, but its attempts failed.

22.     Vivendi, meanwhile, had alleged that it had claims over the money, but the precise nature of those claims was not articulated.

**The contingent payment claim**

23.     On 15 December 2005, the Trustee commenced a claim in this court against Elektrim seeking damages for the loss of the Contingent Payment. The basis of the action is alleged asset-stripping by Elektrim in breach of clause 15.1(A) of the Trust Deed resulting in the loss of the full value of the Contingent Payment obligation under clause 6(k) of the Bond Conditions. The claim is for the loss of a real or substantial chance that the Contingent Payment would have become payable.

**The Part 8 proceedings**

24.     On 2 March 2007 the Trustee began Part 8 proceedings seeking directions. On 2 April 2007, I made a representation order appointing two of the Bondholders, Concord and Acciona, to represent all the Bondholders pursuant to CPR 19.7(2). On 1 May 2007 I

gave judgment holding that the claims intimated by Vivendi to the effect that the monies received by the Trustee were tainted lacked any merit; and I made an order that those claims had no reasonable foundation. I also ordered that notice of my judgment and order of 1 May 2007 be served on Vivendi and ET pursuant to CPR 19.8A. This gave Vivendi the right to apply within 28 days of service to set aside the order of 1 May 2007, failing which the order would be binding on it: CPR 19.8A(8). The notice was served on Vivendi (as acknowledged by their UK solicitors on 23 May 2007) and it was informed that a further hearing of the Part 8 claim was fixed for the week of 5 June 2007. Vivendi has not applied to set aside my order.

25.     On 29 May 2007 VH1 purchased a tranche of bonds from Everest under an Assignment Agreement. These included bonds to which General Motors had apparently been beneficially entitled.

### Anti-suit injunctions: the principles

26.     The broad principle underlying the jurisdiction to grant an anti-suit injunction restraining foreign proceedings is that it is to be exercised when the ends of justice require it. This may occur when the foreign proceedings are vexatious or oppressive; or where the institution of the foreign proceedings is a breach of a binding contract. However, the jurisdiction is one to be exercised with caution. I take the summary of principle from the judgment of Evans-Lombe J sitting in the Court of Appeal in *Royal Bank of Canada v Rabobank* [2004] 1 Lloyd's Rep 471, with the modification of the fifth principle suggested by Mance L.J. in the same case:

> (i) Under English law a person has no right to be sued in a particular forum, domestic or foreign, unless there is some specific factor that gives him that right, but a person may show such a right if he can invoke a contractual provision conferring it on him or if he can point to clearly unconscionable conduct (or the threat of unconscionable conduct) on the part of the party sought to be restrained: *Turner v Grovit* [2002] 1 WLR 107, 118C at para 25 per Lord Hobhouse.

> (ii) There will be such unconscionable conduct if the pursuit of foreign proceedings is vexatious or oppressive or interferes with the due process of this Court: *South Carolina Insurance Co v Assurantie Maatschappij de Zeven Provincien NV* [1987] AC 24 at page 41D; *Glencore International AG v Exter Shipping Ltd* [2002] 2 All ER (Comm) 1, 14a at para 42.

> (iii) The fact that there are such concurrent proceedings does not in itself mean that the conduct of either action is vexatious or oppressive or an abuse of court, nor does that in itself justify the grant of an injunction: *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 817 at page 894C; *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767 at 781; *Airbus Industrie GIE v Patel* [1999] 1 AC 119 at 133G/H.

LLOYD-LEWIS DEC.
EXHIBIT 8, PAGE 8

(iv) However, the court recognises the undesirable consequences that may result if concurrent actions in respect of the same subject matter proceed in two different countries: that 'there may be conflicting judgments of the two courts concerned' or that there 'may be an ugly rush to get one action decided ahead of the other in order to create a situation of res judicata or issue estoppel in the latter': see *The Abidin Daver* [1984] AC 398 at pages 423H–424A per Lord Brandon.

(v) The English court will, generally speaking, only restrain the plaintiff from pursuing proceedings in the foreign court if such pursuit would be vexatious or oppressive. This presupposes that, as a general rule, the English court must conclude that it provides the natural forum for the trial of the action; and further, since the court is concerned with the ends of justice, that account must be taken not only of injustice to the defendant if the plaintiff is allowed to pursue the foreign proceedings, but also of injustice to the plaintiff if he is not allowed to do so. So the court will not grant an injunction if, by doing so, it will deprive the plaintiff of advantages in the foreign forum of which it would be unjust to deprive him: *Société Aerospatiale*, ibid at 896F–H.

(vi) In exercising its jurisdiction to grant an injunction, 'regard must be had to comity and so the jurisdiction is one which must be exercised with caution': *Airbus Industrie*, ibid at 133F. Generally speaking in deciding whether or not to order that a party be restrained in the pursuit of foreign proceedings the court will be reluctant to take upon itself the decision whether a foreign forum is an inappropriate one: *Turner v Grovit*, ibid at para 25.

27.     I add two glosses to this summary:

i)      The first principle recognises that a person may have a right not to be sued in a foreign court if he can show a contractual provision conferring that right on him. If he can, then ordinarily the court will enforce the contract: *Donohoe v Armco Inc* [2002] 1 Lloyd's Rep. 425. By the same token a person may be able to rely on a contractual provision which entitles him not to be sued at all (*The Angelic Grace* [1995] 1 Lloyd's Rep 87), or not to be sued by the particular claimant. If he can, then it seems to me that the court will ordinarily enforce that contract too.

ii)     The courts have refrained from defining what is meant by "vexatious or oppressive", leaving it to be worked out on a case by case basis. Among the examples in the decided cases in which it was held that foreign proceedings fell within that description are cases which are bound to fail (*Shell International Petroleum Co Ltd v Coral Oil Co Ltd* [1999] 2 Lloyd's Rep 606); cases which could and should have formed part of an earlier English action (Dicey & Morris 14th ed para 12-073; *Glencore International AG v*

*Exter Shipping Ltd* [2002] All ER (Comm) 1 (CA), paras 67 and 68) and cases which interfere with the processes of the English court.

**The amended complaint in Miami**

*The amended complaint*

28.    As I have said the complaint was filed on 1 June 2007 and amended on 7 June. It makes claims against both the Trustee and Elektrim. The recitation of the facts is peppered with allegations of fraud against the Trustee. But all those allegations are to be withdrawn. Why they were made in the first place, and upon what material, has not been explained. Following the conclusion of the hearing, I was provided (at my request) with a further version of the amended complaint with the allegations of fraud against the Trustee deleted. I have worked from that document.

*The claim against the Trustee*

29.    I begin with the surviving claim against the Trustee. The claims are against an English trustee, concerning the Trustee's duties under an English law trust deed, expressly governed by English law and containing a non-exclusive English jurisdiction clause, with the Trustee (whose acts are attacked) being in England and the relevant acts having occurred in England. Mr Malek QC, appearing for VH1, accepts that England is the natural forum for this claim. Nor does he suggest that there is any advantage in proceeding in Miami of which VH1 will be deprived if an injunction is granted. The sole substantive question, then, is whether the claim against the Trustee is vexatious or oppressive.

30.    The surviving claim against the Trustee is contained in counts 1 and 2 of the amended complaint. It is first alleged that the Trustee was in breach of fiduciary duty in failing to disclose to Everest the full contents of the Second Partial Award of 2 October 2006 before withdrawal of the bankruptcy petition. It is now conceded by VH1 that this factual allegation is simply wrong. Not only did the Trustee disclose the award to the bondholders' committee, but Mr Torres himself saw it (although he says that he did not understand its significance). Moreover, the lawyers acting for the bondholders' committee themselves instructed the Trustee to obtain an adjournment of the bankruptcy petition for the very purpose of considering the implications of the award. This allegation is hopeless.

31.    The second allegation is that the Trustee failed to obtain from Elektrim the full content of the First Partial Award of 6 June 2006 and disclose it to "Plaintiff" before agreeing to withdraw the petition. (The reference to "Plaintiff" is plainly mistaken because "Plaintiff", i.e. VH1, was not a bondholder at the relevant time, but I ignore that error). However, the Second Partial Award, which the bondholders' committee (including Mr Torres) did have, recited the operative part of the First Partial Award in full. The bondholders did not ask the Trustee to obtain a full copy of the award. Nor did Bingham McCutchen. As an allegation of breach of fiduciary duty, this is also hopeless.

32.    The third allegation is that the Trustee failed to disclose to Everest its knowledge that DT and Elektrim had engaged in a transaction that was contrary to the direction of the Vienna Arbitration Court. But the Trustee expressly applied to the Polish bankruptcy

court for a determination whether it was entitled to accept the money offered by Elektrim. The Polish bankruptcy court ruled that it was. This allegation is likewise hopeless.

33.     The fourth allegation is that the Trustee accepted "tainted money" from Elektrim without consulting Everest or obtaining the prior approval of the bondholders. I should first examine what the pleader means by the nebulous expression "tainted money". In the context of the amended complaint it is clear that it means money which was vulnerable in the hands of the Trustee at the suit of a third party (i.e. Vivendi). This is clear from paragraph 54 of the amended complaint which asserts that the risk was that the money received by the Trustee "would have to be disgorged while at the same time not being able to regain the claw-back provisions for fraudulent conveyances that would have existed if the bankruptcy petition had not been withdrawn." It is plain from this that the pleaded risk of disgorgement is one that is alleged to exist on the basis that Elektrim was *not* made bankrupt. The only such liability could have been a liability to Vivendi. Mr Malek's skeleton argument suggested precisely the opposite of the pleaded case. I reject that suggestion. The pleaded case is clear.

34.     The fourth allegation is therefore a collateral attack on my decision of 1 May in which I held that Vivendi had no arguable proprietary claim to the money which would prevent the Trustee from distributing it to bondholders. VH1 accepts that it is bound by that decision, and that it cannot therefore argue points that contradict or undermine it. The fourth allegation is therefore hopeless; or alternatively it amounts to a collateral attack on a decision of the English court.

