The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VIVENDI S.A. and VIVENDI
HOLDING I CORP., as the Assignee
of a U.S. Elektrim Bondholder,

                    Plaintiffs,

vs.

T-MOBILE USA, INC.; T-MOBILE
DEUTSCHLAND GMBH; T-MOBILE
INTERNATIONAL AG; DEUTSCHE
TELEKOM AG; and ZYGMUNT SOLORZ-
ZAK ,

                    Defendants.

Case No. CV6-1524 JLR

**DECLARATION OF BEN SUTER IN
SUPPORT OF DEFENDANT ZYGMUNT
SOLORZ-ZAK'S MOTION TO DISMISS**

I, BEN SUTER, hereby declare as follows:

1.     I am a attorney in good standing admitted to practice in the States of California, Arizona and Hawaii, as well as before numerous Federal Courts, including the United States Supreme Court. I have been admitted to appear *pro hac vice* in this matter before this Honorable Court. I am a shareholder with the law firm of Keesal, Young & Logan, attorneys for Defendant ZYGMUNT SOLORZ-ZAK ("Mr. Solorz"). As such, I have personal knowledge of the matters set forth herein, and if called to testify, I could and would competently testify to the matters set forth below.

2.     This Declaration is submitted in support of Mr. Solorz's Motion to Dismiss Plaintiff VIVENDI S.A. ("Vivendi") and VIVENDI HOLDING I CORP.'s ("VH1") (collectively, "Plaintiffs")

KYL_SF457786           - 1 -

DECLARATION OF BEN SUTER
IN SUPPORT OF DEFENDANT ZYGMUNT
SOLORZ-ZAK'S MOTION TO DISMISS
- Case No. CV6-1524 JLR

KEESAL, YOUNG & LOGAN
1301 FIFTH AVENUE, SUITE 1515
SEATTLE, WA 98101
(206) 622-3790

1    Third Amended Complaint ("Motion to Dismiss") pending in the United States District Court,

2    Western District of Washington at Seattle.

3         3.    Attached hereto as <u>Exhibit 13</u> is a true and correct copy of the United States Securities

4    & Exchange Commission ("SEC")'s Complaint filed against Vivendi Universal, S.A., Jean-Marie

5    Messier and Guillaume Hannezo dated December 23, 2003.   <u>Exhibit 13</u> was obtained from the

6    following address maintained by the SEC:  http://www.sec.gov.litigation/complaints/comp18523.htm.

7         4.    Attached hereto as <u>Exhibit 14</u> is a true and correct copy of the SEC's Litigation Release

8    No. 18523/Accounting and Auditing Enforcement Release No. 1935, issued on December 24, 2003,

9    obtained from the following SEC address:  http://www.sec.gov.litigation/lirelseases/lr18523.htm.

10        5.    Attached hereto as <u>Exhibit 15</u> is a true and correct copy of the British Court of Appeal

11   (Civil Division) case of *Excelsior Commercial & Industrial Holdings Limited v. Salisbury Hammer*

12   *Aspden & Johnson (A Firm), Betesh & Company (A Firm) [And Formerly Other Parties],* [2002

13   EWCA Civ 879, 2002 WL 1039624.  <u>Exhibit 15</u> was obtained from Westlaw.

15        I declare under penalty of perjury under the laws of the United States that the foregoing is true

16   and correct and that this Declaration was executed in San Francisco, California this 7th day of

17   November 2007.

19                                                  BEN SUTER

28   KYL_SF457786                                    - 2 -

---

**DECLARATION OF BEN SUTER**
**IN SUPPORT OF DEFENDANT ZYGMUNT**
**SOLORZ-ZAK'S MOTION TO DISMISS**
**- Case No. CV6-1524 JLR**

**EXHIBIT 13**

Complaint: Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo



**U.S. Securities and Exchange Commission**

# UNITED STATES DISTRICT COURT
# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### Case No. CV-

Securities and Exchange Commission,

                Plaintiff,

    v.

VIVENDI UNIVERSAL, S.A.,
JEAN-MARIE MESSIER, and
GUILLAUME HANNEZO,

                Defendants.

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint alleges as follows:

### I. SUMMARY

1. Vivendi Universal, S.A. ("Vivendi" or the "Company") is a media and telecommunications conglomerate with substantial holdings in the United States and Europe. Vivendi was formed in December 2000 as a result of a three-way merger of Vivendi's predecessor company with The Seagram Company Ltd. ("Seagram") and French cable giant Canal Plus, S.A. ("Canal+"). In July 2002, Vivendi reported that it experienced a liquidity crisis. Vivendi also began selling many of its assets.

2. Prior to this reported liquidity crisis, Vivendi, its former Chief Executive Officer ("CEO") Jean-Marie Messier ("Messier"), and its former Chief Financial Officer ("CFO") Guillaume Hannezo ("Hannezo") (collectively, "Defendants") committed multiple violations of the antifraud, books and records, internal controls and reporting provisions of the federal securities laws. Between approximately December 2000 and July 2002 (the "relevant time period"), Vivendi, under the direction of Messier, Hannezo and/or other executive officers, reported materially false and misleading information about its "EBITDA" growth and liquidity in its SEC filings and public releases. Defendants and other executive officers of Vivendi also,

SUTER DEC.
EXHIBIT 13, PAGE 1

Complaint: Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo          Page 2 of 20

directly or indirectly, were responsible for improper adjustments to Vivendi's "EBITDA" in order to meet targets during two quarters in 2001, concealed various material commitments and obligations, and failed to disclose the full extent of Vivendi's involvement in a transaction to purchase shares of a Polish telecommunications company.

3. Based on this misconduct, the Commission brings this action to enjoin and restrain Defendants from further violations of the federal securities laws. The Commission requests, among other things, that Defendants be: (1) enjoined from further violations of the federal securities laws as alleged herein, (2) ordered to disgorge all ill-gotten gains they received as a result of the conduct alleged herein, with prejudgment interest, and (3) ordered to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act of 1933 ("Securities Act") and Section 21(d)(3) of the Securities Exchange Act of 1934 ("Exchange Act"). The Commission further requests that the Court issue an Order under Section 21(d)(2) of the Exchange Act prohibiting Messier and Hannezo from acting as officers or directors of any public company as provided in that section.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v (a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

5. Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the acts, practices, and courses of conduct alleged herein.

6. Certain of the acts and practices described herein, which constitute violations of the Securities Act and Exchange Act, occurred within the Southern District of New York. Vivendi is headquartered in Paris, France, but during the relevant time period conducted business and maintained U.S. offices in this judicial district. During the relevant time period, Defendants Messier and Hannezo were, at various relevant times, residents of the Southern District of New York or of Paris, France. Accordingly, venue is proper under Section 22 of the Securities Act and Section 27 of the Exchange Act.

## III. DEFENDANTS

7. Vivendi is a "*société anonyme*" organized under the laws of France and with its corporate headquarters at 42 Avenue Friedland 75380, Paris, Cedex 08, France. During 2001 and 2002, Vivendi maintained offices in Paris, France and New York, New York. Vivendi became a media and telecommunications conglomerate in December 2000 as a result of its merger with Seagram and Canal+. Vivendi's ordinary shares trade on the EuroNext Paris, S.A. (the "Paris Bourse"), and its American Depository Shares ("ADS") trade on the New York Stock Exchange and are registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78(g)]. Vivendi operates on a calendar fiscal year and is required to file annual reports with the Commission on Form 20-F.

SUTER DEC.
EXHIBIT 13, PAGE 2

8. Defendant Jean-Marie Messier, age 47, was CEO of Vivendi and its predecessor companies from 1994 until July 2, 2002. During that time Messier also served as Chairman of Vivendi's Board of Directors. Messier is a French citizen who currently resides in New York, New York.

9. Defendant Guillaume Hannezo, age 42, was CFO of Vivendi and its predecessor companies from 1997 until mid-July 2002. Hannezo is a French citizen who resides in Paris, France. From mid-2001 through at least July 2002, Hannezo resided in New York, New York.

## IV. OTHER RELEVANT ENTITIES

10. Cegetel Group ("Cegetel"), based in France, is a privately held telecommunications operator of fixed line and mobile telephony and Internet services. During the relevant time period, Vivendi, through direct and indirect holdings, owned a 44% stake in Cegetel.

11. Elektrim Telekomunikacja Sp. zo.o ("Telco"), based in Poland, is a holding company that owns various telecommunications assets. Vivendi has owned a stake in Telco since 1999.

12. Maroc Telecom, based in Morocco, is a telecommunications operator of fixed line and mobile telephony and Internet services. Vivendi acquired a 35% stake in Maroc Telecom in 2001.

13. Universal Music Group ("UMG"), based in the United States, is a wholly owned subsidiary of Vivendi.

## V. RELEVANT ACCOUNTING PRINCIPLES

14. Foreign issuers who are required to file annual reports with the Commission report the financial results of their operations in financial statements, which include an income statement and balance sheet, prepared in conformity with the Generally Accepted Accounting Principles ("GAAP") applicable in the United States, their home country, or some other jurisdiction. Foreign issuers include these financial statements in annual reports that they file with the Commission on Forms 20-F. Issuers that submit non-U.S. GAAP financial statements to the Commission must also include in their Forms 20-F, among other things, a reconciliation of net income to U.S. GAAP, and may also choose to include other disclosures required by U.S. GAAP. Foreign issuers also disclose other information to the U.S. public on Forms 6-K.

15. A company's income statement reports, among other things, revenue recognized, expenses incurred, and income earned during a stated period of time. Within an income statement, expenses are generally subtracted from revenues to calculate net income. A company's balance sheet reports, among other things, the assets and liabilities of a company at a point in time, usually as of the end of the company's fiscal quarter or fiscal year.

16. During the relevant time period, Vivendi was a foreign issuer whose primary place of reporting and listing was in Paris, France. Vivendi was also required to file its annual consolidated financial statements with the Commission on Forms 20-F. Vivendi also furnished certain information to the Commission on Forms 6-K during the relevant time period. Also during

SUTER DEC.
EXHIBIT 13, PAGE 3

the relevant time period, Vivendi filed financial information in France with the Commission des Opérations de Bourse ("COB").

