# EXHIBIT B



Neutral Citation Number: [2007] EWHC 2255 (Ch)

Case No: HC07C00763 and HC07C01505

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 12 October 2007

Before :

**MR JUSTICE LEWISON**

- - - - - - - - - - - - - - - - - - - - -

Between :

THE LAW DEBENTURE TRUST
CORPORATION PLC                                          **Claimant**
- and -
(1) CONCORD TRUST
(2) ACCIONA SA
(3) ELEKTRIM SA (IN BANKRUPTCY)
(4) VIVENDI HOLDING 1 CORP                               **Defendants**

And Between:

ELEKTRIM SA (IN BANKRUPTCY)                              **Claimant**

-and-

VIVENDI HOLDINGS 1 CORP                                  **Defendant**

- - - - - - - - - - - - - - - - - - - - -

**Mr Robert Miles QC and Mr Andrew Clutterbuck** (instructed by **Simmons & Simmons**) for
the Claimant.
**Mr Richard Millett QC and Mr Julian Kenny** (instructed by **Barlow Lyde & Gilbert**) for
the third defendant (claimant in the anti-suit injunction).
**Mr Ali Malek QC and Mr David Quest** (instructed by **Orrick Herrington & Sutcliffe**) for
the fourth defendant (defendant in the anti-suit injunction).

Hearing dates: 28th September 2007
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

*Kim Lewison*

THE HONOURABLE MR JUSTICE LEWISON

**Mr Justice Lewison:**

Introduction ................................................................................................................ 2
The relevant terms of the Trust Deed and the bond conditions................................. 3
The background to the claim ...................................................................................... 4
The contingent payment claim ................................................................................... 7
The Part 8 proceedings ............................................................................................... 7
Anti-suit injunctions: the principles .......................................................................... 8
The amended complaint in Miami.............................................................................. 10
   The amended complaint ........................................................................................ 10
   The claim against the Trustee............................................................................... 10
   The claim against Elektrim.................................................................................... 14
Result.......................................................................................................................... 17

**Introduction**

1.      The Law Debenture Trust Corporation plc is the Trustee of €510,000,000 2% Bonds ("the bonds") issued by Elektrim Finance BV and guaranteed by Elektrim S.A. ("Elektrim") pursuant to a supplemental Trust Deed dated 15 November 2002 ("the Trust Deed"). The bonds were due for redemption on 15 December 2005.

2.      As is usual with bonds of this kind, the powers and duties of the Trustee are regulated by the Trust Deed. The bonds are subject to bond conditions, which incorporate all the terms of the Trust Deed. The bonds are in registered form and are held through the two principal clearing systems of eurobonds, Euroclear and Clearstream. At Euroclear and Clearstream banks and brokers maintain securities accounts through which they hold bonds either on their own behalf or as nominees on behalf of others. The bonds are freely tradable, and are likely to be bought by or on behalf of sophisticated investors. The tradable nature of the bonds, and the method of registration of account holders in the clearing system, has the effect that the Trustee will often be unaware of the identity of the person entitled to the bonds. Since early 2001 the bondholders have been represented by a bondholders' committee. The committee has in turn been represented by Bingham McCutchen LLP, an international law firm.

3.      One of the bondholders was Everest Capital Ltd ("Everest"). Apparently, it held the bonds for the benefit of General Motors. At the times relevant to the events I will describe, Everest (or one of its associated companies) was a member of the bondholders' committee. It was represented by Mr Richard Torres. On 29 May 2007 Everest entered into an Assignment Agreement (in which it was described as a "sophisticated investor") which assigned its bonds to Vivendi Holdings 1 Corp ("VH1"), together with certain claims arising out of its position as bondholder.

4.      On 1 June 2007 VH1 filed a complaint in Miami. The complaint was amended on 7 June. By the amended complaint VH1 claims relief against the Trustee and against Elektrim. The applications before me are applications to continue the anti-suit injunctions that I granted against VH1 on 8 June. No applications for final orders have been made under Part 24; and VH1 is unwilling to agree that the applications be treated as the trial of the actions.

**The relevant terms of the Trust Deed and the bond conditions**

5.     The terms of the Trust Deed were incorporated into bond conditions, with the effect that any bondholder became bound by the terms of the Trust Deed as well as by the bond conditions. Among the terms of the Trust Deed are the following:

> "9. Enforcement
>
> 9.1    The Trustee may at any time, at its discretion and without notice, take such proceedings and/or other action as it may think fit against or in relation to [Elektrim Finance] or [Elektrim] to enforce their respective obligations under these presents...
>
> 10. Proceedings, Action and Indemnification
>
> 10.1    The Trustee shall not be bound to take any proceedings mentioned in clause 9 or any other action in relation to these presents unless respectively directed or requested to do so (i) by an Extraordinary Resolution of the holders of the Bonds or (ii) in writing by the holders of at least 30 percent in principal amount outstanding of the Bonds and in either (i) or (ii) then only if it shall be indemnified to its satisfaction against all Liabilities to which it may thereby render itself liable or which it may incur by so doing.
>
> 10.2    Only the Trustee may enforce (i) [against the security provided by Elektrim] or (ii) the provisions of these presents. No Bondholder shall be entitled to proceed directly against [Elektrim Finance] or [Elektrim] to enforce the performance of any of the provisions of these presents unless the Trustee having become bound as aforesaid to take proceedings fails to do so within a reasonable time and such failure is continuing."

6.     Clause 1.2 (H) of the Trust Deed said that any references to taking proceedings included proving in a winding up. By clause 1.2 (A) this extended definition also applied to the bond conditions.

7.     The bond conditions contained a term to similar effect:

> "13. Enforcement of Rights
>
> At any time after the Bonds become due and repayable, the Bond Trustee may, at its discretion and without further notice, institute such proceedings against [Elektrim Finance] or [Elektrim] as it may think fit to enforce the Bonds and the provisions of the [Trust Deed], but it need not take any such proceedings unless (i) it shall have been so directed by an Extraordinary Resolution of the Bondholders or so requested by in writing by holders of at least thirty percent in principal amount outstanding of the Bonds and (ii) it shall have been

indemnified to its satisfaction. No Bondholder may proceed directly against [Elektrim Finance] or [Elektrim] unless the Bond Trustee, having become bound to proceed, fails to do so within a reasonable time and such failure is continuing."

8.   Condition 6 (k) of the bond conditions required Elektrim (as principal) to pay a contingent payment on the Contingent Payment Date. A covenant to the same effect is contained in the Trust Deed. The contingent payment has also been referred to as the "equity kicker". In very broad (and so to some extent inaccurate) terms the amount of the Contingent Payment is the difference between:

   i)    The fair market value of Elektrim's net assets (i.e. its assets after deduction of debt apart from contingent liabilities) as determined on the Contingent Payment Date and

   ii)   €160 million.

