C1

# THIRD
# AMENDED AND RESTATED
# INVESTMENT AGREEMENT

Dated as of 3 September, 2001

by and among

## ELEKTRIM S.A.,
## ELEKTRIM TELEKOMUNIKACJA SP. Z O.O.
## VIVENDI UNIVERSAL S.A.
## VIVENDI TELECOM INTERNATIONAL S.A.

and

## CARCOM WARSZAWA SP. Z O.O.

WATSON, FARLEY & WILLIAMS
SALANS HERTZFELD & HEILBRONN

SHH
WFW
VU

## TABLE OF CONTENTS

ARTICLE 1  OWNERSHIP; EFFECTIVE DATE

Section 1.1  Ownership.                                                    2
Section 1.2  Events at Execution.                                          2
Section 1.3  Effect of Transactions.                                      2
Section 1.4  Effective Date.                                               3
Section 1.5  Conduct of Business pre-Effective Date.                       3
Section 1.6  Organisation prior to the Effective Date.                     4
Section 1.7  Organisation at the Effective Date.                           4
Section 1.8  Termination of Prior Agreements.                             6

ARTICLE 2  GOVERNMENT APPROVALS                                            6

Section 2.1  Governmental Approvals.                                       7
Section 2.2  Stamp Duty (Tax on Civil Law Transactions).                   7

ARTICLE 3  CORPORATE GOVERNANCE                                            7

Section 3.1  Legal Requirements.                                           7
Section 3.2  Implementation; Cooperation of Holders.                       7
Section 3.3  Supervisory Board.                                            7
Section 3.4  Meetings and Actions of the Supervisory Board.                8
Section 3.5  Management Board.                                             9
Section 3.6  Agreements with Holders.                                     10
Section 3.7  Dividend Policy.                                             11
Section 3.8  Dilution of Telco or Carcom Subsidiaries.                    12
Section 3.9  PTC.                                                         12

ARTICLE 4  TRANSFER OF SHARES                                             12

Section 4.1  Share Transfers.                                            14
Section 4.2  Certain Transfers.                                          14
Section 4.3  Assumption Agreement.                                       15
Section 4.4  Pre-emptive Rights.                                         16
Section 4.5  Dispute Resolution; Vivendi Call.                           16
Section 4.6  Sharing of Upside.                                          17
Section 4.7  Form of Consideration of the Shares.                        18
Section 4.8  IPO.                                                        18
Section 4.9  Telco Capital Increases.                                    18

ARTICLE 5  MISCELLANEOUS                                                  19

Section 5.1  Information.                                                20
Section 5.2  Confidentiality; Public Announcements.                      20
Section 5.3  Regulatory Cooperation.                                     21
Section 5.4  Compliance with Law.                                        21
Section 5.5  Non-Competition.                                           21
Section 5.6  No Inconsistent Agreements.                                21
Section 5.7  Term of Agreement.                                         22
Section 5.8  Headings.                                                  22
Section 5.9  Entire Agreement.                                          22
                                                                         22

SHH
VFV
PGV

Section 5.10 Notices. 22
Section 5.11 Governing Law; Arbitration. 23
Section 5.12 Severability. 24
Section 5.13 Other Agreements. 24
Section 5.14 Costs. 25
Section 5.15 No Partnership or Agency. 25
Section 5.16 Successors; Assigns; Transferees. 25
Section 5.17 Defaults. 25
Section 5.18 Amendments; Waivers. 25
Section 5.19 Counterparts. 25
Section 5.20 Recapitalization, etc. 25
Section 5.21 Representations and Warranties of All Parties. 26
Section 5.22 Shares Held Indirectly. 26
Section 5.23 Agreement to share arbitration costs and awards. 26
Section 5.24 Outcome of Arbitrations. 28
Section 5.25 Share Contribution Agreement. 28

ARTICLE 6  CERTAIN DEFINITIONS 29

Section 6.1  10-Day Period. 29
Section 6.2  Acceptance Notice. 29
Section 6.3  Acceptance Period. 29
Section 6.4  Additional Agreement. 29
Section 6.5  Affiliate. 29
Section 6.6  Agreement. 29
Section 6.7  Amended and Restated Investment Agreement. 29
Section 6.8  Applicable Law. 29
Section 6.9  Arbitrations. 30
Section 6.10 Articles. 30
Section 6.11 Assumption Agreement. 30
Section 6.12 Bresnan. 30
Section 6.13 Business Day. 30
Section 6.14 Business Plan. 30
Section 6.15 Carcom. 30
Section 6.16 Carcom Articles. 30
Section 6.17 Carcom Sale Shares. 30
Section 6.18 Carcom Shares. 31
Section 6.19 Carcom Supervisory Board. 31
Section 6.20 Charter Documents. 31
Section 6.21 Collateral Loan Agreement. 31
Section 6.22 Co-Respondents. 31
Section 6.23 Co-Respondent Agreement. 31
Section 6.24 Effective Date. 31
Section 6.25 Elektrim. 31
Section 6.26 Elektrim Autoinvest. 31
Section 6.27 Elektrim Autoinvest Sale Shares. 31
Section 6.28 Elektrim PTC Representative. 32
Section 6.29 Elektrim Supervisory Board Members. 32
Section 6.30 Escrow Agreement. 32
Section 6.31 Euro or €. 32
Section 6.32 Fixed Line Companies. 32

SHH
W FW
PX

Section 6.33 Governmental Approval.
Section 6.34 Governmental Authority.                                           32
Section 6.35 Holders.                                                          32
Section 6.36 Investment Agreements.                                            32
Section 6.37 IPO.                                                              33
Section 6.38 Letter of Understanding.                                          33
Section 6.39 Management Board.                                                 33
Section 6.40 Material Actions.                                                 33
Section 6.41 Nymphe.                                                           33
Section 6.42 Original Investment Agreement.                                    34
Section 6.43 Party or Parties.                                                 34
Section 6.44 Permitted Transferees.                                            34
Section 6.45 Person.                                                           34
Section 6.46 PLN.                                                              34
Section 6.47 Proportionate Share.                                             34
Section 6.48 PTC.                                                              34
Section 6.49 PTC Agreement.                                                    34
Section 6.50 PTC Assumption Agreement.                                         35
Section 6.51 PTC Shareholders' Agreement.                                      35
Section 6.52 PTC Shares.                                                       35
Section 6.53 PTC Supervisory Board.                                            35
Section 6.54 Receivables.                                                      35
Section 6.55 Second Amended and Restated Investment Agreement.                 35
Section 6.56 Selling Party.                                                    35
Section 6.57 Services Agreements.                                              35
Section 6.58 Settlement Agreement.                                             35
Section 6.59 Share Contribution Agreement.                                     36
Section 6.60 Shares.                                                           36
Section 6.61 Shareholder Loan Agreement.                                       36
Section 6.62 Subsidiary.                                                       36
Section 6.63 Supervisory Board.                                                36
Section 6.64 Telco.                                                            36
Section 6.65 Telco Articles.                                                   36
Section 6.66 Telco Capital Increases.                                          36
Section 6.67 Telco Purchase.                                                   36
Section 6.68 Telco Purchase Agreement.                                         37
Section 6.69 Telco Purchase Price.                                             37
Section 6.70 Telco Sale Shares.                                                37
Section 6.71 Telco Shares.                                                     37
Section 6.72 Telco Supervisory Board.                                          37
Section 6.73 Third Party Purchaser.                                            37
Section 6.74 Transactions.                                                     37
Section 6.75 Transfer Notice.                                                  37
Section 6.76 Transferring Holder.                                              37
Section 6.77 USD.                                                              37
Section 6.78 Vivendi.                                                          37
Section 6.79 Vivendi Call.                                                     38
Section 6.80 Vivendi Guarantee.                                                38
Section 6.81 Vivendi Supervisory Board Members.                                38
Section 6.82 Vivendi Telecom.                                                  38
                                                                              38

Section 6.83 Ymer.
Section 6.84 Ymer Purchase.                                    38
Section 6.85 Ymer Purchase Agreements.                         38
Section 6.86 Ymer Purchase Price.                              38
                                                              38

ANNEX 1 FORM OF ASSUMPTION AGREEMENT
                                                               2
ANNEX 2 BUSINESS PLAN PARAMETERS
                                                               3
ANNEX 3 CARCOM ARTICLES
                                                               4
ANNEX 4 TELCO ARTICLES
                                                               5
ANNEX 5 COLLATERAL LOAN AGREEMENT
                                                               6
ANNEX 6 ESCROW AGREEMENTS
                                                               7
ANNEX 7 SERVICES AGREEMENTS
                                                               8
ANNEX 8 SETTLEMENT AGREEMENT
                                                               9
ANNEX 9 SHAREHOLDER LOAN AGREEMENT
                                                              10
ANNEX 10 TELCO PURCHASE AGREEMENT
                                                              11
ANNEX 11 VIVENDI GUARANTEE
                                                              12
ANNEX 12 YMER PURCHASE AGREEMENTS
                                                              13
ANNEX 13 ADDITIONAL AGREEMENT
                                                              14

S HH
WFW
PXGU

**THIRD AMENDED AND RESTATED INVESTMENT AGREEMENT** (this "**Agreement**"), dated as of 3 September, 2001, is by and among ELEKTRIM S.A., a joint-stock company organized under the laws of the Republic of Poland ("**Elektrim**"), ELEKTRIM TELEKOMUNIKACJA SP. Z O.O., a limited liability company organized under the laws of the Republic of Poland ("**Telco**"), VIVENDI UNIVERSAL S.A., a société anonyme organized under the laws of France ("**Vivendi**"), and VIVENDI TELECOM INTERNATIONAL S.A., a société anonyme organized under the laws of France ("**Vivendi Telecom**") and CARCOM WARSZAWA SP. Z O.O, a limited liability company organized under the laws of the Republic of Poland ("**Carcom**"). Unless otherwise defined herein, capitalized terms have the meanings set forth in Article 6.

WHEREAS, Elektrim currently has a position in Poland in the telecommunications sector and wishes to establish a strategic partnership with a suitable partner for its telecommunications business and related services, with a view to establishing a fully integrated, commercially driven telecommunications operator providing voice, internet and data telecommunications services throughout Poland, including services utilizing broadband technologies and with a view to obtaining a listing on the Warsaw Stock Exchange for its business and an initial public offering in accordance with the terms of this Agreement;

WHEREAS, Vivendi has experience in the telecommunications business and is interested in developing new opportunities in the Polish market;

WHEREAS, Telco was organized solely for the purpose of undertaking the joint telecommunications businesses of Vivendi and Elektrim;

WHEREAS, in furtherance of their mutual goals in the Polish telecommunications market, Vivendi and Elektrim are parties to the Original Investment Agreement, the Amended and Restated Investment Agreement, and the Second Amended and Restated Investment Agreement relating to the joint investment in Telco.

WHEREAS, pursuant to the Letter of Understanding entered into between Elektrim and Vivendi as of 27 June, 2001, it was agreed that (i) Vivendi will purchase or procure purchase of the Telco Sale Shares representing 2% of the issued share capital of Telco and the Carcom Sales Shares representing 1% of the issued share capital of Carcom for the Ymer Purchase Price; and (ii) Telco will purchase from Elektrim the shareholdings of Elektrim in the Fixed Line Companies, the Receivables and the Elektrim Autoinvest Sale Shares representing 0.96% of the issued share capital of Elektrim Autoinvest for the Telco Purchase Price;

WHEREAS, Elektrim, Telco, Vivendi, Vivendi Telecom and Carcom now wish to enter into this Agreement to revise the Second Amended and Restated Investment Agreement on the terms and conditions set out in this Agreement;

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, the Parties hereby agree as follows:

1

SHH
WFN
PEC

# ARTICLE I

## OWNERSHIP; EFFECTIVE DATE

Section 1.1    Ownership.

Immediately prior to the execution of this Agreement:

(a)    Elektrim holds 51% of the total issued and outstanding Telco Shares and voting rights of Telco and Vivendi holds directly or indirectly 49% of the total issued and outstanding Telco Shares and voting rights of Telco, and Telco holds 48% of the total issued and outstanding shares and voting rights of PTC.

(b)    Elektrim holds 50% of the total issued and outstanding Carcom Shares and voting rights of Carcom, and Vivendi holds 50% of the total issued and outstanding Carcom Shares and voting rights of Carcom.

(c)    Carcom holds 1.9% of the issued and outstanding shares and voting rights of PTC and 99.04% of the issued and outstanding shares and voting rights of Elektrim Autoinvest, which in turn holds 1.1% of the issued and outstanding shares and voting rights of PTC (the remainder of 0.96% of Elektrim Autoinvest being held by Elektrim).

Section 1.2    Events at Execution.

Immediately upon execution of this Agreement, the Parties shall take the following actions:

(a)    Elektrim hereby irrevocably consents to any future transfer of the Telco Shares held by Vivendi Telecom to Vivendi and waives any and all rights that it may have in relation to the proposed transfer pursuant to the provisions of this Agreement and the articles of association of Telco existing at the date hereof.

(b)    Elektrim shall deliver a certificate executed on its behalf by two executive officers of Elektrim, as to the matters set forth in Sections 5.21.

(c)    Vivendi shall deliver a certificate executed on its behalf by two executive officers of Vivendi, as to the matters set forth in Section 5.21.

(d)    Telco and Elektrim shall enter into the Telco Purchase Agreement (which will include a provision relating to the release of all existing guarantees given by Elektrim of the obligations undertaken by the Fixed Line Companies), together with any ancillary documentation required to be entered into pursuant to such agreement (including but not limited to the Vivendi Guarantee).

(e)    Vivendi shall enter into the Vivendi Guarantee in accordance with the terms of the Telco Purchase Agreement.

2

(f)    Subject to execution of the Telco Purchase Agreement, Elektrim shall enter into the Ymer Purchase Agreements with Ymer, together with any ancillary documentation required to be entered into pursuant to such agreements.

(g)    Elektrim shall enter into the Collateral Loan Agreement with Nymphe, together with any ancillary documentation required to be entered into pursuant to such agreement.

