HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| VIVENDI S.A. and VIVENDI HOLDING I CORP. | ) ) ) | No. CV6-1524 JLR |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **DECLARATION OF DR. GEORG KODEK, LL.M.** |
| T-MOBILE USA, INC., T-MOBILE DEUTSCHLAND GMBH, T-MOBILE INTERNATIONAL AG, DEUTSCHE TELEKOM AG, and ZYGMUNT SOLORZ-ZAK | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## EXPERT REPORT OF GEORG E. KODEK

I, Doktor Georg E. Kodek, do hereby state as follows:

### I. INTRODUCTION

1. I have been asked by counsel for Vivendi S.A. ("Vivendi") and Vivendi Holding I Corp. ("VH1") to provide an expert opinion on Austrian law in connection with the RICO litigation pending before the United States District Court, Western District of Washington, at Seattle (the "RICO Litigation") and to

2

review and comment upon the declaration of Professor Paul Oberhammer dated September 25, 2007 (the "Oberhammer Declaration").

2. Based upon my extensive experience with Austrian law and procedure, as set forth below and in my *curriculum vitae* (Exhibit A), I am competent to testify authoritatively and reliably on various details of the Austrian legal system, including Austrian substantive and procedural law. A complete list of my publications is contained in Exhibit B.

3. In the course of the preparation for this Declaration, I have read a copy of the Third Amended Complaint. I was also provided with the declaration of Professor Paul Oberhammer and with a text of the RICO Act.

## II. QUALIFICATIONS

4. I was appointed to the Austrian Supreme Court effective January 1, 2006. Prior to that, I served as a judge on the Court of Appeals in Vienna from 2003 to 2005. Before that I served as a district court judge for the District of Central Vienna from 1991 to July 1993, when I was appointed to the Superior Court ("*Landesgericht*") Eisenstadt. In that later capacity, I sat primarily as a judge of the appellate division hearing appeals from District Court decisions in civil cases, and also hearing major cases at trial level.

5. I graduated from the University of Vienna Law School in March 1986. I continued my studies and, in March 1987, was awarded a doctorate in law (Doctor Juris). From 1986 to 1987, I clerked for several Austrian courts. In 1988, 1 was trained at the district attorney's office in Eisenstadt, Austria. From August 1988 to May 1989, I attended a graduate program at Northwestern University School of Law in Chicago, Illinois, receiving a Master of Laws (LL.M.) degree. Thereafter, I worked as an intern for the summer in the Kings

3

County District Attorney's Office, Brooklyn, New York. When I returned to Austria, I again clerked for several trial and appellate courts.

6. Since 1995, I have taught civil procedure to future judges and law clerks at the Judiciary Education Center in Schwechat, near Vienna, Austria. I have also been teaching civil procedure at the University of Vienna School of Law since 2001. Recently, I was appointed professor for civil and commercial law at the Vienna University of Economics and Business Administration. There, I work at the Institute for Civil and Commercial Law, teaching civil and commercial law and civil procedure. In addition, I am also deputy director of the Research Institute for Central and Eastern European Law.

7. I have also published several books and more than 80 articles in the field of Austrian civil law and civil procedure. I have co-authored a number of the most recent treatises in the area of civil procedure, including a commentary on the Enforcement of Judgments.[1]  Currently, I am co-authoring a five-volume treatise on Austrian civil procedure and a nine volume treatise on bankruptcy law with several noted law professors and judges. I am also co-editor of the most widely used annotated edition of the Austrian Code of Civil Procedure (Kodek/Klauser, Zivilprozessgesetze, 16th ed., 2006).

8. I have served, since 1991, as an expert for the Council of Europe. Originally, my task was to teach lawyers from Eastern Europe about various topics on procedural law and procedural guarantees. In connection with that appointment, I have presented lectures in Strasbourg, Brussels, Moscow, Vilnius and certain other cities. In the fall of 1997, I was appointed to be one of three Council of Europe experts designated to review the new Code of Civil Procedure of the Federation of Bosnia and Herzegovina. In 2000, I performed a similar mission as

---

[1] Burgstaller and Deixler-Huebner (eds), Exekutionsordnung (4 vols, Lexis-Nexis. Vienna 2002, updated 2006).

