UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VIVENDI S.A., et al.,

　　　　　　　Plaintiffs,

　　v.

T-MOBILE USA, INC., et al.,

　　　　　　　Defendants.

CASE NO. C06-1524JLR

ORDER

This matter comes before the court on Defendants Deutsche Telekom AG ("DT"),
T-Mobile International AG ("T-Mobile International"), T-Mobile Deutschland GmbH
("TMD") and T-Mobile USA, Inc. ("T-Mobile USA") (collectively the "DT Defendants")
and Zygmunt Solorz-Zak's ("Mr. Solorz") motions to dismiss for *forum non conveniens*
(Dkt. ## 86, 102).  Having reviewed the papers submitted by the parties and heard the
argument of counsel the court DISMISSES this action against all Defendants on grounds
of *forum non conveniens.*

## I. BACKGROUND

Plaintiffs Vivendi S.A. and Vivendi Holding I Corp. ("Vivendi Holding"), as the
assignee of General Motors Corp. ("GM"), bring this action under the Racketeer
Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(b), (c) and (d)
against the DT Defendants and Mr. Solorz.  Plaintiffs also assert a claim against the DT
Defendants and Mr. Solorz for common law fraud.  In their complaint, Plaintiffs allege

ORDER-1

that "Defendants engaged in a pattern of racketeering activity, including acts of wire fraud committed in the United States, in order to illegally take over an enterprise," Polska Telefonia Cyfrowa Sp. z o.o. ("PTC").  (Third Amended Complaint "TAC" (Dkt. # 76) ¶ 1.)  Plaintiffs further allege that Defendants have conducted the affairs of Elektrim S.A. ("Elektrim"), a Polish Company controlled by Mr. Solorz and an enterprise-in-fact consisting of the DT Defendants and Mr. Solorz, in a corrupt manner through a pattern of racketeering.  (*Id.*)  Plaintiffs claim that this racketeering activity has included U.S. wire fraud aimed at stealing Vivendi S.A.'s interest in PTC and stripping assets from Elektrim.

In response to the TAC, the DT Defendants filed a motion to dismiss resting on five grounds:  (1) *forum non conveniens*; (2) lack of personal jurisdiction over DT, T-Mobile International and TMD; (3) lack of subject matter jurisdiction; (4) failure to state a RICO claim; and (5) failure to state a claim for common law fraud.  Mr. Solorz also filed a motion to dismiss resting on six grounds:  (1) *forum non conveniens*; (2) lack of personal jurisdiction; (3) lack of standing; (4) lack of subject matter jurisdiction; (5) failure to state a RICO claim; and (6) failure to state a claim for common law fraud.

This twisted tale begins in 1995, when the Polish government granted PTC its first wireless license and PTC began operating as a mobile telecommunications provider. (TAC ¶ 30.)  By early 1999, Elektrim, directly and through a company called Carcom, owned 37.1% of PTC, TMD[1] owned 22.5%, U.S. West International ("U.S. West") owned 22.5%, Polpager owned 4% and a group of Polish minority investors owned the remaining 13.9%.  (TAC ¶ 32.)  The 1995 Shareholders Agreement and Deed of

---

[1]Plaintiffs' manner of pleading the complaint creates confusion.  Instead of referring to each DT Defendant separately, Plaintiffs refer to them collectively (even if every DT Defendant was not directly involved in a particular transaction).  Plaintiffs contend that they did not have a full set of information when they drafted the complaint.  Nevertheless, the court has attempted, using the documents provided by the parties, to determine which DT Defendant actually engaged in each transaction.

ORDER-2

Formation prohibited any transfer of PTC shares without the unanimous consent of certain PTC shareholders and gave each shareholder a call option over another shareholder's shares to be exercised if any other shareholder committed a material breach of the agreement.  (TAC ¶ 31.)

In 1999, U.S. West and the Polish minority investors decided to seek buyers for their shares.  (TAC ¶ 33.)  Plaintiffs allege that at that same time, Elektrim and TMD wanted to gain control over PTC.  (*Id.*)  Elektrim, which was short on cash, initially approached TMD to jointly acquire the shares.  (TAC ¶ 34.)  TMD declined Elektrim's offer, instead acquiring Polpager's 4% and U.S. West's 22.5% stake through a holding company.  (TAC ¶¶ 34-35.)

After TMD refused Elektrim's offer, Elektrim began negotiations with Vivendi S.A. in an effort to get it to help purchase the Polish minority's shares.  (TAC ¶ 37.) Beginning in 1999, Elektrim and Vivendi S.A. entered into a series of agreements that established a joint venture to control PTC which culminated in the Third Amended and Restated Investor Agreement (the "Joint Venture Agreement").  (TAC ¶ 38.)  Elektrim and Vivendi established a joint-venture vehicle called Telco to which they intended to transfer the PTC shares.  (*Id.*)  Carcom Warsawa Sp. z o.o. ("Carcom"), a sister joint venture company, was to hold 3% of PTC's shares.  (*Id.*)  Initially Elektrim used funds that Vivendi S.A. provided to acquire the Polish minority investors' shares.  (*Id.*)  It then contributed all of the PTC shares (48% of the total) to Telco and Vivendi S.A. acquired 49% of Telco and 50% of Carcom.  (*Id.*)  In December 2005, Vivendi S.A. acquired an additional 2% of Telco and 1% of Carcom bringing its respective holdings to 51% of Telco and Carcom.  (*Id.*)

ORDER-3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.    First Vienna Arbitration Panel

On October 21, 1999, TMD initiated arbitration under the Shareholders Agreement and Deed of Formation in Vienna, Austria against Elektrim and the Polish minority investors.  (TAC ¶ 40.)  TMD claimed that it was entitled under a right of first refusal to buy a portion of the Polish minority investors' shares.  (*Id.*)  On April 9, 2003, the arbitration panel denied TMD's claim.  (TAC ¶ 45.)