35.     The fifth allegation is that the Trustee failed to disclose to Everest all the risks of accepting tainted money. This allegation is also hopeless, not least because (as I have decided in a judgment by which VH1 is bound) the money was not tainted. Mr Malek sought to argue that Everest was entitled to rely on the Trustee to draw to its attention how its interests under the bonds might be affected by receipt of the money. This amounts to an allegation that the Trustee had a duty to give advice (either legal or commercial) to the bondholders. The first objection to this argument is that no such duty is pleaded in the amended complaint. It does not, therefore, form any part of the claim that I am asked to restrain. The second objection is that in circumstances in which the bondholders were being advised by an international law firm of the stature of Bingham McCutchen it is inconceivable that the Trustee owed the bondholders any duty to tender legal advice (particularly when there is no allegation that the Trustee was asked for any advice). The third objection is that (as Everest's own Assignment Agreement explicitly records) Everest was a sophisticated investor well able to weigh up the commercial pros and cons of a commercial course of action. The fourth objection is that Everest did not ask the Trustee for any advice. Indeed the hearing on 4 October 2006 was adjourned at the request of (among others) Everest in order for it, together with its own lawyers, to consider the implications of the award of 2 October. The fifth objection is that if the Trustee owed any duty to tender commercial advice it must have owed that duty to all bondholders whether or not they were members of the bondholders' committee. But since the Trustee would have had no means of knowing the identity of all bondholders, no duty can have arisen. This allegation is likewise hopeless.

36.     The sixth allegation is that the Trustee failed to exercise adequate due diligence prior to withdrawing the bankruptcy petition by failing to conduct a full investigation of the legality of the transaction. There are two fatal objections to this allegation. First, the Trustee sought and obtained an order of the Polish bankruptcy court which declared that it was entitled to accept the payment. Second, bondholders holding more than 30 per cent of the value of the bonds instructed it to accept the payment and withdraw the petition. The Trustee is both entitled and obliged to act on the instructions of bondholders holding more than 30 per cent in value of the bonds. This allegation is therefore hopeless.

37.     The seventh allegation is that the Trustee acquiesced in delays of the bankruptcy petition. No loss is alleged to flow from this alleged breach. Moreover, the only particularised allegation of delay relates to the adjournment of the hearing on 4 October 2006, which Everest supported. This allegation is hopeless.

38.     The final allegation is that by withdrawing the petition the Trustee gave up the right to recapture fraudulently transferred assets. This allegation adds nothing to the preceding allegations; and is open to the same objection as the preceding allegations, namely that the Trustee was instructed or authorised to withdraw the petition by bondholders holding more than 30 per cent in value of the bonds. In addition, any action to recapture fraudulently transferred assets would have to have been taken by the liquidator of Elektrim (or its Polish equivalent). The Trustee had no "right" to give up.

39.     Suppose that there is some merit in one or more of the claims against the Trustee, what then? VH1 says that while Everest wanted to be paid it "did not want to receive tainted money and the possible liability that could come with tainted money". But VH1 is bound by my judgment which holds that the money was not tainted. So persistence in this allegation is a collateral attack on my judgment.

40.     In my judgment count 1 of the amended complaint discloses no arguable cause of action against the Trustee for breach of fiduciary duty. Count 2 repeats the same allegations but under the heading of breach of duty of care and diligence. For the same reasons, these allegations disclose no arguable cause of action against the Trustee.

41.     In addition, I consider that the allegations of causation of loss flowing from the alleged breaches are themselves fanciful. The amended complaint goes on to say that had Everest "opposed withdrawal and explained its reasons for doing so, the withdrawal would not have occurred" or that the bankruptcy court "would not have permitted the withdrawal". The Trustee says that its instructions to withdraw the petition came from holders of more than 30 per cent in value of the bonds and that there is no realistic prospect of showing that bondholders other than Everest would have acted differently had they known about the 6 June 2006 Award. It has adduced evidence from the bondholders supporting that position. In riposte Mr Malek says:

i)     Mr Torres' evidence is that in practice the Trustee and the bondholders acted unanimously. Given the Trustee's cautious approach in the past, and the history of litigation between the Trustee and the bondholders, it seems likely that if vociferous objections had been raised by one of the bondholders then the Trustee would have been very reluctant to take any step which might prejudice the bondholders' position.

ii)    Mr Torres might well have been able to muster 30% of the bondholders to support an instruction to pursue the bankruptcy petition. At best the Trustee would have found itself in a position of deadlock.

iii)   Finally, there is the possibility that Everest could have approached the Polish court directly.

42.    The first point to make is that the way Mr Malek puts it is not that "the withdrawal would not have occurred"; but that Everest lost the chance of dissuading the Trustee from withdrawing the petition or of persuading the court that the petition should not be withdrawn. That is not the way in which the claim is pleaded in the amended complaint. I will assume, however, that the greater plea includes the lesser.

43.    The first possibility (namely that a single bondholder's protests could have dissuaded the Trustee from accepting the money and withdrawing the petition) is fanciful. It ignores the Trustee's obligation to act on the instructions of bondholders holding more than 30 per cent in value of the bonds. I regard the suggestion that Everest could have whipped up support from 30 per cent of the bondholders as equally fanciful. In the first place, Everest had no means of knowing who the bondholders were, and the Trustee is not alleged to have had any obligation to inform them of the identity of other bondholders (even if the Trustee had the means of knowledge, which it did not). In the second place, the fact was that the bondholders were being offered repayment of the bonds after many years of waiting. If Elektrim were declared bankrupt, it would have been because its liabilities exceeded its assets, which would in itself have prejudiced its ability to repay the bonds.

44.    The final possibility can also be summarily dismissed. In the first place Everest had no *locus standi* before the Polish bankruptcy court, because it was not a creditor of Elektrim and had not filed a petition for Elektrim's bankruptcy. Moreover the Polish court had made it clear in its ruling of 27 October that a petitioner was entitled to withdraw his petition if he wanted to. It also ruled that a bankruptcy petition could not be founded on an allegation that a contingent claim, if established, would not be met. So the possibility of the equity kicker becoming payable would not have figured in any decision of the Polish court. The idea that the Polish court would have compelled the Trustee to proceed with its petition when it did not want to is fanciful.

45.    Any chance of stopping the withdrawal of the petition that Everest had was not in my judgment a real or substantial chance. It is not, therefore, an actionable head of loss.

46.    In summary, I consider that the amended complaint discloses no arguable cause of action against the Trustee; and moreover discloses no arguable claim for recoverable loss arising out of the alleged breaches. It is a claim that is bound to fail and, in my judgment, is vexatious.

47.    There is a further reason why, in my judgment, the claim in Miami against the Trustee should not be allowed to proceed. One of the principal purposes of the Part 8 proceedings was to determine whether there were any meritorious claims against the Trustee concerning the receipt from Elektrim of the €525m and the events of October 2006. In the course of the proceedings I made a representation order under which the bondholders (including Everest) were represented by two bondholders. In the course of the proceedings the representative bondholders, through leading counsel instructed

on their behalf, argued that the receipt of the monies by the Trustee was lawful and that there was no impediment to distribution. I accepted that argument and gave judgment to that effect. VH1 as assignee of the bonds from Everest is bound by that judgment. Its claim against the Trustee in Miami argues precisely the opposite. Its claim in Miami is therefore a collateral attack on that judgment. In addition the claim that VH1 seeks to advance in Miami is a claim that could and should have been raised in the course of the Part 8 proceedings in this court. If necessary, Everest could have applied to have been separately represented in those proceedings on the ground that there was a conflict of interest between it and the remaining bondholders. It did not; and should not be allowed to do so now.

48.    In my judgment the claim against the Trustee is vexatious and should not be allowed to proceed further. I will continue the anti-suit injunction.

*The claim against Elektrim*

49.    Mr Malek does not suggest that there is any juridical advantage in suing Elektrim in Miami of which VH1 would be unjustly deprived if the anti-suit injunction is continued.

50.    In the amended complaint VH1 alleges that Elektrim made fraudulent misrepresentations and non-disclosures, in particular about the circumstances and legality of the transfer of the PTC shares to DT. These fraudulent misrepresentations are said to have been contained in two press releases issued in the name of DT which VH1 alleges "upon information and belief" (unspecified) were part of a conspiracy between DT and Elektrim to defraud Elektrim's creditors. The DT press releases were intended to, and did, induce Everest and the other bondholders to believe that DT had acquired title to 48 per cent of the PTC shares. According to the press releases DT's title had apparently been obtained lawfully pursuant to the determination of an arbitration tribunal. It appeared that the PTC shares had been irrevocably transferred out of Elektrim in return for the payment of their book value of about €600 million. In reliance on these press releases Everest supported the decision to withdraw the bankruptcy petition. But for the misrepresentations by Elektrim, Everest would have taken steps to prevent a withdrawal of the petition. The steps open to it would have been the same steps alleged in its claim against the Trustee.

51.    The primary ground on which Elektrim bases its claim to an anti-suit injunction is that it says that the claim is made in breach of the terms of the Trust Deed and the bond conditions. The relevant part of the Trust Deed and the bond conditions confer on the Trustee the sole and exclusive right "to enforce the performance of any of the provisions of these presents". Mr Millett QC, appearing for Elektrim, says that the amended complaint in Miami, when taken as a whole, is an attempt to "enforce the performance of … the provisions" of the Trust Deed and/or the bond conditions. Mr Malek, on the other hand, says that the Miami proceedings are not in breach of clause 10.2 because they are not proceedings "to enforce the performance of any of the provisions" of the Trust Deed. The nature of VH1's claim against Elektrim is a claim in fraud, a Florida law tort. No claim in contract is made against Elektrim, either to enforce the Trust Deed or to claim damages for its breach. Consequently there is no contractual impediment to the Miami proceedings.