17. During the relevant time period, Vivendi's consolidated financial statements were prepared in conformity with French GAAP. However, the financial results in Vivendi's consolidated earnings releases issued in the United States during at least portions of the relevant time period were presented as "U.S. GAAP based" or on a "U.S. GAAP basis." Also, during some or all of the relevant time period, U.S. GAAP applied to the financial results of several of Vivendi's business units, including Cegetel and UMG.

18. During the relevant time period, certain of Vivendi's business units established and/or maintained liability accounts or reserve accounts in accordance with U.S. GAAP. For example, these business units established and maintained reserves in connection with accounts receivable that were or may become uncollectible.

19. Statement of Financial Accounting Standards Number 5 ("FAS 5"), "Accounting for Contingencies," requires that an entity's bad debt reserve reflect, at any given point in time, the estimated probable loss inherent in the entity's accounts receivable. It precludes both the use of reserves, including excess reserves, for general or unknown business risks, and the systematic or timed release of reserves into income.

20. Statement of Financial Accounting Concepts No. 5 ("SFAC 5"), "Recognition and Measurement in Financial Statements of Business Enterprises," states that revenue cannot be recognized until it is earned and that revenue is earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.

21. During the relevant time period, Vivendi emphasized two non-U.S. GAAP measurements when it announced its financial results to the public. First, Vivendi typically announced in press releases and other public statements its earnings before interest, taxes, depreciation, and amortization, which is commonly known as EBITDA. Second, Vivendi reported its "Operating Free Cash Flow" (also referred to as "Operational Free Cash Flow"), which Vivendi defined in its earnings releases as "EBITDA minus capital spending minus changes in working capital minus other expenses."

## VI. FACTUAL ALLEGATIONS

22. Vivendi traces its origins to 1853, and for much of its history was known for providing environmental management services. In December 2000, however, Vivendi acquired Seagram and Canal+, and during 2001 and 2002 acquired all or a portion of the outstanding shares or assets of various other media and telecommunications companies, such as Houghton Mifflin Company, MP3.com, USA Networks, Inc., and Maroc Telecom. Until it recently began disposing of certain assets, Vivendi was one of Europe's largest companies in terms of assets and revenues, with holdings in the United States that included Universal Studios Group, Universal Music Group, and USA Networks Inc. The cost of these acquisitions, when combined with the Seagram and Canal+ purchases, totaled more than $60 billion in cash, stock and assumed debt, and increased the debt associated with Vivendi's "Media & Communications" division from approximately €3

SUTER DEC.
EXHIBIT 13, PAGE 4

billion at the beginning of 2000 to over €21 billion in 2002. [During the relevant time period the exchange rate for Euros to U.S. Dollars ranged from a high of approximately €1.18 to the U.S. Dollar to a low of €1.01 to the U.S. Dollar.]

23. In July 2002, Messier and Hannezo resigned from their positions with Vivendi, and the Company's new management disclosed that Vivendi had experienced a liquidity crisis. The liquidity problem that Vivendi publicly disclosed in July 2002 was a stark contrast to the financial picture that Defendants and other executive officers of Vivendi had presented to the public over the preceding months. During the relevant time period, in fact, Defendants and other senior executives of Vivendi engaged in or were responsible for a number of improper practices that produced materially false and misleading EBITDA results and/or concealed Vivendi's true financial condition, including:

- Issuing press releases that falsely portrayed Vivendi's liquidity and cash flow positions;

- Adjusting reserves and engaging in other accounting practices in violation of U.S. GAAP in order to increase Vivendi's EBITDA and meet ambitious earnings targets communicated to the market;

- Failing to disclose the existence of various commitments and contingencies; and

- Failing to disclose part of its investment in a transaction to acquire shares of Telco.

## A. VIVENDI'S MISLEADING 2001 EARNINGS RELEASE AND OTHER PRESS RELEASES

(i) March 5, 2002 Earnings Release for 2001 Fiscal Year

24. On March 5, 2002, Vivendi issued its earnings release for the 2001 fiscal year, approved by Messier, Hannezo and other senior executives, in which Vivendi announced that its Media & Communications business had produced €5.03 billion in EBITDA and just over €2 billion in Operating Free Cash Flow. In its March 5, 2002 earnings press release, Vivendi stated that both of these results were well ahead of EBITDA projections and that the cash flow figure in particular was well ahead of the company's own internal targets. The March 5, 2002 press release also emphasized "the excellent operating results that have been achieved" and stated that the results "confirm the strength of Vivendi Universal's businesses across the board despite a very difficult global economic environment." Further, the earnings release highlighted Vivendi's "fundamentally strong operating results" and claimed that Vivendi was "the only media and communications [company] not to change its numbers and targets."

25. The March 5, 2002 earnings release also stated that based on Vivendi's "excellent" operating results, including its EBITDA and cash flow figures, Vivendi would pay a dividend in May 2002 of €1 per share.

26. The statements in the March 5, 2002 earnings release were materially misleading and falsely presented Vivendi's financial situation. As Vivendi

and its executive officers, including Messier and Hannezo, knew or were reckless in not knowing, the Company's financial condition at this time was worse than Vivendi indicated because of its inability unilaterally to access the earnings and cash flow of two of its most profitable subsidiaries, Cegetel and Maroc Telecom.

27. During the relevant time period, Vivendi owned Cegetel and Maroc Télécom along with other minority shareholders. Due to legal restrictions, Vivendi (as a parent company) was not permitted unilaterally to access the cash flow of subsidiaries, such as Cegetel and Maroc Telecom, in which there were other minority shareholders. In fact, during the relevant time period, Maroc Telecom did not transfer cash to Vivendi, and Vivendi only accessed Cegetel's cash through a short-term current account that Vivendi had to repay by July 31, 2002. During the relevant time period, over 30% of Vivendi's EBITDA and almost half of its cash flow was attributable to those two companies.

28. As Vivendi, Messier, Hannezo and other Vivendi executive officers knew or were reckless in not knowing during the relevant time period, Vivendi's inability unilaterally to access that cash flow substantially impaired Vivendi's ability to satisfy the debt obligations and other operating costs that Vivendi had amassed in connection with its many acquisitions. In fact, at year-end 2001 and during the first half of 2002, Defendants and other senior executives of Vivendi knew or were reckless in not knowing that the Company's overall cash flow was "zero or negative," and that Vivendi "produced negative cash flow from [its] core holdings" such as its entertainment businesses "that [was] barely offset by inaccessible cash flow from minority interests" such as Cegetel and Maroc Telecom. These factors hindered Vivendi's ability to reduce its debt and meet its cash obligations, and resulted in a liquidity condition that was in stark contrast to the representations made in Vivendi's public statements.

29. Moreover, Vivendi's claim in its March 5, 2002 earnings release that, based on the company's "excellent" operating results, it would pay a €1 per share annual dividend compounded the misleading presentation of Vivendi's results. In fact, Vivendi borrowed against credit facilities to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends.

    (ii) Additional Press Releases in 2002

30. In addition to its March 5, 2002 earnings release, Vivendi issued other press releases in the first half of 2002, all of which were authorized by Messier, Hannezo and other Vivendi executive officers, that presented a materially misleading picture of the Company's financial condition and concealed its growing inability to meet its financial obligations.

31. On May 30, 2002, Vivendi issued a press release stating that its "cash situation, which, the Company believes, is comfortable — even assuming an extremely pessimistic market — will enable the Company to continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders." This press release was false and misleading because Vivendi's cash situation was not "comfortable," and Vivendi, Messier, Hannezo and other Vivendi executive officers knew at this time, or were reckless in not knowing, that Vivendi's cash flow was "zero or

negative."

32. On June 26, 2002, Vivendi issued a press release in response to media speculation regarding the Company's liquidity. In that press release, Vivendi claimed that it had "around €3.3 billion in unused credit lines to back up its commercial paper outstanding of nearly €1 billion. The cash situation has greatly improved since the beginning of the year." Vivendi also claimed that "[o]wing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months."

33. Vivendi's access to credit, however, was much worse than this press release indicated. In fact, the day before Vivendi issued its June 26, 2002 press release, at least €900 million of the €3.3 billion in Vivendi credit lines expired. Further, by this date, Vivendi's "cash situation" had not improved since the beginning of the year, but rather had worsened as a result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

34. Defendants' attempts to reassure the market and to deny that it had any liquidity problems were materially misleading. Defendants knew, or were reckless in not knowing, that Vivendi's financial condition was precarious and that there was significant risk that it would experience the liquidity crisis that occurred in July 2002.

## B. VIVENDI'S MISLEADING EBITDA RESULTS FOR THE SECOND AND THIRD QUARTERS OF 2001

35. Vivendi, at the direction of its senior executives, improperly adjusted certain reserve accounts of its subsidiaries and made other accounting entries without supporting documentation and not in conformity with U.S. GAAP in order to meet ambitious earnings targets. During the relevant time period, Defendants referred to these improper efforts to meet or exceed earnings targets as "stretching."

36. At the time of its December 2000 merger with Seagram and Canal+, Vivendi and Messier predicted that the Company would generate annual EBITDA growth of 35% during 2001 and 2002. In order to assure that Vivendi would reach that target, during 2001 Vivendi improperly adjusted various reserve accounts and prematurely recognized income in a manner that was not in conformity with U.S. GAAP, including, in certain instances, FAS 5 and SFAC 5.

  (i) Improper EBITDA Adjustments during the Second Quarter of 2001

37. In late June 2001, Vivendi, Messier, Hannezo and other Vivendi executives became concerned that Vivendi's EBITDA growth for the quarter ended June 30, 2001 might not meet or exceed market expectations. As a result, Vivendi, at the direction of its senior executives, made various improper adjustments that raised Vivendi's EBITDA by almost €59 million, or 5% of the total EBITDA of €1.12 billion that Vivendi reported (excluding the results of the recently-acquired Maroc Telecom) for that quarter.