9.   Under clause 15.1(A) of the Trust Deed, Elektrim and Elektrim Finance both covenanted with the Trustee that each of them would "at all times carry on and conduct its affairs and procure that its Subsidiaries carry on and conduct their respective affairs in a proper and efficient manner".

**The background to the claim**

10.  Elektrim's principal asset is or was its shareholding in a Polish telecommunications company known as PTC. A major French media company called Vivendi Universal SA ("Vivendi") has been in dispute with Elektrim and with Deutsche Telekom AG ("DT"), a major German media company, for several years about the PTC stake. Vivendi alleges that it has invested over €2bn under various agreements and is entitled, through a Polish company which it controls, known as ET or Telco, to the PTC stake. Elektrim and DT, on the other hand, allege that Elektrim was entitled to the PTC stake and that, by virtue of various awards of a Vienna arbitral tribunal, Elektrim is obliged to transfer the stake to DT. The battle for control of the PTC stake has been fought in numerous proceedings, including arbitrations in Vienna, Switzerland and London, and Court proceedings in Poland.

11.  While these various proceedings were pending, the bonds fell due for redemption. Elektrim did not pay. On the instructions of the bondholders, the Trustee began insolvency proceedings against Elektrim in Poland on 3 March 2005 petitioning for Elektrim's bankruptcy. The petition was founded on the sum of €434,541,700.20 plus interest and other amounts being due and payable. The petition was issued pursuant to instructions given to the Trustee under clause 10.1 of the Trust Deed. The petition was presented by the Trustee on behalf of (and as trustee for) the entire class of bondholders. Elektrim fought the petition hard. It initially succeeded in having it dismissed. That was overturned on appeal. It then persuaded the Polish Bankruptcy Court to require a report into its solvency. This all took many months. ET had also issued a bankruptcy petition of its own against Elektrim.

12.  On 2 August 2006 the London Court of International Arbitration ("LCIA") made its Order on Interim Measures No 6 in the arbitration between Vivendi and Elektrim. Paragraph 2 of the order enjoined Elektrim from voluntarily selling or agreeing to sell

the PTC Shares. On 21 September 2006 the district court of Warsaw enjoined Elektrim from disposing of its assets. This order appears to have been granted on the trustee's application.

13.    On 5 September 2006 DT issued a press release stating that a DT group employee had been appointed chief executive of PTC and that:

> "The new management appointment at PTC is a direct consequence of Deutsche Telekom's acquisition of the 48 per cent stake of PTC formerly held by the Polish company Elektrim. The acquisition is based on a call option awarded to Deutsche Telekom by a Court of Arbitration."

14.    The Court of Arbitration referred to was in fact the Vienna Court of Arbitration, and the award referred to was an award of 6 June 2006. On 2 October 2006 the Vienna Arbitration Court issued a Second Partial Award in the arbitration between Elektrim and DT. That award recited the operative parts of the earlier award of 6 June 2006 in which the Court had held that DT had validly exercised an option over Elektrim's shareholding in PTC. It further declared that on payment of the price to be determined, DT would acquire that shareholding. In the body of its Second Partial Award of 2 October the Arbitration Court said:

> "32. In the present case, [DT] itself admits that a great uncertainty shrouds both the thing to be sold and the price for which it should be deemed to have been sold on 15 February 2005.
>
> 33. First, as regards the Option Shares, [DT] has appropriately declared that the present title to the Shares is uncertain, and was uncertain at the time of the exercise of the call option. It points out that "it remains unclear whether DT has acquired 226,080 PTC shares (i.e., over 48% of the PTC shares), on the one hand, or only a single PTC share, on the other" [referring to DT's submissions]. It is known that at least one parallel arbitration between different parties bears on the title on those shares. The Arbitral Tribunal is not informed about those proceedings nor concerning any finding of the other Arbitral Tribunal, so that the above mentioned uncertainty perdures to the fullest extent conceivable. Therefore the validity of the so-called "share purchase agreement" that would have been concluded on 15 February 2005 is put to doubt by reason of the indetermination of its very subject matter, an indetermination which the present proceeding at the present stage cannot lift in any meaningful way...
>
> 34. Second, as concerns the price of the shares whichever they are, this price is neither determined nor determinable at the present time."

15.    It concluded that the exercise by DT of its option fulfilled the requirement to bring about the transfer of the shares once the determination of the precise number and price

had been determined. The order made by the Court was that DT would acquire full legal title to the shares on payment of an amount in cash not less than the current book value of the shares and the provision of an undertaking to pay any subsequent adjustment of the price. It also ordered Elektrim to transfer "full factual control over the Option Shares" to DT. This Partial Award was sent to the bondholders' committee; and was seen by Everest acting by Mr Torres.

16.     The hearing of the bankruptcy petition against Elektrim was due for hearing on 4 October 2006. On that day Bingham McCutchen sent an e-mail to the Trustee's lawyers saying that the bondholders committee (which expressly included Everest) confirmed that they approved of the Trustee applying for an adjournment of the petition to enable them to consider "the implications of the Vienna award" and/or the acceptance of €525 million out of the funds paid by DT on terms that the bankruptcy petition was withdrawn. The hearing was duly adjourned to a further hearing on 27 October in the face of opposition from ET. Also on 4 October 2006, DT issued another press release stating:

> "In yet another award of October 2, 2006, the Arbitral Tribunal in Vienna conferred the ownership title to the disputable 48% of the shares in PTC to [DT] (with effect as of February 15, 2005), which remains in concord with the joint stand of [Elektrim] and [DT] presented to date. For this reason [DT] has paid an amount of more than Euro600m, which surely covers the current book value of the shares in PTC."

17.     On 12 October 2006 an application by ET for an attachment over Elektrim's receivable from DT was rejected by the Polish bankruptcy court. In the Justification for the court's decision the judge explained that Polish law did not prevent a debtor from paying his debts. He also said that the Trustee represented essentially all Elektrim's creditors whose rights had been determined by a final court ruling; and that to prevent Elektrim from paying what it owed the Trustee would in effect decide the bankruptcy proceedings against Elektrim.

18.     At a meeting on 20 October 2006 the Trustee's Polish lawyers learnt of a proposal for DT to make payments into an escrow account.

19.     On 23 October 2006 the LCIA made Order on Interim Measures No 7 in the arbitration between Vivendi and Elektrim. By that order the LCIA declared that their Order on Interim Measures No 6 did not prevent Elektrim from applying the sum of €600 million paid or payable by DT in discharge of Elektrim's liability to the bondholders who had presented the bankruptcy petition. The sum of €600 million was the book value of the PTC shares, payment of which had been contemplated by Order on Interim Measures No 6.