(h)    Elektrim, Vivendi and Vivendi Telecom shall enter into the Settlement Agreement.

(i)    Elektrim shall enter into the Escrow Agreements with Nymphe, Ymer, Societe Generale, Salans Hertzfeld & Heilbronn, D. Oleszczuk Kancelaria Prawnicza Spółka Komandytowa and Beata Gessel i Wspólnicy Spółka Jawna.

(j)    Vivendi and Telco shall enter into the Shareholder Loan Agreement and Vivendi shall advance the sum of €122,000,000 (one hundred and twenty two million Euros) to Telco pursuant to the terms thereof.

(k)    Each of Vivendi and Elektrim shall enter into the Services Agreements with Telco.

(l)    The Parties shall procure that the Telco Articles and Carcom Articles shall be modified by the General Assembly of the Holders of each of Telco and Carcom immediately upon execution of this Agreement so as to reflect the provisions of this Agreement and shall file the Articles with the Commercial Court of Warsaw immediately thereafter and shall procure the registration thereof and shall cooperate in good faith and take all steps reasonably necessary to procure such registration without delay.

(m)    Elektrim shall provide legal opinions from Beata Gessel i Wspólnicy Spółka Jawna confirming to the satisfaction of Vivendi the validity of the transactions contemplated herein and that the representatives of Elektrim executing the agreements to effect such transactions are duly authorized to enter into these agreements for and on behalf of Elektrim.

(n)    Elektrim, Vivendi and Telco shall enter into the Additional Agreement.

Section 1.3    Effect of Transactions.

As a result of, and upon consummation of the Transactions and the transactions contemplated thereby, Elektrim will hold 49% of the total issued and outstanding Telco Shares and voting rights of Telco, Vivendi will hold 49% of the total issued and outstanding Telco Shares and voting rights of Telco, and Ymer will hold 2% of the total issued and outstanding Telco Shares and voting rights of Telco. Elektrim will hold 49% of the total issued and outstanding Carcom Shares and voting rights of Carcom, Vivendi will hold 50% of the total issued and outstanding Carcom Shares voting rights of Carcom and Ymer will hold 1% of the total issued and outstanding Carcom Shares and voting rights of Carcom. Furthermore, Telco will own the Fixed Line Companies and 0.96% of the issued and outstanding shares and voting rights of Elektrim Autoinvest.

Section 1.4    Effective Date.

This Agreement shall become effective (save for the provisions of Articles 1, 2, 3.6, 3.8, 3.9, 4, 5 and 6 which shall become effective immediately upon execution of this Agreement) on the date on which Vivendi shall have obtained the Governmental Approvals referred to in

3

Section 2.1 below which are required for Vivendi (on its own or together with any Subsidiary or Affiliate of Vivendi) to become the owner of 50% or more of the total issued and outstanding Telco Shares and voting rights of Telco (the "**Effective Date**").

Section 1.5    Conduct of Business pre-Effective Date.

(a)    Save as specified below, each of the Parties undertakes to each of the others that prior to the Effective Date:

(i)    it will use its best efforts to procure that Telco, Carcom, Bresnan, Elektrim Autoinvest, the Fixed Line Companies and PTC will not enter into any transaction or agreement or do anything, allow anything to be done or omit to do anything that would be outside its business in the normal course and that such companies continue to operate in accordance with customary business practices and will use their best efforts to preserve and maintain the business and relationship with customers, suppliers and employees of such companies; and

(ii)    it will co-operate in all respects concerning the operation and management of Telco, Carcom, Bresnan, Elektrim Autoinvest, the Fixed Line Companies and PTC.

(iii)    any Material Action shall only be taken if agreed by the Parties, and in the event that the Parties do not agree, Vivendi shall be entitled to exercise the Vivendi Call in accordance with Section 4.5 below.

(b)    Elektrim undertakes to Vivendi that prior to the Effective Date it shall take no action which could affect in any manner whatsoever its shareholding and rights in Telco, Carcom, Bresnan, the Fixed Line Companies, Elektrim Autoinvest and PTC such that it would alter or prevent the consummation of the Transactions and the transactions contemplated under the Ymer Purchase Agreements or the Telco Purchase Agreement and under this Agreement, save that notwithstanding the foregoing, Elektrim shall be entitled prior to the Effective Date to pledge its Shares in accordance with the terms and conditions of Section 4.1 below, save that this entitlement shall not extend to the Telco Sale Shares and the Carcom Sale Shares.

(c)    Elektrim hereby consents to the transfer at any time after the date of this Agreement by Ymer or Nymphe, as the case may be, of the Telco Sale Shares and the Carcom Sale Shares to Vivendi or an Affiliate of Vivendi, or from Nymphe to Ymer, and waives any and all rights that it may have in relation to such a transfer pursuant to this Agreement and the Articles.

Section 1.6    Organisation prior to the Effective Date.

(a)    Immediately following the execution of this Agreement, Elektrim shall procure the resignation of one (1) of its representatives on the Telco Supervisory Board and each of Elektrim and Vivendi shall procure the resignation of one (1) of their representatives on the Telco Management Board.

(b)    In relation to the existing Telco representation on the PTC Supervisory Board, it is agreed between the Parties that immediately following the execution of this Agreement:

(i)    Elektrim shall procure that the Elektrim nominated member of the PTC Supervisory Board holding the position of Chairman shall tender his resignation from such position of Chairman of the PTC Supervisory Board and Elektrim shall also procure the resignation with immediate effect of the other Elektrim nominated member of the PTC Supervisory Board from his Position as a member of the PTC Supervisory Board and the Parties agree that Ymer shall be

entitled to nominate a representative to the PTC Supervisory Board in place of the Elektrim PTC Supervisory Board member resigning pursuant to this Section 1.6 (b)(i);

(ii)    Elektrim shall procure that its remaining representative on the PTC Supervisory Board shall deliver to the CEO of the Telco Management Board an undated letter of resignation signed by such representative in accordance with the requirements specified in Section 3.9(d); and

(iii)    subject to Section 1.6(b)(i) above, each of Elektrim and Telco undertakes to procure that Vivendi's existing representatives on the PTC Supervisory Board shall be nominated and elected as Chairman and as Secretary of the PTC Supervisory Board and each of Vivendi and Elektrim shall procure that its representatives on the PTC Supervisory Board shall vote in favour of such appointments and Elektrim shall procure that its representatives shall decline to be nominated for appointment to such positions.

(c)    Immediately following the execution of this Agreement, the Holders shall hold a General Assembly of the Holders of each of Telco and Carcom, at which the Holders shall, among other matters, take all actions necessary to:

(i)    adopt resolutions to appoint four additional new members of the Management Board of Carcom, one of which shall be nominated by Elektrim, one of which shall be nominated by Vivendi and two of which shall be nominated by Ymer, to form a Management Board composed of six members;

(ii)    adopt resolutions to appoint a new member of the Supervisory Board of Telco in replacement of the Elektrim representative resigning pursuant to Section 1.6(a), to form a Supervisory Board composed of seven members, three of which shall have been appointed by Elektrim, one of which shall have been appointed by Ymer, and three of which shall have been appointed by Vivendi, with Vivendi entitled to appoint the Chairman; and

(iii)    adopt the necessary resolutions in order to adopt new Charter Documents of Carcom and Telco in the form of Annex 3 and 4 and implement the provisions of this Agreement.

(d)    Following the General Assembly referred to in Section 1.6(c) above, the Holders agree to cause to be convened a meeting of the Supervisory Board of Telco which shall, among other matters as soon as practicable thereafter:

(i)    adopt resolutions causing the appointment of two new members of the Management Board of Telco in replacement of the Vivendi and Elektrim representatives resigning pursuant to Section 1.6(a), to form a Management Board of Telco composed of six members, two of which shall have been nominated by Elektrim, two of which shall have been nominated by Vivendi and two of which shall have been nominated by Ymer; and

(ii)    adopt resolutions, if applicable, ratifying the execution of this Agreement by Telco respectively and the consummation of the transactions contemplated thereby.

(e)    The Parties shall procure that the organisational changes set out in this Section 1.6 and in the Ymer Purchase Agreements are immediately filed for registration with the Commercial Court of Warsaw with effect from the date of execution of this Agreement and shall co-operate in good faith and take all steps reasonably necessary to procure such registration without delay.

(f)    From and after the date hereof, each Holder shall vote its Shares at any regular or special meeting of Holders of Telco and Carcom, and shall take all actions necessary, to

5

give effect to the arrangements contemplated by Article 1 of this Agreement and ensure that the Charter Documents of Telco and Carcom in effect following the date hereof do not conflict in any respect with, and where necessary fully implement, the provisions of this Agreement. The amended Charter Documents of Carcom shall contain provisions appointing a new Supervisory Board of Carcom, which shall be composed of seven members, three of which shall be appointed by Elektrim, one of which shall be appointed by Ymer, and three of which shall be appointed by Vivendi, with Vivendi entitled to appoint the Chairman. In order to implement the provisions of Article 1 of this Agreement, the Holders further agree that when any action or vote is required to be taken by the Holders pursuant to this Agreement, each Holder shall use its reasonable best efforts to take or cause the appropriate officers and directors of Telco and Carcom to call, a special or annual meeting of the Holders of Telco and Carcom, as the case may be, to implement such shareholder action, without prejudice to the right of any other Holder to call such a meeting or cause it to be called. Further, each Holder shall use its best efforts to cause the Supervisory Board of Telco and Carcom to adopt, either at a meeting of the Supervisory Board or by actions by unanimous written consent of the Supervisory Board of Telco and Carcom, all the resolutions necessary to implement the provisions of this Agreement.

Section 1.7    Organisation at the Effective Date.

(a)    At the Effective Date, the Holders shall take the necessary actions to appoint the full Supervisory Board of each of Telco and Carcom as provided in Section 3.3.

(b)    Immediately following the Effective Date, the Holders agree to cause to be convened a meeting of the Supervisory Board of each of Telco and Carcom which shall, among other matters adopt resolutions causing the appointment of members of the Management Board of each of Telco and Carcom in accordance with Section 3.5.

(c)    The Parties shall, to the extent this has not already been performed, procure that the organisational changes set out in this Section 1.7 are immediately filed for registration with the Commercial Court of Warsaw with effect from the Effective Date and shall co-operate in good faith and take all steps reasonably necessary to procure such registration without delay.

Section 1.8    Termination of Prior Agreements.

By execution of this Agreement, each of Vivendi, Vivendi Telecom, Elektrim and Telco acknowledge and agree that each of Original Investment Agreement, the Amended and Restated Investment Agreement and the Second Amended and Restated Investment Agreement are hereby terminated in their entirety with immediate effect and are null and void and of no further force and effect. Each of Vivendi, Vivendi Telecom, Elektrim, Telco and Carcom agree to execute (if necessary) such further documents, instruments and agreements and to take all other reasonable actions required to terminate such agreements and obligations as contemplated in this Agreement.

SHH
WTW
DE



## ARTICLE 2

## GOVERNMENT APPROVALS

Section 2.1    Governmental Approvals.

(a)    As soon as reasonably practicable after the date of signing of this Agreement, the Parties shall file applications for, and take all other steps reasonably necessary to obtain, all Governmental Approvals required by any Party in connection with the transactions contemplated by this Agreement.

(b)    The Parties shall co-operate in good faith to make all filings and to take all other steps reasonably necessary to obtain such Governmental Approvals and, promptly after receipt thereof, will notify each other Party of the receipt of any Governmental Approval.

(c)    Each Party shall obtain all necessary shareholder and other corporate authorisations required for it to (i) consummate the transactions contemplated by this Agreement and; (ii) execute this Agreement and perform their respective obligations thereunder.

Section 2.2    Stamp Duty (Tax on Civil Law Transactions).

Save as otherwise specified in this Agreement, the Parties hereby agree that the tax on civil law transactions (formerly stamp duty) and other similar taxes and charges that may become due to be paid by any of Vivendi, Vivendi Telecom, Elektrim, Telco or Carcom in connection with the transactions set forth in this Agreement shall be borne by Vivendi and, to the extent that any such stamp duty and other similar taxes and charges are paid by any of the Parties other than Vivendi, they shall be reimbursed by submitting an invoice or notice to Vivendi for the relevant amount.

## ARTICLE 3

## CORPORATE GOVERNANCE

Section 3.1    Legal Requirements.

Each Holder agrees to vote its Shares and otherwise to use its reasonable efforts to cause Telco and Carcom to comply with and perform its obligations under Applicable Law, this Agreement and other agreements and licenses to which Telco and Carcom are a party and to adopt corporate policies, procedures and compliance programs intended to assure such compliance.

Section 3.2    Implementation; Cooperation of Holders.

From the Effective Date, each Holder shall vote its Shares at any regular or special General Assembly of Holders and shall take all actions necessary, to give effect to the agreements contained in this Agreement and ensure that the Charter Documents of each of Telco and Carcom as in effect at the Effective Date do not conflict in any respect with, and where necessary fully implement, the provisions of this Agreement.    In order to give effect to the provisions of this Article 3, the Holders further agree that when any action or vote is required to be taken by the

Holder, pursuant to this Agreement, each Holder shall use its best efforts to call, or cause the appropriate officers and directors of Telco or Carcom to call, a special or annual General Assembly of Telco or Carcom, as the case may be, to give effect to such shareholder action, without prejudice to the right of any other Holder to call such a General Assembly or cause it to be called. Further, each Holder shall use its best efforts to cause the Telco Supervisory Board or the Carcom Supervisory Board, as the case may be, to adopt, either at a meeting of such Supervisory Board or by actions by unanimous written consent of such Supervisory Board, all the resolutions necessary to give effect to the provisions of this Agreement.

Section 3.3    Supervisory Board.