4

I was appointed to review the new Ukrainian Code of Civil Procedure. In summer 2003 and September 2004, again at the request of the Council of Europe, I reviewed the new Codes of Civil Procedure for Serbia and Montenegro, respectively. Most recently, in 2005 I worked as an expert for the Council of Europe reviewing a draft of the Code of Non-Contentious Proceedings of Montenegro. In 2006 and 2007 I was a member of the drafting committee for the 2007 Austrian Civil Procedure Reform Act.

9. From an American point of view it may be considered unusual for a sitting judge to testify as a legal expert, but this is not the case in Austria. On the contrary, a leading authority on Austrian conflicts of laws, Professor Schwimann, has stated that when foreign law has to be applied, courts should, *inter alia,* rely on the testimony of foreign judges. Also, in 1997 the then attorney general, Dr. Nikolaus Michalek, stated to the Austrian parliament that expert opinions rendered by judges (in cases not assigned to them) are not only permissible, but desirable, in order to achieve a greater "affinity" of judges to academic discussion. In spite of this authority I have limited my activities as an expert to foreign cases and to expert opinions for the Austrian government.

### III. FACTS

10. I understand that the basic facts stated in paragraph 4 of the Oberhammer Declaration are true and correct. In addition, I understand that Vivendi and VH1 allege that the Defendants have engaged in a pattern of racketeering activity and other fraudulent conduct, including U.S. wire fraud, and other actions under the Racketeer Influenced and Corrupt Organizations Act (hereinafter referred to as "RICO"), 18 U.S.C. § 1961 (b), (c) and (d).

5

OPINION

1. There is no cause of action in Austrian law comparable to RICO or common law conspiracy

11. As Prof. Oberhammer concedes at paras. 29-30, in Austrian law[2] there is no statute comparable to RICO or cause of action comparable to common law "conspiracy". Austrian law does not recognize a "pattern" of racketeering activity as sufficient to give rise to a claim for damages. Rather, plaintiffs would have to allege (and prove) specific unlawful acts which directly caused the damage. In case of fraud, plaintiffs would have to allege not only specific false representations, but also that they were entitled to rely on such representations and that such reliance directly caused the damage. Also, the allegation of a "conspiracy" per se, in the absence of specific tortuous acts, would not be sufficient to give rise to a claim. Moreover, tort claims based on conspiracy would be very difficult to establish in Austria, particularly in light of Austrian law of evidence, described *infra*, which has led defendant's expert Professor Oberhammer to conclude in another (unrelated) case that under Austrian law it is "often very difficult to find out internal facts regarding a defendant's company."[3] Here, the Plaintiffs have alleged a global conspiracy implicating directors of T-Mobile USA, Deutsche Telekom, and Elektrim. Thus, it would be extremely difficult, if not impossible, to successfully pursue a claim based on the facts alleged in the Complaints on a pure tort theory under Austrian law. Indeed, no claim based on facts similar to those alleged by plaintiffs has ever been recognized by Austrian courts, and, as far as can be told from the published cases, no such case has ever been brought in Austria.

---

[2] Under Austrian choice of law rules, it is at least possible that Austrian law applies. *See* Oberhammer Declaration para. 31.
[3] Declaration of Professor Oberhammer of January 2002, In re ski train fire in Kaprun, Austria, on November 11, 2000, United States District Court, Southern District of New York, MDL-docket No. 1428.

6

**2.    Austrian courts do not have jurisdiction for all claims raised in the complaint**

12. Professor Oberhammer correctly states that, if filed in Europe, the Brussels regulation no. 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the "Regulation") would apply.  I cannot, however, entirely agree to his analysis as to the courts of what countries would have jurisdiction.  While certainly German courts have jurisdiction over defendants T-Mobile International AG, T-Mobile Deutschland GmbH and Deutsche Telekom AG, all these companies having their "domicile"[4] in Germany (art. 2 of the Regulation), this is by no means clear for Austrian courts.

13. Since none of defendants has its domicile in Austria, jurisdiction of Austrian courts could only be based on "special jurisdiction" pursuant to article 5 of the Regulation.  Under art. 5 no. 5 of the Brussels regulation, a person domiciled in a member state may, in another member state, be sued in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur.  The European Court of Justice has developed a broad notion of the terms "tort, delict or quasi-delict".  The "place where the harmful event occurred" has been held to encompass both the place where the delict was committed as well as the place where the damage occurred.  This concept was first enuntiated in *Bier v. Mines de Potasse d' Alsace,* a case where a chemical factory in France polluted the Rhine river, thus causing damage to a gardening company in the Netherlands.  The ECJ held that under art. 5 no. 3 of the Brussels Convention (the predecessor to the Brussels Regulation) authorized suit both in France, where the wrongful act was committed, as well as in the Netherlands, where the actual damage occurred.[5]

---

[4] Pursuant to art. 60 of the Regulation, a company is domiciled at the place where it has its statutory seat, its central administration or its principal place of business.  In this case it appears that all these criteria point towards Germany.  If the criteria of art. 60 would point to different countries, plaintiff could choose where to bring suit.
[5] ECJ, *Bier v. Mines de Potasse d'Alsace* (1976).