### B.    Second Vienna Arbitration

On December 7, 2000, TMD filed for arbitration pursuant to the Shareholders Agreement and Deed of Formation.  (TAC ¶ 46.)  TMD sought a declaration that:  (1) the purported share transfer from Elektrim to Telco was ineffective; (2) Elektrim continued to own 48% of PTC shares; and (3) Elektrim materially breached the agreement, entitling TMD to exercise its call option over Elektrim's PTC shares.  (Mot.[2] at 4.)  Under the Joint Venture Agreement, Vivendi S.A. was entitled to direct the defense and appoint the law firm to represent Elektrim.  (TAC ¶ 47.)

In Spring 2003, while the Second Vienna Arbitration was still pending, Mr. Solorz allegedly purchased a significant stock interest in Elektrim in violation of Polish securities and antitrust laws.  (TAC ¶ 48.)  The complaint claims, upon information and belief, that "on or about the time [Mr.] Solorz made his investment in Elektrim, [TMD] and [Mr.] Solorz entered into secret discussions regarding a plan whereby (i) [TMD] would take over PTC, (ii) [Mr.] Solorz (through Elektrim) would be unjustly enriched by being paid twice for the PTC Shares that properly belonged to Vivendi S.A., and (iii)

---

[2]The DT Defendants and Mr. Solorz make similar arguments in their motions to dismiss on *forum non conveniens* grounds.  Rather than citing both motions, the court refers to the first filed motion (DT Defendants' motion to dismiss) in this order.  Citations to the response to Mr. Solorz's motion or his reply contain his name, for example, the response to his motion would be cited as, "Resp. to Solorz."

ORDER-4

[Mr.] Solorz's wireless phone company in Poland would be integrated into the T-Mobile global network."  (TAC ¶ 49.)  Plaintiffs claim, upon information and belief, that on or about this time Mr. Solorz began operating Elektrim corruptly with the objective of stealing the PTC shares and stripping Elektrim's assets.  (TAC ¶ 50.)  In order to facilitate their plan, Mr. Solorz on January 14, 2004, caused Elektrim to terminate the attorneys representing Elektrim in the Second Vienna Arbitration.  (TAC ¶ 51.)  On February 20, 2004, Mr. Solorz caused Elektrim to notify Vivendi S.A. that it was unilaterally voiding the Joint Venture Agreement.  (*Id.*)

It is alleged that Elektrim and TMD used the U.S. wires ten times in the Spring and Summer of 2004 to further their conspiracy by "fraudulently inducing Vivendi S.A. into wrongly believing that Elektrim was not colluding with [TMD], and that Elektrim and [TMD] were engaged in good-faith settlement negotiations with Vivendi S.A. when neither was the case."  (TAC ¶¶ 53-54.)  In August 2004, a senior TMD official told Vivendi S.A.'s CFO that a settlement "deal" had been reached and that he could "put the champagne in the fridge."  (TAC ¶ 55.)  The CFO understood TMD's message to mean that a settlement agreement would be executed shortly thereafter.  (*See id.*)  On September 7, 2004, TMD sent Vivendi S.A. a letter saying that it was unable to conclude the proposed settlement.  (TAC ¶ 56.)  On September 29, 2004, Elektrim sent a letter to PTC revoking Telco's appointees to PTC's Management Board and replacing them with Elektrim appointees.  (*Id.*)

On November 26, 2004, the Second Vienna Arbitration Tribunal issued an award stating that Elektrim's transfer of shares was ineffective and that the PTC shares which were the subject of the transfer remained Elektrim's property at all material times; the transfer of the PTC shares to Telco by Elektrim did not qualify as a material default under the Shareholder Agreement but that it would constitute such default if Elektrim did not

ORDER-5

recover the shares from Telco within two months from the notification of the award; and

that the tribunal had no jurisdiction over Telco.  (TAC ¶ 60; Declaration of Steven

Caplow ("Caplow Decl.") (Dkt. # 88), Ex. B.)

Plaintiffs allege, upon information and belief, that TMD and Mr. Solorz had

advance notice of the decision in the Second Vienna Arbitration.  (TAC ¶ 56.)

Plaintiffs claim that TMD and Elektrim's communications with it "falsely expressed a

desire to settle, falsely presented [TMD] and Elektrim as acting independently, and

falsely presented . . . negotiating terms that [TMD and Elektrim] were not considering."

(TAC ¶ 57.)  Plaintiffs further allege that "[b]y fraudulently inducing Vivendi S.A. into

active settlement negotiations during this critical time, Defendants gave themselves

sufficient time and opportunity to implement their scheme to influence the outcome of the

Second Arbitration."  (TAC ¶ 59.)

### C.    Post Second Arbitration Events

On December 17, 2004, Elektrim, allegedly under the control of Mr. Solorz and

with TMD's assistance sought

> truncated partial recognition and enforcement in the Warsaw[, Poland]
> Regional Court of that part of the arbitration award that was adverse to
> Elektrim, entirely omitting the ruling with respect to lack of jurisdiction over
> Telco which was favorable to both Elektrim and Vivendi S.A.  Defendants
> thereby sought to alter the meaning and scope of the Second Vienna Award so
> that it could be used improperly by Elektrim (under Solorz's control) to
> "repossess" the shares from Telco and to set the stage for Elektrim's transfer
> of the PTC shares to T-Mobile and the stripping of Elektrim's assets.
> Defendants also joined forces to bar Telco (and thus Vivendi S.A.) from
> participating in this truncated partial recognition proceeding even though Telco
> was the registered owner of the PTC shares.

(TAC ¶ 62.)  On December 30, 2004, Telco, at Vivendi S.A.'s direction, obtained an

injunction from a different chamber of the Warsaw Regional Court restraining PTC from

making changes to its share registry, including changing the Telco-owned PTC shares

into Elektrim's name.  (TAC ¶ 64.)