52.    The scope of the prohibition is a question of interpretation of the Trust Deed and the bond conditions. In determining what the relevant provisions would mean to a reasonable reader, I must take into account the commercial context within which the words were used, and the purpose which it can be inferred that the provisions were designed to achieve. In an extreme case a court may conclude that something has gone wrong with the language.

53.    The effect of each of clause 10.2 and condition 13 is to prohibit individual bondholders from "enforcing the performance of" the terms of the Trust Deed and of the Bonds against Elektrim, unless the Trustee has become bound to do so and has failed to do so. The question is: what do the quoted words preclude?

54.    Mr Millett submits, and I agree, that the overall structure of the Trust Deed and the bond conditions considered in the light of the evidence leads to the conclusions that:

    i)     The use of a trustee is a common and effective way of aggregating (or pooling) the administration and enforcement of bonds. The benefits of aggregating these tasks are (i) cost savings for everyone and (ii) fairness of outcome between the bondholders *inter se.*

    ii)    However the benefits of the scheme come at a price: i.e. the bondholders have to give up their individual rights of suit against the issuer (and, in this case, against the guarantor of the debts).

    iii)   The bondholders cannot be free to pursue their own claims "to enforce performance of" the bonds individually against Elektrim because otherwise the Trustee scheme does not work. Instead they must trust the Trustee to do it. Of course, if he fails, then and only then may bondholders pursue their own course.

    iv)    The purpose of the clause 10 (and condition 13) regime is to ensure that the class of bondholders all act through the Trustee. That ensures that they all share equally in the fortunes of the investment and that there is no competition between the bondholders.

    v)     Another evident purpose of the regime is to prohibit individual bondholders from pursuing class claims for their own account. If an individual bondholder is free to pursue a claim based on a loss caused to the bondholders as a class, then either there is the potential for multiplicity of actions or for duplication of actions brought by the Trustee on the one hand and individual bondholders on the other.

55.    It is common ground that the phrase "enforce performance of" the bond conditions is not confined to claims for specific performance. It must extend at least to a claim for damages for compensation for non-performance of the bond conditions. However, Mr Millett goes further. He submits that the phrase is apt to include any claim designed to vindicate the rights of a bondholder in his capacity as such. The test of what claims are caught by the phrase should be purposive and substantive, and not procedural or dependent on the ingenuity of the draftsman. A claim designed to compensate a bondholder for the loss of something that would have belonged to him in his capacity as a bondholder is caught by the prohibition, whether the cause of action is pleaded in

contract or tort. Thus a claim such as that advanced in the Miami proceedings, which is designed to secure to the plaintiff the lost value of the equity kicker which would have become payable under the bond conditions is within the prohibition because:

i) The claimed loss is one which was suffered by Everest in its capacity as bondholder, and the claim is therefore one which is designed to vindicate its rights as bondholder;

ii) The allegedly fraudulent statements were not made to Everest individually but, to the extent that they were directed at the bondholders (rather than to the world generally) they were directed to the bondholders as a class. The claimed loss is one which (if established) was suffered by all the bondholders as a class, rather than by Everest individually;

iii) The claimed loss is predicated on Elektrim having been declared bankrupt. If that had happened, the only way of recovering the value attributable to the equity kicker would have been by proving in Elektrim's bankruptcy. Proving in bankruptcy is one of the species of proceedings whose conduct in accordance with the Trust Deed and the bond conditions is exclusively within the control of the Trustee.

56. I accept Mr Millett's submissions for the reasons that he gave. I therefore conclude that the Miami proceedings are proceedings which, in substance, are proceedings to enforce the provisions of the Trust Deed and the bond conditions; and are therefore within the contractual prohibition. The anti-suit injunction should be continued on that ground.

57. In addition Mr Millett argued that the claim as framed was hopeless, both in terms of liability and in terms of causation of loss. The allegedly fraudulent statements were press releases put out by DT; not by Elektrim. DT is said to have colluded with Elektrim in putting out the press releases. The pleaded complaint is that the press release was put out on October 4 2006 "without disclosing the full content of the Second Partial Award". Reading between the lines, it seems to be implicit in that plea that if the full content of the Second Partial Award had been disclosed, the allegation of fraud could not have been made. The complaint goes on to allege that:

"Everest relied on this release, which deceived Everest, … about the content and effect of the Second Partial Award."

58. However, it is now conceded (contrary to Mr Torres' declaration) that Everest in fact saw the full contents of the Second Partial Award at exactly the same time. With the document in its hands, how can it plausibly be argued that it relied on and was deceived by a press release? Moreover, not only did Everest itself have the Second Partial Award in its hands, it was also in the hands of Bingham McCutchen. With highly experienced and competent lawyers retained to advise on and consider the implications of the Second Partial Award, how can it be plausibly argued that Everest relied on a press release rather than on its lawyers' advice? In my judgment there is no real answer to these questions.

59. In addition, for the reasons I have given in relation to the claim against the Trustee, the causal link between the allegedly fraudulent statements and the claimed loss is

THE HONOURABLE MR JUSTICE LEWISON          The Law Debenture Trust Corp. -v- Concord Trust & others
Approved Judgment

fanciful. I consider therefore that the claim as framed against Elektrim is also bound
to fail, and on that ground too the anti-suit injunction should be continued.

**Result**

60.     I will continue both injunctions until trial or further order.

LLOYD-LEWIS DEC.
EXHIBIT 8, PAGE 17

**<u>EXHIBIT 9</u>**

Case No:  HC07C00763/HC07C01505

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand
London WC2A 2LL

<u>Friday, 12 October 2007</u>

BEFORE:
**MR JUSTICE LEWISON**

--------------------

BETWEEN:                                                                    HC07C00763

## LAW DEBENTURE TRUST CORPORATION PLC
Applicant/Claimant

- and -

## (1) CONCORD TRUST
## (2) ACCIONA SA
## (3) ELEKTRIM SA
## VIVENDI HOLDINGS 1 CORP

Respondents/Defendants

--------------------

BETWEEN:                                                                    HC07C01505

## ELEKTRIM SA
**Applicant/Claimant**

- and –

## VIVENDI HOLDINGS 1 CORP
**Respondent/Defendant**

--------------------

<u>MR ROBERT MILES QC</u> (instructed by Simmons & Simmons) appeared on behalf of
the Applicant in proceedings HC07C00763

MR RICHARD MILLETT QC (instructed by Barlow Lyde & Gilbert) appeared on
behalf of the Applicant in proceedings HC07C01505

MR DAVID QUEST (instructed by Orrick Herrington & Sutcliffe) appeared on behalf
of the Respondent in both proceedings HC07C00763 and HC07C01505

--------------------

### Proceedings
--------------------

Digital Transcript of Wordwave International, a Merrill Communications Company
PO Box 1336  Kingston-Upon-Thames  Surrey KT1 1QT
Tel No: 020 8974 7300  Fax No: 020 8974 7301
(Official Shorthand Writers to the Court)

No of Words:4014
No of Folios: 56

1

LLOYD-LEWIS DEC.
EXHIBIT 9, PAGE 1

Friday, 12 October 2007

**A**  MR JUSTICE LEWISON:  For the reasons given in my written judgment, copies of which have been made available in draft, I will continue the anti-suit injunctions.

MR MILES:  My Lord, there are three matters.  First of all the form of the order, whether it should be final or interlocutory.  Secondly costs and third permission to appeal.

**B**  On the first point we put it on the basis that we have issued an application but we have not done it within time so that we have sought an abridgment.  My learned friend Mr Quest's position is he has helpfully notified us this morning that they say they do not consent to summary judgment for a final order because the applications have not been made in accordance with the CPR.  I am now reading from what he said:

**C**  "However, we accept that the evidence and argument which the Court would consider on any subsequent hearing would be the same as that which the judge has already heard and ruled upon.  It is therefore a matter for the Court as to whether it considers it appropriate to make a final order now."

**D**  We would invite your Lordship just to make an order up of your own motion, which you have power to do under the CPR.  My Lord, that is all we say on that.

MR JUSTICE LEWISON:  Mr Millett presumably will say exactly the same thing.  Mr Quest?

MR QUEST:  Mr Miles explained our position.  We do not consent to it and we do not (several inaudible words) submissions to make about it.

**E**  MR JUSTICE LEWISON:  So, there is no particular prejudice.

MR QUEST:  My Lord, no.

MR JUSTICE LEWISON:  Well, in that case I will make a final order on my own motion.

**F**  MR MILES:  My Lord, on the question of costs you have seen our skeleton argument, I hope, seeking indemnity costs.  Essentially we make three main points.  One that the Miami proceedings were absolutely hopeless and the parties were really at one as to the test.  The test is a high one.  The case was so hopeless as to be vexatious.  Secondly that it was a collateral attack on the English Court's process and therefore was an abuse of this Court's process, and third we draw attention to the completely unfounded allegations of fraud which were made in those proceedings for which there was not a jot of evidence and which should never have been made.  For all the reasons we have set out in our skeleton argument we would respectfully suggest that this is an appropriate case for indemnity costs.

**G**

**H**  MR MILLETT:  My Lord, we would say the same thing for the reasons set out in our skeleton argument, which I hope your Lordship received rather late last night.

2

LLOYD-LEWIS DEC.
EXHIBIT 9, PAGE 2

**A**

Particularly paragraph 11.7 in relation to (inaudible) provisions, unless your Lordship wishes to hear from me further on that.

MR JUSTICE LEWISON: No, thank you. Yes, Mr Quest.

MR QUEST: My Lord, we do not resist an order for payment of the trustee's and Elektrim's costs, we do resist the application which is made on an indemnity basis. My Lord, can I deal with the trustee's application and Elektrim's application separately?

**B**

MR JUSTICE LEWISON: Yes, by all means.

**C**

MR QUEST: They do raise rather different issues. I do not think there is any procedure about the test which the Court applies (several inaudible words) the test in itself or whether the case goes so far outside the norm as to justify awarding indemnity costs. In my submission, notwithstanding that the injunction has been granted, the case is not a suitable one for indemnity costs.