Complaint: Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo    Page 8 of 20

38. Defendants increased Vivendi's EBITDA primarily by causing Cegetel, in the weeks leading up to Vivendi's earnings release for the second quarter of 2001, to depart from its historical methodology for determining the level of its reserve for bad debts (accounts receivable) during the second quarter of 2001. That departure resulted in Cegetel taking a lower provision for bad debts during that quarter than its historical methodology required. This improper departure caused Cegetel's bad debts reserve for the second quarter of 2001 to be €45 million less than it should have been. As a result, Vivendi's overall EBITDA for that period was increased by the same amount.

39. During the relevant time period, Cegetel's financial results were fully consolidated into Vivendi's financial statements, which at that time were prepared in accordance with French GAAP, but reconciled to U.S. GAAP. Under U.S. GAAP, FAS 5 precludes the use of reserves, including excess reserves, for general or unknown business risks, and the systemic or time release of reserves into income. Further, FAS 5, paragraph 23, states that an estimate of losses on accounts receivable "normally depend[s] on, among other things, the experience of the enterprise... and appraisal of the receivables in light of the current economic environment."

40. As the Defendants knew or were reckless in not knowing, Cegetel reduced its provision for bad debts during the second quarter of 2001 without the level of documentation and analysis that was required. Further, the decision to take a lower provision for bad debts in the second quarter of 2001 occurred at a time when Cegetel was actually having more difficulty collecting on its bad debts.

41. In addition to taking a lesser bad debt provision in the second quarter of 2001, Cegetel also, at the direction of Vivendi's senior executives, improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of 2001. Altogether, those adjustments at Cegetel totaled €59 million and enabled Vivendi to show overall EBITDA growth of 35% for the second quarter of 2001.

42. Those accounting adjustments at Cegetel were made without proper supporting documentation and as a result, Vivendi's reconciled U.S. GAAP financial statements (which incorporated Cegetel's results) were therefore not in conformity with the requirements of FAS 5.

ii. Second Quarter 2001 Earnings Release

43. Vivendi issued a press release on July 23, 2001 boasting that it had achieved 35% EBITDA growth for the second quarter of 2001. In highlighting this achievement, Messier told the market, "I can only re-emphasize our confidence. We will at least meet our stated targets." The press release further claimed that, in just the first half of the year, Vivendi had already achieved 75% of its incremental EBITDA target for 2001. The press release also represented that, except for Canal+ and certain publishing operations, the results contained in the press release were "U.S. GAAP based."

44. As a result of the various improper adjustments made to Cegetel's

reserve accounts in the second quarter of 2001, these representations in Vivendi's press release were misleading.

45. Vivendi also made false claims in this press release about the increase in the performance of its "telecoms," including Cegetel, over the second quarter of 2000, when in reality over 8% of the telecoms' EBITDA came from the improper adjustments of Cegetel's accounting reserves in violation of FAS 5.

46. The market reacted favorably to Vivendi's July 23, 2001 press release. For example, analysts observed that Vivendi had beaten the expectations and results of its main competitors in the media industry. One analyst noted that Vivendi's results were a "pleasant surprise," while another news report specifically noted that the results of Cegetel and Vivendi's other telecommunications businesses "defied ... the telecommunications meltdown."

47. On the day that Vivendi announced its results, its share price increased by 5% in the United States and 5.5% on the Paris exchange.

(iii) Improper Adjustments of UMG's EBITDA during the Third Quarter of 2001

48. Various improper adjustments to Vivendi's EBITDA also occurred in the third quarter of 2001, and primarily affected the results of its music division, UMG. These improper adjustments increased UMG's reported results for the quarter ended September 30, 2001 by at least €10.125 million, or approximately 4% of UMG's total EBITDA of €250 million for that quarter.

49. Vivendi improperly increased UMG's results in order to reach a predetermined EBITDA figure at UMG for the quarter ended September 30, 2001 of €250 million. At that level, UMG would have been able to show EBITDA growth of approximately 6% versus the same period in 2000, and to outperform its rivals in the music business.

50. At least two improper adjustments were made to UMG's reported results in order to reach an EBITDA figure of €250 million. First, UMG prematurely recognized just over €3 million in deferred revenue that it received in connection with a contract between UMG and other parties. During the quarter ended September 30, 2001, UMG had deferred recognizing the €3 million payment it received on the basis that this payment would need to be refunded if Vivendi and the other parties to the contract failed to meet certain conditions by mid-December 2001. The recognition of this €3 million payment as income in the third quarter of 2001 was not in conformity with U.S. GAAP because those conditions were not met during the third quarter, and the payment remained refundable.

51. Second, in late October 2001, Vivendi temporarily reduced the amount of corporate overhead charges it allocated to UMG by €7 million. This reduction in the corporate overhead charges equaled the exact amount of additional earnings that Vivendi's senior executives determined that UMG would need in order to reach €250 million in EBITDA for the quarter ended September 30, 2001.

52. This overhead allocation was not in conformity with U.S. GAAP. Statement of Financial Accounting Concepts No. 6 ("SFAC 6"), "Elements of Financial Statements," states that allocations are assigned and distributed "according to a plan or a formula." Further, Statement of Financial Accounting Standards No. 131 ("SFAS 131"), "Disclosures about Segments of an Enterprise and Related Information," provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis." During the third quarter of 2001, the Defendants based the overhead allocation charged to UMG not on a plan or formula, but primarily on a desire to reach a specific EBITDA target. This conduct was not in conformity with either SFAC 6 or SFAS 131.

53. Both the corporate overhead adjustment and the premature recognition of the contract revenue occurred after UMG had submitted its accounts to Vivendi for the quarter. Moreover, these accounting adjustments to UMG's EBITDA were made without proper documentation and were not in conformity with U.S. GAAP. Defendants caused Vivendi's results to not be in conformity with U.S. GAAP, and incorporated these inflated results into Vivendi's earnings releases. These practices caused Vivendi's financial reports, press releases, and other market communications to be materially false and misleading.

    (iv) Third Quarter 2001 Earnings Release

54. On October 30, 2001, Vivendi announced in its third quarter 2001 earnings press release, approved by Messier, Hannezo and other senior executives, that UMG had achieved €250 million in EBITDA for the quarter, and 6% EBITDA growth versus the same quarter in 2000. Vivendi touted these results and noted that UMG was able to show growth at a time when its major competitors in the music industry had seen a decrease in earnings. The press release also represented that, except for Canal+, the results contained in the press release were presented on a "U.S. GAAP basis."

55. Again, the market reacted favorably to Vivendi's third quarter earnings release and to UMG's results in particular. Various news reports noted that UMG posted "solid" results that "easily outperform[ed] rivals Sony Corp., EMI Group and BMG in a down economy." Analysts were also pleased with the earnings release. One analyst, for example, had predicted a 1% decline in UMG's EBITDA, and issued a report following the earnings release noting that it was "surprised by a strong performance in music."

56. Because of the improper increases to UMG's EBITDA by, among other things, the premature recognition of deferred income and the reduction of overheard charges for the purpose of meeting Vivendi's target, Vivendi's statements and omissions created the false and misleading impression that UMG's EBITDA in particular, and Vivendi's overall EBITDA, were stronger than they really were. Further, Vivendi's representation that the results for UMG contained in the press release were presented on a "U.S. GAAP basis" was also false.

## C. VIVENDI FAILED TO DISCLOSE MATERIAL COMMITMENTS CONCERNING CEGETEL AND MAROC TELECOM

57. Defendants failed to disclose future commitments regarding Cegetel

Complaint: Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo    Page 11 of 20

and Maroc Telecom that, had Vivendi made the required disclosures, would have revealed doubts about the company's ability to meet its cash needs. Vivendi failed to disclose these commitments in its Commission filings on Forms 20-F for the fiscal years ended 2000 and 2001.

58. Vivendi also failed to disclose these commitments in a series of critical meetings in December 2001 with analysts from Moody's Investors Services ("Moody's") and Standard & Poor's, companies that publish independent credit opinions, research and commentary to assist investors in analyzing the credit risks associated with fixed-income securities. The meetings with the analysts preceded Vivendi's December 17, 2001 announcement that it would spend almost $12 billion to acquire portions of USA Networks, Inc. ("USA Networks") and Echostar Communications ("Echostar"). Because these transactions required Vivendi to spend a large amount of cash and assume additional debt, Vivendi sought "pre-clearance" from Moody's and Standard & Poor's that the transactions, when announced, would not result in a downgrade of Vivendi's credit rating.

59. Moody's and Standard & Poor's based their rating of Vivendi's credit primarily on the company's debt-to-EBITDA ratio. At the time of the December 2001 meetings, both Moody's and Standard & Poor's told Vivendi that its debt-to-EBITDA ratio was too high for it to maintain its investment-grade status. However, both credit rating agencies also told Vivendi that they would not downgrade its credit rating if Vivendi committed to taking certain debt reduction measures in 2002. Senior officers of Vivendi assured Moody's and Standard & Poor's that Vivendi would reduce its debt by several billion dollars during 2002.

60. As a result of these assurances, neither Moody's nor Standard & Poor's downgraded Vivendi after it announced the USA Networks and Echostar transactions. However, Vivendi had not informed Moody's or Standard & Poor's about certain undisclosed commitments that existed at the time of these transactions.

61. These commitments, if disclosed, would have alerted the public to Vivendi's future cash requirements and would have revealed doubts about Vivendi's ability to meet its cash needs.

   (i) The Cegetel Current Account

62. In the summer of 2001, Vivendi, at the direction of Messier, Hannezo and other senior executives, entered into an undisclosed current account with Cegetel, its most profitable and cash-flow positive subsidiary. Pursuant to this current account, which operated much like a loan, Cegetel delivered excess cash to Vivendi on a short-term basis, beginning in August 2001. In return, Vivendi paid Cegetel a market rate of interest, and agreed to return the funds at the expiration of the current account agreement, which at first was December 31, 2001 and was then extended to July 31, 2002.