20.     On 24 October 2006 Bingham McCutchen were asked for bank account details, so that Elektrim might pay off the petition debt. Elektrim paid €525 million to the Trustee on 26 October 2006 without prior agreement or notice. On the morning of 27 October 2006 Bingham McCutchen sent an e-mail to the Trustee's lawyers. It confirmed instructions from Acciona and Trafalgar (bondholders who, between them, held about 38 per cent in value of the bonds and who together with Everest were members of the bondholders' committee). The e-mail said that the bondholders

approved of the Trustee applying to the bankruptcy court for a direction that the payment by Elektrim was lawful; and if that direction was obtained, to permit the petition to be dismissed or to withdraw it. The Trustee was also to attempt to have ET's bankruptcy petition dismissed. At the hearing on that day the Polish bankruptcy court ruled that the payment was lawful. Among the points made by the court in its written ruling were the following:

i)      It had become superfluous to hear the Trustee's petition;

ii)     There was nothing to prevent a debtor from paying off a creditor's claim;

iii)    Although ET opposed withdrawal of the petition it advanced no substantial grounds for its opposition;

iv)     Transfer of the shares was not a voluntary act of Elektrim because DT was exercising a pre-existing right, and hence was not in breach of any court order;

v)      The Trustee represented all the creditors of Elektrim. ET was not a creditor because it had not filed for Elektrim's bankruptcy;

vi)     If the petitioner decides he no longer has an interest in pursuing the bankruptcy, he is entitled to withdraw the petition;

vii)    A genuinely disputed claim cannot lead to a bankruptcy;

viii)   Bankruptcy cannot be declared on the ground that the petitioner is concerned that, in the future, a claim, if established will not be able to be met.

21.     In the light of the court's ruling, the petition was withdrawn and the Trustee retained the money. However, it did not immediately distribute the money to the bondholders because of its concern that ET might appeal against the dismissal of bankruptcy proceedings, resulting in Elektrim's liquidation and a possible claim by a liquidator for the return of the €525 million under "claw-back" provisions in Polish bankruptcy legislation. ET did attempt to appeal, but its attempts failed.

22.     Vivendi, meanwhile, had alleged that it had claims over the money, but the precise nature of those claims was not articulated.

## The contingent payment claim

23.     On 15 December 2005, the Trustee commenced a claim in this court against Elektrim seeking damages for the loss of the Contingent Payment. The basis of the action is alleged asset-stripping by Elektrim in breach of clause 15.1(A) of the Trust Deed resulting in the loss of the full value of the Contingent Payment obligation under clause 6(k) of the Bond Conditions. The claim is for the loss of a real or substantial chance that the Contingent Payment would have become payable.

## The Part 8 proceedings

24.     On 2 March 2007 the Trustee began Part 8 proceedings seeking directions. On 2 April 2007, I made a representation order appointing two of the Bondholders, Concord and Acciona, to represent all the Bondholders pursuant to CPR 19.7(2). On 1 May 2007 I

gave judgment holding that the claims intimated by Vivendi to the effect that the monies received by the Trustee were tainted lacked any merit; and I made an order that those claims had no reasonable foundation. I also ordered that notice of my judgment and order of 1 May 2007 be served on Vivendi and ET pursuant to CPR 19.8A. This gave Vivendi the right to apply within 28 days of service to set aside the order of 1 May 2007, failing which the order would be binding on it: CPR 19.8A(8). The notice was served on Vivendi (as acknowledged by their UK solicitors on 23 May 2007) and it was informed that a further hearing of the Part 8 claim was fixed for the week of 5 June 2007. Vivendi has not applied to set aside my order.

25.    On 29 May 2007 VH1 purchased a tranche of bonds from Everest under an Assignment Agreement. These included bonds to which General Motors had apparently been beneficially entitled.

## Anti-suit injunctions: the principles

26.    The broad principle underlying the jurisdiction to grant an anti-suit injunction restraining foreign proceedings is that it is to be exercised when the ends of justice require it. This may occur when the foreign proceedings are vexatious or oppressive; or where the institution of the foreign proceedings is a breach of a binding contract. However, the jurisdiction is one to be exercised with caution. I take the summary of principle from the judgment of Evans-Lombe J sitting in the Court of Appeal in *Royal Bank of Canada v Rabobank* [2004] 1 Lloyd's Rep 471, with the modification of the fifth principle suggested by Mance L.J. in the same case:

> (i) Under English law a person has no right to be sued in a particular forum, domestic or foreign, unless there is some specific factor that gives him that right, but a person may show such a right if he can invoke a contractual provision conferring it on him or if he can point to clearly unconscionable conduct (or the threat of unconscionable conduct) on the part of the party sought to be restrained: *Turner v Grovit* [2002] 1 WLR 107, 118C at para 25 per Lord Hobhouse.

> (ii) There will be such unconscionable conduct if the pursuit of foreign proceedings is vexatious or oppressive or interferes with the due process of this Court: *South Carolina Insurance Co v Assurantie Maatschappij de Zeven Provincien NV* [1987] AC 24 at page 41D; *Glencore International AG v Exter Shipping Ltd* [2002] 2 All ER (Comm) 1, 14a at para 42.

> (iii) The fact that there are such concurrent proceedings does not in itself mean that the conduct of either action is vexatious or oppressive or an abuse of court, nor does that in itself justify the grant of an injunction: *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 817 at page 894C; *Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767 at 781; *Airbus Industrie GIE v Patel* [1999] 1 AC 119 at 133G/H.

(iv) However, the court recognises the undesirable consequences that may result if concurrent actions in respect of the same subject matter proceed in two different countries: that 'there may be conflicting judgments of the two courts concerned' or that there 'may be an ugly rush to get one action decided ahead of the other in order to create a situation of res judicata or issue estoppel in the latter': see *The Abidin Daver* [1984] AC 398 at pages 423H–424A per Lord Brandon.

(v) The English court will, generally speaking, only restrain the plaintiff from pursuing proceedings in the foreign court if such pursuit would be vexatious or oppressive. This presupposes that, as a general rule, the English court must conclude that it provides the natural forum for the trial of the action; and further, since the court is concerned with the ends of justice, that account must be taken not only of injustice to the defendant if the plaintiff is allowed to pursue the foreign proceedings, but also of injustice to the plaintiff if he is not allowed to do so. So the court will not grant an injunction if, by doing so, it will deprive the plaintiff of advantages in the foreign forum of which it would be unjust to deprive him: *Société Aerospatiale*, ibid at 896F–H.

(vi) In exercising its jurisdiction to grant an injunction, 'regard must be had to comity and so the jurisdiction is one which must be exercised with caution': *Airbus Industrie*, ibid at 133F. Generally speaking in deciding whether or not to order that a party be restrained in the pursuit of foreign proceedings the court will be reluctant to take upon itself the decision whether a foreign forum is an inappropriate one: *Turner v Grovit*, ibid at para 25.