(a)    From the Effective Date, each Holder shall vote its Shares at any regular or special General Assembly of the Holders and shall take all actions necessary to ensure that each Supervisory Board shall consist of no less than three and no more than seven individuals. The members of each Supervisory Board shall be appointed on the following basis: (i) Vivendi, after consultation with Elektrim, shall be entitled to appoint up to four individuals (the "Vivendi Supervisory Board Members") and (ii) Elektrim, after consultation with Vivendi, shall be entitled to appoint up to three individuals (the "Elektrim Supervisory Board Members"). Vivendi shall be entitled to appoint one of the Vivendi Supervisory Board Members as the Chairman of each Supervisory Board. Elektrim shall be entitled to appoint one of the Elektrim Supervisory Board Members as the Vice-Chairman of each Supervisory Board.

(b)    Each Holder (together with their respective Permitted Transferees) shall be entitled at any time and for any reason (or for no reason) to remove any or all of its respective members designated in accordance with Section 3.3(a).

(c)    Any appointment or removal of Vivendi Supervisory Board Members or Elektrim Supervisory Board Members pursuant to Sections 3.3(a) or (b) shall be effected in writing signed by a duly authorised representative of Vivendi or Elektrim, as the case may be, and, subject in the case of each appointment to each Nominee (as defined below) being able and willing to serve as a member of the Supervisory Board, shall take effect upon lodgement of such notice with the Company.

(d)    If, prior to his or her appointment to the Telco Supervisory Board or the Carcom Supervisory Board, as the case may be, pursuant to Section 3.3(a), any appointee ("Appointee") shall be unable or unwilling to serve as a member of the Supervisory Board, the Holder who nominated any such Appointee shall be entitled to nominate a replacement, subject to the provisions of Section 3.3(a), who shall then be a Appointee for purposes of this Section 3.3(d).

(e)    If, following appointment to the Telco Supervisory Board or the Carcom Supervisory Board, as the case may be, pursuant to Section 3.3(a) hereof, any member of the Supervisory Board shall resign or be removed or be unable to serve for any reason prior to the expiration of his or her term as a member of the Supervisory Board, the Holder who appointed such member of the Supervisory Board shall, within twenty (20) Business Days of such event, notify Telco or Carcom (as appropriate) in writing of a replacement member of the Supervisory Board to fill the unexpired term of the member whom such new member is replacing. If a Holder shall fail to provide notice to the Telco Supervisory Board or the Carcom Supervisory Board, as the case may be, as provided in the preceding sentence, the General Assembly of Telco or Carcom (as appropriate) may nominate and elect any other person to fill the vacancy on a temporary basis until such time as such notice is received.

8

SHH
NTW
vG

Section 3.4    Meetings and Actions of the Supervisory Board.

Commencing on the Effective Date, each Holder shall vote its Shares at any regular special General Assembly of Holders of Telco and Carcom and shall take all such other action necessary, to ensure that the Charter Documents of Telco and Carcom contain (to the extent necessary or appropriate) provisions, concerning meetings of the Telco Supervisory Board or the Carcom Supervisory Board, as the case may be, providing in substance that:

(a)    At all meetings of the Supervisory Board, a majority of the entire membership of the Supervisory Board present in person or by teleconference including one Vivendi Supervisory Board Member and one Elektrim Supervisory Board Member shall constitute a quorum for the transaction of business, provided, however, that if a quorum cannot be achieved due to the absence of either all of the Vivendi Supervisory Board Members or all of the Elektrim Supervisory Board Members, and satisfactory notice pursuant to this Section 3.4 is given with respect to a rescheduled meeting of the Supervisory Board, then a simple majority of the entire membership of the Supervisory Board present in person or by teleconference shall constitute a quorum for the transaction of business at such rescheduled meeting.

(b)    Any member of the Supervisory Board may vote by proxy to the extent authorised by Applicable Law.

(c)    In lieu of a face to face meeting, any meeting of the Supervisory Board may be held via a telephone conference call in which all members participating in such meetings can hear and converse with one another.

(d)    In lieu of a face to face meeting or teleconference, any action required or permitted to be taken at any meeting of the Supervisory Board may be taken without a meeting (to the extent permitted by Applicable Law) if all members of the Supervisory Board have been notified of the contents of the draft resolution.

(e)    A meeting of the Supervisory Board may be called (i) by the Chairman of the Supervisory Board at his own discretion; or (ii) by the Chairman of the Supervisory Board within ten (10) Business Days of receipt of a motion from any member of the Supervisory Board; or (iii) if the Chairman of the Supervisory Board shall fail to call a meeting within ten (10) Business Days of receipt of such a motion, by the member of the Supervisory Board who submitted the motion who shall convene the meeting, and designate the date, venue and proposed agenda for such a meeting.

(f)    Notice of every meeting of the Supervisory Board, stating the place, date (which shall be no later than ten (10) Business Days following service of the notice convening such meeting), time and agenda of such meeting, shall be delivered in writing to each member of the Supervisory Board either by telegram or facsimile not less than two (2) Business Days before the date of any such meeting.

(g)    Each member of the Supervisory Board shall be entitled to cast one vote regarding any action taken at a meeting of the Supervisory Board or in any written consent executed in lieu of such a meeting.

(h)    Except for Material Actions, the affirmative vote of a majority of members present at any meeting of the Supervisory Board at which there is a quorum as provided pursuant to Section 3.4(a) (including the proviso as to the procedure if a quorum cannot be achieved) shall be required to take any action.

(i)    All Material Actions shall require the prior approval of a majority of members present at any meeting of the Supervisory Board at which there is a quorum as provided for pursuant to Section 3.4(a) (including the proviso as to the procedure if a quorum cannot be achieved) including in such majority the affirmative vote of at least one of the Vivendi Supervisory Board Members and at least one of the Elektrim Supervisory Board Members.

Section 3.5    Management Board.

(a)    Commencing on the Effective Date, the Holders agree that the operations and management of Telco and Carcom and each of their Subsidiaries (excluding PTC) shall in each case be led by a Chief Executive Officer, in accordance with Applicable Law, who shall be responsible for the overall operations of Telco and Carcom and each of their Subsidiaries (excluding PTC). The Chief Executive Officer and the other members of the Management Board shall constitute the senior executives of each of Telco and Carcom and each of their Subsidiaries (excluding PTC). Each Holder shall procure that each member of the Telco Supervisory Board and the Carcom Supervisory Board shall use best endeavours to appoint professional executives to the Management Board of each of Telco and Carcom and each of their Subsidiaries (excluding PTC) with a view to managing the operations of such companies in contemplation of the IPO referred to in Section 4.8. The members of the Management Board shall report to the Chief Executive Officer and shall manage the operations of Telco and Carcom and each of their Subsidiaries (excluding PTC) respectively in all respects according to internally agreed procedures. The Management Board of each of Telco and Carcom and each of their Subsidiaries (excluding PTC) shall report to the Telco Supervisory Board or Carcom Supervisory Board, as the case maybe, in accordance with Applicable Law and the provisions of their respective Charter Documents.

(b)    From the Effective Date, each Holder shall vote its Shares at any regular or special General Assembly of Holders of each of Telco and Carcom and shall take all such other action necessary, to ensure that the Charter Documents of Telco and Carcom and each of their Subsidiaries (excluding PTC) contain (to the extent necessary or appropriate) provisions concerning meetings of the Management Board of each of Telco and Carcom and each of their Subsidiaries (excluding PTC), providing in substance that appointments to the Management Boards of Telco and Carcom and each of their Subsidiaries (excluding PTC) respectively shall be in accordance with the following procedures:

(i)    the Management Board of each of Telco and Carcom and each of their Subsidiaries (excluding PTC) shall in each case consist of three members unless the Telco Supervisory Board or the Carcom Supervisory Board (as the case may be) shall determine that it shall be five (5);

(ii)    the Management Boards of each of Telco and Carcom and each of their Subsidiaries (excluding PTC) shall consist of persons holding the titles of Chief Executive Officer, Chief Financial Officer and other members of the Management Board of each of Telco and Carcom and each of their Subsidiaries (excluding PTC) as shall be determined by the Supervisory Board of Telco and Carcom respectively, as set forth in this Agreement;

(iii)    through its appointees to the Supervisory Board of each of Telco and Carcom, Elektrim shall be entitled to identify for nomination to, and election by, the Supervisory Board of each of Telco and Carcom, an individual to occupy one of the three positions on the Management Board of each of Telco and Carcom and each of their Subsidiaries (excluding PTC) (or if it shall be determined pursuant to Section 3.5(b)(i) that there shall be five members, Elektrim shall be entitled to nominate two positions), which election(s) shall be procured by Vivendi to be approved in accordance with Section 3.4(i) above respectively by the Telco Supervisory Board and the Carcom Supervisory Board, provided that if any such first nomination does not receive the affirmative vote of Vivendi

Supervisory Board Members, Elektrim shall be entitled to nominate another individual who shall then be appointed to the Management Board by the Supervisory Board of Telco and Carcom, as the case may be;

(iv)    the other nominations for positions on the Management Board of each of Telco and Carcom and each of their Subsidiaries (excluding PTC) shall be identified for nomination to, and election by the Supervisory Board of each of Telco and Carcom, which elections shall be approved in accordance with Section 3.4(i) above respectively by the Telco Supervisory Board and the Carcom Supervisory Board, subject to paragraph (v) below;

(v)    in the event that Elektrim's nominees to the Supervisory Board do not approve any of the individuals nominated for election pursuant to Section 3.5(b)(iv), the Supervisory Board of Telco or Carcom, as the case may be, shall identify a replacement individual for nomination to, and election by the Supervisory Board of each of Telco and Carcom, which election shall be approved by the affirmative vote of a majority of the members present at any meeting of the Supervisory Board of Telco or Carcom, as the case may be, in accordance with Section 3.4(h) above respectively by the Telco Supervisory Board and the Carcom Supervisory Board;

(vi)    the Supervisory Board of each of Telco and Carcom shall appoint the persons nominated pursuant to paragraphs (iii), (iv) and (v) above to their respective positions on the Management Board of each of Telco and Carcom and each of their Subsidiaries (excluding PTC) respectively;

(vii)    the Supervisory Board of each of Telco and Carcom may remove and replace members of the Management Board as the Supervisory Board so determines, whereupon replacement shall be appointed in accordance with the procedure specified in this Section 3.5;

(viii)    whilst and so long as this Agreement is in force, the Parties agree that any agreement, commitment or arrangement which is intended to be legally binding upon Telco and Carcom or any of their Subsidiaries (excluding PTC) shall require the signature of two persons, one of whom shall be a member of the Management Board appointed pursuant to Section 3.5(b)(iv) upon nomination by the Supervisory Board of Telco or Carcom, as the case may be, save that prior to the consummation of the transfer of shares pursuant to the exercise of the Vivendi Call under Section 4.5, any Material Action that has not received prior Supervisory Board approval under Section 3.4(i) shall also require the signature of a member of the Management Board appointed by Elektrim under Section 3.5(b)(iii).

(ix)    the compensation of each of the members of the Management Board shall consist of a salary and bonus to be determined and approved by the Telco Supervisory Board or the Carcom Supervisory Board as appropriate; and

(x)    the Management Board of each of Telco and Carcom shall appoint the Supervisory Boards of each of the Subsidiaries of Telco and Carcom (save for PTC which shall be dealt with in accordance with Section 3.9).

Section 3.6    Agreements with Holders.

(a)    No fees shall be paid for services provided to Telco or its Subsidiaries or Carcom and its Subsidiaries by a Holder or its Affiliates unless pursuant to a written agreement authorized by a qualified majority of the Telco Supervisory Board or the Carcom Supervisory Board respectively as a Material Action under Section 3.4(i). This procedure shall not apply to

11

SHH
WFW ᴅᴇ

those agreements already in existence prior to the date of this Agreement and in relation to the Services Agreements.

(b)    In relation to the Services Agreements, it is hereby agreed that Vivendi and Elektrim shall be entitled to render invoices to Telco for € 3,761,196 and PLN 10.248.733 respectively, payment of which shall constitute full and final settlement of such amounts due in respect of services rendered by Vivendi and Elektrim respectively to Telco during the period commencing 7 December, 1999 up to the date of signature of this Agreement. It is further agreed that the Services Agreements shall be terminated on 10 December, 2001 and the Parties shall undertake to negotiate and conclude revised agreements for the provision of services by each of Elektrim and Vivendi to Telco on reasonable commercial terms as soon as practicable thereafter.

Section 3.7    Dividend Policy.

The distribution of profits of Telco shall be made pursuant to a resolution of the general assembly of the Holders of Telco in accordance with the Articles and Applicable Law. The Holders shall, unless otherwise agreed between them in relation to any financial year, take all steps to procure that there shall be distributed in respect of each financial year all (or such other percentage as the Holders may from time to time agree in writing) of the consolidated profit (after taxation, minority interests, if any, and extraordinary items) of Telco as shown by the financial statements of Telco for that financial year and available for distribution in accordance with Applicable Law and not required to fund the working capital requirements of Telco as set forth in its Business Plan and budget for the relevant financial year.

Section 3.8    Dilution of Telco or Carcom Subsidiaries.

Vivendi undertakes that it shall not, and shall procure that none of its representatives on the Telco Supervisory Board or Management Board or the Carcom Supervisory Board or Management Board shall, take or agree to take any action or support any transaction with a Subsidiary of Telco or Carcom (save for a merger, consolidation or amalgamation between Telco and any of its Subsidiaries) which will result in Vivendi or an Affiliate thereof or any third party acquiring directly or indirectly a stake in any such Subsidiary, unless authorised by a qualified majority of the Telco Supervisory Board or the Carcom Supervisory Board as a Material Action under Section 3.4(i).

Section 3.9    PTC.

(a)    The representatives of Telco on the PTC Supervisory Board will be appointed by the Management Board of Telco. However, it is agreed between the Parties that Elektrim shall, following consultation with Vivendi, be entitled to nominate one candidate (the "Elektrim PTC Representative"), who shall, with the other representatives selected by the Management Board of Telco, be appointed by the Telco Management Board to represent Telco on the PTC Supervisory Board and it is further agreed that Vivendi shall be entitled to nominate the Telco appointed Chairman of the PTC Supervisory Board.