7

14. There is, however, a significant limitation to this concept which Professor Oberhammer fails to mention: In *Shevill v. Presse Alliance*, the European Court of Justice was obviously concerned about forum shopping and tried to limit the scope of art. 5 no. 3 in cases where the connection between the forum and the underlying action is extremely remote. The defendant had published defamatory statements in a newspaper which circulated widely in France, but a few copies were sold in England.[6] Nonetheless, the plaintiffs chose to bring their action in England, where one of the plaintiffs resided. Under the specific circumstances of this case, the Court held that if the action is brought where the damage occurred, only the damage that occurred in that country could be claimed. Damage that occurred outside the country was not recoverable.[7]

15. It is not yet clear whether the European Court of Justice intends to apply this rule in all cases of cross-border damage. If the *Shevill* rule applies to other cases than defamation cases, this would mean that plaintiffs could only sue for their entire damage before the court of defendants' domicile. Alternatively, they could claim the respective part of their damage before the courts of the country or countries where the underlying acts took place which gave rise to the respective part of the damage (which is why the *Shevill* rule is sometimes referred to as the "mosaic theory"). Contrary to Prof. Oberhammer's assertions, it would not be possible to sue for all damages in the courts of the country where just part of the relevant acts took place.[8]

---

[6] Some 237,000 copies were sold in France, compared to only 230 in England, only five of which were sold in Yorkshire, where one of the plaintiffs resided.

[7] ECJ, *Shevill v. Press Alliance* (1995).

[8] At one point in his Declaration (¶ 18), Prof. Oberhammer is more cautious in his conclusions, stating that "[t]*o the extent* Vivendi and Vivendi Holding allege that Mr. Solorz-Zak, in conspiring with the DT defendants, committed his fraudulent behavior (*at least in part*) in Germany, I can draw the conclusion that Vivendi and Vivendi Holding could sue Mr. Solorz-Zak before German courts based on art. 5 para. 3 of the Brussels Regulation" (emphasis added).

8

16. Also, the European Court of Justice has emphasized in a number of decisions that the jurisdictional rules laid down (inter alia) in art. 5 no. 3 of the Brussels Convention must be "restrictively interpreted."[9] This provision is based on the existence of a *particularly close connecting factor* between a dispute and courts other than those for the place where defendant is domiciled, which justifies the attribution of jurisdiction to those courts for reasons relating to the sound administration of justice and the efficacious conduct of proceedings.[10] The same applies to the Brussels Regulation, the successor to the Convention. According to the facts alleged by plaintiffs, only a small part of defendants' acts were committed in Austria. Indeed, only T-Mobile was a party to the arbitration proceedings in Vienna, the only parts of the facts on which the claim is based which occurred in Vienna. Thus, I strongly disagree with Professor Oberhammer's conclusion at para. 28 that Austrian courts would have jurisdiction over the German DT defendants and Mr. Solorz-Zak under art. 5 para. 3 of the Brussels Regulation.

17. Moreover, T-Mobile USA, Inc., has its "domicile" outside the European Union. Therefore it does not fall under the regime of the Brussels regulation. Rather, with respect to T-Mobile USA, Inc., the domestic law of the country where the case is brought applies. Domestic Austrian law is similar to the Brussels regulation in that the courts where defendant has his domicile have jurisdiction. Since in the case of T-Mobile USA, this place is outside Austria, jurisdiction of Austrian courts could only be based on the provisions on special jurisdiction in sections 76 et seq. of the Austrian Judicature Act ("Jurisdiktionsnorm" - JN).