ORDER-6

On February 2, 2005, the Warsaw Regional Court granted Elektrim and TMD's petition.  (TAC ¶ 66.)  Plaintiffs allege that the ruling was then used by "Defendants to illegally strip Telco (and thus Vivendi S.A.) of its $2.5 billion investment in the PTC [s]hares without any compensation."  (*Id.*)  On February 22, 2005, Telco appealed this decision, thereby suspending it.  (TAC ¶ 69.)

Plaintiffs allege that although Telco was not under any legal obligation to return the PTC shares, Telco made a good faith offer to Elektrim to retransfer the shares for fair compensation.  (TAC ¶ 68.)  Under Mr. Solorz's control, Elektrim rejected this offer stating that Telco had no right to compensation.  (*Id.*)  The PTC shares were not returned by Telco to Elektrim within the two months prescribed by the award from the Second Vienna Arbitration.  (*Id.*)

In or around January 2005, the Supervisory Board of PTC appointed new members to the Management Board and revoked Telco and Vivendi S.A.'s appointees.  (TAC ¶ 70.)  Plaintiffs allege that on February 23, 2005, the Management Board "drew up a false and inaccurate shareholder list not reflecting the actual PTC share register.  The inaccurate list made it appear that Elektrim, not Telco, owned the PTC Shares.  Defendants did this notwithstanding that Telco was still the legal shareholder of the PTC Shares."  (*Id.*)  Elektrim, at Solorz's direction, and TMD filed a request with the Warsaw Regional Court to change the government's official share register ("KRS").  (TAC ¶ 71.)  On February 24, 2005, a judge ordered that the KRS be changed to reflect Elektrim as the owner of the shares.  (*Id.*)  Relying on the ruling from the court, Elektrim and TMD "jointly seized control of PTC on or about March 4, 2005, using brute force to physically remove and then bar Telco and Vivendi S.A. representatives from PTC's premises.  Elektrim (under [Mr.] Solorz's control) also took control of PTC's bank accounts."  (TAC ¶ 72.)  Telco filed a criminal report regarding the takeover.  (TAC ¶ 73.)  Vivendi S.A.

ORDER-7

filed a Notice of Dispute pursuant to the treaty between the French Republic and the Republic of Poland on reciprocal encouragement and protection of investments.  (*Id.*)

### D.    Third Vienna Arbitration

After Elektrim failed to restore the status quo ante pursuant to the award in the Second Vienna Arbitration, TMD exercised the call option to buy Elektrim's PTC shares. (Mot. at 4.)  On May 3, 2005, TMD initiated another arbitration against Elektrim in Vienna, Austria.  (TAC ¶ 80.)  TMD sought a declaration that it had validly exercised its call option to acquire Elektrim's PTC shares.  (*Id.*)

Plaintiffs allege that during the course of the Third Vienna Arbitration, Defendants engaged in wire fraud to deceive Vivendi S.A.  (*See* TAC ¶ 84.)  In December 2005, TMD approached Vivendi S.A. seeking a settlement and an agreement through which Vivendi S.A. could recover a portion of its investment and TMD could increase its shares in PTC.  (*Id.*)  Plaintiffs point to one instance in which the parties spoke over U.S. wires where they allege that DT executives made false and misleading statements regarding TMD's relationship with Mr. Solorz and Elektrim.  (TAC ¶ 85.)

Negotiations continued and an agreement was reached.  (TAC ¶ 86.)  On March 25, 2006, representatives of Vivendi S.A. and TMD traveled to Poland to finalize in writing the terms of their agreement.  (*Id.*)  On the morning of March 29, 2006, TMD and Vivendi S.A. met in the offices of Vivendi S.A.'s lawyer to resolve the remaining issues and sign the settlement agreement.  (TAC ¶ 87.)  On that same afternoon the Polish Court of Appeal was scheduled to determine whether to uphold or reverse the Warsaw Regional Court's recognition of the Second Vienna Award.  (*Id.*)  Approximately one to two hours prior to the signing of the settlement agreement the parties learned that the Court of Appeal had upheld the Regional Court's decision.  (TAC ¶ 89.)  TMD withdrew its support for the settlement agreement.  (*Id.*)

ORDER-8

In its first partial award, issued on June 6, 2006, the arbitration panel ruled that TMD lawfully exercised its call option on February 15, 2005 and that TMD "'*will* acquire the shares that Elektrim owned in PTC and *will* be their owner.'"  (TAC ¶ 82.)  On October 2, 2006, a second partial award was issued that stated, effective February 15, 2005, TMD would acquire legal title to the shares once TMD paid "an amount in cash not less than the current book value price for the Option shares" and that it would provide to Elektrim an irrevocable undertaking "to pay the subsequent adjustment of the current book value price for the PTC shares owned by Elektrim within 30 days from the Arbitral Tribunal's award in this regard."  (Caplow Decl., Ex. D.)  In October 2006, TMD paid Elektrim over €600 million for the PTC shares and provided the undertaking.  (*See* TAC ¶ 114.)

### E.    Bankruptcy Petition Against Elektrim

Beginning in February 2005, Everest, located in Miami, Florida, purchased both for its clients and itself Elektrim Finance 2% bonds due December 15, 2005.  (TAC ¶ 74.) These bonds were issued by Elektrim Finance BV, an affiliate of Elektrim, and were guaranteed by Elektrim.  (*Id.*)  When purchasing the bonds for GM, Everest relied on a series of representations made by Elektrim.  (*See* TAC ¶ 75.)  Everest also relied on a Restructuring Agreement that Elektrim entered into in 2002 with holders of the bonds (the "Bondholders").  (TAC ¶ 76.)  In return for the Bondholders' agreement to extend the bonds' repayment date and to lower their interest rate, the Restructuring Agreement required Elektrim to pay the Bondholders 25% of the net asset value of Elektrim in excess of €160 million (the "Equity Kicker").  (*Id.*)  Plaintiffs allege that shortly after Elektrim entered into the Restructuring Agreement, Mr. Solorz began stripping assets from Elektrim, which undermined the value of the Equity Kicker.  (TAC ¶ 77.)