My Lord, what I want to do is to address the specific points that Mr Miles and then Mr Millett make in their skeletons about the conduct of the case. Just before I do that, there is a general point I want to make, which is this.

**D**

Where an anti-suit injunction has been granted on grounds of vexatiousness and oppression it will necessarily be the case, by virtue of granting the injunction, the defendant will have been found to have acted vexatiously in precedent, that is the test that is being applied. It cannot be right, in my submission, that it automatically follows from that that whenever such an injunction has been granted the defendant *ipso facto* becomes liable to pay indemnity costs. There must, in my submission be something in the party's conduct which takes the case out of the norm of anti-suit injunction cases and in that respect, in my submission, when the Court is considering, as it is here, the cost of the English proceedings, not the Miami proceedings, the cost of the English proceedings, the focus should be, when looking at VH1's conduct, its conduct in these proceedings, in these English proceedings.

**E**

So, in the present case, my Lord, the fact that the Court regarded the Miami proceedings as vexatious is what gives rise to the right to injunction, and therefore the right to costs in the ordinary course. If the claimant wants to go beyond that and claim the indemnity costs of the English proceedings there must, in my submission, be something out of the norm about the conduct by VH1 of these English proceedings.

**F**

I will address Mr Miles' criticisms in a moment, but as I understand it there is no criticism made about the way in which the defence of the anti-suit injunction has been handled in the course of these English proceedings. The complaints are all about the Miami proceedings and they are essentially the same complaints that were made in support of the substantive application.

**G**

So, I am going to look at those criticisms. In my submission they are really addressed to the wrong issue.

Having said that by way of introduction can I take you to Mr Miles' skeleton? In fact he has conveniently summarised the points at paragraph 22 on page 5. I will just, if I may, run through those.

**H**

I am going to take them slightly out of order because I want to start with point (d) which is the point that an allegation of fraud was made by VH1 against the trustee,

3

and that is the point that Mr Miles emphasised this morning.  That is of course correct, that the original complaint did make that allegation, however it was made clear in Mr Davis' first witness statement on this application, which was 20 July, that the allegation of fraud against the trustee was not going to be pursued.  I anticipate it will be said, "Well, we have subsequently had a debate at the hearing itself about what consequences that has for the complaint" and your Lordship directed a further blue-pencil draft of the complaint should be filed.  That, in my submission, is really by way of clarifying how that withdrawal would affect the complaint.  I do not think it could be suggested that post 20 July when Mr Davis filed his statement that to the trustee it could appear that VH1 were pursuing a claim of fraud against them in Miami.

So, when one looks at the principal costs of this application, which of course are on the *inter partes* hearing and the costs of dealing with the evidence put in by the trustee in response to Mr Davis and the argument before your Lordship, those proceedings were not concerned with an allegation of fraud because by that time, and indeed at more or less the earliest opportunity on the *inter partes* application, the allegation of fraud against the trustee had been withdrawn.  So that, in my submission, is not a reason to grant indemnity costs or if it is they ought to be confined to the cost of the *ex-parte* application and not what followed.  That is point (d).

Going back to Mr Miles' skeleton and starting at the beginning of the list, to pick up the other points, the first point he makes is that we did not bring our claim in the natural forum and indeed we have accepted, I think, that England is the natural forum.  We have not suggested Florida is the natural forum.  But also we have contended, and it remains our position, that Florida does have jurisdiction to hear this claim.  Evidence was put in by Mr Davis to support that proposition and your Lordship has not ruled otherwise.  Indeed, your Lordship has not ruled on the question of whether Florida has jurisdiction.

MR JUSTICE LEWISON:  It is not for me to rule on that.

MR QUEST:  No, quite, and so one must proceed, in my submission, on the basis that this is a case which at least in the eyes of the Florida Court that Court has jurisdiction.  It is not --

MR JUSTICE LEWISON:  That Court has jurisdiction to decide whether it has jurisdiction.

MR QUEST:  Yes, and there is a dispute between the parties about how that Court would decide that question.  It is not, as the case per se, in itself a precedent to pursue proceedings in a Court which has jurisdiction, even though that Court is not the natural forum.  That is not a precedent in itself.  You are entitled, if you like, to bring proceedings which are not otherwise vexatious in a Court which has jurisdiction, even if that Court is not the natural forum.

So, the point at (a) in isolation again is not a reason for indemnity costs because it is simply saying we have proceeded outside the natural forum but that is not in itself a precedent.

Point (b) is that the proceedings were hopeless.  Well, of course that is what the Court has found.  We do not accept that and we will proceed to appeal that finding.  But, this is really the point I made at the outset, the question of whether

4

LLOYD-LEWIS DEC.
EXHIBIT 9, PAGE 4

proceedings are hopeless or not is the test of the injunction, so the fact that the Court has found against us on that does not mean that there is something unreasonable about taking the point, nor should it follow that indemnity costs should be granted simply because the trustee has got over the hurdle which it is required to in order to get an injunction.

Point (c) said we issued a press release to help us fight DT and Elektrim. Well, that is true, but in my submission that is a minor point and cannot in itself justify an award of indemnity costs (several inaudible words). (d) I have dealt with. (e) seems to be more or less the same point as (b) which is that the proceedings were bound to fail, but what is said parenthetically is the fraud claim was grudgingly withdrawn at the hearing itself. In my submission that is not accurate and as I have said, Mr Davis made it clear in his first statement that he would withdraw any fraud allegation. What was discussed at the hearing (several inaudible words).

Finally point (f). It says that even after VH1 took the assignment from Elektrim we allowed the representative bond-holders to appear on its behalf to make contrary submissions. Again, in my submission that is something of a mis-characterisation of what happened. Of course it is true that because the Court has appointed representative bond-holders, representatives of all the bond-holders, it follows that VH1, as a bond-holder, is bound by the result of that hearing because that is the procedural consequence of the appointment of a representative. But, to say that we allowed them to appeal in advance on its (inaudible) submission suggests that in some way we were active in persuading them to take that point in a way contrary to (inaudible) in Miami and where in fact the true position is that VH1 took no part at all in the proceedings. As I said, it may be the procedural effect of that is it is bound by them. The suggestion that we were in some way pressing for a finding in England contrary to the finding we were seeking in Miami is, in my submission, wrong.

So, in my submission none of the points raised by Mr Miles, either individually or together, even if they are points which the Court should take into account on the question of the basis of assessment justifies a finding (several inaudible words).

My Lord, can I now pick up the points that Mr Millett makes in his skeleton, which again are summarised at the beginning of paragraph 11?

The first says that there was a deliberately designed collateral attack intended to hold up the distribution of the payment by the trustee. Well, again this is a similar point to the one about the fraud. It is true that, as your Lordship is aware, that originally relief was sought, but again in Mr Davis' statement of 20 July he made it clear that we could not thereafter seek to challenge the distribution or to seek any relief based on the distribution. I should say also in relation to point (1) that it is not clear what this has to do with Elektrim. To the extent that there was a dispute it was a dispute between the trustee and the bond-holders as to whether the money should be paid out. I am not sure how Mr Millett (several inaudible words) on his application.

Point (2) seems (several inaudible words). Point (3), (4) and (5) all deal with the question of fraud, and there seems to be a misconception here. We have made it clear we have withdrawn the allegation of fraud against the trustee. We have never withdrawn the allegation of fraud against Elektrim and that is something that was maintained throughout the hearing and indeed was not any part of the judgment, or indeed the argument, when your Lordship decided whether there had been a fraud by Elektrim and that was clearly a factual issue and it is one that we

5

**A**

pursue. So, the suggestion that there has been a withdrawal of those allegations in the matter of indemnity costs is simply wrong, in my submission.

Mr Millett also, point (5), repeats the point about the allegations were only withdrawn during the hearing of the application. Well, I have dealt with that. In fact point (6) also deals with fraud and finally, point (7), which goes to his interpretation point.

**B**

Well, my Lord, this is a point about the interpretation of the bond. It is a point of contractual interpretation. We say that your Lordship ought to interpret it literally and find that the complaint fell outside the term of the bond. Mr Millett says it ought to have a more purportive or substantive interpretation. That is what your Lordship found, well, so be it. (inaudible) reasonable construction point (inaudible) it cannot be said that that justifies an award of indemnity costs.

Those are my submissions on the basis of the assessment.

**C**

MR JUSTICE LEWISON:   Thank you very much.   Who is going to reply first? Mr Miles?

**D**

MR MILES:  My Lord, the first question is the test.  The test is whether or not the conduct is such as to take it out of the norm for litigation, not for litigation involving vexation or oppression. It is as if my learned friend would say, "Well, there is a special category of cases where someone strikes out for abuse of process and the defendant then comes along and says, 'Ah, but it has got to be an abnormal abuse of process before indemnity costs is awarded'." The question is whether it is abnormal or out of the norm for litigation seen as a whole, not abnormal for cases where the defendant has been guilty of vexatious or oppressive conduct. That would be absurd.

**E**

The second point is there are no complaints about the conduct of the UK proceedings as opposed to the Miami proceedings. That is misunderstanding the basis of the application. The complaint we make is that they launched the Miami proceedings as a collateral attack and launched utterly hopeless proceedings. Those are vexatious from the perspective of the English Court. It is the English Court which is determining whether they are vexatious and oppressive and the reason for the jurisdiction absent to contract is the protection of the English Court's process. So, what the Court is saying is that this is conduct which is an attack on the English Court's proceedings or process and that is why it is called vexatious from the perspective of the English Court. You have to look at the conduct as a whole and of course conduct for the purposes of Part 44 includes not only the things that happen in Court but the things that happen out of Court.