63. Although Vivendi maintained cash-pooling arrangements with most of its subsidiaries, the funds that it received from Cegetel were on different terms than these other pooling arrangements. Notably, the current account with Cegetel contained a specific expiration date. Additionally, the Cegetel current account documents contained an "on demand" clause pursuant to which Cegetel could demand immediate reimbursement of the funds that it

deposited with Vivendi at any time.

64. Pursuant to the current account agreement, Cegetel delivered approximately €520 million to Vivendi in August 2001. Between September 2001 and June 2002, the account balance continued to grow, and at various times exceed €1 billion. Vivendi used this money to pay for ordinary operating expenses.

65. Even though the Cegetel current account, and the possibility that Vivendi would have to repay it at any time and certainly no later than July 31, 2002, had a direct impact on Vivendi's liquidity condition, Vivendi did not disclose existence of the Cegetel current account in the liquidity section of its Form 20-F for the fiscal year ended December 31, 2001, which was filed with the Commission on May 28, 2002. Various Commission rules and regulations required disclosure of the Cegetel current account in Vivendi's Form 20-F. For example, Item 303 of Commission Regulation S-K requires issuers to identify any known "demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." Moreover, Item 5(B)(1)(b) of the instructions to Form 20-F requires issuers to disclose "restrictions on the ability of subsidiaries to transfer funds to the company in the form of cash dividends, loans or advances and the impact such restrictions have had or are expected to have on the ability of the company to meet its cash obligations." Vivendi failed to adhere to either of these requirements in connection with its Form 20-F for the fiscal year ended December 31, 2001.

66. In mid-June 2002, Cegetel's other shareholders demanded repayment of the current account from Vivendi. In order to repay Cegetel, Vivendi had to use proceeds from a recently completed asset sale, which Vivendi stated both in its June 26, 2002 press release and in meetings with Moody's and Standard & Poor's would be used to reduce Vivendi's debt. Indeed, despite including a list of purported "upcoming expenditures" in its June 26, 2002 press release, the Defendants failed to disclose the existence of the Cegetel current account or the demand for its repayment.

(ii) Failure to Disclose the Maroc Telecom Side Agreement

67. During 2001 and early 2002, Defendants, along with other senior executives of Vivendi, also failed to disclose a side agreement that Vivendi entered into in February 2001 to purchase an additional €1.1 billion stake in Maroc Telecom, a telecommunications operator of fixed line and mobile telephony and Internet services based in Morocco.

68. In December 2000, the Moroccan government sponsored an auction of 35% of the state-owned Maroc Telecom. Vivendi won the auction with a bid of €2.35 billion. Under the terms of the auction, the Moroccan government, which would retain a 65% stake in Maroc Telecom, required Vivendi to execute a shareholder agreement that would maintain the Moroccan government's control over Maroc Telecom's operations. The terms of that shareholder agreement precluded Vivendi from consolidating Maroc Telecom's results.

69. Defendants, however, wanted to gain control of Maroc Telecom and consolidate its results because Maroc Telecom carried little debt and

Complaint: Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo          Page 13 of 20

generated substantial EBITDA. By consolidating Maroc Telecom, Defendants hoped to increase Vivendi's EBITDA performance and, more importantly, improve the debt/EBITDA ratio used by Moody's and Standard & Poor's to evaluate Vivendi's credit.

70. In February 2001, Vivendi and the Moroccan government entered into a side agreement that required Vivendi to purchase an additional 16% of Maroc Telecom's shares in February 2002 for approximately €1.1 billion. In return, the Moroccan government granted Vivendi certain management rights over the operations of Maroc Telecom upon which Vivendi based its consolidation of Maroc Telecom.

71. Even though Defendants knew the existence and terms of the side agreement, they failed to disclose that Vivendi had committed to purchasing an additional 16% stake in Maroc Telecom, contingent upon the Moroccan government's exercise of the irrevocable put, by February 2002 for €1.1 billion. Vivendi failed to disclose these facts in its public filings with the Commission, the COB, and in other public statements that it made in 2001 and early 2002.

72. For example, on July 2, 2001, Vivendi filed its Form 20-F for the fiscal year ended December 31, 2000, approved by Messier and other senior executives, and signed by Hannezo, which disclosed the following about Maroc Telecom:

### PURCHASE OF INTEREST IN MAROC TELECOM

In December 2000, we announced that we had acquired a 35% stake in Moroccan telecommunications operator Maroc Telcom for approximately E2.3 billion. Maroc Telecom, which operates fixed-line and mobile telephone networks in Morocco, is estimated to have generated revenue of approximately E1.3 billion in 2000. In cooperation with Maroc Telecom, we intend to contribute our telecoms experience to the modernization of the telecommunications industry in Morocco.

73. By omitting to disclose the Maroc Telecom side agreement, and in particular Vivendi's commitment to pay an additional €1.1 billion in February 2002 for additional shares of Maroc Telecom, Vivendi's Form 20-F was materially false and misleading.

74. Vivendi also failed to disclose its commitment with respect to Maroc Telecom in its periodic filing with the COB for the six-month period ended June 30, 2001. On October 17, 2001, Vivendi furnished an English translation of that filing to the Commission on Form 6-K. The COB filing and Vivendi's Form 6-K were reviewed and approved by Messier, Hannezo and other senior executives.

75. Vivendi also failed to disclose the Maroc Telecom side agreement to analysts at Moody's and Standard & Poor's during the December 2001 "pre-clearance" meetings regarding the USA Networks and Echostar transactions. Vivendi's senior executives knew that if Vivendi had disclosed this obligation to pay the Maroc Telecom put, the credit rating agencies may have declined to maintain their credit rating of Vivendi.

76. In February 2002, Vivendi and the Moroccan government agreed to

extend the deadline for the side agreement to September 2005. Vivendi disclosed the renegotiated side agreement in its Form 20-F for the fiscal year ended December 31, 2001, filed on May 28, 2002.

## D. VIVENDI FAILED TO DISCLOSE ALL MATERIAL FACTS CONCERNING ITS PARTICIPATION IN THE TELCO TRANSACTION

77. The Defendants failed to disclose in a timely manner all material facts concerning Vivendi's investment in a fund that purchased a 2% stake in Telco, a Polish telecommunications holding company.

78. In June 2001, Vivendi, which owned 49% of Telco's equity, publicly announced its intention to purchase an additional 2% of Telco's shares from Vivendi's partner in the Telco joint venture. This purchase would have increased Vivendi's ownership of Telco equity from 49% to 51%. Vivendi anticipated that it would have to pay approximately €100 million for the additional Telco shares.

79. After this announcement, Vivendi learned that Poland's antitrust authorities would have to approve the acquisition, a process that could have taken several months. Vivendi also learned that the market in general, and the credit rating agencies in particular, might react negatively to Vivendi's acquisition of additional Telco shares. As a result, rather than directly purchasing the 2% interest in Telco, Vivendi deposited $100 million into an investment fund administered by Société Générale Bank & Trust Luxembourg. That fund subsequently purchased a 2% stake in Telco in September 2001, and continues to own those shares.

80. Vivendi did not disclose all material details about this transaction until 2003. Instead, Vivendi's Form 20-F for the fiscal year ended December 31, 2001, filed with the Commission on May 28, 2002, states only the following concerning Vivendi's interest in Telco:

> *Participation in Elektrim* — In September 2001, Elektrim Telekomunikacja (Telco), in which Vivendi Universal has a 49% interest, acquired all of Elektrim S.A.'s landline telecommunications and Internet assets.

81. Vivendi's statements and omissions concerning Telco in its Form 20-F for the fiscal year ended December 31, 2001 created the false and misleading impression that Vivendi maintained no more than a 49% financial interest in Telco, whether directly or indirectly, even though it had invested in a fund that purchased a 2% stake in Telco. Defendants knew, or were reckless in not knowing, that that disclosure was inadequate and misleading.

82. Had the conduct set forth in paragraphs 7 through 81 above been taken into account when Hannezo's bonus for 2001 was calculated, that bonus would have been reduced by approximately $148,000.

## VIII. CLAIMS FOR RELIEF

### FIRST CLAIM
### Fraud in Violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 thereunder

Complaint: Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo          Page 15 of 20

**(As Against All Defendants)**

83. Paragraphs 1 through 82 are re-alleged and incorporated by reference herein.

84. From December 2000 through July 2002, Defendants, directly or indirectly, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities, as described herein, knowingly or recklessly:

(a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices or courses of business, which operated or would operate as a fraud or deceit upon purchasers of securities and upon other persons.

85. By reason of the foregoing, Defendants Vivendi, Messier and Hannezo violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**SECOND CLAIM**
**Fraud in Violation of Section 17(a)(1) of the Securities Act**
**(As Against All Defendants)**

86. Paragraphs 1 through 82 are re-alleged and incorporated by reference herein.

87. From December 2000 through July 2002, Defendants, directly or indirectly, by the use of the means or instrumentalities of interstate commerce or of the mails, in the offer or sale of securities, as described herein, have knowingly or recklessly employed devices, schemes or artifices to defraud.

88. By reason of the foregoing, Defendants Vivendi, Messier and Hannezo violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**THIRD CLAIM**
**Fraud in Violation of Sections 17(a)(2) and 17(a)(3) of the**
**Securities Act**
**(As Against All Defendants)**

89. Paragraphs 1 through 82 are re-alleged and incorporated by reference herein.

90. From December 2000 through July 2002, Defendants, directly or indirectly, by the use of the means or instrumentalities of interstate commerce or of the mails, in the offer or sale of securities, as described herein, have: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary

to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

91. By reason of the foregoing, Defendants Vivendi, Messier and Hannezo violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## FOURTH CLAIM
### Violations of Section 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1 thereunder
### [Books and Records and Internal Controls Violations]
### (As Against Defendants Messier and Hannezo)

92. Paragraphs 1 through 82 are re-alleged and incorporated by reference herein.

93. Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] prohibits any person from, among other things, circumventing a system of internal accounting controls or failing to implement a system of internal accounting controls.