27.    I add two glosses to this summary:

i)     The first principle recognises that a person may have a right not to be sued in a foreign court if he can show a contractual provision conferring that right on him. If he can, then ordinarily the court will enforce the contract: *Donohoe v Armco Inc* [2002] 1 Lloyd's Rep. 425. By the same token a person may be able to rely on a contractual provision which entitles him not to be sued at all (*The Angelic Grace* [1995] 1 Lloyd's Rep 87), or not to be sued by the particular claimant. If he can, then it seems to me that the court will ordinarily enforce that contract too.

ii)    The courts have refrained from defining what is meant by "vexatious or oppressive", leaving it to be worked out on a case by case basis. Among the examples in the decided cases in which it was held that foreign proceedings fell within that description are cases which are bound to fail (*Shell International Petroleum Co Ltd v Coral Oil Co Ltd* [1999] 2 Lloyd's Rep 606); cases which could and should have formed part of an earlier English action (Dicey & Morris 14th ed para 12-073; *Glencore International AG v*

*Exter Shipping Ltd* [2002] All ER (Comm) 1 (CA), paras 67 and 68) and cases which interfere with the processes of the English court.

**The amended complaint in Miami**

*The amended complaint*

28.    As I have said the complaint was filed on 1 June 2007 and amended on 7 June. It makes claims against both the Trustee and Elektrim. The recitation of the facts is peppered with allegations of fraud against the Trustee. But all those allegations are to be withdrawn. Why they were made in the first place, and upon what material, has not been explained. Following the conclusion of the hearing, I was provided (at my request) with a further version of the amended complaint with the allegations of fraud against the Trustee deleted. I have worked from that document.

*The claim against the Trustee*

29.    I begin with the surviving claim against the Trustee. The claims are against an English trustee, concerning the Trustee's duties under an English law trust deed, expressly governed by English law and containing a non-exclusive English jurisdiction clause, with the Trustee (whose acts are attacked) being in England and the relevant acts having occurred in England. Mr Malek QC, appearing for VH1, accepts that England is the natural forum for this claim. Nor does he suggest that there is any advantage in proceeding in Miami of which VH1 will be deprived if an injunction is granted. The sole substantive question, then, is whether the claim against the Trustee is vexatious or oppressive.

30.    The surviving claim against the Trustee is contained in counts 1 and 2 of the amended complaint. It is first alleged that the Trustee was in breach of fiduciary duty in failing to disclose to Everest the full contents of the Second Partial Award of 2 October 2006 before withdrawal of the bankruptcy petition. It is now conceded by VH1 that this factual allegation is simply wrong. Not only did the Trustee disclose the award to the bondholders' committee, but Mr Torres himself saw it (although he says that he did not understand its significance). Moreover, the lawyers acting for the bondholders' committee themselves instructed the Trustee to obtain an adjournment of the bankruptcy petition for the very purpose of considering the implications of the award. This allegation is hopeless.

31.    The second allegation is that the Trustee failed to obtain from Elektrim the full content of the First Partial Award of 6 June 2006 and disclose it to "Plaintiff" before agreeing to withdraw the petition. (The reference to "Plaintiff" is plainly mistaken because "Plaintiff", i.e. VH1, was not a bondholder at the relevant time, but I ignore that error). However, the Second Partial Award, which the bondholders' committee (including Mr Torres) did have, recited the operative part of the First Partial Award in full. The bondholders did not ask the Trustee to obtain a full copy of the award. Nor did Bingham McCutchen. As an allegation of breach of fiduciary duty, this is also hopeless.

32.    The third allegation is that the Trustee failed to disclose to Everest its knowledge that DT and Elektrim had engaged in a transaction that was contrary to the direction of the Vienna Arbitration Court. But the Trustee expressly applied to the Polish bankruptcy

court for a determination whether it was entitled to accept the money offered by Elektrim. The Polish bankruptcy court ruled that it was. This allegation is likewise hopeless.

33.    The fourth allegation is that the Trustee accepted "tainted money" from Elektrim without consulting Everest or obtaining the prior approval of the bondholders. I should first examine what the pleader means by the nebulous expression "tainted money". In the context of the amended complaint it is clear that it means money which was vulnerable in the hands of the Trustee at the suit of a third party (i.e. Vivendi). This is clear from paragraph 54 of the amended complaint which asserts that the risk was that the money received by the Trustee "would have to be disgorged while at the same time not being able to regain the claw-back provisions for fraudulent conveyances that would have existed if the bankruptcy petition had not been withdrawn." It is plain from this that the pleaded risk of disgorgement is one that is alleged to exist on the basis that Elektrim was *not* made bankrupt. The only such liability could have been a liability to Vivendi. Mr Malek's skeleton argument suggested precisely the opposite of the pleaded case. I reject that suggestion. The pleaded case is clear.

34.    The fourth allegation is therefore a collateral attack on my decision of 1 May in which I held that Vivendi had no arguable proprietary claim to the money which would prevent the Trustee from distributing it to bondholders. VH1 accepts that it is bound by that decision, and that it cannot therefore argue points that contradict or undermine it. The fourth allegation is therefore hopeless; or alternatively it amounts to a collateral attack on a decision of the English court.

35.    The fifth allegation is that the Trustee failed to disclose to Everest all the risks of accepting tainted money. This allegation is also hopeless, not least because (as I have decided in a judgment by which VH1 is bound) the money was not tainted. Mr Malek sought to argue that Everest was entitled to rely on the Trustee to draw to its attention how its interests under the bonds might be affected by receipt of the money. This amounts to an allegation that the Trustee had a duty to give advice (either legal or commercial) to the bondholders. The first objection to this argument is that no such duty is pleaded in the amended complaint. It does not, therefore, form any part of the claim that I am asked to restrain. The second objection is that in circumstances in which the bondholders were being advised by an international law firm of the stature of Bingham McCutchen it is inconceivable that the Trustee owed the bondholders any duty to tender legal advice (particularly when there is no allegation that the Trustee was asked for any advice). The third objection is that (as Everest's own Assignment Agreement explicitly records) Everest was a sophisticated investor well able to weigh up the commercial pros and cons of a commercial course of action. The fourth objection is that Everest did not ask the Trustee for any advice. Indeed the hearing on 4 October 2006 was adjourned at the request of (among others) Everest in order for it, together with its own lawyers, to consider the implications of the award of 2 October. The fifth objection is that if the Trustee owed any duty to tender commercial advice it must have owed that duty to all bondholders whether or not they were members of the bondholders' committee. But since the Trustee would have had no means of knowing the identity of all bondholders, no duty can have arisen. This allegation is likewise hopeless.