(b)    Elektrim shall procure that the Elektrim PTC Representative shall at all times (so far as he or she is able) attend all meetings of the PTC Supervisory Board (unless otherwise instructed by the Management Board of Telco or no other Telco representative on the PTC Supervisory Board has attended the meeting, in which case he or she is forbidden from attending) and shall otherwise use his best efforts to ensure that Telco has a majority at such meeting and shall at all times act in good faith in the interests of Telco to the extent permitted under the terms of this Agreement and shall at all times in normal voting (i.e. open voting), vote with and in support of the other Telco representatives on the PTC Supervisory Board. If one or more of the Telco representatives on the PTC Supervisory Board deem it necessary, in his/her

12

discretion, if the PTC Supervisory Board is to vote on a resolution by secret ballot, then the Elektrim PTC Representative, upon the request of one or more Telco representatives, shall leave the meeting of the PTC Supervisory Board and require that his /her leaving the meeting be noted in the minutes of such meeting and such departure in accordance with such request shall not constitute a breach of the provision of Section 3.9(b).

(c)     The resolution of the Telco Management Board shall state that the Elektrim PTC Representative shall be automatically removed with the immediate effect in the event that he or she should fail to attend any meeting of the PTC Supervisory Board without providing a serious and justifiable reason that is beyond his or her control along with the right to vote by proxy to another Telco representative on the PTC Supervisory Board as nominated by Vivendi, unless providing such proxy was impossible to deliver or should vote or fail to vote at any meeting of the PTC Supervisory Board contrary to instructions given to him or her by the Management Board of Telco, or in the event that no such instructions are given prior to such meeting, if he or she should vote in a manner different to the other representatives of Telco on the PTC Supervisory Board and in such circumstances the provisions of Section 3.9(d) shall apply and Elektrim shall not be entitled ever to nominate a candidate for the replacement for such Elektrim PTC Representative.

(d)     In order to secure performance of the obligations specified in Sections 3.9(b) and (c) above, Elektrim shall (save as specified below) deliver to the CEO of Telco Management Board simultaneously with the appointment of its candidate as the Elektrim PTC Representative, or any subsequent candidate as the Elektrim PTC Representative, an undated letter of resignation signed by such person and in the event of a breach of any of the obligations specified therein by Elektrim or the Eiektrim PTC Representative,  such individual shall immediately be declared resigned by the CEO of the Telco Management Board, who shall have the right to fill in the date into the letter of resignation mentioned above (failing which, for any reason, Elektrim's candidate as the Elektrim PTC Representative shall be revoked); such resignation or revocation shall become immediately effective and shall result in the immediate removal of such individual from the PTC Supervisory Board whereupon a new Telco representative shall be appointed by Telco Management Board with immediate effect. In such circumstances all Elektrim's rights under this Agreement to nominate an individual as the Elektrim PTC Representative, shall terminate with immediate effect and the appointment of the PTC Representative shall become revoked with immediate effect. Furthermore, following such resignation or revocation and without prejudice to any other remedies that may be available to Telco, the provisions of this Section 3.9 shall cease to apply with immediate effect.  The requirement to deliver an undated letter of resignation shall cease as soon as the registration of the Telco Articles has been duly made and non-appealable as confirmed by a legal opinion provided by a Polish law firm acceptable to Vivendi on behalf of Elektrim in a form reasonably acceptable to Vivendi at Elektrim's cost (to be reimbursed by Vivendi) and further confirming Telco's rights under the PTC Shareholders' Agreement to appoint and dismiss four members of the PTC Supervisory Board as provided in the PTC Shareholders' Agreement and the articles of association of PTC whereupon any such letters delivered prior thereto shall be returned to the person in question.

(e)     Elektrim shall be entitled to propose to Telco a candidate to be nominated for election as the ninth member of the PTC Supervisory Board.  Such candidate must satisfy all the requirements for the ninth member of the PTC Supervisory Board as set out in the articles of association of PTC and the PTC Shareholders' Agreement and shall only be put forward for appointment to the PTC Supervisory Board with the prior approval of Vivendi, such approval not to be unreasonably withheld or delayed. Elektrim, Vivendi and Telco shall at any meeting of the Shareholders of PTC at which a resolution for the appointment of such ninth member is proposed, vote in favour of the appointment to the PTC Supervisory Board of such person proposed by Elektrim and approved by Vivendi as the ninth member thereof in accordance with the articles of association of PTC, the PTC Shareholders' Agreement and Applicable Law. For the avoidance of

13

SHH
WfV

doubt, the procedure under this Section 3.9(e) shall only apply in relation to the ninth member of the PTC Supervisory Board and shall not apply to the appointment of any additional members of the PTC Supervisory Board pursuant to changes in the articles of association of PTC or to the PTC Shareholders' Agreement or for any other reason whatsoever. It is further hereby agreed that the provisions set out in this Section 3.9(e) shall only apply whilst the position of ninth member of the PTC Supervisory Board is vacant and in the event that no ninth member of the PTC Supervisory Board is appointed or that save as specified above the candidate proposed by Elektrim pursuant to this Section 3.9(e) is not appointed to the PTC Supervisory Board, no Party shall bear any liability as a consequence thereof.

(f)    Telco shall procure that its representatives on the PTC Supervisory Board shall appoint to the Management Board of PTC the candidates as recommended by the Telco Supervisory Board and shall use best endeavours to appoint professional executives to such positions, which individuals may be employees of Vivendi or Elektrim, however, in the event that Elektrim's nominees to the Telco Supervisory Board do not approve any of the individuals recommended for election pursuant to this Section 3.9(f), Vivendi shall be entitled to propose to the Telco Supervisory Board that it shall identify a replacement individual for recommendation to the Management Board of PTC, which election shall be approved by the affirmative vote of a majority of the members present at any meeting of the Supervisory Board of Telco, in accordance with Section 3.4(h) above by the Telco Supervisory Board.

## ARTICLE 4

## TRANSFER OF SHARES

### Section 4.1    Share Transfers.

Following the Effective Date, and at any time prior to the IPO, no Holder shall directly or indirectly, transfer, sell, assign, pledge, hypothecate or otherwise dispose of ("**Transfer**") of all but not some only, of the Shares held directly or indirectly by it, without offering a right of first refusal (the "**Right of First Refusal**") to the other Holder, whereupon the provisions of Sections 4.2 and 4.3 shall apply, provided that each Holder may Transfer Shares to Permitted Transferees (it being understood that the provisions of Sections 4.2 and 4.3 shall not apply to any such transfer).  For the avoidance of doubt each of Vivendi and Elektrim shall be entitled to pledge their Shares as security for indebtedness incurred by either of Vivendi or Elektrim vis-à-vis established Polish or international banks or financial institutions as well as in relation to the issue of bonds by either Vivendi or Elektrim.  If, in the course of enforcement proceedings, there is to be a sale or any other transfer of any Shares by any Holder, the Supervisory Board of Telco or Carcom shall, on behalf of Telco or Carcom, as the case may be, designate the remaining Holder or Holders to acquire such Shares pro rata to their holding of Shares in Telco or Carcom, as the case may be, at the time of such designation; this procedure shall also apply to any transfer of Shares in case of enforcement of any ordinary pledge or registered pledge.  Moreover, it shall be a condition of any such ordinary pledge or registered pledge documentation that such documentation shall expressly contain provisions recognising the Holders' rights contained in this Agreement and an undertaking by the pledgee in favour of the non-pledging Holders that it shall comply in all respects with such Holders' rights (particularly in relation to the non pledging Party's Right of First Refusal).  In particular, any power of attorney for the registration or enforcement of such a registered pledge shall only contain authorisation to undertake such actions as provided for in this section.  Accordingly, it is agreed that in order to protect the Right of First Refusal of the non-pledging Party the pledge documentation shall include the following legend (or a substantially similar legend with the same effect).  "[The Parties hereby agree that, in the case of the enforcement of this [Registered] Pledge Agreement, the Pledgee shall only be entitled to acquire

14

SHH
bGu
WiW

the shares subject to the pledge, except, if [Telco/Carcom], would not designate the purchaser of such shares pursuant to Article 185 of the Commercial Companies Code and the Company's Articles of Association provided that such purchase shall take place on terms and conditions agreed between the Parties]". Should, in the course of enforcement proceedings, for any reason, the rights of the non-pledging Party stipulated in this section, including in particular the Right of First Refusal, have been not respected by any third party or enforced by any relevant governmental body, and consequently the ownership of the Shares would pass to other person than the non-pledging Party, and in consequence the ownership of Elektrim of Telco Shares would fall below 35% of the issued share capital of Telco at such time, then this Agreement shall terminate, except in that such person accedes to this Agreement in the manner provided for in Section 4.3. Furthermore, any other person, who would intend to acquire from Elektrim the Telco Shares above the 35% threshold, as a result of non-observance of the above procedure, would be required to accede to this Agreement, otherwise such acquisition would be non effective vis-à-vis Telco and the non-pledging Party and the Management Board of Telco would not introduce any such other person as a shareholder of Telco in the relevant share register.

### Section 4.2    Certain Transfers.

(a)    Subject to Section 4.1, if either Holder (the "**Selling Party**") wishes to transfer, directly or indirectly, all but not less than all of its Shares (the "**Sale Shares**") and identifies a *bona fide* potential third party purchaser (the "**Third Party Purchaser**") it shall give to the other Holder (the "**Continuing Party**") notice in writing (a "**Transfer Notice**") of its wish to sell together with details of the Third Party Purchaser, the purchase price and other material terms negotiated *bona fide* between the Selling Party and the Third Party Purchaser. For the avoidance of doubt, a Holder may only sell all but not less than all of its Shares to a Third Party Purchaser.

(b)    Following receipt of a Transfer Notice, the Continuing Party shall by giving to the Selling Party notice in writing (the "**Acceptance Notice**") within a period of 60 days of receipt of the Transfer Notice (the "**Acceptance Period**") have the right to purchase all, but not less than all, of the Sale Shares at a purchase price and the same terms as those negotiated *bona fide* between the Selling Party and the Third Party Purchaser; provided, however, that the purchase price for the Shares of Telco to be paid by the Continuing Party shall include a premium of 5% of the purchase price for such Shares and the Acceptance Notice shall only be valid if it is secured by cash collateral or a bank guarantee for this value from an internationally recognised bank.

(c)    The Continuing Party shall by giving the Acceptance Notice under Section 4.2(b) become bound (subject only to all necessary approvals of competent regulatory authorities) to purchase the Sale Shares.

(d)    Completion of any sale of Shares to a Third Party Purchaser shall be subject to the following conditions:

(i)    the Third Party Purchaser shall have agreed with the Continuing Party to be bound by the provisions of this Agreement binding upon the Selling Party by entering into an Assumption Agreement in accordance with Section 4.3;

(ii)    any loans, loan capital, borrowings and indebtedness in the nature of borrowing (but excluding, for the avoidance of doubt, any debts incurred in the ordinary course of business which are at the relevant time outstanding on inter-company account) owing at that time from Telco or Carcom (as the case may be) to the Selling Party have been assigned to the Third Party Purchaser or replaced by equivalent financing from the Third Party Purchaser, provided, that the Selling Party and the Third Party Purchaser remain jointly and severally liable for such obligations; and

(iii)    if and insofar as the Selling Party required the Third Party Purchaser to assume the obligations of the Selling Party under any guarantees and/or counter-indemnities to third Parties in relation to the business of Telco such assumption shall have taken place provided that any such assumption is without prejudice to the right of the Continuing Party to receive a contribution from the Selling Party for its share of any claim attributable to any liabilities arising in respect of the period during which the Selling Party held Shares.

(e)    All transfers of Shares to a Third Party Purchaser shall automatically include the assignment to such Third Party Purchaser of all rights and obligations of the selling Holder relating to the Sale Shares under this Agreement.

(f)    Completion of the sale and purchase of the Sale Shares shall take place within sixty (60) Business Days of the receipt by the Selling Party of the Acceptance Notice, or, later if the obtaining of any Governmental Approvals is required by any Party in connection with such sale. Provided that if all necessary Governmental Approvals are not obtained within ninety (90) Business Days of the receipt by the Selling Party of the Acceptance Notice, the Acceptance Notice and the rights of the Continuing Party under Section 4.2(b) shall automatically terminate and the Selling Party shall be entitled, subject to Sections 4.2(d) and 4.2(g), to sell the Sale Shares to the Third Party Purchaser. The Holders shall be bound to give all reasonable assistance with a view to obtaining all such Governmental Approvals in a timely manner.

(g)    In the event the Continuing Party does not exercise its rights under Section 4.2(b) or an Acceptance Notice ceases to have effect pursuant to Section 4.2(f), the Selling Party shall, subject to Section 4.2(d), be entitled to transfer the Sale Shares on a *bona fide* arm's length basis to the Third Party Purchaser at a price and on material terms no less favourable to the Selling Party than those specified in the Transfer Notice. The Holders undertake to give all necessary approvals to any such transfer.

Section 4.3    Assumption Agreement.

Prior to the IPO, any transferee of Shares shall execute and deliver to Telco or Carcom, as the case may be, with a copy to the other Holder, an Assumption Agreement in the form attached as Annex 1, whereupon it shall assume the transferor's rights and obligations under this Agreement, including, but not limited to, the obligation to implement the IPO in relation to Telco arising in Section 4.8. The Assumption Agreement shall also include a continuing guarantee by the transferor of such assumed obligations.

Section 4.4    Pre-emptive Rights.

Except as otherwise provided in this Agreement and subject to the terms and conditions of the Articles, if Telco or Carcom issues any additional Shares (including any convertible bonds or warrants or other equity instruments or rights for Shares available under Polish law), each of the Holders shall be entitled, but shall not be obligated, to subscribe or purchase in such offering a maximum number of additional Shares (or convertible bonds or warrants or other equity instruments or rights for Shares) from Telco or Carcom, as the case may be, which ensures that, immediately following such offering of Shares, each Holder shall own the same percentage of outstanding Shares that it owned immediately prior to the offering (or will be in a position to maintain its percentage ownership upon the exercise of any such convertible bonds or warrants or other equity instruments or rights for Shares) and shall, to the extent the other Holders do not exercise their subscription or purchase rights in respect of any such offering, have the priority right to subscribe or purchase such Shares or rights subject to the offering not purchased by the other Holders.