---

[9] ECJ. judgment of June 10, 2004, C-168/02, *Rudolf Kronhofer v. Marianne Maier and Others, at* para.14.
[10] ECJ, C-21/76, *Bier v. Mines de Potasse d'Alsace, at* par. 11, ECJ ; ECJ jdgment of January 11, 1990, C-220/88, *Dumez France SA et al. V. Hessische Landesbank et al, at* para. 17; *Rudolf Kronhofer v. Marianne Maier et al. at* para. 15) (emphasis added).

18. While generally the concept of special jurisdiction under European and domestic Austrian law is similar, there is an important difference in tort cases. Under section 92a of the Austrian Judicature Act, an action can be brought at the locus of a tort only in cases based on wrongful death or injury, wrongful imprisonment and damage inflicted on a tangible object. Thus, Austrian courts in several decisions have confirmed the principle that section 92a does not apply to cases other than the ones enumerated in that provision and therefore is not available to cases where plaintiff seeks compensation for "mere financial loss" ("reiner Vermögensschaden")[11]. Furthermore, there is an additional important difference between domestic Austrian and European law in that under Austrian law in tort cases under section 92a, jurisdiction is only with the courts of the district where the tortuous act was committed; under domestic Austrian law it is immaterial where the resulting effect occurred.[12]

19. For sake of completeness it should be added that T-Mobile USA could not be joined as a co-defendant under Austrian law pursuant to section 93 Austrian Judicature Act. Section 93 only applies if the action is brought in a court of a district where one of the defendants has its domicile. This, however, is not the case here; none of the defendants has its domicile in Austria. Moreover, Austrian courts have construed section 93 fairly narrowly. Thus, the Austrian Supreme Court[13] has held in one case that several tortfeasors who caused the same damage did not fall under section 93, if their liability is based on different factual contributions.

---

[11] Austrian Supreme Court judgment of September 22, 1993, 6 Ob 589/93, and judgment of March 8, 2005, 10 Ob 7/05k = SZ 2005/28; Court of Appeals of Vienna. Judgment of January 4, 1996,16 R 223/95

[12] While the more modern (and, in my opinion, better) view is that section 92a should be interpreted in line with European Union law (see, e.g. Simotta in Fasching, Kommentar zu den Zivilprozessgesetzen, 2nd ed. [2000] § 92a para. 9), under which cases can be brought either where the underlying act was committed or where the effect occurred, the Austrian Supreme Court in a recent decision has endorsed the traditional view (judgment of July 1, 2004, 2 Ob 157/04f).

[13] Austrian Supreme Court, judgment of March 15, 1979, SZ 52/43.

10

Likewise, T-Mobile USA could not be joined under the joinder provisions in the Brussels Regulation. First, as I have demonstrated above, there is no basis to sue the other defendants in Austria based on the Brussels Regulation. Second, T-Mobile USA is domiciled outside the European Union, thus falling outside the scope of application of the Regulation. Professor Oberhammer, while admitting that the question is disputed, suggests that art. 6 para. 1 of the Brussels Regulation could be applied *per analogiam* in cases where both defendants from member states and from third countries, such as the U.S., are involved. Professor Oberhammer fails to mention, however, that the only court decision that dealt with the issue so far has rejected this interpretation[14]. Thus, T-Mobile USA could only be sued in Austria pursuant to section 99 of the Judicature Act if it has property in this country, which I am informed by counsel is not the case.

20. As to defendant Zygmunt Solorz-Zak a Polish citizen, citizenship per se is not enough to warrant application of the Brussels regulation. Jurisdiction under the Brussels regulation is in large measure based on domicile (art. 2 of the Regulation). Before the court of the country of defendant's domicile all claims can be brought (the only exception being rights in rem in real estate and some other areas of law where the Regulation provides for exclusive jurisdiction, *see* art. 22 of the Regulation, which have no bearing on the present case.)[15] Assuming that defendant Solorz-Zak's domicile is in Poland, in Austria only the provisions of the Regulation on special jurisdiction could be invoked. This required a showing that defendant Solorz-Zak committed a tort, delict or quasi-delict in Austria. Damages not based on actions by defendant Solorz-Zak in Austria could not be brought before Austrian courts. Specifically, pursuant to art. 6 para. 1 of

---

[14] Court of Appeals Hamburg IPRspr 1992 Nr 193, 478 (which decision is cited by the very authority Prof. Oberhammer relies on in his Declaration. *See* Leible in Rauscher (ed.), Europäisches Zivilprozessrecht, 2nd ed. (2006) art. 6 Brussels Regulation para. 7, footnote 21).