On March 3, 2005, after Elektrim Finance BV failed to make the required

ORDER-9

principal and interest payments, the Law Debenture Trust Corporation ("LDTC"), the Trustee for the bonds, filed a petition in Polish court to (a) put the guarantor of the bonds, Elektrim, into bankruptcy, (b) stop the asset stripping, (c) recover assets that had been fraudulently transferred from Elektrim and (d) liquidate Elektrim and use its assets to repay the Bondholders and enable the Bondholders to recover the Equity Kicker's full value.  (TAC ¶ 78.)  Plaintiffs allege that:

> The bankruptcy petition posed a major obstacle to Defendants' plan to transfer the PTC shares to [TMD] for below-fair-market value and to facilitate [Mr.] Solorz's stripping of Elektrim's other assets because the bankruptcy would stop fraudulent transfers below market value.  Indeed, the bankruptcy would likely result in Elektrim's liquidation, the recovery of fraudulently transferred assets for the Bondholders' benefit, and either the distribution of Elektrim's assets to Elektrim's creditors or their sale by a court-supervised auction that would have maximized the cash proceeds and the value of the bondholders' Equity Kicker.  Thus, a bankruptcy most certainly would have prevented the illegal PTC Shares transfer to [TMD] and stopped Defendants in their tracks.

(TAC ¶ 79.)

Plaintiffs claim that on September 5, 2006, DT in collusion with Elektrim issued a materially misleading press release that was carried over U.S. wires upon which Everest relied.  (TAC ¶ 101.)  In the press release, DT represented that PTC had been lawfully acquired and control over PTC was being exercised pursuant to an award of the Vienna arbitration panel.  (*Id.*)  Plaintiffs allege, however, that TMD and Elektrim were acting in a manner that was contrary to the panel's award.  (*Id.*)  Plaintiffs believe that the press release was intended to falsely convey to Everest and the U.S. Bondholders that TMD lawfully owned the PTC shares.  (TAC ¶ 102.)

> As a result, Defendants hoped and expected, upon information and belief, that Everest and GM would regard a forthcoming offer from [TMD] and Elektrim to be the best chance for repayment of the Bonds and thus support withdraw of the Bondholders' bankruptcy petition despite a below-market-payment by [TMD] for the PTC shares and failure to obtain any, much less the fair value of the Equity Kicker . . . .

(*Id.*)

ORDER-10

Plaintiffs claim, upon information and belief, that before the Second Partial Award, Mr. Solorz, TMD and Elektrim collaborated "on a plan whereby they would pay the Bondholders' trustee a portion of the proceeds of the illegal transfer of the PTC Shares, mislead Everest and GM as to the transaction's legality, and fraudulently induce Everest and GM into supporting withdrawal of the Bondholders' bankruptcy petition . . . ."  (TAC ¶ 108.)

Plaintiffs allege that on October 4, 2006, while colluding with Mr. Solorz, TMD issued a deceptive statement to the press that TMD knew would be carried on U.S. wires and would mislead Everest and GM.  (TAC ¶ 109.)  Everest relied upon the release in concluding "that the transaction between Elektrim and [TMD] was authorized by the Vienna Arbitration Panel when in fact it was not."  (TAC ¶ 111.)  On that same day, the Polish bankruptcy court held a hearing to determine whether to liquidate Elektrim.  (TAC ¶ 112.)  At the hearing, Elektrim's lawyers asked for an adjournment to study new evidence.  (*Id.*)

On or about October 26, 2006, TMD paid €643 million to Elektrim of which €525 million went to LDTC as Bondholder Trustee and €118 million went to Elektrim.  (TAC ¶ 114.)[3]  Plaintiffs allege that on October 27, 2006, "with Defendants having misled Everest and the U.S. bondholders, LDTC withdrew the bankruptcy petition, irreparably damaging Vivendi Holding by forever precluding them from maximizing the Equity Kicker's value."  (TAC ¶ 115.)

After Vivendi S.A. notified LDTC that it believed the PTC share transfer and

---

[3]In their Opposition to the motion to dismiss, Plaintiffs now claim that on January 31, 2005, Elektrim transferred the PTC shares to another company, Mega Investments Sp. z o.o. ("Mega").  (Resp. at 6; Declaration of Bruno Curis (Dkt. # 116) ¶ 6.)  Plaintiffs now claim that Mega sold the PTC shares to TMD for €643 million and lent €525 million to Elektrim to pay off the Bondholders, keeping the remaining balance, €118 million, for itself and Mr. Solorz.  (*Id.*)

ORDER-11

LDTC's acceptance of the transfer proceeds was illegal, LDTC filed an action in the English High Court against two Bondholders seeking permission to distribute the funds. (TAC ¶ 116.)  On May 1, 2007, the English High Court held that "although Vivendi S.A. might have a claim against Elektrim, Vivendi S.A. did not have a 'proprietary' claim to the money that T-Mobile (either directly or through Elektrim) paid to LDTC as Bondholder trustee."  (TAC ¶ 117.)

On May 29, 2007, Everest, for itself and on behalf of GM, assigned and sold to Vivendi Holding all of the bonds held by Everest including all potential causes of action and claims in law and equity relating to the bonds.  (TAC ¶ 126.)