**F**

**G**

As to the specific points that we made and my learned friend referred to by reference to our skeleton, dealing first with the fraud allegation, it is not right to say that Mr Davis withdrew the fraud allegation in his first witness statement. You may recall, I do not know whether your Lordship has bundle G to L there, tab I50, 489, paragraph 5. Mr Davis describes the claims and then at the end of paragraph 5 says:

> "Although count 3 in its present form, …(reading to the words)… refers also to the trustee, it is intended if the case is allowed to proceed, to amend the Complaint so that the claims in count 3 are made against only Elektrim. [Then at page 497 paragraph 33] As mentioned earlier in this statement while count 3 of the Complaint

**H**

6

LLOYD-LEWIS DEC.
EXHIBIT 9, PAGE 6

A

    in its present form refers to both Elektrim and LDTC, it has been decided, on the basis of the evidence presently available, and without conceding the absence of a good faith basis and proper purpose for making such claims to pursue these claims of common law fraud against Elektrim alone. VH1 intends to maintain the allegations in counts 1 and 2 of the Complaint against LDTC that they acted negligently andin breach of fiduciary duty as well as in breach of their obligations under the Trust Deed."

B

Counts 1 and 2, as your Lordship will recall, included allegations of fraud. If they intended to withdraw the allegations of fraud against the trustee they should have done so in respect of all three counts and not just count 3.

As to the other points the first point we make about it being brought in the wrong forum is not just a forum point. It is that they had the opportunity to bring the case here where if they were really going to make these claims they should have brought them and instead of that they chose to go off to an inappropriate jurisdiction and issued a press release.

C

We take those points together because what that amounts to is tactical behaviour. It was a tactical stunt that they hoped would enable them to prevent distribution. It did not work but they have nonetheless persisted with the case.

As to (e) and (f), my Lord I have already made these points but they should not have persisted in this case when it became utterly clear that the case was hopeless. We pointed out right at the outset that they had had copies of the October award. They still persisted even after that and went through various gymnastics to attempt to continue to justify the position. They should have withdrawn that case and should have ceased defending these proceedings.

D

My Lord, as to the final point that we make, this again is essentially a collateral attack point. All I have done there is essentially to summarise the point you have made in paragraph 47 of the judgment that this is a collateral attack because the representatives acting on their behalf through legal counsel were making representations to this Court which were precisely the opposite of what they are now saying or seeking to say in Miami.

E

We just add this point, they knew of course at the time they took the assignment, before they launched the Miami proceedings, of the existence of these proceedings because they had been served on Vivendi and they chose to take the assignment knowing that representatives had been appointed in this country and were making precisely the opposite set of submissions. So, my Lord, for all of those reasons we say that this is a case that amply justifies the award of indemnity costs.

F

MR MILLETT: My Lord, yes, so do we in respect of Elektrim. I adopt everything that Mr Miles has just said. May I add this? Your Lordship ought, in my submission, to take a holistic approach to this and see what the Miami proceedings were in the round from the beginning to the end. It is, in my submission, utterly unrealistic for this request to seek to pick off Elektrim on the putative basis that the claims against it could have stood alone in the absence of the trustee. He cannot begin to explain how the claims against Elektrim could ever run if the trustee was not party to them.

G

The litigation in Miami was all of a piece in order to achieve an illegitimate, collateral and oppressive result. One can see that from the way it was begun, the timing, and the timing is very telling, the nature of what was assigned under the

H

7

deed of acceptance and the way the claims were framed originally and continue to be framed.

This is not a case where Elektrim was sued in Miami because VH1 had tried to go through the steps in clause 10.2 of the bond deed. In other words try to interest the trustee in pursuing the claim for all the bond-holders that the trustee having to come down to do so had failed. It is obvious why VH1 could not take those steps and that is because it was accusing the trustee of fraud and if not fraud, after 20 July, then serious breach of duty.

Therefore it is simply a mis-characterisation to pretend that somehow because the claims were being maintained against Elektrim in fraud everything is all right.

In addition to that it is impossible to see, as we said in our skeleton, how the claims against Elektrim could possibly stand in fraud anyway once it was accepted that Mr Torres received a second partial award. Your Lordship has so found. You have also granted the injunction on the second basis as well as the first.

Finally, in relation to the question of construction, the point we make at sub-paragraph 7 in our skeleton is in my submission correct. Again it is precisely because VH1 was accusing the trustee of fraud that it could not go through the hoops and they simply chose to ignore the provisions because it did not suit them. They had to ignore them and therefore were forced into arguing what, in my submission, was a wholly unrealistic exercise in literalism which if they brought their mind to bear on it did not have a collateral plan, anybody would have realised, spelled the end for this kind of claim.

Finally, my Lord, they never began to explain to your Lordship or to anybody either before or since why it was that they were not protected by the trustee's contingent payment claim, which had been commenced in London on 15 December 2005.

My Lord, for all those reasons, in addition to Mr Miles', we say that this is a strong case for indemnity costs.

(Judgment given)

LLOYD-LEWIS DEC.
EXHIBIT 9, PAGE 8

## **EXHIBIT 10**

Case No: HC07C00763/
HC07C01505

**NEUTRAL CITATION NUMBER: [2007] EWHC 2471 (Chy)**
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand
London WC2A 2LL

Friday, 12 October 2007

BEFORE:

**MR JUSTICE LEWISON**

--------------------

BETWEEN:

**LAW DEBENTURE TRUST CORP PLC**

Applicant/Claimant

- and -

**VIVENDI HOLDING ONE CORP**

Respondent/Defendant

--------------------

**Mr Robert Miles QC and Mr Andrew Clutterbuck** (instructed by **Simmons & Simmons**) for the Claimant.
**Mr Richard Millett QC and Mr Julian Kenny** (instructed by **Barlow Lyde & Gilbert**) for the third defendant (claimant in the anti-suit injunction).
**Mr Ali Malek QC and Mr David Quest** (instructed by **Orrick Herrington & Sutcliffe**) for the fourth defendant (defendant in the anti-suit injunction).

--------------------

**Judgment As Approved by the Judge**
Crown copyright©
--------------------

Digital Transcript of Wordwave International, a Merrill Communications Company
PO Box 1336 Kingston-Upon-Thames Surrey KT1 1QT
Tel No: 020 8974 7300 Fax No: 020 8974 7301
(Official Shorthand Writers to the Court)

No of words: 489
No of folios:7

LLOYD-LEWIS DEC.
EXHIBIT 10, PAGE 1

1. MR JUSTICE LEWISON:  It is not disputed that VH1 must pay the costs of Law Debenture Trust and also Elektrim.  What is in dispute is whether those costs should be assessed on the standard basis or the indemnity basis.  The Court's power arises under CPR Part 44.3 and sub-rule (4) requires that in deciding what order, if any, to make about costs the Court must have regard to all the circumstances including the conduct of all the parties.

2. Sub-rule (5) goes on to say that the conduct of the parties includes conduct before as well as during the proceedings and in particular the extent to which the parties followed any relevant pre-action protocol.

3. The rules in part 44.3 do not restrict the pre-existing law, which entitles a judge to consider any relevant aspect of the conduct of the parties including their conduct in relation to the matters which gave rise to the litigation.  What gave rise to the litigation in the present case was the institution of a complaint in Miami against both the trustee and against Elektrim.  I found for the reasons I have given in my judgment that the claim is vexatious and amounts to a collateral attack on a judgment of this Court.

4. Mr Miles submits that the complaint was what he called a stunt, originally intended to prevent distribution by the trustee.  That is certainly how it strikes me and it seems to me that the attempt to defend the remaining parts of the complaint was in effect a salvage operation.  Although no serious criticism has been made of the narrow question whether the conduct of the English proceedings has in some way been improper, I am in my view entitled to take into account the overall picture, including the institution and then the continuation of the Miami complaint in circumstances in which, as I have held, that complaint is bound to fail and is vexatious.

5. Those factors do, in my judgment, take this case out of the norm of litigation and it is an appropriate case in which to award costs to be paid on the indemnity basis.

Interim payment of £175,000 is awarded to the Law Debenture Trust on account of costs.

Interim payment of £80,000 is awarded to Elektrim on account of costs.

Permission to appeal is refused.

**EXHIBIT 11**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 07-21431-CIV-KING/Garber

VIVENDI HOLDING I CORP., as the assignee
of an Elektrim Bondholder,

        Plaintiff,

v.

LAW DEBENTURE TRUST CORPORATION, PLC,
and ELEKTRIM S.A.,

        Defendants.

_____/

## NOTICE OF VOLUNTARY DISMISSAL

    Plaintiff Vivendi Holding I Corp. ("VH1") files this Notice of Dismissal Without

Prejudice of this action, pursuant to Fed.R.Civ.P. 41(a)(1).

Dated:  October 23, 2007        Respectfully submitted,
        Miami, Florida

          s/Alexander Angueira
Of Counsel:        ALEXANDER ANGUEIRA (Florida Bar No. 0716091)
ORRICK, HERRINGTON &        aangueira@swmwas.com
SUTCLIFFE, LLP        STEARNS WEAVER MILLER WEISSLER
Lanny J. Davis        ALHADEFF & SITTERSON, P.A.
Garret G. Rasmussen        Suite 2200, Museum Tower
Washington Harbour        150 West Flagler Street
3050 K Street, Northwest        Miami, Florida 33130
Washington D.C. 20007-5135        Telephone:  (305) 789-3200
Telephone: (202) 339-8400        Facsimile:  (305) 789-3395
Facsimile:  (202) 321-7569        **Attorneys for Plaintiff**

LLOYD-LEWIS DEC.
EXHIBIT 11, PAGE 1

**EXHIBIT 12**



# ORRICK

ORRICK, HERRINGTON & SUTCLIFFE
TOWER 42, LEVEL 35
25 OLD BROAD STREET
LONDON EC2N 1HQ
DX: 557 LONDON/CITY

tel +44 (0) 20 7562 5000
fax +44 (0) 20 7628 0078

WWW.ORRICK.COM

REGULATED BY THE
SOLICITORS REGULATION AUTHORITY

A partnership of registered foreign lawyers
and English solicitors.