94. Rule 13b2-1 [17 C.F.R. 240.13b2-1] under the Exchange Act prohibits any person from, directly or indirectly, falsifying or causing to be falsified any book, record or account subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

95. By engaging in the conduct described above, Defendants Messier and Hannezo circumvented and/or failed to implement a system of internal financial controls in violation of Section 13(b)(5).

96. By engaging in the conduct described above, Defendants Messier and Hannezo, caused to be falsified Vivendi's books, records and accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], in violation of Rule 13b2-1 thereunder.

97. By reason of the foregoing, the Defendants Messier and Hannezo violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. 240.13b2-1] thereunder.

## FIFTH CLAIM
### Violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20 and 13a-1 thereunder
### [Reporting Violations]
### (As Against Defendant Vivendi)

98. Paragraphs 1 through 82 are re-alleged and incorporated by reference herein.

99. Section 13(a) of the Exchange Act and Rule 13a-1 thereunder require issuers of registered securities to file with the Commission factually accurate annual and quarterly reports. Exchange Act Rule 12b-20 provides

that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.

100. During the relevant time period, Vivendi was an issuer subject to these reporting requirements.

101. During the relevant time period, as alleged herein, Vivendi filed the following Forms 20-F that contained false or misleading financial information, and/or failed to disclose material information necessary to make the statements, in the light of the circumstances under which they were made, not misleading: (a) Vivendi's Form 20-F for fiscal year ended December 31, 2000, filed with the Commission on July 2, 2001; and (b) Vivendi's Form 20-F for fiscal year ended December 31, 2001, filed with the Commission on May 28, 2002.

102. By reason of the foregoing, the Defendant Vivendi violated Section 13 (a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 [17 C.F.R. §§ 240.12b-20 and 240.13a-1] thereunder.

### SIXTH CLAIM
**Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**
**[Books and Records and Internal Control Violations]**
**(As Against Defendant Vivendi)**

103. Paragraphs 1 through 82 are re-alleged and incorporated by reference herein.

104. Section 13(b)(2)(A) of the Exchange Act requires every issuer of a registered security to make and keep books, records, and/or accounts, which, in reasonable detail, accurately and fairly reflect its transactions and the dispositions of its assets. Section 13(b)(2)(B) of the Exchange Act requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with applicable accounting principles.

105. During the relevant time period, Vivendi was an issuer subject to these reporting and internal control requirements. Vivendi failed to make and keep books, records and/or accounts which, in reasonable detail, accurately and fairly reflected its transactions and the disposition of its assets, and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with applicable accounting principles.

106. By reason of the foregoing, Defendant Vivendi violated Sections 13(b) (2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### SEVENTH CLAIM
**Control Person Liability for Vivendi's Violations of Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act and Exchange Act Rules**

**10b-5, 12b-20 and 13a-1 thereunder**
**(As Against Defendants Messier and Hannezo)**

107. Paragraphs 1 through 82 are re-alleged and incorporated by reference herein.

108. During the relevant time period, as alleged herein, Defendants Messier and Hannezo were, directly or indirectly, control persons of Vivendi for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

109. By reason of the foregoing, Defendants Messier and Hannezo, as control persons are jointly and severally liable with and to the same extent as Vivendi for Vivendi's violations of Sections 10(b), 13(a), and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), and 78m(b)(2)] and Rules 10b-5, 12b-20 and 13a-1 [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-1] thereunder.

## IX. PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### A.
### Permanent Injunctive Relief

Issue a Permanent Injunction, restraining and enjoining:

(1) Defendant Vivendi, its agents, servants, employees, attorneys, and all persons in active concert or participation with it, and each of them from, directly or indirectly violating Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)(2)] and Exchange Act Rules 10b-5, 12b-20 and 13a-1 [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-1] thereunder;

(2) Defendant Messier, his agents, servants, employees, attorneys, and all persons in active concert or participation with him, and each of them from, directly or indirectly: (a) violating Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and § 78m(b)(5)] and Exchange Act Rules 10b-5 and 13b2-1 [17 C.F.R. §§ 240.10b-5 and 240.13b2-1] thereunder; and (b) controlling any person who violates Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)] and Exchange Act Rules 10b-5, 12b-20 and 13a-1 [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-1] thereunder

(3) Defendant Hannezo, his agents, servants, employees, attorneys, and all persons in active concert or participation with him, and each of them from, directly or indirectly: (a) violating Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and § 78m(b)(5)] and Exchange Act Rules 10b-5 and 13b2-1 [17 C.F.R. §§ 240.10b-5 and 240.13b2-1] thereunder; and (b) controlling any person who violates Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)] and Exchange Act Rules 10b-5, 12b-20 and 13a-1 [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-1] thereunder.

Complaint: Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo                    Page 19 of 20

## B.
## Accounting

Issue an Order requiring Defendants Messier and Hannezo to provide an accounting of all proceeds received, directly or indirectly, as a result of the acts and/or courses of conduct complained of herein, including, but not limited to, bonuses and salaries received during the relevant time period.

## C.
## Disgorgement

Issue an Order requiring Defendants Vivendi, Messier and Hannezo to disgorge all ill-gotten profits or proceeds that they received, directly or indirectly, as a result of the acts and/or courses of conduct complained of herein.

## D.
## Penalties

Issue an Order directing Defendants Vivendi, Messier and Hannezo to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d) (3)].

## E.
## Officer and Director Bar

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], enter an Order barring Defendants Messier and Hannezo from acting as an officer or director of an issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## F.
## Further Relief

Grant such other and further relief as may be necessary and appropriate.

## G.
## Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Dated: December 23, 2003

By:_____
Robert B. Blackburn (RB 1545)
Local Counsel for Plaintiff
**SECURITIES AND EXCHANGE**

By:_____

Glenn S. Gordon (GSG 2951)
Associate Regional Director

Complaint: Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo    Page 20 of 20

**COMMISSION**
Woolworth Building, 13th Floor
233 Broadway
New York, New York 10279
(646) 428-1610
(646) 428-1979 (fax)

Ivan P. Harris (IH 2859)
Assistant Regional Director

Gary Klein (GK 4939)
Branch Chief

Teresa J. Verges
Regional Trial Counsel

Christine A. Lynch
Branch Chief

Margarete E. Bronhard
Senior Counsel

Thierry Olivier Desmet
Staff Attorney

Chad Alan Earnst
Staff Attorney

Counsel for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: 305-982-6300
Fax: 305-982-4154

*http://www.sec.gov/litigation/complaints/comp18523.htm*

SUTER DEC.
EXHIBIT 13, PAGE 20

**EXHIBIT 14**

Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo: Lit. Rel. No. 1852...    Page 1 of 3



Home | Previous Page

**U.S. Securities and Exchange Commission**

U.S. Securities and Exchange Commission

Litigation Release No. 18523 / December 24, 2003

Accounting and Auditing Enforcement Release No. 1935 / December 24, 2003

## SEC Files Settled Civil Fraud Action Against Vivendi Universal, S.A., Its Former CEO, Jean-Marie Messier, and Its Former CFO, Guillaume Hannezo

**Defendants Agree to Pay Over $51 Million in Disgorgement and Civil Penalties**

**Complaint Alleges Fraud Between December 2000 and July 2002, Including False Press Releases, Improper Adjustments to Earnings, and Failure to Disclose Future Commitments**

*Securities and Exchange Commission v. Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo, 03-CIV-10195 (S.D.N.Y.)(filed December 23, 2003)*

The Securities and Exchange Commission (Commission) announced today that it filed a settled enforcement action against Vivendi Universal, S.A. (Vivendi), a media and environmental services conglomerate, its former CEO, Jean-Marie Messier (Messier), and its former CFO, Guillaume Hannezo (Hannezo). The settlements include Vivendi's consent to pay a $50 million civil money penalty. The settlements also include Messier's agreement to relinquish his claims to a €21 million severance package that he negotiated just before he resigned his positions at Vivendi, and payment of disgorgement and civil penalties by Messier and Hannezo that total over $1 million.

The Commission's Complaint describes a course of conduct by Vivendi, Messier, and Hannezo that disguised Vivendi's cash flow and liquidity problems, improperly adjusted accounting reserves to meet earnings before income taxes, depreciation, and amortization (EBITDA) targets, and failed to disclose material financial commitments, all in violation of the antifraud provisions of the federal securities laws.

Specifically, the Commission's Complaint includes the following allegations:

- During 2001 and the first half of 2002, Vivendi issued misleading press releases authorized by Messier, Hannezo, and other senior executives. The press releases falsely portrayed Vivendi's liquidity and cash flow as "excellent" or "strong" and as sufficient to meet Vivendi's future liquidity requirements. These statements were

SUTER DEC.
EXHIBIT 14, PAGE 1

Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo: Lit. Rel. No. 1852... Page 2 of 3

misleading in light of Vivendi's inability unilaterally to access the cash flow of two of its most profitable subsidiaries, a situation that substantially impaired Vivendi's ability to satisfy its debt burden and other operating costs.

- Vivendi, at the direction of its senior executives, made improper adjustments that raised Vivendi's EBITDA by approximately €59 million during the second quarter of 2001 and by at least €10 million during the third quarter of 2001. These adjustments were made so that Vivendi could meet ambitious earnings targets that it had communicated to the market.

- Vivendi failed to disclose future financial commitments regarding two of its subsidiaries. Vivendi failed to disclose the commitments in Commission filings and in meetings with analysts. If Vivendi had revealed those commitments, they would have raised doubts about the company's ability to meet its cash needs.

- Vivendi and the other defendants failed timely to disclose all of the material facts about Vivendi's investment in a fund that purchased a 2% stake in Elektrim Telekomunikacja Sp. zo.o (Telco), a Polish telecommunications company in which Vivendi already held a 49% stake.