The Law Debenture Trust Corp. -v- Concord Trust & others

36.    The sixth allegation is that the Trustee failed to exercise adequate due diligence prior to withdrawing the bankruptcy petition by failing to conduct a full investigation of the legality of the transaction. There are two fatal objections to this allegation. First, the Trustee sought and obtained an order of the Polish bankruptcy court which declared that it was entitled to accept the payment. Second, bondholders holding more than 30 per cent of the value of the bonds instructed it to accept the payment and withdraw the petition. The Trustee is both entitled and obliged to act on the instructions of bondholders holding more than 30 per cent in value of the bonds. This allegation is therefore hopeless.

37.    The seventh allegation is that the Trustee acquiesced in delays of the bankruptcy petition. No loss is alleged to flow from this alleged breach. Moreover, the only particularised allegation of delay relates to the adjournment of the hearing on 4 October 2006, which Everest supported. This allegation is hopeless.

38.    The final allegation is that by withdrawing the petition the Trustee gave up the right to recapture fraudulently transferred assets. This allegation adds nothing to the preceding allegations; and is open to the same objection as the preceding allegations, namely that the Trustee was instructed or authorised to withdraw the petition by bondholders holding more than 30 per cent in value of the bonds. In addition, any action to recapture fraudulently transferred assets would have to have been taken by the liquidator of Elektrim (or its Polish equivalent). The Trustee had no "right" to give up.

39.    Suppose that there is some merit in one or more of the claims against the Trustee, what then? VH1 says that while Everest wanted to be paid it "did not want to receive tainted money and the possible liability that could come with tainted money". But VH1 is bound by my judgment which holds that the money was not tainted. So persistence in this allegation is a collateral attack on my judgment.

40.    In my judgment count 1 of the amended complaint discloses no arguable cause of action against the Trustee for breach of fiduciary duty. Count 2 repeats the same allegations but under the heading of breach of duty of care and diligence. For the same reasons, these allegations disclose no arguable cause of action against the Trustee.

41.    In addition, I consider that the allegations of causation of loss flowing from the alleged breaches are themselves fanciful. The amended complaint goes on to say that had Everest "opposed withdrawal and explained its reasons for doing so, the withdrawal would not have occurred" or that the bankruptcy court "would not have permitted the withdrawal". The Trustee says that its instructions to withdraw the petition came from holders of more than 30 per cent in value of the bonds and that there is no realistic prospect of showing that bondholders other than Everest would have acted differently had they known about the 6 June 2006 Award. It has adduced evidence from the bondholders supporting that position. In riposte Mr Malek says:

    i)    Mr Torres' evidence is that in practice the Trustee and the bondholders acted unanimously. Given the Trustee's cautious approach in the past, and the history of litigation between the Trustee and the bondholders, it seems likely that if vociferous objections had been raised by one of the bondholders then the Trustee would have been very reluctant to take any step which might prejudice the bondholders' position.

ii)     Mr Torres might well have been able to muster 30% of the bondholders to support an instruction to pursue the bankruptcy petition. At best the Trustee would have found itself in a position of deadlock.

iii)    Finally, there is the possibility that Everest could have approached the Polish court directly.

42.     The first point to make is that the way Mr Malek puts it is not that "the withdrawal would not have occurred"; but that Everest lost the chance of dissuading the Trustee from withdrawing the petition or of persuading the court that the petition should not be withdrawn. That is not the way in which the claim is pleaded in the amended complaint. I will assume, however, that the greater plea includes the lesser.

43.     The first possibility (namely that a single bondholder's protests could have dissuaded the Trustee from accepting the money and withdrawing the petition) is fanciful. It ignores the Trustee's obligation to act on the instructions of bondholders holding more than 30 per cent in value of the bonds. I regard the suggestion that Everest could have whipped up support from 30 per cent of the bondholders as equally fanciful. In the first place, Everest had no means of knowing who the bondholders were, and the Trustee is not alleged to have had any obligation to inform them of the identity of other bondholders (even if the Trustee had the means of knowledge, which it did not). In the second place, the fact was that the bondholders were being offered repayment of the bonds after many years of waiting. If Elektrim were declared bankrupt, it would have been because its liabilities exceeded its assets, which would in itself have prejudiced its ability to repay the bonds.

44.     The final possibility can also be summarily dismissed. In the first place Everest had no *locus standi* before the Polish bankruptcy court, because it was not a creditor of Elektrim and had not filed a petition for Elektrim's bankruptcy. Moreover the Polish court had made it clear in its ruling of 27 October that a petitioner was entitled to withdraw his petition if he wanted to. It also ruled that a bankruptcy petition could not be founded on an allegation that a contingent claim, if established, would not be met. So the possibility of the equity kicker becoming payable would not have figured in any decision of the Polish court. The idea that the Polish court would have compelled the Trustee to proceed with its petition when it did not want to is fanciful.

45.     Any chance of stopping the withdrawal of the petition that Everest had was not in my judgment a real or substantial chance. It is not, therefore, an actionable head of loss.

46.     In summary, I consider that the amended complaint discloses no arguable cause of action against the Trustee; and moreover discloses no arguable claim for recoverable loss arising out of the alleged breaches. It is a claim that is bound to fail and, in my judgment, is vexatious.

47.     There is a further reason why, in my judgment, the claim in Miami against the Trustee should not be allowed to proceed. One of the principal purposes of the Part 8 proceedings was to determine whether there were any meritorious claims against the Trustee concerning the receipt from Elektrim of the €525m and the events of October 2006. In the course of the proceedings I made a representation order under which the bondholders (including Everest) were represented by two bondholders. In the course of the proceedings the representative bondholders, through leading counsel instructed

on their behalf, argued that the receipt of the monies by the Trustee was lawful and that there was no impediment to distribution. I accepted that argument and gave judgment to that effect. VH1 as assignee of the bonds from Everest is bound by that judgment. Its claim against the Trustee in Miami argues precisely the opposite. Its claim in Miami is therefore a collateral attack on that judgment. In addition the claim that VH1 seeks to advance in Miami is a claim that could and should have been raised in the course of the Part 8 proceedings in this court. If necessary, Everest could have applied to have been separately represented in those proceedings on the ground that there was a conflict of interest between it and the remaining bondholders. It did not; and should not be allowed to do so now.

48.    In my judgment the claim against the Trustee is vexatious and should not be allowed to proceed further. I will continue the anti-suit injunction.

*The claim against Elektrim*

49.    Mr Malek does not suggest that there is any juridical advantage in suing Elektrim in Miami of which VH1 would be unjustly deprived if the anti-suit injunction is continued.