16

SHH
BGr
WTW

Section 4.5    Dispute Resolution; Vivendi Call.

(a)    In the event that any Material Action proposed to be taken is not approved by the affirmative vote of at least one of the Elektrim Supervisory Board Members, the Chairman of the Supervisory Board and the Chief Executive Officer of Elektrim on one side and the Chief Financial Officer or Deputy Chief Financial Officer of Vivendi on the other side shall, within ten (10) Business Days, consider and use their best efforts to satisfactorily resolve the dispute on the Material Action as quickly as practicable and taking into account the need for a quick decision on the Material Action. If, at the end of such 10 Business Day period, no agreement is reached between the Holders with respect to such Material Action, Vivendi shall have the immediate right exercisable in writing delivered to Elektrim within 10 Business Days thereafter (the "Vivendi Call") to require Elektrim to sell to Vivendi all but not less than all of its Shares then held directly or indirectly by Elektrim at a price equal to the Fair Market Value of such Shares (as determined pursuant to Section 4.5(d)), together with a premium of 8% of such Fair Market Value. For the avoidance of doubt the Vivendi Call shall not apply to a dispute arising in relation to item (vii) in the definition of Material Actions.

(b)    The transfer of Shares pursuant to this Section 4.5 shall take place on the later of the 15th Business Day (or the next Business Day thereafter) after the date a Fair Market Value for the Shares has been determined according to Section 4.5(d) and not later than the 15th Business Day from the end of the Valuation Period or, if later, the 15th Business Day (or the next Business Day thereafter) after receipt of any Governmental Approvals required by Vivendi, Telco or Carcom in connection with such transfer. For the avoidance of doubt, the Parties hereby confirm that the provisions of this Section 4.5 shall be construed as a preliminary agreement between them regarding the sale of Shares whereby the subject of the transactions would be all the Shares held by Elektrim, the purchase price shall be calculated by reference to the provisions of Section 4.5(d) below and having if applicable a duration of fifteen (15) years.

(c)    After consummation of the transfer of Shares pursuant to this Section 4.5, (i) this Agreement shall have no further force or effect between Vivendi and Elektrim; and (ii) Vivendi shall be entitled to replace the Elektrim Supervisory Board Members and Elektrim Management Board Members with individuals selected by it. Until the date of consummation of the transfer of Shares pursuant to Section 4.5, neither Telco nor Carcom may proceed with the Material Action proposed to be taken.

(d)    The fair market value of such Shares at the time of their sale pursuant to this section (the "Fair Market Value"), shall be a valuation to be the result of a consensus reached by two independent internationally recognized investment banks (one selected by Elektrim and one selected by Vivendi), applying methods commonly accepted in the industry. In the event the two investment banks are unable to reach a consensus on the valuation and the difference between the valuation of each of the two investment banks is less than or equal to 10% of the value of the lower of the two valuations, the average of the two valuations shall be used to determine the value of the Shares. In the event the two investment banks are unable to reach a consensus on the valuation and the difference between the valuation of each of the two investment banks is greater than 10% of the value of the lower of the two valuations, the two investment banks shall select a third independent internationally recognized investment bank to perform a valuation. Each of the investment banks shall perform such valuations as soon as possible following their engagement but, in any event, not later than 20 Business Days following such engagement (the "Valuation Period"). Of the three valuations, that valuation which differs in magnitude most from the other two valuations shall be disregarded, and the average of the two remaining valuations shall be used to determine the value of the Shares. Elektrim and Vivendi shall each pay the fees and expenses of the investment bank it has chosen. The fees and expenses of the third investment bank, if any, shall be evenly divided between Elektrim and Vivendi.

17

SHH
bGu
WFW

Section 4.6    Sharing of Upside.

(a)    Up to but not including the date of the IPO, Vivendi shall grant the right to Elektrim to share in a portion of any upside Vivendi may realise on the disposal (a "Disposal") of all or part of its stake in Telco and/or Carcom to a third party (the "Upside"). Upon completion of a Disposal, Vivendi shall forthwith notify Elektrim of the payment received by it pursuant to the Disposal and details of any such Upside actually received by Vivendi, which amount shall be divided between Vivendi and Elektrim pro rata to their shareholding in Telco and/or Carcom as soon as practicable following receipt of payment for the sale. For the purposes of this Agreement, the Upside on the Disposal of all of Vivendi's stake in Telco and Carcom (a "Full Disposal") shall be calculated as the positive after tax amount received by Vivendi upon a disposal which exceeds the sum of (i) USD1,223,470,000; (ii) any additional equity investment made by Vivendi in Telco and/or Carcom or any Subsidiaries thereof and/or the cost of settlement with Dete Mobil Deutsche Telekom Mobil Net GmbH borne by Vivendi; (iii) €100,000,000; (iv) an annual rate of return of ten per cent (10%) applied to the sums specified in (i), (ii) and (iii) which shall be applied as from 7 December, 1999 for sums in (i) and (iii), and from the date on which the investment was made for sums in (ii) up to and including the date of the Disposal.

(b)    Notwithstanding the provisions of Section 4.1, if Elektrim consents to the Disposal of part only of Vivendi's stake in Telco and/or Carcom (a "Partial Disposal") the Upside shall be calculated in the same manner as for a Full Disposal. However, the amount resulting from the calculation specified in Section 4.6(a) above shall then be multiplied by the percentage of the Telco and/or Carcom stake that Vivendi has disposed of pursuant to the Partial Disposal in proportion to the total percentage held by Vivendi which amount shall be divided between Vivendi and Elektrim pro rata to their shareholding in Telco and/or Carcom as soon as practicable following receipt of payment for the sale.

(c)    For the avoidance of doubt, Elektrim shall be entitled to share in the Upside on each and every Partial Disposal by Vivendi until Vivendi has disposed of its entire stake in Telco and Carcom. The calculation of the Upside on any Partial Disposal occurring after the first Partial Disposal (a "Subsequent Partial Disposal") shall be made in the same manner as for a Full Disposal but shall be based on the sum of all Partial Disposals having occurred up to that date of and including the Subsequent Partial Disposal. The positive after tax amount resulting from the calculation on a Subsequent Partial Disposal shall then be multiplied by the total percentage of the Telco and/or Carcom stake that Vivendi has disposed of up to that date and including the Subsequent Partial Disposal in proportion to the total percentage held by Vivendi. All payments of Upside by Vivendi to Elektrim pursuant to one or more Partial Disposals shall be deducted from any amount due under a Subsequent Partial Disposal.

Section 4.7    Form of Consideration of the Shares.

No offer from any proposed transferee or selling Holder shall be deemed to be a valid or bona fide offer under any section of this Agreement unless the purchase price of such offer is payable in cash, debt securities with a rating of at least BBB by any recognized national debt rating agency or organization, equity securities of any corporation included in the S&P 500 or EUROSTOXX index, or any combination of the foregoing; provided, however, that the consideration for all sales of Shares under Section 4.5 shall consist solely of cash.

Section 4.8    IPO.

(a)    It is the agreement of the Parties that Telco shall proceed with an initial public offering and listing of the Telco Shares on the Warsaw Stock Exchange (the "IPO") within twelve months following the Effective Date, on the condition that at that date PTC shall have a total minimum equity valuation of USD 4 billion as determined by the lead bank advising the

18

*SHH*

*WFW bcu*

Holders and Telco, and in any event no later than 18 months following the date of signature of this Agreement. In order to implement this commitment, the Holders irrevocable and unconditionally undertake to vote (i) in favour of the merger of Carcom into Telco, unless Elektrim waives this condition; (ii) in favour of the transformation of Telco into joint stock company; and (iii) in favour of admitting Telco Shares to public trade in securities. Furthermore, the Holders shall take such steps as may be required to procure the registration of Telco's transformation by the respective court, save that notwithstanding the foregoing, so long as it shall be applicable, and in any event only until the IPO, the statutes of the transformed Telco shall preserve the Holders' rights under this Agreement.

(b)    The Parties agree to fully co-operate in all respects concerning the preparation and launch of the IPO (including, but not limited to the obligation to provide any and all information to prepare prospectus and full and prompt co-operation with the Securities and Exchange Commission, the advisors and auditors) and further agree that Telco shall appoint financial advisers to act as the global coordinator together with a law firm and other advisers to be appointed by Telco for the IPO. Notwithstanding the foregoing, it is agreed that Elektrim shall be entitled to nominate for appointment by Telco another financial advisor to act as joint global coordinator, which appointment shall be made by Telco, subject to the prior written consent of Vivendi as to the identity of the financial adviser, which consent shall not be unreasonably withheld. As soon as reasonably practicable following the date of this Agreement Vivendi and Elektrim will together appoint one officer of Telco to coordinate the launch of IPO. The officer shall be responsible for operational preparation of the IPO by Telco, including preparation of necessary documentation in connection with the IPO.

(c)    Elektrim shall have a priority right or right of priority to offer its Telco Shares in the IPO over Telco Shares held by Vivendi and over the public subscription for new shares of Telco. It is further understood that Vivendi shall be under no obligation to participate in selling any Telco Shares in the IPO.

Section 4.9    Telco Capital Increases.

(a)    With effect from date of this Agreement, Vivendi shall be entitled to request at any time and Elektrim hereby agrees to vote in favour of the following capital increases of Telco (the "Telco Capital Increases"): (i) capital increases on one or more occasions amounting to an aggregate of up to €240 million; and (ii) any capital increases by way of capitalisation of shareholder loans made by the Holders to Telco and existing at the date of this Agreement excluding the loan pursuant to the Shareholder Loan Agreement; and (iii) any additional capital increases agreed in the Business Plan, the main parameters of which are attached to the Agreement as Annex 2. The Telco Capital Increases shall be subject to the pre-emption provisions set out in Section 4.4 above.

(b)    Each of Vivendi, Elektrim and Telco shall procure that the first annual Business Plan following the date of this Agreement shall be finalised and agreed between them within three (3) months of the date of signature of this Agreement.

(c)    In the event that Elektrim does not or is unable to subscribe to one or more of the Telco Capital Increases following the Effective Date, then Vivendi shall have the exclusive right to subscribe within the subscription period provided for by law to such entitlement of Elektrim and Elektrim shall have the right (the "Elektrim Call Option") to purchase in one or more tranches from Vivendi such number of Telco Shares as may be issued by Telco pursuant to the Telco Capital Increase so as to permit Elektrim to own the percentage of outstanding Telco Shares that it owned immediately following the Effective Date. The price payable by Elektrim upon exercise of the Elektrim Call Option shall be equal to the subscription price paid by Vivendi for such Telco Shares, plus an annual rate of return of ten per cent (10%) on such subscription

19

SHH

WFW 8X6V

price. The Elektrim Call Option shall be exercisable at any time following a Telco Capital Increase in which Elektrim has not taken up its entitlement prior to the IPO by issue of a written notice by Elektrim to Vivendi indicating its intention to exercise the Elektrim Call Option. The stamp duty and other similar taxes and charges incurred by Elektrim in connection with the exercise of the Elektrim Call Option shall be met by Elektrim. For the avoidance of doubt, the Parties hereby confirm that the provisions of this Section 4.9 shall be construed as a preliminary agreement between them regarding Telco Shares which are the subject at any time of the Elektrim Call Option, that the purchase price for such Telco Shares shall be calculated by reference to the provisions set out above and having a term commencing on the date hereof and expiring on the earlier of the IPO or five (5) years. In the event that Elektrim shall hold less than 35% of the Telco Shares, this Elektrim Call Option shall terminate forthwith.

## ARTICLE 5

## MISCELLANEOUS

Section 5.1    Information.

(a)    From and after the date of signing of this Agreement, each Holder shall vote its Shares at any annual or extraordinary General Assembly of Telco and Carcom, and shall take all such other action reasonably necessary, to cause Telco and Carcom to permit each Holder to examine the separate books, records and accounts to be kept by Telco and Carcom and to be supplied with all information, including monthly management accounts and operating statistics and other trading and financial information, in such form as each Holder may reasonably require to keep it properly informed about the business and affairs of Telco and Carcom.

(b)    Without prejudice to the generality of Section 5.1 (a), from and after the date of signing of this Agreement, each Holder shall vote its Shares at any regular or special General Assembly of Telco and Carcom, as the case may be, and shall take all such other action reasonably necessary, to cause Telco and Carcom as the case maybe to furnish to each Holder, within periods reasonably required by each Holder:

(i)    for each fiscal year of Telco and Carcom, financial statements of Telco and Carcom in the form and at times required by Polish law;

(ii)    for each fiscal year and fiscal quarter of Telco and Carcom, annual audited financial statements and quarterly unaudited financial statements which shall be prepared in accordance with internationally generally accepted accounting principles and denominated in Polish Zloty and either U.S. dollars or Euros by one of the "big five" international accounting firms that shall be the same as Elektrim's auditor (initially Arthur Andersen); and

(iii)    in advance of each fiscal year of Telco, the Business Plan in a consolidated form.

(c)    From and after the date of signing of this Agreement, each Holder shall vote its Shares at any regular or special General Assembly of Telco and Carcom, as the case may be, and take all such other action reasonably necessary, to cause the Telco Supervisory Board and the Carcom Supervisory Board respectively to provide to each Holder, within 40 Business Days after the end of each fiscal year, a statement of material financial transactions between Telco and its Affiliates and Carcom and its Affiliates and/or any material related party transactions with a Holder or its Affiliate. For the avoidance of doubt, for the purposes of this Section 5.1, the term

20

SHH
WFW BG

"material" shall mean transactions with a value of more than €50,000 (fifty thousand Euros) or its equivalent per month.

Section 5.2    Confidentiality; Public Announcements.