[15] This is conceded by Professor Oberhammer (*see* Oberhammer Declaration para. 24 ).

11

the Regulation, defendant Solorz-Zak could not be joined as a co-defendant in an Austrian proceeding, because that provision authorizes joinder only if the case is brought in a country where one of the defendants is domiciled. Since none of the defendants has its domicile in Austria, this provision does not apply.

21. Therefore, under European and domestic Austrian law it would not possible to raise all claims of plaintiffs against all defendants in this action before an Austrian court.

### 3.    Some additional points about Austrian procedural law

22. Under Austrian rules of civil procedure, there is no equivalent to discovery proceedings in American law. The taking of evidence takes place only during trial. Before the institution of proceedings, evidence may be taken only if there is a risk that evidence may otherwise be lost or that the use of it may be made more difficult (section 384 paragraph 1 Austrian Code of Civil Procedure). Moreover, this procedure is available only for third-party witnesses and experts, but not for documents and the examination of parties.[16] Also, while there are relatively broad duties to turn over documents at trial, the court cannot directly compel a party to turn over documents. Rather, there is only an indirect sanction in that the court can consider a refusal to turn over documents when weighing the evidence. The same is true for testimony of the parties. If a party fails to testify, the court can use such refusal when weighing the evidence; however, the court cannot (except in divorce cases) compel a party to undergo questioning by its opponent. Also, false testimony given by a party is not punishable as perjury unless the party testifies under oath (which almost never occurs in practice). While in academic literature it was suggested to introduce at least some form of coercion for the

---

[16] It should be noted that civil law distinguishes between witnesses and parties. Only third-parry witnesses are seen as witnesses, whereas parties are seen as a separate category of evidence to which special rules different from those for witnesses apply.

12

presentation of documents[17], the Austrian legislature and the Austrian courts have not taken up this proposal.

23. Additional difficulties may arise from the rule, developed by Austrian courts, that evidence is inadmissable which is obtained by "probing" or "investigating" ("Ausforschungsbeweis" or "Erkundungsbeweis"). Rather, the taking of evidence is permissible only with respect to those facts which the party has previously asserted in relative detail. In other words, the taking of evidence does not have the purpose to find out new facts or supplement the assertions of a party. Furthermore, under well established case law, so-called "excess results of evidence" ("überschießende Beweisergebnisse") must not be considered by the court. Therefore, the court in its judgment may consider only those results of the evidence that are covered by assertions of the parties.

24. In claims for damages in tort, the burden of proof for causing the damage is always on the injured party. According to the prevailing opinion, proof in a civil proceeding requires a degree of probability so high as to be the equivalent of certainty so that no reasonable person assessing the conditions of life will have any doubt.[18] Under this rule, the requirements for proof in civil cases are equally high as those in criminal cases.

25. It is exactly these inherent limitations of the Austrian law of evidence that led Professor Oberhammer to conclude in earlier (unrelated) proceeding that "it is often very difficult in Austrian litigation to find out internal facts regarding a defendant's company."[19] In this declaration, Professor Oberhammer, after stating

---

[17] See, e.g. Bajons, Die Beweisführung durch Handelsbücher. Zugleich ein Beitrag zu den Grenzen prozessualer Vorlagepflichten (Production of evidence by means of commercial books. Also a discussion on the limitations of procedural duties to present evidence), NZ 1991, 58. In his 2002 declaration (cited above), Professor Oberhammer describes this proposal as "very reasonable".

[18] Fasching, Lehrbuch des österreichischen Zivilprozessrechts, 2nd ed. (1990) para. 802.

[19] Oberhammer Declaration of January 2002, In re ski train fire in Kaprun, Austria. on November 11, 2000, United States District Court, Southern District of New York, MDL Docket No. 1428, ¶ 16. For sake of completeness it should also be pointed out that in the same declaration (id. At ¶ 20) Professor Oberhammer voices concerns as to the duration of complex proceedings in Austria.

13

that Austrian and German law are similar in this respect, also cited approvingly a conclusion of Professor Schlosser, a well-known German scholar, that successful plaintiffs in well-known American lawsuits would hardly have a chance in German courts due to the rules of evidence there.[20]

\*\*\*\*\*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

EXECUTED this 20th day of November, 2007

Dr. Georg E. Kodek

---

[20] Schlosser, Die lange Reise in die prozessuale Moderne (Germany's long journey into procedural modernity), JZ 1991, 599.