**F.    Additional Foreign Proceedings**

During and after the Second and Third Vienna Arbitrations, Vivendi S.A. initiated litigation and several arbitrations across Europe.  The proceedings discussed below are a mere sampling of the related actions that have been filed and/or are pending in courts around the world.  At oral argument Plaintiffs' counsel informed the court that 30 or 40 actions arising out of this dispute have been filed in courts throughout the world. (4/16/08 Hearing Transcript (Dkt. # 153) ("Tr.") 31.)

**1.    Poland**

More than a dozen actions have been filed in Polish courts relating to the PTC dispute.  (Declaration of Uli Kuehbacher ("Kuehbacher Decl.") (Dkt. # 87) ¶ 23.)  Some of these matters are ongoing.  (*See id.*)

**2.    Austria**

Vivendi S.A., through Telco sought to annul the Second Vienna Arbitration award. (Kuehbacher Decl. ¶ 24.)  On December 18, 2006, the Austrian Supreme Court affirmed the dismissal of the annulment action and ordered Telco to pay costs and attorney's fees. (Kuehbacher Decl. ¶ 25.)

ORDER-12

### 3.   France

In April 2005, Vivendi Universal filed suit in the Commercial Court of Paris alleging that DT and T-Mobile International AG & Co. KG violated French law by breaking off settlement talks in 2003 and 2004 in bad faith and colluding with Elektrim. In that case, Vivendi Universal seeks, among other things, damages in the amount of its alleged PTC investment.  (Kuehbacher Decl. ¶¶ 26-27.)

### 4.   Germany

Vivendi S.A. filed suit against DT asking the court to prohibit DT from making any statements to the effect that DT owned the disputed PTC shares.  (Kuehbacher Decl. ¶ 28.)  In a November 7, 2006 decision the court rejected Vivendi S.A.'s claim.  (*Id.*)

### 5.   Switzerland

In April 2006, Vivendi filed for arbitration before the International Court of Arbitration of the International Chamber of Commerce.  (Kuehbacher Decl. ¶ 29.) Vivendi claims to be the owner of the disputed PTC shares based on an oral agreement. (*Id.*)  Vivendi seeks to regain the disputed PTC shares or to recover its lost investment. (*Id.*)

## II.  ANALYSIS

"[A] district court has discretion to respond at once to a defendant's *forum non conveniens* plea, and need not take up first any other threshold objection.  In particular, a court need not resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction) or personal jurisdiction over the defendant if it determines that, in any event, a foreign tribunal is plainly the more suitable arbiter of the merits of the case."  *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, __ U.S. __, 127 S. Ct. 1184, 1188 (2007). "A federal court has discretion to dismiss a case on the ground of *forum non conveniens* when an alternative forum has jurisdiction to hear the case, and . . . trial in the chosen

ORDER-13

forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems." *Id.* at 1190 (internal quotation marks and citations omitted).  In determining whether to dismiss an action on *forum non conveniens* grounds "the court must examine:  (1) whether an adequate alternative form exists, and (2) whether the balance of private and public interest factors favors dismissal." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001).

### A.      Deference to Plaintiffs' Choice of Forum

The Defendants bear the burden of proving that an adequate alternative forum exists.  *Id.* at 1143.  A plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen its home forum.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981).  "When the home forum has been chosen, it is reasonable to assume that this choice is convenient.  When the plaintiff is foreign, however, this assumption is much less reasonable.  Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." *Id.* at 255-56.

On October 23, 2006, Vivendi S.A. filed its complaint against several foreign entities and T-Mobile USA.  Vivendi S.A., a French entity, was the sole plaintiff. However, after certain of the defendants filed a motion to dismiss on May 17, 2007 for among other reasons, *forum non conveniens,* Vivendi S.A. on June 25, 2007 sought to amend its complaint to add a new U.S. plaintiff, Vivendi Holding.  Vivendi Holding is a Delaware corporation with its principal place of business in New York City.  Vivendi Holding seeks to bring its claims against the Defendants as an assignee of Everest and GM pursuant to a May 29, 2007 assignment agreement between Vivendi Holding and

ORDER-14

Everest.  Plaintiffs argue that Vivendi Holding had "legitimate business reasons for making the acquisitions" but they failed to articulate these reasons in their brief.  (Resp. at 10.)  At oral argument when asked about the reasons for adding Vivendi Holding to the case, Plaintiffs conceded that one of the reasons the claims were acquired and Vivendi Holding was added was to strengthen the United States connection to this case.  (Tr. 30.)  Plaintiffs also claimed that the other important reason they acquired the claims was as a "hedge" for Vivendi S.A. so that if it is not able to "prove that the[] [PTC] shares go all the way back to Telco, and therefore to Vivendi, the group can still as a whole have some recovery because [Vivendi Holding] as a bondholder would be entitled to its share of the PTC shares if and when they come back to Elektrim."  (Tr. 30-31.)  Although there may be some business aspect to this decision, it appears to be largely a litigation strategy.

The sudden purchase/assignment of claims and the addition of a United States-based plaintiff seven months after the filing of the complaint in response to a motion to dismiss on *forum non conveniens* grounds leads the court to give little deference to the initial foreign plaintiff Vivendi S.A. and the late-added U.S. plaintiff Vivendi Holding's choice of forum.  The Second Circuit summarizes the applicable law stating where

> the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*. . . . On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons-such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum-the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts.

*Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001).