A list of partners' names and professional
qualifications is open to inspection at the
address above.

7 November 2007

Our ref:  MF/604816.20085
Your ref: 95818-18/RZB/3.73

*BY HAND*

Barlow Lyde & Gilbert
Beaufort House
15 St Botolph Street
London
EC3A 7NJ
**Attention: Mr. Richard Black**

Dear Sirs,

**Re:    Elektrim SA v Vivendi Holdings 1 Corp - Claim No. HC07C01505**

We enclose by way of service a copy of our client's Appellant's Notice, filed on Friday, 2 November 2007, Form N161B Notes for Respondents and letter from the Civil Appeals Office. Please acknowledge safe receipt.

Yours faithfully,

*Orrick, Herrington + Sutcliffe*

**Orrick, Herrington & Sutcliffe**

Encs.

OHS LONDON:360092362.1

## Pwysig
## Nodiadau i atebyddion

Mae copi o rybudd apelydd (apêl) wedi'i gyflwyno i chi.

Os ydy'r rhybudd yn cynnwys cais am hawl i apelio, does dim rhaid i chi wneud unrhyw beth nes i chi dderbyn hysbysiad gan y llys bod caniatâd wedi'i roi.

Os rhoddir caniatâd, dim ond ychydig o amser fydd gennych i ymateb i'ro apêl. Rhaid i chi benderfynu beth i'w wneud ar frys.

Gallwch:
- ♦ hefyd apelio yn erbyn yr un gorchymyn; neu
- ♦ ofyn am amrywio'r gorchymyn; neu
- ♦ ofyn i'r llys apêl gadarnhau'r gorchymyn am resymau gwahanol neu ychwanegol i'r rheini a roddwyd gan y llys is (y llys a wnaeth y gorchymyn rydych chi'n apelio yn ei erbyn); neu
- ♦ ofyn i'r gorchymyn gael ei gadarnhau am yr un rhesymau ag yr oedd y llys is wedi dibynnu arnynt; neu
- ♦ wneud dim

Os ydych chi am apelio, amrywio neu gadarnhau'r gorchymyn rydych chi'n apelio yn ei erbyn am resymau gwahanol neu ychwanegol, bydd angen i chi lenwi **Rhybudd Atebydd (Ffurflen N162)** a'i anfon i'r llys. **Does gennych chi ddim llawer o amser i wneud hyn.** Mae'r ffurflen hon, y nodiadau cyfarwyddyd ar gyfer ei llenwi a thaflen o'r enw *Rwyf am apelio* ar gael yn rhad ac am ddim o unrhyw swyddfa llys neu Swyddfa Ceisiadau Interim Barnwyr yn y Llysoedd Barn Brenhinol, Strand, Llundain, WC2A 2LL. Byddant yn egluro'r terfynau amser ac yn dweud wrthych chi am y dogfennau bydd eu hangen arnoch i gefnogi'ch apêl.

Gallwch hefyd lenwi rhybudd atebydd os ydych chi am ofyn i'r llys apêl gadarnhau'r gorchymyn am yr un rhesymau a roddwyd yn y llys is ond bod gennych ddadleuon ychwanegol i'w rhoi gerbron y llys apêl. Fel arall, gallwch osod y dadleuon ychwanegol hyn mewn 'dadl fframwaith', h.y. dogfen sy'n nodi'r pwyntiau rydych chi am eu rhoi gerbron y llys apêl. Gallwch ddefnyddio Ffurflen N163 i osod eich dadl fframwaith. Mae'r ffurflen hon hefyd ar gael o unrhyw swyddfa llys neu'r Llysoedd Barn Brenhinol yn y cyfeiriad uchod.

Mae gwybodaeth am apelio gerbron y Llys Apêl ar gael gan Gofrestrfa'r Swyddfa Apeliadau Sifil, Ystafell E307, Y Llysoedd Barn Brenhinol, Strand, WC2A 2LL.

**Os na fyddwch chi'n llenwi rhybudd atebydd nac yn ffeilio dadl fframwaith, chewch chi ddim dibynnu ar unrhyw ddadleuon ychwanegol yng ngwrandawiad yr apêl oni bai fod y rheini wedi'u codi yn y llys is, neu oni bai fod y llys yn caniatáu i chi wneud hynny.**

## Important
## Notes for respondents

You have been served with a copy of an appellant's notice (an appeal).

If the notice includes an application for permission to appeal, you need do nothing unless and until you receive notice from the court that permission has been given.

If permission is given, you will only have a limited time in which to reply to the appeal. You must decide what to do quickly.

You can:
- ♦ also appeal against the same order; or
- ♦ ask for the order to be varied; or
- ♦ ask that the order be upheld by the appeal court for different or additional reasons than those given by the lower court (the court who made the order being appealed); or
- ♦ ask that the order be upheld for the same reasons relied on by the lower court; or

- ♦ do nothing

If you wish to appeal, vary or uphold the order being appealed for different or additional reasons, **you will need to complete a Respondent's Notice (Form N162) and send it to the court. You have a very limited time to do this.** This form, the notes for guidance for completing it and a leaflet *I want to appeal* can be obtained free from any court office or Judges' Interim Applications Office at the Royal Courts of Justice, Strand, London, WC2A 2LL. They will explain about time limits and tell you the documents you will need to support your appeal.

You may also complete a respondent's notice if you simply wish to ask the appeal court to uphold the order for the reasons given in the lower court but have additional arguments to make to the appeal court. Alternatively you may set these additional arguments out in a 'skeleton argument', i.e. a document which just sets out the points you wish to make to the appeal court. Form N163 can be used to set out your skeleton argument. This form can also be obtained from any court office or the Royal Courts of Justice at the above address.

Information about making an appeal to the Court of Appeal can be obtained from the Civil Appeals Office Registry, Room E307, Royal Courts of Justice, Strand, WC2A 2LL.

**If you do not complete a respondent's notice or file a skeleton argument, you will not be able to rely on any additional arguments at the hearing of the appeal which were not raised in the lower court unless the court gives you permission.**

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 2

# Appellant's notice

(All appeals except small claims track appeals)

| For Court use only | |
|---|---|
| Appeal Court Ref. No. | 2007/2497 |
| Date filed | 2 NOV 07 |

Notes for guidance are available which will help you complete this form. Please read them carefully before you complete each section.

*(Court seal: SUPREME COURT OF JUDICATURE COURT OF APPEAL CIVIL DIVISION — SEAL — 2 NOV 2007)*

## Section 1   Details of the claim or case you are appealing against

Claim or Case no.   | HC07C00763 and HC07C01505 |

Name(s) of the   ☑ Claimant(s)   ☐ Applicant(s)   ☐ Petitioner(s)

| The Law Debenture Trust Corporation plc (in Case No. HC07C00763)<br>Elektrim S.A. (in Case No. HC07C01505) |
|---|

Name(s) of the   ☑ Defendant(s)   ☐ Respondent(s)

| Concord Trust; Acciona S.A.; Elektrim S.A.; Vivendi Holdings 1 Corp (in Case No. HC07C00763)<br>Vivendi Holdings 1 Corp (in Case No. HC07C01505) |
|---|

Details of the party appealing ('The Appellant')

Name

| Vivendi Holdings 1 Corp |
|---|

Address (including postcode)

| 800 Third Avenue New York<br>NY 10022<br>USA | Tel No. | 00 1 212 572 7855 |
|---|---|---|
| | Fax | 00 1 212 572 7496 |
| | E-mail | |

Details of the Respondent to the appeal

Name

| The Law Debenture Trust Corporation plc (HC07C00763) and Elektrim S.A. (HC07C01505) |
|---|

Address (including postcode)

| Law Debenture Trust Corporation plc<br>Fifth Floor, 100 Wood Street, London EC2V 7EX<br>Tel: 020 7606 5451  Fax: 020 7606 0643<br>and<br>Elektrim S.A.<br>77-79 Panska Street, 00834 Warsaw, Poland<br>Tel: 00 48 22 432 8801  Fax: 00 48 22 432 8756 | Tel No. | |
|---|---|---|
| | Fax | |
| | E-mail | |

Details of additional parties (if any) are attached      ☐ Yes   ☐ No

N161 Appellant's notice (07.06)                                    HMCS

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 3

## Section 2    Details of the appeal

From which court is the appeal being brought?

☐ The County Court at

☐ High Court District Registry at

☑ The Royal Courts of Justice

☐ Other (please specify)

What is the name of the Judge whose decision you want to appeal?

The Honourable Mr Justice Lewison

What is the status of the Judge whose decision you want to appeal?

☐ District Judge or Deputy        ☐ Circuit Judge or Recorder

☐ Master or Deputy               ☑ High Court Judge or Deputy

What is the date of the decision you wish to appeal?

12 October 2007

To which track, if any, was the claim or case allocated?

☐ Fast track

☐ Multi track

☑ Not allocated to a track

Nature of the decision you wish to appeal

☐ Case management decision       ☐ Grant or refusal of interim relief

☑ Final decision                  ☐ A previous appeal decision

## Section 3    Legal representation

Are you legally represented?                        ☑Yes    ☐No

If 'Yes', please give details of your
solicitor below

Your solicitor's name

| Orrick, Herrington & Sutcliffe |
| --- |

Your solicitor's address (including postcode)

| Level 35, Tower 42 25 Old Broad Street London EC2N 1HQ | Tel No. | 020 7562 5000 |
| --- | --- | --- |
| | Fax | 020 7628 0078 |
| | E-mail | |
| | DX | 557 London/City |
| | Ref. | MF/604816.20085 |

Are you, the Appellant, in receipt of a Legal Aid Certificate
or a Community Legal Service Fund (CLSF) certificate?        ☐Yes    ☑No

Is the respondent legally represented?                ☑Yes    ☐No

If 'Yes', please give details of the
respondent's solicitor below

The respondent's solicitor's address (including postcode)

| Simmons & Simmons (HC07C00763) CityPoint, One Ropemaker Street London  EC2Y 9SS Ref: London/010/011922-00364/JD/EFS and Barlow Lyde & Gilbert (HC07C01505) Beaufort House, 15 St Botolph Street London  EC3A 7NJ Ref: 95818-18/RZB/3.73 | Tel No. | (S&S) 020 7628 2020; (BLG) 020 7247 2277 |
| --- | --- | --- |
| | Fax | (S&S) 020 7628 2070; (BLG) 020 7071 9000 |
| | E-mail | |
| | DX | (S&S) Box No 12; (BLG) 155 London CDE |
| | Ref. | |

## Section 4    Permission to appeal

Do you need permission to appeal?                    ☑Yes    ☐No

Has permission to appeal been granted ?