All of the defendants consented to the settlements without admitting or denying the Commission's allegations. The settled action permanently enjoins Vivendi, Messier, and Hannezo from further violations of the federal securities laws and includes other substantial relief:

- Vivendi is required to pay a civil money penalty in the amount of $50 million and disgorgement of $1;

- Messier is required to relinquish his claim to a severance package of about €21 million, to pay a civil money penalty of $1,000,000, and disgorgement of $1;

- Hannezo is required to disgorge $148,149, and to pay a penalty of $120,000; and

- Messier and Hannezo are prohibited from serving as an officer or director of a public company for, respectively, 10 and 5 years.

The Commission intends to direct that disgorgement and penalties paid in this case be paid to defrauded investors, including those who held Vivendi's ordinary shares and its American Depository Shares during the time period alleged in the Commission's Complaint, pursuant to Section 308 (Fair Funds for Investors) of the Sarbanes-Oxley Act of 2002.

The €21 million payment, now valued at approximately $25 million (including interest), to which Messier is relinquishing his claim has already been placed in an escrow account as a result of the Commission's successful litigation pursuant to Section 1103 of the Sarbanes-Oxley of 2002. On the SEC's motion, the District Court in New York ordered Vivendi to place those funds in escrow on September 24, 2003.

SUTER DEC.
EXHIBIT 14, PAGE 2

Vivendi Universal, S.A., Jean-Marie Messier, and Guillaume Hannezo: Lit. Rel. No. 1852...   Page 3 of 3

The Commission acknowledges the cooperation of the United States Attorney's Office for the Southern District of New York and the Autorité des marches financiers, formerly the Commission des Opérations de Bourse. The Commission's investigation is continuing.

*See also* Litigation Release No. 18352 (September 16, 2003)

➤ SEC Complaint in this matter

*http://www.sec.gov/litigation/litreleases/lr18523.htm*

Home | Previous Page                                    Modified: 12/29/2003

**EXHIBIT 15**

Status: ☻ Judicial Consideration or Case History Available

**Excelsior Commercial & Industrial Holdings Limited v Salisbury Hammer Aspden & Johnson (A Firm), Betesh & Company (A Firm) [And Formerly Other Parties]**

No: A2/2001/1734

Court of Appeal (Civil Division)

12 June 2002

**Neutral Citation Number: [2002] EWCA Civ 879**

**2002 WL 1039624**

Before: The Lord Chief Justice of England and Wales (The Lord Woolf of Barnes) Lord Justice Waller and Lord Justice Laws

Wednesday 12th June, 2002

On Appeal from the High Court of Justice Queen's Bench Division (His Honour Judge Bradbury)

**Representation**

- Mr Nicholas Davidson QC (instructed by Messrs Ward Hadaway, Newcastle upon Tyne NE1 3DX) appeared on behalf of The Appellant.
- Mr Alastair Hammerton (instructed by Messrs Beachcroft & Wansbrough Manchester M2 7LP) appeared on behalf of The First Respondent.
- Mr Roger Stewart QC and Mr Graham Chapman (instructed by Messrs Reynolds Porter Chamberlain, London WC1V 7HA) appeared on behalf of the Second Respondent.

**JUDGMENT**

THE LORD CHIEF JUSTICE:

1. This appeal raises an issue of some importance to the run of general litigation as to when it is appropriate to make an order for costs on an indemnity basis. It arises in a case where the defendants made a joint payment into court of £100,000, and where the claimant recovered nominal damages of £2 against the fifth defendant, and failed entirely against the other defendant who was then involved in the proceedings.

2. The appropriate order as to costs to be made is usually a question which is determined having regard to the facts of the particular case and having regard to the relevant provisions of the <u>Civil Procedure Rules</u>. For that reason it is important where there is an appeal on an issue of costs for this court to have well in mind the facts of the particular case in determining the appeal. In many situations an order for costs which may seem initially surprising becomes readily explicable when the particular facts are examined. In my judgment that is true of this case. Fortunately in this appeal this court is greatly assisted by the judgment of His Honour Judge Bradbury in the court below. Mr Davidson QC, for whose submissions we are immensely indebted, appropriately acknowledged how well and carefully reasoned was the judgment of Judge Bradbury. That judgment enables us to deal with the facts more succinctly than otherwise.

**The Facts**

3. The claimant purchased a company which owned Wesley Mill, at Bamber Bridge near Preston on 9 March 1992. Prior to the company being purchased, the mill was substantially destroyed by fire. In view of the fire, the amount of the insurance payable for the damage to the mill clearly was an important factor in assessing the value of the company. £1.32 million was recovered from the insurance company. The claimants contend that if the mill had been fully insured approximately £1 million more would have been payable by the insurers. The first defendants were the loss assessors in relation to negotiating the claim on behalf of the company. It is suggested that the first defendants represented that the mill was fully insured. The other (the fifth) defendant with whom we are concerned were the solicitors for the claimant in relation to the acquisition by the claimant of the company, namely William Coupe (Bamber Bridge) Ltd ("Coupe").

4. The claimant contended that the fifth defendants failed to carry out their retainer and failed to ascertain that the mill was not fully insured. The fifth defendants contend that their retainer did not

SUTER DEC.
EXHIBIT 15, PAGE 1

require them to perform that task. On that issue the fifth defendants were unsuccessful. However, nominal damages of £2 only were awarded by the judge for two reasons. First, the judge was satisfied that the failure of the fifth defendants to ascertain that the mill was not fully insured did not affect the conduct of the claimant. They would in any event have wanted to proceed with the purchase. The second basis upon which the judge came to his conclusion, that only nominal damages were payable, was because the claimant had not suffered any loss in consequence of the breach of duty by the fifth defendants. We were shown the relevant figures by Mr Stewart QC who appeared before us and in the court below on behalf of the fifth defendants. On those figures it is not surprising that the judge should have come to the conclusions to which I have just referred. This was an attractive proposition for the claimant, and it is clear that they would have wished to have proceeded with it. The additional sum which, if the property had been fully insured, would have been payable would have been a windfall because the claimant's proposal in relation to the property meant that the sum of money for insurance actually received was ample to enable the claimant profitably to carry out the transaction upon which they were intent.

5. The first and fifth defendants made a Part 36 payment into court of £100,000 on 7 June 2001. After a lengthy trial, on 18 July 2001 His Honour Judge Bradbury dismissed the claim against the first defendant. He concluded that the claimant was entitled to judgment against the fifth defendant in the sum of £2 as nominal damages. Thirdly, he concluded that the claimant should pay the first defendant's costs of the action on the standard basis up to 8 June 2001, the day after the Part 36 payment, and on an indemnity basis thereafter, such costs to be the subject of detailed assessment if not agreed. He also came to the conclusion that the claimant should pay the fifth defendants' costs of the action on the standard basis up to 8 June 2001, and on an indemnity basis thereafter, such costs to be the subject of detailed assessment if not agreed. He also made an order for payment out of the sum which had been paid into court.

6. There had originally been 14 defendants. It is unnecessary to go into the reasons why by the time of the trial the action proceeded against only the first and fifth defendants.

7. The judge was asked to give permission to appeal. He was prepared to give only limited permission to appeal against the order for the indemnity costs in favour of the first defendant and against the order for costs which was made in respect of the fifth defendant.

8. The claimant wished to advance other arguments on the appeal and therefore sought permission from this court. Permission was refused on the papers by Latham LJ who gave his decision on 19 October 2001, and by Rix LJ who considered the matter on 30 November 2001. In respect of the decision of Rix LJ, a copy of the transcript of which is before us, it is to be noted that, whereas he considered in relation to the fifth defendant there was no arguable grounds for appealing the issue of causation, he was not as emphatic about the position in relation to the proposed appeal in respect of quantum. Rix J said that as the claimant could not succeed on the point of causation, it was not necessary to go into the question of quantum because clearly in order to succeed on an appeal as to quantum the claimant would have to succeed on the question of causation.

## The Argument on the Appeal

9. Before coming to the main matter on this appeal, it is convenient to consider Mr Davidson's argument in support of the appeal in relation to the part of the judge's order which required the claimant to pay costs to the fifth defendant throughout the proceedings. As has already been indicated, those costs were on two separate bases: one on the standard basis up to the payment into court; and thereafter, on the indemnity basis. Mr Davidson correctly submits that the claimant was partly successful against the fifth defendants. The fifth defendants had argued that their retainer did not require them to go into the adequacy of the insurance. In that they were found to be wrong. Again it was not surprising that Judge Bradbury should have come to that conclusion because the contemporary documents supported the claimant's contention that that was a matter on which they were required to advise. However, this is a case where Mr Stewart submits that the fact that the fifth defendants were contesting the issue of their liability to the claimant did not significantly affect the costs. That argument was canvassed before the judge who heard the case. He was well aware of all the relevant circumstances and he accepted Mr Stewart's arguments. It is very difficult for this court to second-guess a decision of that sort. The trial judge is in by far the best position to do so. In my judgment it would be inappropriate for this court to try and establish that this was a case where a separate order for costs should have been made, having regard to the decision in relation to the issue as to the terms of the retainer.

## Partial Orders for Costs

10. Mr Davidson referred to the decision of this court on special orders for costs in A E I Rediffusion Music Ltd v Phonographic Performance Ltd [1999] 1 WLR 1507, and relied in particular on a passage in

SUTER DEC.
EXHIBIT 15, PAGE 2

my judgment in that case at page 1522. If the factual situation had been different from that which was contended for by Mr Stewart, it seems to me that this could well have been a case where it would have been appropriate to have recognised the failure of the claimant on a particular issue and reflected that in the costs. But if Mr Stewart was right in the argument that he advanced (which, as I have indicated, the judge was in the best position to determine), then it would not be an appropriate case in which to take that view. Putting the matter shortly, Mr Stewart is saying that in a practical sense the fact that the terms of the retainer was in issue did not affect the evidence which would have had to be called before the hearing. I am not satisfied that the judge's approach to that was other than appropriate so I would not disturb his order.