50.    In the amended complaint VH1 alleges that Elektrim made fraudulent misrepresentations and non-disclosures, in particular about the circumstances and legality of the transfer of the PTC shares to DT. These fraudulent misrepresentations are said to have been contained in two press releases issued in the name of DT which VH1 alleges "upon information and belief" (unspecified) were part of a conspiracy between DT and Elektrim to defraud Elektrim's creditors. The DT press releases were intended to, and did, induce Everest and the other bondholders to believe that DT had acquired title to 48 per cent of the PTC shares. According to the press releases DT's title had apparently been obtained lawfully pursuant to the determination of an arbitration tribunal. It appeared that the PTC shares had been irrevocably transferred out of Elektrim in return for the payment of their book value of about €600 million. In reliance on these press releases Everest supported the decision to withdraw the bankruptcy petition. But for the misrepresentations by Elektrim, Everest would have taken steps to prevent a withdrawal of the petition. The steps open to it would have been the same steps alleged in its claim against the Trustee.

51.    The primary ground on which Elektrim bases its claim to an anti-suit injunction is that it says that the claim is made in breach of the terms of the Trust Deed and the bond conditions. The relevant part of the Trust Deed and the bond conditions confer on the Trustee the sole and exclusive right "to enforce the performance of any of the provisions of these presents". Mr Millett QC, appearing for Elektrim, says that the amended complaint in Miami, when taken as a whole, is an attempt to "enforce the performance of … the provisions" of the Trust Deed and/or the bond conditions. Mr Malek, on the other hand, says that the Miami proceedings are not in breach of clause 10.2 because they are not proceedings "to enforce the performance of any of the provisions" of the Trust Deed. The nature of VH1's claim against Elektrim is a claim in fraud, a Florida law tort. No claim in contract is made against Elektrim, either to enforce the Trust Deed or to claim damages for its breach. Consequently there is no contractual impediment to the Miami proceedings.

52.    The scope of the prohibition is a question of interpretation of the Trust Deed and the bond conditions. In determining what the relevant provisions would mean to a reasonable reader, I must take into account the commercial context within which the words were used, and the purpose which it can be inferred that the provisions were designed to achieve. In an extreme case a court may conclude that something has gone wrong with the language.

53.    The effect of each of clause 10.2 and condition 13 is to prohibit individual bondholders from "enforcing the performance of" the terms of the Trust Deed and of the Bonds against Elektrim, unless the Trustee has become bound to do so and has failed to do so. The question is: what do the quoted words preclude?

54.    Mr Millett submits, and I agree, that the overall structure of the Trust Deed and the bond conditions considered in the light of the evidence leads to the conclusions that:

    i)    The use of a trustee is a common and effective way of aggregating (or pooling) the administration and enforcement of bonds. The benefits of aggregating these tasks are (i) cost savings for everyone and (ii) fairness of outcome between the bondholders *inter se*.

    ii)    However the benefits of the scheme come at a price: i.e. the bondholders have to give up their individual rights of suit against the issuer (and, in this case, against the guarantor of the debts).

    iii)    The bondholders cannot be free to pursue their own claims "to enforce performance of" the bonds individually against Elektrim because otherwise the Trustee scheme does not work. Instead they must trust the Trustee to do it. Of course, if he fails, then and only then may bondholders pursue their own course.

    iv)    The purpose of the clause 10 (and condition 13) regime is to ensure that the class of bondholders all act through the Trustee. That ensures that they all share equally in the fortunes of the investment and that there is no competition between the bondholders.

    v)    Another evident purpose of the regime is to prohibit individual bondholders from pursuing class claims for their own account. If an individual bondholder is free to pursue a claim based on a loss caused to the bondholders as a class, then either there is the potential for multiplicity of actions or for duplication of actions brought by the Trustee on the one hand and individual bondholders on the other.

55.    It is common ground that the phrase "enforce performance of" the bond conditions is not confined to claims for specific performance. It must extend at least to a claim for damages for compensation for non-performance of the bond conditions. However, Mr Millett goes further. He submits that the phrase is apt to include any claim designed to vindicate the rights of a bondholder in his capacity as such. The test of what claims are caught by the phrase should be purposive and substantive, and not procedural or dependent on the ingenuity of the draftsman. A claim designed to compensate a bondholder for the loss of something that would have belonged to him in his capacity as a bondholder is caught by the prohibition, whether the cause of action is pleaded in

contract or tort. Thus a claim such as that advanced in the Miami proceedings, which is designed to secure to the plaintiff the lost value of the equity kicker which would have become payable under the bond conditions is within the prohibition because:

i)  The claimed loss is one which was suffered by Everest in its capacity as bondholder, and the claim is therefore one which is designed to vindicate its rights as bondholder;

ii) The allegedly fraudulent statements were not made to Everest individually but, to the extent that they were directed at the bondholders (rather than to the world generally) they were directed to the bondholders as a class. The claimed loss is one which (if established) was suffered by all the bondholders as a class, rather than by Everest individually;

iii) The claimed loss is predicated on Elektrim having been declared bankrupt. If that had happened, the only way of recovering the value attributable to the equity kicker would have been by proving in Elektrim's bankruptcy. Proving in bankruptcy is one of the species of proceedings whose conduct in accordance with the Trust Deed and the bond conditions is exclusively within the control of the Trustee.

56.  I accept Mr Millett's submissions for the reasons that he gave. I therefore conclude that the Miami proceedings are proceedings which, in substance, are proceedings to enforce the provisions of the Trust Deed and the bond conditions; and are therefore within the contractual prohibition. The anti-suit injunction should be continued on that ground.

57.  In addition Mr Millett argued that the claim as framed was hopeless, both in terms of liability and in terms of causation of loss. The allegedly fraudulent statements were press releases put out by DT; not by Elektrim. DT is said to have colluded with Elektrim in putting out the press releases. The pleaded complaint is that the press release was put out on October 4 2006 "without disclosing the full content of the Second Partial Award". Reading between the lines, it seems to be implicit in that plea that if the full content of the Second Partial Award had been disclosed, the allegation of fraud could not have been made. The complaint goes on to allege that:

> "Everest relied on this release, which deceived Everest, …
> about the content and effect of the Second Partial Award."

58.  However, it is now conceded (contrary to Mr Torres' declaration) that Everest in fact saw the full contents of the Second Partial Award at exactly the same time. With the document in its hands, how can it plausibly be argued that it relied on and was deceived by a press release? Moreover, not only did Everest itself have the Second Partial Award in its hands, it was also in the hands of Bingham McCutchen. With highly experienced and competent lawyers retained to advise on and consider the implications of the Second Partial Award, how can it be plausibly argued that Everest relied on a press release rather than on its lawyers' advice? In my judgment there is no real answer to these questions.