(a)    Each Holder agrees, as set forth below, to treat as confidential all technology and other information, together with any analyses, studies or other documents or records prepared by Telco, Bresnan, Carcom, the Fixed Line Companies, PTC, a Holder, its Affiliates, or any representative or other Person acting on behalf of a Holder (collectively, "Authorized Representatives"), which contain or otherwise reflect or are generated from technology and other information provided by a Holder, Telco, Bresnan, Carcom, the Fixed Line Companies or PTC (as such, a "Provider") to Telco, Bresnan, Carcom, the Fixed Line Companies, PTC or to other Holders in connection with Telco's, Bresnan's, Carcom's, the Fixed Line Companies' or PTC's business or this Agreement (collectively, "Confidential Matter").

(b)    Each Holder agrees that it will hold any Confidential Matter in strict confidence and will not, and will use its reasonable efforts to insure that neither Telco, Bresnan, Carcom, the Fixed Line Companies, PTC nor any of their Authorized Representatives will, disclose any Confidential Matter, provided that a Holder (or its Authorized Representative) may disclose any such technology or other information; (i) as has become generally available to the public; (ii) as may be required or appropriate in any report, statement or testimony submitted to any regulatory or judicial body having or claiming to have jurisdiction over the Holder (or its Authorized Representatives); (iii) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation; or (iv) as to which the Provider has consented in writing.

(c)    Nothing in this Section shall prevent any of the Parties from disclosing confidential information if and to the extent required by Polish law or the laws of other jurisdictions that such information be disclosed.  In this connection, each of the Holders shall use its reasonable efforts, subject to the need to make prompt and timely disclosure required by law and applicable securities regulations, to provide the other an opportunity to review and comment on reports, statements or releases pertaining to their involvement in the transactions contemplated by the Parties hereto where practicable.

Section 5.3    Regulatory Cooperation.

The Holders shall cooperate with each other to ensure that all information necessary or desirable for the making of (or responding to any requests for further information consequent upon) any notifications or filings made in connection with this Agreement, the transactions contemplated hereunder or any on-going regulatory filings or other obligations in connection with the operations of Telco, Bresnan, Carcom, the Fixed Line Companies and PTC, is supplied to the Holder dealing with such notifications and filings.

Section 5.4    Compliance with Law.

In the performance of their respective obligations under this Agreement, each Holder shall comply with, and shall vote its Shares at any regular or special meeting of shareholders of Telco and Carcom to cause Telco and Carcom to be managed in compliance with all Applicable Laws, regulations and orders.

Section 5.5    Non-Competition.

Subject to the requirements of Applicable Law, each Holder undertakes that neither it nor any of its Subsidiaries shall (whether alone or jointly with others, or whether as principal, agent, shareholder or otherwise and whether for its own benefit or that of others) directly or

21

SHH

WTW bG

indirectly engage in or carry on or be interested in any business in Poland in competition with Telco, Bresnan, Carcom, the Fixed Line Companies, Elektrim Autoinvest or PTC (or any of their Subsidiaries) within the fields of telephony products in Poland, save that Elektrim's holding of shares in companies undertaking exclusively Internet and data communications business, including, without limitation, Polish Phonesat Sp. z o.o, InterNet Polska Sp. z o.o., VPN Services Sp. z o.o., CT Creative Team Sp. z o.o., e-Center Sp. z o.o., Poland.com SA and Elektrim Online Sp. z o.o., EasyNet. S.A. and AGS New Media Sp. z o.o. (and any entity created by the reorganisation, consolidation or amalgamation of such companies) shall not constitute a breach of this Section 5.5,

Section 5.6    No Inconsistent Agreements.

The Holders will not (and will cause neither Telco nor Carcom to) hereafter undertake any steps and/or enter into any agreement with respect to its Shares that is inconsistent with the rights granted to, and the obligations undertaken by, the Holders in this Agreement.

Section 5.7    Term of Agreement.

This Agreement shall terminate without prejudice to any accrued rights and obligations of a Holder at such date; (i) in relation to Telco, if any Holder (together with its Permitted Transferees) ceases to hold 20% of the issued and outstanding Telco Shares and in relation to Carcom, if any Holder (together with its Permitted Transferees) ceases to hold 20% of the issued and outstanding Carcom Shares; or (ii) upon liquidation, dissolution, winding up or bankruptcy of Elektrim or Vivendi ; or (iii) upon the IPO; or (iv) upon the mutual agreement of the Holders; or (v) the consummation of the events comprising Performance Failure Completion (as defined in the Additional Agreement) in accordance with the provisions of Section 4.1 of the Additional Agreement provided, that Sections 5.2 and 5.11 shall survive the termination of this Agreement.

Section 5.8    Headings.

The headings in this Agreement are for convenience of reference only and shall not control or affect the meaning or construction of any provisions hereof.

Section 5.9    Entire Agreement.

There are no restrictions, representations, warranties or covenants with respect to the subject matter hereof, other than those expressly set forth or referred to herein or therein. Save in respect of agreements entered into in consummation of the transactions contemplated by this Agreement and in particular, but not limited to any agreement entered into simultaneously with this Agreement, this Agreement supersedes the Letter of Understanding and all prior agreements and understandings between the Parties hereto with respect to the subject matter hereof and thereof.

Section 5.10    Notices.

Any notice, request, instruction or other document to be given hereunder by any Party hereto to another Party hereto shall be in writing and shall be sent by facsimile, registered mail or courier or delivered personally to the address of the Party set forth below or, in the case of a Permitted Transferee or third party transferee, to the persons at the address set forth in the written agreement executed pursuant to Section 4.3, or to such other address as the Party to whom notice is to be given may provide in a written notice to the other Parties. No notice shall be effective except upon actual delivery, or with respect to any notice to be given hereunder by facsimile, unless the Party sending the notice contacts each intended recipient and obtains confirmation of the transmission of such facsimile in writing.

22

SHH
NFW bcu

Elektrim:

    Elektrim S.A.
    77/79 Panska Street
    00 834 Warsaw
    Poland
    Fax:   + 48 22 652 8756
    Attn:  President or Acting President of the Management Board

Telco:

    Elektrim Telekomunikacja Sp. z o.o.
    77/79 Panska Street
    00 834 Warsaw
    Poland
    Fax:   +48 22 652 8756
    Attn:  President of the Management Board/Chief Financial Officer

Vivendi:

    Vivendi SA
    42, avenue de Friedland
    75008 Paris France
    Fax:   + 33 1 71 71 11 27
    Attn:  Dominique Gibert - Deputy CFO

Vivendi Telecom:

    Vivendi Telecommunications International SA
    1, Place de la Coupole,
    92084, Paris,
    La Defense Cedex, France
    Fax:   + 33 1 71 00 26 12
    Attn:  Michel Picot – Senior Executive – Vice President

Carcom:

    Carcom Warszawa Sp. z o.o.
    77/79 Panska Street
    00 834 Warsaw
    Poland
    Fax:   + 48 22 652 8700
    Attn:  Jacek Walczykowski

Section 5.11  Governing Law; Arbitration.

    (a)    The laws of Poland shall govern the interpretation, validity and performance of the terms of this Agreement, regardless of the law that might be applied under applicable principles of conflicts of laws.

    (b)    The Parties hereto shall attempt to resolve any dispute arising out of, or in connection with, this Agreement amicably and promptly by negotiations between designated senior executives of the Parties who have authority to settle the dispute.  Notwithstanding the foregoing, with respect to any dispute not resolved in the normal course of business, any Party may give any

23

other Party written notice of such dispute (the "Dispute Notice") and that it seeks, subject to the conditions herein, to refer such dispute to such senior executives for resolution. Upon receipt of the Dispute Notice, the designated senior executives of the applicable Parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute; provided, however, that if the matter has not been resolved within ten (10) Business Days of the date of the Dispute Notice (the "10-Day Period"), any Party hereto may give written notice (the "Arbitration Notice") to the other Parties that it intends to resolve the dispute by arbitration in accordance with paragraph (c) below. Nothing in the dispute resolution procedure described in this paragraph shall in any way preclude a Party from commencing arbitration in accordance with Section 5.11(c) and (d) below at any time after the service of a Dispute Notice for the purposes of seeking interim protective measures or injunctions from the arbitration tribunal.

(c)     Upon expiration of the 10-Day Period and issuance of an Arbitration Notice, any dispute arising out of or in relation to this Agreement (including any question regarding the existence, validity or termination of this Agreement) shall be referred to arbitration for final settlement pursuant to the arbitration rules of the London Court of International Arbitration (the "Rules") by three arbitrators. Vivendi and Elektrim shall have the right to nominate one arbitrator each with the chairman to be nominated by the LCIA Court. In the event that Telco and/or Carcom is also a party to such arbitration its nominated arbitrator shall be the same as the person nominated by Telco's and/or Carcom's co-claimant or co- respondent as the case may be. The seat of such arbitration to be London. The language of the arbitration shall be English. The Parties agree to exclude any rights of application or appeal to the Polish or French courts to the fullest extent permitted by law in connection with any question of law arising in the course of the arbitration or with respect to any award made (except in respect to any interim injunction or interim relief for which the Parties reserve the right to file applications before the Polish or French courts). The decision and award of the arbitrators shall be final and binding and non-appealable, and shall be enforceable in any court of competent jurisdiction.

(d)     If at any time, a dispute arising pursuant to Section 5.11(b) is exclusively between Parties with Polish nationality, the matter shall be referred to arbitration by the Arbitration Court of the Warsaw Chamber of Commerce under and in accordance with the Rules and in all other respects in accordance with the provisions of Section 5.11(c) unless any such provisions are contrary to Applicable Law in which case the relevant provisions of the rules of the Arbitration Court of the Warsaw Chamber of Commerce shall apply.

Section 5.12  Severability.

The invalidity, illegality or unenforceability of one or more of the provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of this Agreement, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the Parties hereunder shall be enforceable to the fullest extent permitted by law. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the greatest extent possible.

Section 5.13  Other Agreements.

Nothing contained in this Agreement shall be deemed to be a waiver of, or release from, any obligations any Party hereto may have under, or any restrictions on the transfer of Shares imposed by, any other agreement.

Section 5.14  Costs.

Save as expressly stated to the contrary in this Agreement, each of the Holders shall pay its own costs, charges and expenses incurred in connection with the preparation and implementation of this Agreement and the transactions contemplated by it.

Section 5.15  No Partnership or Agency.

Nothing in this Agreement (or any of the arrangements contemplated hereby) shall be deemed to constitute a partnership between the Holders nor, save as may be expressly set out herein, constitute either Holder the agent of the other Holder for any purpose. In addition, unless otherwise agreed in writing between the Holders, neither of them shall enter into contracts with third parties as agent for Telco, Carcom, the Fixed Line Companies, Elektrim Autoinvest, PTC or for the other Holder nor shall either Holder describe itself as agent as aforesaid or in any way hold itself out as being an agent as aforesaid.

Section 5.16  Successors; Assigns; Transferees.

The provisions of this Agreement shall be binding upon and accrue to the benefit of the Parties hereto and their respective successors and permitted assigns as contemplated by Article 5. No Party may assign or transfer to any other Person, any of its right, title or interest in this Agreement, except to a Permitted Transferee.

Section 5.17  Defaults.

A default by any Party to this Agreement in such Party's compliance with any of the conditions or covenants hereof or performance of any of the obligations of such Party hereunder shall not constitute or execute a default by any other Party.

Section 5.18  Amendments; Waivers.

This Agreement may not be amended, modified or supplemented and no waivers of or consents to departures from the provisions hereof may be given unless consented to in writing by the Holders and witnessed by a Polish Notary Public.

Section 5.19  Counterparts.

This Agreement has been executed in ten (10) counterparts, five (5) in English and five (5) in Polish. Each Party shall receive one English version and one Polish language version. In the case of discrepancies between the Polish and English versions, the English version shall prevail.

Section 5.20  Recapitalization, etc.

In the event that any capital stock or other securities are issued in respect of, in exchange for, or in substitution of, any Shares by reason of any reorganization, recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to shareholders or combination of Shares or any other change in the capital structure of Telco or Carcom, appropriate adjustments shall be made to the relevant provisions of this Agreement so as to fairly and equitably preserve, as far as practicable, the original rights and obligations of the Parties hereto under this Agreement.



Section 5.21    Representations and Warranties of All Parties.

Each of Elektrim, Telco, Vivendi and Carcom hereby represents and warrants to each other that:

(a)    It is duly organized and validly existing under the laws of its jurisdiction of organization.

(b)    It has all necessary corporate power and authority to enter into this Agreement to which it is a Party and to perform its obligations thereunder. The execution, delivery and performance of this Agreement and any other agreement to which it is a Party and the consummation of the transactions contemplated hereby have been duly authorized by its management board and ratified by its supervisory board, and no other corporate proceedings or actions are necessary to authorize this Agreement or any other agreements or documents required to consummate such transactions.

(c)    Each of this Agreement and any agreement ancillary to it to which it is a Party constitutes a legal, valid and binding obligation of such Party.

(d)    The execution and delivery of this Agreement and any document ancillary to it to which it is a Party do not, and the performance of this Agreement by such Party will not, conflict with or violate:

(i)    any provision of the articles of association or other corporate organization documents of such Party; or

(ii)    any law applicable to such Party or its contractual obligations, its properties or assets.

Section 5.22    Shares Held Indirectly.

Any references in this Agreement to shares of Telco, Carcom, the Fixed Line Companies, PTC and Elektrim Autoinvest shall include shares held both directly and indirectly by the holder thereof.

Section 5.23    Agreement to share arbitration costs and awards.

The Parties acknowledge that the Arbitrations have been instituted by Dete Mobil Deutsche Telekom Mobil Net GmbH ("DT") in Vienna.  The Parties agree that they have a mutuality of interest in connection with the Arbitrations. It is agreed that the Parties shall share in the costs, expenses and risks of the Arbitrations and more particularly agree as follows:

(a) Vivendi hereby agrees that Vivendi will pay to, or recover from Elektrim, 50% of Elektrim's and Telco's liability or recovery under a final award issued pursuant to the Arbitrations for money damages.  Provided, however, that for the first USD100,000,000 of any liability or recovery referred to above, Vivendi shall solely bear the burden and enjoy benefit thereof.  In all cases, sharing will occur promptly upon presentation of a certified final award or judgment and release, unless otherwise provided herein.