ORDER-15

Plaintiffs are trying to manufacture connections to the United States in an effort to avoid a *forum non conveniens* dismissal.  This leads the court to question why Vivendi S.A. selected the Western District of Washington to bring suit.  In its response to the DT Defendants' motion Plaintiffs argue:  "This is the only forum where Plaintiffs can get a full hearing with proper discovery and with the reasonable prospect that Court orders will be enforced—all under a statute that squarely addresses all the aspects of Defendants' complex, multi-year racketeering.  The Defendants have flouted European arbitral and court orders, and that U.S. courts are better-suited for complex cases, are wholly proper reasons for bringing suit in this forum."  (Resp. at 8-9.)  An examination of the record reveals that Vivendi S.A. has sought relief in numerous courts for the alleged theft of the PTC shares and, when it is not satisfied with the results in a particular forum, it finds a different forum and files a new lawsuit or arbitration hoping to obtain a different result.  This court is just the latest stop on Vivendi S.A.'s world-wide search to find a court to rule in its favor.  More importantly, the briefing and argument demonstrate that Plaintiffs have chosen the United States for procedural advantages and because of the availability of favorable law (RICO).  The court finds that Vivendi S.A. is engaged in forum shopping; accordingly, the court grants little deference to Plaintiffs' choice of forum.

**B.    Adequate Alternative Fora**

An alternative forum is adequate when the defendants are amenable to service of process in the foreign forum and the foreign forum provides the plaintiffs with "some remedy" for their wrongs.  *Lueck*, 236 F.3d at 1143.  "[I]t is only in rare circumstances . . . where the remedy provided by the alternative forum . . . is so clearly inadequate or unsatisfactory, that it is no remedy at all . . . ."  *Id.* (citation and internal quotation marks omitted).

ORDER-16

Defendants claim that there are multiple alternative fora where they are amenable to service of process.  Defendants filed two declarations which state that each of the German DT Defendants and Mr. Solorz would be amenable to suit in each of Poland, Germany and Austria.  (Declaration of Wojciech Popiolek ("Popiolek Decl.") ¶¶ 12-13; Declaration of Paul Oberhammer ("Oberhammer Decl.") ¶¶ 27-28.)  Additionally at oral argument counsel for the DT Defendants stated, "let me be clear, if the Court is asking whether we would consent - - whether T-Mobile USA would consent to jurisdiction in Poland, it would."  (Tr. 44.)  The DT Defendants also argue, citing *In re Ski Train*, 499 F. Supp. 2d 437, 447 n.71 (S.D.N.Y. 2007), that even if T-Mobile USA is not subject to the jurisdiction of any of the alternative fora that T-Mobile USA is not a real party in interest and need not be subject to the jurisdiction of the alternative fora as a condition of a *forum non conveniens* dismissal.  (Mot. at 12.)  Defendants claim that *forum non conveniens* discovery confirms that T-Mobile USA was not involved in any conduct relevant to Plaintiffs' claims.  (*Id.*)

Plaintiffs respond that T-Mobile USA is not subject to the jurisdiction of any of the foreign fora proposed by Defendants.  (Resp. at 8.)  In support of this argument Plaintiffs cite several declarations from their experts including declarations from an expert on Polish law.  (*See* Declarations of Wojciech Kozlowski (Dkt. ## 119, 136).)  Those declarations do not directly contradict the declaration of the DT Defendants' expert Mr. Popiolek who asserts that a Polish court would have jurisdiction over T-Mobile USA, nor do those declarations conclude that jurisdiction would definitively not exist in Poland over T-Mobile USA.  (*See* Popiolek Decl. ¶¶ 14-15.)  Regardless, T-Mobile USA has now consented to jurisdiction in a Polish court.  Even if T-Mobile USA had not consented the court is not convinced that T-Mobile USA is a real party in interest.  *See In re Ski Train*, 499 F. Supp. 2d at 447 n.7.  Notably this lawsuit is the first

ORDER-17

time in a nearly decade-long dispute that T-Mobile USA has been named as a party in any action seeking redress for Defendants' alleged wrongs.  Because of T-Mobile's consent the court need not reach the real party in interest issue.

Citing several declarations, Plaintiffs next argue that Mr. Solorz is not subject to the jurisdiction of courts in Germany, France, England or Austria.  (Resp. at 8; Resp. to Solorz at 16.)  As the court has determined that all parties are amenable to suit in Poland, it is of no import and the court need not decide whether Mr. Solorz is amenable to suit in multiple alternative fora.

Plaintiffs also assert that the foreign fora are not adequate because they do not outlaw racketeering.  (Resp. at 8.)  As Defendants point out, a plaintiff may not "defeat a motion to dismiss on the ground of *forum non conveniens* merely by showing that the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum.  The possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry."  *Piper Aircraft*, 454 U.S. at 247.  "[I]t is only in 'rare circumstances . . . where the remedy provided by the alternative forum . . . is so clearly inadequate or unsatisfactory, that it is no remedy at all.'"  *Lueck*, 236 F.3d at 1143 (citation omitted).  The Ninth Circuit has held that "the inability to assert a RICO claim in a foreign forum does not preclude a forum non conveniens dismissal."  *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 769 (9th Cir. 1991).  The DT Defendants submitted a declaration from their expert on Polish law asserting that Plaintiffs would be entitled to a remedy for the alleged wrongs committed against them.  (*See* Popiolek Decl. ¶¶ 18-35.)  Plaintiffs fail to persuasively address this evidence or demonstrate that their possible recovery in any of the alternative fora would be so clearly inadequate or unsatisfactory that it is no remedy at all.

ORDER-18

Plaintiffs next argue that "Defendants' proffered alternatives do not provide for broad discovery and thus are not well-suited to complex conspiracy cases such as this." (Resp. at 8.)  This is not a proper basis on which to hang a determination that the suggested foreign fora are inadequate.  Discovery mechanisms that are not identical to those in the United States do not render an alternative forum inadequate.  *See, e.g., Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001) (noting that "plaintiffs' concerns about Argentine filing fees, the lack of discovery in Argentine courts, and their fear of delays in the Argentine courts do not render Argentina an inadequate forum"); *Manela v. Garantia Banking Ltd.*, 940 F. Supp. 584, 591 (S.D.N.Y. 1996) (internal citation omitted) (noting that "[w]hile the Court is not prepared to say that unavailability of document discovery would never render an alternative forum inadequate the circumstances in which that might be so would be rare indeed"); *Doe v. Hyland Therapeutics Div.*, 807 F. Supp. 1117, 1124 (S.D.N.Y. 1992) (stating that "the fact that Ireland's procedures provide less extensive discovery devices, or otherwise limit the scope of discovery, does not constitute a colorable basis for the conclusion that Ireland is less than an adequate forum").  Further, Plaintiffs fail to identify what discovery they fear they would be deprived of if forced to litigate in a foreign forum.