☐ Yes                            ☑ No

| Date of order granting permission | | Orrick, Herrington & Sutcliffe |
| --- | --- | --- |
| | | |
| Name of Judge granting permission | | the Appellant('s solicitor) seek permission to appeal. |
| | | |

## Section 5    Other information required for the appeal

Please set out the order (or part of the order) you wish to appeal

The Appellant wishes to appeal against the orders made on 12th October 2007 by the Honourable Mr. Justice Lewison (in both actions) that it must not:

(1) Take any further step in the proceedings it has commenced against the Claimant in the United States District Court of Florida, Miami Division, Case No 07-21431 ("the Miami Proceedings") save for the purpose of discontinuing the same;

(2) Commence any proceedings whether in Florida or elsewhere in the world against the Claimant for the relief claimed in the complaint in the Miami Proceedings or based on the allegations contained therein;

and that the Appellants pay the Claimant's costs of their applications and of the actions as against Vivendi Holdings 1 Corp on the indemnity basis.

Does your appeal include any issues arising from the Human Rights Act 1998?     ☐ Yes   ☑ No

Are you asking for a stay of execution of any judgment against you?     ☐ Yes   ☑ No

If 'Yes' you must complete **Part A of Section 8**

Have you lodged this notice with the court within 21 days of the date on which the Judge made the decision you wish to appeal?     ☑ Yes   ☐ No

If 'No' you must complete **Part B of Section 8**

Are you making any other applications?     ☐ Yes   ☑ No

If 'Yes' you must complete **Part C of Section 8**

## Section 6    Grounds for appeal and arguments in support

Please state, in numbered paragraphs, **on a separate sheet** attached to this notice and entitled 'Grounds of Appeal' (also in the top right hand corner add your claim or case number and full name), why you are saying that the Judge who made the order you are appealing was wrong.

☑ The arguments (known as a 'Skeleton Argument') in support of the 'Grounds of Appeal will follow within 14 days of filing this Appellant's Notice

**OR**

☐ The arguments (known as a 'Skeleton Argument') in support of the 'Grounds of Appeal' are set out **on a separate sheet** and attached to this notice.

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 6

## Section 7    What are you asking the Appeal Court to do?

I am asking the appeal court to:-
(please tick the appropriate box)

☑ set aside the order which I am appealing

☐ vary the order which I am appealing and substitute the following order. Set out in the following space the order you are asking for:-

☐ order a new trial

## Section 8    Other applications

Complete this section **only** if you are asking for orders **in addition** to the order asked for in Section 7.

**Part A**
I apply for a stay of execution because:

**Part B**
☐ I do not need an extension of time for filing my appeal notice because it has been filed within the extended time granted by the Judge whose decision I am appealing.

**OR**

☐ I apply for an extension of time for filing my appeal notice because (set out the reasons for the delay. You must also set out in Section 9 what steps you have taken since the decision you are appealing).

**Part C**
I apply for an order that:

because

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 7

## Section 9   Evidence in support

In support of my application(s) in Section 8, I wish to rely upon the following evidence:

---

**Statement of Truth**

I believe (The appellant believes) that the facts stated in this section are true.

Full name

Name of appellant's solicitor's firm

signed

position or office held

Appellant ('s solicitor)

(if signing on behalf of firm or company)

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 8

## Section 10   Supporting documents

To support your appeal you should file with this notice all relevant documents listed below. To show which documents you are filing, please tick the appropriate boxes.

If you do not have a document that you intend to use to support your appeal complete the box over the page.

☑ two additional copies of your appellant's notice for the appeal court;

☑ one copy of your appellant's notice for each of the respondents;

☐ one copy of your skeleton argument for each copy of the appellant's notice that is filed;

☐ a sealed *(stamped by the court)* copy of the order being appealed;

☑ a copy of any order giving or refusing permission to appeal, together with a copy of the judge's reasons for allowing or refusing permission to appeal;

☐ any witness statements or affidavits in support of any application included in the appellant's notice;

☐ a copy of the order allocating the case to a track *(if any)*; and

☐ a copy of the legal aid or CLSF certificate *(if legally represented)*.

A bundle of documents for the appeal hearing containing copies of all the papers listed below:-

☑ a sealed copy *(stamped by the court)* of your appellant's notice;

☐ a sealed copy *(stamped by the court)* of the order being appealed;

☑ a copy of any order giving or refusing permission to appeal, together with a copy of the judge's reasons for allowing or refusing permission to appeal;

☐ any affidavit or witness statement filed in support of any application included in the appellant's notice;

☐ a copy of the skeleton argument;

☑ a transcript or note of judgment, and in cases where permission to appeal was given by the lower court or is not required those parts of any transcript of evidence which are directly relevant to any question at issue on the appeal;

☑ the claim form and statements of case (where relevant to the subject of the appeal);

☑ any application notice (or case management documentation) relevant to the subject of the appeal;

☐ in cases where the decision appealed was itself made on appeal (eg from district judge to circuit judge), the first order, the reasons given and the appellant's notice used to appeal from that order;

☐ in the case of judicial review or a statutory appeal, the original decision which was the subject of the application to the lower court;

☐ in cases where the appeal is from a Tribunal, a copy of the Tribunal's reasons for the decision, a copy of the decision reviewed by the Tribunal and the reasons for the original decision and any document filed with the Tribunal setting out the grounds of appeal from that decision;

☑ any other documents which are necessary to enable the appeal court to reach a decision; and

☐ such other documents as the court may direct.

Reasons why you have not supplied a document and date when you expect it to be available:-

| Title of document and reason not supplied | Date when it will be supplied |
|---|---|
| Sealed Order in HC07C01505 - minute of Order not yet approved. | by 16 November 2007 |
| Appellant's Skeleton Argument in support of Grounds of Appeal. | by 16 November 2007 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Signed [signature] Appellant('s Solicitor)

2/11/07

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 10

APPEAL COURT REFERENCE NO.

IN THE COURT OF APPEAL
ON APPEAL FROM THE HIGH COURT OF JUSTICE
CHANCERY DIVISION

HC07C00763

BETWEEN:

VIVENDI HOLDINGS 1 CORP

Appellant

AND:

LAW DEBENTURE TRUST CORPORATION

Respondent

HC07C01505

BETWEEN:

VIVENDI HOLDINGS 1 CORP

Appellant

AND:

ELEKTRIM SA

Respondent

GROUNDS OF APPEAL

OHS LONDON:360092204.1
1-3203 M3P/M3P

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 11

The Miami Proceedings

1.    Vivendi Holdings 1 Corporation ("**VH1**") applies for permission to appeal against orders of Lewison J ("**the Judge**") dated 12 October 2007:

1.1    Restraining VH1 from:

a.    taking any further step in the proceedings it has commenced against Law Debenture Trust Corporation plc ("**the Trustee**") and Elektrim SA ("**Elektrim**") in Miami, Florida ("**the Miami Proceedings**");

b.    commencing any proceedings whether in Florida or elsewhere in the world (except where the EU Jurisdiction Regulation applies) against the Trustee or Elektrim for the relief claimed in the complaint in the Miami Proceedings ("**the Complaint**") or based on the allegations contained therein;

1.2    Declaring that the Miami Proceedings against Elektrim constitute a breach of clause 10.2 of the Trust Deed referred to below.

2.    VH1's case in the Miami proceedings, insofar as now intended to be pursued, is in summary as follows:

2.1    Everest Capital Ltd ("**Everest**") was the holder of bonds issued by Elektrim Finance BV and guaranteed by Elektrim. VH1 has acquired Everest's bonds and claims as its assignee.

2.2    The terms of the bonds provided for the bondholders to receive, in addition to repayment of the principal amount of the bonds and interest, a contingent payment (referred to as "the equity kicker")

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 12

Jased on Elektrim net assets on a specified date. Depending on the value of the assets, the contingent payment might be very large.

2.3  The Trustee is the trustee of the proceeds of the bonds pursuant to an amended and restated Trust Deed.

2.4  Elektrim defaulted on the bonds and in March 2005 the Trustee commenced bankruptcy proceedings against Elektrim in Poland.

2.5  Elektrim's principal asset prior to the summer of 2006 was its interest in shares in Polska Telefonica Cyfrowa ("**PTC**"), one of the leading providers of mobile telephone services in Poland. The PTC shares were owned by Telco, a company in which Elektrim holds a 49% shareholding and Vivendi SA controls 51%. The market value of the PTC shares is very large, potentially as much as €3bn.

2.6  The ownership of PTC shares is the subject of a long-running dispute between Elektrim, Deutsche Telekom ("**DT**") and Vivendi SA.

2.7  In May 2005, Deutsche Telekom commenced arbitration proceedings in Vienna against Elektrim claiming a right to acquire the PTC shares at book value pursuant to a call option granted by Elektrim to DT. The book value is very much less than the market value.

2.8  In September and October 2006, Elektrim and DT colluded to make fraudulent market announcements that DT had acquired the PTC shares from Elektrim pursuant to an order of the Vienna arbitral tribunal. The announcements were false in that, although partial awards had been made by the arbitral tribunal in June and October 2006, they did not have the effect of conferring title to the PTC shares on DT.