**Indemnity Orders for Costs**

11. In relation to the principal issue on the appeal it is necessary to turn, first, to the relevant provisions of the CPR. Whilst not forgetting the general provisions of Part 1 the CPR, it is convenient, first, to go to the provisions of Part 44.3 which, so far as relevant, read:

> (1) The court has discretion as to —
>
> (a) whether costs are payable by one party to another;
>
> (b) the amount of those costs; and
>
> (c) when they are to be paid.
>
> (2) If the court decides to make an order about costs —
>
> (a) the general rule is that the unsuccessful party will be ordered to pay the costs of the successful party; but
>
> (b) the court may make a different order.
>
> ....
>
> (4) In deciding what order (if any) to make about costs, the court must have regard to all the circumstances, including —
>
> (a) the conduct of all the parties;
>
> (b) whether a party has succeeded on part of his case, even if he has not been wholly successful; and
>
> (c) any payment into court or admissible offer to settle made by a party which is drawn to the court's attention (whether or not made in accordance with Part 3).
>
> (Part 36 contains further provisions about how the court's discretion is to be exercised where a payment into court or an offer to settle is made under that Part.)
>
> (5) The conduct of the parties includes —
>
> (a) conduct before, as well as during, the proceedings, and in particular the extent to which the parties followed any relevant pre-action protocol;
>
> (b) whether it was reasonable for a party to raise, pursue or contest a particular allegation or issue;
>
> (c) the manner in which a party has pursued or defended his case or a particular allegation or issue;
>
> (d) whether a claimant who has succeeded in his claim, in whole or in part, exaggerated his claim.
>
> (6) The orders which the court may make under this rule include an order that a party must pay —
>
> (a) a proportion of another party's costs;
>
> (b) a stated amount in respect of another party's costs;
>
> (c) costs from or until a certain date only;

SUTER DEC.
EXHIBIT 15, PAGE 3

(d) costs incurred before proceedings have begun;

(e) costs relating to particular steps taken in the proceedings;

(f) costs relating only to a distinct part of the proceedings; and

(g) interest on costs from or until a certain date, including a date before judgment.

...."

12. The provisions of Part 44.3 make it clear how wide and generous is the discretion of the court in making orders as to costs. Equally it is made clear that, in exercising its judicial discretion, it is the obligation of the court to look at the circumstances of the case in general, and here I make particular reference to the wide terms of paragraph 44.3(5).

13. Part 44.4(1)sets out the two bases of assessment, namely the standard basis and the indemnity basis. In addition to drawing attention to those two different bases it provides:

"... the court will not in either case allow costs which have been unreasonably incurred or are unreasonable in amount."

14. I draw attention particularly to that passage of 44.4 because it emphasises the general requirement that costs which are to be ordered to be paid must not be unreasonably incurred or unreasonable in amount.

15. 44.4(2) and 44.4(3) draw a distinction between the difference in substance between a standard order for costs and an indemnity order for costs. The differences are two-fold. First, the differences are as to the onus which is on a party to establish that the costs were reasonable. In the case of a standard order, the onus is on the party in whose favour the order has been made. In the case of an indemnity order, the onus of showing the costs are not reasonable is on the party against whom the order has been made. The other important distinction between a standard order and an indemnity order is the fact that, whereas in the case of a standard order the court will only allow costs which are proportionate to the matters in issue, this requirement of proportionality does not exist in relation to an order which is made on the indemnity basis. This is a matter of real significance. On the one hand, it means that an indemnity order is one which does not have the important requirement of proportionality which is intended to reduce the amount of costs which are payable in consequence of litigation. On the other hand, an indemnity order means that a party who has such an order made in their favour is more likely to recover a sum which reflects the actual costs in the proceedings. The question of whether an order for costs on a standard or indemnity basis is made in litigation of the sort with which we are here concerned may be a matter of substantial financial significance. That no doubt explains why in this case the claimants have considered the matter one which justified the appeal which is now before us.

16. Having referred to the parts of the CPR which I have done so far, it is next necessary to refer to Part 36 insofar as it deals with questions of costs. However, before doing so it is appropriate to draw attention to the language of 44.4 again, and in particular the passage in brackets which refers to the fact that Part 36 contains further provisions about how the court's discretion is to be exercised where a payment into court or an offer to settle is made under that Part. I may not be doing justice to Mr Davidson, but I detected in his submissions a suggestion that in this case it was not necessary for this court to go further than to examine the terms of Part 36. If that was part of Mr Davidson's submissions then I would, with respect, suggest that he is wrong because Part 44 is of general application and it continues to be applicable in relation to cases to which Part 36 applies.

17. Part 36.20deals with the situation which we have here. It provides:

"(1) This rule applies where at trial a claimant —

(a) fails to better a Part 36 payment; or

SUTER DEC.
EXHIBIT 15, PAGE 4

(b) fails to obtain a judgment which is more advantageous than a defendant's Part 36 offer.

(2) Unless it considers it unjust to do so, the court will order the claimant to pay any costs incurred by the defendant after the latest date on which the payment or offer could have been accepted without needing the permission of the court."

18. The language of 36.20 has to be contrasted with the language of Part 36.21. Part 36.21 deals with the situation where a claimant has made a Part 36 offer. The significance of 36.21 is that, unlike 36.20, it refers specifically to the court being entitled to order costs on the indemnity basis from the latest date when the defendant could have accepted the offer which had been made. Equally, it refers to interest on a higher rate than normal in the case of situations where it applies. When Part 36.20 is compared with 36.21, light is thrown on the appropriate approach to the application of Part 36.20.

19. The clear inference from the absence of any reference to an indemnity basis in 36.20 is that, in normal circumstances, an order for costs which the court is required under that Part to make, unless it considers it unjust to do so, is an order for costs on the standard basis. That means that if the court is going to make an order for indemnity costs, as it can in a case where Part 36.20 applies, it should do so on the assumption that there must be some circumstance which justifies such an order being made. If I may here adopt the way it was put in argument by Waller LJ, there must be some conduct or (I add) some circumstance which takes the case out of the norm. Mr Davidson's argument on this part of the appeal is that there was here not found by the judge any such circumstance.

20. As is to be expected, the decision of the judge in relation to costs was expressed succinctly. A judge is not expected to give a detailed decision as to why he is making an order. However, if he is going to make an order for costs which is not the normal order expected under the particular provisions of the CPR, then the parties are entitled to know the basis of that order and the judge is required to explain that so far as is necessary to do.

21. Having heard the arguments on both sides, Judge Bradbury's response was as follows:

"I have heard nothing in the submissions about costs to justify, in my mind, any substantial variation of the general rule, which is that the unsuccessful party will be ordered to pay the costs of the successful party.

Plainly there could be really nothing to be said in relation to the costs sought by Salisbury [the first defendant]. They are entitled to their costs on a standard basis, certainly to the 8th June, and I am satisfied in the circumstances of this case that they are justified in seeking an order for costs on an indemnity basis from the 8th June, and I make that order."

22. I will return to the part of that statement where the judge dealt with the making of the indemnity order, but so far as he dealt with the order on a standard basis, Mr Davidson does not criticise his decision.

23. The judge then went on to deal with the fifth defendant. He said:

"In relation to Betesh, I am satisfied that, notwithstanding the areas of negotiation in relation to case management that have been brought to my attention, that it is still appropriate to make an order that the claimant pay the costs of Betesh on a standard basis ...."

24. As I understand his decision, the judge clearly rejected the argument which Mr Davidson put forward before him as to why there should be a special order for costs made and accepted the approach of Mr Stewart. As I have already said, I do not think that part of his decision can be faulted. The judge continued:

SUTER DEC.
EXHIBIT 15, PAGE 5

> ".... I have seen and heard nothing to suggest that I should make any different order than that which I made in relation to Salisbury. So they too will be entitled to their costs on an indemnity basis from the 8th June."

25. I fully accept that that does not provide any clear exposition as to why an order was being made on an indemnity basis. When he sought permission to appeal, Mr Davidson very properly indicated that perhaps this court would be helped by knowing more about the particular circumstances which the judge had in mind when making the order which he did. To that the judge said:

> "I can tell you the circumstance I had in mind is that from the 8th June the claimants were aware of the payment into court of £100,000."

Mr Davidson says that, in view of that statement, the judge was making the order on the basis of the payment into court.

26. In considering the judge's approach it is also important to bear in mind that, initially, he was under the impression that the CPR might require him to make an indemnity order. However, moments before the judge made the order which he did, he was told in clear terms by Mr Stewart, most appropriately, that that was not the situation; that there is no rule about indemnity costs so far as payment into court is concerned in these circumstances; and that the claimant has 21 days to accept the payment in on the basis that he gets the full costs of the claim. In my judgment, the judge was saying that, having regard to the background circumstances of this case, the payment into court should have been accepted and the fact that it had not been accepted meant that it was appropriate to make an indemnity order for costs. I have no doubt that the judge was aware that there had to be something to justify his exercising his discretion out of accord with what would be the norm in regard to the particular facts of this case.

27. Approaching the matter in that way, it seems to me that the judge was entitled to come to the conclusion which he did. The evidence on behalf of the claimant as to the matters of significance was given by the director, Mr Smith. It is clear that the judge accepted that the approach that he adopted in advancing the claim on behalf of the claimant was not justified. Mr Smith must have known that he intended to go on with this purchase in any event and would not have been affected by knowledge that the property was not fully insured. So far as he was concerned, the additional sum which could have been payable by the insurance company would have been a windfall. To pursue a claim in those circumstances against either defendant in the way that he did was conduct which it seems to me, in my judgment, would justify a judge saying that if the sum of £100,000 is not accepted out of court, that is a standard of behaviour which makes it appropriate for an order for costs to be made which is not the norm.