59.  In addition, for the reasons I have given in relation to the claim against the Trustee, the causal link between the allegedly fraudulent statements and the claimed loss is

fanciful. I consider therefore that the claim as framed against Elektrim is also bound to fail, and on that ground too the anti-suit injunction should be continued.

**Result**

60.    I will continue both injunctions until trial or further order.

# EXHIBIT C

IN THE HIGH COURT OF JUSTICE                              No. HC07C01505

CHANCERY DIVISION

[2007] EWHC 1605 (CH)


                                                    Royal Courts of Justice

                                                    Friday, 29th June 2007



                              Before:

                       MR. JUSTICE LEWISON



B E T W E E N :

                         ELEKTRIM SA                          Claimant

                           - and -

               VIVENDI HOLDINGS 1 CORPORATION               Defendant

                         _____


                *Transcribed by BEVERLEY F. NUNNERY & CO*
                *Official Shorthand Writers and Tape Transcribers*
          *Quality House, Quality Court, Chancery Lane, London WC2A 1HP*
                 *Tel: 020 7831 5627   Fax: 020 7831 7737*


                         _____


MR. R. MILLETT QC and MR. P. McGRATH (instructed by Barlow Lyde & Gilbert) appeared
    on behalf of the Claimant.

MR. A. MALEK QC and MR. D. QUEST (instructed by Orrick) appeared on behalf of the
    Defendant.


                         _____



                       J U D G M E N T

                   (As approved by the Judge)

1  MR. JUSTICE LEWISON:
2
3  1  This is an application to extend the scope of an anti-suit injunction, which
4     I granted in early June and which was continued by undertakings on, I think,
5     15th June. The order was granted to restrain Vivendi Holdings 1 Corporation
6     from continuing proceedings in Miami against Elektrim AS and the Law
7     Debenture Trust.
8
9  2  The basis on which I granted that injunction was that Vivendi Holdings 1
10    Corporation as a bond holder was bound by the terms of the trust deed, which
11    required claims against Elektrim for breaches of the terms of the trust deed and
12    the bonds to be brought by the trustee rather than by the bond holders, and also
13    precluded proprietary claims being made against the trustee as a result of a
14    judgment which I gave on 1st May.
15
16 3  The current application concerns a proposal to join Vivendi Holdings 1
17    Corporation as an additional plaintiff to a complaint which has been made in
18    the United States District Court for the Western District of Washington at
19    Seattle. The matters sought to be pleaded in the third amended complaint do
20    not, in my view, amount to a collateral attack on my judgment of 1st May.
21    That judgment dealt only with the possibility that Vivendi SA might be able to
22    pursue a proprietary claim against the trustee.
23
24 4  The question for decision is whether Vivendi's claim was a bar to the trustee
25    distributing monies which it had received towards the redemption of the bonds.
26    I held that the claims were no such bar on the grounds that the claims were
27    fanciful claims, but I reached that conclusion partly because of an order made
28    by an arbitral tribunal releasing the money for payment of the bonds, and
29    partly also on the ground that the trustee was a *bona fide* purchaser for value
30    without notice of the proprietary claim.
31
32 5  In the present case, the application to extend the anti-suit injunction is made by
33    Elektrim SA. But one of the unusual features of the application is that the
34    proceedings which it seeks to restrain are not proceedings brought against it,
35    but are proceedings brought against Mr. Solorz, who is I understand a
36    shareholder and director of Elektrim. It is common ground that Mr. Solorz is
37    not a party to any contract which gives him a legal right not to be sued in a
38    particular jurisdiction. The application, therefore, is based on the proposition
39    that the proposed amendments to the complaint before the Seattle court would
40    amount to oppressive and vexatious proceedings.
41
42

6   Mr. Millett QC says that, in effect, the complaint as sought to be amended
    treats Mr. Solorz as the *alter ego* of Elektrim and, therefore, what I am in
    effect being asked to do is to declare that my order made earlier this month
    extends to a person, who in legal terms is the same as Elektrim SA, and that
    would include Mr. Solorz in circumstances where he is being sued as the *alter
    ego* of Elektrim.

7   There is, in my judgment, considerable force in that submission. If it were the
    case that Vivendi Holdings 1 Corporation simply sidestepped the order which
    I granted by suing Mr. Solorz as the *alter ego* of Elektrim, that would, in my
    view, justify the extension of the injunction. But whether that is the case is
    essentially, as it seems to me, a matter for the Seattle court to determine by an
    examination of the amended complaint sought to be put before it. As it seems
    to me, on what I have to accept is a relatively cursory examination of the third
    amended complaint, there are allegations made against Mr. Solorz which do
    not seem to me to rely on the proposition that he is to be treated simply as the
    *alter ego* of Elektrim.

8   Paragraph 2 of the amendment alleges that T-Mobile conspired with Solorz
    and Elektrim under Solorz's control to do various things. Mr. Solorz and
    Elektrim are pleaded in that paragraph as two separate conspirators. In para.77
    there is an allegation that the asset stripping alleged was done to allow
    Mr. Solorz to enrich himself without fear of being held accountable.

9   Count two in para.149 alleges a claim against Mr. Solorz for operating
    Elektrim as a corrupt enterprise and para.169 pleads a specific statement by
    Mr. Solorz himself, which is later in the complaint alleged to have been false.
    Paragraph 169 also makes allegations against Mr. Solorz of causing Elektrim
    to be stripped of his shares and, as I understood Mr. Millett in his last remarks,
    he accepts that that is a separate standalone obligation which would not be
    caught by the injunction anyway.

10  This not being a case in which there is a legal right not to be sued, this is a case
    in which the principles of comity have a much greater weight than in cases
    where this court is simply being asked to enforce a contract. I do not consider
    that this is an appropriate case to take the extraordinary step of interfering with
    the process of a foreign court. In my judgment, it will be for the Seattle court
    to decide whether or not these proceedings are in breach of the injunction
    which I granted. I am, however, prepared to say that when I referred to the
    claimant in my order I would have included anyone who is equivalent to the
    claimant and who is sued simply as the *alter ego* of the claimant, Elektrim.

---

BEVERLEY F NUNNERY & CO
OFFICIAL SHORTHAND WRITERS

# EXHIBIT D

**BINGHAM McCUTCHEN**

# Memorandum

**Privileged and Confidential**

DATE: 21 June 2006

Bingham McCutchen LLP
41 Lothbury
London EC2R 7HF
England
020.7661.5300
020.7661.5400 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

TO:  Certain Holders of Elektrim Bonds

FROM:  Bingham McCutchen LLP

RE:  **Elektrim S.A.: Analysis of the 2006 Vienna Arbitration Award**

We refer to the recent press announcements in relation to the ownership of PTC and set out below a summary of Clifford Chance's advice on the legal implications under Polish law of the latest award of the Vienna Tribunal in the arbitration between Elektrim S.A. ("**Elektrim**") and T-Mobile Deutschland GmbH ("**DT**"), confirming that DT has validly exercised its Call Option over Elektrim's shares in PTC (the "**PTC Shares**").