(b)    Vivendi and Elektrim will each bear on a 50/50 basis all reasonable costs associated with the Arbitrations, including, without limitation, attorneys' fees, costs and disbursements; legal expenses; court or arbitration fees; witness' fees and expenses; experts' fees and expenses; costs of discovery, investigation and disclosure. All such expenses shall be payable within ninety days after receipt by the respective Party of an invoice explaining in detail the origin

26

*SHH*
*WFW*
*BGU*

of the expenses provided, however, that any such costs shall be agreed between the Holders in advance.

(c)  Vivendi shall have control over the conduct by Elektrim and Telco of the defenses and counterclaims in the Arbitrations and shall have the right to appoint and remove counsel for Elektrim and Telco in the Arbitrations. Without limitation to the foregoing, Vivendi shall have the right to appoint Watson, Farley & Williams ("WFW") (or any other counsel of its choice) as principal counsel for Elektrim and Telco in respect of the Arbitrations. Principal counsel so selected by Vivendi shall have ultimate responsibility for, and control of, the conduct of the Arbitrations on behalf of Elektrim and Telco, but will consult with any other co-counsel for Elektrim, Telco and the Co-Respondents (if applicable) in the Arbitrations (including Soltysinski Kawecki & Szlezak ("SKS") before taking any material action. Elektrim and Telco shall promptly execute all documents (including powers of attorney) which may be required to put into effect Vivendi's instructions with regard to the choice of counsel in each of the Arbitrations. Vivendi shall have the right to give direct instructions to such counsel acting on behalf of Elektrim and Telco as to the conduct of the Arbitrations. Elektrim and Telco agree that counsel acting for them in the Arbitrations shall be authorised by them to act on the sole instructions given by Vivendi as to the conduct of the Arbitrations, provided that such counsel shall, in the case of any important matter, have consulted with Elektrim. Elektrim and Telco shall promptly provide Vivendi and their counsel in the Arbitrations with such information and assistance as they require in order to conduct the Arbitrations, including assistance with regard to the preparation of witness statements from present and former officers, employees and agents of Elektrim. Vivendi shall have free access to all information, papers, books and records of Elektrim and Telco or their agents or attorneys related to each of the Arbitrations except as prohibited by Applicable Law. Elektrim and Telco shall each designate an individual officer or employee whose primary responsibility will be assisting counsel with the conduct of the Arbitrations and shall ensure that the provision of such assistance is that person's primary responsibility. In addition, Elektrim and Telco shall provide such other information or documents as Vivendi requires in connection with each of the Arbitrations, including, without limitation, receipts for payment of fees and expenses paid and documents supporting invoices submitted to Vivendi for payment. Elektrim and Telco agree that any information provided to counsel selected by Vivendi as aforesaid can be passed by such counsel to Vivendi. Elektrim and Telco agree that any counsel selected by Vivendi to act for them as counsel in the Arbitrations shall be entitled to act for Vivendi now and in the future in relation to this Agreement and any dispute arising under this Agreement, whilst continuing to act as counsel in each of the Arbitrations. Elektrim and Telco agree to execute any amendments, restatements or novations to the Retainer Agreement between Vivendi, Elektrim, WFW and SKS as may be required by Vivendi to give effect to this section.

(d)  Elektrim hereby agrees that at the direction of Vivendi it shall promptly take all actions and make such filings, assert such claims, counterclaims and defenses in respect of any breach or alleged breach by DT of its obligations under the existing PTC Shareholders' Agreement, the By-Laws of PTC or existing under Polish law.

(e)  Vivendi and Elektrim shall consult prior to concluding any settlement discussions with DT regarding the Arbitrations. Settlement of the Arbitrations with DT may be entered into by Vivendi on behalf of Elektrim and/or Telco without their consent, save that Elektrim's prior consent shall be required for settlements which involve payments to DT in excess of USD 100 million, such prior consent not to be unreasonably withheld by Elektrim. Elektrim and Telco agree to take all steps necessary to implement any settlement. Elektrim and Telco are strictly prohibited, without Vivendi's written consent, from (i) entering settlement discussions concerning the Arbitrations; (ii) agreeing any letter of intent (or similar arrangement) concerning the settlement of the Arbitrations; and (iii) concluding a settlement of either of the Arbitrations. Failure to obtain Vivendi's written consent as aforesaid shall relieve Vivendi of any obligation under this Agreement.

27

(f)  Any information, materials, books or papers obtained by Vivendi from Elektrim solely in connection with Vivendi's control of the Arbitration shall be for the internal use of Vivendi and its counsel, and shall remain confidential and be protected from disclosure to any third-party.

(g)  Without prejudice to Vivendi's rights under Section 5.23 of this Agreement, Vivendi will use its reasonable endeavours to mitigate or minimise any liability of Elektrim to the Co-Respondents under the Co-Respondent Agreement.  Elektrim will endeavour to renegotiate the terms of any such Co-Respondent Agreement so as to eliminate or minimise any restriction or limitation on Elektrim's right to settle the Arbitrations and any financial liability of Elektrim to the Co-Respondents arising from the failure of Elektrim to obtain the consent of the Co-Respondents to any such settlement.  Vivendi will cooperate with Elektrim to conclude such renegotiation on satisfactory terms with the Co-Respondents without itself incurring any financial liability in respect thereof.

### Section 5.24    Outcome of Arbitrations.

(i)     In the event that Telco is required, as a result of any final enforceable order in the Arbitrations or in any proceedings in relation thereto, to transfer any PTC shares to Elektrim, then Elektrim agrees that to the extent that there is no further order in either the Arbitrations requiring the transfer of any shares to DT, it will retransfer all PTC shares held by it back to Telco at a price (whether nominal or otherwise) and in a manner and at a time to be determined by Vivendi in its absolute discretion.  Until Elektrim has transferred its PTC shares to Telco as required by Vivendi, Elektrim agrees to hold such PTC shares on trust for Telco and further agrees (a) not to seek to sell, agree to sell, transfer, encumber, or otherwise dispose of or create any interest in the PTC shares, and (b) to exercise all voting and any other rights attached to the PTC shares (including making all appointments to PTC's Supervisory and Management boards as well as any other PTC committees) strictly on Telco's instructions which shall be obtained before any such rights are exercised.

(ii)     In the event that Telco is required, as a result of any final enforceable order in the Arbitrations or in any proceedings in relation thereto, to transfer any of its shares in PTC to DT and Elektrim receives consideration for such transfer either directly from DT or indirectly through the other Respondents named in the PTC arbitration any such consideration shall be paid directly and immediately to Telco.

### Section 5.25    Share Contribution Agreement.

Elektrim and Telco agree to take all such steps as may be necessary to revive and keep in force by renewing every six months the Resolution dated 10 December 1999 increasing Telco's share capital so that as soon as the dispute with DT is resolved or DT executes the PTC Assumption Agreement, the transfer of the one share currently retained by Elektrim in PTC can be completed in accordance with the Share Contribution Agreement.  Pending the resolution of the dispute with DT, Elektrim agrees to continue to hold that one share on trust for Telco and to exercise all voting and any other rights attached to the share strictly on Telco's instructions, which shall be obtained before any such rights are exercised.  Elektrim hereby confirms that Telco has validly assumed all of Elektrim's rights and obligations under the PTC Shareholders' Agreement pursuant to the PTC Assumption Agreement.

SHH
WTW
ben



# ARTICLE 6

## CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the meanings ascribed to them below:

Section 6.1    10-Day Period.

The term "**10-Day Period**" shall have the meaning set forth in Section 5.11(b).

Section 6.2    Acceptance Notice.

The term "**Acceptance Notice**" shall have the meaning set forth in Section 4.2(b).

Section 6.3    Acceptance Period.

The term "**Acceptance Period**" shall have the meaning set forth in Section 4.2(b).

Section 6.4    Additional Agreement.

The term "**Additional Agreement**" shall mean the additional agreement to be entered into signing of this Agreement between Elektrim, Vivendi, Ymer and Telco, a copy of which is attached to this Agreement as Annex 13.

Section 6.5    Affiliate.

The term "**Affiliate**" shall mean any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

Section 6.6    Agreement.

The term "**Agreement**" shall mean this Third Amended and Restated Investment Agreement and each of the other agreements and instruments contemplated by this Agreement to be entered into by one or more of the Parties in relation to the transactions contemplated by this Agreement.

Section 6.7    Amended and Restated Investment Agreement.

The term "**Amended and Restated Investment Agreement**" shall mean the Amended and Restated Investment Agreement, dated September 7, 1999, among Elektrim, Vivendi and Telco.

Section 6.8    Applicable Law.

The term "**Applicable Law**" shall mean any law or regulation presently in force or issued from time to time in the territory of the Republic of Poland, and any requirement to act or refrain from acting issued by a Polish Governmental Authority.



SHH

Section 6.9    Arbitrations.

The term "Arbitrations" means the two arbitrations initiated by Dete Mobil Deutsche Telekom MobilNet GmbH ("DT") with the International Arbitration Centre of the Austrian Federal Economic Chamber in Vienna under reference SCH 4682 and SCH-4750 and shall include any further arbitration involving DT, Elektrim and Telco under the PTC shareholders Agreement or Deed of Formation and any proceedings commenced by or against Elektrim or Telco in any jurisdiction which are ancillary to these arbitrations proceedings (or any proceedings relating to the transfer of any shares in PTC as referred to above) which seek, for example, injunctive relief or the disclosure or gathering of evidence

Section 6.10    Articles.

The term "Articles" shall refer to the Telco Articles and the Carcom Articles.

Section 6.11    Assumption Agreement.

The term "Assumption Agreement" shall mean the agreement in the form set out in Annex 1 to be entered into in accordance with the requirements of Section 4.3.

Section 6.12    Bresnan.

The term "Bresnan" shall mean Bresnan International Partners (Poland), L.P., a limited partnership organised and existing under the laws of the State of Delaware.

Section 6.13    Business Day.

The term "Business Day" shall mean any day except a Saturday, Sunday or other day which is a public holiday in either Poland or France.

Section 6.14    Business Plan.

The term "Business Plan" shall mean with respect to Telco the annual Business Plan (including the annual budget of Telco) prepared by the Chief Executive Officer with assistance of the Management Board of Telco and adopted by the Telco Supervisory Board, the main parameters of which are set out in Annex 2.

Section 6.15    Carcom.

The term "Carcom" shall mean Carcom Warszawa Sp. z o.o., a limited liability company organized under the laws of the Republic of Poland.

Section 6.16    Carcom Articles.

The term "Carcom Articles" shall refer to the articles of association of Carcom in the form attached to this Agreement at Annex 3, to be adopted by Carcom on the date of signing of this Agreement in accordance with Section 1.2, as amended from time to time.

Section 6.17    Carcom Sale Shares.

The term "Carcom Sale Shares" means the 346 Carcom Shares representing 1% of the issued share capital of Carcom to be purchased by Ymer from Elektrim.

SHH
WITW
ben



**Section 6.18    Carcom Shares.**

The term "**Carcom Shares**" shall mean the ordinary shares of PLN 1,000 each of Carcom.

**Section 6.19    Carcom Supervisory Board.**

The term "**Carcom Supervisory Board**" shall mean the Supervisory Board of Carcom.

**Section 6.20    Charter Documents.**

The term "**Charter Documents**" shall include the Articles, by-laws, notarial deeds of contribution and registration and related constitutional documents of each of Telco and Carcom as in effect from time to time.

**Section 6.21    Collateral Loan Agreement.**

The term "**Collateral Loan Agreement**" shall mean the collateral loan agreement to be entered into between Elektrim and Nymphe pursuant to the Ymer Purchase Agreement, a copy of which is attached to this Agreement as Annex 5.

**Section 6.22    Co-Respondents.**

The term "**Co-Respondents**" shall mean the parties to the Co-Respondent Agreement (other than Elektrim), being, Kulczyk Holding S.A., Towarzystwo Ubezpieczeń i Reasekuracji "WARTA" S.A., BRE Bank S.A., DPFR-BRE Sp. z o.o.

**Section 6.23    Co-Respondent Agreement.**

The term "**Co-Respondent Agreement**" means the agreement of December, 1999 relating to the Arbitrations and made between the Co-Respondents and Elektrim.

**Section 6.24    Effective Date.**

The term "**Effective Date**" shall have the meaning set forth in Section 1.4.

**Section 6.25    Elektrim.**

The term "**Elektrim**" shall mean Elektrim S.A., a joint-stock company organized under the laws of the Republic of Poland.

**Section 6.26    Elektrim Autoinvest.**

The term "**Elektrim Autoinvest**" shall mean Elektrim Autoinvest S.A., a joint stock company organized under the laws of the Republic of Poland.

**Section 6.27    Elektrim Autoinvest Sale Shares.**

The term "**Elektrim Autoinvest Sale Shares**" means the 48 shares of PLN 150.00 each shares in Elektrim Autoinvest representing 0.96% of the issued share capital of Elektrim Autoinvest to be purchased by Telco from Elektrim.

SHH
WFW
mar

Section 6.28    Elektrim PTC Representative.

The term "**Elektrim PTC Representative**" shall have the meaning set out in Section 3.9.

Section 6.29    Elektrim Supervisory Board Members.

The term "**Elektrim Supervisory Board Members**" shall have the meaning set forth in Section 3.3.

Section 6.30    Escrow Agreement.

The term "**Escrow Agreements**" shall mean the escrow agreements to be entered into upon signing of this Agreement between Ymer, Nymphe, Elektrim, Societe Generale, Salans Hertzfeld & Heilbronn D. Oleszczuk Kancelaria Prawnicza Spółka Komandytowa and Beata Gessel i Wspólnicy Spółka Jawna, a copies of which are attached to this Agreement as Annex 6.

Section 6.31    Euro or €.

The term "**Euro**" or "**€**" means euros, the single currency of participating member states of the European Union.

Section 6.32    Fixed Line Companies.