Lastly, Plaintiffs make several comments that seem to suggest that they believe that the courts in Austria, France, Germany, Poland, Switzerland and the U.K. are not adequate to try this case.  They claim that "Defendants' systematic failure to honor [past] judgments proves that the European fora are inadequate substitutes for this action." (Resp. to Solorz at 17.)  Plaintiffs provide no evidence that they have sought and been denied assistance from any of the courts of any of these alternative fora in enforcing judgments.  Defendants' alleged failure to comply with court orders and judgments, when Plaintiffs' have failed to seek assistance from these courts, will not support a finding that

ORDER-19

1    these fora are inadequate.

2        **C.    Balance of Private and Public Interest Factors**

3        "Ordinarily a plaintiff's choice of forum will not be disturbed unless the 'private

4    interest' and the 'public interest' factors strongly favor trial in a foreign country." *Lueck*,

5    236 F.3d at 1145.  The Ninth Circuit instructs that if "the balance of conveniences

6    suggests that trial in the chosen forum would be unnecessarily burdensome for the

7    defendant or the court, dismissal is proper." *Id.* (citation and internal quotation marks

8    omitted.)

9

10       **1.    Private Interest Factors**

11       The court considers the following private interest factors:  "(1) the residence of the

12   parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to

13   physical evidence and other sources of proof; (4) whether unwilling witnesses can be

14   compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of

15   the judgment; and (7) all other practical problems that make trial of a case easy,

16   expeditious and inexpensive." *Id.* (internal quotation marks and citation omitted).  "[A]

17   court's focus should not rest on the number of witnesses or quantity of evidence in each

18   locale.  Rather, a court should evaluate the materiality and importance of the anticipated

19   evidence and witnesses' testimony and then determine their accessibility and convenience

20   to the forum." *Id.* at 1146.

21       The parties in this case, with the exception of Vivendi Holding and T-Mobile USA

22   are residents of France, Germany or Poland.  (*See* TAC ¶¶ 19, 21-22, 25, 28.)  Vivendi

23   Holding's home forum is New York and T-Mobile USA's home forum is Washington.

24   (*See* TAC ¶¶ 20, 23.)  Five of the seven parties reside outside the United States in Europe.

25   Plaintiffs acknowledge that "there may be more witnesses outside the United States than

26   within, [] [and] the material foreign witnesses are spread across six different countries,

27

28

ORDER-20

including the United States, necessitating international witness travel no matter the forum." (Resp. at 13-14.)  Defendants respond that of the twenty-two persons or groups of persons with allegedly discoverable information identified by Vivendi—nine reside in France, seven in Poland, three in the United States and three in the United Kingdom. (*See* Caplow Decl., Ex. H.)  It appears that at least one of the witnesses located in the United States, has information regarding only "the relationship of T-Mobile International AG to T-Mobile USA, Inc." and not the substance of the dispute between the parties. (*Id.*)  Even though witness travel will be necessary in this case, travel within Europe is certainly more convenient for the majority of witnesses than travel from Europe to the west coast of the United States.  These factors favor a European forum.

In their brief Plaintiffs concede that "significant documentary evidence is located abroad" but that scanning and posting the documents to a secure website makes the location of documentary evidence far less important than in the past.  (Resp. at 14.)  An examination of Plaintiffs' initial disclosures confirms that the majority of what it believes to be relevant documents are located in Europe.  Although the court recognizes that technology for electronic review and transmission of documents has progressed mightily over the past several years, this technology does not come without cost.  It makes no sense to engage in this process if the documents can be reviewed more easily in a location that would not necessitate scanning each document.[4]  Additionally, given the location of the documents, it is safe to assume that at least some of them will be in a language other than English (the parties have not provided information to the court regarding what language or languages the various entities use to conduct business).  The court finds that

---

[4]The court recognizes that regardless of where the case is held the parties may choose to have the documents scanned as scanned documents are easier to work with and, depending on the way in which they are scanned, can be searched using key words and phrases.

ORDER-21

this factor slightly favors a European forum.

The fourth factor examines whether the court could compel unwilling witnesses to testify. Plaintiffs claim that this factor is neutral because Poland, France, Germany and the United Kingdom[5] are all signatories to the Hague Convention which allows judicial authorities to obtain evidence located in another signatory country. Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters art. 1, Mar. 18, 1970. Defendants counter that "while Plaintiffs could seek to depose such witnesses through the Hague Convention and letters rogatory, the need to resort to such cumbersome means of evidence gathering weighs strongly against proceeding in this forum." (Reply at 6.) Defendants contend that if the case were heard in Poland, Germany, France or Austria that European Commission Regulation 1206/2001 provides for a much more efficient method of taking evidence than the Hague Convention. (Mot. at 14 n.16.) The court recognizes that letters rogatory could be used to compel witnesses, located in countries that are signatories to the Hague Convention to testify; it seems, however, incredibly burdensome to engage in that lengthy process when Plaintiffs could bring their claim in a country where more witnesses reside and where the parties could take advantage of European Commission Regulation 1206/2001 the purpose of which is to simplify and accelerate the taking of evidence. (*See* Oberhammer Decl., Ex. T.) In the court's experience, the letters rogatory process is anything but simple and accelerated. This factor slightly favors the European fora.