2.9  Following these announcements, the Trustee, DT and Elektrim reached an agreement that if DT paid the book value of the PTC

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 13

shares to Elektrim, and if Elektrim used €525m of that money to repay the bonds, then the Trustee would withdraw its bankruptcy petition.

2.10    Shortly before the hearing of its petition, the Trustee received €525m and the petition was withdrawn.

2.11    Everest contends that if it had appreciated that the market announcements were false and that DT's title to the shares had *not* been acquired pursuant to an order of the arbitral tribunal, then it would have opposed the withdrawal of the petition. That is because if Elektrim had been been adjudicated bankrupt on the Trustee's petition then its trustee in bankruptcy could under Polish bankruptcy law have sought to recapture assets transferred by Elektrim taking place up to one year before the filing of the petition. This would have meant that Elektrim's estate might have recaptured the PTC shares from DT and also other assets which had been stripped out of Elektrim during the relevant period. These assets would have given significant value to the equity kicker, resulting in a substantial benefit to Everest.

2.12    Everest contends that in those circumstances, if it had known the true facts, it could and would have persuaded the Trustee to proceed with the petition, or could and would have persuaded a sufficient number of other bondholders to instruct the Trustee to proceed.

2.13    Everest contends that:

a.      Elektrim acted fraudulently in misrepresenting the circumstances of the transfer of the PTC shares, misrepresenting its asset position generally, and in failing to disclose that it had caused or allowed assets to be stripped from the company;

b.      The Trustee acted in breach of a fiduciary duty of reasonable care and skill in failing to proceed with the petition and/or in

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 14

failing to draw the attention of the bondholders to the terms of the June/October 2006 arbitral awards and to warn that the announcements made about the transfer of the PTC shares were false;

c.     As a result of Elektrim's fraud and the Trustee's breach of duty, it has lost the value or potential value of the equity kicker.

**Claims against the Trustee**

3.     The Judge granted an anti-suit injunction to the Trustee on the grounds that:

3.1     The claims pleaded in the Miami Proceedings were bound to fail and therefore vexatious.

3.2     The Miami Proceedings amounted to a collateral attack on an earlier judgment dated 1 May 2007 given by the Judge in the proceedings by the Trustee for directions in relation to the distribution of the money received from Elektrim.

4.     In granting the injunction, the Judge erred in the following respects.

5.     In ¶50(c) of the Complaint, VH1 alleges that the Trustee wrongfully failed to disclose its knowledge that DT and Elektrim had engaged in a transaction that was contrary to the direction of the arbitral tribunal. The Judge held (in ¶32 of the Judgment) that that allegation was hopeless because the Trustee had sought and obtained from the Polish bankruptcy court a determination that it was entitled to accept payment under the bonds from Elektrim. However, the Polish bankruptcy court was concerned only with the question of whether payment was consistent with earlier injunctions which it had granted. Even if the Trustee was entitled as a matter of Polish law to accept

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 15

payment from Elektrim, it was not in the interests of the bondholders to do so because, by withdrawing the petition on payment, the ability to recapture the PTC shares and other assets was prejudiced.

6.    In ¶50(e)–(f) of the Complaint, VH1 alleges that the Trustee wrongfully accepted tainted funds from Elektrim and wrongfully failed to disclose the risks. The Judge held (in ¶¶33–34 of the Judgment) that that allegation related to the risk of a third party, in particular Vivendi SA, asserting a proprietary right to the funds, and that the allegation was accordingly a collateral attack on his judgment of 1 May 2007, in which he held that Vivendi SA had had no such right. As to that:

6.1    The allegation in the Complaint that the funds were tainted is not an allegation that they were subject to a prior interest of a third party. Rather it is an allegation that the funds were at risk of recapture by a trustee in a subsequent bankruptcy of Elektrim (for example, in Elektrim's current bankruptcy on its own petition). That issue was not previously before the Judge and he did not decide it in the 1 May 2007 judgment.

6.2    In holding otherwise, the Judge misinterpreted the Complaint; alternatively, he failed to give any consideration to the fact that the Complaint could be amended if the allegation was not fully or adequately pleaded.

6.3    The Judge also said (in ¶35 of the Judgment) that ¶50(f) of the Complaint amounted to an allegation that Trustee had a duty to give advice to the bondholders, but that that allegation was hopeless because (a) no such duty had been pleaded, (b) the bondholders had advice from their own lawyers, (c) Everest was a sophisticated investor, (d) Everest did not ask for advice, and (e) the Trustee had no means of knowing the identity of the bondholders.

6.4    As to that:

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 16

a.  VH1's case is not that the Trustee had a duty to give general advice but that it should have ensured that the bondholders had a sufficient understanding of their position to make appropriate decisions. That case was sufficiently identified in the Complaint. Alternatively, any omissions in the pleading could be corrected by amendment.

b.  The extent and existence of the Trustee's duty, and how it might be affected by the sophistication of the parties and their access to other advice, depends on the context. The issue is, in part at least, one of fact and degree and ought to have been left for consideration by the foreign court trying VH1's action, after discovery in accordance with the procedure of that court. It was wrong in principle for the Judge to consider and decide the issue on an application for an anti-suit injunction.

7.  In ¶50(g) of the Complaint, VH1 alleges that the Trustee wrongfully failed to exercise adequate due diligence prior to withdrawing the petition. The Judge held (at ¶36 of the Judgment) that the Trustee had acted, as it was entitled and obliged to act, on the instructions of bondholders holding more than 30% in value of the bonds. That holding, while correct as far as it goes, fails to take account of VH1's case that those instructions would not have been given had Everest been in a position, by opposing the withdrawal of the petition in circumstances where the Trustee normally expected unanimity from the bondholders, to persuade the Trustee and bondholders to proceed with the petition.

8.  The Judge further held (¶¶41–45 of the Judgment) that VH1's case that Everest could have prevented the withdrawal of the petition, and/or that it lost the opportunity of doing so, was fanciful and that VH1 could not establish that any loss had been caused by the Trustee's conduct. As to that:

8.1  VH1 has made factual allegations, supported by evidence, that Everest could and would have persuaded the Trustee and the other bondholders to proceed with the bankruptcy petition with a view to obtaining a much larger sum in respect of the equity kicker, or that if necessary it could itself have persuaded the Polish court to adjudicate Elektrim bankrupt.

OHS LONDON:360092204.1
1-3203 M3P/M3P

7

8.2    The allegations are not bound to fail and the issues ought in any event to have been left for consideration by the foreign court trying VH1's action, after discovery in accordance with the procedure of that court. It was wrong in principle for the Judge to consider and decide these issues on an application for an anti-suit injunction.

9.    The Judge further held (¶47 of the Judgment) that the claims in the Miami proceedings were inconsistent with the position taken by representative bondholders in the proceedings by the Trustee for directions, and/or could and should have been raised in those proceedings. As to that:

9.1    Whilst VH1 accepts that it is bound by the 1 May 2007 judgment in those proceedings by reason of the representation order made therein, it was not a party to the proceedings and took no part in them.

9.2    Those proceedings were in any event concerned only with the distribution of the funds received by the Trustee in connection with the withdrawal of the bankruptcy petition (which had already taken place); they were not concerned with the events leading up to the withdrawal or whether the withdrawal was in the interests of the bondholders.

9.3    Even if Everest could have applied to join the proceedings to bring claims against the Trustee, there is no rule of law or procedure which requires it to do so; it was entitled to bring the claims in another forum having jurisdiction over them.

**Claim against Elektrim**

10.    The Judge granted an anti-suit injunction to Elektrim and declaratory relief on the grounds that:

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 18

10.1    The claims pleaded in the Miami Proceedings were bound to fail and therefore vexatious.

10.2    The Miami Proceedings were in breach of clause 10.2 of the Trust Deed, which provides that no Bondholder shall be entitled to proceed directly against Elektrim *"to enforce the performance of any of the provisions"* of the Trust Deed unless the Trustee having become bound to take proceedings failed to do so within a reasonable period and such failure is continuing.

11.    In granting the injunction and declaratory relief, the Judge erred in the following respects.

12.    The nature of VH1's claim against Elektrim is apparent from the Amended Complaint: it is a claim in fraud, a Florida law tort. No claim in contract is made against Elektrim, either to enforce the Trust Deed or to claim damages for breach of it. There was therefore no breach of clause 10.2.

13.    The Judge was wrong to hold (in ¶56 of the Judgment) that the claims were nevertheless within the terms of clause 10.2 because they were "in substance" proceedings to enforce the performance of the Trust Deed. In so holding, the Judge misconstrued the Trust Deed and gave an unjustifiably extended meaning to clause 10.2 when its literal meaning was clear.

14.    The Judge further held (¶58) that since the October award of the Vienna arbitral tribunal was in the hands of Everest and the bondholders' lawyers, Bingham McCutchen, it could not plausibly be argued that Everest relied on DT's announcements. As to that:

14.1    Whether Everest relied on information received from Elektrim and/or DT about the transfer of the PTC shares is an issue of fact. VH1's case, support by evidence, is that Everest in fact did not appreciate, and was not advised about, the effect of the second partial award and in fact believed that the transfer of the PTC shares had been ordered by the arbitral tribunal.

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 19

14.2    It was wrong in principle for the Judge to dismiss that case on an application for an anti-suit injunction. The issue ought to have been left for consideration by the foreign court trying VH1's action.

14.3    The Judge failed to take account of the fact that Everest's case in fraud against Elektrim is not limited to the allegation that Elektrim colluded in the making of the false announcements.

15.    The Judge further held (¶59 of the Judgment) that the causal link between the statements by Elektrim and the claimed loss was fanciful for the same reasons given in respect of the claims against the Trustee. Paragraph 8 above is repeated.

Conclusion

16.    The appeal should be allowed on the grounds set out above.

LLOYD-LEWIS DEC.
EXHIBIT 12, PAGE 20