28. The court was referred to a number of authorities in the course of argument on this subject. I would only briefly refer to two cases so far as this issue is concerned. The first is Reid Minty (a firm) v Gordon Taylor [2002] 2 All ER 150. In that case May LJ approached a different factual situation from that which we are considering in a way which I find wholly appropriate. He said:

> "31. Thus, in my view, the letter of 3 December 1999 may be rather more persuasive than the letter of 1 September 1999 — although I emphasise that the court has to take all relevant circumstances into account.
>
> 32. There will be many cases in which, although the defendant asserts a strong case throughout and eventually wins, the court will not regard the claimant's conduct of the litigation as unreasonable and will not be persuaded to award the defendant indemnity costs. There may be others where the conduct of a losing claimant will be regarded in all the circumstances as meriting an order in favour of the defendant of indemnity costs. Offers to settle and their terms will be relevant and, if they come within Pt 36, may, subject to the court's discretion, be determinative."

29. As May LJ emphasised, all relevant circumstances must be taken into account.

SUTER DEC.
EXHIBIT 15, PAGE 6

30. In Kiam v MGN Ltd (No 2) [2002] 2 All ER 242, this court was concerned about a possible assumption that if an offer of payment into court was not accepted by a claimant, then automatically the claimant would be liable for costs on an indemnity basis as opposed to a standard basis. This court made it clear that such an approach is wrong. In the course of his judgment, with which the other members of the court agreed, Simon Brown LJ in paragraphs 12 and 13 said as follows:

> "12. I for my part, understand the court there to have been deciding no more than that conduct, albeit falling short of misconduct deserving of moral condemnation, can be so unreasonable as to justify an order for indemnity costs. With that I respectfully agree. To my mind, however, such conduct would need to be unreasonable to a high degree; unreasonable in this context certainly does not mean merely wrong or misguided in hindsight. An indemnity costs order made under Pt 44 (unlike one made under Pt 36) does, I think, carry at least some stigma. It is of its nature penal rather than exhortatory. The indemnity costs order made on the principal appeal in McPhilemy'scase was certainly of that character. We held ([2001] 4 All ER 361 at [29]) that the appeal involved an abuse of process on the footing that 'to have permitted the defendants to argue their case on perversity must inevitably have brought the administration of justice into disrepute among right-thinking people'.
>
> 13. It follows from all this that in my judgment it will be a rare case indeed where the refusal of a settlement offer will attract under Pt 44 not merely an adverse order for costs, but an order on an indemnity rather than standard basis. Take this very case. No encouragement in the way of an expectation of indemnity costs was required for him to make his offer to accept £75,000; its object was to reduce the damages to that level. Where, as here, one member of the court considered the jury's award 'wholly excessive', and thought that £60,000 would have been the highest sustainable award, it seems to me quite impossible to regard the appellant's refusal to accept the £75,000 offer as unreasonable, let alone unreasonable to so pronounced a degree as to mention an award of indemnity costs. It is very important that the Reid Minty case should not be understood and applied for all the world as if under the CPR it is now generally appropriate to condemn in indemnity costs those who decline reasonable settlement offers."

31. In the context of that case I see that those paragraphs set out the need for there to be something more than merely a non-acceptance of a payment into court, or an offer of payment, by a defendant before it is appropriate to make an indemnity order for costs. Insofar as that is the intent of those paragraphs, I have no difficulty with them. However, I would point out the obvious fact that the circumstances with which the courts may be concerned where there is a payment into court may vary considerably. An indemnity order may be justified not only because of the conduct of the parties, but also because of other particular circumstances of the litigation. I give as an example a situation where a party is involved in proceedings as a test case although, so far as that party is concerned, he has no other interest than the issue that arises in that case, but is drawn into expensive litigation. If he is successful, a court may well say that an indemnity order was appropriate, although it could not be suggested that anyone's conduct in the case had been unreasonable. Equally there may be situations where the nature of the litigation means that the parties could not be expected to conduct the litigation in a proportionate manner. Again the conduct would not be unreasonable and it seems to me that the court would be entitled to take into account that sort of situation in deciding that an indemnity order was appropriate.

32. I take those two examples only for the purpose of illustrating the fact that there is an infinite variety of situations which can come before the courts and which justify the making of an indemnity order. It is because of that that I do not respond to Mr Davidson's submission that this court should give assistance to lower courts as to the circumstances where indemnity orders should be made and circumstances when they should not. In my judgment it is dangerous for the court to try and add to the requirements of the CPR which are not spelt out in the relevant parts of the CPR. This court can do no more than draw attention to the width of the discretion of the trial judge and re-emphasise the point that has already been made that, before an indemnity order can be made, there must be some conduct or some circumstance which takes the case out of the norm. That is the critical requirement.

33. In this case I am satisfied there was such a circumstance as I have indicated. That being so, it seems to me that the appeal in respect of the indemnity issues should be rejected. In view of what I have already said about the other issue, in my judgment this appeal should be dismissed.

SUTER DEC.
EXHIBIT 15, PAGE 7

LORD JUSTICE WALLER:

34. I agree, but as a party to the judgment in Kiam v MGN Ltd (NO 2), much relied on by Mr Davidson, I should perhaps add a word. The Court of Appeal has been concerned to put right certain misconceptions following the coming into force of the CPR and to give some guidance to courts at first instance in four recent authorities. But it does so by reference to the circumstances of the individual cases with which it is concerned.

35. The first, Petrotrade Inc v Texaco Ltd [2002] 1 WLR 947, was concerned to give general guidance on the approach to Part 36.2(1), but also dealt with the circumstances where there had not been a trial and gave encouragement to the courts to consider awarding higher rates of interest and indemnity costs in such cases by way of analogy.

36. The second, McPhilemy v Times Newspapers Ltd (No 2) [2002] 1 WLR 934, was concerned to dispel the myth that an order for indemnity costs under Part 36.2(1) was a penal measure to punish unreasonable conduct.

37. Reid Minty v Taylor [2002] All ER 150 was concerned with the exercise of discretion under Part 44.3 and emphasised that it was not necessary for there to be conduct deserving moral condemnation for the court to have power to order indemnity costs. In that case there was an offer by the defendants that if the claimant discontinued, the defendant would pay the costs, and if the offer was not accepted a threat was made that indemnity costs would be sought. The judge in that case felt constrained to find conduct deserving of moral condemnation before awarding indemnity costs under Part 44.3, but the Court of Appeal said that he was wrong to be so constrained. It was in that context that May LJ made the observations to which my Lord has referred in paragraphs 32 and 33. He also made the observation at paragraph 28:

> "As the very word 'standard' implies, this will be the normal basis of assessment where the circumstances do not justify an award on an indemnity basis. If costs are awarded on an indemnity basis, in many cases there will be some implicit expression of disapproval of the way in which the litigation has been conducted. But I do not think that this will necessarily be so in every case."

38. In Kiam v MGN Ltd (No 2) the court was concerned with an offer which had been made by the claimant before the appeal came on. The claimant had been awarded £105,000 by a jury. The defendant appealed on the basis that the award was too high. An offer was made to take £75,000 and the defendant refused. The appeal was pursued and lost. The majority held that the £105,000 should not be disturbed, but the minority judgment would have reduced the award to £60,000. The argument on costs was that, in the light of the majority view, it was quite unreasonable to refuse to accept £75,000. On one view, it can be seen that it was arguable that it was unreasonable to refuse to accept £75,000. But the point made by the judgment of Simon Brown LJ was that hindsight may show that it was unreasonable not to accept a better offer but that will not normally be sufficient for an award of costs on an indemnity basis. Simon Brown LJ was concerned to stress that where all that was relied upon is the failure to accept a reasonable offer, it will be to a high degree of unreasonableness before an award of indemnity costs should be made. But his language is not apposite to all circumstances, as my Lord has pointed out. My Lord has referred to the example of a test case where a litigant wishes to pursue a case to obtain a ruling, whatever steps the other party has taken to prevent himself being a party to litigation, and the ruling goes against the person bringing the desired test case. That conduct cannot, as my Lord has said, be categorised as unreasonable, never mind unreasonable to a high degree. But the case might well be one outside "the norm", thus justifying an order for indemnity costs. In agreement with my Lord, this court should strive, first, not to replace language of the rules with other phrases; and secondly, should also strive to leave the question of costs so far as possible to the discretion of judges at first instance. Certain principles have to be adhered to, as indicated by the rules. So far as relevant to this case, the first principle is that expressed by May LJ in paragraph 28 in Reid Minty(which I have read). "As the very word 'standard' implies, this will be the normal basis". From that first principle it is also possible to say that in the context of Part 36.20, or under Part 44.3 the mere fact that an offer of settlement or a Part 36 offer has been made by a defendant and then been bettered, will not necessarily lead to an order for costs on an indemnity basis.

39. The question will always be: is there something in the conduct of the action or the circumstances of the case which takes the case out of the norm in a way which justifies an order for indemnity costs?

SUTER DEC.
EXHIBIT 15, PAGE 8

40. In this case, if the judge had awarded indemnity costs simply on the basis that a Part 36 offer had been made and bettered, I would be inclined to have interfered with that decision. But there are clear indications that what happened here was that the judge took the view that this was a speculative claim by the claimant which the defendants had made various attempts to resolve outside the court and in relation to which the Part 36 offer was the final straw. The key factor which demonstrates to my satisfaction that this was the judge's approach is the fact that the cut-off date he chose from which costs would be on an indemnity basis, was the date of the payment in, not the date up to which the claimant would have had the opportunity to take the money or to accept the Part 36 offer. The judge fully appreciated the 21 days which the claimant had because he was told of that immediately prior to commencing his judgment. But he still chose the date of the payment in. In my view he must have said to himself: "This is a case which is close to being out of the norm in any event", and once the claimant was (and I use the words that the judge himself used when explaining the matter to Mr Davidson) "aware of the payment in", it was a case that the claimant should only be entitled to pursue on the basis that they paid indemnity costs if they lost.

41. Thus I agree that the appeal should be dismissed.

LORD JUSTICE LAWS:

42. I agree with both judgments.

ORDER: Appeal dismissed with costs in each case of each defendant on the standard basis on the amounts submitted less £750.

Crown copyright

© 2007 Sweet & Maxwell Ltd

Westlaw UK

SUTER DEC.
EXHIBIT 15, PAGE 9