1.    **The Background**

1.1    On 12 June 2006, Elektrim disclosed that it had received a partial award of the Vienna Arbitral Tribunal, issued in the arbitration between Elektrim and DT. According to reports, the Arbitral Tribunal has declared that DT validly exercised its Call Option with respect to the PTC Shares on the basis of Article 16 of the PTC Shareholders' Agreement (the "**June 2006 Vienna Award**"). According to the award, the exercise of the Call Option was valid because Elektrim was in Material Default, as defined in the PTC Shareholders' Agreement. The price to be paid by DT to Elektrim for the PTC Shares will be determined in the second phase of the arbitration on the basis of Article 16.3 of the PTC Shareholders' Agreement.

1.2    At the press conference held on the same day and in subsequent comments, we understand that Elektrim stated that the Arbitral Tribunal has invited both DT and Elektrim to reach a settlement as to price to be paid for the PTC Shares. Elektrim is also reported to have said that:

(a)    It was found to be in Material Default because it did not recover the PTC Shares within the two months period ordered by the Arbitral Tribunal in November 2004 (the "**2004 Vienna Award**");

(b)    It would not be challenging the June 2006 Vienna Award;

(c)    It hoped that when the Tribunal determined the price to be paid by DT, it would take into account the fact that Elektrim was in Material Default due to reasons beyond its control (namely the conduct of ET and VU, who prevented Elektrim from recovering the PTC Shares;

A list of Partners' names and their professional qualifications is open for inspection at 41 Lothbury, London EC2R 7HF. Bingham McCutchen LLP is a limited liability partnership existing under the laws of the Commonwealth of Massachusetts regulated by the Law Society. All Partners are either Registered Foreign Lawyers or Solicitors.

21 June 2006
Page 2

(d)   DT has been the owner of the PTC Shares since 15 February 2005; and

(e)   It is considering suing ET/VU for damage caused as a result of ET/VU preventing Elektrim from recovering the PTC Shares within the 2 month deadline set by the 2004 Vienna Award.

**2.    Elektrim's appeal against the judgment of the court of first instance in Vienna quashing part of the 2004 Vienna Award**

Bingham McCutchen LLP
bingham.com

2.1   On 11 July 2006 there will be a hearing in the Court of Appeal in Vienna, which will consider Elektrim's appeal against the judgment of the court of first instance in Vienna, quashing part of the 2004 Vienna Award. If the appeal is rejected it is very likely that the June 2006 Vienna Award will not survive. In these circumstances, ET/VU will probably file a petition for a re-opening of the proceedings regarding recognition of the 2004 Vienna Award. If they successfully quash the recognition judgment the legal status of the PTC Shares will be very similar to their status prior to the 2004 Vienna Award.

**3.    The June 2006 Vienna Award and the Bankruptcy of Elektrim**

3.1   The June 2006 Vienna Award purports to confirm that DT validly exercised its Call Option on 15 February 2005 and, as of that date, the PTC Shares were transferred to DT. Clifford Chance has advised that if this assumption is correct, then the bankruptcy of Elektrim is unlikely to automatically invalidate the exercise of the Call Option. If the Call Option was validly exercised and the PTC Shares transferred to DT prior to the date on which bankruptcy was declared, the PTC Shares will not form part of the bankruptcy estate. The fact that the price has not yet been determined does not change the analysis significantly: as a matter of Polish law it is sufficient for a sale agreement to be valid if it contains a mechanism for determining the purchase price. Such a mechanism is included in Article 16.3 of the PTC Shareholders' Agreement.

3.2   It is possible that the Receiver of Elektrim will attempt to challenge the DT Call Option on the grounds that the transfer of the PTC Shares at book value is a transaction at an undervalue. Undervalue transactions are deemed ineffective vis-à-vis the bankruptcy estate if they are carried out less than a year prior to the bankruptcy petition being filed. However, it is unlikely that the exercise of the DT Call Option can be successfully challenged by the receiver on this basis. This is because Elektrim entered into the transaction 1995 when it originally made an irrevocable offer to DT and granted it the Call Option. Technically speaking, Elektrim has not since been involved in any transaction - whilst the Arbitral Tribunal seems to confirm that DT validly accepted Elektrim's offer, it is on the basis that it did so without the "legal" involvement of Elektrim. Accordingly, the fact that DT accepted the offer within a year of the Trustee's bankruptcy petition being filed is unlikely to enable the receiver to successfully challenge the exercise of the Call Option.

21 June 2006
Page 3

4.    **Impact of June 2006 Vienna Award on Pending Proceedings**

Actio Pauliana against Mega.

4.1    If DT successfully exercised its Call Option in February 2005 and the PTC Shares were never contributed to Mega then the Trustee's Actio Pauliana claim is likely to fail. This is because:

Bingham McCutchen LLP
bingham.com

(a)    By virtue of Actio Pauliana, the Trustee is seeking a declaration that the contribution of the PTC Shares by Elektrim to Mega was ineffective against the Trustee/Bondholders.

(b)    If the Actio Pauliana is successful, the Trustee would have the right to enforce its claims directly against Mega's assets, namely the PTC Shares held by Mega, but the PTC Shares would remain under the ownership of Mega.

(c)    However, if the June 2006 Vienna Award is upheld and recognised in Poland, then the PTC Shares could never have been contributed to Mega as they did not belong to Elekrim at the time of the contribution and were therefore not capable of being transferred.

4.2    Clifford Chance has considered whether it would be possible and in the Bondholders' interests, for the Trustee to now argue that the transfer to Mega by Elektrim was effective. Such an argument would be based on the fact that, notwithstanding that the registration of the increase of the share capital in Mega took place in July 2005, after DT had exercised its Call Option, the shares in PTC were effectively contributed to Mega in January 2005, following the resolution of Mega's shareholders. However, the difficulty with this argument is that even if it could be shown that the PTC Shares were capable of being contributed to Mega in January 2005, any such transfer to Mega would be met with the same problems as the original transfer to ET if it was not approved by the PTC Supervisory Board, and would likely be held to be ineffective in accordance with the 2004 Vienna Award.

The Contingent Payment Claim

4.3    The value of Elektrim's assets for the purpose of calculating of the Contingent Payment will be significantly decreased if the 2006 Vienna Award is upheld. Although we currently have no evidence of collusion between DT and Elektrim we should monitor closely further events and consider various actions against Elektrim/DT if it becomes evident that any of them deliberately or negligently decreased the value of Elektrim's assets.

**Bingham McCutchen LLP**

**21 June 2006**