The term "**Fixed Line Companies**" shall mean:

(i)      3,100,000 shares of PLN 100.00 each, representing 100% of the issued capital of Regionalne Sieci Telekomunikacyjne El-Net S.A.;

(ii)     38,688 shares of PLN 1,000.00 each, representing 96% of the issued share capital of Elektrim TV-Tel Sp. z o.o; and

(iii)    56,650 shares of PLN 100.00 each, representing 99.39% of the issued share capital of Telefonia Regionalna Sp. z o.o.

Section 6.33    Governmental Approval.

The term "**Governmental Approval**" shall mean all authorizations, consents, decrees, permits, waivers, privileges and approvals from, and filings with, all relevant Governmental Authorities.

Section 6.34    Governmental Authority.

The term "**Governmental Authority**" shall mean all relevant jurisdictions and the government and any ministry, department, political subdivision, instrumentality, judicial or administrative body, agency, corporation or commission under the direct or indirect control of such country or any subdivision or jurisdiction therein.

Section 6.35    Holders.

The term "**Holders**" shall mean Elektrim, Vivendi and their respective Permitted Transferees, and any other person who shall become a Party to this Agreement pursuant to Article 4 and any combination of them, and the term "**Holder**" shall mean any such person.

SHH
WTW
DGV

Section 6.36    Investment Agreements.

The term **"Investment Agreements"** shall mean this Agreement and each of the Original Investment Agreement, the Amended and Restated Investment Agreement and the Second Amended and Restated Investment Agreement (in each case as amended) entered into by the Parties in relation to Telco.

Section 6.37    IPO.

The term **"IPO"** shall have the meaning set forth in Section 4.8.

Section 6.38    Letter of Understanding.

The term **"Letter of Understanding"** means the letter of understanding dated 27 June, 2001 and made between Elektrim and Vivendi

Section 6.39    Management Board.

The term **"Management Board"** shall mean the Management Board of Telco or of Carcom or of any of their Subsidiaries (excluding PTC), as the context shall require.

Section 6.40    Material Actions.

The term **"Material Actions"** shall mean:

(i)      recommendations by the Telco Supervisory Board or the Carcom Supervisory Board for consideration at a General Assembly of shareholders of Telco or Carcom regarding (A) the merger or consolidation of Telco or Carcom with any other entity (other than the Subsidiaries of Telco or Carcom, as the case may be), (B) joint ventures, co-operations, partnerships or long term alliances deemed to have a value in excess of USD 50,000,000, or (C) the sale of all or substantially all of the assets of Telco or Carcom;

(ii)      the filing of a request for the declaration of bankruptcy or insolvency or the liquidation, dissolution or winding up of Telco or Carcom, except where such filings are required by law;

(iii)      recommendations by the Telco Supervisory Board or the Carcom Supervisory Board for consideration at a General Assembly of shareholders of Telco or Carcom regarding any amendment to the Deed of Formation of Telco, Carcom or the Charter Documents, where such amendment has a material adverse effect on the interests of Elektrim (other than capital increases of Telco required to ensure that Telco has a debt/equity ratio of 50/50 (at book value) and the Telco Capital Increases);

(iv)      make any borrowings, enter into any hire purchase, lease, credit sale or similar agreement (other than for payments not exceeding USD 20,000,000 per year and periods not exceeding three years) or grant or permit the creation of or suffer to subsist any security interest (other than for the purpose of refinancing the Telco Purchase Price and maximum of USD300,000,000 project financing for Regionalne Sieci Telekomunikacyjne El-Net S.A) over the whole or part of its undertaking property or asset (except for any lien arising by operation of law);

(v)      terminate the appointment of the auditors of Telco or Carcom;

33

SHH
WFW
ben

(vi)     alter the accounting reference date or its accounting policies, bases or methods from those initially agreed by the parties;

(vii)     entry by Telco and Carcom or any Subsidiary of Telco or Carcom into any agreement of a material nature with any Party or Affiliate of a Party or a related party of any of the Parties;

(viii)     admit or apply for admission of the Shares or the shares of any Subsidiary of Telco or Carcom to any recognised stock exchange; or

(ix)     dilute the share capital of any of Subsidiary of Telco or Carcom as provided in Section 3.8 of this Agreement.

Section 6.41     Nymphe.

The term "Nymphe" shall mean Nymphe Finance S.A., a société anonyme organised and existing under the laws of Luxemburg.

Section 6.42     Original Investment Agreement.

The term "Original Investment Agreement" shall mean the Investment Agreement, dated June 7, 1999, among Elektrim, Vivendi and Telco.

Section 6.43     Party or Parties.

The term "Party" shall mean, at any time, each person that is a Party to, or is otherwise bound by this Agreement, at such time and "Parties" shall mean all such persons.

Section 6.44     Permitted Transferees.

The term "Permitted Transferees" shall mean, any Holder or any Party to this Agreement and with respect to any Holder or Party, any Affiliate of such Holder or Party.

Section 6.45     Person.

The term "Person" shall mean an individual, partnership, corporation, business trust, joint stock company, trust, unincorporated association, joint venture, or other entity of whatever nature.

Section 6.46     PLN.

The term "PLN" means Polish zloty.

Section 6.47     Proportionate Share.

The term "Proportionate Share" shall mean as of any date with respect to any Holder the percentage of the issued and outstanding Telco Shares or Carcom Shares, as the case may be, owned by such Holder as of such date.

Section 6.48     PTC.

The term "PTC" means Polska Telefonia Cyfrowa Sp. z o.o., a company organized and existing under the laws of Poland.

Section 6.49     PTC Agreement.

The term **"PTC Agreement"** means the Purchase Agreement, dated May 17, 1999, by and among BRE Bank S.A., Kulczyk Holdings SA, and Elektrim, as amended, supplemented or otherwise modified from time to time.

Section 6.50     PTC Assumption Agreement.

The term **"PTC Assumption Agreement"** shall mean the assumption and amendment agreement relating to the PTC Shareholders' Agreement made between Telco and the parties to the PTC Shareholders' Agreement and dated 3 February 2000.

Section 6.51     PTC Shareholders' Agreement.

The term **"PTC Shareholders' Agreement"** shall mean the agreement relating to PTC dated 21 December, 1995 and made between Elektrim, Polpager Sp. z o.o, US West International BV, DT, Elektrim Autoinvest, and Kulczyk Holding SA (as amended).

Section 6.52     PTC Shares.

The term **"PTC Shares"** shall mean the shares of PTC capital stock which are held directly by Telco (48% of issued and outstanding share capital of PTC) and indirectly through Elektrim-Autoinvest (1.1% of the issued and outstanding share capital of PTC) and through Carcom (1.9% of the issued and outstanding share capital of PTC) which in aggregate represent 51% of such stock.

Section 6.53     PTC Supervisory Board.

The term **"PTC Supervisory Board"** shall mean the Supervisory Board of PTC constituted in accordance with the terms of the PTC Shareholders' Agreement.

Section 6.54     Receivables.

The term **"Receivables"** shall have the meaning given to it in the Telco Purchase Agreement.

Section 6.55     Second Amended and Restated Investment Agreement.

The term **"Second Amended and Restated Investment Agreement"** shall mean the second Amended and Restated Investment Agreement dated 7 December, 1999 among Elektrim, Vivendi and Telco.

Section 6.56     Selling Party.

The term **"Selling Party"** shall have the meaning set forth in Section 4.2.

Section 6.57     Services Agreements.

The term **"Services Agreements"** shall mean the agreements for the provision of services by each of Elektrim and Vivendi Telecom to Telco, copies of which are attached to this Agreement as Annex 7.

Section 6.58    Settlement Agreement.

The term "**Settlement Agreement**" shall mean the agreement to be entered into upon signing of this Agreement between Elektrim, Vivendi and Vivendi Telecom, a copy of which is attached to this Agreement as Annex 8.

Section 6.59    Share Contribution Agreement.

The term "**Share Contribution Agreement**" shall mean the conditional share contribution agreement made between Elektrim and Telco dated 28 January 2000.

Section 6.60    Shares.

The term "**Shares**" shall mean the Telco Shares and the Carcom Shares together and the term "**Share**" shall mean one of the same as the context shall require.

Section 6.61    Shareholder Loan Agreement.

The term "**Shareholder Loan Agreement**" shall mean the agreement to be entered into upon signing of this Agreement by Vivendi relating to the shareholder loan of € 122,000,000 (one hundred and twenty two million Euros), a copy of which is attached to this Agreement as Annex 9.

Section 6.62    Subsidiary.

The term "**Subsidiary**" shall mean any corporate or other entity, a majority of the shares or other equity interests (having voting power) of which are owned, directly or indirectly, by the person specified.

Section 6.63    Supervisory Board.

The term "**Supervisory Board**" shall mean the Telco Supervisory Board or the Carcom Supervisory Board as the context shall require.

Section 6.64    Telco.

The term "**Telco**" shall mean Elektrim Telekomunikacja Sp. z o.o., a limited liability company organized under the laws of the Republic of Poland.

Section 6.65    Telco Articles.

The term "**Telco Articles**" shall refer to the articles of association of Telco in the form attached to this Agreement at Annex 4, to be adopted by Telco on the date of signing of this Agreement in accordance with Section 1.2, as amended from time to time.

Section 6.66    Telco Capital Increases.

Section 4.9.    The term "**Telco Capital Increases**" shall have the meaning specified in



Section 6.67     Telco Purchase.

The term **"Telco Purchase"** means the proposed purchase by Telco from Elektrim of the Fixed Line Companies and the Elektrim Autoinvest Sale Shares for the Telco Purchase Price.

Section 6.68     Telco Purchase Agreement.

The term **"Telco Purchase Agreement"** means the agreement to effect the Telco Purchase to be entered into upon signing this Agreement between Elektrim and Telco in the form attached to this Agreement as Annex 10.

Section 6.69     Telco Purchase Price.

The term **"Telco Purchase Price"** means the consideration of €491,000,000 (four hundred and ninety-one million Euros) to be payable by Telco for the Fixed Line Companies and the Elektrim Autoinvest Sale Shares, pursuant to the Telco Purchase Agreement.

Section 6.70     Telco Sale Shares.

The term **"Telco Sale Shares"** means the 2,001,619 Telco Shares representing 2% of the issued share capital of Telco to be purchased by Ymer from Elektrim.

Section 6.71     Telco Shares.

The term **"Telco Shares"** means the ordinary shares of PLN 100 each of Telco.

Section 6.72     Telco Supervisory Board.

The term **"Telco Supervisory Board"** shall mean the Supervisory Board of Telco.

Section 6.73     Third Party Purchaser.

The term **"Third Party Purchaser"** shall have the meaning set forth in Section 4.2.

Section 6.74     Transactions.

The term **"Transactions"** shall mean the Ymer Purchase and the Telco Purchase together.

Section 6.75     Transfer Notice.

The term **"Transfer Notice"** shall have the meaning set forth in Section 4.2.

Section 6.76     Transferring Holder.

The term **"Transferring Holder"** shall have the meaning set forth in Section 4.2.

Section 6.77     USD.

The term **"USD"** shall mean United States dollars.

37

Section 6.78    Vivendi.

The term "Vivendi" shall mean Vivendi Universal S.A., a société anonyme organized under the laws of France.

Section 6.79    Vivendi Call.

The term "Vivendi Call" shall have the meaning set forth in Section 4.5(a).

Section 6.80    Vivendi Guarantee.

The term "Vivendi Guarantee" shall meant the guarantee to be entered into pursuant to the Telco Purchase Agreement by Vivendi in favour of Elektrim in respect of Telco's obligations to Elektrim under the Telco Purchase Agreement, a copy of which is attached to this Agreement as Annex 11.

Section 6.81    Vivendi Supervisory Board Members.

The term "Vivendi Supervisory Board Members" shall have the meaning set forth in Section 3.3.

Section 6.82    Vivendi Telecom.

The term "Vivendi Telecom" shall mean Vivendi Telecom International S.A., a société anonyme organized under the laws of France.

Section 6.83    Ymer.

The term "Ymer" means Ymer Finance S.A., a société anonyme organized and existing under the laws of Luxemburg.

Section 6.84    Ymer Purchase.

The term "Ymer Purchase" means the proposed purchase by Ymer from Elektrim of the Telco Sale Shares and the Carcom Sale Shares for the Ymer Purchase Price.

Section 6.85    Ymer Purchase Agreements.

The term "Ymer Purchase Agreements" means the agreements to be entered into following the signing of the Telco Purchase Agreement between Ymer and Elektrim to effect the Ymer Purchase in the form attached to this Agreement as Annex 12.

Section 6.86    Ymer Purchase Price.

The term "Ymer Purchase Price" means the consideration of €100 million to be paid by Ymer to Elektrim for the Telco Sale Shares and Carcom Sale Shares pursuant to the Ymer Purchase Agreements.

38

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be duly executed as of the date first above written and the signatures of the Parties hereto have been witnessed by a Polish notary public.

**ELEKTRIM S.A.**

By:
Name:
Title:    CEO

By:
Name:
Title:

Signature confirmation by Notary Public

**ELEKTRIM TELEKOMUNIKACJA SP. Z O.O.**

By:
Name:
Title:

Philippe Houdoin
Vice President

Laurent Mémer
Member of the Board

Signature confirmation by Notary Public

**VIVENDI UNIVERSAL S.A.**

By:
Name:    JF WILKINSON
Title:    Attorney

as attorney for Vivendi Universal SA pursuant to a power of attorney dated 3 September 2001

Signature confirmation by Notary Public

**VIVENDI TELECOMMUNICATIONS INTERNATIONAL S.A.**

By:
Name:    Vice President Finance
Title:    Philippe Houdoin

as attorney for Vivendi Telecommunications International SA pursuant to a power of attorney dated 30th August 2001

Signature confirmation by Notary Public

**CARCOM WARSZAWA SP. Z O.O**

By:
Name:
Title:    Président

Philippe Houdoin
Vice President

Signature confirmation by Notary Public

F:\V\Vivendi\closing\03.09\Third Investment eng07.doc

39