Plaintiffs argue that the fifth factor, the cost of bringing the witnesses to trial is neutral because "[e]ach of the parties has substantial resources, and the relative cost to

---

[5]Plaintiffs also listed Austria as a signatory but it does not appear that Austria is a signatory to the Hague Convention of the Taking of Evidence Abroad in Civil or Commercial Matters. *See* http://www.hcch.net/index_en.php?act=conventions.status&cid=82#nonmem (last visited June 5, 2008).

ORDER-22

each of bringing witnesses to trial in this District versus another forum is immaterial."
(Resp. at 15.)  As Defendants point out, the fact that the Defendants have substantial
resources to pay the costs of bringing the witnesses to trial does not mean that the court
should impose upon them the burden of litigating in an otherwise inconvenient forum.
*See, e.g., Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 489 (S.D.N.Y. 2006).  The court
recognizes that wherever this case is held witnesses will need to travel; however, the
court finds that the cost of transporting most of the witnesses within Europe and a few
witnesses from the United States to Europe would be less than the cost of transporting the
majority of witnesses from Europe to the west coast of the United States.  This factor
favors a European forum.

The sixth factor, the enforceability of the judgment, does not strongly favor the
United States or any of the alternative European fora.  As Plaintiffs argue, it would
certainly not be difficult to enforce a judgment against T-Mobile USA in this District;
however, they completely ignore the fact that the other Defendants are all residents of
other countries.  They make no claim that it would be easier to enforce a judgment
against those Defendants in the United States.  It would be easier to enforce a German
judgment against the German defendants and a Polish judgment against the Polish
defendant.  Because there is not one forum in which it would be easy to enforce a
judgment against all of the Defendants the court finds that this factor is neutral.

The last factor is all other practical problems that make trial of a case easy,
expeditious and inexpensive.  Neither party focused on this factor and the court finds that
it is neutral.

The court finds that the private interest factors weigh in favor of the alternative
European fora and dismissal.

ORDER-23

## 2.    Public Interest Factors

The court considers the following public interest factors:  (1) local interest of the lawsuit; (2) the court's familiarity with governing law; (3) burden on local courts and juries; (4) congestion in the court; and (5) the costs of resolving a dispute unrelated to this forum.  *Lueck*, 236 F.3d at 1147.

Plaintiffs argue that the first factor, local interest, favors trying the case here because "(i) both GM and [Vivendi Holding] are U.S. companies; (ii) Vivendi, as owner of Universal Music Group and part owner of NBC Universal, employs thousands of U.S. citizens in the United States, (iii) DT relies on U.S. financial markets to raise capital, such as trading on the New York Stock Exchange, and (iv) U.S. citizens are entitled to honest services from their local carrier."  (Resp. at 16.)  Defendants note that *forum non conveniens* discovery has yet to support Plaintiffs' allegations regarding T-Mobile USA's participation in the conduct alleged in the complaint.  (Mot. at 15.)  Notably, Plaintiffs do not contest this statement in their response to the motion to dismiss.  At oral argument, Plaintiffs conceded that despite obtaining discovery targeted at determining T-Mobile USA's role, if any, they still had not uncovered any connection between T-Mobile USA and the acts alleged in the complaint:  "We want a bite at the apple to see *if* we are right, that T-Mobile USA is a direct and significant participant in the conspiracy."  (Tr. 29 (emphasis added).)  Additionally, the eleventh hour purchase of claims from GM and the addition of Vivendi Holding, a U.S. based corporation, does not necessarily create a local interest.  All of the claims in this case center around Polish and other European entities and activities that occurred largely, if not exclusively, in Europe.  If there is any local interest in this case it is slight and does not exceed or even come close to the interest that other forums such as Austria, France, Germany or Poland have in the adjudication of this controversy.

ORDER-24

1   Plaintiffs argue that the second factor, the court's familiarity with the governing
2   law also favors this forum.  Plaintiffs and Defendants quibble about which issues will
3   require this court to apply foreign law; however, they all agree that the court will need to
4   apply foreign law to some issues.  (*See* Mot. at 16; Resp. at 18.)  The court is not familiar
5   with the laws of the countries connected to this dispute, including Austria, France,
6   Germany, Poland, Switzerland and the U.K.  Although the need to apply foreign law in
7   and of itself is not a sufficient reason to dismiss on *forum non conveniens* grounds, the
8   need to apply foreign law here favors dismissal.  *See Piper Aircraft*, 454 U.S. at 260 n.29.

9   The third factor, burden on local courts and juries, also favors dismissal.  Most, if
10  not all of the events giving rise to the claims in this case occurred outside the United
11  States and primarily involve foreign corporations, entities and individuals.  It would be
12  unreasonable to ask local jurors to invest a substantial amount of time in hearing this
13  complex case when it has a tenuous connection to the United States.

14  Neither party argues that the fourth factor, court congestion, favors this court or
15  one of the alternative fora.  The court has received no information from either party
16  regarding the congestion of the proposed alternative fora and so the court finds this factor
17  to be neutral.

18  Finally, the fifth factor, the costs of resolving a dispute unrelated to this forum,
19  also weighs in favor of dismissal.  The court has already found that the connection of this
20  case to the United States is tenuous at best and it sees no reason to expend further
21  resources in adjudicating this dispute when those resources could be more properly
22  directed to adjudicating cases with real connections to this District.

23  The court finds that the balance of private and public interest factors weighs in
24  favor of dismissing this case.  The court also finds that the balance of conveniences
25  clearly suggests that trial in the Western District of Washington would be unnecessarily

ORDER-25

burdensome for the Defendants and that dismissal is proper.

### III.  CONCLUSION

For the reasons stated above this case is dismissed on *forum non conveniens* grounds.  The court GRANTS the DT Defendants (Dkt. # 86) and Mr. Solorz's (Dkt. # 102) motions to dismiss.

DATED this 5th day of June, 2008.


JAMES L. ROBART
United States District Judge

ORDER-26